UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SELINA SOULE, a minor, by         :
Bianca Stanescu, her mother;      :
CHELSEA MITCHELL, a minor, by     :
Christina Mitchell, her mother;   :
ALANNA SMITH, a minor, by         :
Cheryl Radachowsky, her mother;   :
ASHLEY NICOLETTI, a minor, by     :
Jennifer Nicoletti, her mother,   :

    Plaintiffs,               :
                              :
v.                                :  Case No. 3:20-cv-00201 (RNC)
                              :
CONNECTICUT ASSOCIATION OF        :
SCHOOLS, INC. d/b/a CONNECTICUT   :
INTERSCHOLASTIC ATHLETIC          :
CONFERENCE; BLOOMFIELD PUBLIC     :
SCHOOLS BOARD OF EDUCATION;       :
CROMWELL PUBLIC SCHOOLS BOARD     :
OF EDUCATION; GLASTONBURY         :
PUBLIC SCHOOLS BOARD OF           :
EDUCATION; CANTON PUBLIC          :
SCHOOLS BOARD OF EDUCATION;       :
DANBURY PUBLIC SCHOOLS BOARD OF   :
EDUCATION,                        :
                              :
    Defendants,               :
                              :
and                               :
                              :
ANDRAYA YEARWOOD; THANIA          :
EDWARDS on behalf of her          :
daughter, T.M.; CONNECTICUT       :
COMMISSION ON HUMAN RIGHTS,       :
                              :
    Intervenors.              :

RULING AND ORDER

This case involves a challenge to the transgender

participation policy of the Connecticut Interscholastic Athletic

1

Conference ("CIAC"), the governing body for interscholastic
athletics in Connecticut, which permits high school students to
participate in sex-segregated sports consistent with their
gender identity.[1]  Plaintiffs claim that the CIAC policy puts
non-transgender girls at a competitive disadvantage in girls'
track and, as a result, denies them rights guaranteed by Title
IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688,
and implementing regulations, which require that if a school
provides athletic programs or opportunities segregated by sex,
it must do so in a manner that "[p]rovides equal athletic
opportunity for members of both sexes."  34 C.F.R. §106.41(c).
Defendants have jointly moved to dismiss the action on numerous
grounds.  For reasons discussed below, I conclude that the
plaintiffs' challenge to the CIAC policy is not justiciable at
this time and their claims for monetary relief are barred and
dismiss the action on this basis without addressing the other
grounds raised in the joint motion.

I.

In February 2020, plaintiffs Selina Soule and Chelsea
Mitchell, then high school seniors, and Alanna Smith, then a
high school sophomore, brought this action seeking a preliminary

---

[1] The CIAC policy requires member schools to determine eligibility to
participate in sex-segregated athletics based on "the gender identification
of [the] student in current school records and daily life activities in the
school . . . ."  ECF No. 141 ¶ 74.

2

injunction to prevent transgender girls from competing in events scheduled to take place during the 2020 Spring Outdoor Track season. Plaintiffs alleged that without a preliminary injunction, they would continue to face unfair competition by two transgender students, Andraya Yearwood and Terry Miller, then high school seniors. Plaintiffs claimed that by permitting "male-bodied athletes" -- defined as "individuals with an XY genotype" -- to compete in girls' track, the defendants were denying them an opportunity to compete for places on the victory podium in violation of Title IX and 34 C.F.R. § 106.41(c). The issue raised by the plaintiffs is one of first impression.[2]

Prior to bringing this action, the plaintiffs had filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR"). OCR initiated an investigation in response to the complaint but took no action to prevent Yearwood and Miller from competing in the 2020 Spring Track Season, so the plaintiffs filed this suit. Explaining the need for immediate relief, the motion stated:

> Plaintiffs Soule and Mitchell are seniors in high school, and the brief remainder of this academic year contains the final track and field competitions of their high school athletic careers. The Spring track season begins in March, with the first interscholastic meet subject to the CIAC

---

[2] The issue implicates opposing interests that are not easily reconciled. <u>See</u> Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, <u>Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule</u>, 27 Duke J. Gender L. & Pol'y 69, 99 (2020).

Policy scheduled to occur as soon as April 4, 2020.  Absent
immediate injunctive relief from this Court, the
irreparable harm they will suffer under the continuing
operation of the Defendants' policy and its enforcement
will leave their concluding interscholastic athletics
season marred and their personal experience substantially
injured.  Though Plaintiff Alanna Smith is a sophomore, her
interests are no less immediately impacted or properly
honored with immediate equitable relief, as the profound
interests in and experience of high school athletics are
concurrently fleeting and formative, and each season of
eminent value and importance.

