# 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA
MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA
SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY
NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs-Appellants*,

v.

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a
CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE;
BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION;
CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION;
GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION;
CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY
PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her
daughter, T.M.; CONNECTICUT COMMISSION ON HUMAN
RIGHTS,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of
Connecticut, Case No. 3:20-cv-00201 (RNC)

## OPENING BRIEF OF APPELLANTS

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. HOLCOMB
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
cholcomb@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
cbarnett@ADFlegal.org

*Counsel for Appellants*

**Appellants Request Oral Argument**

## CORPORATE DISCLOSURE STATEMENT

As private individuals, Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti (collectively, Plaintiffs) have no parent corporation and no stockholders.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ............................................................................... v

Jurisdictional Statement ......................................................................... 1

Statement of the Issues .......................................................................... 2

Statement of the Case ............................................................................. 4

    A.    Statutory Background .................................................................. 4

    B.    Factual Background ..................................................................... 6

    C.    Procedural History ...................................................................... 9

Summary of Argument ........................................................................... 12

I.    Female athletes have a right to have their victories properly
    acknowledged. Yet CIAC's current athletic records do not
    fairly or accurately recognize female achievements. Plaintiffs
    have a redressable injury in seeking to correct these records. ..... 15

    A.    Standard of Review ................................................................. 15

    B.    CIAC's discriminatory Policy deprived female athletes
        like Plaintiffs of their fair chance to be champions.
        Athletic records now codify and exacerbate that injury.
        An injunction requiring Defendants to correct their
        records would redress this injury. ........................................ 15

    C.    Athletic records also affect Plaintiffs' college
        recruitment and future employment opportunities. An
        injunction requiring the Defendants to correct those
        records would redress Plaintiffs' utilitarian injuries. .......... 20

II.  CIAC's discriminatory Policy actively harms female athletes. It imposes a barrier that forces female athletes like Plaintiffs to compete at a disadvantage. Their Title IX claims are not moot. ..............................................................................26

    A.  Standard of Review ............................................................26

    B.  Defendants failed to demonstrate that Alanna and Ashley will not face male competition and thus failed to meet their burden..................................................................27

    C.  CIAC's Policy actively harms female athletes by discriminating against them.................................................28

    D.  Since CIAC's discriminatory Policy harms female athletes, Alanna and Ashley need not identify a particular transgender athlete to keep this controversy live. ......................................................................33

    E.  Biological males have competed in women's sports for the last 3 years. It is more than theoretically possible that they will continue to do so.............................................38

    F.  Alanna and Ashley's claims are "capable of relief yet evading review." ...................................................39

III.  CIAC intentionally enacted a Policy that discriminated against female athletes. CIAC did not need prelitigation notice that its actions violated Title IX. It had that notice nonetheless....................................................................42

    A.  Standard of Review ............................................................42

    B.  Educational institutions like CIAC and its member schools do not need prelitigation notice that their acts violate Title IX when they intentionally enact discriminatory athletic policies.............................43

C.    Title IX's text—and the Supreme Court's mandate to interpret it broadly—put CIAC and its member schools on notice that a private cause of action could allege even "unprecedented" forms of intentional sex discrimination. ....................................................... 45

IV.  The district judge has displayed unfair bias that would lead an objective observer to question his impartiality. This court should reassign the case on remand. ............................................ 48

    A.    Governing Legal Standards .................................. 48

    B.    The district judge weighed in on the ultimate issue in this case. His comments would cause a reasonable observer to question his partiality. ....................................... 49

    C.    The district judge's dismissal of female athletic achievement would further cause a reasonable observer to question his partiality. ....................................... 52

Conclusion ........................................................................ 54

Certificate of Service ...................................................... 57

Certificate of Compliance ............................................... 58

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ........................................................... 28, 30, 35

*Adarand Constructors, Inc. v. Slater*,
    528 U.S. 216 (2000) .................................................................... 27

*Allen v. Wright*,
    468 U.S. 737 (1984) .................................................................... 19

*Barrett v. West Chester University of Pennsylvania of State System of Higher Education*,
    2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) ................................. 40

*Barry v. Lyon*,
    834 F.3d 706 (6th Cir. 2016) .................................................. 37, 41

*Biediger v. Quinnipiac University*,
    616 F. Supp. 2d 277 (D. Conn. 2009) ............................................ 41

*Biediger v. Quinnipiac University*,
    691 F.3d 85 (2d Cir. 2012) ................................................... passim

*Boucher v. Syracuse University*,
    164 F.3d 113 (2d Cir. 1999) ......................................................... 37

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
    190 F.3d 705 (6th Cir. 1999) ....................................................... 29

*Cape v. Tennessee Secondary School Athletic Association*,
    563 F.2d 793 (6th Cir. 1977) ....................................................... 29

*Cheney v. United States District Court for the District of Columbia*,
    542 U.S. 367 (2004) .................................................................... 11

*Clark v. Arizona Interscholastic Association,*
  695 F.2d 1126 (9th Cir. 1982) ...................................................... 30

*Cohen v. Brown University,*
  101 F.3d 155 (1st Cir. 1996) ............................................... 21, 22, 25

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ..................................................................... 15

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
  526 U.S. 629 (1999) ..................................................................... 45

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ........................................................... 22, 25

*Doe ex rel. Doe v. Vermillion Parish School Board,*
  421 F. App'x 366 (5th Cir. 2011) ................................................. 35

*Dubuisson v. Stonebridge Life Insurance Company,*
  887 F.3d 567 (2d Cir. 2018) ........................................................ 15

*Flint v. Dennison,*
  488 F.3d 816 (9th Cir. 2007) ........................................................ 20

*Franklin v. Gwinnett County Public Schools,*
  503 U.S. 60 (1992) ....................................................................... 43

*Gebser v. Lago Vista Independent School District,*
  524 U.S. 274 (1998) ................................................................ 43, 45

*Haines v. Liggett Group, Inc.,*
  975 F.2d 81 (3d Cir. 1992) ................................................ 14, 49, 51

*Hatter v. Los Angeles City High School District,*
  452 F.2d 673 (9th Cir. 1971) ........................................................ 20

*Honig v. Doe,*
  484 U.S. 305 (1988) ..................................................................... 41

*In re Martinez-Catala,*
  129 F.3d 213 (1st Cir. 1997) ........................................................ 53

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) .................................................... 44, 45, 46, 47

*Kelley v. Board of Trustees,*
    35 F.3d 265 (7th Cir. 1994) .......................................... 4

*Legal Services Corp. v. Velazquez,*
    531 U.S. 533 (2001) ...................................................... 51

*Libertarian Party of Erie County v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020) .......................................... 15

*Ligon v. City of New York,*
    736 F.3d 118 (2d Cir. 2013) ........................... 14, 48, 51, 54

*Liteky v. United States,*
    510 U.S. 540 (1994) ...................................................... 51

*Los Angeles County v. Davis,*
    440 U.S. 625 (1979) ...................................................... 27

*Mansourian v. Regents of University of California,*
    602 F.3d 957 (9th Cir. 2010) .................................. passim

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) .................................... passim

*Mhany Management, Inc. v. County of Nassau,*
    819 F.3d 581 (2d Cir. 2016) .......................................... 27

*Neal v. Board of Trustees of California State Universities,*
    198 F.3d 763 (9th Cir. 1999) ........................... 6, 17, 21, 54

*Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville,*
    508 U.S. 656 (1993) ................................................ 28, 34

*O'Connor v. Board of Education of School District 23,*
    449 U.S. 1301 (1980) .................................................... 30

*Ohlensehlen v. University of Iowa,*
    2020 WL 7651974 (S.D. Iowa Dec. 24, 2020) .................. 40

*Papelino v. Albany College of Pharmacy of Union University*,
    633 F.3d 81 (2d Cir. 2011)............................................................ 42

*Parents Involved in Community Schools v. Seattle School District
No. 1*,
    551 U.S. 701 (2007) ....................................................... 35, 36, 42

*Parker v. Franklin County Community School Corp.*,
    667 F.3d 910 (7th Cir. 2012) ................................................. 18, 19

*Pederson v. Louisiana State University*,
    213 F.3d 858 (5th Cir. 2000) ................................................. passim

*Portz v. St. Cloud State University*,
    196 F. Supp. 3d 963 (D. Minn. 2016) ........................................... 36

*Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*,
    850 F.3d 507 (2d Cir. 2017)........................................................ 26

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)........................................................ 53

*United States v. Robin*,
    553 F.2d 8 (2d Cir. 1977)........................................................... 53

*United States v. Sanchez-Gomez*,
    138 S. Ct. 1532 (2018) ......................................................... 39, 40

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ............................................................... 51

*United States v. Thompson*,
    76 F.3d 442 (2d Cir. 1996).......................................................... 50

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................... 36

*United States v. Wedd*,
    993 F.3d 104 (2d Cir. 2021)........................................................ 50

*Williams v. School District of Bethlehem*,
    998 F.2d 168 (3d Cir. 1993)........................................................ 30

*Yellow Springs Exempted Village School District Board of*
    *Education v. Ohio High School Athletic Association*,
    647 F.2d 651 (6th Cir. 1981) .......................................... 10

