# 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs-Appellants*,

v.

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her daughter, T.M.; CONNECTICUT COMMISSION ON HUMAN RIGHTS,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Connecticut, Case No. 3:20-cv-00201 (RNC)

## JOINT APPENDIX
## VOLUME 1 (PAGES JA1-180)

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. HOLCOMB
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
cholcomb@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
cbarnett@ADFlegal.org

*Counsel for Appellants*

LINDA L. YODER
PETER J. MURPHY
SHIPMAN & GOODWIN, LLP
1 Constitution Plaza
Hartford, CT 06103
(860) 251-5717
lyoder@goodwin.com
pjmurphy@goodwin.com

JOHANNA ZELMAN
FORDHARRISON LLP
CityPlace II
185 Asylum Street
Suite 610
Hartford, CT 06103
(860) 740-1361
jzelman@fordharrison.com

DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
dmonastersky@hl-law.com

*Counsel for Defendants-Appellees*

DAN BARRETT
ACLU FOUNDATION OF CONNECTICUT
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

MICHAEL E. ROBERTS
CONNECTICUT COMMISSION ON
HUMAN RIGHTS & OPPORTUNITIES
450 Columbus Blvd., Suite 2
Hartford, CT 06103
(860) 541-4715
michael.e.roberts@ct.gov

*Counsel for Intervenors-Appellees*

# TABLE OF CONTENTS

| ECF No. | Document Description | Page |
|---|---|---|
| **VOLUME 1** | | |
| | Docket Report | JA1 |
| 12-2 | Declaration of Professor Gregory Brown in Support of Motion for Preliminary Injunction | JA29 |
| 12-4 | Declaration of Chelsea Mitchell in Support of Motion for Preliminary Injunction | JA68 |
| 94 | Transcript from April 16, 2020 hearing on motions to intervene | JA79 |
| 141 | Second Amended Complaint | JA130 |
| **VOLUME 2** | | |
| 174 | Transcript from February 26, 2021 hearing on motion to dismiss | JA181 |
| 178 | Ruling and Order Granting Motion to Dismiss | JA259 |
| 179 | Judgment | JA288 |
| 180 | Notice of Appeal | JA290 |

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,EFILE

# U.S. District Court
# District of Connecticut (New Haven)
# CIVIL DOCKET FOR CASE #: 3:20-cv-00201-RNC

Soule et al v. Connecticut Association of Schools, Inc. et al
Assigned to: Judge Robert N. Chatigny
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 02/12/2020
Date Terminated: 04/26/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Selina Soule**
*a minor, by Bianca Stanescu, her mother*

represented by **Howard M. Wood , III**
Phelon, Fitzgerald & Wood
773 Main St.
Manchester, CT 06040
860-643-1136
Email: howard.wood@pfwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H. Howard**
Fiorentino, Howard, Patrone, P.C.
773 Main Street
Manchester, CT 06040
860-643-1136
Fax: 860-643-5773
Email: jim.howard@pfwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Waggoner**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690
Fax: 202-347-3622
Email: kwaggoner@adflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christiana M. Holcomb**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690

JA001

Email: cholcomb@adflegal.org
*ATTORNEY TO BE NOTICED*

**Jeff Shafer**
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020
Email: jshafer@langdonlaw.com
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

**Roger Greenwood Brooks**
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
919-402-1758
Email: rbrooks@adflegal.org
*ATTORNEY TO BE NOTICED*

**Tw Parker Douglas**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690
Email: pdouglas@ADFlegal.org
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chelsea Mitchell**
*a minor, by Christina Mitchell, her mother*

represented by **Howard M. Wood , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H. Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Waggoner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christiana M. Holcomb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeff Shafer**
(See above for address)
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

JA002

**Roger Greenwood Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tw Parker Douglas**
(See above for address)
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alanna Smith**                                    represented by   **Howard M. Wood , III**
*a minor, by Cheryl Radachowsky, her*                              (See above for address)
*mother*                                                           *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**James H. Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Waggoner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christiana M. Holcomb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeff Shafer**
(See above for address)
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

**Roger Greenwood Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tw Parker Douglas**
(See above for address)
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ashley Nicoletti**                                represented by   **Howard M. Wood , III**
*a minor, by Jennifer Nicoletti, her mother*                       (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**James H. Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA003

**Kristen Waggoner**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Greenwood Brooks**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tw Parker Douglas**
(See above for address)
*TERMINATED: 11/05/2020*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Connecticut Association of Schools, Inc.**
*doing business as*
Connecticut Interscholastic Athletic
Conference

represented by **Linda L. Yoder**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
860-916-7156
Email: lyoder@goodwin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Joseph Murphy**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
860-251-5950
Fax: 860-251-5316
Email: pjmurphy@goodwin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler Bischoff**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
860-251-5812
Email: tbischoff@goodwin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bloomfield Public Schools Board of**
**Education**

represented by **Elizabeth Mott Smith**
Ford Harrison LLP
CityPlace II

JA004

185 Asylum Street
Suite 610
Hartford, CT 06103
860-740-1358
Email: esmith@fordharrison.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Johanna G. Zelman**
Ford Harrison, LLP
CityPlace II
185 Asylum Street
Suite 610
Hartford, CT 06103
860-740-1361
Fax: 860-740-1393
Email: jzelman@fordharrison.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mohammad Shihabi**
FordHarrison LLP
60 East 42nd Street
Ste 51st Floor
New York, NY 10165
202-527-8407
Email: mshihabi@fordharrison.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Cromwell Public Schools Board of Education** | represented by | **Elizabeth Mott Smith**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Johanna G. Zelman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Mohammad Shihabi**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Glastonbury Public Schools Board of Education** | represented by | **David S. Monastersky**<br>Howd & Ludorf, LLC<br>65 Wethersfield Avenue<br>Hartford, CT 06114-1190<br>860-249-1361<br>Fax: 860-249-7665<br>Email: dmonastersky@hl-law.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

JA005

**Defendant**

**Canton Public Schools Board of Education**      represented by      **David S. Monastersky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Danbury Public Schools Board of Education**      represented by      **Linda L. Yoder**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Joseph Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler Bischoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Andraya Yearwood**      represented by      **Dan Barrett**
American Civil Liberties Union - CT
765 Asylum Ave., 1st Floor
Hartford, CT 06105
860-471-8471
Email: dbarrett@acluct.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
New York
125 Broad St.
Ste 18th Fl.
New York
New York, NY 10004
212-284-7320
Email: cstrangio@aclu.org
*ATTORNEY TO BE NOTICED*

**Elana Spungen Bildner**
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
860-471-8475
Email: ebildner@acluct.org
*ATTORNEY TO BE NOTICED*

JA006

**Galen Sherwin**
Aclu
125 Broad Street
Ste 18th Floor
New York, NY 10004
212-519-7819
Fax: 212-549-2650
Email: gsherwin@aclu.org
*ATTORNEY TO BE NOTICED*

**James D. Esseks**
American Civil Liberties Union Foundation
125 Broad Street
Ste 18th Floor
New York, NY 10004
212-549-2627
Fax: 212-549-2650
Email: jesseks@aclu.org
*ATTORNEY TO BE NOTICED*

**Joshua A. Block**
American Civil Liberties Union
125 Broad Street
Floor 18
New York, NY 10004
212-549-2593
Email: jblock@aclu.org
*ATTORNEY TO BE NOTICED*

**Lindsey Kaley**
American Civil Liberties Union Foundation
125 Broad Street
Ste 18th Floor
New York, NY 10004
212-519-7823
Email: lkaley@aclu.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**
**Thania Edwards**                    represented by **Dan Barrett**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

                                      **Chase Strangio**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Elana Spungen Bildner**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Galen Sherwin**
                                      (See above for address)

JA007

*ATTORNEY TO BE NOTICED*

**James D. Esseks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua A. Block**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsey Kaley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **Commission on Human Rights and Opportunities** | represented by | **Michael Roberts**<br>Commission on Human Rights &<br>Opportunities<br>450 Columbus Blvd.<br>Suite 2<br>Hartford, CT 06103<br>860-541-4715<br>Email: michael.e.roberts@ct.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Interested Party**

| | | |
|---|---|---|
| **U.S. Department of Education** | represented by | **Joshua E Gardner**<br>DOJ-Civ<br>Poc Agostinho, Jean<br>1100 L St., N.W.<br>Ste 12200<br>Washington, DC 20530<br>202-305-7583<br>Email: joshua.e.gardner@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Interested Party**

| | | |
|---|---|---|
| **Betsy DeVos** | represented by | **Joshua E Gardner**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Interested Party**

| | | |
|---|---|---|
| **U.S. Department of Education Office for Civil Rights** | represented by | **Joshua E Gardner**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Amicus**

**United States**

represented by **Amanda Dallo**
DOJ-Crt
950 Pennsylvania Ave. NW
4con
Ste 10th Floor
Washington, DC 20530
202-616-2679
Email: amanda.dallo@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Donnelly**
DOJ-Crt
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
202-616-2788
Email: matthew.donnelly@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/12/2020 | 1 | COMPLAINT against All Defendants ( Filing fee $400 receipt number ACTDC-5691204.), filed by Selina Soule, Alanna Smith, Chelsea Mitchell. (Attachments: # 1 Civil Cover Sheet)(Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | | Request for Clerk to issue summons as to All Defendants. (Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | 2 | MOTION for Attorney(s) Roger G. Brooks to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691797) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Roger G. Brooks, # 2 Text of Proposed Order)(Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | | Judge Robert N. Chatigny added. (Nuzzi, Tiffany) (Entered: 02/12/2020) |
| 02/12/2020 | 3 | MOTION for Attorney(s) Jeffrey A. Shafer to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691855) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Jeffrey A. Shaffer, # 2 Text of Proposed Order)(Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | 4 | MOTION for Attorney(s) Christiana M. Holcomb to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691868) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Christiana M. Holcomb, # 2 Text of Proposed Order)(Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | 5 | Order on Pretrial Deadlines: Amended Pleadings due by 4/12/2020. Discovery due by 8/13/2020. Dispositive Motions due by 9/17/2020. Signed by Clerk on 02/12/2020.(Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 6 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER Signed by Judge Robert N. Chatigny on 02/12/2020.(Murphy, Tatihana) (Entered: 02/12/2020) |

| 02/12/2020 | 7 | STANDING PROTECTIVE ORDER Signed by Judge Robert N. Chatigny on 02/12/2020.(Murphy, Tatihana) (Entered: 02/12/2020) |
|---|---|---|
| 02/12/2020 | 8 | MOTION for Attorney(s) Kristen K. Waggoner to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5692198) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Kristen K. Waggoner, # 2 Text of Proposed Order) (Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | 9 | NOTICE TO COUNSEL/SELF-REPRESENTED PARTIES : Counsel or self-represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 5 Order on Pretrial Deadlines, 3 MOTION for Attorney(s) Jeffrey A. Shafer to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691855) filed by Chelsea Mitchell, Alanna Smith, Selina Soule, 6 Electronic Filing Order, 4 MOTION for Attorney(s) Christiana M. Holcomb to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691868) filed by Chelsea Mitchell, Alanna Smith, Selina Soule, 2 MOTION for Attorney(s) Roger G. Brooks to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691797) filed by Chelsea Mitchell, Alanna Smith, Selina Soule, 8 MOTION for Attorney(s) Kristen K. Waggoner to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5692198) filed by Chelsea Mitchell, Alanna Smith, Selina Soule, 7 Standing Protective Order, 1 Complaint filed by Chelsea Mitchell, Alanna Smith, Selina Soule Signed by Clerk on 02/12/2020.(Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 10 | ORDER granting 2 Motion to Appear Pro Hac Vice as to Roger G. Brooks. Certificate of Good Standing due by 4/12/2020. Signed by Clerk on 02/12/2020. (Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 11 | ORDER granting 3 Motion to Appear Pro Hac Vice as to Jeffrey A. Shafer. Certificate of Good Standing due by 4/12/2020.. Signed by Clerk on 02/12/2020. (Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 12 | MOTION for Preliminary Injunction by Chelsea Mitchell, Alanna Smith, Selina Soule.Responses due by 3/4/2020 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Order)(Wood, Howard) (Entered: 02/12/2020) |
| 02/12/2020 | 13 | ORDER granting 4 Motion to Appear Pro Hac Vice as to Christiana M. Holcomb. Certificate of Good Standing due by 4/12/2020. Signed by Clerk on 02/12/2020. (Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 14 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education* with answer to complaint due within *21* days. Attorney *Howard M. Wood, III* *Phelon, Fitzgerald & Wood* *773 Main St.* *Manchester, CT 06040*. (Murphy, Tatihana) (Entered: 02/12/2020) |
| 02/12/2020 | 15 | MOTION to Expedite *Hearing to Show Cause and Briefing Schedule* by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Text of Proposed Order)(Wood, Howard) (Entered: 02/12/2020) |
| 02/13/2020 | 16 | MOTION for Attorney(s) Kristen K. Waggoner to be Admitted Pro Hac Vice by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Kristen Waggoner, # 2 Text of Proposed Order)(Wood, Howard) (Entered: 02/13/2020) |

JA010

| 02/14/2020 | 17 | ORDER granting 16 Motion to Appear Pro Hac Vice Certificate of Good Standing due by 4/14/2020. Signed by Clerk on 2/14/2020. (Murphy, Tatihana) (Entered: 02/14/2020) |
| 02/14/2020 | 18 | ORDER denying as moot 8 Motion to Appear pro hac vice in light of ECF No.17. Signed by Judge Robert N. Chatigny on 2/14/2020. (Rickevicius, L.) (Entered: 02/14/2020) |
| 02/14/2020 | 19 | NOTICE of Appearance by Dan Barrett on behalf of Andraya Yearwood, Thania Edwards (Barrett, Dan) (Entered: 02/14/2020) |
| 02/14/2020 | 20 | OBJECTION re 15 MOTION to Expedite *Hearing to Show Cause and Briefing Schedule* filed by Thania Edwards, Andraya Yearwood. (Barrett, Dan) (Entered: 02/14/2020) |
| 02/14/2020 | 21 | NOTICE of Appearance by Jeff Shafer on behalf of Chelsea Mitchell, Alanna Smith, Selina Soule (Shafer, Jeff) (Entered: 02/14/2020) |
| 02/14/2020 | 22 | NOTICE of Appearance by Roger Greenwood Brooks on behalf of Chelsea Mitchell, Alanna Smith, Selina Soule (Brooks, Roger) (Entered: 02/14/2020) |
| 02/14/2020 | 23 | NOTICE of Appearance by Christiana M. Holcomb on behalf of Chelsea Mitchell, Alanna Smith, Selina Soule (Holcomb, Christiana) (Entered: 02/14/2020) |
| 02/18/2020 | 24 | REPLY to Response to 15 MOTION to Expedite *Hearing to Show Cause and Briefing Schedule* filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Howard, James) (Entered: 02/18/2020) |
| 02/19/2020 | 25 | NOTICE of Appearance by Kristen Waggoner on behalf of Chelsea Mitchell, Alanna Smith, Selina Soule (Waggoner, Kristen) (Entered: 02/19/2020) |
| 02/20/2020 | 26 | SUMMONS Returned Executed by Alanna Smith, Chelsea Mitchell, Selina Soule. Bloomfield Public Schools Board of Education served on 2/18/2020, answer due 3/10/2020; Canton Public Schools Board of Education served on 2/18/2020, answer due 3/10/2020; Connecticut Association of Schools, Inc. served on 2/19/2020, answer due 3/11/2020; Cromwell Public Schools Board of Education served on 2/19/2020, answer due 3/11/2020; Danbury Public Schools Board of Education served on 2/19/2020, answer due 3/11/2020; Glastonbury Public Schools Board of Education served on 2/18/2020, answer due 3/10/2020. (Howard, James) (Entered: 02/20/2020) |
| 02/20/2020 | 27 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference Re: Next Steps set for 2/27/2020 at 2:00 PM before Judge Robert N. Chatigny. Plaintiffs' counsel will initiate the call to chambers at 860-240-2629 (conference line only) with all counsel on the line. (Rickevicius, L.) (Entered: 02/20/2020) |
| 02/20/2020 | 28 | CERTIFICATE OF GOOD STANDING re 4 MOTION for Attorney(s) Christiana M. Holcomb to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691868) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Holcomb, Christiana) (Entered: 02/20/2020) |
| 02/20/2020 | 29 | CERTIFICATE OF GOOD STANDING re 3 MOTION for Attorney(s) Jeffrey A. Shafer to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691855) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Shafer, Jeff) (Entered: 02/20/2020) |
| 02/20/2020 | 30 | CERTIFICATE OF GOOD STANDING re 16 MOTION for Attorney(s) Kristen K. Waggoner to be Admitted Pro Hac Vice by Chelsea Mitchell, Alanna Smith, Selina Soule. (Waggoner, Kristen) (Entered: 02/20/2020) |
| 02/20/2020 | 31 | NOTICE of Appearance by Peter Joseph Murphy on behalf of Connecticut Association of Schools, Inc. (Murphy, Peter) (Entered: 02/20/2020) |
| 02/20/2020 | 32 | NOTICE of Appearance by Linda L. Yoder on behalf of Connecticut Association of |

| | | Schools, Inc. (Yoder, Linda) (Entered: 02/20/2020) |
|---|---|---|
| 02/21/2020 | 33 | NOTICE of Appearance by Johanna G. Zelman on behalf of Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education (Zelman, Johanna) (Entered: 02/21/2020) |
| 02/21/2020 | 34 | NOTICE of Appearance by Elizabeth Mott Smith on behalf of Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education (Smith, Elizabeth) (Entered: 02/21/2020) |
| 02/21/2020 | 35 | MOTION for Attorney(s) Chase Strangio, Joshua Block, James Esseks, Lindsey Kaley, and Galen Sherwin to be Admitted Pro Hac Vice (paid $375 PHV fee; receipt number ACTDC-5707968) by Thania Edwards, Andraya Yearwood. (Barrett, Dan) (Entered: 02/21/2020) |
| 02/21/2020 | 36 | MOTION to Intervene *as Defendants* by Thania Edwards, Andraya Yearwood.Responses due by 3/13/2020 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Barrett, Dan) (Entered: 02/21/2020) |
| 02/21/2020 | 37 | NOTICE of Appearance by David S. Monastersky on behalf of Canton Public Schools Board of Education, Glastonbury Public Schools Board of Education (Monastersky, David) (Entered: 02/21/2020) |
| 02/25/2020 | 38 | ORDER granting 35 Motion to Appear Pro Hac Vice as to Chase Strangio, Joshua Block, James Esseks,Lindsey Kaley, and Galen Sherwin, Certificate of Good Standing due by 4/25/2020. Signed by Clerk on 2/25/2020. (Murphy, Tatihana) (Entered: 02/25/2020) |
| 02/25/2020 | 39 | CERTIFICATE OF GOOD STANDING re 2 MOTION for Attorney(s) Roger G. Brooks to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5691797) by Chelsea Mitchell, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 02/25/2020) |
| 02/26/2020 | 40 | NOTICE of Appearance by Galen Sherwin on behalf of Thania Edwards, Andraya Yearwood (Sherwin, Galen) (Entered: 02/26/2020) |
| 02/26/2020 | 41 | NOTICE of Appearance by Michael Roberts on behalf of Commission on Human Rights and Opportunities (Roberts, Michael) (Entered: 02/26/2020) |
| 02/26/2020 | 42 | NOTICE of Appearance by Joshua A. Block on behalf of Thania Edwards, Andraya Yearwood (Block, Joshua) (Entered: 02/26/2020) |
| 02/26/2020 | 43 | MOTION to Intervene by Commission on Human Rights and Opportunities.Responses due by 3/18/2020 (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Exhibit)(Roberts, Michael) (Entered: 02/26/2020) |
| 02/26/2020 | 44 | NOTICE of Appearance by Chase Strangio on behalf of Thania Edwards, Andraya Yearwood (Strangio, Chase) (Entered: 02/26/2020) |
| 02/26/2020 | 45 | NOTICE of Appearance by James D. Esseks on behalf of Thania Edwards, Andraya Yearwood (Esseks, James) (Entered: 02/26/2020) |
| 02/26/2020 | 46 | NOTICE of Appearance by Lindsey Kaley on behalf of Thania Edwards, Andraya Yearwood (Kaley, Lindsey) (Entered: 02/26/2020) |
| 02/26/2020 | 47 | Memorandum in Opposition re 36 MOTION to Intervene *as Defendants* filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Exhibit A)(Wood, Howard) (Entered: 02/26/2020) |
| 02/27/2020 | 48 | NOTICE of Appearance by Peter Joseph Murphy on behalf of Danbury Public Schools Board of Education (Murphy, Peter) (Entered: 02/27/2020) |
| 02/27/2020 | 49 | NOTICE of Appearance by Linda L. Yoder on behalf of Danbury Public Schools Board |

| | | of Education (Yoder, Linda) (Entered: 02/27/2020) |
|---|---|---|
| 02/27/2020 | 50 | EXHIBIT *A - CORRECTED* by Chelsea Mitchell, Alanna Smith, Selina Soule re 47 Memorandum in Opposition to Motion. (Wood, Howard) (Entered: 02/27/2020) |
| 02/27/2020 | 51 | ORDER: As discussed on the telephonic status conference, the preliminary schedule is as follows. The individual proposed intervenors will file a reply brief in support of their motion to intervene on or before March 2, 2020. The CHRO will file a supplemental brief in support of its motion to intervene on or before March 2, 2020; plaintiffs will file an opposition brief on or before March 6, 2020; and the CHRO will file a reply brief on or before March 9, 2020. Defendants will file a brief outlining their positions on the issues of the case on or before March 13, 2020. The parties will then meet and confer in person at the offices of Shipman & Goodwin LLP on March 19, 2020 at 2:00 PM to discuss the needs of the case and propose a schedule. Signed by Judge Robert N. Chatigny on 2/27/2020.(Gazzola, Mario) (Entered: 02/27/2020) |
| 02/27/2020 | 52 | Minute Entry for proceedings held before Judge Robert N. Chatigny: Telephone Status Conference re Preliminary Schedule held on 2/27/2020. Total Time: 1 hour and 9 minutes. (Court Reporter Warner, D.) (Pipech, L.) (Entered: 02/28/2020) |
| 02/28/2020 | 53 | REPLY to Response to 36 MOTION to Intervene *as Defendants* filed by Thania Edwards, Andraya Yearwood. (Strangio, Chase) (Entered: 02/28/2020) |
| 03/02/2020 | 54 | Supplemental EXHIBIT by Commission on Human Rights and Opportunities re 43 MOTION to Intervene . (Roberts, Michael) (Entered: 03/02/2020) |
| 03/02/2020 | 55 | Memorandum in Support re 36 MOTION to Intervene *as Defendants* filed by Connecticut Association of Schools, Inc.. (Murphy, Peter) (Entered: 03/02/2020) |
| 03/03/2020 | 56 | Memorandum in Support re 36 MOTION to Intervene *as Defendants* filed by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Zelman, Johanna) (Entered: 03/03/2020) |
| 03/04/2020 | 57 | RESPONSE re 56 Memorandum in Support of Motion, 55 Memorandum in Support of Motion by Chelsea Mitchell, Alanna Smith, Selina Soule. (Wood, Howard) (Entered: 03/04/2020) |
| 03/05/2020 | 58 | MOTION for Extension of Time until April 20, 2020 to file an answer or otherwise respond to Complaint 1 Complaint by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education. (Zelman, Johanna) (Entered: 03/05/2020) |
| 03/06/2020 | 59 | Memorandum in Opposition re 58 MOTION for Extension of Time until April 20, 2020 to file an answer or otherwise respond to Complaint 1 Complaint filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Wood, Howard) (Entered: 03/06/2020) |
| 03/06/2020 | 60 | Memorandum in Opposition *to Motion of the CHRO* re 43 MOTION to Intervene filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Wood, Howard) (Entered: 03/06/2020) |
| 03/09/2020 | 61 | REPLY to Response to 43 MOTION to Intervene filed by Commission on Human Rights and Opportunities. (Roberts, Michael) (Entered: 03/09/2020) |
| 03/11/2020 | 62 | ORDER granting 58 Motion for Extension of Time to 4/20/2020 to file an answer or otherwise respond to the lawsuit filed by Plaintiffs. Signed by Judge Robert N. Chatigny on 3/11/2020. (Rickevicius, L.) (Entered: 03/11/2020) |

| 03/11/2020 | | Answer deadline updated for Bloomfield Public Schools Board of Education to 4/20/2020; Canton Public Schools Board of Education to 4/20/2020; Connecticut Association of Schools, Inc. to 4/20/2020; Cromwell Public Schools Board of Education to 4/20/2020; Danbury Public Schools Board of Education to 4/20/2020; Glastonbury Public Schools Board of Education to 4/20/2020. (Rickevicius, L.) (Entered: 03/11/2020) |
|---|---|---|
| 03/13/2020 | 63 | Joint NOTICE by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education (Murphy, Peter) (Entered: 03/13/2020) |
| 03/17/2020 | 64 | NOTICE by Chelsea Mitchell, Alanna Smith, Selina Soule *Position Re: Anonymity of minor* (Howard, James) (Entered: 03/17/2020) |
| 03/17/2020 | 65 | Joint MOTION clarification on Proposed Intervenors' participation in meet and confer on 3/19/2020 by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood.Responses due by 4/7/2020 (Zelman, Johanna) (Entered: 03/17/2020) |
| 03/18/2020 | 66 | Joint MOTION for Clarification *CORRECTED* by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood. (Zelman, Johanna) (Entered: 03/18/2020) |
| 03/18/2020 | 67 | Memorandum in Opposition re 65 Joint MOTION clarification on Proposed Intervenors' participation in meet and confer on 3/19/2020 filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 03/18/2020) |
| 03/18/2020 | 68 | ORDER granting in part and denying in part 65 Motion. Insofar as the motion seeks clarification of the right of proposed intervenor-defendants Yearwood and Edwards to participate in tomorrow's conference, it is granted; insofar as it seeks an order permitting their counsel to actively participate in the conference in the same manner and to the same extent as counsel for the existing parties (i.e. as if their motion to intervene had already been granted unconditionally), it is denied. At this preliminary stage, and for purposes of this conference, the proposed intervenors' legal interests are more than adequately represented by counsel for the defendants, whose position on the matters to be discussed appears to closely align with that of the proposed intervenors in all material respects. This order does not exclude counsel from attending the conference. Proposed intervenors' counsel may attend by telephone as observers, just as counsel would be able to do if the conference were conducted in open court. Of course, proposed intervenors' counsel is free to speak with defendants' counsel during any breaks, again just as counsel would be able to do if the conference were in open court. The same is true of counsel for proposed intervenor-defendant CHRO. At the outset of the conference, CIAC should provide as much information as possible about the possibility that spring athletics will have to be cancelled due to the novel coronavirus pandemic, and the parties should then discuss what the impact of that would be on this case. So ordered. Signed by Judge Robert N. Chatigny on 3/18/20. (Chatigny, Robert) (Entered: 03/18/2020) |
| 03/18/2020 | 69 | EXHIBIT by Chelsea Mitchell, Alanna Smith, Selina Soule re 64 Notice (Other). (Brooks, Roger) (Entered: 03/18/2020) |
| 03/19/2020 | 70 | NOTICE of Appearance by James H. Howard on behalf of Chelsea Mitchell, Alanna Smith, Selina Soule (Howard, James) (Entered: 03/19/2020) |

| 03/19/2020 | 71 | MOTION for Extension of Time until March 27, 2020 to file report concerning results of meet and confer by Chelsea Mitchell, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 03/19/2020) |
|---|---|---|
| 03/20/2020 | 72 | ORDER granting 71 Consent Motion for Extension of Time to 3/27/2020 to report to the Court concerning the results of discussions between the parties. Signed by Judge Robert N. Chatigny on 3/20/2020. (Rickevicius, L.) (Entered: 03/20/2020) |
| 03/20/2020 | 73 | ORDER finding as moot 66 Motion for Clarification. Signed by Judge Robert N. Chatigny on 3/20/20. (Chatigny, Robert) (Entered: 03/20/2020) |
| 03/24/2020 | 74 | NOTICE of Appearance by Matthew Donnelly on behalf of United States (Donnelly, Matthew) (Entered: 03/24/2020) |
| 03/24/2020 | 75 | NOTICE by United States *of Statement of Interest* (Donnelly, Matthew) (Entered: 03/24/2020) |
| 03/26/2020 | 76 | CERTIFICATE OF GOOD STANDING re 35 MOTION for Attorney(s) Chase Strangio, Joshua Block, James Esseks, Lindsey Kaley, and Galen Sherwin to be Admitted Pro Hac Vice (paid $375 PHV fee; receipt number ACTDC-5707968) by Thania Edwards, Andraya Yearwood. (Kaley, Lindsey) (Entered: 03/26/2020) |
| 03/27/2020 | 77 | Joint RESPONSE by Chelsea Mitchell, Alanna Smith, Selina Soule *(From Meet-and-Confer Conference)*. (Brooks, Roger) (Entered: 03/27/2020) |
| 03/27/2020 | 78 | Joint RESPONSE by Thania Edwards, Andraya Yearwood *and all parties regarding conference on conditions of intervention*. (Barrett, Dan) (Entered: 03/27/2020) |
| 03/28/2020 | 79 | CASE MANAGEMENT ORDER: The Court thanks counsel for the Parties' Joint Response From Meet-And-Confer Conference. The parties' respective proposals reflect due consideration of numerous issues in a compressed timeframe, which is appreciated. Based on the latest available information concerning the current status of the pandemic in Connecticut, and its probable future course, it seems all but certain that school will not resume before the fall term. Accordingly, having had the benefit of the parties' joint report, and mindful of the proposals it contains, I think it will be most helpful if counsel confer and submit a supplemental Joint Response, on or before April 6, 2020, with regard to the following: assuming CIAC will soon be forced to cancel spring athletics due to the pandemic, what issues will still need to be adjudicated in this case, in what order should the issues be taken up, and what schedule should be adopted for adjudicating the issues? For example, what impact will cancellation of the spring season have on the plaintiffs' claims for declaratory and injunctive relief? If plaintiffs intend to press claims for declaratory and injunctive relief notwithstanding cancellation of the spring season, what steps will be required to adjudicate the claims, what would be the best sequence for those steps, and what schedule should be adopted for completing them? If, as has been reported, plaintiffs intend to seek damages in any event, what steps will be required to adjudicate any such claims, what would be the optimal sequence for those steps, and what schedule should be adopted for completing them? For example, would defendants seek to file a pre-discovery motion to dismiss? Assuming such a motion were to be filed, what schedule would counsel suggest for briefing and arguing the motion? Counsel should note that the Court is in the process of making arrangements to conduct proceedings remotely during the lockdown, which is now expected to last some months. If counsel need more time to confer and submit the Supplemental Joint Response, they may request an extension of the April 6 deadline by calling chambers (i.e. without the need for filing a formal motion). So ordered. Signed by Judge Robert N. Chatigny on 3/28/20.(Chatigny, Robert) (Entered: 03/28/2020) |

JA015

| 04/06/2020 | 80 | MOTION to Expedite *Order to Show Cause Hearing* by Chelsea Mitchell, Alanna Smith, Selina Soule. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Brooks, Roger) (Entered: 04/06/2020) |
|---|---|---|
| 04/06/2020 | 81 | Joint RESPONSE *From Meet-and-Confer Concerning Case Scheduling in the Event of Complete Cancellation of Spring Season* filed by Chelsea Mitchell, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 04/06/2020) |
| 04/08/2020 | 82 | ORDER denying 80 Motion to Expedite. Plaintiffs' motion to expedite asks the Court to proceed with their motion for a preliminary injunction as though high school track meets, which have been indefinitely suspended due to the coronavirus pandemic, will be conducted before the fall. The motion relies on CIAC's decision to "hold off as long as possible before cancelling all spring sport experiences." Plaintiffs' desire to run track this spring is perfectly understandable, as is CIAC's wish to avoid disappointing student athletes like the plaintiffs until it has no alternative. Realistically, however, the possibility that track meets will be held this spring (or even this summer) appears to be remote at best, unfortunately. The coronavirus pandemic has created a national emergency and resulted in a lockdown across Connecticut with all schools and nonessential businesses closed. People are expected to remain in their homes and are prohibited from gathering in public. How long these extraordinary and unprecedented measures will have to remain in place in order to protect public health is unknown and unknowable. However, it would be very surprising to me if responsible public officials in Connecticut were to reopen schools and conduct sporting events this spring when the highly contagious, potentially lethal coronavirus is expected to continue to be present throughout the state. If spring sports must be cancelled because of the ongoing pandemic, which is by far the most likely outcome at this point, expedited treatment of the plaintiffs' motion for preliminary injunction is unwarranted. The motion for a preliminary injunction is predicated on the plaintiffs' claim that they have a legal right to run in track events for girls this spring without having to compete against transgender girls. If no track events can be held this spring due to the pandemic, plaintiffs have no need for such a preliminary injunction. Any claims for other injunctive relief or damages that plaintiffs wish to press in this litigation can be taken up in accordance with a schedule that gives all concerned adequate time to address the various issues of law and fact discussed in the parties' submissions concerning scheduling. A tailored scheduling order that aims to achieve that objective will be entered today. Accordingly, the motion to expedite is hereby denied. So ordered. Signed by Judge Robert N. Chatigny on 4/8/20. (Chatigny, Robert) (Entered: 04/08/2020) |
| 04/08/2020 | 83 | SCHEDULING ORDER: Please read full text of attached Order for details. Answer due 4/27/2020; Discovery due by 12/31/2020; Initial Status Report due by 5/8/2020; Prefiling Conference Request Re: Rule 12 motions due by 4/20/2020; Prefiling Conference Request Re: Dispositive motions due 11/16/2020; Settlement Conference 1/2021; Trial Ready Date 4/30/2021; Trial Brief due by 3/20/2021. Signed by Judge Robert N. Chatigny on 4/8/2020. (Rickevicius, L.) (Entered: 04/08/2020) |
| 04/08/2020 | 84 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Status Conference set for 5/14/2020 at 10:00 AM before Judge Robert N. Chatigny. Please use the following dial in information for the call. Call in- 866-434-5269; Access Code: 8189198# (Rickevicius, L.) (Entered: 04/08/2020) |
| 04/10/2020 | 85 | MOTION for Extension of Time until July 1, 2020 *to* file certificates of good standing by Thania Edwards, Andraya Yearwood. (Barrett, Dan) (Entered: 04/10/2020) |
| 04/11/2020 | 86 | ORDER granting 85 Motion for Extension of Time. Signed by Judge Robert N. Chatigny on 4/11/20. (Chatigny, Robert) (Entered: 04/11/2020) |

| 04/13/2020 | 87 | MOTION for intervention Order by Thania Edwards, Andraya Yearwood. (Barrett, Dan) (Entered: 04/13/2020) |
|---|---|---|
| 04/14/2020 | 88 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference Re: 36 Motion to Intervene and 43 Motion to Intervene set for 4/16/2020 at 10:00 AM before Judge Robert N. Chatigny. Please use the following call in information: Call in 866-434-5269; access code 8189198#. (Rickevicius, L.) (Entered: 04/14/2020) |
| 04/16/2020 | 90 | Minute Entry. Proceedings held before Judge Robert N. Chatigny: taking under advisement 36 Motion to Intervene; taking under advisement 43 Motion to Intervene; Motion Hearing held on 4/16/2020 re 43 MOTION to Intervene filed by Commission on Human Rights and Opportunities, 36 MOTION to Intervene *as Defendants* filed by Thania Edwards, Andraya Yearwood. Total Time: 1 hour and 30 minutes(Court Reporter Darlene Warner.) (Bozek, M.) (Entered: 04/17/2020) |
| 04/17/2020 | 89 | AMENDED COMPLAINT against Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education, filed by Alanna Smith, Chelsea Mitchell, Selina Soule.(Brooks, Roger) (Entered: 04/17/2020) |
| 04/20/2020 | 91 | Joint MOTION for Joinder *of U.S. Department of Education* by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Murphy, Peter) (Entered: 04/20/2020) |
| 04/22/2020 | 92 | ORDER granting 36 Motion to Intervene; finding as moot 87 Motion for Order. The only seriously contested issue with regard to the proposed intervenors (PIs) motion to intervene as of right under Fed. R. Civ. P. 24(a) is whether they have overcome the presumption that their interests are adequately represented by the existing defendants. I conclude that the presumption has been overcome. Inadequacy of representation may be established when a would-be defendant seeks to raise a defense that will not be raised otherwise. See Meriwether v. Trustees of Shawnee State Univ., No. 1:18-cv-753, 2019 WL 2052110, *12 (S.D. Ohio May 9, 2010) (in suit by professor challenging colleges antidiscrimination policy, intervention granted to transgender student and LBTG student advocacy group because they intended to assert arguments based on the Equal Protection Clause, Title IX and the ADA that the college was required to treat transgender students in accordance with their gender identity, an argument the college had not made in its motion to dismiss and was unlikely to make, thus overcoming the presumption of adequacy of representation). Here, the PIs seek to raise a defense that the relief sought by the complaint would constitute impermissible discrimination against them in violation of Title IX and the Equal Protection Clause. Based on the defendants written submissions and the comments of defense counsel during the recent telephone conference, none of the defendants adequately represents the interests of the PIs in defending the action on this basis. CIAC intends to defend on the ground that it is not subject to suit under Title IX, that state law controls, and that the definition of sex in Title IX is ambiguous. Bloomfield and Cromwell intend to defend on the ground that they owe no Title IX obligations to students, like the plaintiffs, who do not attend their schools. The remaining defendants, Danbury, Glastonbury and Canton, have disclaimed any interest in advocating for the rights of students, like the PIs, who do not attend their schools. Bloomfield and Cromwell may argue that the relief sought would violate Title IX but they will not argue that it would violate the Equal Protection Clause. Nor will any of the other defendants. Accordingly, I find that the interests of the PIs are not so similar to those of the existing |

