# 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs-Appellants*,

v.

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her daughter, T.M.; CONNECTICUT COMMISSION ON HUMAN RIGHTS,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Connecticut, Case No. 3:20-cv-00201 (RNC)

**JOINT APPENDIX**
**VOLUME 2 (PAGES JA181-291)**

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. HOLCOMB
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
cholcomb@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
cbarnett@ADFlegal.org

*Counsel for Appellants*

LINDA L. YODER
PETER J. MURPHY
SHIPMAN & GOODWIN, LLP
1 Constitution Plaza
Hartford, CT 06103
(860) 251-5717
lyoder@goodwin.com
pjmurphy@goodwin.com

JOHANNA ZELMAN
FORDHARRISON LLP
CityPlace II
185 Asylum Street
Suite 610
Hartford, CT 06103
(860) 740-1361
jzelman@fordharrison.com

DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
dmonastersky@hl-law.com

*Counsel for Defendants-Appellees*

DAN BARRETT
ACLU FOUNDATION OF CONNECTICUT
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

MICHAEL E. ROBERTS
CONNECTICUT COMMISSION ON
HUMAN RIGHTS & OPPORTUNITIES
450 Columbus Blvd., Suite 2
Hartford, CT 06103
(860) 541-4715
michael.e.roberts@ct.gov

*Counsel for Intervenors-Appellees*

# TABLE OF CONTENTS

| ECF No. | Document Description | Page |
|---------|---------------------|------|
| **VOLUME 1** | | |
| | Docket Report | JA1 |
| 12-2 | Declaration of Professor Gregory Brown in Support of Motion for Preliminary Injunction | JA29 |
| 12-4 | Declaration of Chelsea Mitchell in Support of Motion for Preliminary Injunction | JA68 |
| 94 | Transcript from April 16, 2020 hearing on motions to intervene | JA79 |
| 141 | Second Amended Complaint | JA130 |
| **VOLUME 2** | | |
| 174 | Transcript from February 26, 2021 hearing on motion to dismiss | JA181 |
| 178 | Ruling and Order Granting Motion to Dismiss | JA259 |
| 179 | Judgment | JA288 |
| 180 | Notice of Appeal | JA290 |

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3      - - - - - - - - - - - - - - - - x
                                        :
4      SELINA SOULE, A MINOR, BY        :   No. 3:20CV201(RNC)
        BIANCA STANESCU, HER MOTHER,    :
5      CHELSEA MITCHELL, A MINOR, BY    :
        CHRISTINA MITCHELL, HER MOTHER,:
6      ALANNA SMITH, A MINOR, BY        :
        CHERYL RADACHOWSKY, HER MOTHER,:
7                                        :
                       Plaintiffs,      :
8                                        :
                vs                      :
9                                        :
       CONNECTICUT ASSOCIATION          :
10      OF SCHOOLS, INC., D/B/A         :
        CONNECTICUT INTERSCHOLASTIC     :
11     ATHLETIC CONFERENCE, ET AL.      :
                                        :   HARTFORD, CONNECTICUT
12                     Defendants.      :   FEBRUARY 26, 2021
                                        :
13     - - - - - - - - - - - - - - - - x

14                        ORAL ARGUMENT

15                         VIA ZOOM

16

17         BEFORE:

18              HON. ROBERT N. CHATIGNY, U.S.D.J.

19

20

21                     DARLENE A. WARNER, RDR
                       OFFICIAL COURT REPORTER

22

23

24

25

```
 1    APPEARANCES:

 2         FOR THE PLAINTIFFS:

 3              ALLIANCE DEFENDING FREEDOM
                     15100 N. 90th Street
 4                   Scottsdale, Arizona 85260
                BY:  ROGER GREENWOOD BROOKS, ESQ.
 5
                FIORENTINO, HOWARD, PATRONE, P.C.
 6                   773 Main Street
                     Manchester, Connecticut 06040
 7              BY:  JAMES H. HOWARD, ESQ.

 8         FOR THE DEFENDANTS:

 9              SHIPMAN & GOODWIN
                     One Constitution Plaza
10                   Hartford, Connecticut 06103-2819
                BY:  LINDA L. YODER, ESQ.
11                   PETER MURPHY, ESQ.
                     TYLER BISCHOFF, ESQ.
12
                FORD HARRISON, LLP
13                   CityPlace II
                     185 Asylum Street
14                   Suite 610
                BY:  JOHANNA G. ZELMAN, ESQ.
15
                HOWD & LUDORF
16                   65 Wethersfield Avenue
                     Hartford, Connecticut 06114-1190
17              BY:  DAVID S. MONASTERSKY, ESQ.

18

19

20

21

22

23

24

25
```

JA182

```
 1        FOR THE INTERVENORS:

 2                AMERICAN CIVIL LIBERTIES UNION - NY
                      125 Broad Street
 3                    Floor 18
                      New York, New York 10004
 4                BY:  JOSHUA  A. BLOCK, ESQ.
                      CHASE STRANGIO, ESQ.
 5
                  AMERICAN CIVIL LIBERTIES UNION - CT
 6                    765 Asylum Avenue, 1st Floor
                      Hartford, Connecticut 06105
 7                BY:  DAN BARRETT, ESQ.

 8                COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES
                      450 Columbus Boulevard Avenue, Suite 2
 9                    Hartford, Connecticut 06103
                  BY:  MICHAEL ROBERTS, ESQ.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JA183

1                          10:00 A.M.

2

3              THE COURT:  Good morning.  Thank you for being

4      available this morning.  This is a hearing in the Soule

5      case.

6              We scheduled this hearing to give you an

7      opportunity to address the pending motions to dismiss.

8      Your briefs are admirably thorough, and I appreciate the

9      efforts you have made to help me with the case.  Today you

10     will have an opportunity to make whatever additional

11     presentations you wish.

12             Let me begin by asking counsel to please enter

13     their appearances starting plaintiffs' counsel.

14             MR. BROOKS:  Roger Brooks, Your Honor, with the

15     Alliance Defending Freedom on behalf of all plaintiffs.

16             THE COURT:  Good morning.

17             MR. HOWARD:  James Howard with Fiorentino,

18     Howard, Petrone also on behalf of the plaintiffs.

19             THE COURT:  Good morning.

20             MR. HOWARD:  Good morning, Your Honor.

21             THE COURT:  Turning then to defendants' counsel.

22             MS. YODER:  Attorney Linda Yoder of the law firm

23     of Shipman & Goodwin representing the defendant CIAC and

24     the Danbury Board of Education.

25             THE COURT:  Good morning.

1          MS. ZELMAN:  Your Honor, Johanna Zelman from

2    Ford Harrison representing Bloomfield and Cromwell.

3          THE COURT:  Good morning.

4          MS. ZELMAN:  Good morning, Your Honor.

5          MR. MONASTERSKY:  Your Honor, David Monastersky

6    Glastonbury and Canton boards of education.

7          THE COURT:  Good morning.

8          MR. MONASTERSKY:  Good morning, Your Honor.

9          MR. BLOCK:  Good morning, Your Honor, Joshua

10   Block and Chase Strangio on behalf of the individual

11   intervenors.

12         MR. BARRETT:  Good morning, Your Honor, Dan

13   Barrett on behalf of the individual intervenor defendants.

14         THE COURT:  Good morning.

15         MR. ROBERTS:  Good morning, Your Honor, Michael

16   Roberts for the intervenor defendant Commission On Human

17   Rights and Opportunities.

18         THE COURT:  Good morning, thank you.

19         MR. MURPHY:  Good morning, Judge, Peter Murphy

20   for CIAC and Danbury as well.

21         THE COURT:  Thank you.

22         MR. BISCHOFF:  And good morning, Your Honor,

23   also on behalf of CIAC and the Danbury Board of Education,

24   Tyler Bischoff.

25         THE COURT:  Good morning.

1         Is that everyone who wants to enter an

2    appearance?

3              (Pause)

4         Very good.

5         I see that our court reporter, Darlene Warner,

6    is with us this morning.  Darlene, are you able to hear

7    everyone?

8         THE COURT REPORTER:  Good morning, Your Honor, I

9    am able to hear everyone, thank you.

10        THE COURT:  Thank you.

11        It may be helpful if you mute your phone or

12   other device when you aren't actively participating as a

13   speaker.  We find that it tends to help with the

14   technology in providing everybody with the best

15   opportunity to hear what is being said, so I would

16   appreciate your consideration in that regard.

17        Let me ask counsel for the moving parties

18   whether you have discussed how you would like to proceed

19   this morning with regard to which counsel will be

20   addressing which issues.

21        MS. YODER:  We have, Your Honor, and others can

22   jump in if I am incorrect in this, but Attorney Joshua

23   Block is going to be addressing the -- whether there is a

24   cognizable claim under Title IX and the related issues.

25             I am then going to address if there's any

1    questions or concerns about the standing issues that are

2    in pages 14 to 17 of the brief as well as the claims of

3    effective accommodation, Attorney Monastersky is going to

4    address the Pennhurst argument, and Attorney Zelman is

5    going to address claims against individual defendants and

6    any other areas relevant to -- that I may have missed.

7    But we are all prepared to address questions from the

8    Court on any of the issues as they relate to our

9    particular clients.

10              THE COURT:  All right, thank you.

11              Am I right in understanding that you would like

12   me to entertain argument in the order in which you just

13   listed the issues starting with Attorney Block?

14              MS. YODER:  Yes, Your Honor.  Although, again,

15   we're prepared to answer any questions you have in any

16   order you would like us to present.

17              THE COURT:  Okay, thank you.

18              Before we turn to your presentations, let me ask

19   whether there is anything that anybody wants to bring to

20   my attention prior to those presentations.

21              MR. BROOKS:  Nothing today from the plaintiffs,

22   Your Honor.

23              THE COURT:  All right, thank you.

24              Finally, let me ask whether any of the parties

25   are present and participating.  I'd like to know if that's

1    the case.

2              MR. BROOKS:  Your Honor, of course it's

3    difficult in this context, I believe that at least one of

4    my clients, Chelsea Mitchell, is listening but not

5    participating actively and I frankly cannot vouch for the

6    whole set.

7              THE COURT:  All right.

8              Do we have representatives from any of the other

9    parties or --

10             MS. YODER:  Your Honor -- I'm sorry -- Mr. Glen

11   Lungarini is here listening representing the CIAC.  He

12   will not be participating actively in any way in the

13   argument.

14             THE COURT:  All right.  Do we have the

15   intervenor defendants present today?

16             MR. BLOCK:  I don't believe so, Your Honor.

17             THE COURT:  All right, very well, thank you.

18             Attorney Block, you're welcome to proceed.

19             MR. BLOCK:  Thank you, Your Honor, and we

20   decided to put this argument first because I think it cuts

21   to the chase the most.

22             As an initial matter, we've laid out in the

23   brief all the ways that excluding Andrea and Terry and

24   other girls who are transgender, from competing on the

25   same teams of other girls would violate their rights under

JA188

```
1    Title IX and the Equal Protection Clause.

2              But the central issue in this case is even

3    easier than that.  The central issue isn't whether Title

4    IX or the Equal Protection Clause requires that schools

5    treat transgender girls equally as other girls, the

6    question is whether Title IX prohibits schools from doing

7    so.

8              And the plaintiffs here have advanced an

9    argument that is completely lacking in any source of

10   judicial authority or even in any agent interpretation

11   before this past year.  And of course the only agency

12   interpretation that they have cited to support them has

13   now been withdrawn and rescinded.

14             So this is truly an unprecedented claim and it's

15   unprecedented for two independent reasons:

16             First, nothing in the text of Title IX or any

17   Department of Education regulation or guidance or in each

18   additional decision has ever purported to define the sex

19   of students who are transgender, much less define whether

20   or not they can participate in separated sports or

21   facilities on the same terms as other students.