In addition to CIAC, the complaint named as defendants the
school boards for the three high schools attended by the
plaintiffs (Glastonbury, Canton, and Danbury) and the two high
schools attended by the transgender students (Bloomfield and
Cromwell).  All five schools are members of CIAC and, as such,
must abide by its transgender participation policy.

Soon after the complaint was filed, Yearwood, Miller, and
the Connecticut Commission on Human Rights and Opportunities
("CHRO") filed motions to intervene, which the plaintiffs
opposed.  Before the plaintiffs' motion for a preliminary
injunction could be heard, Connecticut declared a public health
emergency in response to the Covid-19 pandemic.  Schools and
nonessential businesses were closed across the state, and
interscholastic athletic competition was suspended indefinitely.
Plaintiffs subsequently filed an amended complaint adding Ashley
Nicoletti, then a sophomore, as a plaintiff.  They also renewed
their motion for an expedited hearing, which was opposed by the

defendants and proposed intervenors on the ground that the 2020
Spring Track season was likely to be cancelled in its entirety.

Following oral argument, the motions to intervene were
granted, either as a matter of right or permissively, thereby
enabling Yearwood, Miller, and the CHRO to participate in this
litigation as additional defendants along with the CIAC and the
five school boards. The plaintiffs' motion for expedited
treatment was denied because of Covid-19, which would prevent
resumption of interscholastic athletic competition for the rest
of the academic year. Further proceedings in this case were
then stayed by agreement while the plaintiffs sought appellate
review of a ruling denying a recusal motion.[3] After the stay was
lifted, defendants filed the pending motion to dismiss, which
has been fully briefed and argued.

II.

Plaintiffs' second amended complaint alleges that CIAC's
transgender participation policy

> is now regularly resulting in boys displacing girls in
> competitive track events in Connecticut -- excluding
> specific and identifiable girls including Plaintiffs from
> honors, opportunities to compete at higher levels, and
> public recognition critical to college recruiting and

---

[3] Plaintiffs moved for my recusal on the ground that I had demonstrated bias
by calling on plaintiffs' counsel to refrain from continuing to refer to
Yearwood and Miller as "males," which I regarded as needlessly provocative.
Plaintiffs' counsel argued that this usage was necessary because the present
action concerns the effects of biological differences between persons born
male and persons born female.

scholarship opportunities that should go to these outstanding female athletes.

As a result, in scholastic track competition in Connecticut, more boys than girls are experiencing victory and gaining the advantages that follow, even though postseason competition is nominally designed to ensure that equal numbers of boys and girls advance to higher levels of competition.  In the state of Connecticut, students who are born female now have materially *fewer* opportunities to stand on the victory podium, fewer opportunities to participate in post-season elite competition, fewer opportunities for public recognition as champions, and a much smaller chance of setting recognized records, than students who are born make.

Plaintiffs claim that

This reality is discrimination against girls that directly violates the requirements of Title IX: "Treating girls differently regarding a matter so fundamental to the experience of sports – the chance to be champions – is inconsistent with Title IX's mandate of equal opportunity for both sexes." McCormick ex rel. McCormick v. Sch. Dist. Of Mamaroneck, 370 F.3d 275, 295 (2d Cir. 2004).

Plaintiffs request:

A declaration that Defendants have violated Title IX by failing to provide competitive opportunities that effectively accommodate the abilities of girls;

A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

An injunction prohibiting all Defendants, in interscholastic competitions sponsored, organized, or participated in by the Defendants or any of them, from permitting males -- individuals with an XY genotype -- from participating in events that are designated for girls, women, or females;

An injunction requiring all Defendants to correct any and all records, public and non-public, to remove male athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions

designated for girls or women, and conversely to correctly
give credit and/or titles to female athletes who would have
received such credit and/or titles but for the
participation of males in such competition;

An injunction requiring all Defendants to correct any and
all records, public or non-public, to remove times achieved
by male athletes from any records purporting to record
times achieved by girls or women;

An award of nominal and compensatory damages and other
monetary relief as permitted by law; [and]

An award of Plaintiffs' reasonable attorneys' fees and
expenses, as authorized by 42 U.S.C. § 1988.

### III.

### A.

In the joint motion to dismiss, the defendants first
contend that the plaintiffs lack standing to seek an injunction
enjoining enforcement of the CIAC policy.  Standing refers to
the personal stake a plaintiff must have in a disputed issue in
order to be able to obtain a judicial determination of the issue
in federal court.  See Warth v. Seldin, 422 U.S. 490, 498 (1975)
("In essence the question of standing is whether the litigant is
entitled to have the court decide the merits of the dispute or
of a particular issue.").  Under Article III of the United
States Constitution, the judicial power of the federal courts is
limited to adjudicating "cases" and "controversies."  The law of
standing implements this limitation by requiring a plaintiff to
demonstrate that she requires judicial relief in order to
redress a legally cognizable injury to her.  See Allen v.