## **Statutes**

20 U.S.C. § 1681(a) ............................................................ 1, 5

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 1343 ................................................................... 1

28 U.S.C. § 455(a) .............................................................. 11

## **Other Authorities**

118 Cong. Rec. 5808 (1972) ................................................ 21

130 Cong. Rec. 18,535 (1984) .............................................. 4

*ACLU Statement on Revoking of Title IX Guidance for*
    *Transgender Students & Impact on Gavin Grimm Supreme*
    *Court Case*, ACLU (Feb. 22, 2017) ................................. 42

Chris W. Surprenant, *Accommodating Transgender Athletes*, 18
    GEO. J. OF L. & PUB. POL'Y 905 (2021) ................................. 5, 30, 31

Connecticut Interscholastic Athletic Conference, 2019–2020
    Handbook, https://perma.cc/8UVS-6NLD ...................... 19

Doriane Lambelet Coleman & Wickliffe Shreve, *Comparing*
    *Athletic Performances: The Best Elite Women to Boys & Men*,
    DUKE LAW: CTR. FOR SPORTS LAW & POLICY,
    https://perma.cc/H29T-USY2 ......................................... 29

Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano,
    *Re-Affirming the Value of the Sports Exception to Title IX's*
    *General Non-Discrimination Rule*, 27 DUKE J. OF GENDER L.
    & POL'Y 69 (2020) ............................................... passim

FIELD OF DREAMS (Universal Pictures 1989) .........................................22

Jodi Hudson, *Complying with Title IX of the Education Amendments of 1972: The Never-Ending Race to the Finish Line*, 5 SETON HALL J. OF SPORT L. 575 (1995)...........................5, 26

Kevin Draper & Juliet Macur, *Sha'Carri Richardson, A Track Sensation, Tests Positive for Marijuana*, N.Y. TIMES (July 6, 2021), https://perma.cc/PYA4-9YWY .............................................24

*More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. COMMISSION ON CIVIL RIGHTS (July 1980)...............................4

Nicolas Roulin & Adrian Bangerter, *Extracurricular Activities in Young Applicants' Resumes: What are the Motives Behind Their Involvement?*, 48 INT'L J. OF PSYCHOLOGY 871 (2013)..........23

Note, *Cheering on Women and Girls in Sports: Using Title IX to Fight Gender Role Oppression*, 110 HARV. L. REV. 1627 (1997) .....................................................................................25, 52

Pat Forde, *The Flukish, Fascinating Rise—and Sudden Disappearance—of the 2019 Kentucky Derby Champion*, SPORTS ILLUSTRATED (May 1, 2020) ...............................................24

Reed Larson, David Hansen & Giovanni Moneta, *Differing Profiles of Developmental Experiences Across Types of Organized Youth Activities,* 42 DEV. PSYCH. 849 (2006)..................................23

*Title IX at 45*, NATIONAL COALITION FOR WOMEN & GIRLS IN EDUCATION (2017)....................................................................4, 21

## Rules

Fed. R. App. P. 4(a)(1)(A) ..........................................................................1

## Regulations

34 C.F.R. § 106.41(a) .................................................................................5

## JURISDICTIONAL STATEMENT

This case arose when four female athletes sued in the United States District Court for the District of Connecticut under Title IX to the Education Amendments, *see* 20 U.S.C. § 1681(a), to vindicate their federal statutory rights. The district court exercised federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343 and had authority to grant the requested equitable relief under 28 U.S.C. § 1343.

Plaintiffs moved for a preliminary injunction that would have stopped the Connecticut Interscholastic Athletics Conference and its member schools from violating Plaintiffs' civil rights under Title IX. But the district court never ruled on the motion. Instead, the court granted Defendants' motion to dismiss on April 26, 2021. Plaintiffs then timely filed their notice of appeal on May 26, 2010. *See* Fed. R. App. P. 4(a)(1)(A).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1.  To have standing, Plaintiffs must plead an injury that a favorable court decision will redress. Plaintiffs have identified specific races they would have won but for the Policy and have alleged that official records do not give them the fair recognition they deserve. Moreover, these inaccurate records could harm Plaintiffs' prospects at college recruitment and future employment. Do Plaintiffs have a redressable injury?

2.  Under Title IX, female athletes suffer an injury when a school erects a barrier that hinders their ability to compete. The Connecticut Interscholastic Athletics Conference enacted a Policy that allows biological males to compete in female athletics, thus diminishing female athletes' opportunities to compete and achieve victory. Does this barrier give plaintiffs Alanna Smith and Ashley Nicoletti a live controversy against CIAC's Policy?

3.  A compensatory action under Title IX requires that schools have notice that their conduct violated the statute. CIAC intentionally adopted a policy that discriminates against female athletes. Did CIAC and its member schools have sufficient notice that their conduct violated Title IX?

4.  This Court can reassign a case on remand if, at the very least, an objective observer would question the district judge's impartiality. Here, the district judge refused to rule on Plaintiffs'

motion for a preliminary injunction, diminished Plaintiffs' interests in athletic achievements, and ordered Plaintiffs to refrain from calling the transgender athletes biological males, even though that was the center of Plaintiffs' theory of the case. At minimum, would an objective observer question the district judge's partiality?

## STATEMENT OF THE CASE

### A.     Statutory Background

Female athletes have suffered historic discrimination. Although "[p]articipation in athletics has long been viewed as an integral part of the educational process in American high schools and colleges," women have faced significant hurdles just to participate. *More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. COMM'N ON CIV. RIGHTS, at iii (July 1980). For a time, many public high schools did not have girls' sports teams, which drastically reduced the number of women who could compete in college. Moreover, the average university devoted a mere 2% of its athletic budget to women's sports teams. *Title IX at 45*, NAT'L COAL. FOR WOMEN & GIRLS IN EDUC. (2017). As a result, for most of history, "women [have been] denied opportunities for athletic competition and scholarships." 130 Cong. Rec. 18,535 (1984) (statement of Rep. Snowe).

Fifty years ago, that started to change. "Congress itself recognized that addressing discrimination in athletics presented a unique set of problems." *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994). To address this as well as other disparities in education, in 1972, Congress enacted Title IX of the Education Amendments. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

From the start, the implementing regulations defined "program or activity" to include interscholastic athletics. 34 C.F.R. § 106.41(a). That "triggered an athletic revolution that changed the face of intercollegiate athletics." Jodi Hudson, *Complying with Title IX of the Education Amendments of 1972: The Never-Ending Race to the Finish Line*, 5 SETON HALL J. OF SPORT L. 575, 575 (1995). Before Title IX, less than 5% of women participated in high school sports; by 2019, that number skyrocketed to 43%. Chris W. Surprenant, *Accommodating Transgender Athletes*, 18 GEO. J. OF L. & PUB. POL'Y 905, 908 (2021). Title IX has effected a similar change in collegiate sports, with women making up only 3% of college athletes in 1971 but today making up 43.5%. *Id.*

As a result, "[w]omen and girls today have the opportunity only boys and men had in the previous period to reap the widely recognized and highly valued benefits of being physically strong, of being on teams and developing the myriad skills associated with competitive sport, of attending college on athletic scholarships, and of high-end competitive experiences." Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. OF GENDER L. & POL'Y 69, 72 (2020). In short, Title IX has "enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory [and] the

5

agony of defeat." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

### B. Factual Background

In Connecticut, however, female track athletes have experienced the "agony of defeat" disproportionately to the "thrill of victory"—and disproportionately to the experience of male athletes. That's because the Connecticut Interscholastic Athletic Conference adopted a policy that bases participation in women's athletics solely on a student-athlete's "gender identification." JA149. Under this Policy, if a biological male identifies as female, then that athlete can compete in women's events—even though "scientists agree that males and females are materially different with respect to the main physical attributes that contribute to athletic performance." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 92 (cleaned up). That difference means that "even the very best females are not competitive for the win against males." *Id.* at 115; *accord* JA34 ("[L]arge numbers of men and even adolescent boys are able to outperform the very top-performing women."). Biological males, if allowed to compete, will dominate women's sports.

That is exactly what happened in Connecticut's high school track and field. In 2017, Andraya Yearwood, a biologically male athlete who identified as female, started running in women's track and field. JA150. Unsurprisingly, Yearwood, even as a freshman, claimed two State Class

6

championships that year.[1] JA151. Yearwood also went on to rank third in the State Open championship. JA153.

Male dominance became starker in 2018. That year, Terry Miller, another biologically male athlete who identified as female, switched from competing in boys' track to girls' track events. JA153. Despite never advancing to a State Class or State Open championship as a male runner, Miller took first prize at the women's 2018 State Open championship, with Yearwood as the runner-up. JA153–54. Chelsea Mitchell, a freshman at the time, finished in fourth place. JA154.

The 2019 events saw similar results. In a preliminary State Class race, Miller and Yearwood ranked second and third place, respectively, bumping freshman athlete Ashley Nicoletti from qualifying for the final State Class race. JA157. And in one preliminary State Open championship race, Miller and Yearwood took the top slots—preventing Selina Soule from advancing to the final State Open championship race. JA155. In that final State Open race, Miller and Yearwood again took the top prizes, leaving Chelsea Mitchell—the fastest female in the

---

[1] Connecticut track and field involves multiple tiers of competition. First, athletes may qualify to compete in statewide "Class" races based on school size. JA150. "[T]he top-performing students within each State Class championship qualify to participate in the State Open championships," wherein the top State athletes compete against each other regardless of school size. *Id.* Finally, "the top performers in the State Open championships qualify to participate in the New England Championship." *Id.*

state—to finish in third place. JA155. Chelsea and another female athlete, Alanna Smith, also lost to Miller in another State Open championship race that year. JA158.