JA017

defendants that adequate representation of their interests is assured. See id.; cf. Christa McAuliffe Intermediate School PTO v. de Blasio, No. 18 Civ. 11657(ER), 2020 WL 1432213, *5 (S.D.N.Y. March 24, 2020) (in action by Asian-American groups challenging changes to program governing admission to Citys selective high schools, intervention as of right granted to students seeking to defend changes based on the programs history of discrimination, a defense the existing defendants would not make). Permissive intervention is proper in any event because the PIs have a strong personal interest in the subject matter of the case and they are in a position to make a valuable contribution to the Courts understanding of the case. See New York v. U.S. Dept. of Health and Human Services, 2019 WL 3531960, *4 (S.D.N.Y. Aug. 2, 2019) (in action by states challenging HHS rule allowing medical personnel to abstain from providing services due to religious beliefs, motion for intervention as of right by medical personnel seeking to defend the rule denied but permissive intervention granted); United States v. New York City Housing Authority, 326 F.R.D. 411, 417-18 (S.D.N.Y. 2018) (in action against to redress health and safety violations by Housing Authority, motion to intervene as of right by tenant organizations denied but permissive intervention granted). Moreover, they have expressed a willingness to accept conditions on their participation that will avoid unduly burdening the existing parties or the Court. Accordingly, the motion is hereby granted. So ordered. Signed by Judge Robert N. Chatigny on 4/22/2020. (Gazzola, Mario) (Entered: 04/22/2020)

| 04/22/2020 | 93 | ORDER [CORRECTED TEXT ORDER 92] Granting (36) Motion to Intervene, finding as moot (87) Motion For Order. The only seriously contested issue with regard to the proposed intervenors' (PIs) motion to intervene as of right under Fed. R. Civ. P. 24(a) is whether they have overcome the presumption that their interests are adequately represented by the existing defendants. I conclude that the presumption has been overcome. Inadequacy of representation may be established when a would-be defendant seeks to raise a defense that will not be raised otherwise. See Meriwether v. Trustees of Shawnee State Univ., No. 1:18-cv-753, 2019 WL 2052110, *12 (S.D. Ohio May 9, 2010) (in suit by professor challenging college's antidiscrimination policy, intervention granted to transgender student and LGBT student advocacy group because they intended to assert arguments based on the Equal Protection Clause, Title IX and the ADA that the college was required to treat transgender students in accordance with their gender identity, an argument the college had not made in its motion to dismiss and was unlikely to make, thus overcoming the presumption of adequacy of representation). Here, the PIs seek to raise a defense that granting the relief sought by the complaint would constitute impermissible discrimination against them in violation of Title IX and the Equal Protection Clause. Based on the defendants' written submissions and the comments of defense counsel during the recent telephone conference, none of the defendants adequately represents the interests of the PIs in defending the action on this basis. CIAC intends to defend on the ground that it is not subject to suit under Title IX, state law controls, and the term "sex" in Title IX is ambiguous. Bloomfield and Cromwell intend to defend on the ground that they owe no Title IX obligations to students, like the plaintiffs, who do not attend their schools. The remaining defendants, Danbury, Glastonbury and Canton, have disclaimed any interest in advocating for the rights of students, like the PIs, who do not attend their schools. Bloomfield and Cromwell may argue that granting the relief sought would violate Title IX but they will not argue that it would violate the Equal Protection Clause. Nor will any of the other defendants. Accordingly, I find that the interests of the PIs are not so similar to those of the existing defendants that adequate representation of their interests is assured. See id.; cf. Christa McAuliffe Intermediate School PTO v. de Blasio, No. 18 Civ. 11657(ER), 2020 WL 1432213, *5 (S.D.N.Y. March 24, 2020)(in action by Asian-American groups challenging changes to program governing admission to City's selective high schools, intervention as of right granted to students seeking to defend changes based on the program's history of discrimination, a |

JA018

| | | |
|---|---|---|
| | | defense the existing defendants would not make). Permissive intervention is proper in any event because the PIs have a strong personal interest in the subject matter of the case and they are in a position to make a valuable contribution to the Court's understanding of the case. See New York v. U.S. Dept. of Health and Human Services, 2019 WL 3531960, *4 (S.D.N.Y. Aug. 2, 2019)(in action by states challenging HHS rule allowing medical personnel to abstain from providing services that conflicted with their beliefs, motion for intervention as of right by medical personnel seeking to defend the rule denied but permissive intervention granted); United States v. New York City Housing Authority, 326 F.R.D. 411, 417-18 (S.D.N.Y. 2018)(in action to redress health and safety violations by Housing Authority, motion to intervene as of right by tenant organizations denied but permissive intervention granted). Moreover, the PIs have expressed a willingness to accept conditions on their participation that will avoid unduly burdening the existing parties or the Court. Accordingly, the motion is hereby granted. So ordered. Signed by Judge Robert N. Chatigny on 4/22/80.(Chatigny, Robert) (Entered: 04/22/2020) |
| 04/22/2020 | 94 | TRANSCRIPT of Proceedings: Telephone Conference held on 04.16.20 before Judge Robert N. Chatigny. Court Reporter: Darlene A. Warner. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/13/2020. Redacted Transcript Deadline set for 5/23/2020. Release of Transcript Restriction set for 7/21/2020. (Warner, D.) (Entered: 04/22/2020) |
| 04/22/2020 | 95 | ORDER granting 43 Motion to Intervene with regard to alternative request for permissive intervention. Fed.R.Civ.P. 24(b) provides that a state agency may be permitted to intervene when a party's claim or defense is based on a statute or executive order administered by the agency. See generally Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1912 (2020 Update). That is the situation here: in defending against the plaintiffs' claims, at least some of the defendants (if not all) can be expected to rely on the antidiscrimination provisions in Conn. Gen. Stat. § 10-15c(a) and Conn. Exec. Order 56 (Feb. 23, 2017), which are enforced by CHRO. CHRO has a particular interest in intervening in this case because the plaintiffs are expected to argue that Title IX renders § 10-15c(a) and Exec. Order 56 invalid and unenforceable. See ECF No. 60 at 5-6 (citing U.S. Const. art. VI, cl. 2). As the state agency charged with enforcing the statute and Executive Order, CHRO has a strong interest in obtaining a judicial determination that neither measure is preempted by Title IX, and it is also uniquely situated to assist the Court in resolving the issue. During the recent telephone conference, CHRO's counsel explained that the agency seeks intervenor status rather than amicus status because of its experience in other cases when its participation was limited to that of an amicus. I credit the statements of CHRO's counsel that as an intervenor-defendant, CHRO will be better able to contribute to development of the issues. There is no basis for a finding that intervention by CHRO will unduly delay or prejudice adjudication of the plaintiffs' rights. Permissive intervention by CHRO is therefore appropriate in this instance. Whether the agency is entitled to intervene as of right need not be decided and I express no opinion on that matter. Accordingly, the motion to intervene is hereby granted with regard to the alternative request for permissive intervention. So ordered. Signed by Judge Robert N. Chatigny on 4/22/20. (Chatigny, Robert) (Entered: 04/22/2020) |

JA019

| | | |
|---|---|---|
| 04/24/2020 | 96 | NOTICE by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule *(Preliminary Statement of Relief Sought)* (Brooks, Roger) (Entered: 04/24/2020) |
| 04/24/2020 | 97 | Joint NOTICE by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood *Request for Pre-Filing Conference* (Zelman, Johanna) (Entered: 04/24/2020) |
| 04/27/2020 | 98 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Pre-Filing Conference set for 5/4/2020 at 2:00 PM before Judge Robert N. Chatigny. Please use the following call in information. Call in-866-434-5269, Access Code- 8189198#. (Rickevicius, L.) (Entered: 04/27/2020) |
| 05/01/2020 | 99 | Second MOTION for Extension of Time until June 4, 2020 to File Rule 12 Motions by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood. (Zelman, Johanna) (Entered: 05/01/2020) |
| 05/04/2020 | 100 | NOTICE of Appearance by Joshua E Gardner on behalf of U.S. Department of Education, Betsy DeVos, U.S. Department of Education Office for Civil Rights (Gardner, Joshua) (Entered: 05/04/2020) |
| 05/04/2020 | 101 | Minute Entry for proceedings held before Judge Robert N. Chatigny: Telephonic Pre-Filing Conference held on 5/4/2020. 11 minutes(Court Reporter Darlene Warner.) (Bozek, M.) (Entered: 05/05/2020) |
| 05/08/2020 | 102 | CERTIFICATE OF GOOD STANDING re 35 MOTION for Attorney(s) Chase Strangio, Joshua Block, James Esseks, Lindsey Kaley, and Galen Sherwin to be Admitted Pro Hac Vice (paid $375 PHV fee; receipt number ACTDC-5707968) by Thania Edwards, Andraya Yearwood. (Strangio, Chase) (Entered: 05/08/2020) |
| 05/08/2020 | 103 | MOTION to Transfer/Disqualify/Recuse Judge by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion to Disqualify, # 2 Exhibit A)(Brooks, Roger) (Entered: 05/08/2020) |
| 05/08/2020 | 104 | Joint STATUS REPORT by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 05/08/2020) |
| 05/11/2020 | 105 | CANCELLATION NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Status Conference set for 5/14/2020 at 10:00 AM before Judge Robert N. Chatigny is cancelled. (Rickevicius, L.) (Entered: 05/11/2020) |
| 05/11/2020 | 106 | Memorandum in Opposition re 91 Joint MOTION for Joinder *of U.S. Department of Education* filed by Betsy DeVos, U.S. Department of Education, U.S. Department of Education Office for Civil Rights. (Attachments: # 1 Affidavit of Randolph Wills) (Gardner, Joshua) (Entered: 05/11/2020) |
| 05/19/2020 | 107 | Consent MOTION for Extension of Time until June 8, 2020 to Respond to U.S. Department of Education's Opposition to Defendants' Motion to Join the Department of Education As A Party To This Action 106 Memorandum in Opposition to Motion, by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of |

| | | Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education. (Murphy, Peter) (Entered: 05/19/2020) |
|---|---|---|
| 05/20/2020 | 108 | ORDER granting 107 Consent Motion for Extension of Time to 6/8/2020 to Respond to U.S. Department of Education's Opposition to Defendants' Motion to Join the Department of Education As A Party To This Action 106 Memorandum in Opposition to Motion. Signed by Judge Robert N. Chatigny on 5/20/2020. (Rickevicius, L.) (Entered: 05/20/2020) |
| 05/20/2020 | 109 | Consent MOTION for Extension of Time until June 5, 2020 to Respond to Plaintiffs' First Requests for Production of Documents by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education. (Murphy, Peter) (Entered: 05/20/2020) |
| 05/21/2020 | 110 | ORDER granting 109 Consent Motion for Extension of Time to 6/5/2020 to Respond to Plaintiffs' First Requests for Production of Documents. Signed by Judge Robert N. Chatigny on 5/21/2020. (Rickevicius, L.) (Entered: 05/21/2020) |
| 05/27/2020 | 111 | MOTION for Attorney(s) Mohammad B. Shihabi to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number ACTDC-5880231) by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Zelman, Johanna) (Entered: 05/27/2020) |
| 05/29/2020 | 112 | CERTIFICATE OF GOOD STANDING re 35 MOTION for Attorney(s) Chase Strangio, Joshua Block, James Esseks, Lindsey Kaley, and Galen Sherwin to be Admitted Pro Hac Vice (paid $375 PHV fee; receipt number ACTDC-5707968) by Thania Edwards, Andraya Yearwood. (Block, Joshua) (Entered: 05/29/2020) |
| 05/29/2020 | 113 | Memorandum in Opposition re 103 MOTION to Transfer/Disqualify/Recuse Judge filed by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Strangio, Chase) (Entered: 05/29/2020) |
| 06/03/2020 | 114 | MOTION for Attorney(s) Mohammad B. Shihabi to be Admitted Pro Hac Vice by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Zelman, Johanna) (Entered: 06/03/2020) |
| 06/04/2020 | 115 | ORDER granting 114 Motion to Appear for Attorney Mohammad B. Shihabi to be Admitted Pro Hac Vice. Certificate of Good Standing due by 8/3/2020. Signed by Clerk on 6/4/2020. (Agati, Kathryn) (Entered: 06/04/2020) |
| 06/04/2020 | 116 | ORDER finding as moot 111 Motion to Appear for Attorney Mohammad B. Shihabi to be Admitted Pro Hac Vice. Signed by Clerk on 6/4/2020. (Agati, Kathryn) (Entered: 06/04/2020) |
| 06/08/2020 | 117 | REPLY to Response to 91 Joint MOTION for Joinder *of U.S. Department of Education* filed by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education. (Attachments: # 1 Exhibit A)(Murphy, Peter) (Entered: 06/08/2020) |
| 06/12/2020 | 118 | NOTICE of Appearance by Mohammad Shihabi on behalf of Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education (Shihabi, Mohammad) |

| | | (Entered: 06/12/2020) |
|---|---|---|
| 06/12/2020 | 119 | REPLY to Response to 103 MOTION to Transfer/Disqualify/Recuse Judge filed by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Attachments: # 1 Exhibit A)(Brooks, Roger) (Entered: 06/12/2020) |
| 06/15/2020 | 120 | NOTICE of Appearance by Tyler Bischoff on behalf of Connecticut Association of Schools, Inc., Danbury Public Schools Board of Education (Bischoff, Tyler) (Entered: 06/15/2020) |
| 06/16/2020 | 121 | ORDER denying 103 Motion to Transfer/Disqualify/Recuse Judge. Plaintiffs have moved for my recusal pursuant to 28 U.S.C. s 455(a) because during a telephone conference I informed plaintiffs' counsel that I wanted them to refrain from continuing to refer to the transgender females involved in this case as "males." In calling on plaintiffs' counsel to accept that limitation going forward, I explained that for plaintiffs' counsel to continue to call these transgender youth "males" would be needlessly provocative, and inconsistent with norms of civility in judicial proceedings, which I want to be careful to maintain. As I further explained, for plaintiffs' counsel to refer to these young people as "transgender females" in accordance with their gender identity would entail no concession whatsoever relating to the merits of the case; plaintiffs' counsel would still be able to refer to them as "biologically male" with "male bodies." They just couldn't refer to them as "males, period." Plaintiffs assert that as a result of my statement the public might reasonably believe that I am partial or biased. Plaintiffs have clarified that what troubles them in particular is my statement that for plaintiffs' counsel to refer to the transgender students involved in this case as "transgender females" rather than "males" would be consistent with "science." Plaintiffs argue that "the public might reasonably conclude that the Court has bias in [this] case where [plaintiffs'] arguments, claims, and expert testimony are based on the assertion that athletes born male remain male as a matter of scientific fact no matter their gender identity, and that as a result those athletes have 'an unfair competitive advantage to competition' in women's and girls' sports." ECF No. 199, at 3-4. I do not agree that the public might reasonably construe my reference to "science" as a comment on the merits of the issue whether transgender athletes have an unfair competitive advantage in girls' sports. In the telephone conference, I stated that referring to the transgender youth involved in this case as "transgender females" would be consistent with "science, common practice, and perhaps human decency." That statement does not reflect a preconceived conclusion on the issue of unfair competitive advantage presented by this case. In fact, and as I think objective members of the public would readily understand, the "science" I referred to is not the science relating to the issue of unfair competitive advantage but the science that tells us calling transgender girls "males" can cause significant mental and emotional distress. The insight provided by this science has led to a "common practice" of referring to transgender persons by their gender identity, which is viewed by many as a matter of "human decency." Thus, as I said, referring to these transgender youth as "transgender females" would be consistent with "science, common practice, and perhaps human decency." By referring to science in this way, in this context, and for this purpose, I did not state or imply anything about whether the transgender youth in this case do or do not enjoy an unfair competitive advantage when they compete in girls' track. To the extent plaintiffs' counsel argue that they must be able to refer to the transgender girls in this case as "males, period" in order to fulfill their responsibilities as zealous advocates, and that they have an absolute Constitutional right to do so, the argument is unpersuasive. The issue of unfair competitive advantage can be fully and fairly litigated consistent with professional ethics and constitutional protections without referring to the transgender females involved in this case as "males, period." I think objective members of the public would agree. I also think objective members of the public would understand that just because I want plaintiffs' counsel to avoid needlessly calling the transgender females in this case "males, period" does not mean I am partial or |

| | | biased with regard to any issue in the case. Accordingly, the motion is hereby denied. Signed by Judge Robert N. Chatigny on 6/16/20. (Chatigny, Robert) (Entered: 06/16/2020) |
|---|---|---|
| 06/25/2020 | 122 | ENTERED IN ERROR - Joint NOTICE by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education *to Reconvene Pre-Filing Conference* (Zelman, Johanna) Modified on 6/29/2020 to enter in error as letters cannot be efiled (Agati, Kathryn). (Entered: 06/25/2020) |
| 06/25/2020 | 123 | ENTERED IN ERROR - NOTICE by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule re 122 Notice (Other) *Response to Request to Reconvene Pre-filing Conference* (Brooks, Roger) Modified on 6/29/2020 to enter in error as letters cannot be efiled (Agati, Kathryn). (Entered: 06/25/2020) |
| 06/30/2020 | 124 | Joint MOTION to Reconvene May 4, 2020 Pre-Filing Conference re 101 Pre-Filing Conference by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education.Responses due by 7/21/2020 (Zelman, Johanna) (Entered: 06/30/2020) |
| 07/01/2020 | 125 | NOTICE of Appearance by Elana Spungen Bildner on behalf of Thania Edwards, Andraya Yearwood (Bildner, Elana) (Entered: 07/01/2020) |
| 07/01/2020 | 126 | MOTION for Extension of Time until August 1, 2020 to file certificates of good standing 86 Order on Motion for Extension of Time by Thania Edwards, Andraya Yearwood. (Barrett, Dan) (Entered: 07/01/2020) |
| 07/02/2020 | 127 | ORDER granting 126 Motion for Extension of Time to 8/1/2020 to file certificates of good standing. Signed by Judge Robert N. Chatigny on 7/2/2020. (Rickevicius, L.) (Entered: 07/02/2020) |
| 07/02/2020 | 128 | MOTION for Attorney(s) Parker Douglas to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-5951356) by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Attachments: # 1 Affidavit of Parker Douglas, # 2 Text of Proposed Order)(Howard, James) (Entered: 07/02/2020) |
| 07/07/2020 | 129 | ORDER granting 128 Motion to Appear for Attorney Parker Douglas to be Admitted Pro Hac Vice. Certificate of Good Standing due by 9/5/2020. Signed by Clerk on 7/7/2020. (Agati, Kathryn) (Entered: 07/07/2020) |
| 07/07/2020 | 130 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Status Conference set for 7/17/2020 at 11:00 AM before Judge Robert N. Chatigny. Please use the following dial in information for the call. Dial in 866-434-5269, Access Code 8189198# (Rickevicius, L.) (Entered: 07/07/2020) |
| 07/07/2020 | 131 | ORDER finding as moot 124 Motion to reconvene in light of ECF No. 130. Signed by Judge Robert N. Chatigny on 7/7/2020. (Gazzola, Mario) (Entered: 07/07/2020) |
| 07/08/2020 | 132 | CERTIFICATE OF GOOD STANDING re 126 MOTION for Extension of Time until August 1, 2020 to file certificates of good standing 86 Order on Motion for Extension of Time by Thania Edwards, Andraya Yearwood. (Sherwin, Galen) (Entered: 07/08/2020) |
| 07/13/2020 | 133 | NOTICE of Appearance by Tw Parker Douglas on behalf of Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule (Douglas, Tw Parker) (Entered: 07/13/2020) |
| 07/13/2020 | 134 | CERTIFICATE OF GOOD STANDING re 128 MOTION for Attorney(s) Parker Douglas to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-5951356) by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Douglas, Tw Parker) (Entered: 07/13/2020) |

JA023

| 07/15/2020 | 135 | ORDER granting 99 Motion for Extension of Time. Rule 12 motions may be filed without a prefiling conference on or before August 21, 2020. The prefiling conference scheduled for July 17 is cancelled, and the prefiling conference requirement is waived. The Rule 12 motions should be addressed to the amended complaint and may challenge the amended complaint on any basis that the movant wishes to present, including the argument that the amended complaint is procedurally improper. The briefing schedule provided by the Local Rules will govern. So ordered. Signed by Judge Robert N. Chatigny on 7/15/20. (Chatigny, Robert) (Entered: 07/15/2020) |
| 07/15/2020 | | Set Deadlines: Dispositive Motions due by 8/21/2020. (Rickevicius, L.) (Entered: 07/15/2020) |
| 07/15/2020 | 136 | CANCELLATION NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Status Conference set for 7/17/2020 at 11:00 AM before Judge Robert N. Chatigny is CANCELLED. (Rickevicius, L.) (Entered: 07/15/2020) |
| 07/22/2020 | 137 | MOTION for Separate Statement of Claims by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education.Responses due by 8/12/2020 (Murphy, Peter) (Entered: 07/22/2020) |
| 08/07/2020 | 138 | Consent MOTION to Amend/Correct 89 Amended Complaint, by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule.Responses due by 8/28/2020 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Brooks, Roger) (Entered: 08/07/2020) |
| 08/10/2020 | 139 | ORDER granting 138 Consent Motion to Amend/Correct. The amended complaint must be e-filed no later than 8/12/2020. So ordered. Signed by Judge Robert N. Chatigny on 8/10/2020. (Rickevicius, L.) (Entered: 08/10/2020) |
| 08/10/2020 | | Set Deadlines: Amended Pleadings due by 8/12/2020. (Rickevicius, L.) (Entered: 08/10/2020) |
| 08/10/2020 | 140 | ORDER denying as moot 137 Motion for Separate Statement of Claims in light of ECF No. 139. So ordered. Signed by Judge Robert N. Chatigny on 8/10/2020. (Rickevicius, L.) (Entered: 08/10/2020) |
| 08/11/2020 | 141 | AMENDED COMPLAINT *(Second)* against Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Glastonbury Public Schools Board of Education, filed by Chelsea Mitchell, Selina Soule, Alanna Smith, Ashley Nicoletti.(Brooks, Roger) (Entered: 08/11/2020) |
| 08/13/2020 | 142 | MOTION for Leave to File Excess Pages by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood. (Bildner, Elana) (Entered: 08/13/2020) |
| 08/13/2020 | 143 | ORDER granting 142 Motion for Leave to File Excess Pages. Signed by Judge Robert N. Chatigny on 8/13/2020. (Rickevicius, L.) (Entered: 08/13/2020) |
| 08/17/2020 | 144 | Joint MOTION to Stay *Discovery Pending Outcome of Writ of Mandamus* by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education.Responses due by 9/7/2020 (Zelman, Johanna) (Entered: 08/17/2020) |

JA024

| 08/21/2020 | 145 | MOTION to Dismiss *Second Amended Complaint* by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood.Responses due by 9/11/2020 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Bildner, Elana) (Entered: 08/21/2020) |
|---|---|---|
| 08/25/2020 | 146 | ORDER granting 144 Motion to Stay. Signed by Judge Robert N. Chatigny on 825/20. (Chatigny, Robert) (Entered: 08/25/2020) |
| 08/25/2020 | 147 | MOTION for Extension of Time until August 25, 2020 *for* filing certificate of good standing 127 Order on Motion for Extension of Time by Thania Edwards, Andraya Yearwood. (Attachments: # 1 Appendix certificate of good standing)(Barrett, Dan) (Entered: 08/25/2020) |
| 08/25/2020 | 148 | ORDER granting 147 Motion for Extension of Time. Signed by Judge Robert N. Chatigny on 8/25/2020. (Rickevicius, L.) (Entered: 08/25/2020) |
| 08/26/2020 | 149 | MOTION for Extension of Time until September 9, 2020 file Certificate of Good Standing by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Shihabi, Mohammad) (Entered: 08/26/2020) |
| 08/27/2020 | 150 | ORDER granting 149 Motion for Extension of Time to 9/9/2020 to File Certificate of Good Standing. Signed by Judge Robert N. Chatigny on 8/27/2020. (Rickevicius, L.) (Entered: 08/27/2020) |
| 09/01/2020 | 151 | CERTIFICATE OF GOOD STANDING re 114 MOTION for Attorney(s) Mohammad B. Shihabi to be Admitted Pro Hac Vice by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Shihabi, Mohammad) (Entered: 09/01/2020) |
| 09/09/2020 | 152 | MOTION for Leave to File Excess Pages by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 09/09/2020) |
| 09/10/2020 | 153 | ORDER granting 152 Motion for Leave to File Excess Pages. Signed by Judge Robert N. Chatigny on 9/10/2020. (Rickevicius, L.) (Entered: 09/10/2020) |
| 09/11/2020 | 154 | Memorandum in Opposition re 145 MOTION to Dismiss *Second Amended Complaint* filed by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Brooks, Roger) (Entered: 09/11/2020) |
| 09/18/2020 | 155 | MOTION for Leave to File Excess Pages *on Reply* by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, Andraya Yearwood. (Bildner, Elana) (Entered: 09/18/2020) |
| 09/19/2020 | 156 | ORDER granting 155 Motion for Leave to File Excess Pages. Signed by Judge Robert N. Chatigny on 9/19/20. (Chatigny, Robert) (Entered: 09/19/2020) |
| 09/25/2020 | 157 | REPLY to Response to 145 MOTION to Dismiss *Second Amended Complaint* filed by Bloomfield Public Schools Board of Education, Canton Public Schools Board of Education, Commission on Human Rights and Opportunities, Connecticut Association of Schools, Inc., Cromwell Public Schools Board of Education, Danbury Public Schools Board of Education, Thania Edwards, Glastonbury Public Schools Board of Education, |

| | | Andraya Yearwood. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Bildner, Elana) (Entered: 09/25/2020) |
|---|---|---|
| 09/29/2020 | 158 | MOTION for Leave to File *Supplemental Memorandum in Support of Motion to Join the U.S. Department of Education as Party* by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H)(Zelman, Johanna) (Entered: 09/29/2020) |
| 09/30/2020 | 159 | ORDER granting 158 Motion for Leave to File. Signed by Judge Robert N. Chatigny on 9/30/2020. (Rickevicius, L.) (Entered: 09/30/2020) |
| 09/30/2020 | 160 | Supplemental Memorandum in Support re 91 Joint MOTION for Joinder *of U.S. Department of Education* filed by Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Zelman, Johanna) (Entered: 09/30/2020) |
| 11/04/2020 | 161 | MOTION for Jeff Shafer and Parker Douglas to Withdraw as Attorney by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 11/04/2020) |
| 11/05/2020 | 162 | ORDER granting 161 Motion to Withdraw as Attorney. Attorney Joshua E Gardner; Christiana M. Holcomb; James H. Howard; Lindsey Kaley; David S. Monastersky; Peter Joseph Murphy; Michael Roberts; Jeff Shafer; Tw Parker Douglas and James D. Esseks terminated. Signed by Judge Robert N. Chatigny on 11/5/2020. (Rickevicius, L.) (Entered: 11/05/2020) |
| 11/20/2020 | 163 | CORRECTED ORDER: Due to a technical error, the following counsel were terminated in error on 11/5/2020: Attorney Joshua E Gardner; Christiana M. Holcomb; James H. Howard; Lindsey Kaley; David S. Monastersky; Peter Joseph Murphy; Michael Roberts and James D. Esseks. Counsel Jeff Shafer; Tw Parker Douglas are correctly terminated. All other counsel, specifically Attorney Joshua E Gardner; Christiana M. Holcomb; James H. Howard; Lindsey Kaley; David S. Monastersky; Peter Joseph Murphy; Michael Roberts and James D. Esseks are reinstated. So ordered Signed by Judge Robert N. Chatigny on 11/20/2020. (Rickevicius, L.) (Entered: 11/20/2020) |
| 11/25/2020 | 164 | MANDATE of USCA dated 11/25/2020 Denying Petition for a Writ of Mandamus. (Bozek, M.) (Entered: 11/30/2020) |
| 12/17/2020 | 165 | Joint MOTION for Status Conference by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. (Brooks, Roger) (Entered: 12/17/2020) |
| 12/23/2020 | 166 | ORDER granting 165 Motion for Conference. Signed by Judge Robert N. Chatigny on 12/23/2020. (Rickevicius, L.) (Entered: 12/23/2020) |
| 12/23/2020 | 167 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference set for 1/5/2021 at 10:00 AM before Judge Robert N. Chatigny. Please use the following dial in information for the call. Dial in 866-434-5269, Access Code 8189198#. (Rickevicius, L.) (Entered: 12/23/2020) |
| 01/05/2021 | 169 | Minute Entry for proceedings held before Judge Robert N. Chatigny: Telephone Status Conference held on 1/5/2021. 27 minutes (Court Reporter Darlene Warner.) (Bozek, M.) (Entered: 01/15/2021) |
| 01/12/2021 | 168 | NOTICE of Hearing on Motion re: 145 MOTION to Dismiss *Second Amended Complaint*. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT |

JA026

| | | PHOTO IDENTIFICATION. Oral Argument set for 2/26/2021 at 10:00 AM via Zoom before Judge Robert N. Chatigny. Signed by Judge Robert N. Chatigny on 1/12/2021.(Bozek, M.) (Entered: 01/12/2021) |
|---|---|---|
| 01/12/2021 | | NOTICE regarding hearing via Zoom: The oral argument re 145 motion to dismiss scheduled for 2/26/2021 at 10:00 AM will be conducted via Zoom. The video link is https://www.zoomgov.com/j/1615952448?pwd=S0UyV2EyQmZHYWs4S2dsK2JtUEwxUT09 and call in numbers are 1-669-254-5252 US (San Jose) or 1-646-828-7666 US (New York).<br><br>Meeting ID: 161 595 2448<br><br>Meeting Password: 018927<br><br>Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Bozek, M.) (Entered: 01/12/2021) |
| 02/23/2021 | 170 | NOTICE of Appearance by Amanda Dallo on behalf of United States (Dallo, Amanda) (Entered: 02/23/2021) |
| 02/23/2021 | 171 | NOTICE by United States *of Withdrawal of Statement of Interest* (Dallo, Amanda) (Entered: 02/23/2021) |
| 02/23/2021 | 172 | NOTICE by Betsy DeVos, U.S. Department of Education, U.S. Department of Education Office for Civil Rights re 106 Memorandum in Opposition to Motion, (Attachments: # 1 Exhibit)(Gardner, Joshua) (Entered: 02/23/2021) |
| 02/26/2021 | 173 | Minute Entry for proceedings held before Judge Robert N. Chatigny: Motion Hearing held on 2/26/2021 re 145 MOTION to Dismiss *Second Amended Complaint* filed by Bloomfield Public Schools Board of Education, Connecticut Association of Schools, Inc., Thania Edwards, Andraya Yearwood, Canton Public Schools Board of Education, Cromwell Public Schools Board of Education, Glastonbury Public Schools Board of Education, Commission on Human Rights and Opportunities, Danbury Public Schools Board of Education. Total Time: 2 hours and 14 minutes (Court Reporter Darlene Warner.) (Bozek, M.) (Entered: 03/04/2021) |
| 03/25/2021 | 174 | TRANSCRIPT of Proceedings: Oral Argument held on 02.26.21 before Judge Robert N. Chatigny. Court Reporter: Darlene A. Warner. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/15/2021. Redacted Transcript Deadline set for 4/25/2021. Release of Transcript Restriction set for 6/23/2021. (Warner, D.) (Entered: 03/25/2021) |
| 03/30/2021 | 175 | ORDER finding as moot 15 Motion to Expedite. Signed by Judge Robert N. Chatigny on 3/30/2021. (Chatigny, Robert) (Entered: 03/30/2021) |

JA027

| 03/30/2021 | 176 | ORDER finding as moot 12 Motion for Preliminary Injunction. Signed by Judge Robert N. Chatigny on 3/30/2021. (Chatigny, Robert) (Entered: 03/30/2021) |
|---|---|---|
| 03/30/2021 | 177 | ORDER denying 91 Motion for Joinder. The motion is denied, with the concurrence of the parties, in light of the case developments discussed in ECF No. 172, which have made the requested joinder unnecessary at this time. So ordered. Signed by Judge Robert N. Chatigny on 3/30/2021. (Chatigny, Robert) (Entered: 03/30/2021) |
| 04/25/2021 | 178 | ORDER granting 145 Motion to Dismiss. See attached ruling and order for details. Signed by Judge Robert N. Chatigny on 4/25/2021. (Price, N.) (Entered: 04/25/2021) |
| 04/26/2021 | 179 | JUDGMENT entered in favor of the defendants dismissing the action. For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms Signed by Clerk on 4/26/2021.(Bozek, M.) (Entered: 04/26/2021) |
| 04/26/2021 | | JUDICIAL PROCEEDINGS SURVEY - FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link: https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey (Bozek, M.) (Entered: 04/26/2021) |
| 05/26/2021 | 180 | NOTICE OF APPEAL as to 178 Order on Motion to Dismiss, 179 Judgment by Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, Selina Soule. Filing fee $ 505, receipt number ACTDC-6522475. (Brooks, Roger) (Entered: 05/26/2021) |
| 05/26/2021 | 181 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 180 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: none. (Agati, Kathryn) (Entered: 05/28/2021) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/23/2021 18:17:54 | | |
| **PACER Login:** cindyeville | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 3:20-cv-00201-RNC |
| **Billable Pages:** 26 | **Cost:** | 2.60 |

JA028

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SELINA SOULE, a minor, by Bianca
Stanescu, her mother; CHELSEA
MITCHELL, a minor, by Christina
Mitchell, her mother; ALANNA
SMITH, a minor, by Cheryl
Radachowsky, her mother,

*Plaintiffs,*

v.