22             And the second is that even if the Court were to

23   indulge the argument that Title IX somehow defines girls

24   who are transgender and who are recognized in their school

25   records as girls to be, in the plaintiff's words,
```

JA189

1    biological males, that still wouldn't state a claim under

2    Title IX for either effective accommodation or equal

3    treatment.  So I'll address the first of those issues

4    first.

5            This exact same question has been litigated in

6    the context of students using sex-separated restrooms, and

7    every single circuit, six circuits in total, have rejected

8    the arguments that Title IX or its regulations somehow

9    requires that girls who are transgender have to use the

10   boys room or boys who are transgender have to use the

11   girls room.

12           As the Ninth Circuit said, Title IX doesn't

13   require sex-separated restrooms at all, much less prohibit

14   schools from taking gender identity into account.

15           The Eleventh Circuit recently said the same

16   thing, that Title IX doesn't define a transgender

17   student's sex or dictate how they use separated

18   facilities, and exactly the same reasoning applies here in

19   the context of sports that, you know, whatever the

20   plaintiffs' policy arguments might be, those policy

21   arguments are just simply not reflected in the text of

22   Title IX or its regulations, those regulations do not

23   require sex-separated teams in the first place much less

24   dictate the manner in which they are sex separated.

25           The plaintiffs' only response to that argument

JA190

1    is that they say that sports are different from restrooms

2    because sports are, according to plaintiffs, separated to

3    account for physiological characteristics between men and

4    women.  And, you know, regardless of whether their policy

5    argument for that is true or not, their complaint ties all

6    those physiological characteristics to changes that occur

7    in puberty.  According to their own complaint, it's not

8    tied to chromosomes, it's not tied to what your sex organs

9    are at birth, it's tied to changes that occur in puberty.

10          And I think whether or not you think those

11   allegations are true -- we have to accept them as true for

12   the purposes of the motion to dismiss -- there's no way

13   that those fit into the plain meaning of the word "sex" in

14   Title IX, that sex isn't defined as physical changes that

15   occur in puberty.

16          So they are shoehorning their argument into the

17   text of the word "sex" in a 1972 statute.

18          So I'm happy to move on to the second part of

19   the argument if the Court doesn't have any questions on

20   the first question about how Title IX purports to define

21   the sex of the students who are transgender.

22          THE COURT:  You're welcome to proceed, thank

23   you.

24          MR. BLOCK:  Thank you, Your Honor.

25          The second is that even if the Court were to

JA191

1    indulge in the assumption that Title IX does require the

2    schools classify girls who are transgender and who are

3    recognized in their school records as girls to be males

4    for the purposes of sex-separated sports, plaintiffs still

5    wouldn't state a claim under Title IX.  Title IX just

6    doesn't support the type of claim plaintiffs are making.

7            I'll start with the effective accommodation

8    claim.

9            There is a three-part test for effective

10   accommodation claims, and plaintiffs do not even bother

11   trying to fit their claims into that three-part test,

12   because it plainly doesn't apply.

13           The first prong in the three-part test is

14   whether or not the schools provide substantially

15   equivalent -- excuse me -- provides equal participation

16   opportunities for boys and girls that are substantially

17   proportional to their enrollment.  That is a question that

18   is defined at the macro level considering all sports

19   teams, all participation opportunities.  It is not defined

20   at a micro level for how many people in how many contexts.

21   It's a holistic inquiry.

22           Plaintiffs don't allege that CIAC or any of the

23   schools fails that holistic inquiry, and of course they

24   can't do so.  In addition to, you know, the fact of there

25   being opportunities on the track team, there's

1    opportunities throughout the athletic program, and

2    Connecticut provides even more opportunities in some other

3    jurisdictions because it allows girls to play on even

4    contact sport teams with boys.

5           So in Connecticut, girls play ice hockey and are

6    active participants on that team.  If you were to do an

7    aggregate total, and this is in one of the footnotes in

8    the brief, there's just no support for the idea that

9    Connecticut fails, you know, part one of that prong.  And

10   of course satisfying any one of those three prongs is the

11   defense to advance the claim of effective accommodation.

12          So instead of applying the actual test that's

13   been developed and applied in every other case for

14   adjudicating effective accommodation claims, plaintiffs

15   are creating their own tests cobbled together from

16   snippets of statements of cases taken from out of context.

17          They say that participation opportunities can't

18   be illusory, and we agree that participation opportunities

19   can't be illusory, but the way that term is defined in the

20   case law is having situations where girls are allowed to

21   try out for a team but never make it, or cases in which

22   girls are forced to sign up, basketball players are also

23   forced to sign up for the swimming team in order to pump

24   up the numbers of statistics for girls competing even

25   though the girls have no intention of actually swimming or

JA193

1    competing on that team.  No court, no agency has ever

2    defined a participation opportunity as winning an equal

3    number of trophies.

4            The only reference in all of the statutes, all

5    of the regulations, all of the guidance on when a school

6    is required to provide sex-separated teams exclusively for

7    one sex or the other is in a snippet of the 1979 policy

8    statements.  And that says that when a school provides a

9    sport for members of one sex, it has to either allow the

10   other sex to compete in the sport or create a separate

11   team if the evidence shows that they cannot actively

12   participate in the same team as boys, try out or actively

13   compete in the same team as boys.  And so that test on its

14   own isn't a test about winning an equal number of

15   trophies, it's the ability to actively compete.

16           And what's sort of striking here is in this

17   track and field -- in the setting of track and field, what

18   you have is you have several different events at each of

19   the meets, any one student can only choose to compete in

20   three different events, and you have the plaintiffs in

21   this case not only winning their own, you know, first

22   place medals, their own national championships in a

23   variety of events, but you have them on occasion

24   out-racing the intervenors in this case.

25           So they are competing actively, they are winning

JA194

1    some races, no one's guaranteed to win every race, but

2    that is not what Title IX requires.

3           The plaintiffs in this case are accomplished

4    athletes who have gained a great deal from the athletic

5    opportunities offered to them and they've won national

6    acclaim from that.  But there's room enough on the podium

7    for everyone in that accommodating the interests of these

8    particular athletes doesn't require schools to shove aside

9    the girls who are transgender and deny them participation

10   opportunities too.

11          So that's the effective accommodation claim.

12          But the one other point I would make is that

13   plaintiffs' case is based on this theoretical idea that

14   somehow if you allow girls who are transgender to be on

15   sports teams, then cisgender girls will be categorically

16   and systemically squeezed out.

17          And, yes, that is a sort of a very aggressive

18   prediction of what might happen in the future, that

19   there's no -- but it has no actual basis in fact,

20   including today, cisgender girls are not being squeezed

21   out.  This policy has been in place for seven years now

22   and there is a grand total of two girls who are

23   transgender that have been identified as winning anything.

24          Similar policies are in place throughout the

25   country, and as the judge in Hecox noted, maybe there's

1    four instances total of girls who are transgender that

2    have won stuff in active competition here.

3              So the fact is that no one's being pushed off

4    any podiums, no one's being squeezed out of anything.  If

5    this were an alternative universe in which schools were

6    filled with girls that were transgender that were winning

7    every single competition and picking up every single slot

8    of participation, then maybe plaintiffs' theory of the

9    case would have more traction.  But that's just an

10   empirical assertion about what will happen to cisgender

11   girls if there's participation of transgender girls, and

12   there's no factual basis for that empirical assertion

13   right now.

14             THE COURT:  If I understand your argument

15   correctly, even in that alternative universe, you would

16   say that it's a policy question that has not been

17   determined by the legislature.

18             MR. BLOCK:  Exactly, Your Honor, so this is

19   arguing in the alternative.

20             I think first of all, you know, whatever

21   someone's policy position on how transgender girls should

22   be competing in sports and what requirements should or

23   should not be put in place, Title IX doesn't answer that

24   question.

25             You know, I think that the plaintiffs are

1    testifying in legislatures, in state legislatures, to try

2    to pass laws matching their view of what should happen.

3    Title IX, you know, doesn't already embody that vision.

4           But, so I guess I'm saying that once you get

5    past whether or not girls who are transgender are even,

6    you know, whether it's even legitimate to consider them as

7    being anything different than cisgender girls in the first

8    place, you have to get to whether or not the claims the

9    plaintiffs are bringing even fit into the equal effective

10   accommodation framework.

11          If the Court doesn't have other questions on

12   effective accommodation, I'll turn to the equal treatment

13   claims.

14          So for equal treatment, this is even simpler,

15   that equal treatment claims are based on equal treatment

16   of the girls teams and the boys teams.  That's what it's

17   about.  Do they get the same facilities?  Do they get the

18   same funding?  Do they get the same, you know,

19   programmatic publicity in terms of putting up posters

20   about their games?  It's not about whether, you know,

21   individual people on those teams get their articles -- or

22   have articles written up about them.  It's about the

23   treatment of the two separate teams.

24          And there's no allegations here that the girls

25   track team and the boys track team are treated differently

1    in any way for purposes of any of the factors for an equal

2    treatment claim.

3            So again, I think plaintiffs' claims simply

4    don't fit into the doctrine for how you make out these

5    claims.  So I feel like that point is probably one of the

6    most straightforward ones in the case, that it's assessed

7    at a team-by-team level, not assessed by, you know, who

8    gets to participate on a particular team or not or who

9    gets to win a trophy on a particular team or not.

10            Unless the Court has any further questions, I

11    don't want to take up more time than necessary.

12            THE COURT:  Thank you, Attorney Block, I

13    appreciate your input.

14            I think we can turn now to Attorney Yoder.

15            MS. YODER:  Thank you, Your Honor.  I believe

16    that many of the claims in this case and what you'll hear

17    today are issues that are overlapping.

18            When the CIAC in 2013 adopted its current

19    policy, it was looking to make athletic opportunities --

20    and this is one area where I believe both the plaintiffs

21    and the defendants agree, and there's probably not too

22    many areas where we agree -- but it's one area where we

23    agree, which is really at the high school level, the

24    significant, significant benefits that can be given to

25    young people in being allowed to participate in sports.

JA198

1           And CIAC in 2013 adopted a policy that was

2    inclusionary to ensure that those benefits were extended

3    to all girls, not just a subcategory of girls or basically

4    so that a subcategory of girls, transgender girls, were

5    not excluded from sports participation, and this is what

6    this Court is being asked to consider in this case:

7    Should there be -- does Title IX require or prohibit

8    public schools and the state athletic association that

9    sanctions events from permitting a category of girls,

10   young people in high school, from benefiting from these

11   sports opportunities by participating.  And the argument

12   is that these students should in fact be excluded from the

13   ability to participate in high school sports because that

14   is somehow unfair or discriminatory against other

15   cisgender young girls who will be competing.

16           And when you look at Title IX and you look at

17   some of the other cases that interpret Title IX, they look

18   at the facts that our population between male and female

19   in this country is roughly equal and for at the time that

20   Title IX was enacted, they said because of discriminatory

21   views of the abilities of women, women were not being

22   given opportunities.

23           And again, to follow up on Attorney Block's

24   point, they wanted to make sure that substantially equal

25   opportunities were provided to young women to be able to

1    participate in those activities.

2              By allowing transgender girls to participate in

3    sports since 2013 -- and they undoubtedly were

4    participating before but this is the current rule that's

5    being challenged -- there has been no showing that the

6    sort of parade of horribles that is predicted by the

7    plaintiffs has occurred or is likely to occur.

8              And when we're looking at standing of two of the

9    plaintiffs who are still in high school and compete in the

10   track area, for them to say we need to enjoin in the track

11   and field area, even beyond the activities that we

12   participate in, the ability of transgender girls to

13   participate in high school sports because we might not win

14   a certain competition, we might come in second or third or

15   fourth, is not at all what Title IX was about.

16             And it is also the case that given this

17   seven-year history, they've identified two individuals who

18   have graduated, but they've identified no really

19   likelihood of the future harm that they are predicting,

20   that they are going to be excluded from meaningful

21   participation in sports.

22             And despite the statistics, which we again talk

23   about in our brief, they can look at a single competition

24   and identify the various plaintiffs and say in this single

25   competition, my pace in a track event -- which gets

JA200

1     recorded, and when we're looking at colleges and

2     universities and other people looking at them, their pace

3     is recorded, it's public -- my pace was somewhat less than

4     one of the intervenor defendants in this particular one

5     race that I've identified -- except for one of the

6     plaintiffs has identified more situations -- and as a

7     result, I had been discriminated against.

8             And that is not what, again, Title IX requires

9     or Title IX is about.  It is not this eradication across

10    the board of opportunities for cisgender girls to compete

11    in sports, and an injunction eliminating the opportunity

12    for transgender girls to compete at all is not what Title

13    IX requires or the goals underlying Title IX that are

14    cited by both sides look to accomplish.

15            We've already talked a little bit about equal

16    treatment when it goes to the equal treatment of the

17    individual public schools, and this is addressed on

18    pages 38 to 40 of the brief.  Again it talks about on a

19    school level, do we offer equal opportunities?  Do we

20    offer track and field that is meaningful?  Yes.

21            And in fact to say to a school, you cannot

22    participate in CIAC events, means you're not going to be

23    able to offer meaningful opportunities to compete in track

24    and field and other sports events.

25            When we look at the injunction for the looking

JA201

1     forward to saying these individuals should be able to take

2     some discovery and move forward on this idea that they are

3     going to be systematically excluded, there's absolutely

4     nothing in the complaint that would indicate that

5     discovery is going to lead to any different conclusion in

6     this area when you look at it from a legal basis.

7            In terms of the other request for injunctive

8     relief, which is to expunge the existence and

9     participation of these two transgender girls so that the

10    scores and races would show that in the past they did not

11    compete, again that's addressed in our brief.  We do not

12    think there is anything in Title IX that justifies or

13    would permit that kind of relief, and therefore are

14    looking to say that there is no standing or cause of

15    action under that area.

16           With regard to the other area that I would like

17    to address, the cause of action against the home schools,

18    and each plaintiff has identified that their claim is only

19    against the school that they attend or currently attend,

20    again this is tied into the fact that they're saying to

21    those schools:  You have not provided to me a meaningful

22    opportunity.  And given the allegations in the brief

23    showing the number of occasions in which they have

24    competed at sports activities, the success they've had in

25    the sports activity that they've chosen to compete in,

1    there is no basis to conclude that they have been denied

2    either effective accommodations or equal treatment.

3            Again, they're looking at one specific event out

4    of the multiple events that were made available to me.  I

5    came in with a pace or -- a pace that put me in a lower

6    placement than a transgender girl, and again I'm looking

7    to enjoin that person from having an opportunity to

8    participate in sports even though I still have had a

9    meaningful opportunity to participate in that sport

10   myself, I am a certainly looking to deny that to another.

11   And both the CIAC and the individual defendants feel that

12   there is no basis on that allegation which underlies the

13   complaint, the entire complaint, to move forward with this

14   action.

15           With that, if there's any question from the

16   Court, I'm happy to answer those questions, otherwise I'll

17   turn it over to our next attorney.

18           THE COURT:  All right.

19           With regard to the standing of Ms. Smith and

20   Ms. Nicoletti to seek prospective relief, is there any

21   evidence in the record to lend support to a finding that

22   transgender girls will be competing in track later this

23   year or next year?

24           MS. YODER:  Your Honor, there is no evidence in

25   the record that that is the case.

1    It is the policy that should such transgender

2    girls choose to try out for or compete in those areas,

3    they are permitted under the current policy.  And we want

4    to be candid about that.  That is the purpose of the

5    policy is to allow all girls to have the benefit of

6    participating in high school sports in an inclusionary

7    way, but there has been no identification anywhere in the

8    complaint other than the two individuals who have

9    graduated that any transgender youth would be competing in

10   any of the events that these plaintiffs might wish to

11   compete in.

12            THE COURT:  On that point, based on my review of

13   the record, the only references I could find that bear on

14   the question of standing to seek perspective relief can be

15   found in the revised enforcement letters that your clients

16   received from the Office of Civil Rights last summer,

17   which refers to interviews with athletic directors, I

18   believe, possibly principals, possibly coaches, in which

19   the person interviewed stated that to his or her knowledge

20   there were no other transgender girls seeking to compete

21   besides the intervenors referred to there as Students A

22   and B.

23            So on this record, it appears that there is no

24   basis for a finding that Ms. Smith or Ms. Nicoletti need

25   an order from the Court to protect them against the

1    complaint of unfair competition.

2                MS. YODER:  That is correct, Your Honor.

3                THE COURT:  All right.

4                With regard to the claim for expungement or

5    alteration of records, it gets to be a bit intricate

6    looking at all of the information presented in the briefs;

7    but at the bottom line, Attorney Yoder, what is your

8    understanding of what Ms. Soule and Ms. Mitchell would ask

9    the Court to do by way of altering or amending their own

10   records, the records of their own athletic performance,

11   not erasing what might have been achieved by other people,

12   but with respect to their personal interests.

13               MS. YODER:  Your Honor, track -- and in this

14   case the sprints that we're looking at -- every person's

15   pace is recorded.  So whether you came in first, second or

16   third by one second, your accomplishment is recorded, how

17   you compare to people who were there on that particular

18   day, how you compare to people nationally, what you

19   accomplished on that day is recorded in your personal

20   time, that is out there.

21               So my understanding, and certainly plaintiffs'

22   counsel can correct me if I'm wrong, is that they would

23   like the times of other individuals expunged so that their

24   time showing how they ran on that day compared to other

25   people who ran in that race on that day might put them at

JA205

1     a higher number in terms of the ranking.

2              So if you had 30 people, and I came in, my pace

3     put me at 25th, if you eliminated person who was 24th and

4     you renumber the register, on that particular day, I came

5     in 24th and not 25th.

6              We have two problems with that, Your Honor.

7              One is that we think that erasing the

8     accomplishments of other individuals is inappropriate.

9              But, two, any race and your pace on that day

10    depended on a whole variety of factors, and this idea that

11    I would have therefore -- I have some kind of specific

12    injury in not placing higher among the runners who ran

13    that day, and if a transgender athlete had not been

14    allowed to compete, I somehow would have in fact ran the

15    same race, come in at the same pace, but gotten more

16    recognition for that because someone was eliminated from

17    the list, that is my understanding of the injury that's

18    being claimed.

19             And again, their pace, their score, how they did

20    that day in that race is out there for anybody to see who

21    wants to see it.  There is no relief that's going to

22    change that.  It is -- the injury is, I would like to show

23    -- or the alleged injury is, I would like to show on that

24    day that another runner -- I'd like to not show that that

25    other runner was there, and therefore, my pace would put

1    me -- if you renumber the outcome, would put me at a

2    higher number in that particular event.

3              And for the reasons expressed in the brief, we

4    believe that is not appropriate relief for them to be

5    seeking under Title IX.

6              THE COURT:  Thank you.

7              Let me turn then to Attorney Monastersky,

8    please.

9              MR. MONASTERSKY:  Good morning, Your Honor.

10             So the issue about whether the plaintiffs can

11   take retrospective relief is pretty well briefed by the

12   parties.  I'm not going to belabor the general standard.

13             But one important part of the general standard

14   under the Pennhurst doctrine is that the recipient of the

15   federal funds has to be put on notice that if they engage

16   in intentional conduct that clearly violates the terms of

17   the statute, then they can be held liable for

18   retrospective relief.

19             What the plaintiffs argue is that once they

20   allege intentional discrimination, the debate's over, they

21   can seek retrospective relief in damages.  But they

22   absolutely failed to recognize the modification on that

23   issue is that the violation has to violate the clear terms

24   of the statute.

25             Now there's no doubt that it is not clear