7

Wright, 468 U.S. 737, 751 (1984) (noting that, to have standing under Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief"); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (discussing three elements of standing: injury in fact, causal connection to defendant's conduct, and redressability).[4] Unless a plaintiff's personal stake in a disputed issue satisfies the standing requirement, the court lacks jurisdiction to adjudicate the issue at the plaintiff's request. See Warth, 422 U.S. at 498 (explaining that standing doctrine is "founded in concern about the proper -- and properly limited -- role of the courts in a democratic society").[5]

The defendants contend that the plaintiffs lack standing with regard to the principal form of relief at issue -- an injunction preventing enforcement of the CIAC policy. Soule and Mitchell have graduated and thus are no longer eligible to compete in CIAC-sponsored events. But Smith and Nicoletti, now

---

[4] "Injury" in this context signifies harm to the plaintiff, either actual or imminent, due to unlawful conduct attributable to the defendant. To provide standing to sue, the injury to the plaintiff must be "distinct" and "palpable," and not "abstract," "hypothetical," or "conjectural." See Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

[5] The standing requirement must be satisfied with regard to each claim and form of relief. Town of Chester, N.Y. v. Laroe Ests., Inc., 137 S. Ct. 1645, 1650 (2017). Therefore, in applying the requirement, each claim and form of relief must be analyzed separately.

juniors, have another year of eligibility.  Whether their interest in obtaining the requested injunction is still sufficient to support adjudication of their claim on the merits is the main issue presented by the joint motion to dismiss.

Defendants argue that Smith and Nicoletti lack standing because they have not identified a transgender student who is likely to compete against them next season.  Defendants further argue that, "[e]ven if Smith and Nicoletti could allege with any certainty that girls who are transgender will imminently compete in track and field, and that they will personally compete against those transgender girls, Smith and Nicoletti cannot credibly allege that they will finish in particular spots in particular races next year if girls who are transgender are barred from competing."  ECF No. 145-1 at 16.

Plaintiffs correctly argue that the issue is one of mootness rather than standing.  ECF No. 154 at 45.  The standing inquiry concerns a plaintiff's personal stake in the outcome of an action at the time the action is filed; mootness, on the other hand, ensures that a plaintiff maintains a sufficient personal stake in the outcome of an action for the duration of the litigation.  See Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc., 906 F.3d 215, 220–21 (2d Cir. 2018) ("The consequences of losing a stake in ongoing litigation are determined not by asking whether the party losing its stake in

9

the litigation has lost its <u>standing</u> but by asking whether the action has become <u>moot</u>." (emphasis in original)).  However, standing and mootness are closely related doctrines of justiciability rooted in Article III.  The Supreme Court has described mootness as "the doctrine of standing set in a time frame."  <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 189 (2000) (referring to "this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)'" (quoting <u>Arizonans for Off. Eng. v. Arizona</u>, 520 U.S. 43, 68 n.22 (1997))).  And the underlying concern of the two doctrines is the same -- a plaintiff seeking relief in federal court must maintain a "legally cognizable interest" in the outcome of the action.  <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013).  In other words, a plaintiff must retain a "personal stake" that "subsists through all stages of federal judicial proceedings."  <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998).  "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  <u>Id.</u>; <u>see also</u> <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. 792 (2021) ("At all stages of litigation,

a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings.").

Defendants have the burden of establishing mootness, as plaintiffs point out. Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 603 (2d Cir. 2016). But the burden is not the one plaintiffs describe in their brief. Elaborating on the defendants' burden, plaintiffs argue that "[i]f standing exists at the time injunctive relief is requested, then that request will not be deemed moot unless defendants meet 'the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again.'" ECF No. 154 at 45 (quoting Laidlaw, 528 U.S. at 189). To satisfy this standard of mootness, plaintiffs continue, "[s]ubsequent events must make it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

The burden plaintiffs describe does not apply here. Plaintiffs are relying on an "extremely strict standard" of mootness applied by courts when a defendant argues that its voluntary cessation of the challenged conduct has served to moot the case. See Wright & Miller, 33 Fed. Prac. & Proc. Judicial