Overall, from 2017 through 2019, Yearwood and Miller, two biologically male athletes, won 13 girls' state-championship titles and occupied more than 68 opportunities to advance to and participate in exclusive higher-level competitions—opportunities that would otherwise have gone to females. JA159. In fact, in seven important state-level events, Yearwood and Miller won 13 out of 14 "girls" championships, leaving a female runner to win just one. *Id.* (Needless to say, in the boys division, males won all 14 parallel "boys" championships.)

Female athletes like Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti have each personally felt the Policy's impact. They trained hard to shave fractions of seconds off their race times so they could compete in state and regional meets, stand atop the winners' podium, and perhaps even secure college athletic scholarships and gainful employment beyond. JA72, 164. Yet those dreams were dashed, as the Policy forced them to compete—and lose— to biological males.

In 2020, Selina and Chelsea graduated from high school. So did Yearwood and Miller. Since then, Alanna and Ashley have continued to compete in CIAC-sponsored high school track events. They intend to do so in the next school year.

## C.    Procedural History

The world that these female athletes experienced is not the world that Title IX intended. So these four athletes sued CIAC and five Connecticut high schools, alleging that the Policy violates Title IX, both by failing to provide female athletes with equal treatment, benefits, and opportunities, and by failing to provide female athletes with effective accommodations for their interests and abilities. The Plaintiffs sought prospective relief: a declaration that the Policy violates Title IX, and an injunction against its continued enforcement. They also sought retrospective relief for the harms imposed by the Policy: an additional injunction that would require CIAC and its member schools to correct all athletic records by properly crediting the achievements and championships of female athletes, including Plaintiffs.[2]

On February 12, 2020, Plaintiffs, concurrent with the filing of their complaint, moved for a preliminary injunction. But here as on the track, Plaintiffs were denied a fair chance. Even after Plaintiffs requested an expedited hearing on their motion, the district court never even required Defendants to file a brief in response, never conducted any argument or hearing on it, and never ruled on the motion until denying it as moot nearly 14 months later.

---

[2] Since Selina and Chelsea have graduated, only Alanna and Ashley seek prospective relief against the Policy.

By contrast, when—soon after Plaintiffs filed suit—Yearwood and Miller moved to intervene as defendants, the district court set a prompt hearing on that motion. And at that hearing, the district judge, on his own initiative and without any request from Defendants, ordered Plaintiffs' counsel to "not refer to the proposed intervenors as 'males'" but rather as "'transgender females.'" JA104. Plaintiffs' counsel represented that doing so would prevent him from vigorously representing Plaintiffs' interests. JA106. Plaintiffs' arguments, after all, hinge on the biological distinctions between the male and female sexes—on the fact that, when "males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981).

Nonetheless the district court dismissed this interest. The court declared that "[t]his isn't a case involving males who have decided that they want to run in girls' events. This is a case about girls who say that transgender girls should not be allowed to run in girls' events." JA104. Moreover, the court asserted that referring to Yearwood and Miller as "transgender females," rather than biological males, was "more accurate" and "consistent with science, common practice and perhaps human decency." JA107. And the court essentially accused Plaintiffs'

10

counsel of "bullying" by calling Yearwood and Miller biological males. *Id.* If Plaintiffs' counsel had an issue with the order, the judge told him to take it up with this Court.[3] *Id.* The district court then granted Yearwood and Miller's motion to intervene.

Shortly thereafter, Defendants moved to dismiss the case. By the time the court finally ruled on the motion, Yearwood and Miller had graduated. On that basis, the court held that Plaintiffs' request for injunctive relief against the Policy's enforcement was moot. For, the court said, it was those athletes' "participation in girls' track that provided the impetus for this action." JA271. Without them or any other identifiable transgender athletes as competitors, the court reasoned that the Plaintiffs lacked an identifiable interest "in seeking to enjoin enforcement of the CIAC policy." JA271–72.

Not only that, but the court also held that the Plaintiffs lacked standing to seek an injunction requiring corrections to *past* athletic records. The court failed to acknowledge the inherent value in recognizing Plaintiffs' accomplishments and championships. And the court discounted the Plaintiffs' concerns about the effect of accurate

---

[3] Plaintiffs promptly did so. First, Plaintiffs requested that the district judge correct the error himself through the process of disqualification. *See* 28 U.S.C. § 455(a). The district judge instead doubled down on his position and denied the motion. Plaintiffs then petitioned this Court for mandamus to reassign the case. Because mandamus is a "drastic and extraordinary" interlocutory remedy, *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004), this Court denied the petition.

records on future employment as speculative. To the district court, a prospective employer might not care about Plaintiffs' athletic achievements. Even if they did care, the court mused that an employer would look at a corrected record but nevertheless discover that female athletes like Chelsea didn't "actually" take first place.

Finally, the court dismissed Plaintiffs' request for damages because the court did not think that CIAC and its member schools received adequate notice that the Policy violated Title IX.

Plaintiffs then timely filed a notice of appeal.

## SUMMARY OF ARGUMENT

CIAC's Policy actively harms female athletes, including Plaintiffs. Because biological males can compete in Connecticut women's events, female athletes like Plaintiffs are robbed of the numerous benefits that fair competition affords. That includes the "chance to be champions." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004). It also includes the chance to be *recognized* as champions. And in a society that places a high value on athletic achievements, the Policy forces Plaintiffs to lose a competitive edge when trying to earn college scholarships or when entering the workforce. These harmful effects could be remedied by an injunction that requires CIAC and its member schools to remove biologically male competitors from the girls' division athletic records. These corrected records would then accurately reflect Plaintiffs' competitive victories

12

against other biologically female athletes and allow them to report such victories to colleges and employers. The district court erred in holding that Plaintiffs did not have a redressable injury.

Not only does the Policy rob female athletes of the recognition they deserve, it also "creates a barrier" that keeps them from competing on an equal footing. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000). It robs them of "*genuine* athletic participation opportunities." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 101 (2d Cir. 2012) (emphasis added). Alanna and Ashley—who will continue to run track next year under the Policy's shadow—need not identify a specific transgender athlete to have an active interest in enjoining the Policy, for the Policy itself harms them. Accordingly, the district court erred when it held that Plaintiffs' request for injunctive relief against the Policy was moot.

Finally, CIAC and its member schools did not need but had more than adequate notice that the Policy violated Title IX. Federal funding recipients, like CIAC and its member schools, need prelitigation notice that their conduct violates Title IX "only when the alleged Title IX violation consists of an institution's deliberate indifference to acts that do not involve official policy of the recipient entity." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) (cleaned up). Yet "decisions with respect to athletics are . . . easily attributable to the funding recipient and always—by definition—intentional." *Id.* at 968 (cleaned up). CIAC and its member schools therefore had sufficient

13

notice when they intentionally enacted a discriminatory Policy that allows biological males to compete against female athletes.

When this Court remands for reconsideration, it should reassign this case. To do so, this Court need only find that a reasonable observer would question the district judge's partiality. *Ligon v. City of N.Y.*, 736 F.3d 118, 128 (2d Cir. 2013) (per curiam). That standard is lower than the one implicated by Plaintiffs' earlier mandamus petition. Here, after sitting on Plaintiffs' motion for a preliminary injunction for over a year without even requiring Defendants to brief a response, the district judge commented on "the ultimate issue to be determined by a jury," *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 98 (3d Cir. 1992) (en banc), *as amended* (Sept. 17, 1992), and he did so in a way that would cause a reasonable observer to question his partiality. To preserve the "appearance of justice," this Court should therefore reassign the case on remand. *Ligon*, 736 F.3d at 128.

I. **Female athletes have a right to have their victories properly acknowledged. Yet CIAC's current athletic records do not fairly or accurately recognize female achievements. Plaintiffs have a redressable injury in seeking to correct these records.**

### A. Standard of Review

This Court reviews "*de novo* the district court's decision to dismiss plaintiffs' complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), construing the complaint in plaintiffs' favor and accepting as true all material factual allegations contained therein." *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 573 (2d Cir. 2018) (citation omitted).

### B. CIAC's discriminatory Policy deprived female athletes like Plaintiffs of their fair chance to be champions. Athletic records now codify and exacerbate that injury. An injunction requiring Defendants to correct their records would redress this injury.

To have standing, Plaintiffs must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (cleaned up). Redressability requires only a "non-speculative likelihood that the injury can be remedied by the requested relief." *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020). Here, Plaintiffs have identified specific races and opportunities that they lost because the Policy allowed biological males

to compete. As a result, CIAC records do not recognize Plaintiffs' actual achievements—an inherent harm that the courts can redress.