CONNECTICUT ASSOCIATION OF
SCHOOLS d/b/a CONNECTICUT
INTERSCHOLASTIC ATHLETIC
CONFERENCE; BLOOMFIELD
PUBLIC SCHOOLS BOARD OF
EDUCATION; CROMWELL PUBLIC
SCHOOLS BOARD OF EDUCATION;
GLASTONBURY PUBLIC SCHOOLS
BOARD OF EDUCATION; CANTON
PUBLIC SCHOOLS BOARD OF
EDUCATION; DANBURY PUBLIC
SCHOOLS BOARD OF EDUCATION,

*Defendants.*

Case No. 3:20-cv-00201-RNC

Dated: February 12, 2020

## DECLARATION OF PROFESSOR GREGORY BROWN

I, Gregory A. Brown, declare as follows:

1.     I serve as Professor of Exercise Science in the Department of

Kinesiology and Sport Sciences at the University of Nebraska Kearney.

2.     In the attached Expert Declaration which I executed on January 7,

2020, I provide certain information and certain expert opinions based on my

1

JA029

expertise and professional familiarity with exercise physiology and my review of the
currently available science.

3.      The statements made in my Expert Declaration do represent my
expert opinion, and I believe all facts asserted therein to be true and correct.

        I declare under penalty of perjury that the foregoing is true
        and correct.

Signed: _____
          Dr. Gregory A. Brown

Date: _____Feb. 10, 2020_____

Signed and affirmed before me on the 10th day of February, 2020 by Gregory A.
Brown, who proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

_____
(Signature)

_____
(Printed Name) Bethany L. Johnson

GENERAL NOTARY - State of Nebraska
BETHANY L. JOHNSON
My Comm. Exp. December 27, 2022

My commission expires: Dec 27, 2022

JA030

# EXPERT DECLARATION OF GREGORY A. BROWN, Ph.D.

I, Dr. Gregory A. Brown, declare as follows:

## Qualifications

1.     I serve as Professor of Exercise Science in the Department of Kinesiology and Sport Sciences at the University of Nebraska Kearney. I have served as a tenured (and nontenured) professor at universities for over a decade.

2.     I teach classes in Exercise Physiology.

3.     In August 2002, I received a Doctor of Philosophy degree from Iowa State University, where I majored in Health and Human Performance, with an emphasis in the Biological Bases of Physical Activity. In May 1999, I received a Master of Science degree from Iowa State University, where I majored in Exercise and Sport Science, with an emphasis in Exercise Physiology.

4.     I have received many awards over the years, including the Mortar Board Faculty Excellence Honors Award, College of Education Outstanding Scholarship / Research Award, and the College of Education Award for Faculty Mentoring of Undergraduate Student Research.

5.     I have authored more than 40 refereed publications and more than 50 refereed presentations in the field of Exercise Science. I have authored chapters for multiple books in the field of Exercise Science. And I have served as a peer reviewer for over 25 professional journals, including The American Journal of Physiology, the International Journal of Exercise Science, and The Journal of Applied Physiology.

6.     My areas of research have included the endocrine response to testosterone prohormone supplements in men and women, the effects of testosterone prohormone supplements on health and the adaptations to strength training in men, the effects of energy drinks on the physiological response to exercise, and assessment of various athletic training modes in males and females. Articles that I have published that are closely related to topics that I discuss in this declaration, and to articles by other researchers that I cite and discuss in this declaration, include:

       a. Studies of the effect of ingestion of a testosterone precursor on circulating testosterone levels in young men. Douglas S.

1

JA031

King, Rick L. Sharp, Matthew D. Vukovich, Gregory A. Brown, et al., *Effect of Oral Androstenedione on Serum Testosterone and Adaptations to Resistance Training in Young Men: A Randomized Controlled Trial*, JAMA 281: 2020-2028 (1999); G. A. Brown, M. A. Vukovich, et al., *Effects of Anabolic Precursors on Serum Testosterone Concentrations and Adaptations to Resistance Training in Young Men*, INT J SPORT NUTR EXERC METAB 10: 340-359 (2000).

b.  A study of the effect of ingestion of that same testosterone precursor on circulating testosterone levels in young women. G. A. Brown, J. C. Dewey, et al., *Changes in Serum Testosterone and Estradiol Concentrations Following Acute Androstenedione Ingestion in Young Women*, HORM METAB RES 36: 62-66 (2004.)

c.  A study finding (among other things) that body height, body mass, vertical jump height, maximal oxygen consumption, and leg press maximal strength were higher in a group of physically active men than comparably active women, while the women had higher percent body fat. G. A. Brown, Michael W. Ray, et al., *Oxygen Consumption, Heart Rate, and Blood Lactate Responses to an Acute Bout of Plyometric Depth Jumps in College-Aged Men And Women*, J. STRENGTH COND RES 24: 2475-2482 (2010).

d.  A study finding (among other things) that height, body mass, and maximal oxygen consumption were higher in a group of male NCAA Division 2 distance runners, while women NCAA Division 2 distance runners had higher percent body fat. Furthermore, these male athletes had a faster mean competitive running speed (~3.44 min/km) than women (~3.88 min/km), even though the men ran 10 km while the women ran 6 km. Katherine Semin, Alvah C. Stahlnecker, Kate A. Heelan, G. A. Brown, et al, *Discrepancy Between Training, Competition and Laboratory Measures of Maximum Heart Rate in NCAA Division 2 Distance Runners*, JOURNAL OF SPORTS SCIENCE AND MEDICINE 7: 455-460 (2008).

7.  I attach a copy of my current Professional Vita, which lists my education, appointments, publications, research, and other professional experience.

2

Case 21-1365, Document 41, 07/09/2021, 3135054, Page37 of 184

8.     I have been asked to offer my opinions about whether males have inherent advantages in athletic performance over females, and if so the scale and physiological basis of those advantages, to the extent currently understood by science. I have also been asked to offer my opinion as to whether the sex-based performance advantage enjoyed by males is eliminated if feminizing hormones are administered to male athletes who identify as transgender.

9.     The opinions in this declaration are my own, and do not necessarily reflect the opinions of my employer, the University of Nebraska.

10.     I have not been compensated for my time spent in preparing this declaration.

## **Overview**

11.     Based on my professional familiarity with exercise physiology and my review of the currently available science, including that contained in the sources I cite in this declaration, it is my professional opinion that:

   a.     At the level of elite competition, men, or adolescent boys, have an advantage over women, or adolescent girls, in almost all athletic contests;

   b.     Biological male physiology is the basis for the performance advantage that men, or adolescent boys, have over women, or adolescent girls, in almost all athletic contests; and

   c.     Administration of androgen inhibitors and cross-sex hormones to men, or adolescent boys, after male puberty, and administration of testosterone to women or adolescent girls, after female puberty, does not eliminate the performance advantage of men or adolescent boys over women or adolescent girls in almost all athletic contests.

12.     In short summary, men, and adolescent boys, perform better in almost all sports than women, and adolescent girls, because of their inherent physiological advantages that develop during male puberty. In general, men, and adolescent boys, can run faster, output more physical power, jump higher, and exercise greater physical endurance than women, and adolescent girls.

13.     Indeed, while after the onset of puberty males are on average taller and heavier than females, a male performance advantage over females has been measured in weightlifting competitions even between males and females matched for body mass.

JA033

14.     These performance advantages are also very substantial, such that large numbers of men and even adolescent boys are able to outperform the very top-performing women. To illustrate, Doriane Coleman, Jeff Wald, Wickliffe Shreve, and Richard Clark created the figure below (last accessed on Monday, December 23, 2019 at https://bit.ly/35yOyS4), which shows that the *lifetime best performances* of three female Olympic champions in the 400m event—including Team USA's Sanya Richards-Ross and Allyson Felix—would not match the performances of literally thousands of boys and men, *just in 2017 alone*, including many who would not be considered top tier male performers:



4

15.     Coleman and Shreve also created the table below (last accessed on Monday, December 23, 2019 at https://bit.ly/37E1s2X), which "compares the number of boys—males under the age of 18—whose results in each event in 2017 would rank them above the single very best elite [adult] woman that year:"

| TABLE 1 – World's Best Woman v. Under 18 Boys | | | |
|---|---|---|---|
| Event | Best Women's Result | Best Boys' Result | # of Boys Outperforming |
| 100 Meters | 10.71 | 10.15 | 124[+] |
| 200 Meters | 21.77 | 20.51 | 182 |
| 400 Meters | 49.46 | 45.38 | 285 |
| 800 Meters | 1:55.16[*] | 1:46.3 | 201+ |
| 1500 Meters | 3:56.14 | 3:37.43 | 101+ |
| 3000 Meters | 8:23.14 | 7:38.90 | 30 |
| 5000 Meters | 14:18.37 | 12:55.58 | 15 |
| High Jump | 2.06 meters | 2.25 meters | 28 |
| Pole Vault | 4.91 meters | 5.31 meters | 10 |
| Long Jump | 7.13 meters | 7.88 meters | 74 |
| Triple Jump | 14.96 meters | 17.30 meters | 47 |

16.     Coleman and Shreve also created the table below (last accessed on Monday, December 23, 2019 at https://bit.ly/37E1s2X), which compares the number of men—males over 18—whose results in each event in 2017 would have ranked them above the very best elite woman that year.

| TABLE 2 – World's Best Woman v. Number of Men Outperforming | | | |
|---|---|---|---|
| Event | Best Women's Result | Best Men's Result | # of Men Outperforming |
| 100 Meters | 10.71 | 9.69 | 2,474 |
| 200 Meters | 21.77 | 19.77 | 2,920 |
| 400 Meters | 49.46 | 43.62 | 4,341 |
| 800 Meters | 1:55.16* | 1:43.10 | 3,992+ |
| 1500 Meters | 3:56.14 | 3:28.80 | 3,216+ |
| 3000 Meters | 8:23.14 | 7:28.73 | 1307+ |
| 5000 Meters | 14:18.37 | 12:55.23 | 1,243 |
| High Jump | 2.06 meters | 2.40 meters | 777 |
| Pole Vault | 4.91 meters | 6.00 meters | 684 |
| Long Jump | 7.13 meters | 8.65 meters | 1,652 |
| Triple Jump | 14.96 meters | 18.11 meters | 969 |

17.     These advantages result, in large part, from higher testosterone concentrations in men, and adolescent boys, after the onset of male puberty. Higher testosterone levels cause men, and adolescent boys, to develop more muscle mass, greater muscle strength, less body fat, higher bone mineral density, greater bone

5

JA035

Case 3:21-1365   Document 141   07/09/2021   3135054   Page 40 of 184

strength, higher hemoglobin concentrations, larger hearts and larger coronary blood vessels, and larger overall statures than women, and adolescent girls. In addition, maximal oxygen consumption ($VO_2max$), which correlates to ~30-40% of success in endurance sports, is higher in both elite and average men and boys than in comparable women and girls when measured in regards to absolute volume of oxygen consumed and when measured relative to body mass. Testosterone is also associated with increased aggressiveness, which may offers competitive advantages for men over women.

18.    Although androgen deprivation may modestly decrease some physiological advantages that men and adolescent boys have over women and adolescent girls, it cannot fully eliminate those physiological advantages once an individual has passed through male puberty. For example, androgen deprivation does not reduce bone size, does not alter bone structure, and does not decrease lung volume or heart size.  Nor does androgen deprivation in adult men completely reverse the increased muscle mass acquired during male puberty.

19.    In this declaration, I present, in the headings marked with Roman numerals, certain of my opinions about sex-based differences in human physiology and the impact of those differences on the athletic performance of men and women. For each of these opinions, I then provide a brief overview, and a non-exhaustive summary of studies published in science journals or other respected sources that support and provide in part the basis of my opinion, also quoting relevant findings of each article.

20.    In particular, I cite nine articles published in scientific journals. I provide capsule summaries of those nine articles below.

a.    The first resource I cite is David J. Handelsman, Angelica L. Hirschberg, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39:5 ENDOCRINE REVIEWS 803 (2018). This article correlates data about performance differences between males and females with data from over 15 liquid chromatography-mass spectrometry studies of circulating testosterone in adults, as a function of age. The authors conclude, among other things, that "[f]rom male puberty onward, the sex difference in athletic performance emerges as circulating concentrations rise as the testes produce 30 times more testosterone than before puberty, resulting in men having 15- to 20-fold greater circulating testosterone than children or women at any age." (804)

b.    The second resource I cite is Valérie Thibault, Marion Guillaume, et al., *Women & Men in Sport Performance: The Gender Gap Has Not Evolved Since 1983*, 9 J. OF SPORTS SCIENCE & MEDICINE 214 (2010). This

6

JA036

Case 21-1365, Document 41, 07/09/2021, 3135054, Page41 of 184

article analyzes results from 82 athletic events since the beginning of the modern Olympic era, and concludes in part that while a wide sex-based performance gap existed before 1983, due to a likely combination of physiological and non-physiological reasons, the sex-based performance gap stabilized in 1983, at a mean difference of 10.0 % ± 2.94 between men and women for all events. (214)

c.  The third resource I cite is Beat Knechtle, Pantelis T. Nikolaidis, et al., *World Single Age Records in Running from 5 km to Marathon*, 9 FRONTIERS IN PSYCHOLOGY 1 (2013). This article analyzes results from a study of the relationship between performance and age in races of several lengths, and reports in part that "[i]n all races [studied], women were significantly slower than men." (7)

d.  The fourth resource I cite is Romuald Lepers, Beat Knechtle, et al., *Trends in Triathlon Performance: Effects of Sex & Age*, 43 SPORTS MED 851 (2013). This article analyzes results from various triathlon events over the course of about 15 years, and reports in part a sex-based performance gap between the sexes of no less than 10% in every component event, with this sex-based performance gap increasing with age.

e.  The fifth resource I cite is Espen Tønnessen, Ida Siobhan Svendsen, et al., *Performance Development in Adolescent Track & Field Athletes According to Age, Sex, and Sport Discipline*, 10:6 PLoS ONE 1 (2015). This article analyzes the 100 all-time best Norwegian male and female track and field results (in persons aged 11 to 18) from the 60m and 800m races, and the long jump and high jump events. The results show that sex-specific differences that arise during puberty significantly affect event results, with males regularly outperforming females after age 12.

f.  The sixth resource I cite is David J. Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding with the Onset of Male Puberty*, 87 CLINICAL ENDOCRINOLOGY 68 (2017). This article analyzes results from a secondary quantitative analysis of four published sources that report performance measures in swimming meets, track and field events, and hand-grip strength. The results show in part that the onset and tempo of sex-based performance divergence were very similar for all performance measures, and that this divergence closely paralleled the rise of circulating testosterone in adolescent boys.

g.  The seventh resource I cite is Louis Gooren, *The Significance of Testosterone for Fair Participation of the Female Sex in Competitive Sports*, 13 ASIAN J. OF ANDROLOGY 653 (2011). This article highlights specific

7

JA037

research that indicates pubertal testosterone increases result in significant physiological advantages for men and adolescent boys, compared to women and girls, after the onset of male puberty.

> h.      The eighth resource I cite is Taryn Knox, Lynley C. Anderson, et al., *Transwomen in Elite Sport: Scientific & Ethical Considerations*, 45 J. MED ETHICS 395 (2019). This article confirms from available science that higher testosterone levels provide an all-purpose benefit in sport, and that the current International Olympic Guidelines rule requiring  males who identify as transgender to keep testosterone levels under 10 nmol/L for 1 year does not eliminate (or even come close to eliminating) the performance advantage of their male physiology.

> i.      The ninth resource I cite is Louis J. G. Gooren & Mathijs C. M. Bunck, *Transsexuals & Competitive Sports*, 151 EUROPEAN J. OF ENDOCRINOLOGY 425 (2004). This article analyzes results from a study that compared pretreatment physiological measurements in 17 female-to-male transsexuals with the measurements after one year of cross-sexual treatment in 19 male-to-female transsexuals undergoing sex reassignment therapy. The results in part confirmed that androgen deprivation in male-to-female transsexuals increases the overlap in muscle mass with women but does not reverse certain effects of androgenization that had occurred during male puberty.

21.      I explain my opinions and the results of these studies in more detail below.

## Opinions

### I.      Biological men, or adolescent boys, have an advantage over women, or adolescent girls, in almost all athletic contests.

22.      As one team of researchers has recently written, "Virtually all elite sports are segregated into male and female competitions. The main justification is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger, muscles and bones as well as a higher circulating hemoglobin level." David J. Handelsman, Angelic L. Hirschberg, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39:5 ENDOCRINE REVIEWS 803 (2018).

23.      In fact, biological men, and adolescent boys, substantially outperform comparably aged women, and adolescent girls, in competitions involving running

speed, swimming speed, cycling speed, jumping height, jumping distance, and strength (to name a few, but not all, of the performance differences). These performance advantages for men, and adolescent boys, are inherent to the biological differences between the sexes and are not due to social or cultural factors, as evidenced by minimal to no change in the percentage differences between males and females in world class and record setting performances in the past 40 years.

24.    I highlight below key findings about male performance advantages from seven studies or datasets.

### A.    David J. Handelsman, Angelica L. Hirschberg, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39:5 ENDOCRINE REVIEWS 803 (2018):

25.    The Handelsman et al. (2018) authors demonstrate a consistent pattern of divergence of athletic performance, in favor of males, across the years of puberty and strongly correlating to increasing testosterone levels in adolescent males.  The pattern is observed in events exercising a variety of muscle systems.  In sum, the Handelsman et al. (2018) authors report: "Corresponding to the endogenous circulating testosterone increasing in males after puberty to 15 to 20 nmol/L (sharply diverging from the circulating levels that remain <2 nmol/L in females), male athletic performances go from being equal on average to those of age-matched females to 10% to 20% better in running and swimming events, and 20% better in jumping events." (812)

26.    Taken from Handelsman's Figure 1, the chart below indicates "sex differences in performance (in percentage) according to age (in years) in running events, including 50m to 2 miles." (813)



9

27.    Taken from Handelsman's Figure 1, the chart below indicates "sex differences in performance (in percentage) according to age (in years) … in jumping events, including high jump, pole vault, triple jump, long jump, and standing jump." (813)



28.    Taken from Handelman's Figure 1, the chart below indicates "a fitted sigmoidal curve plot of sex differences in performance (in percentage) according to age (in years) in running, jumping, and swimming events, as well as the rising serum testosterone concentrations from a large dataset of serum testosterone of males. Note that in the same dataset, female serum testosterone concentrations did not change over those ages, remaining the same as in prepubertal boys and girls. Data are shown as mean and SEM of the pooled sex differences by age." (813)



10

29.     These authors also note the significance, for athletic competition, of the subjective nature of "gender identity" in current understanding: "Prompted by biological, personal, and societal factors, volitional expression of gender can take on virtually any form limited only by the imagination, with some individuals asserting they have not just a single natal gender but two genders, none, a distinct third gender, or gender that varies (fluidly) from time to time…." For this reason, the authors conclude: "[I]f gender identity were the basis for eligibility for female sports, an athlete could conceivably be eligible to compete at the same Olympics in both female and male events. These features render the unassailable personal assertion of gender identity incapable of forming a fair, consistent sex classification in elite sports." (804)

## B.     Valérie Thibault, Marion Guillaume, et al., *Women & Men in Sport Performance: The Gender Gap has not Evolved Since 1983*, 9 J. OF SPORTS SCIENCE & MEDICINE 214 (2010):

30.     The Thibault et al. authors note that there was a large but narrowing sex-based performance gap between men's and women's Olympic athletic performances before 1983, which could hypothetically be attributed to a combination of social, political, or other non-physiological reasons, in addition to physiological reasons. However, "the gender gap in Olympic sport performance has been stable since 1983" (219) "at a mean difference of $10.0\% \pm 2.94$ between men and women for all [Olympic] events." (222)

31.     Since then, even when performances improve, the "progressions are proportional for each gender." (219-20)

32.     The results of this study "suggest that women's performances at the high level will never match those of men" (219) and that "women will not run, jump, swim or ride as fast as men." (222) The authors conclude that this gap, now stable for 30+ years, is likely attributable to physiology, and thus that "[s]ex is a major factor influencing best performances and world records." (222)

33.     Breaking these performance advantages out by event, the authors report the following sex-based performance gaps in Olympic sport competitions since 1983:

a.     "The gender gap ranges from 5.5% (800-m freestyle, swimming) to 36.8% (weightlifting)." (222)

b.     Olympic world records in running events indicate that men perform "10.7% (± 1.85)" better than women since gender gap stabilization. (217)

     c.     Olympic world records in jumping events indicate that men perform "17.5% (± 1.11)" better than women since gender gap stabilization. (217)

     d.     Olympic world records in swimming events indicate that men perform "8.9 % (± 1.54)" better than women since gender gap stabilization. (218)

     e.     Olympic world records in cycling sprint events indicate that men perform "6.95% (± 0.16)" better than women since gender gap stabilization. (219)

     f.     Olympic world records in weightlifting events indicate that men perform "36.8% (± 6.2)" better than women since gender gap stabilization. Note that the Olympics first introduced women's weightlifting events in 1998, and "no breakpoint date has been detected yet." (219)

34.    "The top ten performers' analysis reveals a similar gender gap trend with a stabilization in 1982 at 11.7%" when averaged across all events. (222)

### C.    Beat Knechtle, Pantelis T. Nikolaidis, et al., *World Single Age Records in Running from 5 km to Marathon*, 9 FRONTIERS IN PSYCHOLOGY 1 (2013):

35.    A comparison of performances in races of a variety of distances showed that "[i]n all races, women were significantly slower than men. The estimated sex differences … were increasing" as race distances increased from 8km.[1]

### D.    Romuald Lepers, Beat Knechtle, et al., *Trends in Triathlon Performance: Effects of Sex & Age*, 43 SPORTS MED 851 (2013):

36.    Based on data from a variety of elite triathlon and ultra-triathlon events spanning 22 years, the Lepers et al. authors reported that "elite males appear to run approximately 10–12 % faster than elite females across all endurance running race distances up to marathon, with the sex difference narrowing as the race distance increases. However, at distances greater than 100 km, such as the 161-km ultramarathon, the difference seems even larger, with females 20–30 % slower than males." (853)

---

[1] Throughout this Declaration, in the interest of readability I have omitted internal citations from my quotations from the articles I cite.  The sources cited by these authors may of course be found by reference to those articles.

JA042

37.     Lepers and Knechtle Table 1 below shows the "[m]ean sex differences in time performance for swimming, cycling, running and total time at different national and international triathlons." (854)

| Event | Sex difference in time performance (%) | | | |
|---|---|---|---|---|
| | Swim | Cycle | Run | Total |
| Short distance (1.5–40–10 km): [30, 79] | | | | |
| Zurich (Switzerland) from 2000 to 2010 | | | | |
|   Top five elite overall | 15.2 | 13.4 | 17.1 | 14.8 |
|   Top five AG, from 18 to 54 years | 18.5 | 15.5 | 18.5 | 17.1 |
| World Championship from 2009 to 2011 | | | | |
|   Top ten AG, from 18 to 64 years | 13.3 | 10.7 | 7.5 | 12.0 |
| Half Ironman (1.9–90–21 km): [31, 79] | | | | |
| Rapperswil (Switzerland) from 2007 to 2010 | | | | |
|   Top five elite overall | 14.1 | 12.3 | 12.5 | 12.6 |
|   Top five AG, from 18 to 54 years | 22.3 | 16.4 | 19.2 | 17.6 |
| World Championship from 2009 to 2011 | | | | |
|   Top ten AG, from 18 to 64 years | 12.4 | 11.2 | 14.5 | 12.6 |
| Off-road triathlon (1.5–30–10 km): [9] | | | | |
| World championship (Maui, USA) from 2007 to 2009 | | | | |
|   Top ten elite overall | 12.4 | 19.6 | 18.4 | 18.2 |
| Ironman (3.8–180–42 km): [2, 32, 34] | | | | |
| World championship (Kona, Hawaii, USA) from 1988 to 2007 | | | | |
|   Top ten elite overall | 9.8 | 12.7 | 13.3 | 12.6 |
|   Top ten AG, from 18 to 64 years | 12.1 | 15.4 | 18.2 | 15.8 |
| Zurich (Switzerland) from 1995 to 2010 | | | | |
|   Top ten elite overall | 14.0 | 13.2 | 18.2 | 14.9 |

38.     "[F]or ultratriathlons, it has been shown that with increasing length of the event, the best females became relatively slower compared with the best males. Indeed, if the world's best performances are considered, males were 19 % faster than the females in both Double and Triple Ironman distance, and 30 % faster in the Deca-Ironman distance." (854)

39.     "The average sex difference in swimming performance during triathlon for race distances between 1.5 and 3.8 km ranged between approximately 10 and 15 % for elite triathletes." (854)

13

JA043

40.     Lepers and Knechtle Table 2 below shows the "[m]ean percentage differences in times for swimming, cycling, running and total event between the top ten females and males … in 2012 at four international triathlons:" (855)

| Event | Sex difference in performance in top ten athletes in 2012 (mean $\pm$ SD) | | | |
|---|---|---|---|---|
| | Swim | Cycle | Run | Total |
| Hawaii Ironman Triathlon (3.8–180–42 km) | 14.1 $\pm$ 7.9 | 13.1 $\pm$ 2.3 | 7.3 $\pm$ 2.9 | 11.3 $\pm$ 0.5 |
| Olympics Triathlon (1.5–40–10 km) with drafting | 11.8 $\pm$ 2.0 | 11.3 $\pm$ 0.6 | 14.7 $\pm$ 0.8 | 14.1 $\pm$ 7.9 |
| Hy-Vee Triathlon (1.5–40–10 km) without drafting | 8.6 $\pm$ 4.8 | 10.2 $\pm$ 3.5 | 8.6 $\pm$ 4.4 | 9.3 $\pm$ 0.5 |
| World Championship Off-Road Triathlon (1.5–30–10 km) | 15.2 $\pm$ 15.5 | 22.6 $\pm$ 4.4 | 15.1 $\pm$ 6.7 | 17.3 $\pm$ 2.9 |

41.     "[T]he sex difference in performance between the best male and female ultraswimmers is more generally close to 11–12 %, which corresponds to values observed for swimming in triathlon." (855)

42.     "Sex differences in triathlon cycling vary from 12 to 16% according to the level of expertise of participating triathletes for road-based triathlons." (855)

43.     "In track cycling, where females are generally weaker than males in terms of power/weight ratios, the performance gap between males and females appears to be constant (<11 %) and independent of the race distance from 200 to 1,000 m." (855)

44.     "In ultra-cycling events, such as the 'Race Across America,' sex difference in performance was around 15 % among top competitors. Greater muscle mass and aerobic capacity in males, even expressed relative to the lean body mass, may represent an advantage during long-distance cycling, especially on a relatively flat course such as Ironman cycling, where cycling approximates to a non-weight-bearing sport. Indeed, it has been shown that absolute power output (which is greater for males than for females) is associated with successful cycling endurance performance because the primary force inhibiting forward motion on a flat course is air resistance." (855-56)

45.     "Interestingly, for elite triathletes, the sex difference in mountain bike cycling during off-road triathlon (<20 %) is greater than cycling sex differences in conventional road-based events. Mountain biking differs in many ways from road cycling. Factors other than aerobic power and capacity, such as off-road cycling economy, anaerobic power and capacity, and technical ability might influence off-road cycling performance. Bouts of high-intensity exercise frequently encountered

14

JA044

during the mountain biking leg of off-road triathlon (lasting <1 h 30 min for elite males and <2 h for elite females) can result from (1) having to overcome the constraints of gravity associated with steep climbs, (2) variable terrain necessitating wider tires and thus greater rolling resistance, and (3) isometric muscle contractions associated with the needs of more skilled bike-handling skills, not so often encountered in road cycling. However, in particular, lower power-to-weight ratios for female than for male triathletes inevitably leave them at a disadvantage during steep climbs." (856)

46.     "During the 1988–2007 period, the top ten elite males have run the Hawaii Ironman marathon on average 13.3 % faster than the top ten females." (856)

### E.     Espen Tønnessen, Ida Siobhan Svendsen, et al., *Performance Development in Adolescent Track & Field Athletes According to Age, Sex & Sport Discipline*, 10:6 PLoS ONE 1 (2015):

47.     While both sexes increase performance across the teen years, the Tønnessen et al. authors found performance advantages for male athletes associated with the onset of puberty and becoming increasingly larger across the years of puberty, in a chronological progression that was closely similar across diverse track and field events.

48.     "The current results indicate that the sex difference evolves from < 5% to 10–18% in all the analyzed disciplines from age 11 to 18 yr. The gap widens considerably during early adolescence before gradually stabilizing when approaching the age of 18. This evolution is practically identical for the running and jumping disciplines. The observed sex differences at the age of 18 are in line with previous studies of world-class athletes where a sex difference of 10–12% for running events and ~19% for jumping events has been reported." (8)

49.     "Male and female athletes perform almost equally in running and jumping events up to the age of 12. Beyond this age, males outperform females. Relative annual performance development in females gradually decreases throughout the analyzed age period. In males, annual relative performance development accelerates up to the age of 13 (for running events) or 14 (for jumping events) and then gradually declines when approaching 18 years of age. The relative improvement from age 11 to 18 was twice as high in jumping events compared to running events. For all of the analyzed disciplines, overall improvement rates were >50% higher for males than for females. The performance sex difference evolves from < 5% to 10-18% in all the analyzed disciplines from age 11 to 18 yr." (1)

50.     "Recent studies of world-class athletes indicate that the sex difference is 10–12% for running events and ~19% for jumping events." (2)

15

JA045

51.     Tønnessen and Svendsen's Table 1 below shows the "[e]xpected progressions in running and jumping performance for 11-18 [year] old males and females," as deduced from "[t]he 100 all-time best Norwegian male and female 60-m, 800-m, long jump and high jump athletes in each age category . . . ." (1, 4)

Table 1.  Expected progressions in running and jumping performance for 11–18 yr old males and females.

| Age (yr) | 60 m | | 800 m | | Long Jump | | High Jump | |
|---|---|---|---|---|---|---|---|---|
| | Boys Progression (s and %) | Girls Progression (s and %) | Boys Progression (s and %) | Girls Progression (s and %) | Boys Progression m (%) | Girls Progression m (%) | Boys Progression m (%) | Girls Progression m (%) |
| 11–12 | -0.35 (4.1) | -0.35 (4.0) | -6.4 (4.4) | -7.3 (4.8) | +0.35 (7.4) | +0.36 (7.9) | +0.11 (7.4) | +0.10 (7.2) |
| 12–13 | -0.48 (5.8) | -0.25 (2.9) | -8.7 (6.2) | -5.5 (3.8) | +0.43 (8.6) | +0.30 (6.0) | +0.12 (7.9) | +0.09 (6.3) |
| 13–14 | -0.29 (3.7) | -0.16 (2.0) | -5.9 (4.5) | -3.6 (2.6) | +0.50 (9.0) | +0.21 (4.1) | +0.13 (8.1) | +0.06 (3.6) |
| 14–15 | -0.10 (1.3) | -0.02 (0.2) | -5.2 (4.1) | -2.2 (1.6) | +0.34 (5.6) | +0.13 (2.4) | +0.08 (4.3) | +0.04 (2.4) |
| 15–16 | -0.17 (2.3) | -0.08 (1.0) | -3.2 (2.7) | -1.6 (1.2) | +0.28 (4.4) | +0.10 (1.8) | +0.07 (3.6) | +0.03 (1.8) |
| 16–17 | -0.10 (1.4) | -0.07 (0.8) | -2.3 (1.9) | -1.5 (1.2) | +0.19 (2.9) | +0.06 (1.1) | +0.05 (2.5) | +0.01 (0.6) |
| 17–18 | -0.05 (0.7) | -0.02 (0.2) | -1.5 (1.4) | -0.6 (0.4) | +0.17 (2.5) | +0.02 (0.4) | +0.04 (1.9) | +0.01 (0.5) |

Data are mean (standard deviation) for top 100 Norwegian male and female performers in each discipline.

52.     Tønnessen and Svendsen's Table 2 below shows the "[s]ex ratio in running and jumping performance for 11-18 [year] old males and females," as deduced from "[t]he 100 all-time best Norwegian male and female 60-m, 800-m, long jump and high jump athletes in each age category . . . ." (1, 6)

Table 2.  Sex ratio in running and jumping performance for 11–18 yr old males and females.

| | 60 m | 800 m | Long Jump | High Jump |
|---|---|---|---|---|
| 11 | 0.99 | 0.95 | 0.96 | 0.97 |
| 12 | 0.98 | 0.96 | 0.97 | 0.96 |
| 13 | 0.96 | 0.93 | 0.94 | 0.95 |
| 14 | 0.94 | 0.92 | 0.90 | 0.90 |
| 15 | 0.93 | 0.89 | 0.87 | 0.89 |
| 16 | 0.92 | 0.88 | 0.85 | 0.87 |
| 17 | 0.91 | 0.87 | 0.84 | 0.85 |
| 18 | 0.91 | 0.86 | 0.82 | 0.84 |

Data are calculated from mean results of top 100 Norwegian male and female performers in each discipline.