```
 1    whether the participation of transgender athletes on girls
 2    teams violates Title IX, and the brief sets forth that the
 3    history of actions by the Department of Education
 4    essentially flip-flopping back and forth on this issue --
 5    and just this week we saw another reversal by the
 6    Department of Education and the Department of Justice.
 7    Just on Tuesday or Wednesday the Department of Justice
 8    withdrew its statement of interest in this case, as well
 9    as the Department of Education withdrawing its notice of
10    impending enforcement actions and saying, listen, that's
11    not our position anymore, it's clear that the recipients
12    of the fundings, that is the defendants in this case, were
13    not put on notice by Congress as well as the Department of
14    Education with its enforcement regulations that the
15    participation of transgender girls in the manner in which
16    it's alleged in this case would violate the clear terms of
17    Title IX.
18          It's -- and in fact, we've seen multiple
19    decisions from the courts throughout the country that sex
20    includes transgender individuals under the definition
21    within the statute.
22          So I don't -- it's the defense position that the
23    plaintiffs cannot establish that their allegations in the
24    complaint would put the defendants on notice that they
25    violated the clear terms of Title IX.  It's just simply
```

JA208

1     not there.

2             And the actions of the Department of Education,

3     the Department of Justice in the decisions throughout the

4     nation clearly demonstrate that at best it's ambiguous in

5     terms of, at best, in terms of the plaintiffs' argument.

6     But we take the position that it's not even -- that if

7     there's a violation -- but there has been no violation in

8     terms of allegations of the complaint and broader about

9     the protections under Title IX.

10            So in terms of the relief which the plaintiffs

11    can seek if this case goes forward involving a motion to

12    dismiss, it would be limited to the injunctive relief and

13    that the plaintiffs cannot recover any retrospective

14    relief.

15            Now, one of the issues that the plaintiffs also

16    raise in their opposition is that this isn't the proper

17    time to raise this issue in terms of what is the proper

18    relief, and that's for another day, but they don't set

19    forth any case law to support that position and it is

20    indeed proper on a motion to dismiss for failure to state

21    a claim that they haven't stated a claim for which they

22    can recover the retrospective relief.

23            One other issue is that it is not relevant to

24    the analysis whether the defendants are agents of the

25    state in terms of whether the damages in retrospective

1    relief can be recovered.

2            The Pennhurst doctrine applies to all recipients

3    of federal funding, and the issue about whether there's

4    sovereign immunity or not is not going to have a bearing

5    on this analysis because it's absolutely clear that the

6    defendants were not put on notice by the clear terms of

7    the statute that what's alleged in the complaint would

8    hold them for violation of Title IX.

9            If the Court has any other questions on this

10   issue, I'd be happy to address them, but otherwise I'll

11   yield to others so we can get through today's proceeding.

12           THE COURT:  Thank you.

13           Attorney Zelman?

14           MS. ZELMAN:  Good morning, Your Honor.  I want

15   to briefly address the issue of liability against my two

16   clients, Bloomfield Board of Education and the Cromwell

17   Board of Education.  I think before we talk about it, I

18   think it's important to understand who attended or attends

19   what school.

20           Ms. Soule attended Glastonbury, Ms. Mitchell

21   attended Canton, Ms. Smith attends Danbury and

22   Ms. Nicoletti attends Immaculate.

23           Immaculate is not a defendant to this action

24   presumably because it's a private school but it is part of

25   the CIAC.

1           Terry attends Bloomfield and Andrea -- or

2   attended Bloomfield, I should say, and Andrea attended

3   Cromwell.

4           So what we have here is four plaintiffs who are

5   bringing a Title IX suit against school districts where

6   they did not attend school.  And the plaintiffs, although

7   they oppose our motion for dismissal on these grounds that

8   these plaintiffs did not attend either Bloomfield or

9   Cromwell schools, they have not cited to a single case

10   that would give this Court the ability to hear these

11   claims.

12           You know, I think we would have to concede that

13   there is no case that is directly on point here, so we

14   have to look outside of this specific factual

15   circumstances to what is most closely related.  And what

16   is most closely related under Title IX is a series of

17   cases that talk about statutory standing under Title IX in

18   the context of sexual assault.

19           There are a number of cases throughout the

20   districts that deal with this issue where a student who

21   attends one school brings a claim against a different

22   school.  Most of these cases are in the higher ed context,

23   and all almost unanimously have found that a student

24   attending School A cannot sue School B because that

25   basically the student of School A is not meant as the

1     beneficiary of the funds received by School B.  And that's

2     precisely what we have here.

3              I think the case that's most instructive is Doe

4     v. Brown University it's a First Circuit case.  In that

5     case the plaintiff, Ms. Doe, attended Providence College.

6     She alleged sexual assault by a student at Brown

7     University while she was at Brown University.  She then

8     brought a Title IX claim against Brown University and it

9     was clearly held that because she did not afford herself

10    of any of the educational opportunities at Brown, she

11    could not maintain a claim under Title IX against Brown.

12             So I think that's the case that's the most on

13    point.

14             There was one case in -- and I'm trying to look

15    at the circuit because it's a Kentucky case -- where there

16    was a reversal of the court and I believe the plaintiffs

17    cite it in their brief -- Doe v. University of Kentucky

18    out of the Sixth Circuit.

19             This case is completely distinguishable from the

20    situation we have here.  The Second Circuit did reverse

21    the lower court decision on that case.  But it was

22    specifically because the student in question attended a

23    community college, which was essentially part and parcel

24    to the University of Kentucky, and so they were unable to

25    basically say that the two districts weren't so

JA212

1    intertwined.

2            I mean the woman in that case lived on the

3    university campus, she used the student services, she paid

4    dues to the student government at the university.  That's

5    not what we have here.  What we have here is four students

6    who attend schools who are bringing suit against two

7    districts where they have no contact with at all.

8            And so if Your Honor has any questions, I'm

9    happy to answer them.

10            THE COURT:  Thank you.

11            Let me turn now to Mr. Brooks.

12            MR. BROOKS:  Thank you, Your Honor, and let me

13    just ask, can you hear me clearly?

14            THE COURT:  Yes.

15            MR. BROOKS:  In speaking of equal athletic

16    opportunities, I feel a little bit like I'm playing tennis

17    with four people on the other side.  I will see what I can

18    do.

19            Your Honor, we've heard actually quite a number

20    of statements about no factual basis and no showing and a

21    number of statements of things outside the complaint.

22            Let me start by beginning to taking us back to

23    the core facts in the complaint.  That is, as far as we

24    know, the first biologically male athlete to take

25    advantage of the CIAC policy to run in girls track, that

1    first occurred in the spring of 2017, and within three

2    years or really two and a half years of seasons,

3    biological males had taken 15 state championships in track

4    events, in girls track events, set a number of state

5    records which may never be broken by biological girls and,

6    as alleged in the complaint, had taken more than 85

7    opportunities for girls to participate in advanced

8    competitions, championships state and regional

9    championships.

10          One example that's detailed in the complaint,

11   Terry Miller who is now 18 -- and I heard counsel mention

12   Terry's name so I think we don't have to worry about

13   that -- Terry Miller competed in boys track in 2017 and

14   through the winter of 2018 seasons and never qualified for

15   any state championship meet, didn't qualify, never mind

16   win.

17          In 2018, Terry chose to run in the girls track

18   identifying as gender identity as a girl, and immediately

19   involved not just to qualification, but to taking girls

20   state championship in the 100-meter and not simply just

21   pushing Terry Miller down from 24 to 25, to use an example

22   that was given, but pushing her off the top three victory

23   podium.  No, there isn't room for everybody on the victory

24   podium.

25          So our core contention in this case is that

1    Title IX promises equal opportunities and equal athletic

2    experiences to our daughters but the CIAC policy is in

3    fact giving girls extra lessons in losing.

4              What the defendants ask this Court to hold by

5    their motion as a matter of law -- and of course that's

6    where we're at procedurally -- is that a policy that

7    permits individuals who have every biological, genetic,

8    physiological hormonal attribute of maleness, which

9    includes -- and there's details in the complaint and of

10   course there will be extra factual development -- but that

11   includes height and muscle mass and muscle strength and

12   endurance and oxygen transport and lung size and heart

13   size, individuals who have all those advantages of male

14   physiology, to then allow them to take team spots and

15   victory spots and advancements to elite competitions based

16   on gender identity, simply cannot violate Title IX no

17   matter how severe the resulting impact on the

18   opportunities and experiences of that half of the student

19   body who were born with xx chromosomes and all that

20   follows from the physiologically as they grow and mature;

21   that's the position the defendants ask you to adopt as a

22   matter of law.

23             I'm glad to hear that we have not spent time in

24   this argument on the issues of testosterone suppression

25   and hormones, the policy doesn't require any of that and

1   it has not been contended by the defendants that either of

2   the intervenors have suppressed testosterone to female

3   levels for any or all of the period for these events that

4   the plaintiffs describes going forward.

5          Now, we did hear the argument this morning, the

6   kind of it's no big deal argument this morning, it's just

7   two.  Simultaneously we heard that, yes, CIAC thinks it's

8   important and intends to allow other individuals to

9   compete based on female gender identity, but I would

10  emphasize, Your Honor, that what's going on here isn't

11  just about two, and that's why we are all here and there's

12  so many here.

13         A 2018 paper -- this report of course is outside

14  the complaint, but I just flag things that will come in in

15  due course in expert evidence -- a 2018 paper published in

16  the prestigious Journal of Pediatrics reported an

17  extremely extensive survey, almost all ninth to eleventh

18  graders in Minnesota, just I believe three years ago,

19  which reported that 2.7 percent of those students, ninth

20  to eleventh graders, claimed a transgender or a gender

21  non-conforming identity.  And that's an order of

22  magnitude, perhaps two orders of magnitude, higher than

23  historic figures that often get bandied around.

24         What that means is that there are in Minnesota

25  thousands of students claiming a transgender identity as

```
1    high school students.  We don't have a similar survey for

2    Connecticut, but there's no reason to doubt that it isn't

3    similar -- we're all part of one big culture these days --

4    and that's thousands of students in Connecticut, and that

5    many in the upcoming season and upcoming seasons will be

6    seeking to compete to participate in athletics.  And the

7    problem for the law is, what does that mean for equity,

8    for fairness, for equal experiences and indeed for safety

9    for girls?

10             And because we see that coming, because we see

11   the actual impact of just two, and we see what's coming,

12   this is raising concerns across the political spectrum.

13             Professor Coleman and openly lesbian tennis

14   athlete Martina Navratilova wrote in the Washington Post,

15   2019 I believe, that in sports, quote, the relevance of

16   sex is undeniable.  And they went on to say that

17   pretending that it's irrelevant will cause the very harm

18   that Title IX was enacted to address.