11

Review § 8347 (2d ed.); see also Concentrated Phosphate, 393
U.S. at 203 (distinguishing the voluntary cessation exception
from the general mootness standard and explaining that the
voluntary cessation standard erects a higher bar to mootness
because if a defendant could moot a case by voluntarily ceasing
the challenged conduct, "the courts would be compelled to leave
'[t]he defendant . . . free to return to his old ways'" (quoting
United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953))).
This stringent standard does not apply when mootness is based on
a change in circumstances other than voluntary cessation of the
challenged conduct.  See Laidlaw, 528 U.S. at 214 (Scalia, J.,
dissenting) ("The required showing that it is 'absolutely clear'
that the conduct 'could not reasonably be expected to recur'
is not the threshold showing required for mootness, but the
heightened showing required in a particular category of cases
where we have sensibly concluded that there is reason to be
skeptical that cessation of violation means cessation of live
controversy.  For claims of mootness based on changes in
circumstances other than voluntary cessation, the showing we
have required is less taxing, and the inquiry is indeed properly
characterized as one of 'standing set in a time frame.'"
(emphasis in original)).  Thus, the correct inquiry for our
purposes is the typical mootness question: whether "the issues
presented are no longer 'live' or the parties lack a legally

12

cognizable interest in the outcome." DiMartile v. Cuomo, 834 F. App'x 677, 678 (2d Cir. 2021) (quoting Already, 568 U.S. at 91).

Applying this standard, I conclude that the request to enjoin enforcement of the CIAC policy has become moot due to the graduation of Yearwood and Miller, whose participation in girls' track provided the impetus for this action. There is no indication that Smith and Nicoletti will encounter competition by a transgender student in a CIAC-sponsored event next season. Defendants' counsel have represented that they know of no transgender student who will be participating in girls' track at that time.[6] It is still theoretically possible that a transgender student could attempt to do so. Even then, however, a legally cognizable injury to these plaintiffs would depend on a transgender student running in the same events and achieving substantially similar times. Such "speculative contingencies" are insufficient to satisfy the case or controversy requirement of Article III. Hall v. Beals, 396 U.S. 45, 49 (1969); see also Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998) (noting that it will not "suffice to hypothesize the possibility that at some future time, under circumstances that could only be guessed at now, the parties could theoretically become embroiled in a like controversy once again"). As a result, Smith and

---

[6] This representation was made during a colloquy with counsel regarding the present motion. See ECF No. 174 at 24-25.

Nicoletti currently lack a legally cognizable interest in seeking to enjoin enforcement of the CIAC policy. See Already, 568 U.S. at 100 (finding moot plaintiff's request for injunctive relief because plaintiff's "only legally cognizable injury . . . is now gone and . . . cannot reasonably be expected to recur"); Cheeseman v. Carey, 623 F.2d 1387, 1392 (2d Cir. 1980) (holding that request for injunction was moot after plaintiffs "received all the relief due them" and that the "issue thus now lacks one of the requisites of a live controversy, namely, a 'real and immediate' threat of injury").

Smith and Nicoletti contend that their challenge to the CIAC policy falls within the exception to the mootness doctrine for a controversy that is capable of repetition while evading judicial review. See United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1540 (2018). "A dispute qualifies for [this] exception only 'if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" Id. (quoting Turner v. Rogers, 564 U.S. 431, 439-440 (2011)). To qualify for this "severely circumscribed" exception, Knaust, 157 F.3d at 88, which is available only in "exceptional situations," Spencer, 523 U.S. at 17, a plaintiff must do more than make a "speculative and theoretical assertion" that an injury might

14

recur.  <u>Lillbask ex rel. Mauclaire v. State of Conn. Dep't of
Educ.</u>, 397 F.3d 77, 86 (2d Cir. 2005).  Rather, a plaintiff must
allege that it is "'reasonable to expect' and 'probable' -- not
simply possible -- that the complaining party would again be
subjected to the 'action for which he initially sought
relief.'"  <u>Deeper Life Christian Fellowship, Inc. v. Sobol</u>, 948
F.2d 79, 82 (2d Cir. 1991) (quoting <u>Honig v. Doe</u>, 484 U.S. 305,
318-22 (1988)); <u>see</u> <u>New Jersey Carpenters Health Fund v.
Novastar Mortg., Inc.</u>, 753 F. App'x 16, 20 (2d Cir. 2018)
(explaining that, to fit within this exception to mootness,
plaintiffs "must show that these same parties are reasonably
likely to find themselves in dispute of the issues raised"
(quoting <u>Video Tutorial Servs., Inc. v. MCI Telecomms. Corp.</u>, 79
F.3d 3, 6 (2d Cir. 1996) (per curiam))).