Start with Chelsea. In 2017, Chelsea "would have had the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships"—but the Policy allowed Yearwood to compete against her and take away this opportunity. JA152. Then, in 2018, Chelsea "would have won second place statewide" but lost to Yearwood and Miller to rank fourth instead. JA154. Moreover, in 2019, Chelsea claimed a silver medal at the State Class championship—but would have claimed a gold medal if the Policy did not permit Miller to compete against her. Finally, and most egregiously, but for the Policy, Chelsea "would have made her school's history as the first female athlete . . . ever to be named State Open Champion." JA156. Instead, she finished behind Yearwood and Miller and "was repeatedly referred to in the press as the 'third-place competitor.'" JA74, 156. Twice that year, Chelsea lost out on her "chance to be [a] champion[ ]." *McCormick*, 370 F.3d at 295. Overall, Chelsea "lost four state championship titles, two All New England awards, medals, points and publicity," all because the Policy allowed biological males to compete against her. JA69.

The other Plaintiffs have similar stories. In 2019, Alanna—even as a freshman—would have finished runner-up at a State Open Championship event; instead, the Policy caused her to finish third. JA158. And, but for the Policy, Ashley "would have advanced to the

16

next level of competition in . . . [a] state championship . . . and competed for a spot at the State Open Championship." JA157. Likewise, in 2019, the Policy kept Selina from advancing beyond a preliminary race to the championship finals. In all three instances, the Policy allowed biological males to compete against Selina, Alanna, and Ashley and deprive them of the "thrill of victory." *Neal*, 198 F.3d at 773.

Athletes compete to win. "The greater the potential victory, the greater the motivation to the athletes." *McCormick*, 370 F.3d at 294. Like Chelsea, each Plaintiff worked hard to "shave mere fractions of seconds off" her run time. JA72. They "trained harder than ever," "never missed a practice," "squeezed in extra workouts where [they] could." *Id.* Though Title IX promised these girls "the chance to be champions"—something this Court has described as "fundamental to the experience of sports," *McCormick*, 370 F.3d at 295—the Policy made that promise "illusory," *Biediger*, 691 F.3d at 101. By permitting male competition, the Policy deprived female athletes like Plaintiffs of their fair chance.

Athletic records now give that deprivation a lasting and public stamp of official approval. Instead of accurately recognizing the fair results of Plaintiffs' hard work, CIAC's records instead showcase the subjugation of female achievement. These records "send[ ] a message to the girls . . . that they are not expected to succeed and that the school does not value their athletic abilities as much as it values the abilities

17

of the boys." *McCormick*, 370 F.3d at 295. Chelsea, for instance, averred that the lack of fair recognition came as a "gut punch" that left her feeling defeated and upset that "many great female athletes" have been "wiped from the books." JA74, 78.

That is a redressable harm. Imagine a female athlete who was erased from the record books by a competitor who did not play by the rules. No one would question whether that female athlete has a redressable harm. The same is true of female athletes denied recognition by being forced to compete against biological males. If Title IX affords female athletes the "chance to be champions," then it also affords them the right to be *recognized* as champions. *See McCormick*, 370 F.3d at 295. Title IX "not only requires schools to establish athletic programs for female athletes, but also prohibits schools from discriminating against females participating in those programs by denying equivalence in benefits," such as championship recognition. *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012). Boys who compete in CIAC-sponsored events do not worry that their achievements will be "erased" or "wiped from the books" due to unfair competition. An injunction requiring CIAC to properly recognize female victories would extend that same benefit to female athletes.

CIAC itself recognizes the value in accurate athletic records that recognize fair competition. CIAC's most recent handbook notes that, if an athlete "participated while under the influence of performance

enhancing substances," that athlete's victories would be "declared forfeitures" and "all records will be expunged." Connecticut Interscholastic Athletic Conference, 2019–2020 Handbook at 103, https://perma.cc/8UVS-6NLD. If athletes did not have an inherent interest in having their achievements recognized, CIAC would not need to correct records that were distorted from unfair competition. The fact that CIAC does so belies the district court's conclusion that female athletes like Plaintiffs lack standing to correct the athletic records.

The district court, in fact, never discussed the inherent value to female athletes of having their achievements properly recognized. Instead, the court focused solely on athletic records' utilitarian value. While Plaintiffs contend that accurate records serve an important utilitarian purpose, Plaintiffs primarily seek to vindicate their interest in "showcas[ing] their athletic ability and competitiveness." *Parker*, 667 F.3d at 916.

Inaccurate records harm Plaintiffs as competitive athletes. When records fail to appropriately credit female achievements, athletes like Plaintiffs feel "erased." JA74. Such a stigmatizing injury "is one of the most serious consequences of discriminatory government action and is sufficient . . . to support standing . . . to those persons who are personally denied equal treatment." *Allen v. Wright*, 468 U.S. 737, 755 (1984). No less than any other athlete, Plaintiffs want their hard work accurately and fairly recognized. They especially want their

19

achievements valued as much as boys' achievements. *See McCormick*, 370 F.3d at 296. CIAC's current records deny them that benefit. An injunction requiring CIAC to correct those records would redress Plaintiffs' injury.

### C. Athletic records also affect Plaintiffs' college recruitment and future employment opportunities. An injunction requiring the Defendants to correct those records would redress Plaintiffs' utilitarian injuries.

Not only do Plaintiffs have a sufficient interest in vindicating their right to be recognized as champions, but they also have a utilitarian interest in correcting the athletic records. "When a student's record contains negative information derived from allegedly unconstitutional school regulations . . . that information may jeopardize the student's future employment or college career." *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007); *Hatter v. Los Angeles City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971). Here, Alanna and Ashley have sound reason to fear missing out on college recruitment opportunities because the current records do not accurately testify to their achievements. So, too, could these records affect all four Plaintiffs' prospects at future employment, even years down the road. "State champion" on a résumé speaks loudly to employers about qualities of grit, determination, and hard work.

But if the records are amended, Plaintiffs could then point to official records that accurately reflect their achievements. That could

20

open doors to "the many tangible benefits," like college recruitment and future employment opportunities, "that flow from just being given a chance to participate in" interscholastic athletics. *Neal*, 198 F.3d at 773. After all, Title IX was intended to "provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have *a fair chance to secure jobs* of their choice with equal pay for equal work." *Cohen v. Brown Univ.*, 101 F.3d 155, 167 (1st Cir. 1996) (quoting 118 Cong. Rec. 5808 (1972) (remarks of Senator Evan Bayh)) (emphasis added). Plaintiffs thus have a second redressable interest in correcting the inaccurate records.

The district court dismissed the utilitarian value of accurate athletic records as resting on "speculative guesswork." Not so. Our society places a high value on athletic achievements. And "[t]he proposition that females don't need to be competitive for the win is no longer viable." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 119. Indeed, an overwhelming number of female business executives—94%—participated and recorded achievements in interscholastic sports. *Title IX at 45*, NAT'L COAL. FOR WOMEN & GIRLS IN EDUC. It is neither speculative nor guesswork to conclude that employers would find females' athletic achievements relevant. Most employers "will likely react in predictable ways" and

consider Plaintiffs more favorably in light of their achievements. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

The district court's reasoning mirrors logic that courts have routinely rejected in other circumstances. In *Cohen*, for instance, a university tried to escape Title IX liability by arguing that "significant disparity in athletic opportunities for men and women . . . is the result of a gender-based differential in the level of interest in sports." 101 F.3d at 178. The university argued that it did not know women's interest in sports, so it should not have to satisfy its Title IX obligations based on speculation. But the First Circuit rejected that argument and noted that "[i]nterest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience." *Id.* at 179. Women's interest in sports was not speculative, the First Circuit reasoned, because it predictably would evolve as an effect of a corrective action. (In other words, if the university built opportunities, female athletes would come. *See* FIELD OF DREAMS (Universal Pictures 1989)).

That's also true here. Contrary to what the district court concluded, redressability "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect" of shining a spotlight on female athletes' achievements. *Dep't of Com.*, 139 S. Ct. at 2566. Combine that statistic with the fact that 94% of female business executives participated in interscholastic sports, and this Court does not have to guess at employers' interest in athletic

22

achievements. Like the university in *Cohen*, Defendants cannot escape liability by arguing that correct athletic records have an uncertain impact on employers. If the Defendants correct those records, employers will notice.

Furthermore, those athletic records are just as relevant to college recruiters and employers as a student's disciplinary records. The district court concluded that a "student's disciplinary record is always relevant to college recruiters and prospective employers," while an athletic record is not. JA278. But that belies the value employers place on athletic accomplishments. At a minimum, athletic achievements highlight valuable skill sets. For instance, athletes derive "goal setting, persistence, problem solving, teamwork, managing emotions, and managing time" from competitive sports. Reed Larson, David Hansen & Giovanni Moneta, *Differing Profiles of Developmental Experiences Across Types of Organized Youth Activities,* 42 DEV. PSYCH. 849, 850 (2006). And most student-athletes see athletic achievements as a way to inform employers about these skills. Moreover, achievements can "distinguish them[ ] from other[ ]" applicants. Nicolas Roulin & Adrian Bangerter, *Extracurricular Activities in Young Applicants' Resumes: What are the Motives Behind Their Involvement?*, 48 INT'L J. OF PSYCHOLOGY 871 (2013). Athletic achievements—and the accurate records that attest to them—are much more relevant to an athlete's future prospects than the district court credited.