16

53.     Tønnessen and Svendsen's Figure 1 below shows "[p]erformance development from age 11 to 18 in running and jumping disciplines. Data are mean ± [standard deviation] for 60 m, 600 m, long jump, and high jump for top 100 Norwegian male and female performers in each discipline:" (4)



54.     Tønnessen and Svendsen's Figure 3 below shows the "[s]ex difference for performance in running and jumping disciplines from age 11 to 18. Data are mean and 95% [confidence intervals] for 60 m, 600 m, long jump, and high jump for top 100 Norwegian male and female performers in each discipline:" (6)



17

JA047

55. As for the 60m race, the tables and charts above illustrate:

a. "[B]oys improve 0.3–0.5 [seconds] over 60 m sprint each year up to the age of 14 [years] (very large to nearly perfect annual effect), 0.1–0.2 [seconds] annually from 14 to 17 [years] (moderate to large annual effect), and 0.05 [seconds] from age 17 to 18 [years] (moderate effect). Relative annual improvement peaks between 12 and 13 [years] (5.8%; nearly perfect effect), and then gradually declines to 0.7% between age 17 and 18 [years] (moderate effect)." (3)

b. "On average, boys improve their 60 m performance by 18% from age 11 to 18 [years]. Girls improve 0.35 [seconds] over 60 m from age 11 to 12 [years] (4%; very large effect). Then, absolute and relative annual improvement gradually slows and almost plateaus between age 14 and 15 (0.02 s; 0.2%; trivial effect). From age 15 to 17, annual improvement increases somewhat to 0.07–0.08 [seconds] (~1%; moderate effect) before plateauing again between age 17 and 18 (0.02 s; 0.2%; trivial effect). In total, girls improve their 60-m performance by 11% from age 11 to 18 [years]…. [T]he sex difference for 60 m sprint evolves from 1.5% at age 11 to 10.3% at the age of 18…. [T]he sex ratio for 60 m running performance develops from 0.99 at age 11 to 0.91 at age 18." (4-5)

56. As for the 800m race, the tables and charts above illustrate:

a. "[B]oys improve 6–9 [seconds] over 800 m each year up to age 14 [years] (very large to nearly perfect annual effect). Relative annual improvement peaks between age 12 and 13 (6.2%; nearly perfect effect), then gradually decreases to 1.5 [seconds] between age 17 and 18 (1.4%; moderate effect)." (5)

b. "On average, boys enhance their 800-m performance by 23% from age 11 to 18. For girls, both absolute and relative annual performance development gradually decreases across the analysed age stages. The improvement is slightly above 7 [seconds] between age 11 and 12 [years] (4.8%: very large effect), decreasing to only 0.6 [seconds] from age 17 to 18 (0.4%; small effect)…. [G]irls enhance their 800-m performance by 15% from age 11 to 18. The 800 m performance sex difference evolves from 4.8% at the age of 11 to 15.7% at the age of 18…. [T]he sex ratio for 800 m running performance develops from 0.95 at age 11 to 0.86 at age 18." (5)

57. As for the long jump, the tables and charts above illustrate:

JA048

a. "[A]nnual long jump improvement among boys gradually increases from 35 cm between age 11 and 12 [years] (7.4%; very large effect) to 50 cm between age 13 and 14 (9%; very large effect). Both absolute and relative annual development then gradually falls to 17 cm between age 17 and 18 (2.5%; moderate effect)." (5)

b. "[B]oys, on average, improve their long jump performance by 48% from age 11 to 18 yr. For girls, both absolute and relative annual performance enhancement gradually falls from age 11 to 12 [years] (36 cm; 7.9%; very large effect) until nearly plateauing between 17 and 18 [years] (2 cm; 0.4%; trivial effect). Overall, girls typically improve their long jump performance by 26% throughout the analysed age stages. The sex difference in long jump evolves from 3.6% at the age of 11 to 18% at the age of 18…. [T]he sex ratio for long jump performance develops from 0.96 at age 11 to 0.82 at age 18." (5)

58.    As for the high jump, the tables and charts above illustrate:

a. "[B]oys improve their high jump performance by 11–13 cm each year up to the age of 14 (7–8%; very large annual effects). Both absolute and relative annual improvement peaks between age 13 and 14 (13 cm; 8.1%; very large effect), then gradually decreases to 4 cm from age 17 to 18 (1.9%; moderate annual effect)." (6)

b. "Overall, boys improve their high jump performance by, on average, 41% from age 11 to 18. For girls, both absolute and relative annual improvement decreases from 10 cm from age 11 to 12 [years] (7.2%; very large effect) until it plateaus from age 16 (1 cm; ~0.5%; small annual effects). Overall, girls typically improve their high jump performance by 24% from age 11 to 18. The sex difference in high jump performance evolves from 3.5% at the age of 11 to 16% at the age of 18…. [T]he sex ratio for high jump performance develops from 0.97 at age 11 to 0.84 at age 18." (6-7)

## F.    David J. Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding with the Onset of Male Puberty*, 87 CLINICAL ENDOCRINOLOGY 68 (2017):

59.    Analyzing four separate studies, Handelsman (2017) found very closely similar trajectories of divergence of athletic performance between the sexes across the adolescent years, in all measured events.

19

JA049

60. As illustrated by Figure 1 of Handelsman (2017) below, study results showed that "[i]n swimming performance, the overall gender differences were highly significant . . . ." (69)



61. As illustrated by Figure 2 of Handelsman (2017) below, "[i]n track and field athletics, the effects of age on running performance showed that the prepubertal differences of 3.0% increased to a plateau of 10.1% with an onset ($ED_{20}$) at 12.4 years and reaching midway ($ED_{50}$) at 13.9 years. For jumping, the prepubertal difference of 5.8% increased to 19.4% starting at 12.4 years and reaching midway at 13.9 years." (70)



20

62.     As also illustrated in Figure 2 of Handelsman (2017), the author found a strong correlation between the increasing male performance advantage and blood serum testosterone levels, and reported: "The timing of the male advantage in running, jumping and swimming was similar [across events] and corresponded to the increases in serum testosterone in males." (70)



### G.     International Weightlifting Federation "World Records":

63.     I accessed weightlifting records as posted by the International Weightlifting Federation at https://www.iwf.net/results/world-records/. The records collected below are as of November 1, 2019.

64.     As the chart below illustrates, junior men's and women's world records (age 15-20) for clean and jerk lifts indicate that boys or men perform better than girls or women even when they are matched for body mass. Similar sex differences can be found for the snatch event on the International Weightlifting Federation website.

| Junior Men's and Women's World Records (ages 15-20) for Clean and Jerk | | | |
| --- | --- | --- | --- |
| Men's weight (kg) | Record (kg) | Women's weight (kg) | Record (kg) |
| 56 | 171 | 58 | 142 |
| 62 | 183 | 63 | 147 |
| 69 | 198 | 69 | 157 |
| 77 | 214 | 75 | 164 |
| 85 | 220 | 90 | 160 |
| 94 | 233 | +90 | 193 |

21

JA051

## II. Biological male physiology is the basis for the performance advantage that men, or adolescent boys, have over women, or adolescent girls, in almost all athletic contests.

65.    Common observation and knowledge tell us that, across the years of puberty, boys experience distinctive physical developments that largely explain the performance advantages I have detailed above.  These well-known physical developments have now also been the subject of scientific measurement and study.

66.    At the onset of male puberty the testes begin to secrete greatly increased amounts of testosterone. Testosterone is the primary "androgenic" hormone. It causes the physical traits associated with  males such as facial and body hair growth, deepening of the voice, enlargement of the genitalia, increased bone mineral density, increased bone length in the long bones, and enhanced muscle growth (to name just a few of testosterone's effects).  The enhanced muscle growth caused by testosterone is the "anabolic" effect often discussed when testosterone is called an anabolic steroid.

67.    Women lack testes and instead have ovaries, so they do not experience similar increases in testosterone secretion. Instead, puberty in women is associated with the onset of menstruation and increased secretion of "estrogens." Estrogens, most notably estradiol, cause the feminizing effects associated with puberty in women which include increased fat tissue growth in the hips, thighs, and buttocks, development of the mammary glands, and closure of the growth plates in long bones.  The smaller amount of muscle growth typically seen in women during puberty explains in part the athletic performance gap between men, and boys after the onset of puberty, and women and girls.

### A.    Handelsman, Hirschberg, et al. (2018)

68.    In addition to documenting objective performance advantages enjoyed by males as I have reviewed above, Handelsman and his co-authors also detail physiological differences caused by male puberty—and by developments during puberty under the influence of male levels of testosterone in particular—that account for those advantages. These authors state: "The striking male postpubertal increase in circulating testosterone provides a major, ongoing, cumulative, and durable physical advantage in sporting contests by creating larger and stronger bones, greater muscle mass and strength, and higher circulating hemoglobin as well as possible psychological (behavioral) differences. In concert, these render women, on average, unable to compete effectively against men in power-based or endurance-based sports." (805)

22

JA052

69.     First, Handelsman et al. explain that all of these physiological differences appear to be driven by male levels of circulating testosterone.  "The available, albeit incomplete, evidence makes it highly likely that the sex difference in circulating testosterone of adults explains most, if not all, of the sex differences in sporting performance. This is based on the dose-response effects of circulating testosterone to increase muscle mass and strength, bone size and strength (density), and circulating hemoglobin, each of which alone increases athletic capacity, as well as other possible sex dichotomous, androgen-sensitive contributors such as mental effects (mood, motivation, aggression) and muscle myoglobin content. These facts explain the clear sex difference in athletic performance in most sports, on which basis it is commonly accepted that competition has to be divided into male and female categories." (823)

70.     "Prior to puberty, levels of circulating testosterone as determined by LC-MS are the same in boys and girls . . . . They remain lower than 2 nmol/L in women of all ages. However, from the onset of male puberty the testes secrete 20 times more testosterone resulting in circulating testosterone levels that are 15 times greater in healthy young men than in age-similar women." (806) "[T]he circulating testosterone of most women never reaches consistently >5 nmol/L, a level that boys must sustain for some time to exhibit the masculinizing effects of male puberty." (808)

71.     "The characteristic clinical features of masculinization (e.g., muscle growth, increased height, increased hemoglobin, body hair distribution, voice change) appear only if and when circulating testosterone concentrations rise into the range of males at mid-puberty, which are higher than in women at any age even after the rise in circulating testosterone in female puberty." (810)

72.     "[The] order-of-magnitude difference in circulating testosterone concentrations is the key factor in the sex difference in athletic performance due to androgen effects principally on muscle, bone, and hemoglobin." (811)

73.     "Modern knowledge of the molecular and cellular basis for androgen effects on skeletal muscle involves effects due to androgen (testosterone, DHT) binding to the AR that then releases chaperone proteins, dimerizes, and translocates into the nucleus to bind to androgen response elements in the promoter DNA of androgen-sensitive genes. This leads to increases in (1) muscle fiber numbers and size, (2) muscle satellite cell numbers, (3) numbers of myonuclei, and (4) size of motor neurons. Additionally, there is experimental evidence that testosterone increases skeletal muscle myostatin expression, mitochondrial biogenesis, myoglobin expression, and IGF-1 content, which may augment energetic and power generation of skeletal muscular activity." (811)

23

JA053

74. **Muscle mass** is perhaps the most obvious driver of male athletic advantage. "On average, women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 70% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight. Whereas numerous genes and environmental factors (including genetics, physical activity, and diet) may contribute to muscle mass, the major cause of the sex difference in muscle mass and strength is the sex difference in circulating testosterone." (812)

75. "Dose-response studies show that in men whose endogenous testosterone is fully suppressed, add-back administration of increasing doses of testosterone that produce graded increases in circulating testosterone causes a dose-dependent (whether expressed according to testosterone dose or circulating levels) increase in muscle mass (measured as lean body mass) and strength. Taken together, these studies prove that testosterone doses leading to circulating concentrations from well below to well above the normal male range have unequivocal dose-dependent effects on muscle mass and strength. These data strongly and consistently suggest that the sex difference in lean body mass (muscle) is largely, if not exclusively, due to the differences in circulating testosterone between men and women. These findings have strong implications for power dependent sport performance and largely explain the potent efficacy of androgen doping in sports." (813)

76. "Muscle growth, as well as the increase in strength and power it brings, has an obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events. There is convincing evidence that the sex differences in muscle mass and strength are sufficient to account for the increased strength and aerobic performance of men compared with women and is in keeping with the differences in world records between the sexes." (816)

77. Men and adolescent boys also have distinct athletic advantages in **bone size, strength, and configuration**.

78. "Sex differences in height have been the most thoroughly investigated measure of bone size, as adult height is a stable, easily quantified measure in large population samples. Extensive twin studies show that adult height is highly heritable with predominantly additive genetic effects that diverge in a sex-specific manner from the age of puberty onwards, the effects of which are likely to be due to sex differences in adult circulating testosterone concentrations." "Men have distinctively greater bone size, strength, and density than do women of the same age. As with muscle, sex differences in bone are absent prior to puberty but then

24

JA054

accrue progressively from the onset of male puberty due to the sex difference in exposure to adult male circulating testosterone concentrations." (818)

79. "The earlier onset of puberty and the related growth spurt in girls as well as earlier estrogen-dependent epiphyseal fusion explains shorter stature of girls than boys. As a result, on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men. These changes create an advantage of greater bone strength and stronger fulcrum power from longer bones. (818)

80. **Male bone geometry** also provides mechanical advantages. "The major effects of men's larger and stronger bones would be manifest via their taller stature as well as the larger fulcrum with greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities." (818) Further, "the widening of the female pelvis during puberty, balancing the evolutionary demands of obstetrics and locomotion, retards the improvement in female physical performance, possibly driven by ovarian hormones rather than the absence of testosterone." (818)

81. Beyond simple performance, the greater density and strength of male bones provides higher protection against stresses associated with extreme physical effort: "[S]tress fractures in athletes, mostly involving the legs, are more frequent in females with the male protection attributable to their larger and thicker bones." (818)

82. In addition to advantages in muscle mass and strength, and bone size and strength, men and adolescent boys have **greater hemoglobin levels** in their blood as compared to women and girls, and thus a greater capability to transport oxygen within the blood, which then provides bioenergetic benefits. "It is well known that levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12% on average.... Increasing the amount of hemoglobin in the blood has the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure." (816) "It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities." (816)

25

JA055

**B.    Louis Gooren, *The Significance of Testosterone for Fair Participation of the Female Sex in Competitive Sports*, 13 Asian J. of Andrology 653 (2011)**

83.    Gooren et al. like Handelsman et al., link male advantages in height, bone size, muscle mass, strength, and oxygen carrying capacity to exposure to male testosterone levels:  "Before puberty, boys and girls hardly differ in height, muscle and bone mass. Pubertal testosterone exposure leads to an ultimate average greater height in men of 12–15 centimeters, larger bones, greater muscle mass, increased strength and higher hemoglobin levels." (653)

**C.    Thibault, Guillaume, et al. (2010)**

84.    In addition to the testosterone-linked advantages examined by Handelsman et al. (2018), Thibault et al. note sex-linked differences in body fat as impacting athletic performance: "Sex has been identified as a major determinant of athletic performance through the impact of height, weight, body fat, muscle mass, aerobic capacity or anaerobic threshold as a result of genetic and hormonal differences (Cureton et al., 1986; Maldonado-Martin et al., 2004; Perez-Gomez et al., 2008; Sparling and Cureton, 1983)." (214)

**D.    Taryn Knox, Lynley C. Anderson, et al., *Transwomen in Elite Sport: Scientific & Ethical Considerations*, 45 J. MED ETHICS 395 (2019):**

85.     Knox et al. analyze specific testosterone-linked physiological differences between men and women that provide advantages in athletic capability, and conclude that "[E]lite male athletes have a performance advantage over their female counterparts due to physiological differences." (395) "Combining all of this information, testosterone has profound effects on key physiological parameters that underlie athletic performance in men. There is substantial evidence regarding the effects on muscle gain, bone strength, and the cardiovascular and respiratory system, all of which drive enhanced strength, speed and recovery. Together the scientific data point to testosterone providing an all-purpose benefit across a range of body systems that contribute to athletic performance for almost all sports." (397-98)

86.    "It is well recognised that testosterone contributes to physiological factors including body composition, skeletal structure, and the cardiovascular and respiratory systems across the life span, with significant influence during the pubertal period. These physiological factors underpin strength, speed and recovery with all three elements required to be competitive in almost all sports. An exception is equestrian, and for this reason, elite equestrian competition is not gender-

segregated. As testosterone underpins strength, speed and recovery, it follows that testosterone benefits athletic performance." (397)

87.      "High testosterone levels and prior male physiology provide an all-purpose benefit, and a substantial advantage. As the IAAF says, 'To the best of our knowledge, there is no other genetic or biological trait encountered in female athletics that confers such a huge performance advantage.'" (399)

88.      These authors, like others, describe sex-linked advantages relating to **bone size and muscle mass.** "Testosterone also has a strong influence on bone structure and strength. From puberty onwards, men have, on average, 10% more bone providing more surface area. The larger surface area of bone accommodates more skeletal muscle so, for example, men have broader shoulders allowing more muscle to build. This translates into 44% less upper body strength for women, providing men an advantage for sports like boxing, weightlifting and skiing. In similar fashion, muscle mass differences lead to decreased trunk and lower body strength by 64% and 72%, respectively in women. These differences in body strength can have a significant impact on athletic performance, and largely underwrite the significant differences in world record times and distances set by men and women." (397)

89.      Knox et al. also identify the relatively higher percentage of **body fat** in women as both inherently sex-linked, and a disadvantage with respect to athletic performance. "Oestrogens also affect body composition by influencing fat deposition. Women, on average, have higher percentage body fat, and this holds true even for highly trained healthy athletes (men 5%–10%, women 8%–15%). Fat is needed in women for normal reproduction and fertility, but it is not performance enhancing. This means men with higher muscle mass and less body fat will normally be stronger kilogram for kilogram than women." (397)

90.      Knox et al. detail the relative performance disadvantage arising from the oestrogen-linked **female pelvis shape**:  "[T]he major female hormones, oestrogens, can have effects that disadvantage female athletic performance. For example, women have a wider pelvis changing the hip structure significantly between the sexes. Pelvis shape is established during puberty and is driven by oestrogen. The different angles resulting from the female pelvis leads to decreased joint rotation and muscle recruitment ultimately making them slower." (397)

91.      "In short, higher testosterone levels lead to larger and stronger bones as well as more muscle mass providing a body composition-related performance advantage for men for almost all sports. In contrast, higher oestrogen levels lead to changes in skeletal structure and more fat mass that can disadvantage female athletes, in sports in which speed, strength and recovery are important." (397)

27

92.     Knox et al. break out multiple sex-linked contributions to a male advantage in **oxygen intake and delivery**, and thus to energy delivery to muscles. "Testosterone also influences the cardiovascular and respiratory systems such that men have a more efficient system for delivering oxygen to active skeletal muscle. Three key components required for oxygen delivery include lungs, heart and blood haemoglobin levels. Inherent sex differences in the lung are apparent from early in life and throughout the life span with lung capacity larger in men because of a lower diaphragm placement due to Y-chromosome genetic determinants. The greater lung volume is complemented by testosterone-driven **enhanced alveolar multiplication rate** during the early years of life." (397)

93.     "Oxygen exchange takes place between the air we breathe and the bloodstream at the alveoli, so more alveoli allows more oxygen to pass into the bloodstream. Therefore, the greater lung capacity allows more air to be inhaled with each breath. This is coupled with an improved uptake system allowing men to absorb more oxygen. Once in the blood, oxygen is carried by haemoglobin. Haemoglobin concentrations are directly modulated by testosterone so men have higher levels and can carry more oxygen than women. Oxygenated blood is pumped to the active skeletal muscle by the heart. The left ventricle chamber of the heart is the reservoir from which blood is pumped to the body. The larger the left ventricle, the more blood it can hold, and therefore, the more blood can be pumped to the body with each heartbeat, a physiological parameter called 'stroke volume'. The female heart size is, on average, 85% that of a male resulting in the stroke volume of women being around 33% less. Putting all of this together, men have a much more efficient cardiovascular and respiratory system, with testosterone being a major driver of enhanced aerobic capacity." (397)

### E.     Lepers, Knechtle, et al. (2013)

94.     Lepers et al. point to some of these same physiological differences as explaining the large performance advantage they found for men in triathlon performance.  "Current explanations for sex differences in [maximal oxygen uptake] among elite athletes, when expressed relative to body mass, provide two major findings. First, elite females have more (<13 vs. <5 %) body fat than males. Indeed, much of the difference in [maximal oxygen uptake] between males and females disappears when it is expressed relative to lean body mass. Second, the hemoglobin concentration of elite athletes is 5–10 % lower in females than in males." (853)

95.     "Males possess on average 7–9 % less percent body fat than females, which is likely an advantage for males. Therefore, it appears that sex differences in percentage body fat, oxygen-carrying capacity and muscle mass may be major factors for sex differences in overall triathlon performance. Menstrual cycle, and

JA058

possibly pregnancy, may also impact training and racing in female athletes, factors that do not affect males." (853)

### F.   Tønnessen, Svendsen, et al. (2015)

96.   Tønnessen et al. likewise point to some of the same puberty and testosterone-triggered physiological differences discussed above to explain the increasing performance advantage of boys across the adolescent years, noting that "[T]here appears to be a strong mechanistic connection between the observed sex-specific performance developments and hormone-dependent changes in body composition during puberty." (7) "Beyond [age 12], males outperform females because maturation results in a shift in body composition. Our results are in line with previous investigations exploring physical capacities such as [maximal oxygen uptake] and isometric strength in non-competitive or non-specialized adolescents." (7)

97.   "[S]ex differences in physical capacities (assessed as [maximal oxygen uptake] or isometric strength in the majority of cases) are negligible prior to the onset of puberty. During the adolescent growth spurt, however, marked sex differences develop. This can primarily be explained by hormone dependent changes in body composition and increased red blood cell mass in boys." (2)

98.   "Sexual dimorphism during puberty is highly relevant for understanding sex-specific performance developments in sports. The initiation of the growth spurt in well-nourished girls occurs at about 9–10 yrs of age. Age at peak height velocity (PHV) and peak weight velocity (PWV) in girls is 11–12 and 12–13 yrs, respectively, with an average 7–9 cm and 6–9 kg annual increase. The growth spurt and PHV in girls occurs approximately 2 years earlier than for boys. However, the magnitude of the growth spurt is typically greater in boys, as they on average gain 8–10 cm and 9–10 kg annually at PHV and PWV, respectively. Girls experience an escalation in fat mass compared to boys. Fat free mass (FFM) (also termed lean muscle mass) is nearly identical in males and females up to the age of 12–13 yrs. FFM plateaus in females at 15–16 years of age, but continues increasing in males up to the age of 19–20 yrs. On average, boys and girls increase their FFM by 7.2 and 3.5 kg/year$^{-1}$, respectively, during the interval near peak height velocity. Corresponding estimates for changes in absolute fat mass are 0.7 and 1.4 kg/year$^{-1}$, while estimates for relative fatness are -0.5% and +0.9%/year$^{-1}$ in boys and girls, respectively." (2)

99.   "During puberty, boys begin to produce higher levels of circulating testosterone. This affects the production of muscle fibers through direct stimulation of protein synthesis. Higher testosterone levels result in more muscle mass, which in turn facilitates greater power production and more advantageous ground reaction

JA059

forces during running and jumping. Adolescent weight gain in boys is principally due to increased height (skeletal tissue) and muscle mass, while fat mass remains relatively stable. In contrast, during puberty girls begin to produce higher levels of circulating estrogen and other female sex hormones. Compared to their male counterparts, they experience a less pronounced growth spurt and a smaller increase in muscle mass, but a continuous increase in fat mass, thereby lowering the critical ratio between muscular power and total body mass." (7)

100.    "The relatively greater progress in jumping exercises can also be explained by growth and increased body height during puberty. The increase in body height means that the center of gravity will be higher, providing better mechanical conditions for performance in jumping events." (8)

### G.    Louis J. G. Gooren & Mathijs C. M. Bunck, *Tanssexuals & Competitive Sports*, 151 EUROPEAN J. OF ENDOCRINOLOGY 425 (2004):

101.    In their study of performance of transsexual athletes, Louis et al. note that "[b]efore puberty, boys and girls do not differ in height, muscle and bone mass. Recent information shows convincingly that actual levels of circulating testosterone determine largely muscle mass and strength." (425) "Testosterone exposure during puberty leads ultimately to an average greater height in men of 12–15 cm, larger bones and muscle mass, and greater strength." (425)

### H.    Handelsman (2017)

102.    Handelsman (2017) notes the existence of a "stable and robust" performance gap between males and females, with no narrowing "over more than three decades" (71), observing that "[i]t is well known that men's athletic performance exceeds that of women especially in power sports because of men's greater strength, speed and endurance. This biological physical advantage of mature males forms the basis for gender segregation in many competitive sports to allow females a realistic chance of winning events. This physical advantage in performance arises during early adolescence when male puberty commences after which men acquire larger muscle mass and greater strength, larger and stronger bones, higher circulating haemoglobin as well as mental and/or psychological differences. After completion of male puberty, circulating testosterone levels in men are consistently 10-15 times higher than in children or women at any age." (68)

JA060

103.   To illustrate, Figure 3 of Handelsman (2017) below indicates, "the age trends in hand-grip strength showed a difference in hand-grip strength commencing from the age of 12.8 years onwards (Figure 3). Prior to the age of 13 years, boys had a marginally significant greater grip strength than girls (n=45, t=2.0, P=.026), but after the age of 13 years, there was a strong significant relationship between age and difference in grip strength (n=18, r=.89, P<.001)." (70)



104.   Handelsman (2017) in particular focuses on the correlation between the development of this performance gap and the progress of male adolescence and circulating testosterone levels in boys. "The strength of the present study is that it includes a wide range of swimming as well as track and field running and jumping events as well as strength for nonathletes for males and females across the ages spanning the onset of male puberty. The similar timing of the gender divergence in each of these settings to that of the rise in circulating testosterone to adult male levels strongly suggests that they all reflect the increase in muscular size and strength although the impact of other androgen-dependent effects on bone, haemoglobin and psychology may also contribute." (71-72)

105.   "In this study, the timing and tempo of male puberty effects on running and jumping performance were virtually identical and very similar to those in swimming events. Furthermore, these coincided with the timing of the rise in circulating testosterone due to male puberty. In addition to the strikingly similar timing and tempo, the magnitude of the effects on performance by the end of this study was 10.0% for running and 19.3% for jumping, both consistent with the gender differences in performance of adult athletes previously reported to be 10%-12% for running and 19% for jumping." (71)

106.   "In the swimming events, despite the continued progressive improvements in individual male and female event records, the stability of the gender difference over 35 years shown in this study suggests that the gender differences in performance are stable and robust." (71)

31

107.   "The similar time course of the rise in circulating testosterone with
that of the gender divergences in swimming and track and field sports is strongly
suggestive that these effects arise from the increase in circulating testosterone from
the start of male puberty." (71) "It is concluded that the gender divergence in
athletic performance begins at the age of 12-13 years and reaches adult plateau in
the late teenage years. Although the magnitude of the divergence varies between
athletic skills, the timing and tempo are closely parallel with each other and with
the rise in circulating testosterone in boys during puberty to reach adult male
levels." (72)

108.   Handelsman (2017) notes several specific physiological effects of male
levels of circulating testosterone that are relevant to athletic performance:

   a.   "Adult male circulating testosterone also has marked effects on
   bone development leading to longer, stronger and denser bone than in age-
   matched females." (71)

   b.   "A further biological advantage of adult male circulating
   testosterone concentrations is the increased circulating haemoglobin. Men
   have ~10 g/L greater haemoglobin than women with the gender differences
   also evident from the age of 13-14 years." (71)

109.   Handelsman (2017) also observes that "exposure to adult male
testosterone concentrations is likely to produce some mental or psychological effects.
However, the precise nature of these remains controversial and it is not clear
whether, or to what extent, this contributes to the superior elite sporting
performance of men in power sports compared with the predominant effects on
muscle mass and function." (71)

I.   **Centers for Disease Control & Prevention, "National Health
   Statistics Reports Number 122," CDC (2018):**

110.   To obtain data on height, weight, and body mass differences between
men and women, I accessed the "National Health Statistics Reports Number 122"
published by the Centers for Disease Control & Prevention, at
https://www.cdc.gov/nchs/data/nhsr/nhsr122-508.pdf, which is based on data
through 2016.

111.   The average height for a U.S. adult man is 5 feet 9 inches and for a
U.S. adult woman the average height is 5 feet 4 inches. (3)

112.   The average weight for a U.S. adult man is 197.8 lbs. and for a U.S.
adult woman the average weight is 170.5 lbs. (6)

JA062

113.    The average body mass index for a U.S. adult man is 29.1, and the average body mass index for a U.S. adult woman is 29.6. (3)

**III.    Administration of cross-sex hormones to men, or adolescent boys, after male puberty does not eliminate their performance advantage over women, or adolescent girls, in almost all athletic contests.**

114.    So far as I am aware, secondary school leagues do not have rules requiring testosterone suppression as a condition of males qualifying to compete in girls' athletic events based on a claim of a female gender identity.  At the collegiate level, the "NCAA Policy on Transgender Student-Athlete Participation" requires only that such males be on unspecified and unquantified "testosterone suppression treatment" for "one calendar year" prior to competing in women's events.  The International Olympic Committee requires that males be on testosterone suppression treatment that successfully reduces testosterone to less than 10 nmol/L in order to compete in women's events.

115.    In fact, the effects of hormone administration of testosterone suppression on elite athletes remains largely unquantified from a scientific perspective due to the lack of research in this population.

116.    That said, it is obvious that some effects of male puberty that confer advantages for athletic performance—in particular bone size and configuration— cannot be reversed once they have occurred.

117.    In addition, some studies have now determined that other physiological advantages conferred by male puberty are also not fully reversed by later hormonal treatments associated with gender transition. Specifically, studies have shown that the effects of puberty in males including increased muscle mass, increased bone mineral density, increased lung size, and increased heart size, are not completely reversed by suppressing testosterone secretion and administering estrogen during gender transition procedures in males.

118.    For example, suppressing testosterone secretion and administering estrogen in post pubescent males does not shrink body height to that of a comparably aged female, nor does it reduce lung size or heart size. Indeed, while testosterone suppression and estrogen administration reduce the size and density of skeletal muscles, the muscles remain larger than would be expected in a typical female even when matched for body height or mass.  A general tenet of exercise science is that larger muscles are stronger muscles due to larger muscles containing more contractile proteins.  Thus, while gender transition procedures will impair a male's athletic potential it is still highly unlikely to be reduced to that of a

JA063

comparably aged and trained female. I review below relevant findings from several studies.

### A.   Handelsman, Hirschberg, et al. (2018)

119.   Handelsman et al. (2018) note that in "transgender individuals, the developmental effects of adult male circulating testosterone concentrations will have established the sex difference in muscle, hemoglobin, and bone, some of which is fixed and irreversible (bone size) and some of which is maintained by the male circulating testosterone concentrations (muscle, hemoglobin)." (824)

120.   "[D]evelopmental bone effects of androgens are likely to be irreversible." (818)

121.   With respect to muscle mass and strength, Handelsman et al. (2018) observe that suppression of testosterone in males to levels currently accepted for transsexual qualification to compete in women's events will still leave those males with a large strength advantage. "Based on the established dose-response relationships, suppression of circulating testosterone to <10 nmol/L would not eliminate all ergogenic benefits of testosterone for athletes competing in female events. For example, according to the Huang *et al.* study, reducing circulating testosterone to a mean of 7.3 nmol/L would still deliver a 4.4% increase in muscle size and a 12% to 26% increase in muscle strength compared with circulating testosterone at the normal female mean value of 0.9 nmol/L. Similarly, according to the Karunasena *et al.* study, reducing circulating testosterone concentration to 7 nmol/L would still deliver 7.8% more circulating hemoglobin than the normal female mean value. Hence, the magnitude of the athletic performance advantage in DSD athletes, which depends on the magnitude of elevated circulating testosterone concentrations, is considerably greater than the 5% to 9% difference observed in reducing levels to <10 nmol/L." (821)

### B.   Gooren (2011)

122.   In addition to noting that the length and diameter of bones is unchanged by post-pubertal suppression of androgens (including testosterone) (653), Gooren found that "[i]n spite of muscle surface area reduction induced by androgen deprivation, after 1 year the mean muscle surface area in male-to- female transsexuals remained significantly greater than in untreated female-to-male transsexuals." (653) "Untreated female-to-male transsexuals" refers to biological females, who will have hormonal levels ordinarily associated with women.

123.   As I have explained above, greater muscle surface area translates into greater strength assuming comparable levels of fitness.

34

## C.     Knox, Anderson, et al. (2019)

124.    In their recent article, Knox et al. reviewed the physiological effects of reducing circulating testosterone levels below 10nmol/L, the level current accepted by the International Olympic Committee (IOC) (2015) guidelines as adequate to permit males to enter as women in Olympic competition.

125.    Knox et al. note the unarguable fact that 10nmol/L is a far higher level of circulating testosterone than occurs in women, including elite women athletes. "Transwomen [meet IOC guidelines] to compete with testosterone levels just under 10 nmol/L. This is more than five times the upper testosterone level (1.7 nmol/L) of healthy, premenopausal elite cis-women athletes. Given that testosterone (as well as other elements stemming from Y-chromosome-dependent male physiology) provides an all-purpose benefit in sport, suggests that transwomen have a performance advantage." (398)

126.    As to **bone strength**, Knox et al. report that a "recent meta-analysis shows that hormone therapy provided to transwomen over 2 years maintains bone density so bone strength is unlikely to fall to levels of cis-women, especially in an elite athlete competing and training at high intensity. Increased bone strength also translates into protection against trauma, helping with recovery and prevention of injury." (398)

127.    Based on a review of multiple studies, Knox et al. report that, in addition to bone size, configuration, and strength, "hormone therapy will not alter … **lung volume or heart size** of the transwoman athlete, especially if [that athlete] transitions postpuberty, so natural advantages including joint articulation, stroke volume and maximal oxygen uptake will be maintained." (398)

128.    With respect to **muscle mass and strength**, Knox et al. found that "healthy young men did not lose significant muscle mass (or power) when their circulating testosterone levels were reduced to 8.8 nmol/L (lower than the IOC guideline of 10 nmol/L) for 20 weeks. Moreover, retention of muscle mass could be compensated for by training or other ergogenic methods. In addition, the phenomenon of muscle memory means muscle mass and strength can be rebuilt with previous strength exercise making it easier to regain muscle mass later in life even after long intervening periods of inactivity and mass loss." (398)

129.    Indeed, Knox et al. observe that oestradiol—routinely administered as part of hormone therapy for transwomen—is actually known to *increase* muscle mass, potentially providing an *additional* advantage for these athletes over women. "While testosterone is the well-recognised stimulator of muscle mass gain, administration of oestradiol has also been shown to activate muscle gain via

35

JA065

oestrogen receptor-β activation. The combination of oestradiol therapy and a baseline testosterone of 10 nmol/L arguably provides transwomen athletes with an added advantage of increased muscle mass, and therefore power." (398)

130.    Summing up these facts, Knox et al. observe: "A transwoman athlete with testosterone levels under 10 nmol/L for 1 year will retain at least some of the physiological parameters that underpin athletic performance. This, coupled with the fact that [under IOC rules] transwomen athletes are allowed to compete with more than five times the testosterone level of a cis-woman, suggests transwomen have a performance advantage." (398) Indeed, considering the magnitude of the advantages involved, Knox et al. conclude that the physiological advantages resulting from male puberty that are not negated by post-pubertal hormonal therapy "provide a strong argument that transwomen have an intolerable advantage over cis-women." (399)

### D.    Gooren & Bunck (2004)

131.    Measuring the concrete significance of the fact that bone size and configuration cannot be changed after puberty, Gooren and Bunk reported that "[Male-to-female transsexuals] were on average 10.7 cm taller (95% CI 5.4–16.0 cm) than [female-to-male transsexuals] (7)." (427)

132.    With respect to muscle mass, Gooren and Bunk reported what other authors have since described in more detail: "After 1 year of androgen deprivation, mean muscle area in [male-to-female transsexuals] had decreased significantly but remained significantly greater than in [female-to-male transsexuals] before testosterone treatment." (427)  To be clear, female-to-male transsexuals "before testosterone treatment" are biological females with natural female hormone levels.

133.    "The conclusion is that androgen deprivation in [male-to-female transsexuals] increases the overlap in muscle mass with women but does not reverse it, statistically." (425)

### E.    Likely effects of proposed more stringent testosterone suppression requirements.

134.    There have been reports that the IOC plans to reduce the acceptable level of circulating testosterone in males seeking to compete in women's events to 5 nmol/L.  However, more recent reports indicate that this proposal has been put on hold due to objections that this lower level would still not eliminate the physiological advantage of such males over women. See *"IOC delays new transgender guidelines after scientists fail to agree,"* THE GUARDIAN, Sept. 24, 2019.