19             Just earlier this month a headline working group

20   of elite women athletes, including former Olympic and

21   national champions, two transgender athletes, Dr. Renee

22   Richards, former tennis star, and Joanna Harper, this

23   women's sports policy working group has put out a major

24   legislative initiative in a briefing book in which they

25   point to the very facts that are in front of this Court
```

JA217

1    which they say we are thus increasingly likely to face

2    situations like that in Connecticut where trans athletes

3    seek to compete in girls sports.  And they emphasize there

4    is strong scientific evidence that trans girls and women

5    have an unfair advantage over biological females even

6    after a year of estrogen suppressing treatment.

7              So as these statements suggest the science is

8    becoming, if anything, crystalized.  And indeed, just

9    since we filed the second amended complaint, international

10   sporting bodies are taking action to address this real

11   problem.

12             Just since we filed our amended complaint in

13   early August, in October the world rugby federation was in

14   the news for deciding after an extensive study that safety

15   for biological females meant that male bodied athletes,

16   even of the transgender female identity, simply could not

17   be permitted to compete in that women's contact sport.

18             And the Swiss Supreme Court in August, but

19   perhaps two weeks after we filed our amended complaint,

20   upheld an international arbitration decision that

21   sustained track rules that excluded Caster Semenya from

22   female international track competition because Caster

23   Semenya was born with xx, born with testicles, not

24   ovaries, even as a result of a developmental defect, those

25   testicles were internal producing testosterone.  But

1    Caster had been raised with a female gender identity all

2    her life.

3              This is the situation that comes in front of

4    this Court.  Now, obviously it is not your role today to

5    solve a difficult policy question nor indeed to adjudicate

6    the facts we've talked about, but to answer the question

7    of law because we're here on a motion to dismiss.  And

8    Your Honor has been on the bench a long time.  I'm not

9    going to take your time emphasizing motion to dismiss

10   standards, you know them well.

11             I want to agree with Attorney Block that really

12   the legal question boils down to the meaning of sex in the

13   athletic regulations of Title IX.  And just to be clear,

14   we heard some reference to the bathroom cases, there are a

15   set of distinct regulations implemented in '75 and then

16   official commentary afterwards that focus specifically and

17   exclusively on athletics.  And it is those regulations,

18   the 1975 regulations, the 1979 policy interpretation, the

19   1996 clarification -- obviously some more clarification

20   will be coming down one of these days -- these are

21   particular to athletics.

22             So my point is this, the case turns on the

23   meaning of sex, or I should say the legal sufficiency of

24   the claim turns on the meaning of sex in the athletic

25   regulations based on Title IX, because athletics are not

1      mentioned explicitly in the text of the Title IX statute

2      itself, which as Your Honor knows is a very high level

3      text with a great deal delegated to regulation.

4              So let me go as far as to say that if sex in the

5      Title IX athletic regulations must now be construed as a

6      matter of law to mean gender identity rather than

7      biological sex, necessarily and for all purposes, then

8      this Court should dismiss this case.

9              And I say that because it's obviously not the

10     business of Title IX to worry about one set of girls

11     depriving a different set of biological females of

12     opportunities.  And if you conclude, therefore, that the

13     law now prohibits us from distinguishing between

14     biological females on the one hand and biological males of

15     the transgender female identity on the other, then there's

16     nothing left to talk about if we're not permitted to make

17     that distinction.

18             On the other hand, if sex in the Title IX

19     athletic regulations refers to the dimorphic reproductive

20     biology of our species like all higher species, then the

21     case we contend -- obviously I have many counsel to

22     respond to -- but then we contend the case cannot be

23     dismissed.

24             And we contend that it's not possible to read

25     sex in the Title IX athletic regulations to mean or to

1    include gender identity for three primary reasons.

2             First, the text of those regulations won't allow

3    it;

4             Second, the substitution would destroy the very

5    logical basis of separate sports in the first place; and

6             Third, in the recent Bostock case, the Supreme

7    Court rejects rather than supporting confusion between

8    gender identity and sex.

9             Because I say this is the heart of the case, let

10   me walk through those three if I may, Your Honor.

11            The -- we have -- we deal with this in our brief

12   beginning at page 18, that the accepted meaning of sex in

13   1972 when Title IX was enacted, 1975 when the key

14   regulations were enacted, was clearly unambiguously

15   referring to the division by reproductive function of the

16   species.  What the Supreme Court referred to in the very

17   next year in Frontiero v. Richardson as the, quote, an

18   immutable characteristic of each one of us.

19            And Your Honor for the kind of parsing of the

20   meaning and citation of historical resources as to what

21   sex meant in that time period in addition to Frontiero v.

22   Richardson, let me just call the Court's attention to

23   Ulane v. Eastern Airlines 742 F.2d 1081.  It's a Seventh

24   Circuit case.  I cite it not as a binding precedent in any

25   way, but simply for the careful review of the meaning of

JA221

1      sex as of 1972, a topic that I did not at an earlier stage

2      in my life that I would ever be debating.

3              There's also a structural reason that sex in the

4      regulations can't be construed to mean gender identity.

5      No one will dispute that every respected LGBTQ voice

6      agrees that gender identity can be male, female, both,

7      neither, somewhere on the spectrum.  But the regulations

8      repeatedly refer to one sex and the other sex or sometimes

9      to both sexes.  You cannot retrofit a concept that can be

10     neither or something other or somewhere on the spectrum

11     into the whole binary structure of the athletic

12     regulations of Title IX.  Your Honor, I've also said that

13     the attempt to rework sex to include gender identity

14     destroys the very logical basis for sex-separated sports.

15              Now, in general, Title IX has been understood to

16     prohibit what we would think of as separate but equal

17     treatment of the sexes.  The reason for the special

18     permission for sex-separated athletics that is contained

19     in the 1975 regulation, as we cite in page 9 of our

20     opposition and again on the 1979 policy interpretation, is

21     what the Ninth Circuit in its court case in 1982, referred

22     to as the average physiological differences, closed quote,

23     between the two sexes after puberty in particular.

24              We don't separate our athletics for social

25     reasons.  We don't do it to affirm cooperative feminine

1    behavior over here and aggressive masculine behavior over

2    there.  On the contrary, if anything, we do it for the

3    reason that was articulated by -- and this is in the

4    complaint at paragraph 44 -- a woman who prior to this has

5    been called more than once the Godmother of Title IX,

6    Dr. Bernice Sandler.

7             She testified in '75 in front of Congress

8    endorsing, supporting, the regulations that had been

9    adopted and that provided for separated sports.  She said

10   that failure to separate by sex would, quote, effectively

11   eliminate opportunities for women and, quote, would not

12   appear to be in line with the principle of equal

13   opportunity.  So since the reason for the separation is

14   biological, then the only logically justifiable basis for

15   separation, Your Honor, is the biology.

16            Performance capabilities, physiological

17   capabilities, depends on biology not on identity.  And the

18   principles contended for by the defendants is that sports

19   should be separated, yes, but based on gender identity,

20   not biology.  But there's no underlying justification for

21   separation by gender identity.  That's not what athletic

22   ability depends on.

23            Now, Your Honor, a few minutes ago I claimed

24   Bostock as supporting our reading of Title IX.  Your Honor

25   I'm sure is very familiar with the case, and I won't

JA223

1    detail the facts a lot.  There is certainly a lay or press

2    reading of Bostock out there that concludes that any line

3    drawn or action taken that could be described as

4    discriminating against transgender individuals in any way

5    violates Title VII and therefore likely also Title IX or

6    some law.  Obviously justice Gorsuch was far more precise

7    than that.

8            Aimee Stephens, the transgender plaintiff in the

9    consolidated case was born male and came to identify as

10   female and according to the court Stephens was fired,

11   quote, simply for being transgender.

12           And then Justice Gorsuch went on to note that

13   you can't identify somebody as transgender, you can't

14   define that status without knowing and referring to that

15   individual's biological sex.  So he concluded that the

16   firing was, based at least, in part on Stephens'

17   biological sex.

18           In that analysis, he doesn't at all conflate sex

19   identity.  Indeed, the problem is that they're different.

20   And the majority emphasized, they said on page 1746, we

21   agree that homosexuality and transgender status are

22   distinct concepts from sex.  Your Honor they are, they

23   were, they are in the Title IX regulations pertaining to

24   athletics.

25           And we contend that if you can't read sex in the

1    Title IX athletic regulations to mean gender identity,

2    then the displacement of girls by biological males based

3    on gender identity can state a Title IX claim.  And if

4    that's the case that these plaintiffs have adequately

5    alleged that claim, and they have adequately alleged it

6    because they allege that they have -- the policy has

7    resulted in actual denial of equal treatment, treatment

8    and opportunities for female athletes in Connecticut, that

9    it's affected them personally, that their harm has been

10   caused by these defendants.

11          And Your Honor, we heard some reference to what

12   was fairly referred to as bathroom cases.  Let me comment

13   on those.

14          I believe that counsel for the defendants said

15   that courts in bathroom cases have held that sex -- I'll

16   actually quote their reply brief.  I think it parallels

17   what perhaps Mr. Block said.

18          "The courts in bathroom cases have held that sex

19   in Title IX should be read to mean or include gender

20   identity."

21          Respectfully, I'll say to the Court that with

22   regard to most of the cases cited by the defendants,

23   that's just mistaken, and in particular I would point the

24   Court to the Ninth Circuit's holding in Parents for

25   Privacy v. Barr, the Third Circuit's holding in Doe v.

1    Boyertown and the Seventh Circuit's holding in Whitaker v.

2    Kenosha.

3            What those courts did, they did not confuse sex

4    and gender identity.  What they said is that Title IX

5    doesn't require separate bathroom facilities and that the

6    plaintiffs had failed do show that a policy that allowed

7    individuals to use the bathroom of their gender identity,

8    that allowed individuals of the opposite biological sex

9    into the restroom, had failed to show that that created a

10   pervasively hostile environment therefore denying

11   plaintiffs equal educational experiences.

12           Well, that was the conclusion of those courts

13   and that was an interesting analysis, but it's unrelated

14   to the analysis that apply in the athletic context under

15   these distinct athletic regulations.

16           Now, it's true that two appeals courts have

17   misunderstood Bostock and as a result have reached the

18   conclusion that sex now means gender identity.  Those two

19   courts are wrong, and let me call them out.  One is the

20   Eleventh Circuit decision in the Adams v. School Board

21   case, and the other is the Fourth Circuit in the Grimm v.

22   Gloucester case.

23           And just looking at the Grimm decision, for

24   example, they recognize that the plaintiff was excluded

25   from the boys restroom not based on identity but by

1    reference to the student's, quote, biological gender.  A

2    true summary of what happened.

3            But the Court went on to express huge

4    uncertainty as to the meaning of sex in the 40 year old

5    regulation relating to locker rooms and privacy spaces

6    which was enacted in 1980.  And they denounced what they

7    referred to as the board's own, quote, inventive

8    classification biological gender, and they accused the

9    board of relying on, quote, discriminatory notions of what

10   sex means.

11           And, Your Honor, as to that case, as with the

12   Adams v. School Board case, we would simply say that the

13   circuits that haven't lost their grip on the plain meaning

14   of sex -- the Ninth, the Seventh and the Third -- have it

15   right, and that the Fourth Circuit in Grimm and the

16   Eleventh Circuit in Adams have it wrong, and that our view

17   in that regard is strongly reinforced by Bostock's

18   unambiguous statement that transgender status is a

19   different concept from sex.

20           Well, I have said that if a claim based on the

21   taking of opportunities from biological females biological

22   males based on gender identity can state a claim, then

23   these plaintiffs have done so.  Let me move on and address

24   that if I may, Your Honor.

25           Counsel said in essence that this is an

JA227

1    unprecedented claim, and that we certainly concede.  It's

2    an unprecedented claim because this is fundamentally a new

3    type of policy in recent years and a new type of problem

4    for those who are born female.

5            The defendants say, and I'll speak first to

6    the -- our Count Two, which is the right to equal

7    treatment and opportunities in athletics.

8            The defendants have argued, they state in their

9    brief at page 23, their opening brief, that we have no

10   claim because we haven't alleged that girls received

11   lesser participation opportunities.  And Attorney Yoder

12   referred more than once to the proposition that the CIAC

13   and the schools have provided, quote, meaningful

14   opportunities to girls.

15           Now, in fact, we have specifically alleged that

16   girls are denied equal opportunities to participate in

17   advanced meets in particular by this policy.  And we've

18   alleged that not only with regard to girls generally, we

19   have a large amount of statistical information, or I

20   should say by detail, in paragraphs 108 through 109, and

21   Table 16, we've alleged that specifically with regard to

22   Chelsea Mitchell that she was denied opportunities to

23   participate in advanced meets as a result of the policy,

24   paragraph 87; Ashley Nicoletti, the same, paragraph 100;

25   Selina Soule the same, paragraph 91.

1              Now, it's also -- the participation question is

2      also irrelevant as a matter of law.  It is not true that

3      Title IX is satisfied by the mere right to get on the

4      track or field or even by having some meaningful athletic

5      experience.

6              We have cited long-respected Department of

7      Education and HEW, its predecessor, regulatory sources and

8      case law that insist that Title IX guarantees our

9      students, are daughters who are born female, a lot more

10     than that.  We summarize these on pages 16 to 17 of our

11     complaint.  But in brief, the McCormick Court, in looking

12     over all the regulatory authority and precedent, said that

13     the Title IX guarantees girls to equal opportunities to,

14     quote, engage in post-season competition.

15             The 1996, OCR policy clarification says that

16     Title IX guarantees girls equal quality of competition.

17     Well, we've alleged that that's been denied, that having

18     to step to the finish line and be advised to race against

19     individuals with inherent and large physiological

20     advantages out of the starting gate is not an equal

21     competition.

22             And we allege in the complaint how Alanna Smith

23     says that she and her friends, when they step up to the

24     finish line and they see this transgender competitor, they

25     know they're just racing for second or third place because

1    that's how it is.  You step there saying, well, I can't

2    win because -- because why?  Because I was born female.

3                And the McCormick court again emphasized,

4    participation isn't enough.  Meaningful experience isn't

5    enough.  Title IX guarantees our daughters equal chances

6    to be champions.

7                So, Your Honor, I'll leave the sufficiency of

8    allegations of Count Two to those points and to the

9    briefing.  I believe that is clear.

10               I think the effective accommodation count

11   deserves a little more comment.

12               The defendants said in their brief that a

13   typical effective accommodation claim -- and they use the

14   word "typical" -- involves failure to provide certain

15   sports desired by girls.  And I think counsel may have

16   referred to funding and publicity.

17               It is certainly true that those are what typical

18   effective accommodation cases look like up to the present.

19   But that's irrelevant as a matter of law because the most

20   frequent setting or problem that arises doesn't limit the

21   law.

22               We have spent quite a bit of effort in our

23   briefing and in our complaint parsing an effective

24   accommodation regulatory requirement which manifests

25   itself again in the '75 regulations, the '79 policy

1    interpretation, the 1996 clarification, and out of that, I

2    find three sometimes repeated articulations of what

3    effective accommodation requires schools to provide to

4    girls in athletics.  Those are these:

5            They are obliged to provide, quote, competitive

6    opportunities which equally reflect girls' abilities.

7    That's from the 1979 policy interpretation.  Competitive

8    opportunities which equally affect abilities.

9            The 1975 regulation itself refers to, quote,

10   levels of competition that effectively accommodate each

11   sex distinct abilities.

12           And the 1996 clarification requires that schools

13   provide quality of competition which accommodates those

14   distinctive abilities.

15           And, Your Honor, a situation where you step to

16   the starting line knowing that you can't win or that it's

17   extremely improbable not because you haven't tried hard or

18   not because you're not as gifted but because you're up

19   against a male-bodied athlete is, we submit, not an equal

20   quality of competition as to what these girls' brothers

21   experience when they step to the starting line.

22           And beyond that, let me leave that issue also to

23   the briefing, which I think is detailed on that point.

24           I will say that we have -- on the question of

25   are the athletic abilities different, we have alleged

1     quite in the complaint -- and that of course is a subject