Plaintiffs argue that this exception to mootness applies
because "[f]irst one, then another, male-bodied athlete has
participated in girls' track competitions under CIAC auspices
for each of the last three years," and "CIAC and the Defendant
Schools insist on continuing the Policy that enables this."  ECF
No. 154 at 46.  As just discussed, however, there is no
indication that Smith and Nicoletti will face competition by a
transgender student next season.  The Second Circuit has
repeatedly declined to apply the "capable of repetition"
exception when an injury's recurrence "is <u>not</u> reasonably likely

15

but, at best, only a theoretical and speculative possibility." Lillbask, 397 F.3d at 86 (emphasis in original); see Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet, 260 F.3d 114, 121 (2d Cir. 2001) (declining to apply the capable of repetition exception because, although plaintiff's age and status as a student "mean[t] recurrence [wa]s theoretically possible, that is insufficient to support the requisite 'reasonable expectation' of recurrence"); Knaust, 157 F.3d at 88 (holding that exception did not apply because "nothing ha[d] been shown to suggest any 'reasonable expectation' that [plaintiff] [would] confront any like situation in the future"); Courshon v. Berkett, 16 F. App'x 57, 63 (2d Cir. 2001) (rejecting exception for claims based on "mere speculation" of recurrence); Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79, 82–83 (2d Cir. 1991) (holding that, though injury could happen "in the next few years," it was "not imminent" and "not sufficiently likely to recur"); Armstrong v. Ward, 529 F.2d 1132, 1136 (2d Cir. 1976) (rejecting application of the exception because, although there was "a possibility" the dispute would recur, "such speculative contingencies afford no basis for our passing on the substantive issues [appellees] would have us decide" (quoting Hall, 396 U.S. at 49)).[7]

---

[7] Plaintiffs submit that they "have no ability to know what male-bodied athletes may register to compete in girls' track events in the next season."

Plaintiffs also fail to show that the injury they complain
about, if it did recur, would "evade review."  If it turns out
that a transgender student does register to compete in girls'
track next season, Smith and Nicoletti will be able to file a
new action under Title IX along with a motion for a preliminary
injunction.  Plaintiffs have expressed doubt that such a motion
could be heard and decided in a timely manner.  However, it is
reasonable to expect that if Smith and Nicoletti were to allege
facts satisfying the traditional requirements for a preliminary
injunction, a request for an expedited hearing would be granted.[8]
Plaintiffs' request for an expedited hearing in this case was
denied only because of Covid-19 and the ensuing suspension and
cancellation of CIAC-sponsored events.  Accordingly, I conclude
that the request for an injunction enjoining enforcement of the
CIAC policy is now moot.[9]

---

ECF No. 154 at 38.  That may be true.  Even so, no case has been cited or
found in which mootness was avoided under the "capable of repetition"
exception on the seemingly paradoxical ground that the plaintiff had no way
of knowing whether the injury would recur.

[8] At the hearing, the plaintiffs would have to show that without a preliminary
injunction, they would sustain immediate, irreparable harm -- the showing
traditionally required to obtain injunctive relief.  See Levin v. Harleston,
966 F.2d 85, 90 (2d Cir. 1992).

[9] Plaintiffs' request for a declaratory judgment is moot for the same reasons.
Declaratory relief is a form of prospective relief that requires a plaintiff
to show "a sufficient likelihood that he will again be wronged in a similar
way." Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012)
(quoting Lyons, 461 U.S. at 111).  Because plaintiffs have failed to make
such a showing, their claims for declaratory relief must be dismissed.  See
Preiser v. Newkirk, 422 U.S. 395, 402 (1975) (explaining that, to determine
whether a request for declaratory relief has become moot, the question is
"whether the facts alleged, under all the circumstances, show that there is a

B.

Defendants next argue that plaintiffs lack standing to seek an injunction requiring changes in the defendants' records. Plaintiffs seek an order requiring the defendants to revise records of races in which Yearwood or Miller competed by eliminating them from the order of finish and moving everyone else up one position. Defendants contend that with regard to this requested relief, plaintiffs fail to satisfy the redressability element of standing, which requires a plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560.[10] Plaintiffs respond that the requested revisions are relevant to their ability to get scholarships and jobs -- scholarships in the case of Smith and Nicoletti, jobs in the case of all the plaintiffs.

---

substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (emphasis in original) (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941))); Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."); Golden v. Zwickler, 394 U.S. 103, 110 (1969) (holding that plaintiff was not entitled to declaratory relief because it was "most unlikely" that his alleged injury would recur and there was thus not a "specific live grievance" or "sufficient immediacy and reality" to warrant the requested relief).

[10] Defendants also dispute the underlying assumption that the races would have resulted in the same order of finish if Yearwood and Miller did not compete. However, as plaintiffs correctly point out, the order of finish is regularly adjusted in this manner when a runner has been disqualified after the completion of a race.