The district court derided Plaintiffs' desire for accurate athletic records because, even if Defendants correct their records to showcase female achievements, a prospective employer would "learn that [the female athlete] did not *actually* finish first." JA277 (emphasis added). Presumably, the district court meant that an employer would find out that Chelsea did not cross the finish line first. Yet the court did not explain why that fact would matter to an employer. Society values and awards those who win according to the rules of the game, even if they did not technically cross the finish line first. That's why nearly every sports league—including CIAC—has policies that allow them to correct records when they discover an unfair advantage in competition. *See, e.g.*, Kevin Draper & Juliet Macur, *Sha'Carri Richardson, A Track Sensation, Tests Positive for Marijuana*, N.Y. TIMES (July 6, 2021), https://perma.cc/PYA4-9YWY ("U.S.A. Track & Field has notified other women who competed in the 100-meter final at the trials about the failed drug test, according to two people with direct knowledge of the information, and several runners have been told that they have moved up a spot in the final standings."). And that's why Country House is still the winner of the 2019 Kentucky Derby, even if by disqualification. Pat Forde, *The Flukish, Fascinating Rise—and Sudden Disappearance—of the 2019 Kentucky Derby Champion*, SPORTS ILLUSTRATED (May 1, 2020) ("After 125 seconds of racing last May 4, then a 22-minute delay for a steward's ruling that elevated the runner-up colt to first and

disqualified Maximum Security, a garland of roses was laid across Country House's shoulders. Then *the winner* of the 2019 Kentucky Derby all but disappeared. He'd come up out of nowhere *to win* the Derby, then promptly returned there." (emphasis added)). With corrected records, Chelsea could rightfully claim two championships, even if she did not cross the finish line first. And Alanna could claim runner-up status rather than third place. It is "predictable," not speculative, that an employer would value those achievements. *Dep't of Com.*, 139 S. Ct. at 2566.

The district court's reasoning here unfortunately echoes "archaic and overbroad generalizations" about female athletic achievements. *Cohen*, 101 F.3d at 179. Implicit in the district court's analysis is the idea that female achievement does not matter when juxtaposed against male achievement—that a female athlete's victory only counts if she crossed the finish line before a male athlete. To the district court, an employer would not credit a female athlete if she did not "actually finish" ahead of a biologically male competitor. *See McCormick*, 370 F.3d at 296 ("Despite substantial progress in attitudes about women and sports, the competitive accomplishments of male athletes may continue to be valued more than the achievements of female athletes.").

This logic trivializes female athletes' achievements. Note, *Cheering on Women and Girls in Sports: Using Title IX to Fight Gender Role Oppression*, 110 HARV. L. REV. 1627, 1630 (1997). And it would

essentially force female athletes "on the sidelines to applaud the success of their male counterparts" rather than receive recognition for their own. *Complying with Title IX*, 5 SETON HALL J. OF SPORT L. at 575. Fortunately, society at large does not credit female athletes' achievements the way that the district court assumed. "The proposition that showcasing strong female-bodied *champions* is not a high value social good is no longer viable; see Serena Williams and Allyson Felix." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 119 (emphasis added). The district court's assumptions are exactly the types of generalizations that Title IX sought to eradicate.

An injunction that requires Defendants to correct athletic records to recognize female athletes' achievements would bolster Plaintiffs' prospects for college recruitment and future employment. Plaintiffs therefore have a redressable injury. The district court erred when it concluded otherwise.

## II. CIAC's discriminatory Policy actively harms female athletes. It imposes a barrier that forces female athletes like Plaintiffs to compete at a disadvantage. Their Title IX claims are not moot.

### A. Standard of Review

When a district court dismisses for lack of jurisdiction, including for mootness, this Court reviews "the district court's factual findings for clear error and its legal conclusions *de novo.*" *Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 850 F.3d 507, 511 (2d Cir. 2017) (citation omitted).

### B. Defendants failed to demonstrate that Alanna and Ashley will not face male competition and thus failed to meet their burden.

The burden to show that a controversy has become moot "logically falls on a defendant." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). That burden "is a heavy one." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). For "[i]t is no small matter to deprive a litigant of the rewards of its efforts. . . . Such action on grounds of mootness would be justified only if it were *absolutely clear* that the litigant no longer had any need of the judicial protection it sought." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000) (per curiam) (emphasis added).

Defendants failed to make it "absolutely clear" that female athletes like Alanna and Ashley will not face male competition in the future. Over the last 3 years, biological males have competed in women's sports in Connecticut. That is "not a fluke." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 116. "As [transgender] students . . . are increasingly comfortable coming out at school . . . the number of 'out' trans kids is growing beyond the small percentages described in earlier population surveys." *Id.* at 115. That growth "appears to be an upward trajectory" that shows no signs of decline. *Id.* Defendants have access to school records and could show that no biological male who self-identifies as female plans to compete in

27

female athletic events. That they have not means that they failed to meet their burden.

The district court erroneously shouldered Alanna and Ashley with the burden of showing a transgender competitor to avoid mootness. Yet it was the Defendants' burden, not Alanna and Ashley's, to make it "absolutely clear" that biologically male athletes would not compete against Alanna and Ashley. This Court should reverse the district court's error.

## C. CIAC's Policy actively harms female athletes by discriminating against them.

CIAC's discriminatory Policy harms athletes like Alanna and Ashley. The harm comes from a "discriminatory classification" that erects a barrier preventing female athletes "from competing on an equal footing." *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (quoting *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 667 (1993)). And "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that [she] would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter*, 508 U.S. at 667; *accord Pederson*, 213 F.3d at 871 (comparing Title IX injuries to Equal Protection

28

injuries). Thus, to have a live controversy against CIAC's Policy, Alanna and Ashley need show only that they face a discriminatory barrier.

They have done so. The Policy determines eligibility to compete in sex-specific athletic competitions solely based on "the gender identification of [a] student in current school records and daily life activities in the school[.]" JA149. That means that a biological male who nonetheless self-identifies as female can compete in women's sports.

This classification discriminates against and harms biological female athletes. Under this Policy, "[i]t takes little imagination to realize that . . . the great bulk of the females [will] quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds as recognized by Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705 (6th Cir. 1999). In sports, "there is an average 10–12% performance gap between elite males and elite females." Doriane Lambelet Coleman & Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys & Men*, Duke Law: Ctr. for Sports Law & Policy, https://perma.cc/H29T-USY2; *accord* JA33 ("[M]en, and adolescent boys, perform better in almost all sports than women, and adolescent girls, because of their inherent physiological advantages that develop during male puberty.") "This advantage isn't simply a difference in degree—it's not just that male athletes are

bigger, faster, stronger—but it's a difference in kind—*pound for pound, male bodies are more athletic.*" *Accommodating Transgender Athletes*, 18 GEO. J. OF L. & PUB. POL'Y at 911. Given the advantages inherent in male physiology, biological females like Alanna and Ashley are unable to "compet[e] on an equal footing"—one of the core harms that Title IX sought to redress. *Pena*, 515 U.S. at 211; *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J.) ("Without a gender-based classification in competitive . . . sports, there would be a substantial risk that boys would dominate the girls' program and deny them an equal opportunity to compete in interscholastic events."); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (observing that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" in female athletics); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 178 (3d Cir. 1993) (noting expert testimony that "if positions on the field hockey team were open to girls and boys, eventually boys would dominate, eliminating the opportunities of females" (cleaned up)). That inability fails to "effectively accommodate the interests and abilities" of female athletes. *Pederson*, 213 F.3d at 871.

The Policy also gives female athletes less opportunities than male athletes. Title IX requires that educational institutions provide female athletes with "*genuine* athletic participation opportunities." *Biediger*, 691 F.3d at 101 (emphasis added). Schools cannot offer "illusory"

opportunities where female athletes have "no hope of competing or otherwise participating meaningfully." *Id.* And "[m]eaningful participation [must] provide[ ] the opportunity to receive [a] full range of physical and non-physical benefits"—including the opportunity to succeed. *Accommodating Transgender Athletes*, 18 GEO. J. OF L. & PUB. POL'Y at 907. Yet here, the Policy does not recognize female athletes "as equally skillful but having certain biological disadvantages when compared to their male counterparts." *Id.* at 913.

As a result, the Policy flatly denies girls equal "opportunities to engage in . . . post-season competition." *McCormick*, 370 F.3d at 289. In a 2019 preliminary State Class race, for instance, Ashley placed ninth. Yet only the top eight competitors advanced to the final State Class championship race. Without the Policy, Ashley would have ranked seventh and had a chance to compete in that final race.[4]

More fundamentally, the Policy also "places a ceiling on the possible achievement of the female [athletes]" and "[t]reats girls

---

[4] Although Selina and Chelsea have graduated and do not seek injunctive relief against the Policy's enforcement, they suffered similar lost opportunities that further underline the Policy's discriminatory impact. In a 2017 State Open Championship race, Chelsea finished seventh, but only the top six competitors advanced to the New England Championship. The Policy cost her this opportunity. And in 2019, Selina ranked eighth in a preliminary State Open race that limited advancement to the final championship race to the top seven runners. Again, but for the Policy, Selina would have advanced.

differently regarding a matter . . . fundamental to the experience of sports—the chance to be champions." *Id.* at 295. In a different race at the 2019 State Open event, Alanna finished third in the final championship race, whereas she would have finished runner-up but for the Policy.[5]

As long as the Policy remains in effect, female athletes like Alanna and Ashley will have to show up to races not knowing whether they will face fair competition. They will feel "anxious and stressed," unsure whether their hard work and preparation will result only in a loss to a biological male. JA78. Yet male athletes will train and compete under no such shadow.