JA066

135.   I am not aware of studies measuring the impact on athletic performance of reducing circulating testosterone in males to 5 nmol/L.  However, in light of the facts reviewed above concerning physiological characteristics that are irreversible after male puberty, it is clearly correct that a reduction of the IOC requirement to this level would not eliminate the physiological advantage of males over women.  Further, given that the *mean* female concentration of circulating testosterone is 0.9 nmol/L (Handelsman et al. (2018) (821)), with the *high* end of the normal female range being about 1.7 nmol/L (Knox et al. (2019) (398)), a level of 5 nmol/L of circulating testosterone remains between *300% and 500% higher* than normal female levels.  Given the findings of Huang et al. and Karunasena et al. reported in Handelsman et al. (2018) (821) and quoted above concerning the effects of suppressing circulating testosterone in adult males to 7.3 and 7 nmol/L respectively (just 46% and 40% respectively above the IOC's proposed 5 nmol/L level), it is reasonable to expect that males in whom testosterone is suppressed to 5 nmol/L will also continue to enjoy physiological advantages even in somewhat malleable parameters including muscle size, muscle strength, and circulating hemoglobin, as compared to females.

By:   _____

Professor Gregory A. Brown, Ph.D.

Date:   _January 7, 2020_

37

JA067

## UNITED STATES DISTRICT COURT
### District of Connecticut

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother, | Case No. 3:20-cv-00201-RNC |
| *Plaintiffs*, | **DECLARATION OF CHELSEA MITCHELL** |
| v. | Dated: February 12, 2020 |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION, | |
| *Defendants*. | |

## DECLARATION OF CHELSEA MITCHELL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Chelsea Mitchell, declare as follows:

1.      I am a seventeen-year-old senior at Canton High School in Canton, Connecticut.

2.      I am an elite female athlete and compete in Connecticut Interscholastic Athletic Conference (CIAC) track and field events.

3.      In the indoor track season, I compete in the 55m dash, the 300m, the long jump, and occasionally various relays.

1

JA068

4.      In the outdoor track season, I compete in the 100m, 200m, long jump, triple jump, occasionally the 400m, and occasionally various relays.

5.      During the school year, I usually train two hours per day, six days per week. In the summer, I still train one or two hours per day, three to four days per week.

6.      From the Spring 2017 outdoor track season to present—six track seasons and counting—I have competed against biological males in my track and field athletic events due to the CIAC policy.

7.      In total, I have lost four state championship titles, two All New England awards, medals, points, and publicity due to the CIAC policy that permits males to compete in girls' athletic events in Connecticut.

***2016-2017 Freshman Year***

8.      I first competed against a male in girls' track and field as a fourteen-year-old freshman at the Spring 2017 outdoor CIAC State Open Championship.

9.      On the way to this meet, I was instructed by my coach to respond "no comment" if asked about the issue of males competing in the female category.

10.      In the 100m final at the 2017 outdoor State Open, I placed 7th overall. The top six receive a medal and qualify to advance to the New England Regional Championship: one of those top six spots was taken by a male:

JA069

**Table 1: 2017 CIAC State Open Women's Outdoor Track 100m Results (June 5, 2017)[1]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 12 | F | Caroline O'Neil | 12.14s | Daniel Hand |
| 2* | 12 | F | Kathryn Kelly | 12.36s | Lauralton Hall |
| 3* | 9 | M | Andraya Yearwood | 12.41s | Cromwell |
| 4* | 11 | F | Tia Marie Brown | 12.44s | Windsor |
| 5* | 12 | F | Kiara Smith | 12.59s | Jonathan Law |
| 6* | 11 | F | Kate Hall | 12.62s | Stonington |
| 7 | 9 | F | Chelsea Mitchell | 12.69s | Canton |
| 8 | 12 | F | Tiandra Robinson | FS | Weaver |

\* Qualified for the New England Championship.

### *2017-2018 Sophomore Year*

11.    During my sophomore year, I learned that Andraya Yearwood's school was reclassified to the Class S division for indoor track events (the school remained a Class M for outdoor track events)—which was the same class as my school.

12.    This news was frustrating for me, because I felt that an indoor Class S championship in sprints was now out of my reach as I would be racing against a male competitor.

13.    At the February 10, 2018, indoor Class S Championship in the 300m, I was knocked out of advancing to the State Open by just one spot—a spot was taken by Andraya.

14.    On April 27, 2018, at the first invitational race of the Spring 2018 outdoor season, I was seeded in the 100m in a lane between not just one, but two male athletes: Terry Miller and Andraya Yearwood.

---

[1] AthleticNet, https://www.athletic.net/TrackAndField/meet/306453/results/f/1/100m, last visited February 8, 2020.

JA070

15.     I distinctly remember seeing Terry look over to Andraya and say: "You and me, one and two." At fifteen years old, I felt extremely intimidated to run against bigger, faster, and stronger male competitors.

16.     But Terry was right. I should have won that 100m race; but instead, Terry and Andraya took first and second place, while I placed third.

17.     Similarly, at the Spring 2018 outdoor State Open Championship, Terry won the women's 100m event by a wide margin, while Andraya finished second.

18.     But for CIAC's policy, I would have won second place statewide:

**Table 2: 2018 CIAC State Open Championship Women's Outdoor Track 100m Results (June 4, 2018)[2]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 10 | M | Terry Miller | 11.72s | Bulkeley |
| 2* | 10 | M | Andraya Yearwood | 12.29s | Cromwell |
| 3* | 11 | F | Bridget Lalonde | 12.36s | RHAM |
| 4* | 10 | F | Chelsea Mitchell | 12.39s | Canton |
| 5* | 11 | F | Maya Mocarski | 12.47s | Fairfield Ludlowe |
| 6* | 10 | F | Selina Soule | 12.67s | Glastonbury |
| 7 | 12 | F | Tia Marie Brown | 12.71s | Windsor |
| 8 | 11 | F | Ayesha Nelson | 12.80s | Hillhouse |

\* Qualified for the New England Championship.

19.     Bridget Lalonde beat me by just three-hundredths of a second, but I was so relieved that she did. Emotionally, it was less of a loss to be denied runner-up status than to be denied a first place State Open Championship—a feat almost unheard of for a high school sophomore.

---

[2] AthleticNet,
https://www.athletic.net/TrackAndField/meet/334210/results/f/1/100m, last visited February 8, 2020.

JA071

Case 21-1365, Document 41, 07/09/2021, 3135054, Page76 of 184

20.     At the 2018 outdoor New England Regional Championship, I placed seventh in the 100m. Only the top six medal and receive the All New England award—one of those top six spots was taken by Terry.

21.     Had I earned the title of All New England, I would have made Canton High School history as the first Canton female athlete to win this prestigious award.

### 2018-2019 Junior Year

22.     In the fall of my junior year, I learned that Terry Miller transferred to Bloomfield, another Class S school.

23.     I was devastated, fearing that with two males competing in my division, my chances of ever winning a state championship in sprints were now over.

24.     I trained harder than ever, spending countless hours to shave mere fractions of seconds off of my times. I never missed a practice, squeezed in extra workouts where I could, and saw my race times consistently drop.

25.     But it was not enough. And my fears of losing championship after championship were realized in the Winter and Spring 2019 seasons.

26.     At the February 7, 2019, indoor Class S State Championship, Terry finished first in the 55m. I placed second. But for the CIAC's policy, I would have been named the Class S State Champion in the 55m.

27.     The February 16, 2019, indoor State Open Championship saw similar results and a similar impact. Terry and Andraya finished first and second

JA072

respectively in both the preliminary and final Women's 55m races, each time

defeating the fastest girl by a wide margin. I placed third in the final.

28.     But for CIAC's policy, I would have won the 2019 State Open

Championship in the 55m dash:

**Table 3:  2019 CIAC State Open Championship Women's Indoor Track 55m
Preliminary Results (February 16, 2019)[3]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | Terry Miller | 7.00s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.07s | Cromwell |
| 3* | 12 | F | Cori Richardson | 7.24s | Windsor |
| 4* | 11 | F | Chelsea Mitchell | 7.27s | Canton |
| 5* | 12 | F | Kate Shaffer | 7.27s | Conard |
| 6* | 12 | F | Ayesha Nelson | 7.29s | Hillhouse |
| 7* | 12 | F | Maya Mocarski | 7.34s | Fairfield Ludlowe |
| 8 | 11 | F | Selina Soule | 7.37s | Glastonbury |
| 9 | 10 | F | Kisha Francois | 7.41s | East Haven |

* Qualified for the women's 55m final.

**Table 4:  2019 CIAC State Open Championship Women's Indoor Track 55m
Final Results (February 16, 2019)[4]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | Terry Miller | 6.95s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.01s | Cromwell |
| 3* | 11 | F | Chelsea Mitchell | 7.23s | Canton |
| 4* | 12 | F | Kate Shaffer | 7.24s | Conard |
| 5* | 12 | F | Ayesha Nelson | 7.26s | Hillhouse |
| 6* | 12 | F | Maya Mocarski | 7.33s | Fairfield Ludlowe |
| 7 | 12 | F | Cori Richardson | 7.39s | Windsor |

* Qualified for the New England Championship.

---

[3] AthleticNet, https://www.athletic.net/TrackAndField/meet/352707/results/f/1/55m,
last visited February 8, 2020.
[4] *Id.*

6

JA073

Case 21-1365, Document 41, 07/09/2021, 3135054, Page78 of 184

29.     Instead, I was not named State Open Champion in the 55m, I received a bronze medal instead of a gold medal, and I did not make Canton High School history as the first ever Canton female athlete to be named a State Open Champion.

30.     However, after the 55m race, I returned to the finals of the long jump, which had no males competing. While listening to them announce Terry as the winner and new meet record holder in the 55m, I won the long jump event to solidify my place in the Canton record books as the first Canton indoor track athlete—male or female—to be named a State Open Champion.

31.     State Open Champions are recognized as All-State Athletes, an award listed on college applications, scholarship applications, and college recruiting profiles. State Open Champions are invited to the All-State Banquet, and get their name celebrated on a banner in their high school gym. I did not receive any of these awards for the 55m. But I was able to receive these awards for my long jump championship.

32.     After the State Open Championship, I was repeatedly referred to in the press as the "third-place competitor, who is not transgender." It felt like a gut punch. I was the fastest biological girl in the 55m race at the State Open Championship, but the press did not mention my name—I felt erased.

33.     At the March 2, 2019, indoor New England Regional Championship, Terry took first and Andraya took second place in the 55m dash. I missed medaling and being named All New England Champion by just two spots—two spots that were taken by male competitors.

JA074

34.     Following Terry Miller's sweep of the CIAC's Indoor Class S, State Open, and New England titles in the 55m dash and 300m, Terry was named "All-Courant girls indoor track and field athlete of the year" by the Hartford Courant newspaper. This felt like a slap in the face to female athletes.

35.     In the Spring 2019 outdoor season, I competed against both Terry and Andraya in the Class S Championship. At this event, I ran the fastest biological female times in the 100m and 200m across all state class meets.

36.     But because of the CIAC's policy, being the fastest biological girl just was not good enough to experience the thrill of victory. Instead, at the 2019 Class S Championship, Terry placed first in the 100m and 200m, while I placed second in both events. I won the long jump and received a state title. But because of the CIAC's policy, I took home only one state title instead of three.

37.     The trend continued at the 2019 outdoor State Open Championship as Terry easily won the women's 200m race. But for CIAC's policy, Cori Richardson would have won the state championship, Alanna Smith would have finished runner-up, and Olivia D'Haiti would have advanced to the New England Championship:

JA075

**Table 5: 2019 CIAC State Open Championship Women's Outdoor Track 200m Final Results (June 3, 2019)[5]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | Terry Miller | 24.33s | Bloomfield |
| 2* | 12 | F | Cori Richardson | 24.75s | Windsor |
| 3* | 9 | F | Alanna Smith | 25.01s | Danbury |
| 4* | 11 | F | Chelsea Mitchell | 25.24s | Canton |
| 5* | 12 | F | Nichele Smith | 25.38s | East Hartford |
| 6* | 12 | F | Bridget Lalonde | 25.55s | RHAM |
| 7 | 12 | F | Olivia D'Haiti | 25.63s | Kolbe-Cathedral |

* Qualified for the New England Championship.

38.　But I did receive one opportunity to compete on a more level playing field. At the Spring 2019 State Open Championship in the 100m, Terry, the top-seed in the race, false-started and was disqualified. This opened the door for me: I was able to relax, focus on my race, and win. I set a personal record of 11.67 seconds, made Canton High School history as the first sprinter to be a state open champion in any sprint event, medaled, received significant media publicity, and advanced to the New England Regional Championships.

39.　I went on to win the New England Regional Championships in the 100m dash and was named All New-England. Here, too, I made Canton High School history as the first female to win a New England Championship.

40.　Thereafter, I was awarded Track Athlete of the Year by the Connecticut High School Coaches Association, and the Hartford Courant named me 2019 All-Courant Girls Outdoor Track and Field Athlete of the Year and the Bo Kolinsky Female Athlete of the Year (across all sports).

---

[5] AthleticNet,
https://www.athletic.net/TrackAndField/MeetResults.aspx?Meet=364088&show=all,
last visited February 8, 2020.

JA076

41.     My new personal record, State Open Champion and All New-England awards put me in a much better recruiting position for college scholarships—all because a false start that prevented a male from competing against me in the women's division leveled the playing field.

***2019-2020 Senior Year***

42.     I am now in my senior year of high school and competing in the final indoor track season of my high school athletic career. I am currently ranked second in the state in the women's 55m behind a biological male. The Connecticut State Championship for Class S will be held on February 14, 2020, the Connecticut State Open Championship will be held on February 22, 2020, and the New England Regionals Championship will be held on February 29, 2020.

43.     I plan to compete in the 2020 Spring Outdoor Season. The official first practice date is March 21, 2020, and the first meet is April 4, 2020. Key end-of-season meets include the Connecticut State Open Championship and the New England Regional Championship.

44.     These final two track seasons are my last opportunities to win championships, titles, set personal high school records, and win All New England awards.

45.     These are opportunities that once lost, cannot be recovered. I will never be a high school athlete again.

46.     It feels defeating to know that records at my high school, CIAC, AthleticNet, MySportsResults, CT.Milesplit.com, and others do not reflect the four

10

state titles and two All New England awards I should have earned. It is upsetting to know that the meet records of many great female athletes before me have also been wiped from the books.

47.     Competing against males makes me feel anxious and stressed. And stress has a direct, negative impact on my athletic performance.

48.     I try to stay positive, to take support from family and friends, but it is hard when I know that I must compete against those who have a biological advantage because they were born male.

49.     I look forward to competing next year in college where I will be working towards a professional career in the sports industry.

*Chelsea Mitchell*

Chelsea Mitchell

Subscribed and sworn before me this **11** day of February, 2020.

*Susan M Davies*

Commissioner of Superior Court

Notary Public, my commission expires *November 30, 2022*

```
SUSAN M DAVIES
Notary Public
Connecticut
My Commission Expires Nov 30, 2022
```

11

JA078

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
SELINA SOULE, A MINOR, BY       :   No. 3:20CV201(RNC)
 BIANCA STANESCU, HER MOTHER,   :
CHELSEA MITCHELL, A MINOR, BY   :
 CHRISTINA MITCHELL, HER MOTHER,:
ALANNA SMITH, A MINOR, BY       :
 CHERYL RADACHOWSKY, HER MOTHER,:
                                :
              Plaintiffs,       :
                                :
         vs                     :
                                :
CONNECTICUT ASSOCIATION         :
 OF SCHOOLS, INC., D/B/A        :
 CONNECTICUT INTERSCHOLASTIC    :
ATHLETIC CONFERENCE, ET AL.     :
                                :   HARTFORD, CONNECTICUT
              Defendants.       :   APRIL 16, 2020
                                :
- - - - - - - - - - - - - - - - x
```

TELEPHONE CONFERENCE ON MOTIONS


    BEFORE:

        HON. ROBERT N. CHATIGNY, U.S.D.J.




                        DARLENE A. WARNER, RDR
                        OFFICIAL COURT REPORTER

APPEARANCES:

    FOR THE PLAINTIFFS:

        ALLIANCE DEFENDING FREEDOM
           15100 N. 90th Street
           Scottsdale, Arizona 85260
        BY:  JEFF SHAFER, ESQ.
           ROGER GREENWOOD BROOKS, ESQ.
           CHRISTIANA M. HOLCOMB, ESQ.

        FIORENTINO, HOWARD, PATRONE, P.C.
           773 Main Street
           Manchester, Connecticut 06040
        BY:  JAMES H. HOWARD, ESQ.

    FOR THE DEFENDANTS:

        SHIPMAN & GOODWIN
           One Constitution Plaza
           Hartford, Connecticut 06103-2819
        BY:  LINDA L. YODER, ESQ.
           PETER JOSEPH MURPHY, ESQ.

        FORD HARRISON, LLP
           CityPlace II
           185 Asylum Street
           Suite 610
        BY:  JOHANNA G. ZELMAN, ESQ.

        HOWD & LUDORF
           65 Wethersfield Avenue
           Hartford, Connecticut 06114-1190
        BY:  DAVID S. MONASTERSKY, ESQ.

```
FOR THE PROPOSED INTERVENORS:

        AMERICAN CIVIL LIBERTIES UNION - NY
            125 Broad Street
            Floor 18
            New York, New York 10004
        BY:  JOSHUA  A. BLOCK, ESQ.
            CHASE STRANGIO, ESQ.

        AMERICAN CIVIL LIBERTIES UNION - CT
            765 Asylum Avenue, 1st Floor
            Hartford, Connecticut 06105
        BY:  DAN BARRETT, ESQ.

        COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES
            450 Columbus Boulevard Avenue, Suite 2
            Hartford, Connecticut 06103
        BY:  MICHAEL ROBERTS, ESQ.
```

```
 1                              10:00 A.M.

 2

 3               THE COURT:  Good morning, this is the Judge

 4      speaking.  The announcement informs me that there are 16

 5      people who are participating in this telephone conference.

 6      That's quite a large group.

 7               Why don't we do a roll call starting with

 8      plaintiffs' counsel.

 9               Would you please state your appearances for the

10      record?

11               MR. BROOKS:  Roger Brooks with Alliance

12      Defending Freedom on behalf --

13               MR. SHAFER:  Jeff Shafer --

14                    (Telephone interference)

15               THE COURT:  Excuse me.  I'm having some trouble

16      here.

17               May I suggest that anybody on this call who is

18      not in the process of speaking should mute whatever phone

19      they're using.  That may help.  So please keep your phone

20      on mute unless I call on you to speak.

21               Let's try again.  Let's start with the

22      appearances of counsel for the plaintiffs.

23               MR. BROOKS:  Roger Brooks with Alliance

24      Defending Freedom on behalf of the plaintiffs.

25               MR. SHAFER:  Jeff Shafer with Alliance Defending
```

JA082

1    Freedom on behalf of the plaintiffs.

2              MS. HOLCOMB:  Christiana Holcomb, Alliance

3    Defending Freedom on behalf of plaintiff.

4              MR. HOWARD:  James Howard, Fiorentino, Howard

5    Petrone also on behalf of the plaintiffs.

6              THE COURT:  Which of you will be speaking on

7    behalf of the plaintiffs in this call?

8              MR. BROOKS:  Roger Brooks.

9              THE COURT:  All right, thank you.

10             Now let's turn to defense counsel.  Why don't we

11   start with counsel for the Connecticut Association of

12   Schools.

13             MS. YODER:  Linda Yoder representing the

14   Connecticut Association of Schools and also the Danbury

15   Board of Education.

16             THE COURT:  Okay.

17             Counsel for Bloomfield?

18             MS.  ZELMAN:  Johanna Zelman representing

19   Bloomfield Board of Education and Cromwell Board of

20   Education.

21             THE COURT:  And Canton?

22             MR. MONASTERKSY:  David Monastersky representing

23   Canton and Glastonbury Board of Educations.

24             THE COURT:  Is that everybody on behalf of the

25   school boards?

1        MR. MURPHY:  Peter Murphy here, Your Honor, too

2    with Linda Yoder for Connecticut Association of Schools

3    and Danbury.

4        THE COURT:  All right, thank you.

5        Now, turning to the proposed interveners.

6        MR. BLOCK:  Thank you, Your Honor, this is Josh

7    Block on behalf of proposed interveners Andraya and Terry;

8    and with me on the line also are Chase Strangio and Dan

9    Barrett.

10       THE COURT:  Which of you will be speaking on

11   behalf of these proposed interveners during this call?

12       MR. BLOCK:  I will be speaking, Joshua Block.

13       THE COURT:  All right, thank you.

14       CHRO?

15       MR. ROBERTS:  Yes, Your Honor, Michael Roberts

16   for the CHRO.

17       THE COURT:  All right.  Is there anybody we've

18   missed?

19            (Pause)

20       THE COURT:  Hearing nothing, I assume that

21   everyone who wants to enter an appearance has done so.

22       Proceeding from there, this is a telephone

23   conference to address the pending motions to intervene,

24   ECF documents 36 and 43.

25       I have read the papers that you have submitted

1    in support of and in opposition to these motions, and in

2    this telephone conference you will have an opportunity to

3    make any additional presentations you wish.

4              Why don't we start with counsel for the

5    individuals who propose to intervene as defendants

6    Yearwood and Edwards.

7              Is there anything you would like to add to your

8    papers?

9              MR. BLOCK:  Thank you, Your Honor.  This is

10   Joshua Block.  I guess only very, very briefly.

11             We think this is a textbook case for

12   intervention under the Second Circuit's decision in

13   Brennan and Bridgeport Guardians.  It's a case where you

14   have two mirror image claims of discrimination and the

15   fundamental question is whether granting the relief to the

16   plaintiffs would cure discrimination or rather inflict

17   discrimination on my client.

18             I think that the Second Circuit's cases are

19   clear that the school or employer is really just a

20   stakeholder in those claims and that our interest

21   fundamentally cannot be adequately represented.

22             And I think that's also confirmed by all the

23   cases we've cited in which transgender students have been

24   allowed to intervene in similar circumstances.

25             And then just on permissive intervention, I

1    think in addition to us needing to protect our own

2    interest, our clients are most directly affected.  They

3    have the most knowledge about their own medical treatments

4    and about the races they race in.  And this is a situation

5    where our clients are going to be in the middle of

6    discovery, either as witnesses or as parties, and they're

7    going to be subject to a great many discovery requests.

8              And we think that it would be sort of

9    fundamentally unfair to have them so involved in a lawsuit

10   that is fundamentally about them without them having the

11   agency to represent their own interests in that process.

12             So unless the Court has any further questions,

13   that's all we have to say.

14             THE COURT:  All right.  I do have some follow-up

15   questions.

16             The plaintiffs focus on the adequacy of

17   representation element of the analysis and argue that you

18   have failed to overcome the presumption of adequacy of

19   representation.

20             In the cases that you cite, the one that seemed

21   to me to be most on point, looked carefully at the

22   question whether the proposed intervenors would seek to

23   raise arguments that the existing party had failed to make

24   in a then pending motion to dismiss.

25             The Court concluded that the presumption of

1    adequacy of representation was overcome because there was

2    the significant difference between the arguments the

3    proposed intervener wished to make and the arguments that

4    had been made at that point in the pending motion to

5    dismiss.

6         With that precedent in mind, can you please

7    explain for me whether your clients would make arguments

8    that the existing parties are not going to make and if so,

9    what are those arguments and how do they differ from the

10   arguments that the existing parties are intending to

11   present?

12        MR. BLOCK:  Thank you, Your Honor.  I'm happy to

13   address that question; and then I want to say afterwards,

14   I don't think that that's an essential requirement.

15        But to answer the specific question:  Our

16   clients, you know, intend to argue that excluding them or

17   excluding transgender girls, especially them, from

18   participating on girls' teams based on their chromosomes,

19   would affirmatively violate Title IX, and that it would

20   affirmatively violate the Equal Protection Clause.

21        And the school boards are not usually in the

22   business of arguing that actions they take will place

23   themselves in legal jeopardy under Title IX or the Equal

24   Protection Clause because, you know, they're often sued by

25   transgender students as well.

JA087

1          So I think that is the fundamental set of

2     arguments that we intend to make and we're in the best

3     position to make.

4          I do think that the precedent from -- Meriwether

5     is I think the case you were referencing -- I think in

6     that case the facts that deal with the motion to dismiss

7     that has been filed and was being reviewed, was really

8     icing on the cake, that the standard is whether adequacy

9     of representation is assured.  And it's not whether it's

10    already been proven, it's whether there's a substantial

11    risk of lack of adequacy of representation.  And I don't

12    think the Court has to wait for motions to dismiss to be

13    filed before making that determination.

14          And I guess the one additional fact I would

15    bring to light is the followup to the Ricci case in which

16    the City of New Haven affirmatively argued that they would

17    be subject to disparate impact liability if they had not

18    set aside the firefighter exam; and nevertheless, after

19    they lost that case, African American firefighters were

20    allowed to bring their counter suit.

21          So even if our interest would otherwise be

22    adequately represented, we're not going to be bound by the

23    judgment unless we are parties.  And so the risk of

24    conflicting lawsuits here is inevitable unless we are

25    actually bound to the judgment in this case.

1           THE COURT:  Thank you.

2           Picking up on that last point, by way of

3   clarification with regard to the risk of future lawsuits,

4   as we all know, sadly, Connecticut is in lockdown and it

5   appears that Connecticut is likely to remain in lockdown

6   for some significant period of time, making it highly

7   unlikely that your clients will be given an opportunity to

8   run yet again as high school athletes, unfortunately; and

9   so I'm wondering, what is the risk of a future lawsuit by

10  your clients if the plaintiffs in this case managed to

11  prevail?

12          As a practical matter, how would their interest

13  in the case be impaired?  What is the claim for relief

14  that remains of concern to them personally, given the

15  indefinite suspension of the track season and how would

16  that interest be impaired if they weren't permitted to

17  intervene as parties now?

18          MR. BLOCK:  Well, Your Honor, for their request

19  for injunctive relief, plaintiffs are seeking an order

20  requiring the school to expunge all records of our

21  clients' past accomplishments on the girls sports team.

22          So not only records in their possession, it also

23  is to seek out and seek to amend any other records, so

24  their scores, their rankings, their medal awards; and so

25  that is a form of injunctive relief that they're

JA089

1    continuing to seek that is targeted directly at our

2    clients.

3          And I believe that they're continuing to seek

4    that form of injunctive relief, you know, precisely

5    because of the standards for injunctive relief and damages

6    can be different under Title IX.  And so they -- my

7    understanding is that they are continuing to seek those

8    orders.  And I think expunging the records of our clients'

9    competition would be an Article III injury in fact and,

10    you know, would plainly give rise to our own sets of

11    claims.

12          THE COURT:  Let me ask you to please pause for a

13    moment, Mr. Block, and call on Mr. Brooks to tell us

14    whether in fact the plaintiffs do intend to continue to

15    seek injunctive relief in the form of expunging records.

16          Mr. Brooks, do they or do they not?

17          MR. BROOKS:  Your Honor, the answer to that is,

18    yes, we will continue to seek that relief.  That is part

19    of the relief requested.

20          THE COURT:  So your point is, Mr. Block, that if

21    the plaintiffs were to prevail on that claim, your clients

22    would be in a position to bring a future lawsuit to seek

23    to have the expungement of the records reversed?

24          MR. BLOCK:  That's correct, Your Honor.

25          THE COURT:  Okay, is there anything other than

1    the expungement of the records that is at issue here that

2    you think could provide the basis for a future lawsuit if

3    the plaintiffs were to prevail?

4           MR. BLOCK:  I don't think there is another thing

5    that would provide us with an Article III injury in fact,

6    no.  I think that we would still qualify as having a

7    legally protectable interest, which is a different

8    standard, and permissive intervention would also still be

9    justified.  But I don't think there's another basis for a

10   dueling lawsuit.

11          THE COURT:  Again, let me ask you to please

12   pause, Mr. Block, and let me call on counsel for the

13   existing defendants to clarify whether they agree or

14   disagree with your argument that adequacy of

15   representation is not assured.

16          On that point, I'd like to hear first from

17   Attorney Yoder.

18          MS. YODER:  Yes, Your Honor.  We do support the

19   proposed intervention in this matter.  We feel very

20   strongly that the CIAC does not represent individual

21   athletes.  In fact, their structure is such that

22   individual athletes address their issues with the public

23   school and the public schools address issues with the

24   CIAC.  And one of the original claims raised in this

25   matter was that the CIAC would not speak directly to the

1    parents of one of the plaintiffs.

2           We really feel strongly that we are in the

3    middle here, that the claims have said, you know, on the

4    plaintiffs' side, Title IX is clear and it's preemptive.

5    The guidance from the prior administration was you look to

6    state law and state law is clear and supports the

7    plaintiffs' position.

8           So CIAC believes that all of the proposed

9    interveners are necessary parties here and that we do

10   not -- and in fact have somewhat different interests than

11   the CIAC.

12          THE COURT:  What about in your capacity as

13   counsel for Danbury?  Do you see a difference of interest

14   that justifies intervention to the individuals?

15          MS. YODER:  I do think for Danbury, Danbury

16   feels that it's not a proper party to this action at all

17   because it simply participates in a league that allowed

18   one of the plaintiffs to participate in track.

19          So to ask it to take some action with regard to

20   what another school did with regards to who they put on

21   their roster, Danbury's feeling that it's not in a

22   position to represent any of the claims by the proposed

23   interveners.  Because again it simply is a school that

24   participates in the CIAC and allowed one of the plaintiffs

25   through that process to have participated on the track

1  team.

2  So Danbury feels that its position in this case

3  is very different and it would have no -- in defending the

4  claim against it, it is not in any position to defend

5  either of the two individual athletes from the other

6  school.  It had no input into their participation, and

7  that's really not the direct claim against it, and it's

8  not in any position to redact any records or change any

9  records.

10  So I think it's in a very different position and

11  very strongly feel that it is not representing the

12  interests of these two individual athletes given the

13  posture of the case.

14  THE COURT:  Okay, thank you.

15  Let me call next on Attorney Zelman, please.

16  MS. ZELMAN:  Sure, Your Honor, and good morning.

17  So both of the proposed intervenors do attend my

18  clients' school, one in Bloomfield and one in Cromwell.

19  Cromwell and Bloomfield, although will defend this

20  lawsuit, neither believe that they are in or out of the

21  position to completely protect the rights of the two

22  individual athletes.

23  Both strongly agree and support the intervention

24  of them.  There are multiple scenarios under which the

25  rights of the individuals in Danbury -- I'm sorry, in

1    Cromwell and Bloomfield could diverge.

2              For example, if Bloomfield and Cromwell could

3    agree to potentially settle the case -- I don't think it

4    would happen, but hypothetically could agree to that --

5    and the individual intervenors, their rights could be

6    affected by any kind of settlement.  And certainly that

7    would be something that they would need to participate in

8    to protect their own rights.

9              I also, similar to what Attorney Yoder was just

10   saying, we do not believe Bloomfield or Cromwell are

11   proper parties.  We do not believe that the plaintiffs

12   have standing to sue them.  And none of the plaintiffs

13   attended either one of these schools.  So there is a

14   number of situations under which neither Bloomfield nor

15   Cromwell could adequately represent the interest of the

16   proposed intervener.

17             I also would say that, in terms of the record, I

18   could foresee a situation where Bloomfield and Cromwell

19   are required to strike a record and we would be under

20   court order to do that, and both interveners would have

21   their own set of rights to then oppose that.  Those would

22   be rights that Bloomfield and Cromwell could not protect.

23             And I will certainly answer any questions that

24   Your Honor may have.

25             THE COURT:  Thank you.

1           By way of clarification, what records do your

2      clients have that reflect the accomplishments of the

3      individuals who seek to intervene?

4           MR. ZELLNER:  Well, I believe the records are --

5      may be held by the CIAC.  I'm not 100 percent sure at this

6      point -- we haven't done discovery -- where all the

7      records are held.

8           But there are acknowledgments in the school

9      records about the winnings of both intervenors.  Those

10     would be those tossed.  And other acknowledgments that

11     occurred within the school.

12          THE COURT:  But as you point out, none of the

13     plaintiffs have attended Bloomfield or Cromwell?

14          MR. ZELLNER:  Correct.  Bloomfield and Cromwell

15     are where the two proposed intervenors attend school.

16          THE COURT:  Right.  So if none of the plaintiffs

17     has attended either of your clients' schools, Bloomfield

18     or Cromwell, for them to seek expungement of your records

19     would have to be predicated on something that would give

20     them a particular stake in those records?

21          MR. ZELLNER:  Correct.  I think there's a

22     fundamental standing issue under Title IX.

23          Title IX does not require my clients to protect

24     the rights of students in attending other schools.

25          THE COURT:  With regard to Title IX, is it your

1    intention to argue that Title IX compels your client

2    schools, Bloomfield and Cromwell, to permit the individual

3    interveners to participate as they have done in girls

4    track?

5              MR. ZELLNER:  Certainly.  And I certainly think

6    that we would argue that state law requires that as well.

7              THE COURT:  Would you also invoke their rights

8    under the Equal Protection Clause?

9              MR. ZELLNER:  At this point I don't believe so.

10             THE COURT:  Okay.

11             MR. ZELLNER:  I'm not sure that my clients in

12   the district have standing to invoke the equal --

13   individual equal protection rights of two students that

14   attend those schools.

15             THE COURT:  All right, thank you.

16             MR. ZELLNER:  Sure, my pleasure.

17             THE COURT:  Mr. Monastersky?

18             MR. MONASTERSKY:  Yes, Your Honor.

19             So Canton and Glastonbury are essentially in the

20   same position that Danbury is in in the fact that two of

21   the plaintiffs attend those districts respectively.

22             My clients certainly are not going to be

23   asserting the individual rights of the intervening

24   plaintiffs, and we are not in a position to be arguing for

25   their -- certainly their equal protection rights or even

JA096

1  their Title IX rights.

2           I'm simply going to be defending my clients'

3  actions in this matter, and which were simply as Attorney

4  Yoder explained, were simply permitting plaintiffs to

5  participate on track teams.

6           So I don't -- I am not in the position, and my

7  clients are not in the position, of asserting the rights

8  of the individuals.  And, frankly, we're not concerned

9  about protecting the rights of the individuals.

10           THE COURT:  All right, thank you.

11           (Pause)

12           THE COURT:  Mr. Block, coming back to you at

13  this point, we have talked a bit about the plaintiffs'

14  request for an injunction expunging records.  Are you in a

15  position to tell me this morning what records would be of

16  interest to your clients in that regard?

17           In other words, if they were to find themselves

18  in a position whereby records were at risk for being

19  expunged, can you tell me what records would be of concern

20  to them in particular?

21           MR. BLOCK:  Well, Your Honor, I don't have as

22  much insight into the recordkeeping practices and what

23  specifically plaintiffs are seeking to expunge.  I think

24  in addition to, you know, trophies, history of awards,

25  there's the -- every runner's times for every race they've

JA097

1    run is publicly available and posted on these websites for

2    track and field teams, and that website is cited

3    repeatedly in the complaint.

4          I read the requested injunction as requiring

5    CIAC to seek out and attempt to correct those records as

6    well.  It's essentially to whatever extent possible,

7    taking all steps to erase the records of, you know, my

8    clients' times.

9          And if you look up on this website, it shows,

10   you know, they ranked this number at the state level, they

11   ranked stat number of New England.  It's just a public

12   record of all their races and their best scores.

13         And so I -- maybe plaintiffs can clarify the

14   scope of the injunction they're requesting, but because I

15   think their claims are tied to an injury from lack of

16   public recognition, that they are seeking not just to

17   affect the internal recordkeeping of CIAC, but to, you

18   know, erase the public manifestations of their

19   accomplishment to the extent that CIAC can make those

20   requests or seek corrections from third parties.

21         THE COURT:  Let me follow up by once again

22   turning to Attorney Brooks.

23         Mr. Brooks, please be as helpful as you can be

24   this morning in explaining what your clients would be

25   seeking with regard to expungement of records.

JA098

1        What records do you have in mind and what basis

2    would they have for seeking expungement of those records?

3        MR. BROOKS:  Well -- and for the court reporter,

4    this is Roger Brooks speaking.

5        For the CIAC itself -- and again, as a lot of my

6    colleagues said earlier, we've not had discovery and what

7    I say today may not be fully accurate because I do not

8    have it.  My understanding is the CIAC itself, and to a

9    lesser extent, individual schools, maintain records of

10   awards and championships in publicly available forms which

11   may be boxed on the wall, or more commonly this day and

12   age it's online on websites.  And certainly part of our

13   request would be that the defendant organizations, schools

14   and CIAC correct those records to reflect what should have

15   been the achievements of various girls and young women in

16   various races.

17       It is also true that times, results from races,

18   are maintained -- well, of course they're published in the

19   press sometimes -- and they are maintained by a private

20   service, as Mr. Block mentioned.  Nobody can tell the

21   press what to print and we wouldn't seek that.

22       And as for the private organization, they're not

23   a party, and I think the limit of what we would seek would

24   be asking that CIAC send corrected and accurate

25   information to that organization, or those organizations

JA099

1    if there are more than one, and then what they do with

2    that, of course they would be directly subject to an order

3    of this Court, and that would be in their hands.

4              THE COURT:  So if we take each of your

5    plaintiffs in turn, we start with the first named

6    plaintiff, Ms. Soule, what record would she seek to have

7    altered, expunged or corrected?

8              I gather from what you have just said that she

9    would call on CIAC to do something by way of altering

10   records to reflect that but for the participation of the

11   proposed interveners, she would have won or placed?

12             MR. BROOKS:  We put all that in great detail in

13   the complaint, and I don't have that memorized or in front

14   of me at the moment.

15             But, yes, if there's a record that says that she

16   came in third and absent the participation of a male

17   competitor, she would have come in second, then the

18   request would be that the records be corrected to reflect

19   that reality.  And on a race-by-race basis followed by a

20   time-by-time basis, perhaps not exhaustively, but

21   extensively, put those details in the complaint.

22             I apologize it, I don't have it at my fingertips

23   this morning.

24             THE COURT:  Okay.  Given the impact of the

25   lockdown on the reality of our lives in Connecticut,

JA100

1    including the reality of this case, the request for

2    injunctive relief with regard to records seems to loom

3    larger at this point than it did before, and I would very

4    much appreciate a statement from the plaintiffs to be

5    filed on the docket setting out exactly what that request

6    for injunctive relief entails.

7          I understand that you haven't had discovery,

8    that's certainly fair for you to point out, but there must

9    be some basis for this claim, and given its centrality to

10   this case at this point, it would be most helpful to me if

11   I had such a statement from you; and it would be

12   particularly helpful if you could set forth each

13   individual plaintiff's request for injunctive relief.

14         If a plaintiff did not attend a defendant

15   school, I'd be interested to know what records that

16   plaintiff would ask that school to alter; and if there is

17   no such request being made, then would you please tell me

18   that so there's no misunderstanding.

19         MR. BROOKS:  Your Honor, we can certainly do

20   that within the bounds of our present understanding.

21         I will say that our focus definitely at this

22   point is -- and this is, of course, assuming that there's

23   no tag in spring season that gets active, our focus is on

24   protecting the winter season, which may require us to

25   return to the question of a preliminary protection.

1           So our primary focus right now is on protecting,

2   for the plaintiff who will be at school next year,

3   protecting a season, and correcting records is -- it's

4   important, but it doesn't have the same immediate urgency.

5           But we're happy to provide what you request to

6   the best of our present understanding.

7           THE COURT:  And when could you provide that?

8           I'd like to have it as soon as reasonably

9   possible.

10          MR. BROOKS:  Well, is the end of next week

11  workable, Your Honor?

12          THE COURT:  Yes, that's fine.

13          Then we'll look forward to seeing that on the

14  docket before the end of the business day a week from

15  tomorrow.

16          In the meantime, and I don't want to prolong

17  this unduly, but I think it's helpful when we're all on

18  the phone if we take advantage of the opportunity to try

19  to get a clear idea of what we're dealing with here.

20          You refer to the winter season.  I understand

21  that two of the three plaintiffs will be graduating and

22  both of the interveners, the proposed intervenors, are

23  graduating.  Where does that leave this case with regard

24  to the so-called winter season?

25          MR. BROOKS:  Well, as far as impact on the

JA102

1    plaintiffs' impact, essential impact would be on Alanna

2    Smith.

3              With regard to the graduation of the two

4    proposed intervenors, that leaves us in the situation

5    where over the last three years, plaintiffs, including

6    Alanna, when she arrived in high school has faced

7    competition from male athletes.  In at least one of those

8    cases, really by a surprise, an athlete from the previous

9    season had competed in boys track and field.

10             So absent discovery and given the way the CIAC

11   policy works of confidentiality and non-disclosure, we

12   don't know, but the reality of the last experience is this

13   is a real and impending threat to next season as well.  We

14   need discovery to find out, and we need to find out if the

15   situation we face indicates preliminary relief.

16             So obviously I anticipate a dispute about that.

17   But that's -- if we wait until the season starts, as it's

18   been very clear, it will be too late to get through a

19   process to get relief.  So we can't realistically wait

20   until the season starts and see who shows up on the

21   starting line.

22             THE COURT:  What grade is Alanna in at the

23   moment?

24             MR. BROOKS:  She's in tenth grade this year, so

25   she'll be a junior next year.

JA103

1          THE COURT:  Is she aware, to your knowledge, of

2     any other participant in female track who is transgender

3     besides the people who are named in the complaint?

4          MR. BROOKS:  To my knowledge, she is not aware,

5     just as Selina was not aware, of transgender athletes

6     until she abruptly met them on the track.

7          THE COURT:  All right, thank you.

8          Let me raise a point that undoubtedly will cause

9     some consternation for you, Mr. Brooks, and your

10    colleagues, but I exercise my prerogative as the presiding

11    judge in this instance and I hope you will forgive me.

12         I don't think we should be referring to the

13    proposed intervenors as "male athletes."  I understand

14    that you prefer to use those words, but they're very

15    provocative, and I think needlessly so.  I don't think

16    that you surrender any legitimate interest or position if

17    you refer to them as transgender females.  That is what

18    the case is about.  This isn't a case involving males who

19    have decided that they want to run in girls' events.  This

20    is a case about girls who say that transgender girls

21    should not be allowed to run in girls' events.

22         So going forward, we will not refer to the

23    proposed intervenors as "males"; understood?

24         MR. BROOKS:  Your Honor, I hear what you're

25    saying.  If I may respond?

JA104

1    THE COURT:  No, no, I just want to be sure you

2    understand what I'm saying.

3    MR. BROOKS:  May I respond?

4    THE COURT:  If you first tell me you understand

5    what I'm saying.

6    MR. BROOKS:  I do understand what you're saying.

7    THE COURT:  All right, then go ahead.  If you

8    want to respond, go right ahead.

9    MR. BROOKS:  Your Honor is right that this is

10   exactly what the case is about.

11   The entire focus of the case has to do with the

12   fact that male bodies have a physiological advantage over

13   female bodies that gives them an unfair advantage to

14   competition.

15   The entire focus of the case is the fact that

16   the CIAC policy allows individuals who are

17   physiologically, genetically male to compete in girls'

18   athletics.

19   But if I use the term "females" to describe

20   those individuals -- and we've said in our opening brief,

21   we're happy to use their preferred names, because

22   names are not the point to the case.  Gender identity is

23   not the point of this case.  The point of this case is

24   physiology of bodies driven by chromosomes and the

25   documented athletic advantage that comes from a male body,

JA105

1   male hormones, and male puberty in particular.

2           So, Your Honor, I do have a concern that I am

3   not adequately representing my client and I'm not

4   accurately representing their position in this case as it

5   has to be argued before Your Honor and all the way up if I

6   refer to these individuals as "female," because that's

7   simply, when we're talking about physiology, that's not

8   accurate, at least in the belief of my clients.

9           So I believe --

10          THE COURT:  I'm fairly --

11          MR. BROOKS:  I --

12          THE COURT:  Go ahead, I'll let you finish.

13          MR. BROOKS:  So I believe, consistent with

14  vigorous representation of my clients, I am not -- as I

15  sit here right now, Your Honor, this is a serious thing to

16  say -- I am not sure that I can comply with that direction

17  consistent with vigorous representation of the position

18  that my clients are putting forward here.

19          If you see Dr. Brown's expert report that we put

20  in in support of the preliminary injunction, you will see

21  that it's all about male and female bodies using the terms

22  as they're understood in science, and we can't get away

23  from that.

24          THE COURT:  Mr. Brooks, are you done?

25          MR. BROOKS:  I am.

1      THE COURT:  Okay, thank you.

2           I'm not asking you to refer to these individuals

3  as "females."  I know that you don't want to do so.  What

4  I'm saying is you must refer to them as "transgender

5  females" rather than as "males."  Again, that's the more

6  accurate terminology, and I think that it fully protects

7  your client's legitimate interests.  Referring to these

8  individuals as "transgender females" is consistent with

9  science, common practice and perhaps human decency.

10          To refer to them as "males," period, is not

11  accurate, certainly not as accurate, and I think it's

12  needlessly provocative; and, for me, civility is a very

13  important value, especially in litigation.

14          So if you feel strongly that you and your

15  clients have a right to refer to these individuals as

16  "males" and that you therefore do not want to comply with

17  my order, then that's unfortunate.  But I'll give you some

18  time to think about it and you can let me know if it's a

19  problem.  If it is, gosh, maybe we'll need to do

20  something.  I don't want to bully you, but at the same

21  time, I don't want you to be bullying anybody else.

22          Maybe you might need to take an application to

23  the Court of Appeals.  I don't know.  But I certainly

24  don't want to put civility at risk in this case.  Quite

25  the opposite.  My goals for this case include, very

JA107

1    importantly, the goal of maintaining civil discourse,

2    respectful, humane, intelligent, civil discourse in the

3    course of the case.  Nothing more, nothing less.

4            Beyond that, let me turn now to Mr. Block and

5    ask:  Is there anything more that you want to say in

6    support of your application to intervene?

7            MR. BLOCK:  Your Honor, this isn't on the merits

8    of the application, but if we could have some guidance

9    about in terms of upcoming deadlines, whether we should

10   tender a request for a prefiling conference or any other

11   stuff while we, you know, wait for either a future filing

12   or an order, that would be helpful for us in just figuring

13   out how to proceed.

14           THE COURT:  Whoever is pressing buttons on their

15   phone, please don't do that.

16           Let me now come back to Mr. Brooks.

17           Mr. Brooks, this is your opportunity to make

18   whatever presentation you want to make this morning in

19   opposition to the motion to intervene filed on behalf of

20   the transgender females.

21           Is there anything you would like to add to your

22   papers?

23           MR. BROOKS:  Yes, Your Honor, briefly; but may I

24   ask a follow-up question on your earlier instruction?

25           THE COURT:  Sure.

JA108

1    MR. BROOKS:  Do you have any objection to our

2    referring to those intervenors simply as transgender

3    athletes?

4    THE COURT:  That's fine.  That's fine with me.

5    MR. BROOKS:  Am I correct that you also have no

6    objection to our discussing, as need be to make argument,

7    the fact that they have male bodies and, in at least one

8    case, don't deny that they went through male puberty?

9    THE COURT:  That is your prerogative, certainly.

10   As you say, that's what the case is about.

11   MR. BROOKS:  Thank you, Your Honor.  That's very

12   helpful, and I appreciate it.

13       So on the position of the proposed -- individual

14   proposed interveners, let me emphasize that the challenge

15   of this lawsuit is against a policy and the authorities,

16   not against the individuals.  We don't accuse, have never

17   accused them, those individuals, of doing anything at all

18   wrong.  They are simply following the policy, and that's

19   not an accusation against them, and we're not seeking to

20   bind the individuals by judgment in any way.

21       I'd also like to point out that an intervention

22   by affected individuals in a Title IX athletics-related

23   case would be, so far as we have been able to find in the

24   case law, and there's 50 years of case law, it would be

25   unprecedented.

JA109

1          Athletics Title IX cases often involved some

2   solutions.  The McCormick case is one example where if the

3   girls won then the boys teams had to be scheduled off

4   season and miss out on championships.

5          We're all aware of those many cases in the

6   college level, men's varsity teams have had to be

7   eliminated or reduced in status to achieve the merits and

8   funding balance requirements of Title IX.  And in both

9   cases, the boys or the men are directly impacted.

10          And that's not a defect, that's not a wrong,

11  that's a legislative choice that Congress made in passing

12  Title IX.

13          As I say, we don't see a single case out there

14  with the affected boys or affected men, as the case in

15  most of the Title IX athletic litigation, are thought of

16  or are treated as either necessary parties or are in the

17  case as intervenors.

18          Now, I don't want to repeat our -- but I think

19  we've spelled out in some detail -- about the burden on

20  the intervener to show not to speculate, not to

21  hypothesize, but to show inadequate representation.

22          We've heard this morning a few different

23  arguments.  It's been suggested that the CIAC is just a

24  stakeholder caught in the middle here.  But CIAC is not

25  behaving like a stakeholder caught in the middle.

JA110

1    There are litigations where an institution comes

2    forward and says, we don't care, we're a stakeholder.

3    That's not how CIAC is behaving.  They have

4    adopted this policy and vigorously defended it publicly.

5    More than that, they have and all the defendant schools

6    have maintained the defense of the policy in the face of

7    findings by the Department of Education that they need to

8    change the policy, they're violating Title IX, and that

9    process is whatever it leads to.

10    But my point is simply that they're not acting

11    like stakeholders, they're acting like parties who intend

12    to vigorously defend the policy.  And as one of my

13    esteemed colleagues said earlier, certainly she intends to

14    make the argument that Title IX and state law require the

15    policies.

16    So what we hear is organizations that adopted

17    the policy, they believe in the policy, they have retained

18    competent counsel to defend the policy, and they're in

19    fact vigorously defending the policy before the Office of

20    Civil Rights and before this Court.

21    One of my colleagues said, well, the adequacy of

22    representation is not ensured and put forth hypotheticals

23    about possible settlement, possible arguments that might

24    or might not be made.  I think we've cited the case law

25    that says that just doesn't meet the threshold of the

1    burden with regard to a demonstration of an adequate

2    representation.  It's all hypotheticals.

3            And the Butler case we cited to Your Honor from

4    the Second Circuit is quite strong and says it's even more

5    strong when the entity defending the law is governmental.

6    It takes an even stronger showing to overcome the

7    presumption of adequacy.

8            Mr. Block spent some time saying his clients

9    have distinct factual information not directly available

10   to the schools and such.  He does say in his brief, and

11   I'm not aware of any case law that suggests that's a basis

12   for intervention.  That's a basis for putting witness on

13   the stand or for taking discovery.

14           Your Honor, the last thing I would say is,

15   speaking to permissive intervention, I'm aware that

16   there's obviously more discretion in that area.  But

17   multiplication of parties does increase the burden on

18   plaintiffs.  Generally plaintiffs are allowed to choose

19   the jurisdiction, the lawsuit that they want to structure.

20   Of course, absent the type of tests and burdens that we've

21   just been discussing.

22           And when you look at the precedent that we've

23   cited in our brief on this matter where they go through

24   adequacy of representation, what they don't do is say,

25   well, you didn't demonstrate inadequate representation,

1    but you know what, come on in through permissive

2    intervention anyway.  That's just not the path of what the

3    courts do when they find a demonstration of inadequate

4    representation has not been made, is to deny intervention.

5    I think you'll see that in case after case.

6         And the final thing I'll say, Your Honor, and I

7    don't want to seem to concede anything, but this is the

8    burden point:  If permissive intervention were granted, we

9    would strongly urge the Court to not be structured in a

10   way that minimizes increased burden; that is that the

11   discovery limitations are structured per size so that

12   adding interveners doesn't increase the burden on

13   plaintiffs, and that interveners are -- I mean, their

14   claimed point is that they have different additional

15   arguments to make.  And we would suggest that if they're

16   permitted to intervene, which I've indicated as strongly

17   as I can they shouldn't be, that they be permitted to have

18   separate briefs and separate page limits only for the

19   purpose of advancing argument that in fact the CIAC for

20   instance and other defendants generally are not making.

21        And with that, Your Honor, I will stop.

22        THE COURT:  Thank you.

23        Putting aside the points you just made about

24   limitations on intervention, which I think are fair, do

25   you want to comment on the argument heard earlier that