2     for expert submissions, we did put in an expert submission

3     with our preliminary injunction motion way back when,

4     which includes many scientific facts that are not in the

5     complaint.  But in the complaint, for instance, we have --

6     well, let me see, this one is perhaps not in the

7     complaint.

8           A study that was done recently, went through all

9     the public records -- and you're beginning to learn from

10     this, or perhaps you knew already -- all these records are

11     publicly posted.  And one scholar went through and

12     identified that in a given year, 2017, male bodied

13     athletes beat the all-time record of world record female

14     sprinter, Allyson Felix, 15,000 times.  Beat that in

15     15,000 recorded times.

16           In other words, the world record woman's sprint

17     time isn't even a significant weigh mark in competition by

18     male-bodied athletes.

19           These are not close questions, these are not

20     large overlaps.  These are radically different

21     physiologies and radically different capabilities.  These

22     are issues which are significantly alleged in the

23     complaint and of course will be developed more fully in

24     expert discovery.

25           Let me talk about the individual defendants, if

1    I may, and whether they are appropriate defendants.

2            I think there's really no contention -- I don't

3    believe I've missed anything -- there's no contention that

4    if a Title IX claim exists, and the CIAC is the sponsor of

5    the policy, is an appropriate defendant.

6            And what about the schools that were or are

7    attended by the plaintiffs?  I'll call it their home

8    schools, if I may:  Glastonbury for Selina Soule, Canton

9    for Chelsea Mitchell, Danbury for Alanna Smith -- and I

10   failed to make a note about Ashley's school, pardon me.

11           Attorney Yoder essentially offered the "good

12   enough" defense on behalf of those schools, that they've

13   provided meaningful experiences.  We've talked about the

14   inadequacy of a meaningful experience.

15           In their briefs in opposition, they essentially

16   raised what I'll call the outsourcing defense.  It's not

17   our rule, we couldn't help it.  It's the CIAC.  But that

18   doesn't work because we have alleged both direct violation

19   by the schools and control violations based on fact that

20   they and their fellow member schools are the sole

21   governing authority of the CIAC.

22           Now, as to direct violation.

23           It's undisputed that the home schools provide

24   interscholastic athletics as an important part of their

25   educational program, and that they do it only through CIAC

1     sponsored sanctioned events.  That's paragraphs 17 to 19

2     of the complaint.

3          Let me ask the Court to undertake a thought

4     experiment.

5          If we suppose that a school provided competitive

6     athletic opportunities, only through a league that in the

7     interest of supposed equity, limited the number of

8     minority players in certain sports who could appear on the

9     court at any given time, well, in my view that would be

10    radically illegal, and the idea that the school could walk

11    away from liability based on the it's-not-my-rule defense,

12    I didn't do it, would have no legal legs at all nor should

13    it here.  Each school has an affirmative obligation to

14    provide equal athletic opportunities for girls who attend

15    those schools.  And we have alleged that they have fallen

16    short in that obligation.

17          Your Honor, I think I will leave the issue of

18    control liability, which is I suppose more intricate to

19    the briefing.  I think it hasn't been raised by opposing

20    counsel.

21          We have cited a case in this very district that

22    approves the control theory of liability for Title IX

23    violations, the Mennone v. Gordon case.  And I would just

24    leave this emphasizing that each -- there is no other

25    authority that sets CIAC policy except the member schools,

JA234

1    the principals who sit in the voting body as described in

2    the complaint, and it cannot be that a large number of

3    schools can join together, adopt a discriminatory policy

4    and then each one of them say, well, you can't hold me

5    liable, it's not my fault.  That is what control liability

6    is for, Your Honor.

7           Let me talk about the intervenors' schools,

8    Cromwell and Bloomfield.

9           Now, Ms. Zelman has argued that what the law

10   says is that only students who are enrolled at a Title IX

11   school can have a claim against that school.  She conceded

12   that there is no on-case point, and I will concede that

13   there is no directly on-case point.  But then she then

14   took the Court to several sexual assault cases in which

15   the assault had nothing to do with the educational program

16   of the school.  An example would be the Arocho v. Ohio

17   University case.  It was cited at page 51.

18           But the contrast here, Your Honor, is dramatic,

19   because what we're talking about here is these schools'

20   interscholastic athletic programs in which the

21   participation by girls from other schools is intended, is

22   invited, is essential, and is indeed the heart of the

23   matter in an interscholastic athletic program.

24           Let's go to the Doe v. Brown University case

25   that Ms. Zelman called the Court's attention to, and that

1    they indeed spent time in their brief on at pages 28 to

2    30.

3           Let me just say, I think we have perhaps

4    adequately highlighted in our brief that the district

5    court decision in that case is fundamentally erroneous and

6    the First Circuit itself was at pains to emphasize they

7    were affirming on different grounds after a de novo a

8    review.  So let's go to the what the First Circuit said.

9    Ms. Zelman said it was most instructive, and I agree.

10          The defendants are arguing a reading of that

11   case that it -- that the First Circuit itself was

12   precisely at pains to contradict, to make impossible,

13   because that court focused not on enrollment, but on

14   nexus.

15          And the focus that they said that discrimination

16   has to be encountered, quote, while participating or

17   athlete attempting to participate in the funding

18   recipient's program or activity.  But then they emphasized

19   in a footnote that participating is a very different thing

20   from enrollment.

21          They said in that Footnote 6 on page 132, "We

22   clarify that a victim need not be an enrolled student,"

23   and they went on to give examples.

24          The victim who had a Title IX claim against

25   Brown University could include, quote, members of the

1    public who are taking part or trying to take part in

2    activities made available to the public which, they said,

3    could include members of the public who are making use of

4    libraries, public lectures, attending sporting events and

5    other activities.

6           Well, if we take the First Circuit at its word,

7    then the reading of this case as advocated by Ms. Zelman,

8    is that a member of the public who is sexually harassed in

9    the stands, if the universities is deliberately

10   indifferent, could have a Title IX claim against the

11   university.  But a young woman who is participating in

12   interscholastic competition on the track at the

13   invitational university, a competition that is part of

14   Brown's athletic program could have no recourse under

15   Title IX.

16          Well, we called that out in our opposition and

17   you'll see in the defendants' reply brief, they simply

18   say, oops, pay no attention to that aspect of the case.

19   They say on page 15, quote, a footnote can never clearly

20   hold anything.

21          And, Your Honor, I would just submit that that

22   is not true as a matter of law; that a court is free to do

23   what the First Circuit said they were doing, which is to

24   elaborate and clarify its holding in a footnote.

25          So Doe v. Brown, of course is not this circuit

JA237

1    and not binding on this Court, but we agree with the

2    defendants that it is most informative on the question of

3    liability of an educational institution to a student who

4    is not actually enrolled in that institution.

5            THE COURT:  Attorney Brooks, excuse me.  We've

6    been going for an hour and a half, and if we were in the

7    courtroom, I would be inclined to take a break for the

8    benefit of the court reporter.  So let me ask you to

9    please be patient for ten minutes and we can take a short

10   break.  Why don't we say 15 minutes.

11           Darlene will that be adequate?

12           THE COURT REPORTER:  That's perfect, Judge,

13   thank you.

14           THE COURT:  All right.

15           Why don't we say we'll resume in 15 minutes, and

16   at that time we'll pick up where we left off.

17           MR. BROOKS:  Very good, Your Honor, thank you.

18           THE COURT:  Thank you.

19               (Whereupon, a recess followed).

20           THE COURT:  Attorney Brooks, are you ready to

21   proceed?

22           MR. BROOKS:  I am, Your Honor.

23           THE COURT:  Thank you.

24           MR. BROOKS:  Your Honor, I think we've come to

25   issues of standing and mootness.  And I would start by

1    urging the Court, as you parse through that, to keep those

2    separate.  I think they need to be kept separate because

3    they're different issues with different burdens.

4          The burden is on the plaintiff to plead facts at

5    the time of the established standing as of the time of the

6    complaint.  The burden is on the defendants to establish

7    mootness and how exactly one would establish that on a

8    motion to dismiss is an open question I don't find much

9    guidance in the case law on.  Also mix into this the scope

10   of appropriate relief, which one of them accurately quoted

11   me as saying that's a question for another day, I'll

12   address that.

13         As to standing, I mean we've parsed through in

14   our papers how each plaintiff at the time that she first

15   filed her claim, alleged facts identifying how -- the

16   reasonable expectation that she would be directly impacted

17   by the policy in what was the then upcoming season, and of

18   course that season didn't upcome due to COVID, but that's

19   neither here nor there.

20         And I believe we've cited authority to Your

21   Honor that the standing question is one that is addressed

22   that is asked in this circuit only as of the time of

23   filing.

24         And I am not certain whether we cited this case

25   in the briefs, so let me mention it:  The Building and

1   Constructions Trades Council of Buffalo v. Downtown

2   Development Corporation, Second Circuit 2006, 448 F.3d

3   138.

4           And there the Second Circuit held that it was

5   reversible error where a district court held that standing

6   had been destroyed by events after the time of the

7   complaint.

8           I am aware that other circuits view -- or

9   perhaps they use the words differently -- but they talk

10  about standing as something that has to exist throughout

11  the time of the litigation.  The Second Circuit is very

12  clear how it has to be applied here.

13          There's been discussion about -- well, there's

14  standing for what?  Well, I think primarily there is

15  standing to assert claims, but I believe it's the case

16  that the standing of these plaintiffs to pursue correction

17  of records -- and there's debates about whether that's an

18  appropriate remedy -- but they're pleading that they have

19  been affected, that they're ranking in publicly posted

20  records, their ranking in their credit for championship

21  victories has been denied to them.

22          So there's standing to pursue correction of

23  records, nominal compensatory damages and attorneys' fees,

24  which are explicitly allowed for Title IX claims, I think

25  are difficult to dispute.

1           Standing to pursue injunctive relief, the

2    defendants say in their reply, that Selina Soule and

3    Chelsea Mitchell who now concede that they do not have

4    standing to seek prospect of relief.  Again, just to

5    untangle things, that's not accurate.  What we conceded by

6    the Second Amended Complaint is that prospective relief

7    would be moot as to those individuals, and therefore they

8    didn't seek it in the Second Amended Complaint.  We've

9    parsed that out carefully.

10          Now, as to Alanna Smith and Ashley Nicoletti,

11   they've argued that the future harms are too speculative

12   because who knows who they will run against.  Your Honor,

13   I would just encourage the Court to look at the example of

14   the Second Circuit's McCormick case.

15          Yes, we have to and did allege as regards to

16   standing at the time a reasonable realistic danger of

17   future harm.  We identified specific events in which they

18   were likely to come up against these competitors.  And

19   then the McCormick case kind of helps us calibrate what

20   realistic danger of harm means.

21          The scenario there was, the issue was, one of

22   the schedulings that would or would not allow

23   hypothetically the Mamaroneck girls soccer team to

24   participate in state finals.  The plaintiffs themselves

25   never participated in the Mamaroneck team, they never

1    demonstrated that they had the skills to make that team,

2    and the Second Circuit noted without dispute that it was a

3    long shot for Mamaroneck to play in the state finals even

4    should the schedule be changed because Mamaroneck had not

5    even won at the more local district level in the previous

6    year, page 294 of that opinion.

7         So, Your Honor, I would just call the Court's

8    attention to that case, which I think demonstrates that

9    the realistic danger threshold for standing is a low, not

10   a high bar.

11        Your Honor, this also I think confusion in the

12   briefing on the argument that standing somehow precludes

13   the plaintiffs from seeking a general injunction against

14   the application of the policy.  They want to try to

15   confine standing to all we can talk about is me, so to

16   speak, and they emphasize, they lead with the Lewis v.

17   Casey case from the Supreme Court, which I'm very happy to

18   call the Court's attention to and agree that it's

19   important.  It's a suit -- but let me explain why.

20        It's a suit by an illiterate prisoner alleging

21   that prison policies deny meaningful access to legal

22   resources.  And while the Supreme Court -- well, what was

23   held by the Supreme Court there is that an illiterate

24   prisoner has no standing to challenge legal aid and access

25   to materials and policies that are relevant to non-English

1    speakers or to those prisoners in lockdown because the

2    plaintiffs were not non-English speaking and they weren't

3    under lockdown.

4         And that's the origin of the language that gets

5    quoted in defendants' brief where Justice Scalia I believe

6    says standing is not dispensed in gross.

7         The point was having ground on one policy

8    doesn't give you the right to challenge other policies.

9    But there was nothing in that decision that the illiterate

10   plaintiff wasn't entitled to challenge and have enjoined

11   the policy as it applied to illiterate prisoners.

12        So standing is the question the Court will ask

13   only as the time of the first filing of each claim for a

14   plaintiff, and I think you'll find that it is alleged

15   perhaps the more concrete question is, are the asserted

16   claims moot.  And particularly is the request for

17   prospective relief mooted by the graduation of

18   intervenors.  And this we've discussed in our opposition

19   at pages 36 through 38.  And the point is, the defendants

20   emphasize the graduation of the intervenors in page 15 of

21   their opening brief and again in their reply.  Let me

22   start at the kind of commonsense level.

23        The intervenors remain in this case.  The only

24   possible interest they have in it is to prevent the

25   correction of records, to preserve what they view as their

1     appropriate and proper records.  Obviously they aren't and

2     never will be affected by this policy again.  But the very

3     fact that they're still in and they still care signifies

4     that these records about who won championships matter to

5     athletes.  This is so much of what athletes strive for.

6     Yes, you want personal best and personal satisfaction, but

7     you want recognition as the fastest girl in Connecticut,

8     the fastest girl in your league.  These records matter,

9     that's why the intervenors are still in.

10              And so the claims -- I believe in general that

11    mootness is a concept that applies to claims not

12    individual requests for relief.

13              And I would call the Court's attention to the

14    case of Suffolk County v. Sebelius, 605 F.3d 135, Second

15    Circuit 2010, and there the Second Circuit emphasized that

16    under the general rule of mootness, court's subject matter

17    jurisdiction ceases only when an event occurs during the

18    course of proceedings or an appeal that makes it

19    impossible for the Court to grant any effectual relief

20    whatsoever to a prevailing party.

21              Your Honor, with the claims for damages,

22    attorneys' fees, correction of records, in addition to

23    prospective injunctive relief, I do not think it is

24    possible to conclude for either one of these claims at

25    this stage in the proceeding before factual development in

1    discovery that no effective relief of any type can be

2    provided under either one of these claims.

3            I'm trying to cut to the chase here, Your Honor.

4            As I've said -- oh, I do now also mention, and

5    Attorney Yoder conceded, that she didn't know who was

6    coming down the pipe for the next season, who would seek

7    to compete, how many transgender athletes might be seeking

8    to compete in CIAC, and she conceded that should any wish

9    to do so, the very purpose of the policy was to ensure

10   that they are permitted to do so.

11           And, Your Honor, I think this case has taught us

12   very clearly that this is a classic situation of capable

13   of repetition, as Attorney Yoder conceded, but evading

14   review; that is a sports season moves very quickly and

15   litigation, as those of us who have been lawyers for

16   awhile know, moves slowly.  Here we are a year after the

17   filing of this complaint.

18           Your Honor, let me also break out for mootness

19   the question of remedies.  Page 39 and 40 we have -- well,

20   in argument it was said that we have not put forward

21   relevant case law.  I would refer the Court to the case

22   law we do cite, 39 to 40 of our opposition, where I think

23   I've quoted before, I won't say it again, the Norwalk CORE

24   decision from the Second Circuit saying that if you

25   dismiss on the basis that the wrong relief or ineffective

1    relief has been requested, quote, the Court has moved too

2    quickly.

3            And we've cited the Supreme Court saying in the

4    Holt Civic Club case that a federal court may not dismiss

5    a potentially meritorious claim because the requested

6    relief was, quote, not the correct one.

7            Whether respective relief is necessary or

8    appropriate, these are all questions for another day after

9    discovery and development of the facts when it will

10   perhaps no longer be true that none of us know what's

11   coming down the pike.  These are issues where the school

12   has information, the schools have information, and of

13   course the plaintiffs have none having had no substantial

14   discovery on that sort of issue.

15           I'll say in passing, Your Honor, that I agree

16   with the defendants that state actor status is not an

17   issue here when it comes to remedies, that's not the basis