18

After careful consideration, I conclude that the plaintiffs' theory of redressability is not sufficiently supported to provide any of the plaintiffs with standing. Based on the plaintiffs' detailed submissions, which are accepted as true and construed most favorably to them, it appears that but for the CIAC policy: (1) Chelsea Mitchell would have finished first in four elite events in 2019,[11] and qualified for the 2017 New England Regional Championship in the Women's 100m; (2) Selina Soule would have advanced to the next level of competition in the 2019 CIAC State Open Championship in the Women's Indoor 55m; (3) Ashley Nicoletti would have qualified to run in the 2019 CIAC Class S Women's Outdoor 100m; and (4) Alanna Smith would have finished second in the Women's 200m at the 2019 State Outdoor Open.

Plaintiff's theory of redressability has some cogency in the case of Chelsea Mitchell. Changing the defendants' records could provide her with a basis to list four additional wins on her resume, and those wins might well be of interest to a prospective employer. But it seems inevitable that before making an offer to Mitchell, a prospective employer impressed by her record would learn that she did not actually finish first in

---

[11] Specifically, Mitchell would have won the CIAC Outdoor Track, Class S, Women's 100m and 200m; the CIAC Indoor Track, Class S, Women's 55m; and the CIAC Indoor Track, Open, Women's 55m.

the four races.  In other words, even with the requested
changes, Mitchell's position with regard to her employment
prospects would remain essentially the same.[12]

The two cases plaintiffs cite in support of their theory of
redressability are readily distinguishable because both involve
expungement of erroneous disciplinary action from a student's
school record.  See Flint v. Dennison, 488 F.3d 816, 825 (9th
Cir. 2007); Hatter v. Los Angeles City High Sch. Dist., 452 F.2d
673, 674 (9th Cir. 1971).  A student's disciplinary record is
always relevant to college recruiters and prospective employers.
Here, in contrast, the requested revisions might well have no
bearing on Mitchell's employment prospects.  At a minimum,
gauging the effect of the requested revisions on prospective
employers requires guesswork.  The Supreme Court has been
"reluctant to endorse standing theories that require guesswork
as to how independent decisionmakers will exercise their
judgment."  Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013);
see also ASARCO Inc. v. Kadish, 490 U.S. 605, 614–15 (1989);
Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 42–43
(1976).

---

[12] Plaintiffs' submissions provide no basis to conclude that changing the
defendants' records would be relevant to the educational or employment
prospects of the other plaintiffs.

C.

The remaining issue is whether plaintiffs' claims for money damages are barred. The Supreme Court has held that monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640 (1999). Defendants submit that they did not receive the requisite notice. I agree.[13]

The notice requirement derives from Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981), where the Court considered whether a state entity, in accepting federal funds under the Developmentally Disabled Assistance and Bill of Rights Act, agreed to assume the costs of providing disabled persons with appropriate treatment in the least restrictive environment. The "crucial inquiry," the Court stated, was whether Congress had provided "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated" to underwrite the high costs of such treatment. Pennhurst, 451 U.S. at 25.

---

[13] Plaintiffs argue that the question of notice should be deferred until a later stage of the case. However, if the plaintiffs' claims for money damages are barred due to lack of adequate notice, the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case -- attorney's fees and expenses -- is "insufficient, standing alone, to sustain jurisdiction." Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993); see also Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990); Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021) ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded . . . .").

Because Congress had failed to provide clear notice, the relief requested by the plaintiff class was unavailable. "Though Congress' power to legislate under the spending power is broad," the Court explained, "it does not include surprising participating States with post-acceptance or 'retroactive' conditions." Id.

There can be no doubt that the clear notice required by Pennhurst is lacking here. Title IX broadly prohibits discrimination in educational programs and activities on the basis of sex. See 20 U.S.C. § 1681(a); Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 175 (2005) (noting that Title IX is a "broadly written general prohibition on discrimination"). Congress left it to the Department of Education ("ED") to promulgate specific rules. See 20 U.S.C. § 1682; see also Biediger v. Quinnipiac Univ., 691 F.3d 85, 96 (2d Cir. 2012) ("Congress explicitly delegated to the administering agency 'the task of prescribing standards for athletic programs under Title IX.'" (quoting McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 288 (2d Cir. 2004))); Catherine Jean Archibald, Transgender Bathroom Rights, 24 Duke J. Gender L. & Pol'y 1, 27-28 (2016) ("States that accept federal funding for education programs [under Title IX] have agreed to prohibit sex discrimination and to allow the Federal Government to make interpretations about what prohibiting sex discrimination

requires."). Whether the defendants received the requisite notice thus depends primarily on the guidance provided to them by ED. See Davis, 526 U.S. at 647 (guidance issued by ED providing that certain discrimination violates Title IX would have "contribute[d] to [the School] Board's notice of proscribed misconduct" had it been issued earlier).