The Policy will continue to harm Alanna and Ashley—and other female athletes—going forward. Yearwood and Miller may have graduated, but the Policy will continue to offer female athletes the

---

[5] Here, too, the Policy harmed Selina and Chelsea. At the 2018 State Open Championship race, Miller and Yearwood took the top two prizes in a race where Chelsea and Selina finished, respectively, fourth and sixth. But for the Policy, they instead would have ranked third and fifth. The 2019 State Open Championship races saw similar results: Miller and Yearwood claimed top prizes in a preliminary race, whereas Chelsea and Selina ranked fourth and eighth—precluding Selina from advancing to the final championship race. And in that final race, Chelsea came in third, her "chance to be a champion" dashed by Miller and Yearwood again taking the top two positions. But for the Policy, Chelsea would have "made her school's history as the first female athlete . . . ever to be named State Open Champion." JA156, Instead, press referred to her as the "third-place competitor." JA74, 156.

chance to "participate" but not to do so meaningfully. It will continue to sideline female athletes' opportunities to win. And it will continue to subject Alanna and Ashley to a system that inevitably prejudices them by forcing them to face a level of competition that does not accommodate their different physiological characteristics and attributes.

Given this barrier, Alanna and Ashley have an actual controversy against the Policy.

**D.   Since CIAC's discriminatory Policy harms female athletes, Alanna and Ashley need not identify a particular transgender athlete to keep this controversy live.**

Because CIAC's Policy *itself* harms Alanna and Ashley, they "need only demonstrate that [they are] 'able and ready' to compete" to seek an injunction against the Policy. *Pederson*, 213 F.3d at 871. They have done so. When Plaintiffs filed their complaint, all four—including Alanna and Ashley—averred that they intended to compete in various upcoming track meets. Alanna and Ashley specifically stated that they "expect[] to compete in CIAC track and field competitions next year [2021] and throughout [their] high school years." JA170.

Yet Alanna and Ashley need *not* identify a specific transgender competitor. The district court erroneously concluded that Alanna and Ashley's claims were moot because Yearwood and Miller's "participation in girls' track provided the impetus for this action," and without another identifiable transgender competitor, Alanna and Ashley had no interest

33

in enjoining the Policy's enforcement. JA271. Yet it is CIAC's discriminatory Policy, not Yearwood or Miller's conduct, which is challenged in this lawsuit. "In much the same way as set-aside programs, the injury here results from the imposed barrier." *Pederson*, 213 F.3d at 871. It was the Policy that allowed biological males to compete against and deprive Alanna and Ashley of "opportunities to engage in . . . post-season competition." *McCormick*, 370 F.3d at 289. And it was the Policy that deprived Ashley and Alanna of the "chance to be champions." *Id.* at 295.

As with Equal Protection plaintiffs, Title IX plaintiffs do not need to identify a specific competitor if they have sufficiently identified a discriminatory barrier. *Pederson*, 213 F.3d at 871 (declaring "the Supreme Court's Equal Protection jurisprudence instructive" when considering female athletes' standing in a Title IX case). In several Equal Protection cases, the Supreme Court has held that, "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that [she] would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter*, 508 U.S. at 666. Rather, the injury that keeps a controversy live "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*

34

That holds true even if the disadvantaged party can overcome the barrier. Consider *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007). There the Supreme Court found a live controversy from the mere fact that students would have to "compete in a race-based system that *may* prejudice [them]." *Id.* at 719 (emphasis added). Though it was "possible that children . . . will not be denied admission to a school based on their race," that did not "eliminate the injury claimed." *Id.* In fact, even where one student had "been granted a transfer" to his preferred elementary school, the Court noted that he "may again be subject to assignment based on [ ] race" when he enrolled in middle school. *Id.* at 719–20. That possibility sufficed to make the case a live controversy.

Also instructive is *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). There, a contractor complained that he had to compete for federal projects in a system that advantaged bidders who employed minority subcontractors. And "[e]ven though the contractor sought injunctive relief, which necessarily would apply to future contracts in which the result of its bid could not yet be known, the Court held there was" a live controversy. *Doe ex rel. Doe v. Vermillion Parish Sch. Bd.*, 421 F. App'x 366, 373 (5th Cir. 2011) (discussing *Adarand*). The discriminatory barrier itself, even in the face of an unknown competitor, kept the controversy alive.

35

So too here. Alanna and Ashley have been subjected to a discriminatory Policy that determines participation in women's sports based not on the "[i]nherent differences between men and women"—differences that for 50 years have been recognized and respected in the course of "advancing full development of the talent and capacities of our Nation's" female athletes—but instead on self-determined gender identity. *See United States v. Virginia*, 518 U.S. 515, 533 (1996). This Policy allows biologically male athletes to unfairly rob female athletes of their "chance to be champions." *McCormick*, 370 F.3d at 295. Like the female athletes in *McCormick*, who wanted "a chance to compete at the Regional and State championships" but were "denied this opportunity" when boys were not, Alanna and Ashley have suffered a "disparity that is substantial enough to deny equality of athletic opportunity." *Id.* at 296.

That disparity comes directly from the Policy. No matter whether there is a transgender athlete who will compete against Alanna and Ashley in the next track season, that does not "eliminate the injury claimed." *Parents Involved*, 551 U.S. at 719. They will have "to compete in a . . . system that *may* prejudice [them]." *Id.* (emphasis added); *cf. Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("Plaintiffs' expectation that they *may* be treated unequally in violation of Title IX's terms is an irreparable harm." (emphasis added)). And, just as the contractor in *Adarand* did not know the outcome of future

contract bids but nonetheless had an active controversy, so too do Alanna and Ashley, even though they do not know about specific biologically male competitors. The Policy itself provides enough harm to keep this case live.

The district court erred when it narrowly defined the harm needed to keep this case live. Although the Policy continues to apply to and harm Alanna and Ashley, the court still dismissed their case as moot because "[t]here is no indication that Smith and Nicoletti will encounter competition by a transgender student in a CIAC-sponsored event next season." JA271. And although it is "theoretically possible that a transgender student could" compete, the court faulted Alanna and Ashley for failing to show that such a competitor would "run[ ] in the same events and achiev[e] substantially similar times." JA271.

That was error. Courts have allowed Title IX suits to move forward if a plaintiff demonstrated unequal treatment—even if "the chain of potential events" is not "air-tight or even probable." *See Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016). In *Boucher*, female lacrosse and softball players sued a university for failing to field their teams as varsity. *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115–16 (2d Cir. 1999). Yet "[n]either the district court nor [this Court] discussed whether any of the students possessed the skills necessary to make one of the unfielded varsity teams." *Pederson*, 213 F.3d at 871 (discussing *Boucher*). Indeed, this Court "never even questioned [the female

37

athletes'] standing to bring effective accommodation claims" under Title IX. *Id.* What mattered was that the athletes faced and suffered from a discriminatory barrier.

Alanna and Ashley face such a barrier here. Without an injunction against the Policy, they will show up to each race not knowing whether they will face "bigger, faster, and stronger male competitors." JA71. They will not know whether their preparation will translate into a fair "chance to be [a] champion[ ]" or if male competition will unfairly rob them of that benefit. *McCormick*, 370 F.3d at 295. These harms come from the Policy. Accordingly, Alanna and Ashley need not show a specific transgender competitor, let alone one who will run against them and achieve "substantially similar times." JA271. The district court therefore erred when it held them to this stricter standard and dismissed the case as moot.

**E.    Biological males have competed in women's sports for the last 3 years. It is more than theoretically possible that they will continue to do so.**

Although the Policy itself harms Alanna and Ashley—regardless of whether a transgender athlete actually competes—the likelihood that Alanna and Ashley will face such a competitor is not speculative. Over the last 3 years, biological males have competed in women's sports in Connecticut. As noted above, that is "not a fluke." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 116.

"As [transgender] students . . . are increasingly comfortable coming out at school . . . the number of 'out' trans kids is growing beyond the small percentages described in earlier population surveys." *Id.* at 115. That growth "appears to be an upward trajectory" that shows no signs of decline. *Id.* Thus, it is more than theoretically possible that Alanna and Ashley will face a biologically male competitor; it is likely.

And it's also likely—not speculative—that Alanna and Ashley will lose to such a competitor. Biological "sex is outcome determinative." *Id.* at 117. "[I]t is well-established that athletic but not necessarily elite males dominate females in almost every sport and event, which is true without regard to how individuals identify." *Id.* at 115–16. Plaintiffs' experience in Connecticut bears this out. In seven important state-level events, biologically male athletes won 13 out of 14 championships, leaving a biological female athlete to win just one.