```
1    permitting intervention by these individuals avoids the

2    risk of future litigation were your clients to prevail on

3    the request for expungement of records?

4              MR. BROOKS:  Well, Your Honor, in our system

5    there's always a risk, there's so many contexts.  There is

6    a risk of future litigation, and obviously adjudication

7    from this Court that either Title IX requires what my

8    clients believe it requires or doesn't require what my

9    clients believe it requires.  It's going to be appealed,

10   we're going to get authoritative word from the Second

11   Circuit, and at that point, that's very likely, depending

12   on what the Second Circuit says, that's likely to

13   forestall a follow-up lawsuit or end this lawsuit one way

14   or the other.

15             So I think there's going to be an appeal.  I'm

16   not giving away trade secrets here to say that what this

17   Court decides is almost certain to be appealed.  And after

18   that authoritative instruction is out there, anybody who

19   chooses to file a follow-on lawsuit is very speculative.

20             THE COURT:  All right, then, thank you.

21             Mr. Block, you get the last word on this, and

22   then I'm going to turn to Mr. Roberts.

23             MR. BLOCK:  Sure, thank you, Your Honor.  I want

24   to respond to this assertion that this is unprecedented in

25   Title IX lawsuits to intervene.
```

1          I'm not aware of any Title IX lawsuit that has

2     been brought to exclude someone from participating.  That,

3     under my understanding, is what's unprecedented here.

4          The Title IX lawsuits that I'm aware of are

5     either people suing to either join a team or people suing

6     to contest the elimination of their team.

7          The Mamaroneck case, the relief they were

8     seeking was to move the girls team to the fall to be

9     treated equally.  And there are certainly cases where a

10    school on its own in perceived need to comply with Title

11    IX has eliminated a boys team.

12         Those aren't lawsuits brought by a private

13    individual seeking relief requiring a school to eliminate

14    another team.  Those are often suits where the school

15    eliminates a team and then the boys team then sues.

16         So I agree, it's unusual to have intervention in

17    an athletics Title IX lawsuit, but that's because this is

18    a very unusual fact pattern in which the alleged

19    participation of a specific identified individual that is

20    causing the plaintiffs' alleged injury.

21         The second point I just want to make is, I think

22    the constitutional arguments are really central here, that

23    what happens with respect to Title IX or the statute is

24    not even close to being the full ballgame of the arguments

25    that need to be made.

JA115

1      And then the third point is, I think that, you

2   know, in this specific context in Brennan and in

3   Bridgeport Guardians, the Second Circuit could not have

4   been clearer about why intervention is necessary in this

5   specific type of fact pattern.

6      This is not a party seeking to intervene to

7   suspend the constitutionality of a law that affects the

8   citizenry at large.  This is a unique fact pattern in

9   which the government is an employer, in this case a school

10  district, and I think that the Second Circuit cases,

11  Brennan and Bridgeport Guardians, are directly on point.

12      And similarly in the Ricci case, things went all

13  the way up to the Supreme Court and the Supreme Court

14  ruled in favor of Ricci with really broad language.  And

15  the Second Circuit said, even though this case from the

16  Supreme Court, it still didn't find for the other

17  firefighters with their disparate impact suit, because

18  that would be fundamentally inconsistent with the idea

19  that everyone is entitled to their own representation and

20  their own interests aren't virtually represented by

21  someone else.

22      So those are just the brief points on the

23  intervention aspect right.

24      For permissive intervention, I can -- I know

25  many, many cases where intervention, as a right is denied,

JA116

1    but then permissive intervention is granted.

2           We are obviously very eager and willing to

3    reduce any added duplicative briefing or any added burden.

4    I think that some sort of formal requirement of separate

5    briefs with discrete issues will add to the burden and

6    complication rather than simplify things.

7           To the extent we have common arguments, we will

8    not be seeking to lay them out differently.  I don't know

9    if Your Honor prefers that all the arguments be

10   consolidated into a single brief.  But would we are happy

11   to do whatever sort of filing is necessary to reduce

12   burdens.

13          But we just want our clients to be able to have

14   a place at the table in representing their own legal

15   interests here.

16          THE COURT:  All right, thank you.

17          Let me turn now to the motion submitted by the

18   CHRO.

19          Let me call on Mr. Roberts at this time to make

20   whatever additional presentation you would like to make in

21   support of that submission.

22          Mr. Roberts.

23          MR. ROBERTS:  Good morning, Your Honor, Michael

24   Roberts for the commission.

25          Just briefly, we lay out the substance of all of

JA117

1    our points in what we have submitted already.

2            We -- the commission is the state agency that

3    enforces Connecticut antidiscrimination statutes.  This

4    lawsuit is making, in essence, a discrimination claim.

5            Among the statutes that the commission enforces

6    are:  State statutes that require the quality of

7    opportunity in the education context; that there be full

8    and equal accommodations in places that include public

9    schools; and that those provisions be fulfilled on the

10   basis of both sex and gender identity and expression.

11           The commission enforces Connecticut General

12   Statutes Section 46a-58 which converts deprivations of

13   federal rights into a violation of that statute that the

14   commission enforces.

15           So I think that the commission's interests and

16   our motion for intervention is guided by what occurred in

17   Boy Scouts of America v. Wyman, where -- even though the

18   claims in that case included constitutional arguments, you

19   know, and the commission does not directly enforce the

20   United States Constitution -- we had an interest because

21   our ability to carry out our enforcement mandate and

22   ensure the integrity of our decision-making process would

23   be impacted by the claims that were at issue there.

24           It didn't matter in that case that there were

25   other state entities that were already defendants.  The

Comptroller's Office, the State of Connecticut, were already present in that case as named defendants and were being ably represented. But the commission had a unique and distinct interest and it was granted the ability to intervene.

We have a unique lens through which we view this case that is not otherwise represented by the named defendants who are the other proposed intervenors. My sense is, just from what's been submitted and in discussions with counsel so far, that while we may on those that are -- are seeking to be on the side of the "v" in this case, see a similar final destination for this case that we would hope to achieve.

The path by which we would reach that destination varies and that the Commission would approach this case and this argument with the goal of having a cohesive enforcement scheme between Title IX -- that could then be enforced through 46a-58 -- and the state statutory scheme as they all apply to this situation.

And so I think that the standards for intervention are met by the commission and that our motion should be granted.

THE COURT: Okay, thank you. Let me follow up very briefly.

Would your interest in this matter be fully

```
1    served if you were to participate as an amicus?
2              MR. ROBERTS:  I think not, Your Honor, because
3    we --
4              THE COURT:  Go ahead.
5              MR. ROBERTS:  I think not because we would be
6    largely beholden to the arguments raised by the parties.
7              There have been instances before where the
8    commission has been an amicus and the Connecticut Supreme
9    Court, among other courts, has noted that the commission
10   has raised, in the court's language, very interesting
11   questions but because they were not raised by the parties,
12   the court declined to address them.  In other instances,
13   the court has decided to address our questions and then
14   found a way to do so.
15             But, you know, we would be limited in that way.
16   We would be beholden to the arguments raised by parties
17   who do not share our interests in the cohesiveness of the
18   statutory schemes.
19             And so while I think that there are certainly
20   arguments that we could make as an amicus, it would not be
21   the same and our approach to the case and the arguments
22   that we would raise and the way they would be reflected in
23   the proceedings would not be the same.
24             THE COURT:  Okay, thank you.
25             Mr. Brooks, this is your opportunity to make any
```

JA120

1    additional points you wish to make with regard to this

2    motion to intervene by the CHRO.

3              MR. BROOKS:  Your Honor, thank you.

4              What I've heard is new today.  Much of this is

5    new.  There's details in our briefing.

6              I do believe CHRO is interested but has no legal

7    interest, and I will call the Court to the case that we've

8    cited in our brief.

9              The Sixth Circuit, Brewer v. Republic Steel

10   case, obviously not binding authority by this Court, but

11   it is by far the most on point in the nation which dealt

12   with a very similar situation in the Ohio Civil Rights

13   Commission that wanted to intervene in a Title VII

14   lawsuit, and the Court concluded and explained in some

15   detail that that was not the type of interest -- the

16   Commission didn't have the type of interest contemplated

17   by Rule 24.

18             CHRO simply has no rights, no claims, no

19   obligations under Title IX, and those are the things --

20   and it also doesn't have an interest under the Second

21   Circuit's teaching and tests as articulated in Our Best

22   Produce case that we cite.

23             And I would emphasize to your court -- to Your

24   Honor, that everything Mr. Roberts said about the nature

25   of their interests which has to do with cohesiveness

JA121

1  between the state regime and a federal regime and federal

2  law interpreted the way they would like to interpret it,

3  well, given that federal law is a uniform thing across the

4  country, what CHRO is articulating is an interest that

5  justifies intervention, then representatives of every one

6  of the 50 states has an absolute, equal and identical

7  interest in intervention.  And that clearly isn't the law

8  and it's not the right answer.  They have no particular

9  interest.

10          The other thing I would just flag, as we pointed

11 out in our brief, that CHRO is a very specific statute

12 created independent commission created with certain and

13 limited authority, and it has statutory authority to

14 conduct administrative proceedings.  It has very specific

15 statutory authority about when to bring enforcement

16 actions in Connecticut Superior Court, and it has no

17 statutory authorization to seek to intervene to

18 participate in federal litigation.

19          It is not, in any statutory place, authorized as

20 the voice of the State of Connecticut.  It is an

21 independent commission, which is a very different

22 thinking.

23          The general authority to litigate on behalf of

24 Connecticut, it is invested in the Attorney General, who

25 is not here today seeking to intervene.

JA122

1        So we do believe, Your Honor, that like any

2   other party that is interested but doesn't have a legal

3   interest, the right solution for CHRO is to file an amicus

4   brief, which certainly an initial statement of their views

5   on the important legal issues here, a request to file that

6   amicus, the plaintiffs would not oppose.  And I wouldn't

7   even rule out that there may be later stages in the

8   proceeding where they would seek leave to file a

9   subsequent amicus brief.

10       And we believe that, in general, that's where

11  they should be standing procedurally.

12       THE COURT:  All right.  Thank you.

13       Mr. Roberts, you get the last word on this one.

14       MR. ROBERTS:  Just very briefly, Your Honor.

15       I think in our reply memorandum we dispatched

16  pretty summarily the arguments based on Brewer and the

17  possibility of everyone in the nation being interested in

18  this case simply through 46a-58, which is a unique among

19  state statutes, and the commission's relation to that

20  statute is unique among state civil rights agencies and

21  sets the commission apart, particularly where we are in

22  Connecticut and the commission is the state civil rights

23  agency charged by statute with enforcing Connecticut's

24  civil rights and antidiscrimination protections.

25       To the extent that the plaintiffs have

JA123

1  challenged the commission's authority to be here, I would

2  simply say that neither the district courts nor the Second

3  Circuit were -- felt impeded by the commission's

4  intervention in Wyman, which is of course a federal action

5  dealing with constitutional claims.

6       And in that case, there's no indication that the

7  State of Connecticut, the Attorney General's Office, the

8  state defendants that were named separately from the

9  commission were impeded or otherwise objected to the

10  commission's participation as an intervenor.

11       THE COURT:  With regard to the option of

12  granting amicus status, I think I probably need to focus

13  very specifically on your point earlier that the CHRO has

14  the freedom to raise issues on its own.  It could find

15  itself called on or even sought out on important points

16  during the litigation.

17       So directing that particular concern, why would

18  it be a problem or a risk in that regard if I were to

19  specifically invite the CHRO to submit one or more briefs

20  addressing issues that CHRO could helpfully address in

21  order to provide me with a better understanding of the

22  case?

23       If I were to do that, would you be satisfied to

24  participate as an amicus?

25       MR. ROBERTS:  I would have a couple of concerns

JA124

1   with that, Your Honor.

2           One would be our access to discovery.  We have

3   made clear that we do not intend to notice any depositions

4   or propound the discovery in this case.  We have asked for

5   the ability to participate and have access to what comes

6   out of discovery.  And in Wyman, that participation led to

7   the commission filing a separate motion for summary

8   judgment, separate from the state defendants.

9           The other concern that I would have, as Your

10  Honor will -- of course we hope, that anything we submit

11  as either an amicus or intervenor would be of help to the

12  Court, I guess I would just be concerned with the specific

13  questions that would be posed to the commission as an

14  amicus.

15          In the sense that there are specific questions

16  that are raised and the commission's participation and

17  briefing as an amicus is limited to the specific questions

18  rather than perhaps, you know, the expertise and

19  experience that we bring to the table, we may see

20  something a little differently or have a specific nuance

21  to particularly our enforcement scheme, the state

22  framework and the potential impact on some of what occurs

23  in this case on that framework, that the ability to make

24  our own motions and submit our own materials or briefing

25  or whatever other arguments that we may raise ourselves to

**JA125**

1      this case may -- you know, we would have more latitude to

2      do that as a party, as an intervenor party, than we would

3      as an amicus.

4            We simply would not wish there to be issues left

5      unaddressed or that we would be impeded from addressing as

6      an amicus that we might be able to based on our own and

7      make sure our presence as an intervenor.

8            THE COURT:  Okay, thank you.

9            It's been a long call, I thank Darlene Warner

10      our court reporter.

11            MS. YODER:  Your Honor, I'm sorry to interrupt,

12      this is Attorney Yoder.

13            At the risk of not bringing forward information

14      that may be relevant to your decision since we have

15      everybody here on the call, I just wanted to bring to your

16      attention:  In addition to CIAC's argument that it is

17      concerned about being sued in multiple forums with

18      multiple outcomes, with different outcomes, the Court has

19      given us a deadline of April 20, I believe, to file a

20      motion to join necessary parties.  And CIAC intends to

21      file at this time a motion to join the Department of

22      Education as a necessary party.

23            And I know we're not arguing that today, but I

24      didn't want -- given that it's related to some of the

25      arguments we've heard today, I didn't want today's session

```
1    to pass without alerting the Court and the other parties

2    of our intent to do so.

3               THE COURT:  You're referring to the Federal

4    Department of Education?

5               MS. YODER:  Yes.

6               THE COURT:  Okay.  Well, I appreciate your

7    bringing that to our attention.

8               As I said, it's been a long call, and I know

9    it's not easy for the court reporter even when we're doing

10   things in the courtroom much less when she has to cope

11   with so many people on the phone.

12              So thank you, Darlene.

13              THE COURT REPORTER:  You're welcome, Judge.

14              THE COURT:  With regard to the timing of this, I

15   know that we have done a tailored scheduling order that

16   requires the existing defendants to submit any request for

17   a prefiling conference in connection with a motion to

18   dismiss on or before a date in the near future.  I don't

19   have that date in front of me.  Is it next Friday?