18   of liability under Title IX.

19           But let me go to Pennhurst, because in the

20   briefs and now again in the argument we've heard a lot

21   about Pennhurst.  And the gist of that argument is that

22   even if the Court were to conclude the permitting male

23   bodied individuals to take opportunities from females

24   could constitute a Title IX violation, there could be no

25   damages claim because that's a novel theory.

JA246

1            Now, Your Honor, that's just not how Pennhurst

2     works.  Pennhurst State says that a court cannot imply a

3     private right with action for damages based on spending

4     power statute absent a clear voice from Congress

5     expressing that intent.

6            And the relevant question, the correct question,

7     here is:  Is a private right of action for damages for

8     intentional discrimination, does a damage action exist

9     under Title IX?  And that the Supreme Court has

10    definitively answered in the Franklin v. Gwinnett County

11    case in 1992.

12           And I guess I have to digress to a kind of

13    strange quirk of Title IX law, which is that the necessary

14    intent for an intentional violation comes not from proving

15    that the parties are sitting there saying, gosh, I want to

16    discriminate against girls, but rather from the intent to

17    offer sex-separated sports; and once one forms the intent,

18    once one acts with intent to separate sports for boys and

19    for girls, then one has satisfied the intent element and

20    has all of the obligations of effective accommodation and

21    equal opportunities that the Title IX regulations require.

22           Well, the defendants say, okay, okay, but your

23    theory of intentional violation, your theory of violation

24    is novel and, Your Honor, I can think we can see from the

25    Supreme Court's case law that that is just not the right

1    question under Pennhurst.  Why do I say that?

2                What we think you'll find in the law is that

3    once an action for intentional violation is -- for

4    intentional discrimination -- is recognized, Pennhurst

5    doesn't act to block damages simply because a particular

6    theory of what constitutes intentional violation is new.

7                If you look at the Franklin case, which I just

8    mentioned, it was the first case to say that there even

9    was a private right of action for damages for

10   discrimination under Title IX.  But the Supreme Court let

11   the damages claim in that case go forward even though in a

12   case of first impression they invoked at page 74 of that

13   decision what they referred to as the normal presumption

14   in favor of all appropriate remedies.

15               And a few years later in the Davis v. Monroe

16   County, they recognize for the first time a cause of

17   action for damages under Title IX based on deliberate

18   indifference to discrimination and harassment by others,

19   by students or teachers; and even though it was a -- even

20   though that was a question of first impression, the

21   damages claim in that case was permitted to go forward.

22               Similarly, 2005, in Jackson v. Birmingham Board

23   of Education, the first time the Supreme Court decided

24   retaliation against somebody who makes a sex

25   discrimination complaint could constitute sex

JA248

1    discrimination itself, it was the first time a case of

2    first impression the damages claim in that action was

3    permitted to go forward.

4           Your Honor, the remedy of correction of records,

5    there was -- we heard the, well, how can you know what

6    would have happened argument.  We heard the general

7    argument that it's all speculative.

8           I would just point out to that, Your Honor, two

9    things:

10          If somebody is subsequently determined to be

11   ineligible for any reason in athletics, the routine

12   solution, not a eccentric solution that we've sought out,

13   the routine solution is the removal of the ineligible

14   person from the records and the increasing of ranking and

15   the awards of prizes of recognition as championship to

16   those who are next in line.

17          So are there perhaps more complicated

18   alternative universes?  Perhaps there are.  But what we're

19   asking for is routine.

20          In the last several decades, 149 Olympic

21   athletes who have won medals have been, after the fact,

22   held to be ineligible, and those have been revoked and

23   those awards have simply trickled down to the next

24   eligible individual.

25          Similarly and perhaps even more to the point,

1   the CIAC bylaws, Article 8(c) addressing a different

2   circumstance of after determining ineligibility state that

3   what should be done is to, quote, require that individual,

4   that individual or team records and performances achieved

5   by such ineligible student, shall be vacated or stricken.

6          So what we're asking for in this situation, if

7   we're correct, and Title IX says no, you can't do this

8   thing, you can't permit male bodied athletes to take spots

9   from female bodied athletes is simply what the CIAC itself

10  provides for in a similar circumstance.  Of course because

11  that argument hadn't come up, that provision of the bylaws

12  isn't, I believe, in the record.  That's a matter for more

13  discovery and development.

14          And with that, Your Honor, I will rest.

15          THE COURT:  Thank you.

16          Let me inquire whether anybody on the

17  plaintiffs' side wants to reply to anything in particular

18  that Attorney Brooks had to say during his presentation?

19          MR. BLOCK:  Yes, Your Honor, briefly, if Your

20  Honor has the time.

21          THE COURT:  Yes.

22          MR. BLOCK:  So I think that -- I mean, a lot of

23  ground was covered, so I think we'll have to pick our

24  battles about which things to highlight orally and which

25  things are addressed in the papers.

1          But with respect to, you know, whether or not

2    this is a cognizable cause of action under Title IX, I

3    heard Mr. Brooks to be arguing a case that is not the case

4    presented here.  Most of his argument was directed to

5    rebutting a claim that Title IX somehow -- that Title IX

6    requires that schools treat girls who are transgender the

7    same as other girls and, I mean, I certainly think it

8    does, but that's not what this case requires the Court to

9    resolve.

10          This case is not about whether Title IX

11    prohibits schools from distinguishing between girls who

12    are transgender and girls who are not; this case is about

13    whether or not Title IX prohibits schools from treating

14    them equally.

15          So I think that much of Mr. Brooks' argument was

16    about how, you know, sex can mean gender identity and how,

17    you know, in order to -- how the Fourth Circuit and the

18    Eleventh Circuit have held that Title IX requires that

19    transgender students be treated equally for purposes of

20    sex-separated facilities, and that's just not this case.

21          This case is about whether Connecticut, pursuant

22    to Connecticut law and its longstanding athletic policy,

23    is allowed to recognize girls who are transgender who are

24    recognized in their school records and daily lives as

25    girls -- some of them have birth certificates recognizing

1    them as girls -- whether Title IX prohibits Connecticut

2    from following state law and providing those girls equal

3    participation in athletics as state law requires.

4           So Mr. Brooks doesn't have to agree with the

5    Fourth Circuit and the Eleventh Circuit.  The issue is

6    whether Connecticut is allowed to make its own choice

7    under Title IX.

8           I also heard a lot of discussion about

9    Switzerland and about regulations and, you know, athletic

10   rugby competitions in the UK, and I think this sort of

11   just highlights that, you know, this case has been brought

12   to serve as a shot across the bow in a larger issue.

13          And the purpose of Article III courts is to

14   address specific claims by specific individuals who are

15   harmed and whose harm can be redressed by the court.  And

16   each of these plaintiffs -- most of them have identified a

17   single instance in which my clients have allegedly taken a

18   slot away from them by outranking them.

19          The only one is Chelsea.  Chelsea is the only

20   one who has raced against my clients more than one or two

21   times.  She has outraced them some of those times.  She is

22   a national ranked figure in the, I think it's either the

23   high jump or the long jump, an incredibly accomplished

24   athlete.  The idea that the participation opportunities

25   have been taken away from her -- well, first of all,

JA252

1     that's not in the complaint at all.  There's no allegation

2     that she's ever been unable to compete in a race as a

3     result of our client's participation; but there's just no

4     predicate for the claim that these particular plaintiffs

5     have been harmed by my particular client.

6              So whatever's going on with the issue of the

7     Switzerland Court of Human Rights doesn't really have

8     relevance here for the United States District Court for

9     Connecticut.

10             I also just, you know, a couple of things just

11    sort of jumped out at me.

12             Mr. Brooks talked about Ulane, a Seventh Circuit

13    decision, which is a notorious Seventh Circuit decision

14    for saying that Title VII didn't protect transgender

15    people who were fired for being transgender.  That is

16    precisely the Seventh Circuit decision that was abrogated

17    by Bostock.

18             Bostock specifically said that this result of

19    the Seventh Circuit in those earlier cases defining the

20    purpose of what Congress was thinking when it passed the

21    statute is an entirely inappropriate inquiry.  What

22    matters is the text that Congress wrote.

23             The statute says nothing about sex-separated

24    sports, zero.  The regulations say schools shall not

25    separate teams on the basis of sex unless in contact

1      sports or when skill is involved, schools may do so.

2              The text of Title IX in its regulations is not a

3      text that requires sex separation of sports in the first

4      place, much less prohibits transgender people from

5      competing in them.

6              And another example is we heard about safety

7      concerns about playing in contact sports.  Connecticut

8      allows girls to play in contact sports with boys.  In

9      Connecticut, if you want to do ice hockey and you're a

10     girl, you have to compete on the coed team against boys.

11     It's a contact sport.  There's checking.  But Title IX

12     allows different states in different athletic communities

13     to make their own determinations about the best way to

14     provide equal accommodation to everyone.

15             It's not a straight jacket that imposes, you

16     know, one requirement of the one and only way to provide

17     equal and effective athletics accommodations, and in fact

18     Connecticut provides many more opportunities to girls

19     because unlike other states, it doesn't exclude girls from

20     competing in contact sports with boys.

21             And then just two other small things.

22             To say that Bostock definitively rejected a

23     definition of facts that had anything to do with gender

24     identity is just simply a false reading of Bostock.

25             The decision is crystal clear that the parties

1    in that case both provided competing definitions of what

2    sex could mean at the time that Title VII was adopted, and

3    the Court said it didn't have to resolve that dispute,

4    because even under a definition of sex that was confined

5    solely to so-called biological sex, the plaintiffs still

6    won.  Bostock, you know, intentionally did not resolve

7    that dispute.

8          And then just say one thing about this idea of

9    Ms. Smith walking up to the starting line and knowing that

10   she can't win.  She's won.  She's outraced them on the

11   starting line.  The idea she's coming there saying, I

12   can't win, it's just not true.  She's won.  Maybe she

13   doesn't win every time.  But it's just like -- it's a

14   false premise.  The scores of my clients are not outside

15   the range of scores of cisgender girls.

16         So this isn't even a situation where you have a

17   Venn diagram where the cisgender girls are competing

18   against transgender girls whose scores fall outside the

19   range of what a cisgender girl is capable of doing; they

20   don't.

21         So I just -- the case here is being brought on a

22   set of hypotheticals, and that in a hypothetical situation

23   might strike someone as being unfair.  But the

24   hypothetical situation, is just not an accurate

25   description of what's going on in Connecticut, what's

1    going on the race track with my clients or with the

2    plaintiffs.

3              I'm happy to -- oh, and another small thing

4    about the intervenors remain in the case even though we've

5    graduated.

6              Intervening defendants don't need to have

7    standing.  The person that needs to have standing is the

8    person asking the Court to take action to do something.

9              It's the plaintiffs that are asking the Court to

10   take action and do something, and in order to do that,

11   they need to show that they were injured.  So no one's

12   contesting an injury in fact.  And traceability, no one's

13   contesting that here for past injury, but they also need

14   to show redressability and for injunctive relief.

15             Part of Article III, whether it's mootness or

16   standing, you need to show you still have a redressable

17   claim.

18             Their redressable claim is for damages which may

19   be precluded from Pennhurst entirely, but the redressable

20   claim for damages, they do not have a redressable claim

21   for their injunctive relief.

22             And I'll end it at that unless the Court has

23   further questions.  I don't want to take up anymore time

24   than necessary.

25             THE COURT:  Thank you.  I appreciate all of the

JA256

1   work you have done.

2              It is likely to be a couple or three weeks

3   before I have a decision for you, but I will endeavor to

4   provide you with a decision as soon as possible.

5              With that, thank you all.  The clerk will

6   adjourn the proceeding.

7                    (Proceedings adjourned at 12:14 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3               In Re: SOULE vs. CIAC

4

5

6          I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

16          /s/_____

17               DARLENE A. WARNER, RDR-CRR
                  Official Court Reporter
                  450 Main Street, Room #223
18                Hartford, Connecticut 06103
                  darlene_warner@ctd.uscourts.gov
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SELINA SOULE, a minor, by          :
Bianca Stanescu, her mother;       :
CHELSEA MITCHELL, a minor, by      :
Christina Mitchell, her mother;    :
ALANNA SMITH, a minor, by          :
Cheryl Radachowsky, her mother;    :
ASHLEY NICOLETTI, a minor, by      :
Jennifer Nicoletti, her mother,

 Plaintiffs,                  :
                                   :
v.                                 :    Case No. 3:20-cv-00201 (RNC)
                                   :
CONNECTICUT ASSOCIATION OF         :
SCHOOLS, INC. d/b/a CONNECTICUT    :
INTERSCHOLASTIC ATHLETIC           :
CONFERENCE; BLOOMFIELD PUBLIC      :
SCHOOLS BOARD OF EDUCATION;        :
CROMWELL PUBLIC SCHOOLS BOARD      :
OF EDUCATION; GLASTONBURY          :
PUBLIC SCHOOLS BOARD OF            :
EDUCATION; CANTON PUBLIC           :
SCHOOLS BOARD OF EDUCATION;        :
DANBURY PUBLIC SCHOOLS BOARD OF    :
EDUCATION,                         :
                                   :
 Defendants,                  :
                                   :
and                                :
                                   :
ANDRAYA YEARWOOD; THANIA           :
EDWARDS on behalf of her           :
daughter, T.M.; CONNECTICUT        :
COMMISSION ON HUMAN RIGHTS,        :
                                   :
 Intervenors.                 :

## RULING AND ORDER

 This case involves a challenge to the transgender

participation policy of the Connecticut Interscholastic Athletic

1

Conference ("CIAC"), the governing body for interscholastic athletics in Connecticut, which permits high school students to participate in sex-segregated sports consistent with their gender identity.[1]  Plaintiffs claim that the CIAC policy puts non-transgender girls at a competitive disadvantage in girls' track and, as a result, denies them rights guaranteed by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and implementing regulations, which require that if a school provides athletic programs or opportunities segregated by sex, it must do so in a manner that "[p]rovides equal athletic opportunity for members of both sexes."  34 C.F.R. §106.41(c). Defendants have jointly moved to dismiss the action on numerous grounds.  For reasons discussed below, I conclude that the plaintiffs' challenge to the CIAC policy is not justiciable at this time and their claims for monetary relief are barred and dismiss the action on this basis without addressing the other grounds raised in the joint motion.

I.

In February 2020, plaintiffs Selina Soule and Chelsea Mitchell, then high school seniors, and Alanna Smith, then a high school sophomore, brought this action seeking a preliminary

---

[1] The CIAC policy requires member schools to determine eligibility to participate in sex-segregated athletics based on "the gender identification of [the] student in current school records and daily life activities in the school . . . ."  ECF No. 141 ¶ 74.

2

JA260

injunction to prevent transgender girls from competing in events scheduled to take place during the 2020 Spring Outdoor Track season. Plaintiffs alleged that without a preliminary injunction, they would continue to face unfair competition by two transgender students, Andraya Yearwood and Terry Miller, then high school seniors. Plaintiffs claimed that by permitting "male-bodied athletes" -- defined as "individuals with an XY genotype" -- to compete in girls' track, the defendants were denying them an opportunity to compete for places on the victory podium in violation of Title IX and 34 C.F.R. § 106.41(c). The issue raised by the plaintiffs is one of first impression.[2]

Prior to bringing this action, the plaintiffs had filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR"). OCR initiated an investigation in response to the complaint but took no action to prevent Yearwood and Miller from competing in the 2020 Spring Track Season, so the plaintiffs filed this suit. Explaining the need for immediate relief, the motion stated:

> Plaintiffs Soule and Mitchell are seniors in high school, and the brief remainder of this academic year contains the final track and field competitions of their high school athletic careers. The Spring track season begins in March, with the first interscholastic meet subject to the CIAC

---

[2] The issue implicates opposing interests that are not easily reconciled. See Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule, 27 Duke J. Gender L. & Pol'y 69, 99 (2020).

JA261

Policy scheduled to occur as soon as April 4, 2020.  Absent
immediate injunctive relief from this Court, the
irreparable harm they will suffer under the continuing
operation of the Defendants' policy and its enforcement
will leave their concluding interscholastic athletics
season marred and their personal experience substantially
injured.  Though Plaintiff Alanna Smith is a sophomore, her
interests are no less immediately impacted or properly
honored with immediate equitable relief, as the profound
interests in and experience of high school athletics are
concurrently fleeting and formative, and each season of
eminent value and importance.

In addition to CIAC, the complaint named as defendants the