Beginning in 2014, ED's Office of Civil Rights ("OCR") notified schools that "[a]ll students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX." Office of Civil Rights, Dept. of Educ., Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities 25 (2014). In 2015, OCR gave notice that "[t]he Department's Title IX regulations permit schools to provide sex-segregated . . . athletic teams . . . [and] [w]hen a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity." Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7, 2015). In 2016, OCR went further, stating unequivocally that "transgender students must be allowed to participate in such activities . . . consistent with their gender identity." Letter from Catherine E. Lhamon, Ass't Sec.

for Civil Rights, U.S. Dep't of Educ. and Vanita Gupta,
Principal Dep. Ass't Attorney for Civil Rights, U.S. Dep't of
Justice (May 13, 2016) [hereinafter "2016 Guidance"].[14]

Plaintiffs argue that OCR reversed course when it issued a
Dear Colleague letter in 2017. See Letter from Sandra Battle,
Acting Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and T.E.
Wheeler, II, Acting Ass't Attorney General for Civil Rights,
U.S. Dep't of Justice (Feb. 22, 2017). The 2017 letter did not
provide any new or different guidance, however. Instead, it
stated that OCR was rescinding the 2016 Guidance "in order to
further and more completely consider the legal issues involved."
The letter expressed OCR's belief that it was required to give
"due regard for the primary role of the States and local school
districts in establishing educational policy." Id. This
assurance could reasonably be interpreted by the defendants to
mean that OCR would be inclined to defer to local authorities.
At a minimum, the letter did not provide clear notice that
allowing transgender students to compete in girls' track would
violate Title IX.

---

[14] These guidance documents are subject to judicial notice because they are
public records whose accuracy cannot be questioned. See Porazzo v. Bumble
Bee Foods, LLC, 822 F. Supp. 2d 406, 411–12 (S.D.N.Y. 2011) (taking notice of
agency guidance documents and other documents); Controlled Air, Inc. v. Barr,
No. 3:19-CV-1420 (JBA), 2020 WL 979874, at *3 n.2 (D. Conn. Feb. 28, 2020),
aff'd, 826 F. App'x 121 (2d Cir. 2020) (same).

No further guidance was provided to the defendants until May 2020, several months after this action was brought, when OCR sent them a Letter of Impending Enforcement Action based on a complaint it had received about Yearwood and Miller competing in girls' track. See ECF No. 117-1. In August 2020, a Revised Letter of Impending Enforcement Action was issued to the defendants, informing them for the first time that OCR interpreted Title IX and its implementing regulations to require that sex-specific sports teams be separated based on biological sex. ECF No. 154-2. This letter and the previous letter were withdrawn in February 2021. ECF No. 172-1. In withdrawing the Revised Enforcement Letter, OCR stated that the letter had been "issued without the review required for agency guidance documents" and should therefore "not be relied upon in this or any other matter." Id. at 2.

In light of this history, it is apparent that OCR did not provide the defendants with clear notice that they would be liable for money damages if they permitted Yearwood and Miller to compete in girls' track. See Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 607 (S.D. Ohio 2016) (no liability could be imposed under Title IX in part because "federal regulations and Title IX guidance indicate[d] that [school] was required" to take the actions at issue and "actions taken by [school] to comply with guidance to implement Title IX cannot have been in

25

violation of Title IX"); <u>Doe v. Columbia Coll. Chicago</u>, 299 F.
Supp. 3d 939, 956–57 (N.D. Ill. 2017), <u>aff'd,</u> 933 F.3d 849 (7th
Cir. 2019) (same because a 2011 Dear Colleague letter required
school's actions); <u>Doe v. Coll. of Wooster</u>, 243 F. Supp. 3d 875,
887 (N.D. Ohio 2017) ("[I]t stands to reason that evidence that
a university has endeavored to comply with federal guidance on
Title IX cannot support a violation of Title IX."); <u>Sch. Dist.
of City of Pontiac v. Sec'y of U.S. Dep't of Educ.</u>, 584 F.3d
253, 277 (6th Cir. 2009) (<u>Pennhurst</u>'s clear-statement rule was
not satisfied in part because "the former Secretary of Education
found that [the provision] means the opposite of what the
current Secretary claims"); <u>New York v. United States Dep't of
Health & Human Servs.</u>, 414 F. Supp. 3d 475, 565–71 (S.D.N.Y.
2019) (holding that states were "denied notice" under <u>Pennhurst</u>
because they would not have "clearly underst[oo]d" that the term
"discrimination" as used in the statute "would be given the
meaning" later ascribed to it); <u>Rosa H. v. San Elizario Indep.
Sch. Dist.</u>, 106 F.3d 648, 658 (5th Cir. 1997) (refusing,
pursuant to <u>Pennhurst</u>, to "retroactively" bind defendants to
ED's later interpretation of Title IX because the government
"cannot modify past agreements with recipients by unilaterally
issuing guidelines through the Department of Education").[15]