### F. Alanna and Ashley's claims are "capable of relief yet evading review."

This Court should also reverse dismissal of Alanna and Ashley's claims because the harms they have suffered are "capable of repetition, yet evading review." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (cleaned up). This exception to the mootness doctrine applies where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a

reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (cleaned up).

Alanna and Ashley satisfy both requirements. Athletes like Alanna and Ashley have but a "finite period of time in which to compete." *Barrett v. West Chester Univ. of Pa. of State Sys. of Higher Educ.*, 2003 WL 22803477, at *14 (E.D. Pa. Nov. 12, 2003). Once the track season starts, should a biological male decide to compete in girls' events, Alanna and Ashley will not have enough time to obtain judicial intervention before they will have to run against—and likely lose to— that biological male.

This litigation—filed in February 2020—starkly illustrates that reality. Defendants were not required to answer Plaintiffs' complaint for six months. Meanwhile, an entire track season elapsed. And although Plaintiffs tried to preclude this possibility when they moved for a preliminary injunction concurrent with their complaint, the district court never ruled on the motion. So the district court's assertion that "Smith and Nicoletti will be able to file a new action under Title IX along with a motion for a preliminary injunction" rings hollow. JA275; *cf. Ohlensehlen v. Univ. of Iowa*, 2020 WL 7651974, at *10 (S.D. Iowa Dec. 24, 2020) (holding that female athletes would suffer irreparable harm if university did not reinstate their team immediately because "[c]ivil cases ordinarily take many months—more often than not, years"

40

at which point "waiting until after trial to reinstate the team will be too late").

Not only that, but the district court's logic "give[s] insufficient consideration to the unique circumstances [interscholastic] athletes face, making short shrift of the brief time-span in which they are permitted to compete and failing to consider the loss that even a year of competition would have on the skills and competitiveness of elite . . . athletes such as [Plaintiffs]." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 292 (D. Conn. 2009). Alanna and Ashley are rising seniors. They have two track seasons remaining. If six months separate a future complaint from an answer, Alanna and Ashley will graduate before the courts can provide any effective relief. The Policy's injury to them is thus too short in duration to be litigated before the controversy expires.

And Alanna and Ashley will experience that same harm again. To demonstrate a "reasonable expectation" that the harm will recur, Alanna and Ashley must show that they "*possibly* could [find themselves] once again in the same situation [they] faced when [the] suit was filed." *Barry*, 834 F.3d at 716. They need not show, as the district court held, "that a recurrence of the dispute [is] more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988).

They easily clear that "reasonable expectation" bar. Even if a transgender athlete does not compete in female sports, Alanna and Ashley will *certainly* "compete in a . . . system that *may* prejudice

41

[them]." *Parents Involved*, 551 U.S. at 719 (emphasis added). And, as argued above, there's a reasonable expectation that they will actively suffer the effects of that prejudicial system. The number of openly transgender students continues to grow. *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 115. Prominent organizations continue to advocate that the biological sex distinction preserved in Title IX should be eradicated. *E.g.*, *ACLU Statement on Revoking of Title IX Guidance for Transgender Students & Impact on Gavin Grimm Supreme Court Case*, ACLU (Feb. 22, 2017) (advocating a gender-identity-based interpretation of Title IX over a sex-based interpretation). Given these factors, Alanna and Ashley will likely face competition from a biologically male athlete.

## III. CIAC intentionally enacted a Policy that discriminated against female athletes. CIAC did not need prelitigation notice that its actions violated Title IX. It had that notice nonetheless.

### A. Standard of Review

This Court reviews *de novo* the district court's dismissal of Plaintiffs' monetary claims. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 88 (2d Cir. 2011).

**B.** **Educational institutions like CIAC and its member schools do not need prelitigation notice that their acts violate Title IX when they intentionally enact discriminatory athletic policies.**

Congress enacted Title IX pursuant to its spending authority. "In *Pennhurst State School and Hospital v. Halderman*, the [Supreme] Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was unintentional." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74 (1992) (cleaned up); *accord Mansourian*, 602 F.3d at 966 (*Pennhurst* "precludes the award of damages for unintentional violations of statutes, like Title IX, enacted pursuant to Congress's spending authority"). Thus, in some private rights of action under Title IX, the Court has held that "a damages remedy will not lie . . . unless an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination . . . and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

But "pre-litigation notice of an alleged violation" is not "a prerequisite to recovery in every Title IX case." *Mansourian*, 602 F.3d at 967. Prelitigation notice is needed only "in cases . . . *that do not involve official policy of the recipient entity*." *Gebser*, 524 U.S. at 290 (emphasis added); *accord, e.g.*, *Mansourian*, 602 F.3d at 967 ("Proof of actual notice is required only when the alleged Title IX violation

43

consists of an institution's deliberate indifference to acts that do not involve official policy of the [institution]." (cleaned up)). When an educational institution "intentionally violates" Title IX, the notice "limitation on private damages actions is not a bar to liability." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

And "[schools'] decisions with respect to athletics are . . . easily attributable to the [institution] and [are] always—by definition—intentional." *Mansourian*, 602 F.3d at 968 (quoting *Jackson*, 544 U.S. at 183); *accord Pederson*, 213 F.3d at 882 (holding that the notice requirement "is not applicable for purposes of determining whether an academic institution intentionally discriminated on the basis of sex by denying females equal athletic opportunity"). "Institutions, not individual actors, decide how to allocate resources between male and female athletic teams. Decisions to create or eliminate teams or to add or decrease roster slots for male or female athletes are official decisions, not practices by individual students and staff." *Mansourian*, 602 F.3d at 968.

So, too, are decisions to allow biological males to compete in girls' events. That decision reflects CIAC's official position. Like all other official athletic policies, it bears an institutional imprimatur. It did not arise by accident, nor was it enacted by "individual students [and] staff." *Id.* Unlike sexual harassment cases—where an educational institution might not know about the actions of its individual agents—

44

here it was CIAC itself that adopted the discriminatory Policy. This athletic decision that "fail[s] effectively to accommodate students of both sexes thus represent[s] 'official policy of the recipient entity' and so [is] not covered by *Gebser*'s notice requirement." *Mansourian*, 602 F.3d at 968 (quoting *Gebser*, 524 U.S. at 290).

By intentionally enacting a discriminatory Policy, Defendants have failed "effectively to accommodate students of both sexes." *Id.* A "notice problem does not arise in a case such as this, in which intentional discrimination is alleged." *Jackson*, 544 U.S. at 182–83. The district court erred when it ruled otherwise.

**C.  Title IX's text—and the Supreme Court's mandate to interpret it broadly—put CIAC and its member schools on notice that a private cause of action could allege even "unprecedented" forms of intentional sex discrimination.**

Title IX forbids "intentional sex discrimination." *Jackson*, 544 U.S. at 173. "[I]ntentional conduct" therefore "violates the clear terms of the statute." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). So when an educational institution acts intentionally, "Title IX itself" supplies "sufficient notice." *Jackson*, 544 U.S. at 183.

That's true even if the intentional conduct violates Title IX in "unprecedented" ways. The Supreme Court's "cases since *Cannon*, such as *Gebser* and *Davis*, have consistently interpreted Title IX's private

cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183. In *Jackson*, for instance, a teacher sued his school system under Title IX, alleging that the school had retaliated against him after he reported sexual discrimination. The school tried to argue that it lacked notice that such retaliation would violate Title IX, but the Supreme Court admonished that "the [school] should have been put on notice" that its intentional conduct violated Title IX because the Court had "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Id.* at 183.

To get around this clear statement of law, CIAC and its member schools dress up a merits argument as a notice problem. They cannot argue that the Policy represents unintentional action. After all, "[schools'] decisions with respect to athletics are . . . easily attributable to the [institution] and [are] always—by definition—intentional." *Mansourian*, 602 F.3d at 968 (quoting *Jackson*, 544 U.S. at 183); *accord Pederson*, 213 F.3d at 882. So Defendants instead argue that, even though their *conduct* was intentional, its discriminatory *effects* were not—and because the *effects* were unintentional, CIAC and the member schools lacked sufficient notice that their *conduct* violated Title IX.

But the Supreme Court has consistently rebuffed that argument. *Jackson* again proves illustrative. There, the school system tried to argue that, even though its conduct—retaliation—was intentional, any

46

ensuing discrimination was not. Although the school presented this argument as a notice issue, the Supreme Court rejected that characterization. For notice purposes, the Court reaffirmed that, so long as the school's conduct was intentional, it had sufficient notice that it could face liability under Title IX—regardless of whether that conduct's *effects* were intentional. "Funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when we decided *Cannon*." *Jackson*, 544 U.S. at 182.