20              MR. ZELLNER:  It's the 20th, Your Honor; Monday,

21   I believe.

22              THE COURT:  Okay.  I think what I will do is

23   move that date to the 24th and I will try to have rulings

24   for you on these motions to intervene in the next couple

25   of business days.  I want to think about what we have
```

JA127

1   talked about this morning.

2            Not by way of complaint at all, but just so you

3   know, the Court is receiving on a daily basis multiple

4   emergency motions by detained persons, both pretrial

5   detainees and sentenced defendants, seeking immediate

6   release based on their fear of contracting this virus.

7            So it may not be feasible for me to get a ruling

8   to you in the next couple of days, although I will do my

9   very best; and in any case, I will do it next week.

10           I think in the meantime anybody, proposed

11  intervenors included, who might want to file a motion to

12  dismiss should endeavor to prepare a prefiling conference

13  request in connection with any such motion so that in the

14  event intervention is granted and it permits motion

15  practice by intervenors, you'll be in a position to go

16  ahead with that part of this pretrial on or before a week

17  from tomorrow.

18           All right, thank you all very much.  We'll

19  adjourn.

20                (Proceedings adjourned at 11:30 a.m..)

21

22

23

24

25

JA128

1                     C E R T I F I C A T E

2

3              In Re: SOULE, ET AL vs. CIAC, ET AL

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                       DARLENE A. WARNER, RDR-CRR
17                      Official Court Reporter
                      450 Main Street, Room #223
18                    Hartford, Connecticut 06103
                    darlene_warner@ctd.uscourts.gov
19

20

21

22

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother, | Case No.: 3:20-CV-00201-RNC |
| *Plaintiffs*, | **SECOND AMENDED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |
| v. | **JURY TRIAL REQUESTED** |
| CONNECTICUT ASSOCIATION OF SCHOOLS d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION, | Dated: August 11, 2020 |
| *Defendants*. | |

## INTRODUCTION

1.      The Plaintiffs are four high school girls who compete in interscholastic girls' track and field in Connecticut. Like large numbers of female athletes around the nation, each Plaintiff has trained much of her life—striving to shave mere fractions of seconds off her race times—in order to experience the personal satisfaction of victory, gain opportunities to participate in state and regional meets, gain access to opportunities to be recruited and offered athletic scholarships by colleges, and more.

2.      Unfortunately for Plaintiffs and other girls in Connecticut, those dreams and goals—those opportunities for participation, recruitment, and scholarships—are now being

directly and negatively impacted by a new policy that is permitting students[1] who are biologically male to compete in girls' athletic competitions if they claim a female gender identity.

3.    This discriminatory policy is now regularly resulting in boys displacing girls in competitive track events in Connecticut—excluding specific and identifiable girls including Plaintiffs from honors, opportunities to compete at higher levels, and public recognition critical to college recruiting and scholarship opportunities that should go to those outstanding female athletes.

4.    As a result, in scholastic track competition in Connecticut, more boys than girls are experiencing victory and gaining the advantages that follow, even though postseason competition is nominally designed to ensure that equal numbers of boys and girls advance to higher levels of competition. In the state of Connecticut students who are born female now have materially *fewer* opportunities to stand on the victory podium, fewer opportunities to participate in post-season elite competition, fewer opportunities for public recognition as champions, and a much smaller chance of setting recognized records, than students who are born male.

5.    This reality is discrimination against girls that directly violates the requirements of Title IX: "Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal

---

[1] Because Title IX focuses on equal opportunities between the sexes, because this Complaint is precisely concerned with effects of *biological* differences between males and females, because the terms "boys" and "men" are commonly understood to refer to males, and to avoid otherwise inevitable confusion, we refer generally in this complaint to athletes who are biologically male as "boys" or "men," and to athletes who are biologically female as "girls" or "women."

JA131

opportunity for both sexes." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370

F.3d 275, 295 (2d Cir. 2004).

## I.  JURISDICTION AND VENUE

6.      This action pursuant to Title IX, 20 U.S.C. § 1681, *et seq*. and its interpreting

regulations, raises federal questions and seeks redress for deprivation of rights protected by

federal law.

7.      This Court has original jurisdiction over the claims asserted in this Complaint

under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law,

and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil

rights protected by federal law.

8.      This Court has authority to award the requested declaratory relief under 28 U.S.C.

§ 2201.  This Court has authority to award the other relief requested under 28 U.S.C. § 2202.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part

of the events or omissions giving rise to the claims occurred in this District and all Plaintiffs and

Defendants reside or have their principal place of business in Connecticut.

## II.  PARTIES

**A.  <u>Plaintiffs</u>**

10.      Plaintiff Selina Soule is a twelfth-grade female student and varsity track and field

athlete at Glastonbury High School. Because Selina Soule is a minor, she brings this action by

her mother, Bianca Stanescu.

11.      Plaintiff Chelsea Mitchell is a twelfth-grade female student and varsity track and

field athlete at Canton High School. Because Chelsea Mitchell is a minor, she brings this action

by her mother, Christina Mitchell.

JA132

12.     Plaintiff Alanna Smith is a tenth-grade female student and varsity track and field athlete at Danbury High School. Because Alanna Smith is a minor, she brings this action by her mother, Cheryl Radachowsky.

13.     Plaintiff Ashley Nicoletti is a tenth-grade female student and varsity track and field athlete at Immaculate High School in Danbury, Connecticut. Because Ashley Nicoletti is a minor, she brings this action by her mother, Jennifer Nicoletti.

14.     Selina Soule, Bianca Stanescu, Chelsea Mitchell, Christina Mitchell, Alanna Smith, Cheryl Radachowsky, Ashley Nicoletti, and Jennifer Nicoletti all reside within the District of Connecticut.

## B.     **Defendants**

15.     Defendant Bloomfield Public Schools Board of Education is located in Bloomfield, Connecticut, and has entered and continues to enter T.M. —a student born male and possessed of a male body— in Connecticut Interscholastic Athletic Conference (CIAC) girls' athletic competitions.

16.     Defendant Cromwell Public Schools Board of Education is located in Cromwell, Connecticut, and has entered and continues to enter Andraya Yearwood—a student born male and possessed of a male body—in CIAC girls' athletic competitions.

17.     Defendant Glastonbury Public Schools Board of Education is located in Glastonbury, Connecticut, and provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of CIAC.

18.     Defendant Canton Public Schools Board of Education is located in Canton, Connecticut, and provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of CIAC.

JA133

19.     Defendant Danbury Public Schools Board of Education is located in Danbury, Connecticut, and provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of CIAC.

20.     On information and belief, each of Bloomfield Public Schools, Cromwell Public Schools, Glastonbury Public Schools, Canton Public Schools, and Danbury Public Schools (collectively, "the Defendant Schools"), receives federal financial assistance.

21.     All programs at the Defendant Schools are therefore subject to the requirements of Title IX.

22.     Defendant Connecticut Association of Schools, Inc., which operates and is referred to herein under the name of the Connecticut Interscholastic Athletic Conference (CIAC) is a Connecticut not-for-profit corporation with its headquarters in Cheshire, Connecticut. CIAC is the "sole governing body for inter-scholastic athletic activities in Connecticut," and "directs and controls" all high school athletics for boys and girls in Connecticut.

23.     CIAC is funded by dues from member schools that are subject to the obligations of Title IX. According to CIAC, "[v]irtually all public and parochial high schools in Connecticut are dues-paying members."

24.     All Defendant Schools are dues-paying members of the CIAC.

25.     On information and belief, all public schools in Connecticut receive federal funds covered by Title IX, and thus are subject to the requirements of Title IX.

26.     CIAC is subject to the obligations of Title IX because it indirectly receives federal funding from its public member-schools, *see* 34 C.F.R. § 106.2(i).

27.     CIAC is also controlled by member schools that are subject to the obligations of Title IX. The CIAC Board of Control is elected by the member schools, and a majority of the

JA134

CIAC Board of Control are principals or other senior administrators of member schools. CIAC policies are established by the principals of the member schools, through the CIAC Legislative Body which is made up of the principals of all member schools.

28.     On information and belief, the majority of CIAC member schools receive federal funds and are subject to the obligations of Title IX.

29.     CIAC is separately subject to the obligations of Title IX because, on information and belief, it receives and accepts federal grant monies. For example, in 2018 CIAC received a grant of more than $350,000 from Special Olympics Connecticut, Inc., which on information and belief was funded in whole or in substantial part by a grant from the United States Department of Education to Special Olympics, Inc., the national parent organization of Special Olympics Connecticut, Inc. for the purpose of funding state-level organizations such as CIAC. On information and belief CIAC continues to receive and accept federal grant monies up to the present.

30.     CIAC controls and governs competition in 27 sports across three seasons each year, including Winter Indoor Track and Spring Outdoor Track. CIAC designates some sports only for boys (e.g. football and baseball), different sports only for girls (e.g. softball), and other sports for both boys and girls (e.g. swimming and track).

31.     For the latter sports, though, CIAC and its member schools have historically separated teams and competitions at the high school level by sex, or at least prohibited boys from competing in the girls' events.

32.     Each Defendant School actively works with and assists CIAC to schedule and organize interscholastic athletic competitions, including track and field meets, that are conducted subject to CIAC rules including the CIAC policy at issue in this litigation. Each defendant board

6

JA135

of education causes the schools and athletic programs under its authority to abide by the rules, regulations, and qualifications of CIAC concerning eligibility, competition rules, and tournament policies and procedures.

<div align="center">

III.    FACTUAL BACKGROUND
</div>

**A.    The Goals and Requirements of Title IX, and Its Impact on Women's Athletics.**

33.    In 1972, Congress enacted Title IX, 20 U.S.C. § 1681, which forbids education programs or activities receiving federal financial assistance from discriminating against persons based on their sex. It provides:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

34.    Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999).

35.    According to one of its primary sponsors, Senator Birch Bayh, Title IX promised women "an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for work." 118 Cong. Rec. 5808 (1972).

36.    Before the enactment of Title IX in 1972, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs," *Williams v. School District of Bethlehem*, 998 F.2d 168, 175 (3rd Cir. 1993), and vastly fewer girls participated in competitive interscholastic athletics than did boys.

37.    Many have argued that the competitive drive and spirit taught by athletics is one important educational lesson that carries over and contributes to lifetime success in the

<div align="center">7</div>

JA136

workplace. Certainly, implementing regulations make clear that Title IX applies in full force to

athletic programs sponsored by recipients of federal financial assistance:

"No person shall, on the basis of sex, be excluded from participation in, be denied the
benefits of, be treated differently from another person or otherwise be discriminated
against in any interscholastic, intercollegiate, club or intramural athletics offered by a
recipient, and no recipient shall provide any such athletics separately on such basis." 34
C.F.R. § 106.41(a).

      38.     In the statute, Congress expressly delegated authority to the United States

Department of Health, Education and Welfare (HEW) to promulgate regulations interpreting

Title IX. 20 U.S.C. §1682. In 1975, HEW promulgated regulations that are codified at 34 C.F.R.

Part 106 (collectively, the "Regulations"). Further, in 1979, the Department of Education Office

for Civil Rights (OCR) issued a policy interpretation of Title IX and the Regulations to provide

recipients with more specific guidance about the statute's application to intercollegiate athletics.

This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy

Interpretation"). Courts have recognized that the Policy Interpretation is also applicable to high

school athletic programs. The Policy Interpretation was further clarified by OCR through

issuance of OCR's 1996 *Clarification of Intercollegiate Athletics Policy Guidance: The Three-

Part Test* (the "OCR Clarification").

      39.     Title IX and its implementing regulations and guidance require that, if an entity

subject to Title IX provides athletic programs or opportunities separated by sex, then it must do

so in a manner that "provide[s] equal athletic opportunity for members of both sexes."  34 C.F.R.

§ 106.41(c).

      40.     As one aspect of equal athletic opportunity, implementing regulations and

guidance state that provided athletic opportunities must "effectively accommodate the interests

and abilities" of girls, as well as of boys. 34 C.F.R. § 106.41(c). Here, the "governing principle"

JA137

is that "the athletic interests and abilities of male and female students must be equally **effectively accommodated**." *Policy Interpretation*, 44 Fed. Reg. at 71,414. More specifically, the institution must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." *Policy Interpretation*, 44 Fed. Reg. at 71,417-418.

41.     As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive **equivalent treatment**, benefits and opportunities." *Policy Interpretation*, 44 Fed. Reg. at 71,415. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," *id*. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity."  44 Fed. Reg. at 71,417.

42.     Title IX has been strikingly successful towards its intended goals. "For example, between 1972 and 2011, girls' participation in high school athletics increased from approximately 250,000 to 3.25 million students." U.S. Dept. of Educ., OCR, *Protecting Civil Rights, Advancing Equity* 33 (2015), https://bit.ly/2VF516Q. In college, women's numbers have grown almost as steeply, from 30,000 to more than 288,000 in 2017-18.[2] Following the United States' famed 1999 Women's World Cup win, the Ninth Circuit wrote that:

"The victory sparked a national celebration and a realization by many that women's sports could be just as exciting, competitive, and lucrative as men's sports. And the victorious athletes understood as well as anyone the connection between a 27–year–old statute [Title IX] and tangible progress in women's athletics." *Neal*, 198 F.3d at 773.

_____

[2] Doriane Lambelet Coleman et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, Duke Journal of Gender Law Policy (forthcoming February 2020), available at SSRN: https://ssrn.com/abstract=3523305, citing https://ope.ed.gov/athletics/#/.

JA138

**B.    Equal Opportunities in Athletics and the Physiological Differences Between the Sexes.**

43.    What Title IX does not require—or even permit—is that recipients blind themselves to students' sex when developing their athletic programs. Sponsors of the statute made that much clear during the debates in Congress,[3] and implementing regulations expressly permit schools to sponsor sex-specific teams "where selection for such teams is based on competitive skill or the activity involved is a contact sport." 34 C.F.R. 106.41(b).

44.    In fact, ignoring the physical differences between the sexes would in many sports make it impossible to "accommodate the . . . abilities" of girls and women, and to provide athletic opportunities of equal quality to girls and women. In 1975, Dr. Bernice Sandler—who is frequently recognized as "the Godmother of Title IX"— told the House Subcommittee on Postsecondary Education, while testifying in support of regulations implementing Title IX, that to operate an entirely coed athletic program, ignoring differences in male and female physiology, would for many sports "effectively eliminate opportunities for women to participate in organized competitive athletics.  For these reasons, such an arrangement would not appear to be in line with the principle of equal opportunity." Statement of Dr. Bernice Sandler, Director, Project on the Status & Education of Women, Ass'n of American Colleges, June 25, 1975, Hearings on Sex Discrimination Regulations at 343.

45.    Dr. Sandler was correct. Permitting males to compete in girls' or women's athletic events doesn't merely add a new level of challenge for determined girls and women. Victory over comparably talented and trained male athletes is impossible for girls and women in the vast

---

[3] S. Ware, Title IX: A Brief History with Documents, at 13 (2007).

10

JA139

majority of athletic competitions, because of inherent and biologically dictated differences between the sexes.

46.     While boys and girls have comparable athletic capabilities before boys hit puberty, male puberty quickly increases the levels of circulating testosterone in healthy teen and adult males to levels ten to twenty times higher than the levels that occur in healthy adult females, and this natural flood of testosterone drives a wide range of physiological changes that give males a powerful physiological athletic advantage over females.

47.     The athletic performance-enhancing effects of testosterone are well known, and the anabolic steroids too often used by athletes to gain an unfair and prohibited advantage are often synthetic modifications of testosterone. Basically, from puberty on, boys and men have a large, natural, and equally unfair "doping" advantage over girls and women.

48.     Physiological athletic advantages enjoyed over girls and women by similarly fit males after puberty include:

> a.      Larger lungs and denser alveoli in the lungs, enabling faster oxygen uptake;
>
> b.      Larger hearts and per-stroke pumping volume, and more hemoglobin per unit of blood, all enabling higher short-term and sustained levels of oxygen transport to the muscles;
>
> c.      An increased number of muscle fibers and increased muscle mass (for example, men have 75%-100% greater cross-sectional area of upper arm muscle than do comparably fit women, while women have 60-70% less trunk and lower body strength than comparably fit men);
>
> d.      Higher myoglobin concentration within muscle fibers, enabling faster transfer and "cellular respiration" of oxygen within the muscle to unleash power;
>
> e.      Larger bones, enabling the attachment of greater volumes of muscle fiber;
>
> f.      Longer bones, enabling greater mechanical leverage thus enabling males to unleash more power, e.g., in vertical jumps;

JA140

g.   Increased mineral density in bones resulting in stronger bones, providing superior protection against both stress fractures and fractures from collisions;

h.   And, of course, U.S. adult males are on average 5 inches taller than U.S. adult women.

49.   Meanwhile, female puberty brings distinctive changes to girls and women that identifiably impede athletic performance, including increased body fat levels which—while healthy and essential to female fertility—creates increased weight without providing strength, as well as wider hips and different hip joint orientation that result in decreased hip rotation and running efficiency.

50.   These are inescapable biological facts of the human species, not stereotypes, "social constructs," or relics of past discrimination.

51.   As a result of these many inherent physiological differences between men and women after puberty, male athletes consistently achieve records 10-20% superior to comparably fit and trained women across almost all athletic events, with even wider consistent disparities in long-term endurance events and contests of sheer strength such as weight-lifting.

52.   The basic physiological differences between males and females after puberty have long been recognized and respected by the different standards set for boys and girls in a number of athletic events. For example:

a.   The net height used for women's volleyball is more than 7 inches lower than that used for men's volleyball.

b.   The standard weight used in high school shot put is 4 kilograms for girls, and 5.44 kilograms (36% heavier) for boys.

c.   The hurdle height used for the high school girls' 100-meter hurdle event is 33 inches, whereas the standard height used for boys' high school 110-meter hurdle is 39 inches.

d.   The standard women's basketball has a circumference of 28 1/2 to 29 inches and a weight of 20 oz, while a standard basketball used in a men's

JA141

> game has a circumference between 29 1/2 to 30 inches and a weight of 22 oz.

53.    In track and field events that do not use equipment, the physiological differences between males and females after puberty are stark in the record books. No one doubts that top male and female high school athletes are equally committed to excelling in their sport, and train equally hard. Yet boys and men consistently run faster and jump higher and farther than girls and women.

54.    For example, in 2017, thousands of men and boys achieved times in the 400m faster than the best lifetime performances of three women Olympic champions in that event. Each year, thousands of men—and dozens or hundreds of high school boys under the age of 18—achieve times (or heights or distances) in track events better than the world's single best elite woman competitor that year.

55.    As Duke Law professor and All-American track athlete Doriane Lambelet Coleman, tennis champion Martina Navratilova, and Olympic track gold medalist Sanya Richards-Ross recently wrote:

The evidence is unequivocal that starting in puberty, in every sport except sailing, shooting and riding, there will always be significant numbers of boys and men who would beat the best girls and women in head-to-head competition. Claims to the contrary are simply a denial of science.

Team USA sprinter Allyson Felix has the most World Championship medals in history, male or female, and is tied with Usain Bolt for the most World Championship golds. Her lifetime best in the 400 meters is 49.26 seconds. In 2018 alone, 275 high school boys ran faster on 783 occasions. The sex differential is even more pronounced in sports and events involving jumping. Team USA's Vashti Cunningham has the American record for high school girls in the high jump at 6 feet, 4½ inches. Last year just in California, 50 high school boys jumped higher. The sex differential isn't the result of boys and men having a male gender identity, more resources, better training or superior discipline. It's

JA142

because they have androgenized bodies.[4]

56.     As Professor Lambelet Coleman further explained in testimony before the House Judiciary Committee on April 2, 2019, in track events even the world's best women's Olympic athletes "would lose to literally thousands of boys and men, including to thousands who would be considered second tier in the men's category. And because it only takes three male-bodied athletes to preclude the best females from the medal stand, and eight to exclude them from the track, it doesn't matter if only a handful turn out to be gender nonconforming."[5]

57.     This stark competitive advantage is equally clear at the high school level. To illustrate, the charts below show the best boys' and girls' times in the nation across five different high school track events during the 2019 indoor and outdoor season:

**Table 1:  Best High School Outdoor 100m Times in 2019[6]**

| Boy | Time | Girl | Time |
|---|---|---|---|
| Matthew Boling | 9.98s | Briana Williams | 10.94s |
| Micah Williams | 10.21s | Semira Killebrew | 11.24s |
| Langston Jackson | 10.23s | Thelma Davies | 11.25s |
| Joseph Fahnbulleh | 10.23s | Tamari Davis | 11.27s |
| Ryan Martin | 10.26s | Arria Minor | 11.31s |
| Kenan Christon | 10.26s | Tianna Randle | 11.32s |
| Lance Broome | 10.27s | Taylor Gilling | 11.32s |
| Tyler Owens | 10.29s | Kenondra Davis | 11.36s |
| Ryota Hayashi | 10.29s | De'anna Nowling | 11.40s |

---

[4] Doriane Lambelet Coleman, Martina Navratilova, et al., *Pass the Equality Act, But Don't Abandon Title IX, Washington Post* (Apr. 29, 2019), https://wapo.st/2VKlNN1.

[5] Testimony and illustrating graphic at https://docs.house.gov/meetings/JU/JU00/20190402/109200/HHRG-116-JU00-Wstate-LambeletColemanP-20190402.pdf, last visited February 11, 2020.

[6] Results listed in this table are publicly available online at AthleticNET, https://www.athletic.net/TrackAndField/Division/Top.aspx?DivID=97967 (boys), and at AthleticNET, https://www.athletic.net/TrackAndField/Division/Top.aspx?DivID=97967&amp;gender=f (girls). These results were last visited February 11, 2020.

| Marquez Beason | 10.30s | Jacious Sears | 11.41s |

**Table 2: Best High School Outdoor 200m Times in 2019[7]**

| Boy | Time | Girl | Time |
|---|---|---|---|
| Matthew Boling | 20.30s | Briana Williams | 22.88s |
| Kenney Lightner | 20.48s | Thelma Davies | 22.95s |
| Cameron Miller | 20.52s | Tamari Davis | 22.96s |
| Kenan Christon | 20.55s | Kayla Davis | 23.08s |
| Kennedy Harrison | 20.60s | Taylor Gilling | 23.10s |
| Joseph Fahnbulleh | 20.67s | Arria Minor | 23.10s |
| Lance Broome | 20.69s | Aaliyah Pyatt | 23.11s |
| Devon Achane | 20.69s | Rosaline Effiong | 23.16s |
| Daniel Garland | 20.73s | Jayla Jamison | 23.19s |
| Langston Jackson | 20.73s | Dynasty McClennon | 23.28s |

**Table 3: Best High School Outdoor 400m Times in 2019[8]**

| Boy | Time | Girl | Time |
|---|---|---|---|
| Justin Robinson | 44.84s | Kayla Davis | 51.17s |
| Myles Misener Daley | 45.62s | Jan'Taijah Ford | 51.57s |
| Emmanuel Bynum | 46.24s | Athing Mu | 51.98s |
| Jayon Woodard | 46.26s | Britton Wilson | 52.06s |
| Alex Collier | 46.33s | Ziyah Holman | 52.12s |
| Jonah Vigil | 46.43s | Kimberly Harris | 52.16s |
| Zachary Larrier | 46.49s | Aaliyah Butler | 52.25s |
| Omajuwa Etiwe | 46.51s | Caitlyn Bobb | 52.79s |
| Sean Burrell | 46.52s | Talitah Diggs | 52.82s |
| Edward Richardson | 46.55s | Aaliyah Butler | 52.87s |

---

[7] Id. These results were last visited February 11, 2020.
[8] Id. These results were last visited February 11, 2020.

JA144

**Table 4: Best High School Indoor 60m Times in 2019**[9]

| Boy | Time | Girl | Time |
|-----|------|------|------|
| Micah Williams | 6.60s | Tamari Davis | 7.27s |
| Lance Lang | 6.62s | Briana Williams | 7.28s |
| Marcellus Moore | 6.65s | Thelma Davies | 7.30s |
| Mario Heslop | 6.70s | Moforehan Abinusawa | 7.32s |
| Langston Jackson | 6.74s | Jacious Sears | 7.33s |
| Javonte Harding | 6.77s | Semira Killebrew | 7.34s |
| LaCarr Trent | 6.79s | Alexa Rossum | 7.40s |
| Justin Robinson | 6.79s | Aliya Wilson | 7.42s |
| Bryan Santos | 6.79s | Kaila Jackson | 7.44s |
| Tre Tucker | 6.80s | Aja Davis | 7.44s |

**Table 5:  Best High School Indoor 800m Times in 2019**[10]

| Boy | Time | Girl | Time |
|-----|------|------|------|
| Alfred Chawonza | 110.57s | Athing Mu | 123.98s |
| Malcolm Going | 110.85s | Roisin Willis | 125.70s |
| Miller Anderson | 111.54s | Michaela Rose | 126.93s |
| Luis Peralta | 112.21s | Victoria Vanriele | 127.24s |
| Jake Renfree | 112.33s | Maggie Hock | 127.68s |
| Liam Rivard | 112.42s | Lily Flynn | 128.15s |
| Conor Murphy | 113.25s | Victoria Starcher | 128.32s |
| Miguel Parrilla | 113.41s | Aleeya Hutchins | 128.52s |

---

[9] Results listed in this table are publicly available online at AthleticNET,
https://www.athletic.net/TrackAndField/Division/Event.aspx?DivID=102510&Event=42  (boys), and at
AthleticNET, https://www.athletic.net/TrackAndField/Division/Event.aspx?DivID=102510&Event=42   (girls), last
visited February 11, 2020.
[10] Results listed in this table are publicly available online at AthleticNET,
https://www.athletic.net/TrackAndField/Division/Event.aspx?DivID=102510&Event=4  (boys), and at AthleticNET,
https://www.athletic.net/TrackAndField/Division/Event.aspx?DivID=102510&Event=22  (girls), last visited
February 11, 2020.

JA145

| Darius Kipyego | 113.43s | Sarah Trainor | 128.60s |
| Theo Woods | 113.53s | Makayla Paige | 128.97s |

58.     In 2016, Vashti Cunningham set the high school American record in the girls'

high jump at 6 feet, 4½ inches, and went on to represent the United States at the Olympics in that

same year. Yet to quote Professor Lambelet Coleman again, if the 2016 girls' high school track

competition had been open to males, "Cunningham would not have made it to her state meet, she

would not be on the national team, and we would not know her name other than as a footnote on

her father's Wikipedia page." And for the vast number of girls who benefit from the experience

of competitive athletics even if they are not future champions, "if sport were not sex segregated,

most school-aged females would be eliminated from competition during the earliest rounds."

(Coleman 2020 at 20-21.)

59.     Plaintiffs do not know whether or if so at what time the students with male bodies

who are competing in girls' CIAC track events began taking cross-sex hormones. Nor does this

matter. Administering testosterone-suppressing drugs to males by no means eliminates their

performance advantage. Some physiological advantages—such as bone size and hip

configuration—cannot be reversed once they have occurred. And suppressing testosterone in

men after puberty also does not completely reverse their advantages in muscle mass and strength,

bone mineral density, lung size, or heart size.

60.     This reality is evident in the performance of male athletes who have competed as

women after taking cross-sex hormones. For example, CeCe Telfer, a male who ran as Craig

Telfer throughout high school and the first two years of college, certified compliance with the

NCAA requirement of one year on testosterone-suppressing drugs and began competing in

female track events in CeCe's senior collegiate year, for the 2019 indoor and outdoor track and

JA146

field seasons. CeCe's "personal best" did not go down substantially in *any* event following at least a year on testosterone suppressing drugs, and in a number of events instead *improved*:

**Table 6: Comparison of "Craig" and "CeCe" Telfer Performance Times Before and After Hormone Suppression**

| Event | "Craig" Telfer | "Cece" Telfer |
|---|---|---|
| Indoor 200 Meter Dash | 24.64s (2017) | 24.45s (2019) |
| Indoor 60 Meter Hurdles | 8.91s   (2018) | 8.33s   (2019) |
| Outdoor 100 Meter Dash | 12.38s (2017) | 12.24s (2019) |
| Outdoor 400 Meter Hurdles | 1:02.00s (2017) | 57.53s (2019) |

61.     Not surprisingly, while *Craig* Telfer ranked 212th and 433rd in the 400-meter hurdles among men's Division II athletes in 2016 and 2017 respectively, *CeCe* Telfer took the Division II national championship in *women's* 400 meter hurdles in 2019.

62.     Minna Sveard, the fastest female runner, finished almost a full two seconds behind Telfer, and was recognized only as coming in second.

63.     In short, if males compete in girls' events after puberty, equally gifted and dedicated female athletes simply can't win.

**C.     Increasing Numbers of Girls Are Losing Athletic Victories and Opportunities to Transgender Competitors Today.**

64.     In the past, it has been argued that the unfair impact of males competing in girls' and women's categories would be trivial, because few males will wish to do so.  But over just the last few years, the problem of boys and men taking opportunities from girls and women has grown very rapidly.

65.     As increasing numbers of males are in fact competing in girls' and women's events each year, girls are in fact losing, and males are seizing one "girls'" or "women's" championship and record after another.

JA147

66.     Meanwhile, multiple sources report that the percentage of children identifying as transgender has multiplied rapidly within just the last few years.

67.     As a larger wave of males claiming transgender identity as girls and women hits high school and college, the number of girls losing out on varsity spots, playing time, medals, advancement to regional meets, championship titles and records, and recognition on the victory podium, will also multiply. Indeed, given that it only takes three males to sweep the titles at local, regional, and national competitions entirely, and given the hard physiological facts reviewed above, if increasing number of males compete in girls' and women's athletics, those born female—girls—will simply vanish from the victory podium and national rankings.

68.     This wave of lost opportunities and lost equality for girls is all the more inevitable when males are not merely permitted to take girls' slots and girls' titles, but are praised by schools and media as "courageous" and hailed as "female athlete of the year" when they do so.

69.     Perhaps worse, if the law permits males to compete as girls in high school, then there is no principled basis on which colleges can refrain from recruiting these "top performing girls" (in reality genetically and physiologically male) for their "women's teams" and offering them the "women's" athletic scholarships.

70.     In sum, because schools are permitting students possessing male physiology to compete against girls and women, girls and women are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory. More, girls and young women are losing their dreams. To American girls the message is, "Give up.  You can't win."

JA148

IV.     THE DISCRIMINATORY CIAC POLICY AND ITS IMPACT ON GIRLS

**A.     CIAC Adopts a New Policy Allowing Boys to Compete in Girls' Events.**

71.     CIAC rightly deems athletics an "integral" part of the state's "total educational program."

72.     CIAC declares that it seeks to offer athletic experiences that satisfy the highest "expectations for fairness, equity, and sportsmanship for all student-athletes and coaches" in order to maximize high school students' "academic, social, emotional, and physical development."

73.     However, at some time before 2017, CIAC adopted a policy ("the CIAC Policy" or "the Policy") pursuant to which CIAC and member schools began allowing boys who identify as girls to compete in girls' athletic events.

74.     The CIAC Policy determines—and requires member schools to determine—eligibility to compete in sex-specific athletic competitions solely based on "the gender identification of that student in current school records and daily life activities in the school . . . ."

75.     As detailed later in this Complaint, CIAC and its member schools have permitted male students to switch, from one season to the next, from competing in boys' events to competing (and winning) in girls' events.

76.     At the time that the CIAC adopted the CIAC Policy, all Defendants were aware that after puberty, a male who competes in girls' events gains an "unfair advantage in competitive athletics" (CIAC By-Laws Article IX, Section B) due to physiological changes that occur during male puberty.

JA149

### B.     CIAC's Policy Has Resulted in Unequal Opportunities for Girls in Track and Field Competitions in Connecticut.

77.     As a result of CIAC's policy, two students who were born genetically and physiologically male and have male bodies, T.M. and Andraya Yearwood, were permitted to compete in girls' athletic competitions beginning in the 2017 track season.

78.     Between them, T.M. and Andraya have taken 15 women's state championship titles (titles held in 2016 by nine different Connecticut female athletes) and have taken more than 85 opportunities to participate in higher level competitions from female track athletes in the 2017, 2018, and 2019 seasons alone. In this section, we detail this adverse impact on girls and young women.

79.     To understand how opportunities to participate in higher levels of athletic competition are determined for student athletes, it is necessary to understand how CIAC has organized interscholastic track and field competition in Connecticut. First, based on performance throughout the season, including in both regular and invitational meets, students may qualify to participate in state "Class" championships, with schools grouped by size (S, M, L, and LL). Thus, for example, a student might win the "Class M Women's Outdoor Track 100m" State championship. Next, the top-performing students within each State Class championship qualify to participate in the State Open championships, in which the top athletes in the state compete against each other regardless of the size of the school that they attend. And finally, the top performers in the State Open championships qualify to participate in the New England Championship.

80.     All names, times, and other information provided in this section are taken from public sources, including Connecticut high school track records available on AthleticNET, at the

JA150

web addresses indicated. The records of male athletes competing in women's events are indicated with gray shading.

81.    In 2017, Andraya's freshman season, Andraya won CIAC's Class M state championship in both the women's outdoor 100m and 200m events:

**Table 7:  2017 CIAC Class M Women's Outdoor Track 100m Results (May 30, 2017)**[11]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 9 | M | Andraya Yearwood | 12.66s | Cromwell |
| 2* | 11 | F | Kate Hall | 12.83s | Stonington |
| 3* | 11 | F | Erika Michie | 12.93s | Woodland |
| 4* | 10 | F | Raianna Grant | 13.17s | Waterbury Career Academy |
| 5* | 9 | F | Se-raya Steward | 13.18s | Kaynor Tech |
| 6 | 12 | F | Jon-yea McCooty | 13.30s | Northwest Catholic |
| 7 | 12 | F | Libby Spitzchuh | 13.35s | Valley Regional |

* Qualified for the State Open.

**Table 8:  2017 CIAC Class M Women's Outdoor Track 200m Results (May 30, 2017)**[12]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 9 | M | Andraya Yearwood | 26.08s | Cromwell |
| 2* | 11 | F | Erika Michie | 26.38s | Woodland |
| 3* | 11 | F | Kate Hall | 26.65s | Stonington |
| 4* | 11 | F | Zora LaBonte | 26.80s | Waterford |
| 5* | 11 | F | Victoria Bower | 27.05s | Rocky Hill |
| 6 | 10 | F | Raianna Grant | 27.26s | Waterbury Career Academy |
| 7 | 10 | F | Sheena Wolliston | 27.30s | Northwest Catholic |

* Qualified for the State Open.

---

[11] AthleticNET, https://www.athletic.net/TrackAndField/MeetResults.aspx?Meet=306447&show=all, last visited February 11, 2020.
[12] Id.

82.     But for CIAC's policy that allows biological males to compete in girls-only events, Kate Hall and Erika Michie would each have won first place in the Class M championship in one of these events in 2017.

83.     In 2016, two different girls did win these Class M state championship titles.

84.     Because only the top five finishers in each event qualified to participate in the Outdoor State Open championship, the decision of CIAC and Defendant Cromwell Board of Education to permit Andraya Yearwood to compete in these girls' events deprived Jon-yea McCooty and Raianna Grant of the opportunities that they had rightfully earned to compete in the State Open championship.

85.     When one female athlete was asked about her loss, she said, "I can't really say what I want to say, but there's not much I can do about it."

86.     It is starkly contrary to the terms, spirit, and goals of Title IX to tolerate a policy which first deprives a girl of an opportunity to participate in elite competition which she has rightfully earned, and then additionally intimidates her into silence about the injustice she has suffered. Nevertheless, Plaintiffs, too, have felt both the injustice and the sense of intimidation and silencing that this girl expressed.

87.     Under CIAC's Policy, Andraya advanced to the 2017 State Open Women's Outdoor Track competition, where—still a freshman—Andraya again deprived a girl of a statewide title and opportunity to advance to still higher levels of competition that she had rightfully earned. But for CIAC's policy, Plaintiff Chelsea Mitchell—then a fourteen-year-old freshman—would have had the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships:

JA152

**Table 9: 2017 CIAC State Open Women's Outdoor Track 100m Results (June 5, 2017)**[13]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 12 | F | Caroline O'Neil | 12.14s | Daniel Hand |
| 2* | 12 | F | Kathryn Kelly | 12.36s | Lauralton Hall |
| 3* | 9 | M | Andraya Yearwood | 12.41s | Cromwell |
| 4* | 11 | F | Tia Marie Brown | 12.44s | Windsor |
| 5* | 12 | F | Kiara Smith | 12.59s | Jonathan Law |
| 6* | 11 | F | Kate Hall | 12.62s | Stonington |
| 7 | 9 | F | Chelsea Mitchell | 12.69s | Canton |
| 8 | 12 | F | Tiandra Robinson | FS | Weaver |

* Qualified for the New England Championship.