school boards for the three high schools attended by the
plaintiffs (Glastonbury, Canton, and Danbury) and the two high
schools attended by the transgender students (Bloomfield and
Cromwell).  All five schools are members of CIAC and, as such,
must abide by its transgender participation policy.

Soon after the complaint was filed, Yearwood, Miller, and
the Connecticut Commission on Human Rights and Opportunities
("CHRO") filed motions to intervene, which the plaintiffs
opposed.  Before the plaintiffs' motion for a preliminary
injunction could be heard, Connecticut declared a public health
emergency in response to the Covid-19 pandemic.  Schools and
nonessential businesses were closed across the state, and
interscholastic athletic competition was suspended indefinitely.
Plaintiffs subsequently filed an amended complaint adding Ashley
Nicoletti, then a sophomore, as a plaintiff.  They also renewed
their motion for an expedited hearing, which was opposed by the

JA262

defendants and proposed intervenors on the ground that the 2020 Spring Track season was likely to be cancelled in its entirety.

Following oral argument, the motions to intervene were granted, either as a matter of right or permissively, thereby enabling Yearwood, Miller, and the CHRO to participate in this litigation as additional defendants along with the CIAC and the five school boards. The plaintiffs' motion for expedited treatment was denied because of Covid-19, which would prevent resumption of interscholastic athletic competition for the rest of the academic year. Further proceedings in this case were then stayed by agreement while the plaintiffs sought appellate review of a ruling denying a recusal motion.[3] After the stay was lifted, defendants filed the pending motion to dismiss, which has been fully briefed and argued.

II.

Plaintiffs' second amended complaint alleges that CIAC's transgender participation policy

> is now regularly resulting in boys displacing girls in competitive track events in Connecticut -- excluding specific and identifiable girls including Plaintiffs from honors, opportunities to compete at higher levels, and public recognition critical to college recruiting and

---

[3] Plaintiffs moved for my recusal on the ground that I had demonstrated bias by calling on plaintiffs' counsel to refrain from continuing to refer to Yearwood and Miller as "males," which I regarded as needlessly provocative. Plaintiffs' counsel argued that this usage was necessary because the present action concerns the effects of biological differences between persons born male and persons born female.

5

JA263

scholarship opportunities that should go to these outstanding female athletes.

As a result, in scholastic track competition in Connecticut, more boys than girls are experiencing victory and gaining the advantages that follow, even though postseason competition is nominally designed to ensure that equal numbers of boys and girls advance to higher levels of competition. In the state of Connecticut, students who are born female now have materially *fewer* opportunities to stand on the victory podium, fewer opportunities to participate in post-season elite competition, fewer opportunities for public recognition as champions, and a much smaller chance of setting recognized records, than students who are born make.

Plaintiffs claim that

This reality is discrimination against girls that directly violates the requirements of Title IX: "Treating girls differently regarding a matter so fundamental to the experience of sports – the chance to be champions – is inconsistent with Title IX's mandate of equal opportunity for both sexes." McCormick ex rel. McCormick v. Sch. Dist. Of Mamaroneck, 370 F.3d 275, 295 (2d Cir. 2004).

Plaintiffs request:

A declaration that Defendants have violated Title IX by failing to provide competitive opportunities that effectively accommodate the abilities of girls;

A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

An injunction prohibiting all Defendants, in interscholastic competitions sponsored, organized, or participated in by the Defendants or any of them, from permitting males -- individuals with an XY genotype -- from participating in events that are designated for girls, women, or females;

An injunction requiring all Defendants to correct any and all records, public and non-public, to remove male athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions

6

JA264

designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of males in such competition;

An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by male athletes from any records purporting to record times achieved by girls or women;

An award of nominal and compensatory damages and other monetary relief as permitted by law; [and]

An award of Plaintiffs' reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988.

III.

A.

In the joint motion to dismiss, the defendants first contend that the plaintiffs lack standing to seek an injunction enjoining enforcement of the CIAC policy.  Standing refers to the personal stake a plaintiff must have in a disputed issue in order to be able to obtain a judicial determination of the issue in federal court.  See Warth v. Seldin, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of a particular issue.").  Under Article III of the United States Constitution, the judicial power of the federal courts is limited to adjudicating "cases" and "controversies."  The law of standing implements this limitation by requiring a plaintiff to demonstrate that she requires judicial relief in order to redress a legally cognizable injury to her.  See Allen v.

7

JA265

Wright, 468 U.S. 737, 751 (1984) (noting that, to have standing under Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief"); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (discussing three elements of standing: injury in fact, causal connection to defendant's conduct, and redressability).[4]  Unless a plaintiff's personal stake in a disputed issue satisfies the standing requirement, the court lacks jurisdiction to adjudicate the issue at the plaintiff's request.  See Warth, 422 U.S. at 498 (explaining that standing doctrine is "founded in concern about the proper -- and properly limited -- role of the courts in a democratic society").[5]

The defendants contend that the plaintiffs lack standing with regard to the principal form of relief at issue -- an injunction preventing enforcement of the CIAC policy.  Soule and Mitchell have graduated and thus are no longer eligible to compete in CIAC-sponsored events.  But Smith and Nicoletti, now

---

[4] "Injury" in this context signifies harm to the plaintiff, either actual or imminent, due to unlawful conduct attributable to the defendant.  To provide standing to sue, the injury to the plaintiff must be "distinct" and "palpable," and not "abstract," "hypothetical," or "conjectural."  See Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

[5] The standing requirement must be satisfied with regard to each claim and form of relief.  Town of Chester, N.Y. v. Laroe Ests., Inc., 137 S. Ct. 1645, 1650 (2017).  Therefore, in applying the requirement, each claim and form of relief must be analyzed separately.

juniors, have another year of eligibility.  Whether their
interest in obtaining the requested injunction is still
sufficient to support adjudication of their claim on the merits
is the main issue presented by the joint motion to dismiss.

Defendants argue that Smith and Nicoletti lack standing
because they have not identified a transgender student who is
likely to compete against them next season.  Defendants further
argue that, "[e]ven if Smith and Nicoletti could allege with any
certainty that girls who are transgender will imminently compete
in track and field, and that they will personally compete
against those transgender girls, Smith and Nicoletti cannot
credibly allege that they will finish in particular spots in
particular races next year if girls who are transgender are
barred from competing."  ECF No. 145-1 at 16.

Plaintiffs correctly argue that the issue is one of
mootness rather than standing.  ECF No. 154 at 45.  The standing
inquiry concerns a plaintiff's personal stake in the outcome of
an action at the time the action is filed; mootness, on the
other hand, ensures that a plaintiff maintains a sufficient
personal stake in the outcome of an action for the duration of
the litigation.  See Klein on behalf of Qlik Techs., Inc. v.
Qlik Techs., Inc., 906 F.3d 215, 220–21 (2d Cir. 2018) ("The
consequences of losing a stake in ongoing litigation are
determined not by asking whether the party losing its stake in

9

the litigation has lost its <u>standing</u> but by asking whether the action has become <u>moot</u>." (emphasis in original)). However, standing and mootness are closely related doctrines of justiciability rooted in Article III. The Supreme Court has described mootness as "the doctrine of standing set in a time frame." <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 189 (2000) (referring to "this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)'" (quoting <u>Arizonans for Off. Eng. v. Arizona</u>, 520 U.S. 43, 68 n.22 (1997))). And the underlying concern of the two doctrines is the same -- a plaintiff seeking relief in federal court must maintain a "legally cognizable interest" in the outcome of the action. <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013). In other words, a plaintiff must retain a "personal stake" that "subsists through all stages of federal judicial proceedings." <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998). "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." <u>Id.</u>; <u>see also</u> <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. 792 (2021) ("At all stages of litigation,

JA268

a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings.").

Defendants have the burden of establishing mootness, as plaintiffs point out. Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 603 (2d Cir. 2016). But the burden is not the one plaintiffs describe in their brief. Elaborating on the defendants' burden, plaintiffs argue that "[i]f standing exists at the time injunctive relief is requested, then that request will not be deemed moot unless defendants meet 'the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again.'" ECF No. 154 at 45 (quoting Laidlaw, 528 U.S. at 189). To satisfy this standard of mootness, plaintiffs continue, "[s]ubsequent events must make it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

The burden plaintiffs describe does not apply here. Plaintiffs are relying on an "extremely strict standard" of mootness applied by courts when a defendant argues that its voluntary cessation of the challenged conduct has served to moot the case. See Wright & Miller, 33 Fed. Prac. & Proc. Judicial

11

Review § 8347 (2d ed.); see also Concentrated Phosphate, 393
U.S. at 203 (distinguishing the voluntary cessation exception
from the general mootness standard and explaining that the
voluntary cessation standard erects a higher bar to mootness
because if a defendant could moot a case by voluntarily ceasing
the challenged conduct, "the courts would be compelled to leave
'[t]he defendant . . . free to return to his old ways'" (quoting
United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953))).
This stringent standard does not apply when mootness is based on
a change in circumstances other than voluntary cessation of the
challenged conduct.  See Laidlaw, 528 U.S. at 214 (Scalia, J.,
dissenting) ("The required showing that it is 'absolutely clear'
that the conduct 'could not reasonably be expected to recur'
is not the threshold showing required for mootness, but the
heightened showing required in a particular category of cases
where we have sensibly concluded that there is reason to be
skeptical that cessation of violation means cessation of live
controversy.  For claims of mootness based on changes in
circumstances other than voluntary cessation, the showing we
have required is less taxing, and the inquiry is indeed properly
characterized as one of 'standing set in a time frame.'"
(emphasis in original)).  Thus, the correct inquiry for our
purposes is the typical mootness question: whether "the issues
presented are no longer 'live' or the parties lack a legally

JA270

cognizable interest in the outcome." DiMartile v. Cuomo, 834 F.
App'x 677, 678 (2d Cir. 2021) (quoting Already, 568 U.S. at 91).

Applying this standard, I conclude that the request to
enjoin enforcement of the CIAC policy has become moot due to the
graduation of Yearwood and Miller, whose participation in girls'
track provided the impetus for this action.  There is no
indication that Smith and Nicoletti will encounter competition
by a transgender student in a CIAC-sponsored event next season.
Defendants' counsel have represented that they know of no
transgender student who will be participating in girls' track at
that time.[6]  It is still theoretically possible that a
transgender student could attempt to do so.  Even then, however,
a legally cognizable injury to these plaintiffs would depend on
a transgender student running in the same events and achieving
substantially similar times.  Such "speculative contingencies"
are insufficient to satisfy the case or controversy requirement
of Article III.  Hall v. Beals, 396 U.S. 45, 49 (1969); see also
Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998)
(noting that it will not "suffice to hypothesize the possibility
that at some future time, under circumstances that could only be
guessed at now, the parties could theoretically become embroiled
in a like controversy once again").  As a result, Smith and

---

[6] This representation was made during a colloquy with counsel regarding the
present motion.  See ECF No. 174 at 24-25.

Nicoletti currently lack a legally cognizable interest in seeking to enjoin enforcement of the CIAC policy. See Already, 568 U.S. at 100 (finding moot plaintiff's request for injunctive relief because plaintiff's "only legally cognizable injury . . . is now gone and . . . cannot reasonably be expected to recur"); Cheeseman v. Carey, 623 F.2d 1387, 1392 (2d Cir. 1980) (holding that request for injunction was moot after plaintiffs "received all the relief due them" and that the "issue thus now lacks one of the requisites of a live controversy, namely, a 'real and immediate' threat of injury").

Smith and Nicoletti contend that their challenge to the CIAC policy falls within the exception to the mootness doctrine for a controversy that is capable of repetition while evading judicial review. See United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1540 (2018). "A dispute qualifies for [this] exception only 'if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" Id. (quoting Turner v. Rogers, 564 U.S. 431, 439-440 (2011)). To qualify for this "severely circumscribed" exception, Knaust, 157 F.3d at 88, which is available only in "exceptional situations," Spencer, 523 U.S. at 17, a plaintiff must do more than make a "speculative and theoretical assertion" that an injury might

14

recur.  Lillbask ex rel. Mauclaire v. State of Conn. Dep't of
Educ., 397 F.3d 77, 86 (2d Cir. 2005).  Rather, a plaintiff must
allege that it is "'reasonable to expect' and 'probable' -- not
simply possible -- that the complaining party would again be
subjected to the 'action for which he initially sought
relief.'"  Deeper Life Christian Fellowship, Inc. v. Sobol, 948
F.2d 79, 82 (2d Cir. 1991) (quoting Honig v. Doe, 484 U.S. 305,
318-22 (1988)); see New Jersey Carpenters Health Fund v.
Novastar Mortg., Inc., 753 F. App'x 16, 20 (2d Cir. 2018)
(explaining that, to fit within this exception to mootness,
plaintiffs "must show that these same parties are reasonably
likely to find themselves in dispute of the issues raised"
(quoting Video Tutorial Servs., Inc. v. MCI Telecomms. Corp., 79
F.3d 3, 6 (2d Cir. 1996) (per curiam))).

Plaintiffs argue that this exception to mootness applies
because "[f]irst one, then another, male-bodied athlete has
participated in girls' track competitions under CIAC auspices
for each of the last three years," and "CIAC and the Defendant
Schools insist on continuing the Policy that enables this."  ECF
No. 154 at 46.  As just discussed, however, there is no
indication that Smith and Nicoletti will face competition by a
transgender student next season.  The Second Circuit has
repeatedly declined to apply the "capable of repetition"
exception when an injury's recurrence "is not reasonably likely

15

but, at best, only a theoretical and speculative possibility." Lillbask, 397 F.3d at 86 (emphasis in original); see Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet, 260 F.3d 114, 121 (2d Cir. 2001) (declining to apply the capable of repetition exception because, although plaintiff's age and status as a student "mean[t] recurrence [wa]s theoretically possible, that is insufficient to support the requisite 'reasonable expectation' of recurrence"); Knaust, 157 F.3d at 88 (holding that exception did not apply because "nothing ha[d] been shown to suggest any 'reasonable expectation' that [plaintiff] [would] confront any like situation in the future"); Courshon v. Berkett, 16 F. App'x 57, 63 (2d Cir. 2001) (rejecting exception for claims based on "mere speculation" of recurrence); Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79, 82–83 (2d Cir. 1991) (holding that, though injury could happen "in the next few years," it was "not imminent" and "not sufficiently likely to recur"); Armstrong v. Ward, 529 F.2d 1132, 1136 (2d Cir. 1976) (rejecting application of the exception because, although there was "a possibility" the dispute would recur, "such speculative contingencies afford no basis for our passing on the substantive issues [appellees] would have us decide" (quoting Hall, 396 U.S. at 49)).[7]

---

[7] Plaintiffs submit that they "have no ability to know what male-bodied athletes may register to compete in girls' track events in the next season."

Plaintiffs also fail to show that the injury they complain about, if it did recur, would "evade review." If it turns out that a transgender student does register to compete in girls' track next season, Smith and Nicoletti will be able to file a new action under Title IX along with a motion for a preliminary injunction. Plaintiffs have expressed doubt that such a motion could be heard and decided in a timely manner. However, it is reasonable to expect that if Smith and Nicoletti were to allege facts satisfying the traditional requirements for a preliminary injunction, a request for an expedited hearing would be granted.[8] Plaintiffs' request for an expedited hearing in this case was denied only because of Covid-19 and the ensuing suspension and cancellation of CIAC-sponsored events. Accordingly, I conclude that the request for an injunction enjoining enforcement of the CIAC policy is now moot.[9]

---

ECF No. 154 at 38. That may be true. Even so, no case has been cited or found in which mootness was avoided under the "capable of repetition" exception on the seemingly paradoxical ground that the plaintiff had no way of knowing whether the injury would recur.

[8] At the hearing, the plaintiffs would have to show that without a preliminary injunction, they would sustain immediate, irreparable harm -- the showing traditionally required to obtain injunctive relief. See Levin v. Harleston, 966 F.2d 85, 90 (2d Cir. 1992).

[9] Plaintiffs' request for a declaratory judgment is moot for the same reasons. Declaratory relief is a form of prospective relief that requires a plaintiff to show "a sufficient likelihood that he will again be wronged in a similar way." Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) (quoting Lyons, 461 U.S. at 111). Because plaintiffs have failed to make such a showing, their claims for declaratory relief must be dismissed. See Preiser v. Newkirk, 422 U.S. 395, 402 (1975) (explaining that, to determine whether a request for declaratory relief has become moot, the question is "whether the facts alleged, under all the circumstances, show that there is a

17

JA275

B.

Defendants next argue that plaintiffs lack standing to seek an injunction requiring changes in the defendants' records. Plaintiffs seek an order requiring the defendants to revise records of races in which Yearwood or Miller competed by eliminating them from the order of finish and moving everyone else up one position.  Defendants contend that with regard to this requested relief, plaintiffs fail to satisfy the redressability element of standing, which requires a plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560.[10]  Plaintiffs respond that the requested revisions are relevant to their ability to get scholarships and jobs -- scholarships in the case of Smith and Nicoletti, jobs in the case of all the plaintiffs.