---

[15] Plaintiffs cite no case under Title IX, or any other Spending Clause
statute, permitting liability to be imposed for conduct that was approved by

In support of their position that the defendants did receive the requisite notice, plaintiffs state that "repeated Supreme Court decisions have put educational institutions 'on notice that they could be subjected to private suits for intentional sex discrimination,' and that this liability 'encompass[es] diverse forms of intentional sex discrimination.'" ECF No. 154 at 45 (quoting Jackson, 544 U.S. at 182-83). Plaintiffs rely on cases involving claims of sexual harassment in violation of Title IX, which are readily distinguishable from the plaintiffs' claims of denial of equal treatment and effective accommodation. See, e.g., Davis, 526 U.S. at 650 (sexual harassment in violation of Title IX requires discrimination "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school"); Gebser, 524 U.S. at 290 (under Title IX, a school is liable for sexual harassment only if it had actual knowledge of harassment

---

the agency responsible for providing guidance to funding recipients. Such a holding would be at odds with Pennhurst itself. In that case, the Court pointedly observed that the very "governmental agency responsible for the administration of the Act and the agency with which the participating States have the most contact, has never understood [the provision] to impose conditions on participating States." Pennhurst, 451 U.S. at 25. To hold that the states received adequate notice, the Court stated, would therefore "strai[n] credulity." Id. The same is true here. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998) (noting that the "central concern" for Pennhurst purposes is whether defendants had fair notice); see also Peter J. Smith, Pennhurst, Chevron and the Spending Power, 110 Yale L.J. 1187, 1191 (2001) (noting the "potential unfairness to state recipients" of binding them to an agency's interpretation of terms in a statute "in cases in which the agency reverses its prior view").

and failed adequately to respond); see also Horner v. Kentucky High Sch. Athletic Ass'n, 206 F.3d 685, 693 (6th Cir. 2000) (noting that Franklin, Gebser, and Davis "all address deliberate indifference to sexual harassment and are not readily analogous" to cases alleging discrimination in athletics).

More pertinent to the notice issue presented here is what courts have said about the obligations of states and local school districts to transgender students under Title IX. See, e.g., Jackson, 544 U.S. at 183–84 (holding that defendants were on notice in part because, "importantly, the Courts of Appeals that had considered the question at the time of the conduct at issue in this case all had already interpreted Title IX to cover retaliation"). In its 2016 Guidance, OCR stated that requiring schools to permit transgender students to participate in sex-segregated activities consistent with their gender identity comported with judicial decisions under Title IX. That statement remains accurate. Courts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity. See A.H. v. Minersville Area Sch. Dist., 408 F. Supp. 3d 536, 552 (M.D. Pa. 2019) (collecting and discussing cases). Every Court of Appeals to consider the issue has so held. See Parents for Privacy v. Barr, 949 F.3d 1210 (9th Cir. 2020), cert. denied, No. 20-62, 2020 WL 7132263 (U.S. Dec. 7, 2020); Doe by & through

Doe v. Boyertown Area Sch. Dist., 897 F.3d 518 (3d Cir. 2018);
Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of
Educ., 858 F.3d 1034 (7th Cir. 2017); Dodds v. United States
Dep't of Educ., 845 F.3d 217 (6th Cir. 2016); G.G. ex rel. Grimm
v. Gloucester Cty. Sch. Bd., 822 F.3d 709 (4th Cir. 2016),
vacated and remanded, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017).
This unbroken line of authority reinforces the conclusion that
the plaintiffs' claims for money damages are barred.[16]

IV.

Accordingly, the motion to dismiss is hereby granted.  The
Clerk may enter judgment in favor of the defendants dismissing
the action.

So ordered this 25th day of April 2021.


/s/ Robert N. Chatigny
Robert N. Chatigny
United States District Judge

---

[16] In a recent case under Title VII, the Supreme Court observed that "it is
impossible to discriminate against a person for being . . . transgender
without discriminating against that individual based on sex."  Bostock v.
Clayton Cty., Georgia, 140 S. Ct. 1731, 1741 (2020).  The parties dispute the
significance of Bostock for cases arising under Title IX's prohibition of sex
discrimination.  But there is no need to get into that dispute now.