Perhaps Defendants did not intend that the Policy would discriminate against female athletes. The schools that discriminated against female athletes by "allocat[ing] resources between male and female athletic teams" would have claimed the same. *Mansourian*, 602 F.3d at 968. So too would the schools that made "[d]ecisions to create or eliminate teams or to add or decrease roster slots for male or female athletes." *Id.* But those schools' intentions did not matter for purposes of notice; their conduct did. Likewise, Defendants here cannot claim that they lacked notice that their intentional actions might violate Title IX.[6]

---

[6] The different agency interpretations of institutions' obligations under Title IX is also relevant for whether CIAC and its member schools actually violated Title IX, not whether they had notice that an official policy could give rise to a private action. Nearly all the cases cited by the district court on this point involved an institution's *liability* under

47

**IV.    The district judge has displayed unfair bias that would lead an objective observer to question his impartiality. This court should reassign the case on remand.**

### A.    Governing Legal Standards

"To reassign a case on remand, [this Court] need only find that the facts might reasonably cause an objective observer to question the judge's impartiality, or absent proof of personal bias requiring recusation [sic], that reassignment is advisable to preserve the appearance of justice." *Ligon*, 736 F.3d at 128. So long as a reasonable observer would question the district judge's partiality, this Court need not find that the judge should have recused. This Court has, in fact, reassigned cases "[e]ven where there is reason to believe that a district judge would fairly conduct further proceedings on remand." *Id.*

This is a lower standard than what Plaintiffs faced when they previously sought mandamus on this issue. And while "not an everyday occurrence," reassignment "is not unusual in this Circuit." *Id.* It "does not imply any personal criticism of the trial judge." *Id.* Instead, "reassignment is simply a mechanism that allows the courts to ensure that cases are decided by judges without even an *appearance* of partiality." *Id.* at 129.

---

Title IX, not notice.

**B.** **The district judge weighed in on the ultimate issue in this case. His comments would cause a reasonable observer to question his partiality.**

A district judge can betray an appearance of partiality when he weighs in on "the ultimate issue to be determined by a jury." *Haines*, 975 F.2d at 98. By asserting what is more consistent with "science," that is exactly what the district judge did here. Plaintiffs presented a case predicated on CIAC's discriminatory Policy that allows biological males to compete in women's athletic events. That case depends in part on human biology and the substantial advantages inherent in male physiology. Yet the district judge declared those subjects off limits: "[t]his isn't a case involving males who have decided that they want to run in girls' events. This is a case about girls who say that transgender girls should not be allowed to run in girls' events." JA104. To the district judge, this case was about gender identity and not, as Plaintiffs claimed, biology. The court essentially dismissed Plaintiffs' characterization of the case and substituted his own.

The district judge went further. Not only did he recharacterize the case, but he castigated Plaintiffs' theory as "bullying" and contrary to "human decency." JA107. Again weighing in on the ultimate issue to be decided by a jury, the district judge described *his own* theory as "more accurate" and "consistent with science" than Plaintiffs'—even though science plays a central role in Plaintiffs' case. *Id.*; *see also* JA29–66; *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF L. & GENDER

49

POL'Y at 87–88 ("To say . . . that it is 'myth' [or] 'outdated stereotype' that males, including trans women and girls not on gender affirming hormones, are 'better' in sport than females is simply to deny science.").

Consistent with his reframed theory, the district judge, acting on his own authority and without hearing any argument on the matter, mandated that Plaintiffs' counsel "refer to the [transgender athletes not] as 'males'" but rather as "transgender females." JA107. Even after Plaintiffs' counsel submitted that the court's order would conflict with his duty to vigorously represent Plaintiffs' position, the court dismissed the concern as "unfortunate" and suggested that Plaintiffs take the issue to "the Court of Appeals." *Id.*

Based on these comments, a reasonable observer would question the district judge's partiality. *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021) (quoting *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996)). Biological science and the bright-line physiological differences between male and female bodies are at the heart of Plaintiffs' case. JA29–66. For instance, Plaintiffs intend to show that "[i]t is fact, not myth or stereotype, that beginning at the onset of male puberty, an insurmountable performance gap between males and females emerges such that even the very best females are not competitive for the win against males, including against second-tier males." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF L. & GENDER POL'Y at 115. Yet, by weighing in on this "ultimate issue to be

determined by a jury," *Haines*, 975 F.2d at 98, the district judge left no question as to where he stood on the issue. Not only that, but he likened Plaintiffs' theory as contrary to "science, common practice and perhaps human decency." JA107. He discredited Plaintiffs' theories before they even had a chance to develop—and that partially because he never ruled on Plaintiffs' request for a preliminary injunction, or even required Defendants to brief a response to it. This behavior revealed "a high degree of . . . antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). To preserve the "appearance of justice," this Court should reassign the case on remand. *Ligon*, 736 F.3d at 128.

The fact that the district judge even ventured into these waters would make a reasonable observer question his partiality. No party asked the district judge to reframe the Plaintiffs' case; he took that role upon himself. But that is not the district judge's job. Federal courts "rely on the parties to frame the issues." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). It is litigants—not courts—that advance "theories and ideas." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). By crossing that line here, the district judge abandoned his role as "neutral arbiter." *Sineneng-Smith*, 140 S. Ct. at 1579.

**C.    The district judge's dismissal of female athletic achievement would further cause a reasonable observer to question his partiality.**

The district court's attitudes toward female athletic achievements reinforce the appearance that he has prejudged this case. For instance, Plaintiffs sought an injunction that would correct athletic records to appropriately celebrate Plaintiffs' athletic achievements. Not only would these corrected records confer Plaintiffs with the recognition they deserve, but such records would also give Plaintiffs a better chance at college recruitment and future employment—especially Chelsea, who could then claim championship victories otherwise denied her under the Policy. Yet the district judge dismissed the effect of the corrected records as speculative guesswork. To the district court, a recorded championship "might well have no bearing on [Chelsea's] employment prospects." JA278.

No objective observer would consider a championship title so small as to have only hypothetical effect on employment prospects. Though female athletes have long had their achievements trivialized, Title IX has come a long way in reversing this misogyny. *Cheering on Women and Girls in Sports*, 110 HARV. L. REV. at 1630. And though Title IX has not completely eradicated archaic assumptions about female athletes' achievements, its advances have nonetheless made clear that "[t]he proposition that females don't need to be competitive for the win is no longer viable." *Re-Affirming the Value of the Sports Exception*, 27 DUKE

52

J. OF GENDER L. & POLICY at 119. The district judge's invocation of an outdated logic betrays, at the very least, an appearance of partiality.

Moreover, the district judge also dismissed Plaintiffs' concerns because, even if the records are corrected, "it seems inevitable that . . . prospective employer[s] impressed by [Plaintiffs'] record would learn that she did not *actually* finish first," so her employment prospects would remain the same. JA277 (emphasis added). Again the district judge's logic hearkens to the very prejudice that Title IX sought to eradicate. "The proposition that showcasing strong female-bodied champions is not a high value social good is no longer viable." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POLICY at 119. The district judge had no reason to invoke it here.

Taken together, "[t]he cumulative effect[s] of [the] judge's individual actions" and "comments . . . could raise some question about impartiality." *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997). An objective observer would conclude that the district judge betrayed the appearance of partiality. Indeed, "the circumstances . . . are such that upon remand [the district judge] . . . cannot reasonably be expected to erase the earlier impressions from his . . . mind." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc) (per curiam). That is all that is needed for this Court to reassign the case on remand. *United States v. Quattrone*, 441 F.3d 153, 193 (2d Cir. 2006) (reassigning on remand when "portions of the transcript raise the concern that certain

comments *could* be viewed as rising beyond mere impatience or annoyance" (emphasis added)). This Court should do so to preserve the "appearance of justice." *Ligon*, 736 F.3d at 128.

## CONCLUSION

Almost 50 years ago, Title IX paved the way for female athletes to experience, in unprecedented ways, "the thrill of victory [and] the agony of defeat." *Neal*, 198 F.3d at 773. Yet CIAC's discriminatory Policy subjects female athletes to the "agony of defeat" with much diminished hope for "the thrill of victory." Athletes like Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti deserve the protections that Title IX promise them—protections like "genuine athletic participation opportunities," *Biediger*, 691 F.3d at 101, and the "chance to be champions," *McCormick*, 370 F.3d at 295. They have a concrete grievance against a system that subjugates their athletic opportunities to biological males'.

Moreover, these female athletes also deserve to have their athletic achievements recognized. At present, athletic records retained by CIAC and its member schools feature biological males occupying winning positions in the girls' division. Those records rob Plaintiffs of the recognition they deserve. They also jeopardize Plaintiffs' competitiveness with college recruiters and future employers.

54

CIAC enacted a Policy that discriminates against female athlete's interests. Though CIAC undoubtedly contests that this Policy does, in fact, discriminate, that question must be resolved by a jury, not by a district court under the guise of a notice problem. For nearly 50 years, educational institutions like CIAC have known that they could be liable under Title IX for intentional acts that have discriminatory effects. Athletic policies are always intentional. CIAC cannot say it lacked notice.

Finally, the district judge has openly expressed hostility against Plaintiffs' theory of the case. He has done so in a way that betrays, at the very least, an appearance of partiality. No reasonable observer would examine the judge's actions and words and then conclude that he could adjudicate this case fairly.

This Court should therefore reverse the district court's order granting Defendants' motion to dismiss, remand the case for further proceedings, and reassign the matter to a different district judge.

Respectfully submitted,

*/s/ John J. Bursch*

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. HOLCOMB
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
cholcomb@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
cbarnett@ADFlegal.org

*Counsel for Appellants*

July 9, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2021, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


*/s/ John J. Bursch*
John J. Bursch

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 12,555 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ John J. Bursch*
John J. Bursch
*Counsel for Appellants*

Dated: July 9, 2021