88.    In the Winter 2017, Spring 2017, and Winter 2018 seasons, T.M. competed in boys' indoor or outdoor track events and did not advance to any state class or open championships in individual events. Just weeks after the conclusion of the Winter 2018 indoor season, T.M. abruptly appeared competing in the girls' events in the Spring 2018 outdoor track season.

89.    T.M.'s switch to competing in the girls' events immediately and systematically deprived female athletes of opportunities to advance and participate in state-level competition. According to AthleticNET records, T.M. never lost a women's indoor 55m or 300m final in the 2018 or 2019 track seasons. Nor has T.M. lost a women's outdoor 100m final in which T.M. competed.

90.    T.M. has also displaced a girl in numerous elimination track events in which T.M. competed. At the 2018 outdoor State Open, for example, T.M. won the women's 100m event by

---

[13] AthleticNet, https://www.athletic.net/TrackAndField/meet/306453/results/f/1/100m, last visited February 11, 2020.

JA153

a wide margin, while Andraya finished second. But for CIAC's policy, Bridget Lalonde would

have won first place statewide in that event, Chelsea Mitchell would have won second place

statewide, and Tia Marie Brown and Ayesha Nelson would have qualified to compete in the New

England Championship:

**Table 10:  2018 CIAC State Open Championship Women's Outdoor Track 100m Results (June 4, 2018)[14]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 10 | M | T.M. | 11.72s | Bulkeley |
| 2* | 10 | M | Andraya Yearwood | 12.29s | Cromwell |
| 3* | 11 | F | Bridget Lalonde | 12.36s | RHAM |
| 4* | 10 | F | Chelsea Mitchell | 12.39s | Canton |
| 5* | 11 | F | Maya Mocarski | 12.47s | Fairfield Ludlowe |
| 6* | 10 | F | Selina Soule | 12.67s | Glastonbury |
| 7 | 12 | F | Tia Marie Brown | 12.71s | Windsor |
| 8 | 11 | F | Ayesha Nelson | 12.80s | Hillhouse |

* Qualified for the New England Championship.

91.     The 2019 State Indoor Open saw similar results and a similar impact. T.M. and

Andraya finished first and second respectively in both the preliminary and final Women's 55m

races, each time defeating the fastest girl by a wide margin:

**Table 11:  2019 CIAC State Open Championship Women's Indoor Track 55m Preliminary Results (February 16, 2019)[15]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | T.M. | 7.00s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.07s | Cromwell |

---

[14] AthleticNet, https://www.athletic.net/TrackAndField/meet/334210/results/f/1/100m, last visited February 11, 2020.
[15] AthleticNet, https://www.athletic.net/TrackAndField/meet/352707/results/f/1/55m, last visited February 11, 2020.

JA154

| 3* | 12 | F | Cori Richardson | 7.24s | Windsor |
| 4* | 11 | F | Chelsea Mitchell | 7.27s | Canton |
| 5* | 12 | F | Kate Shaffer | 7.27s | Conard |
| 6* | 12 | F | Ayesha Nelson | 7.29s | Hillhouse |
| 7* | 12 | F | Maya Mocarski | 7.34s | Fairfield Ludlowe |
| 8 | 11 | F | Selina Soule | 7.37s | Glastonbury |
| 9 | 10 | F | Kisha Francois | 7.41s | East Haven |

* Qualified for the women's 55m final.

**Table 12:  2019 CIAC State Open Championship Women's Indoor Track 55m Final Results (February 16, 2019)**[16]

| Place | Grade | Sex | Name | Time | High School |
| --- | --- | --- | --- | --- | --- |
| 1* | 11 | M | T.M. | 6.95s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.01s | Cromwell |
| 3* | 11 | F | Chelsea Mitchell | 7.23s | Canton |
| 4* | 12 | F | Kate Shaffer | 7.24s | Conard |
| 5* | 12 | F | Ayesha Nelson | 7.26s | Hillhouse |
| 6* | 12 | F | Maya Mocarski | 7.33s | Fairfield Ludlowe |
| 7 | 12 | F | Cori Richardson | 7.39s | Windsor |

* Qualified for the New England Championship.

92.     But for CIAC's policy, Plaintiff Selina Soule as well as Kisha Francois would have advanced to the next level of competition in the indoor state championship 55m preliminary race and competed for a spot at the New England Championship. (Table 11)

93.     But for CIAC's policy, Plaintiff Chelsea Mitchell would have placed first in the 55m at the indoor state championship, been named State Open Champion, received a gold medal instead of a bronze medal, and received public recognition of her achievements. (Table 12)

---

[16] *Id.*

26

JA155

94. But for CIAC's policy, Kate Shaffer would have won second place in the 55m at the indoor state championship; and seventh-place senior Cori Richardson would have qualified for the New England Championship. (Table 12)

95. But for CIAC's policy, Chelsea Mitchell would have made her school's history as the first female athlete from Canton High School indoor ever to be named State Open Champion, and the first ever Canton High School track athlete to be named a State Open Champion.

96. State Open Champions are recognized as All State Athletes, an award listed on college applications, scholarship applications, and college recruiting profiles. State Open Champions are also invited to the All-State Banquet and have their achievements celebrated with a banner in their high school gym.

97. But instead of receiving the accolades and publicity she earned, Chelsea Mitchell was repeatedly referred to in the press as the "third-place competitor."[17]

98. Following T.M.'s sweep of the CIAC's Indoor Class S, State Open, and New England titles in the 55m dash and 300m, this student—genetically male and enjoying the athletic advantages bestowed by male physiology—was named "All-Courant girls indoor track and field athlete of the year" by the Hartford Courant newspaper.[18]

99. In the Spring 2019 track season, T.M. and Andraya Yearwood continued to displace girls including Plaintiffs from victory positions and opportunities to advance to elite levels of competition.

---

[17] *See, e.g.*, https://www.washingtontimes.com/news/2019/feb/24/terry-miller-andraya-yearwood-transgender-sprinter/, last visited February 11, 2020.

[18] https://www.courant.com/sports/high-schools/hc-sp-terry-miller-all-courant-20190410-36bj/, last visited February 11, 2020.

JA156

100.     For example, in the Class S Women's Outdoor Track 100m qualifying race, T.M. and Yearwood took second and third place, excluding two girls from the opportunity to advance to the next level of competition. But for CIAC's policy, Plaintiff Ashley Nicoletti as well as Annabelle Shanks would have advanced to the next level of competition in the outdoor Class S state championship 100m preliminary race and competed for a spot at the State Open Championship:

**Table 13:  2019 CIAC Class S Women's Outdoor Track 100m Preliminary Results (May 30, 2019)**[19]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | F | Chelsea Mitchell | 12.14s | Canton |
| 2* | 11 | M | T.M. | 12.18s | Bloomfield |
| 3* | 11 | M | Andraya Yearwood | 12.50s | Cromwell |
| 4* | 10 | F | Alisia Munoz | 12.73s | Kolbe-Cathedral |
| 5* | 11 | F | Brianna Westberry | 13.05s | Capital Prep |
| 6* | 12 | F | Olivia D'Haiti | 13.08s | Kolbe-Cathedral |
| 7* | 9 | F | D'Jior Delissir | 13.16s | Bloomfield |
| 8* | 12 | F | Sheena Wolliston | 13.22s | Northwest Catholic |
| 9 | 9 | F | Ashley Nicoletti | 13.27s | Immaculate |
| 10 | 10 | F | Annabelle Shanks | 13.30s | Litchfield |

* Qualified for the women's 100m final.

101.     In that outdoor Class S state championship, T.M. and Andraya Yearwood placed first and third respectively in the Women's 100m race. But for CIAC's policy, Plaintiff Chelsea Mitchell would have placed first in the 100m at the Class S outdoor state championship, been

---

[19] AthleticNet, https://www.athletic.net/TrackAndField/meet/365961/results/f/1/100mm, last visited April 9, 2020.

JA157

named State Champion, received a gold medal instead of a silver medal, and received public

recognition of her achievements:

**Table 14:  2019 CIAC Class S Women's Outdoor Track 100m Final Results (May 30, 2019)**[20]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | T.M. | 11.93s | Bloomfield |
| 2* | 11 | F | Chelsea Mitchell | 12.02s | Canton |
| 3* | 11 | M | Andraya Yearwood | 12.28s | Cromwell |
| 4* | 11 | F | Brianna Westberry | 12.82s | Capital Prep |
| 5* | 10 | F | Alisia Munoz | 12.86s | Kolbe-Cathedral |
| 6 | 12 | F | Sheena Wolliston | 13.13s | Northwest Catholic |
| 7 | 12 | F | Olivia D'Haiti | 13.14s | Kolbe-Cathedral |
| 8 | 9 | F | D'Jior Delissir | 13.31s | Bloomfield |

\* Qualified for the State Open.

102.    Similarly, T.M. easily won the Women's 200m race at the 2019 State Outdoor

Open. But for CIAC's policy, Cori Richardson would have won the state championship in this

event, Plaintiff Alanna Smith—as a freshman—would have finished runner-up, and Olivia

D'Haiti would have advanced to the New England Championship:

**Table 15:  2019 CIAC State Open Championship Women's Outdoor Track 200m Final Results (June 3, 2019)**[21]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | T.M. | 24.33s | Bloomfield |
| 2* | 12 | F | Cori Richardson | 24.75s | Windsor |
| 3* | 9 | F | Alanna Smith | 25.01s | Danbury |
| 4* | 11 | F | Chelsea Mitchell | 25.24s | Canton |

---

[20] *Id.*

[21] AthleticNet,  https://www.athletic.net/TrackAndField/MeetResults.aspx?Meet=364088&show=all, last visited February 11, 2020.

JA158

| 5* | 12 | F | Nichele Smith | 25.38s | East Hartford |
| 6* | 12 | F | Bridget Lalonde | 25.55s | RHAM |
| 7 | 12 | F | Olivia D'Haiti | 25.63s | Kolbe-Cathedral |

\* Qualified for the New England Championship.

103.  Considering the nine important state-level competitive events summarized in the tables above (including seven finals and two preliminary races) together with the parallel boys' competitions in these same events at these same meets, the result of the CIAC Policy was that girls received only one first place recognition out of 14 state championship events (Caroline O'Neil in the 200m State Open Women's race on June 5, 2017), while students born with male bodies captured 13 championships.

104.  Students born male, and gifted with male bodies, captured 22 out of 28 first and second place awards in those seven state-level championship events.

105.  And from these competitions, students born male were awarded 68 opportunities to participate in a higher-level state competition, while girls were awarded only 40 such opportunities—little more than half as many as went to boys.

106.  In short, in these events girls received radically fewer opportunities to participate in elite post-season competition than did those born male.

107.  Nor are these isolated examples. The operation of the CIAC Policy has now deprived many female athletes in Connecticut of opportunities to achieve public recognition, a sense of reward for hard work, opportunities to participate in higher level competition, and the visibility necessary to attract the attention of college recruiters and resulting scholarships. The impact summary below identifies over 50 separate times in competitions since 2017 that specific, identifiable girls have been denied the recognition of being named state-level first-place champions, and/or have been denied the opportunity to advance to and participate in higher-level

JA159

competition, in CIAC-sponsored events as a result of the unfair participation of T.M. and Andraya Yearwood in girls' track competitions pursuant to the CIAC Policy.

108.    In sum, the real-world result of the CIAC Policy is that in Connecticut interscholastic track competitions, while highly competitive girls are experiencing the no doubt character-building "agony of defeat," they are systematically being deprived of a fair and equal opportunity to experience the "thrill of victory." A transgender athlete advocate recently wrote in an op-ed that this should be accepted because part of competitive sports is "learning to lose." A policy such as the CIAC Policy that ensures that girls get *extra* lessons in losing, however, cannot be reconciled with Title IX.

**Table 16: CIAC's Policy Impact Summary**

| 2019 Outdoor Track Season | | | | | |
|---|---|---|---|---|---|
| Athlete | School | Meet | Event | Denied State Championship | Denied Participation |
| Chelsea Mitchell | Canton | Class S | 100m | X | |
| Ashley Nicoletti | Immaculate | Class S | 100m | | X |
| Annabelle Shanks | Litchfield | Class S | 100m | | X |
| Olivia D'Haiti | Kolbe-Cathedral | Class S | 100m | | X |
| Sheena Wolliston | Northwest Catholic | Class S | 100m | | X |
| Chelsea Mitchell | Canton | Class S | 200m | X | |
| Brianna Westberry | Capital Prep | Class S | 200m | | X |
| Shelby Dejana | Wilton | Open | 100m | | X |
| Alisia Munoz | Kolbe-Cathedral | Open | 100m | | X |
| Carly Swierbut | Newtown | Open | 100m | | X |
| Cori Richardson | Windsor | Open | 200m | X | |
| Olivia D'Haiti | Kolbe-Cathedral | Open | 200m | | X |

JA160

| 2019 Indoor Track Season | | | | | |
|---|---|---|---|---|---|
| Chelsea Mitchell | Canton | Class S | 55m | X | |
| Sheena Wolliston | Northwest Catholic | Class S | 55m | | X |
| Audrey Strmiska | Griswold | Class S | 55m | | X |
| Jillian Mars | Bloomfield | Class S | 300m | X | |
| Chelsea Mitchell | Canton | Open | 55m | X | |
| Cori Richardson | Windsor | Open | 55m | | X |
| Selina Soule | Glastonbury | Open | 55m | | X |
| Jillian Mars | Bloomfield | Open | 300m | X | |
| Shante Brown | Bloomfield | Open | 300m | | X |
| | | | | | |
| 2018 Outdoor Track Season | | | | | |
| Nikki Xiarhos | Berlin | Class M | 100m | X | |
| Kate Hall | Stonington | Class M | 100m | | X |
| Magnalen Camara | Amisted | Class M | 100m | | X |
| Noelle Konior | Berlin | Class M | 100m | | X |
| Nikki Xiarhos | Berlin | Class M | 200m | X | |
| Kate Hall | Stonington | Class M | 200m | | X |
| Nyia White | Hillhouse | Class M | 200m | | X |
| Addie Hester | Northwestern | Class M | 400m | | X |
| Jada Boyd | Hillhouse | Class M | 400m | X | |
| Bridget Lalonde | RHAM | Open | 100m | X | |
| Tia Marie Brown | Windsor | Open | 100m | | X |
| Ayesha Nelson | Hillhouse | Open | 100m | | X |
| KC Grady | Darien | Open | 100m | | X |
| Nikki Xiarhos | Berlin | Open | 100m | | X |
| Bridget Lalonde | RHAM | Open | 200m | X | |
| Jillian Mars | Bloomfield | Open | 200m | | X |

JA161

| Dominique Valentine | Immaculate | Open | 400m | | X |
|---|---|---|---|---|---|
| | | | | | |
| 2018 Indoor Track Season | | | | | |
| Patricia Jurkowski | Seymour | Class S | 55m | X | |
| Ahyvon Evans | Grasso Tech | Class S | 55m | | X |
| Chelsea Mitchell | Canton | Class S | 300m | | X |
| Haley Bothwell | Sacred Heart | Class M | 55m | | X |
| Patricia Jurkowski | Seymour | Open | 55m | | X |
| Bridget Lalonde | RHAM | Open | 55m | | X |
| Camille McHenry | Windsor | Open | 300m | | X |
| | | | | | |
| 2017 Outdoor Track Season | | | | | |
| Kate Hall | Stonington | Class M | 100m | X | |
| Jon'yea McCooty | Northwest Catholic | Class M | 100m | | X |
| Carly Gable | Northwestern | Class M | 100m | | X |
| Erika Michie | Woodland | Class M | 200m | X | |
| Raianna Grant | WCA | Class M | 200m | | X |
| Erica Marriott | North Haven | Open | 100m | | X |

109.    These charts are examples, and do not include over 40 more missed

championships, recognitions, and participation opportunities for girls in Connecticut who did not

advance to or receive runner-up recognition in statewide competitions including major

invitational meets, as well as girls who did not win or receive runner-up recognition in

conference championships.

110.    The harm inflicted on girls by the CIAC policy, however, goes far beyond

specific lost victories and lost opportunities to participate in elite meets, and far beyond the

JA162

specific girls who have been deprived of that recognition and those opportunities. Instead, the harm extends at least to all girls who participate in track and field events under the CIAC Policy, and indeed to girls—including young girls—who may now or someday *aspire* to become track and field athletes.

111. The cumulative effect of the CIAC Policy is that *all* girls in Connecticut do not receive equal athletic opportunities. Whether or not a girl is the one who loses out to a biological male in a particular race, the quality of competitive opportunities provided to *all* girls does not equally reflect the quality of competitive opportunities provided to boys, because—in contrast to boys—girls are forced to face a level of competition that does not equally reflect and accommodate girls' different physiological characteristics and abilities.

112. Compared to boys, girls competing subject to the CIAC policy lose not only victories and post-season slots, they lose even an equal *hope* of victory, success and recognition. They do not have an equal chance to be champions; they cannot equally dream that if they train hard, they have at least the potential to stand on the victory podium.

113. Instead, when an athlete who is genetically and physiologically male is competing in the girls' division, Plaintiffs and other girls are forced to step to the starting line thinking, "I can't win." "I'm just a girl."

114. The Plaintiffs' personal and attainable goals of victory are being taken from them season after season, and meet after meet.

115. Plaintiff Alanna Smith knows before she gets to the track that she has little hope of winning the top spot against a biological male—she and her fellow female competitors are simply competing for second or third place.

JA163

116.    The Plaintiffs are demoralized, knowing that their efforts to shave mere fractions of a second off of their race times in the hopes of experiencing the thrill of victory could all be for naught, and lost to mid-level male athletes.

117.    For Plaintiff Chelsea Mitchell and many other female athletes, they also feel stress, anxiety, intimidation, and emotional and psychological distress from being forced to compete against males with inherent physiological advantages in the girls' category. While important races always involve some element of stress, Chelsea has felt physically sick before races in which she knew she would have to race against a biological male, while Plaintiff Selina Soule suffered depression after being excluded from participation in State finals because top places in the girls' rankings were occupied by biological males.

118.    And they are told to shut up about it.  As another female Connecticut track athlete who was too afraid to let her name be used told a reporter:

> "There's really nothing else you can do except get super frustrated and roll your eyes, because it's really hard to even come out and talk in public, just because . . . just immediately you'll be shut down."[22]

119.    Chelsea Mitchell was instructed by officials of Canton High School to respond "no comment" if asked about running against male athletes.

### C.    The CIAC Policy Creates Additional and Unequal Risks of Injury for Girls.

120.    The CIAC Policy also applies in full, and with no additional limitations or safeguards, to sports that include bodily contact between players, or contact between players and balls or other equipment, such as soccer, basketball, and lacrosse.

_____

[22] *Quoted in* Kelsey Bolar, *8th Place: A High School Girl's Life After Transgender Students Join Her Sport,* The Daily Signal (May 6, 2019), https://www.dailysignal.com/2019/05/06/8th-place-high-school-girls-speak-out-on-getting-beat-by-biological-boys/, last visited February 11, 2020.

JA164

121.    In these sports, the basic facts of physiology after puberty reviewed above, along with the on-average greater height, weight, and body mass index of males as compared to females, mean that on average, collision with males, or with balls hit or thrown at higher velocity by generally stronger males, create a higher risk of injury for girls and women than they would experience playing against only females.

122.    Studies show that girls and women already suffer a higher rate of concussions than do boys and men when playing the same sports, and that girls suffer longer-lasting negative effects from concussions than do boys. On information and belief, all Defendants are aware of this well-established medical science. On information and belief, already, significant numbers of girls are excluded from participating in athletics in Connecticut each season because they suffer or have suffered a concussion. By exposing girls to yet greater risk of concussion and other injury by permitting males to compete in girls' sports that involve body-to-body or ball-against-body collision, the CIAC Policy fails to appropriately accommodate the physiological capabilities and abilities of girls, and fails to provide equal athletic opportunities for girls.

123.    On information and belief, CIAC has in fact permitted males to compete in CIAC-sponsored competition in girls' sports in addition to track and field. According to a CIAC executive, the Policy "has been applied to teams on several occasions."

**D.    Defendants Are on Notice of Their Violations of Title IX and Have Refused to Take Corrective Action.**

124.    The CIAC and its member schools, including Defendant Schools, have been informed of the ways in which the Policy violates Title IX, and have been informed in detail about the actual impact that the Policy has had and is having on the quantity and quality of competitive opportunities for girls since well before June 18, 2019, on which date Plaintiffs filed

JA165

a complaint concerning the Policy with the U.S. Department of Education Office for Civil Rights

(OCR), and publicly posted that complaint online (the "OCR Complaint").

125.    The OCR Complaint disclosed all facts concerning the impact of the Policy on

female athletes in Connecticut that are gathered in this Complaint through the conclusion of the

Spring 2019 Outdoor Season.

126.    Since receiving the OCR Complaint, Defendants have taken no steps to change

the Policy, to correct official records and publicity materials to give accurate credit to girls who

would have been recognized as victors but for Defendants' violations of Title IX, or to cease and

correct their violations of Title IX in any way whatsoever.

127.    In fact, long before filing the OCR Complaint, parents of Plaintiffs had repeatedly

warned senior officials of CIAC and of Defendant Schools that the Policy was denying girls

equal competitive opportunities and public recognition in track and field. For example, on

February 21, 2018, Christina Mitchell, mother of Plaintiff Chelsea Mitchell, sent a letter to the

Executive Director of CIAC explaining in detail how the Policy deprives girls of fair and equal

opportunities for competition.

128.    After that time, Mrs. Mitchell and Bianca Stanescu, mother of Plaintiff Selina

Soule, met and requested to meet repeatedly with responsible officials of CIAC and Defendant

Schools to discuss their concerns about unfairness to girls, and to request that the Policy be

changed.

129.    In response to these warnings and complaints from parents concerning the effect

of the Policy on girls, Defendants took no steps whatsoever to change the Policy, to correct

official records and publicity materials to give accurate credit to girls who would have been

JA166

recognized as victors but for Defendants' violations of Title IX, or to cease and correct their violations of Title IX in any way whatsoever.

130.    Instead, when in March 2019—a year after her first letter—Mrs. Mitchell sent a third detailed letter on the same topic to the Mr. Glenn Lungarini, then Executive Director of CIAC, Mr. Lungarini informed her that CIAC would no longer accept any communications from her, effectively retaliating against her for her prior complaints of discrimination against girls by imposing a gag order and denying her right to complain of sex-based discrimination against her daughter and other girls in Connecticut schools.

131.    On information and belief, by no later than on or about October 4, 2019, the OCR informed all Defendants that OCR found the allegations of the OCR Complaint sufficiently serious that OCR had initiated a formal investigation of those allegations against all Defendants.

132.    Since receiving notice that the OCR had initiated a formal investigation of Defendants' alleged violations of Title IX, Defendants have taken no steps whatsoever to change the Policy, to correct official records and publicity materials to give accurate credit to girls who would have been recognized as victors but for Defendants' violations of Title IX, or to cease and correct their violations of Title IX in any way whatsoever.

## V.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

133.    All four Plaintiffs intend to compete in the Spring 2020 track and field season. While that season has been seriously disrupted by school closures resulting from the COVID-19 virus, the CIAC has recently announced that "CIAC will explore every possibility for providing student-athletes with a spring [2020] sports experience," and "will make every effort to provide student-athletes experiences that bring closure to their high school sports careers," "includ[ing] consideration of activities beyond graduation and into July."

JA167

134.     If genetically and physiologically male athletes are permitted to compete in girls'
track and field competitions governed by the CIAC Policy in the Spring 2020 season, then
Plaintiffs will likely lose victory, recognition, and advancement opportunities in the spring
season.

135.     Plaintiff Chelsea Mitchell intends to compete in the CIAC Outdoor Class S
Championships currently scheduled for June 3, 2020, in the 100m and 200m events. CIAC has
established 2020 Class S qualifying standards at 13.74s for the 100m, and 28.94s for the 200m.
Based on Chelsea's performance in the 2019 Outdoor track season, in which she achieved a time
of 11.67s in the 100m and 24.79s in the 200m, Chelsea expects to qualify for the CIAC 2020
Outdoor Class S Championship.

136.     Chelsea has a chance of being the fastest girl in the CIAC Class S Championship
in the 100m and 200m for the 2020 Spring season.

137.     Plaintiff Ashley Nicoletti also intends to compete in the CIAC Outdoor Class S
Track Championship in the 100m and 200m. Based on Ashley's performance in the 2019
Outdoor track season, in which she achieved a time of 13.01s in the 100m and 26.78s in the
200m, Ashley expects to qualify for any Outdoor 2020 Class S Championship.

138.     But T.M. is also expected to meet the 2020 Outdoor Class S Championship
qualifying standards for the girls' 100m and 200m races. In the 2019 Outdoor season, T.M.
achieved an 11.64s in the 100m, and 24.18s in the 200m. In fact, T.M. took first place in the
girls' 100m and 200m in the 2019 CIAC Outdoor Class S Championship.

139.     T.M. has repeatedly achieved times faster than the elite girls' times in Connecticut
in the 100m and 200m. T.M. has never lost a girls' CIAC outdoor 100m or 200m final.

140.    If T.M. is permitted to compete in the girls' 100m and 200m events, it is likely
that T.M. will deprive Chelsea and Ashley of a victory position that each girl has earned in the
CIAC Class S Championship.

141.    Andraya Yearwood is also expected to meet the 2020 Outdoor Class S
Championship qualifying standards. During the 2019 Outdoor season, Andraya achieved 12.20s
in the 100m and 25.94s in the 200m.

142.    If Andraya is permitted to compete in the girls' 100m and 200m event, it is likely
that Andraya will deprive Chelsea and Ashley of a victory position that each girl has earned in
the Class S Championship.

143.    Plaintiffs Selina Soule and Alanna Smith intend to compete in the 2020 Outdoor
CIAC Class LL Championship, and based on their 2019 Outdoor track performance, both girls
expect to meet the event qualifying standards: 13.54s in the 100m, and 28.24s in the 200m.
Selina achieved a 12.46s in the 100m and 26.30 in the 200m during the 2019 Outdoor season.
Alanna achieved 12.04s in the 100m and 24.98s in the 200m during the 2019 Outdoor season.

144.    The top five finishers in each class championship will advance to the CIAC State
Open Championships currently scheduled for June 8, 2020.

145.    Chelsea has a chance of being the fastest girl in the State Open in the 100m and
200m for the 2020 Outdoor season and securing a spot to advance to New England Regional
Championships.

146.    Selina, Alanna, and Ashley have a chance of competing for a top spot in the State
Open in the 100m and 200m for the 2020 Outdoor track season and competing for a top spot to
advance to New England Regional Championships.

JA169

147.     But if T.M. and Andraya Yearwood are permitted to compete in the girl's 100m or 200m event, it is likely that one or both of these athletes with male physiology will deprive each of the Plaintiffs of a victory position she has earned at the State Open Championship.

148.     As Chelsea and Selina are seniors, the Spring 2020 track season is their final opportunity to compete in high school track and field events, to improve their scores, to win championships, to receive public recognition of their achievements, and to experience the thrill of victory.

149.     Plaintiff Alanna Smith is a sophomore and expects to compete in CIAC track and field competitions next year and throughout her high school years. Specifically, Alanna plans to compete in track and field events in both the winter and spring seasons of 2021. As noted in paragraph 102 above, Alanna has already been pushed down from an earned second place victory in a 2019 State Championship when T.M. took first place.

150.     Plaintiff Ashley Nicoletti is a sophomore and expects to compete in CIAC track and field competitions next year and throughout her high school years. Specifically, Ashley plans to compete in track and field events in both the winter and spring seasons of 2021. As noted in paragraph 100 above, Ashley has already been excluded from participation in elite competition when participation by two genetically and physiologically male athletes denied Ashley the opportunity to advance to compete for a spot at the State Open Championships.

151.     Plaintiffs do not know which or how many biological males will wish to compete in CIAC girls' track and field events in the Spring 2020 season, or the coming 2020-2021 academic year. In fact, the CIAC Policy denies them the ability to know that until the season starts, as illustrated by the fact that T.M. competed in the boys' events in the Winter 2018 indoor

41

JA170

season and just weeks later started competing in the girl's events in the Spring 2018 outdoor season, with no prior notice to other athletes or their parents.

152.    Each track season lasts only a few weeks. If Alanna and Ashley wait until the start of the next season to seek injunctive relief, the season will be over before there can be any realistic hope of legal redress.

153.    Because of the multiple different negative impacts on girls detailed in this Complaint, Plaintiffs are entitled to injunctive relief prohibiting all Defendants from permitting boys to participate in girls' track and field competitions.

154.    Failure to grant the requested relief will cause irreparable harm to Plaintiffs by continuing to deny them the experience of fair competition that reflects the athletic capabilities of female athletes, as well as the experience of victory and the recognition that can come from victory. Each meet, once over, cannot be redone. Each opportunity lost for participation in an elite meet cannot be recovered. There is no adequate remedy at law for this harm.

155.    The continuing, irreparable harm caused by Defendants' failure to provide equal competitive opportunities for girls in track and field far outweighs any cognizable harm that granting the injunction might cause Defendants, because the requested injunctive relief is already mandated by federal law.

156.    CIAC publicly posts results of past State Championship meets on their website going back at least three years, and on information and belief maintains those records in publicly accessible archives in perpetuity. In addition, schools including at least Defendant School Canton publicly post lists of championships won by their students, going back many years. As a result of competition by male athletes in girls' events in violation of Title IX, female athletes including

JA171

Plaintiffs have been denied accurate public recognition of their athletic achievements and victories in these postings.

157.     Plaintiffs are entitled to injunctive relief requiring all Defendants to correct all league or school records, public or private, to accurately reflect the achievements of these girls only in competition against other girls.

158.     Failure to grant this requested relief will cause irreparable harm to Plaintiffs by continuing to deprive them of public recognition for their hard-earned athletic accomplishments. There is no adequate remedy at law for this harm.

159.     The continuing, irreparable harm caused by Defendants' posting of inaccurate records resulting from the unlawful CIAC Policy outweighs any cognizable harm that granting the harm might cause Defendants, because the requested injunctive relief is already mandated by federal law.

## COUNT I: TITLE IX

### Sex Discrimination by Failing to Provide Effective Accommodation for the Interests and Abilities of Girls

160.     Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs of this Complaint.

161.     All Defendants are subject to the obligations of Title IX.

162.     Defendants have chosen to provide athletic opportunities in track and field separated by sex.

163.     As a result, Defendants have an obligation to provide competitive opportunities for females that accommodate the physical abilities of girls in a manner that ensures that female athletes face competitive opportunities "which equally reflect their abilities" and which provide

JA172

"equal opportunity in . . . levels of competition" as compared to the competitive opportunities enjoyed by boys.

164.    As a result of profound physiological differences between the sexes after puberty, the athletic abilities of girls relevant to track and field competitions are not equal to those of comparably fit and trained boys.

165.    As a result of this inescapable difference, by permitting students who were born male and possess the athletic advantages bestowed by male bodies to compete in girls' track and field events, all Defendants have violated their duty to provide competitive opportunities for female athletes that accommodate their abilities and provide equal opportunities in levels of competition, as illustrated by the fact that in events where students born male have actually been permitted in elite post-season competitions, students born male have been awarded far more first place victories and recognitions than girls, and far more opportunities to advance to state finals.

166.    All Plaintiffs are harmed by Defendants' failure to provide competitive opportunities that fairly and effectively accommodate the athletic abilities of girls. All Plaintiffs have been harmed by Defendant CIAC's imposition and administration of its policy. All Plaintiffs have been harmed by Defendant Bloomfield's conduct in applying and facilitating the CIAC policy. Plaintiffs Selina Soule, Chelsea Mitchell, and Ashley Nicoletti have been harmed by Defendant Cromwell's conduct in applying and facilitating the CIAC policy. Plaintiff Selina Soule has been harmed by Defendant Glastonbury's conduct in applying and facilitating the CIAC policy. Plaintiff Chelsea Mitchell has been harmed by Defendant Canton's conduct in applying and facilitating the CIAC policy. Plaintiff Alanna Smith has been harmed by Defendant Danbury's conduct in applying and facilitating the CIAC policy.

JA173

167.    Such harm includes loss of the experience of fair competition; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; emotional distress, pain, anxiety, and other damages to be proven at trial.

168.    Accordingly, Plaintiffs are entitled to the relief requested herein.

<u>COUNT II: Title IX</u>

<u>Sex Discrimination by Failing to Provide Equal Treatment, Benefits and
Opportunities for Girls</u>

169.    Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs of this Complaint.

170.    All Defendants are subject to the obligations of Title IX.

171.    Defendants have chosen to provide athletic opportunities in track and field separated by sex.

172.    As a result, all Defendants have an obligation to ensure that female athletes receive equivalent treatment, benefits and opportunities in athletic competition as compared to boys.

173.    Equivalent treatment and opportunities require equal opportunities to engage in post-season competition, and more broadly the right to be free of any policies which are "discriminatory in language or effect" or have the effect of denying "equality of athletic opportunity."

174.    As detailed herein, the CIAC Policy deprives female athletes, including Plaintiffs Chelsea Mitchell, Selina Soule, Alanna Smith, and Ashley Nicoletti, of equal opportunities to engage in post-season competition, is discriminatory in effect, and denies girls equality in athletic opportunities, including equal opportunities to achieve and be recognized for victory.

JA174

175.     By providing track and field competitive opportunities for girls subject to the CIAC policy that permits males to participate in girls' events and be recognized as winners of girls' events, all Defendants have violated their obligation under Title IX to provide equal treatment, benefits and opportunities in athletic competition to girls.

176.     All Plaintiffs are harmed by Defendants' failure to provide competitive opportunities that fairly and effectively accommodate the athletic abilities of female athletes. All Plaintiffs have been harmed by Defendant CIAC's imposition and administration of its policy. All Plaintiffs have been harmed by Defendant Bloomfield's conduct in applying and facilitating the CIAC policy. Plaintiffs Selina Soule, Chelsea Mitchell, and Ashley Nicoletti have been harmed by Defendant Cromwell's conduct in applying and facilitating the CIAC policy. Plaintiff Selina Soule has been harmed by Defendant Glastonbury's conduct in applying and facilitating the CIAC policy. Plaintiff Chelsea Mitchell has been harmed by Defendant Canton's conduct in applying and facilitating the CIAC policy. Plaintiff Alanna Smith has been harmed by Defendant Danbury's conduct in applying and facilitating the CIAC policy.

177.     Such harm includes loss of the experience of fair competition; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; emotional distress, pain, anxiety, and other damages to be proven at trial.

178.     Accordingly, Plaintiffs are entitled to the relief requested herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against Defendants and grant Plaintiffs the following relief:

(A)     A declaration that Defendants have violated Title IX by failing to provide competitive opportunities that effectively accommodate the abilities of girls;

JA175

(B)     A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

(C)     An injunction prohibiting all Defendants, in interscholastic athletic competitions sponsored, organized, or participated in by the Defendants or any of them, from permitting males from participating in events that are designated for girls, women, or females;

(D)     An injunction requiring all Defendants to correct any and all records, public or non-public, to remove male athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions;

(E)     An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women;

(F)     An award of nominal and compensatory damages and other monetary relief as permitted by law;

(G)     An award of Plaintiffs' reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988;

(H)     Such other and further relief as the Court deems appropriate.

With respect to provisions (A) through (F) of the foregoing Prayer for Relief:

(1)     Plaintiff Selina Soule seeks declaratory relief, injunctive relief to correct records, and nominal and compensatory damages against Defendants CIAC and the Bloomfield, Cromwell, and Glastonbury Boards of Education.

(2)     Plaintiff Chelsea Mitchell seeks declaratory relief, injunctive relief to correct records, and nominal and compensatory damages against Defendants CIAC and the Bloomfield, Cromwell, and Canton Boards of Education.

(3)     Plaintiff Alanna Smith seeks declaratory relief, injunctive relief to correct records, and nominal and compensatory damages against Defendants CIAC and the Bloomfield and Danbury Boards of Education.

JA176

(4)     Plaintiff Ashley Nicoletti seeks declaratory relief, injunctive relief to correct

records, and nominal and compensatory damages against Defendants CIAC and the

Bloomfield and Cromwell Boards of Education.

(5)     Plaintiffs Smith and Nicoletti further seek the injunctive relief in section (C) of

the Prayer for Relief against all Defendants, to enjoin operation of Defendants' policy

and practice of permitting biological male athletes to compete against females in CIAC

indoor and outdoor track events.


Respectfully submitted this 11th day of August, 2020.

<div align="right">

By: s/ *Roger G. Brooks*

Roger G. Brooks
CT Fed. Bar No. PHV10498
Jeffrey A. Shafer
CT Fed. Bar No. PHV10495
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: rbrooks@ADFlegal.org
Email: jshafer@ADFlegal.org

Kristen K. Waggoner
CT Fed. Bar No. PHV10500
Christiana M. Holcomb
CT Fed. Bar No. PHV10493
Parker Douglas
CT Fed. Bar No. PHV10761
Alliance Defending Freedom
440 First St. NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: kwaggoner@ADFlegal.org
Email: cholcomb@ADFlegal.org
Email: pdouglas@ADFlegal.org

</div>

JA177

Case 21-1365 Document 41 07/09/2021 3135854 Page 182 of 184

Howard M. Wood III
CT Bar No. 68780, CT Fed. Bar No. 08758
James H. Howard
CT Bar No 309198, CT Fed. Bar No 07418
Fiorentino, Howard & Petrone, P.C.
773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136
Fax: (860) 643-5773
Email: howard.wood@pfwlaw.com
Email: james.howard@pfwlaw.com

Attorneys for Plaintiffs

JA178

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Second Amended Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct. Due to the COVID-19 pandemic, I am unable to have this verification notarized; however, I will do so as soon as conditions safely permit.

Executed this 10th day of August, 2020

Christina Mitchell, Plaintiff

JA179

CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2020, a copy of the foregoing Second Amended

Complaint was filed electronically with the Clerk of Court. Service on all parties will be

accomplished by operation of the court's electronic filing system.

s/ *Roger G. Brooks*

Attorney for Plaintiffs

JA180