---

substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (emphasis in original) (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941))); Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."); Golden v. Zwickler, 394 U.S. 103, 110 (1969) (holding that plaintiff was not entitled to declaratory relief because it was "most unlikely" that his alleged injury would recur and there was thus not a "specific live grievance" or "sufficient immediacy and reality" to warrant the requested relief).

[10] Defendants also dispute the underlying assumption that the races would have resulted in the same order of finish if Yearwood and Miller did not compete. However, as plaintiffs correctly point out, the order of finish is regularly adjusted in this manner when a runner has been disqualified after the completion of a race.

After careful consideration, I conclude that the
plaintiffs' theory of redressability is not sufficiently
supported to provide any of the plaintiffs with standing.  Based
on the plaintiffs' detailed submissions, which are accepted as
true and construed most favorably to them, it appears that but
for the CIAC policy: (1) Chelsea Mitchell would have finished
first in four elite events in 2019,[11] and qualified for the 2017
New England Regional Championship in the Women's 100m; (2)
Selina Soule would have advanced to the next level of
competition in the 2019 CIAC State Open Championship in the
Women's Indoor 55m; (3) Ashley Nicoletti would have qualified to
run in the 2019 CIAC Class S Women's Outdoor 100m; and (4)
Alanna Smith would have finished second in the Women's 200m at
the 2019 State Outdoor Open.

Plaintiff's theory of redressability has some cogency in
the case of Chelsea Mitchell.  Changing the defendants' records
could provide her with a basis to list four additional wins on
her resume, and those wins might well be of interest to a
prospective employer.  But it seems inevitable that before
making an offer to Mitchell, a prospective employer impressed by
her record would learn that she did not actually finish first in

---

[11]  Specifically, Mitchell would have won the CIAC Outdoor Track, Class S,
Women's 100m and 200m; the CIAC Indoor Track, Class S, Women's 55m; and the
CIAC Indoor Track, Open, Women's 55m.

JA277

the four races.  In other words, even with the requested changes, Mitchell's position with regard to her employment prospects would remain essentially the same.[12]

The two cases plaintiffs cite in support of their theory of redressability are readily distinguishable because both involve expungement of erroneous disciplinary action from a student's school record.  See Flint v. Dennison, 488 F.3d 816, 825 (9th Cir. 2007); Hatter v. Los Angeles City High Sch. Dist., 452 F.2d 673, 674 (9th Cir. 1971).  A student's disciplinary record is always relevant to college recruiters and prospective employers.  Here, in contrast, the requested revisions might well have no bearing on Mitchell's employment prospects.  At a minimum, gauging the effect of the requested revisions on prospective employers requires guesswork.  The Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013); see also ASARCO Inc. v. Kadish, 490 U.S. 605, 614-15 (1989); Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 42-43 (1976).

---

[12] Plaintiffs' submissions provide no basis to conclude that changing the defendants' records would be relevant to the educational or employment prospects of the other plaintiffs.

JA278

C.

The remaining issue is whether plaintiffs' claims for money damages are barred. The Supreme Court has held that monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640 (1999). Defendants submit that they did not receive the requisite notice. I agree.[13]

The notice requirement derives from Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981), where the Court considered whether a state entity, in accepting federal funds under the Developmentally Disabled Assistance and Bill of Rights Act, agreed to assume the costs of providing disabled persons with appropriate treatment in the least restrictive environment. The "crucial inquiry," the Court stated, was whether Congress had provided "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated" to underwrite the high costs of such treatment. Pennhurst, 451 U.S. at 25.

---

[13] Plaintiffs argue that the question of notice should be deferred until a later stage of the case. However, if the plaintiffs' claims for money damages are barred due to lack of adequate notice, the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case -- attorney's fees and expenses -- is "insufficient, standing alone, to sustain jurisdiction." Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993); see also Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990); Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021) ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded . . . .").

21

Because Congress had failed to provide clear notice, the relief requested by the plaintiff class was unavailable. "Though Congress' power to legislate under the spending power is broad," the Court explained, "it does not include surprising participating States with post-acceptance or 'retroactive' conditions." Id.

There can be no doubt that the clear notice required by Pennhurst is lacking here. Title IX broadly prohibits discrimination in educational programs and activities on the basis of sex. See 20 U.S.C. § 1681(a); Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 175 (2005) (noting that Title IX is a "broadly written general prohibition on discrimination"). Congress left it to the Department of Education ("ED") to promulgate specific rules. See 20 U.S.C. § 1682; see also Biediger v. Quinnipiac Univ., 691 F.3d 85, 96 (2d Cir. 2012) ("Congress explicitly delegated to the administering agency 'the task of prescribing standards for athletic programs under Title IX.'" (quoting McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 288 (2d Cir. 2004))); Catherine Jean Archibald, Transgender Bathroom Rights, 24 Duke J. Gender L. & Pol'y 1, 27-28 (2016) ("States that accept federal funding for education programs [under Title IX] have agreed to prohibit sex discrimination and to allow the Federal Government to make interpretations about what prohibiting sex discrimination

22

requires."). Whether the defendants received the requisite notice thus depends primarily on the guidance provided to them by ED. See Davis, 526 U.S. at 647 (guidance issued by ED providing that certain discrimination violates Title IX would have "contribute[d] to [the School] Board's notice of proscribed misconduct" had it been issued earlier).

Beginning in 2014, ED's Office of Civil Rights ("OCR") notified schools that "[a]ll students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX." Office of Civil Rights, Dept. of Educ., Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities 25 (2014). In 2015, OCR gave notice that "[t]he Department's Title IX regulations permit schools to provide sex-segregated . . . athletic teams . . . [and] [w]hen a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity." Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7, 2015). In 2016, OCR went further, stating unequivocally that "transgender students must be allowed to participate in such activities . . . consistent with their gender identity." Letter from Catherine E. Lhamon, Ass't Sec.

23

JA281

for Civil Rights, U.S. Dep't of Educ. and Vanita Gupta, Principal Dep. Ass't Attorney for Civil Rights, U.S. Dep't of Justice (May 13, 2016) [hereinafter "2016 Guidance"].[14]

Plaintiffs argue that OCR reversed course when it issued a Dear Colleague letter in 2017. See Letter from Sandra Battle, Acting Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and T.E. Wheeler, II, Acting Ass't Attorney General for Civil Rights, U.S. Dep't of Justice (Feb. 22, 2017). The 2017 letter did not provide any new or different guidance, however. Instead, it stated that OCR was rescinding the 2016 Guidance "in order to further and more completely consider the legal issues involved." The letter expressed OCR's belief that it was required to give "due regard for the primary role of the States and local school districts in establishing educational policy." Id. This assurance could reasonably be interpreted by the defendants to mean that OCR would be inclined to defer to local authorities. At a minimum, the letter did not provide clear notice that allowing transgender students to compete in girls' track would violate Title IX.

---

[14] These guidance documents are subject to judicial notice because they are public records whose accuracy cannot be questioned. See Porazzo v. Bumble Bee Foods, LLC, 822 F. Supp. 2d 406, 411–12 (S.D.N.Y. 2011) (taking notice of agency guidance documents and other documents); Controlled Air, Inc. v. Barr, No. 3:19-CV-1420 (JBA), 2020 WL 979874, at *3 n.2 (D. Conn. Feb. 28, 2020), aff'd, 826 F. App'x 121 (2d Cir. 2020) (same).

No further guidance was provided to the defendants until May 2020, several months after this action was brought, when OCR sent them a Letter of Impending Enforcement Action based on a complaint it had received about Yearwood and Miller competing in girls' track.  See ECF No. 117-1.  In August 2020, a Revised Letter of Impending Enforcement Action was issued to the defendants, informing them for the first time that OCR interpreted Title IX and its implementing regulations to require that sex-specific sports teams be separated based on biological sex.  ECF No. 154-2.  This letter and the previous letter were withdrawn in February 2021.  ECF No. 172-1.  In withdrawing the Revised Enforcement Letter, OCR stated that the letter had been "issued without the review required for agency guidance documents" and should therefore "not be relied upon in this or any other matter."  Id. at 2.

In light of this history, it is apparent that OCR did not provide the defendants with clear notice that they would be liable for money damages if they permitted Yearwood and Miller to compete in girls' track.  See Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 607 (S.D. Ohio 2016) (no liability could be imposed under Title IX in part because "federal regulations and Title IX guidance indicate[d] that [school] was required" to take the actions at issue and "actions taken by [school] to comply with guidance to implement Title IX cannot have been in

25

JA283

violation of Title IX"); <u>Doe v. Columbia Coll. Chicago</u>, 299 F. Supp. 3d 939, 956–57 (N.D. Ill. 2017), <u>aff'd,</u> 933 F.3d 849 (7th Cir. 2019) (same because a 2011 Dear Colleague letter required school's actions); <u>Doe v. Coll. of Wooster</u>, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017) ("[I]t stands to reason that evidence that a university has endeavored to comply with federal guidance on Title IX cannot support a violation of Title IX."); <u>Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.</u>, 584 F.3d 253, 277 (6th Cir. 2009) (<u>Pennhurst</u>'s clear-statement rule was not satisfied in part because "the former Secretary of Education found that [the provision] means the opposite of what the current Secretary claims"); <u>New York v. United States Dep't of Health & Human Servs.</u>, 414 F. Supp. 3d 475, 565–71 (S.D.N.Y. 2019) (holding that states were "denied notice" under <u>Pennhurst</u> because they would not have "clearly underst[oo]d" that the term "discrimination" as used in the statute "would be given the meaning" later ascribed to it); <u>Rosa H. v. San Elizario Indep. Sch. Dist.</u>, 106 F.3d 648, 658 (5th Cir. 1997) (refusing, pursuant to <u>Pennhurst</u>, to "retroactively" bind defendants to ED's later interpretation of Title IX because the government "cannot modify past agreements with recipients by unilaterally issuing guidelines through the Department of Education").[15]

---

[15] Plaintiffs cite no case under Title IX, or any other Spending Clause statute, permitting liability to be imposed for conduct that was approved by

In support of their position that the defendants did
receive the requisite notice, plaintiffs state that "repeated
Supreme Court decisions have put educational institutions 'on
notice that they could be subjected to private suits for
intentional sex discrimination,' and that this liability
'encompass[es] diverse forms of intentional sex
discrimination.'"  ECF No. 154 at 45 (quoting <u>Jackson</u>, 544 U.S.
at 182–83).  Plaintiffs rely on cases involving claims of sexual
harassment in violation of Title IX, which are readily
distinguishable from the plaintiffs' claims of denial of equal
treatment and effective accommodation.  <u>See, e.g.</u>, <u>Davis</u>, 526
U.S. at 650 (sexual harassment in violation of Title IX requires
discrimination "so severe, pervasive, and objectively offensive
that it can be said to deprive the victims of access to the
educational opportunities or benefits provided by the school");
<u>Gebser</u>, 524 U.S. at 290 (under Title IX, a school is liable for
sexual harassment only if it had actual knowledge of harassment

---

the agency responsible for providing guidance to funding recipients.  Such a
holding would be at odds with <u>Pennhurst</u> itself.  In that case, the Court
pointedly observed that the very "governmental agency responsible for the
administration of the Act and the agency with which the participating States
have the most contact, has never understood [the provision] to impose
conditions on participating States."  <u>Pennhurst</u>, 451 U.S. at 25.  To hold
that the states received adequate notice, the Court stated, would therefore
"strai[n] credulity."  <u>Id.</u>  The same is true here.  <u>See</u> <u>Gebser v. Lago Vista
Indep. Sch. Dist.</u>, 524 U.S. 274, 287 (1998) (noting that the "central
concern" for <u>Pennhurst</u> purposes is whether defendants had fair notice); <u>see
also</u> Peter J. Smith, <u>Pennhurst, Chevron and the Spending Power</u>, 110 Yale L.J.
1187, 1191 (2001) (noting the "potential unfairness to state recipients" of
binding them to an agency's interpretation of terms in a statute "in cases in
which the agency reverses its prior view").

and failed adequately to respond); see also Horner v. Kentucky
High Sch. Athletic Ass'n, 206 F.3d 685, 693 (6th Cir. 2000)
(noting that Franklin, Gebser, and Davis "all address deliberate
indifference to sexual harassment and are not readily analogous"
to cases alleging discrimination in athletics).

More pertinent to the notice issue presented here is what
courts have said about the obligations of states and local
school districts to transgender students under Title IX.  See,
e.g., Jackson, 544 U.S. at 183-84 (holding that defendants were
on notice in part because, "importantly, the Courts of Appeals
that had considered the question at the time of the conduct at
issue in this case all had already interpreted Title IX to cover
retaliation").  In its 2016 Guidance, OCR stated that requiring
schools to permit transgender students to participate in sex-
segregated activities consistent with their gender identity
comported with judicial decisions under Title IX.  That
statement remains accurate.  Courts across the country have
consistently held that Title IX requires schools to treat
transgender students consistent with their gender identity.  See
A.H. v. Minersville Area Sch. Dist., 408 F. Supp. 3d 536, 552
(M.D. Pa. 2019) (collecting and discussing cases).  Every Court
of Appeals to consider the issue has so held.  See Parents for
Privacy v. Barr, 949 F.3d 1210 (9th Cir. 2020), cert. denied,
No. 20-62, 2020 WL 7132263 (U.S. Dec. 7, 2020); Doe by & through

28

Doe v. Boyertown Area Sch. Dist., 897 F.3d 518 (3d Cir. 2018);

Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of

Educ., 858 F.3d 1034 (7th Cir. 2017); Dodds v. United States

Dep't of Educ., 845 F.3d 217 (6th Cir. 2016); G.G. ex rel. Grimm

v. Gloucester Cty. Sch. Bd., 822 F.3d 709 (4th Cir. 2016),

vacated and remanded, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017).

This unbroken line of authority reinforces the conclusion that

the plaintiffs' claims for money damages are barred.[16]

IV.

Accordingly, the motion to dismiss is hereby granted.  The

Clerk may enter judgment in favor of the defendants dismissing

the action.

So ordered this 25th day of April 2021.

/s/ Robert N. Chatigny<br>Robert N. Chatigny<br>United States District Judge

---

[16] In a recent case under Title VII, the Supreme Court observed that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  Bostock v. Clayton Cty., Georgia, 140 S. Ct. 1731, 1741 (2020).  The parties dispute the significance of Bostock for cases arising under Title IX's prohibition of sex discrimination.  But there is no need to get into that dispute now.

29

JA287

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother, | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs | : <br> : |
| v. | :     CASE NO. 3:20-cv-00201 (RNC) <br> : |
| CONNECTICUT ASSOCIATION OF SCHOOLS d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants | : <br> : <br> : |
| and | : <br> : |
| ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her daughter, T.M.; COMMISSION ON HUMAN RIGHTS and OPPORTUNITIES, | : <br> : <br> : <br> : <br> : |
| Intervenor-Defendants. | : |

## **JUDGMENT**

This action having come before the Court for consideration of the defendants'

and intervenor-defendants' motion to dismiss, before the Honorable Robert N. Chatigny,

United States District Judge. On February 21, 2020, Andraya Yearwood and Thania

JA288

Edwards on behalf of her daughter, T.M., filed a motion to intervene as defendants and on April 22, 2020, the Court granted the motion and Andraya Yearwood and Thania Edwards on behalf of her daughter, T.M., were added as intervenor-defendants in the case. On February 26, 2020, the Commission on Human Rights and Opportunities filed a motion to intervene and on April 22, 2020, the Court granted the motion and the Commission on Human Rights and Opportunities was added as an intervenor-defendant in this case.

The Court having considered the full record of the case including applicable principles of law, and having granted the defendants' and intervenor-defendants' motion to dismiss on April 25, 2021, it is hereby,

ORDERED, ADJUDGED, and DECREED that judgment be and is hereby entered in favor of the defendants dismissing the action.

Dated at Hartford, Connecticut, this 26th day of April, 2021.

ROBIN D. TABORA, Clerk

By: /s/ Michael Bozek
    Michael Bozek
    Deputy Clerk

Entered on Docket: 4/26/2021

JA289

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SELINA SOULE, a minor, by Bianca
Stanescu, her mother; CHELSEA
MITCHELL, a minor, by Christina Mitchell,
her mother; ALANNA SMITH, a minor, by
Cheryl Radachowsky, her mother; ASHLEY
NICOLETTI, a minor, by Jennifer Nicoletti,
her mother,

                Plaintiffs,

      v.

CONNECTICUT ASSOCIATION OF
SCHOOLS, INC. d/b/a CONNECTICUT
INTERSCHOLASTIC ATHLETIC
CONFERENCE; BLOOMFIELD PUBLIC
SCHOOLS BOARD OF EDUCATION;
CROMWELL PUBLIC SCHOOLS BOARD OF
EDUCATION; GLASTONBURY PUBLIC
SCHOOLS BOARD OF EDUCATION;
CANTON PUBLIC SCHOOLS BOARD OF
EDUCATION; DANBURY PUBLIC
SCHOOLS BOARD OF EDUCATION,

                Defendants,

   and

ANDRAYA YEARWOOD; THANIA
EDWARDS on behalf of her daughter, T.M.;
CONNECTICUT COMMISSION ON HUMAN
RIGHTS,

              Intervenors.

Case No. 3:20-cv-00201 (RNC)

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiffs Selina Soule, Chelsea Mitchell,

Alanna Smith, and Ashley Nicoletti, hereby appeal to the United States Court of

Appeals for the Second Circuit from the Ruling and Order (Doc. 178) and Judgment

(Doc. 179) granting Defendants' and Intervenors' Motion to Dismiss, entered in this

action on April 26, 2021.

Respectfully submitted.

s/ *Roger G. Brooks*

| | |
|---|---|
| Kristen K. Waggoner | Roger G. Brooks |
| CT Fed. Bar No. PHV10500 | CT Fed. Bar No. PHV 10498 |
| Christiana M. Holcomb | ALLIANCE DEFENDING FREEDOM |
| CT Fed. Bar No. PHV10493 | 15100 N. 90th Street |
| ALLIANCE DEFENDING FREEDOM | Scottsdale, AZ 85260 |
| 440 First St., NW, Suite 600 | (480) 444-0020 |
| Washington, DC 20001 | rbrooks@ADFlegal.org |
| (202) 393-8690 | |
| kwaggoner@ADFlegal.org | |
| cholcomb@ADFlegal.org | |

Howard M. Wood, III
CT Fed. Bar No. 08758
James T. Howard
CT Fed. Bar No. 07418
Fiorentino, Howard & Petrone, P.C.
773 Main Street
Manchester, CT 06040
(860) 643-1136
howard.wood@pfwlaw.com
james.howard@pfwlaw.com

*Attorneys for Plaintiffs*

May 26, 2021

2

JA291