# 21-1365

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Selina Soule, a minor by Bianca Stanescu, her mother, Chelsea
Mitchell, a minor, by Christina Mitchell, her mother, Alanna Smith, a
minor, by Cheryl Radachowsky, her mother, Ashley Nicoletti, a minor,
by Jennifer Nicoletti, her mother,
*Plaintiffs-Appellants,*

*v.*

Connecticut Association of Schools, Inc, DBA Connecticut
Interscholastic Athletic Conference, Bloomfield Public Schools Board of
Education, Cromwell Public Schools Board of Education, Glastonbury
Public Schools Board of Education, Canton Public Schools Board of
Education, Danbury Public Schools Board of Education,
*Defendants-Appellees,*

*and*

Andraya Yearwood, Thania Edwards on behalf of her daughter T.M.,
and Commission on Human Rights and Opportunities,
*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut, No. 3:20-cv-00201 (RNC)

BRIEF OF INTERVENOR DEFENDANTS-APPELLEES ANDRAYA
YEARWOOD AND THANIA EDWARDS ON BEHALF OF T.M.

Joshua Block
Lindsey Kaley
Galen Sherwin
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2593
jblock@aclu.org

Elana Bildner
Dan Barrett
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
ebildner@acluct.org

*Counsel for Intervenor Defendants-Appellees Andraya Yearwood and Thania Edwards on behalf of T.M.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................iii

INTRODUCTION............................................................1

STATEMENT OF THE CASE....................................................4

SUMMARY OF ARGUMENT....................................................27

LEGAL STANDARD............................................................30

ARGUMENT

   I. Plaintiffs Have Failed to Allege a Cognizable Title IX Claim.....32

      A. Title IX and Its Implementing Regulations Do
         Not Define Girls Who Are Transgender as "Males"
         for Purposes of School Athletics.............................................32

      B. Title IX and Its Regulations Do Not Mandate
         Sex-Separated Teams as the Exclusive Means
         of Promoting Equal Athletic Opportunity..........................38

      C. Plaintiffs Have Not Alleged Cognizable Claims
         of Unequal Athletic Opportunity Under the
         Department of Education 1979 Policy Interpretation...........41

         i. Plaintiffs Have Not Alleged Cognizable Claims for
           "Effective Accommodation" under the 1979 Policy
           Interpretation's "Selection of Sports" Provision................42

         ii. Plaintiffs Have Not Alleged Cognizable Claims for
           "Effective Accommodation" under the 1979 Policy
           Interpretation's "Levels of Competition" Provision............46

i

D. Plaintiffs Have Not Plausibly Alleged an Equal
Treatment Claim.....................................................51

II. The Requested Injunctions Would Violate the Rights
of the Individual Intervenors and Other Girls Who Are
Transgender..............................................................53

A. Plaintiffs Cannot Retroactively Strip Other
Students of Championships They Won in Accordance
With Existing Rules................................................54

B. Plaintiffs' Requested Injunctions Would Violate Title
IX............................................................................55

C. Plaintiffs' Requested Injunctions Would Violate the
Equal Protection Clause.........................................59

III. The Request for Reassignment on Remand Should Be
Denied.......................................................................63

A. The Court's Order Was Consistent With Its Duty
to Maintain Civility in Legal Proceedings.............63

B. The Court's Request for Civility Did Not Prejudge
the Merits of Plaintiffs' Legal Claims....................67

C. The Court Did Not "Trivialize[] Female Athletes'
Achievements".......................................................69

D. The Court Did Not "Sit[] On" Plaintiffs' Motion for a
Preliminary Injunction..........................................70

CONCLUSION.......................................................................71

# TABLE OF AUTHORITIES

## CASES

*Adams v. Baker*,

   919 F. Supp. 1496 (D. Kan. 1996) .......................................................... 40

*Adkins v. City of New York*,

   143 F. Supp. 3d 134 (S.D.N.Y. 2015) .................................................... 60

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,

   671 F.3d 140 (2d Cir. 2011) ............................................................ 12, 31

*Ashcroft v. Iqbal*,

   556 U.S. 662 (2009) ......................................................................... 12, 31

*B.P.J. v. W. Va. State Bd. of Educ.*,

   No. 2:21-CV-00316 (S.D.W. Va. July 21, 2021) ........................... *passim*

*Beattie v. Line Mountain Sch. Dist.*,

   992 F. Supp. 2d 384 (M.D. Pa. 2014) .................................................... 40

*Bednar v. Neb. Sch. Activities Ass'n*,

   531 F.2d 922 (8th Cir. 1976) .................................................................. 40

*Bellin v. Zucker*,

   6 F.4th 463 (2d Cir. 2021) ..................................................................... 31

iii

*Biediger v. Quinnipiac Univ.*,

    691 F.3d 85 (2d Cir. 2012) ................................................... 41, 47, 48, 49

*Bostock v. Clayton Cnty.*,

    140 S. Ct. 1731 (2020) .......................................................... 32, 36, 55, 56

*Canada v. Hall*,

    No. 18-CV-2121 (N.D. Ill. Mar. 21, 2019) ............................................ 65

*Chevron U.S.A. Inc. v. NRDC*,

    467 U.S. 837 (1984) ................................................................................. 41

*Clark v. Ariz. Interscholastic Ass'n*,

    695 F.2d 1126 (9th Cir. 1982) ................................................................. 62

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,

    178 F. Supp. 2d 805 (W.D. Mich. 2001) ................................................ 52

*D.M. by Bao Xiong v. Minn. State High Sch. League*,

    917 F.3d 994 (8th Cir. 2019) ................................................................... 40

*Dixon v. von Blanckensee*,

    994 F.3d 95 (2d Cir. 2021) ...................................................................... 43

iv

*Doe v. Boyertown Area Sch. Dist.*,

    897 F.3d 518 (3d Cir. 2018) .......................................................35, 55, 59

*F.V. v. Barron*,

    286 F. Supp. 3d 1131 (D. Idaho 2018) ...................................................35

*Fabian v. Hosp. of Cent. Conn.*,

    172 F. Supp. 3d 509 (D. Conn. 2016) ...................................................36

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,

    991 F.3d 370 (2d Cir. 2021) .................................................................30

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,

    716 F.3d 302 (2d Cir. 2013) .................................................................31

*Grimm v. Gloucester Cty. Sch. Bd.*,

    822 F.3d 709 (4th Cir. 2016).................................................................36

*Grimm v. Gloucester Cty. Sch. Bd.*,

    972 F.3d 586 (4th Cir. 2020).......................................................*passim*

*Hampton v. Baldwin*,

    No. 3:18-cv-550 (S.D. Ill. Nov. 7, 2018) ...............................................66

*Hecox v. Kenyon*,

    Nos. 21-35813, 21-35815 (9th Cir. 2020) ................................................ 29

*Hecox v. Little*,

    479 F. Supp. 3d 930 (D. Idaho 2020) ............................................ *passim*

*Jackson v. Birmingham Bd. of Educ.*,

    544 U.S. 167 (2005) .................................................................................. 55

*Karnoski v. Trump*,

    926 F.3d 1180 (9th Cir. 2019) .............................................................. 60

*Ketcham v. City of Mount Vernon*,

    992 F.3d 144 (2d Cir. 2021) .................................................................. 63

*Lantz v. Ambach*,

    620 F. Supp. 663 (S.D.N.Y. 1985) ........................................................ 40

*Lynch v. Lewis*,

    No. 7:14-CV-24 HL (M.D. Ga. May 7, 2014) ........................................ 66

*McCormick v. Sch. Dist. of Mamaroneck*,

    370 F.3d 275 (2d Cir. 2004) .......................................................... *passim*

*Natofsky v. City of New York*,

    921 F.3d 337 (2d Cir. 2019) ................................................... 56

*Ollier v. Sweetwater Union High Sch. Dist.*,

    768 F.3d 843 (9th Cir. 2014) ................................................. 49

*Ollier v. Sweetwater Union High Sch. Dist.*,

    858 F. Supp. 2d 1093 (S.D. Cal. 2012) ................................. 53

*P.A. v. Comm'r*,

    293 F.3d 128 (3d Cir. 2002) ..................................................... 5

*Pennhurst State School & Hospital v. Halderman*,

    451 U.S. 1 (1981) .............................................................. 1, 26

*Sessions v. Morales-Santana*,

    137 S. Ct. 1678 (2017) .......................................................... 61

*Skidmore v. Swift & Co.*,

    323 U.S. 134 (1944) .............................................................. 41

*Smith v. Rasmussen*,

    57 F. Supp. 2d 736 (N.D. Iowa 1999) ................................... 66

vii

*Spiegel v. Schulmann*,

   604 F.3d 72 (2d Cir. 2010) ...................................................................63

*State v. Cantrill*,

   No. L-18-1047, 2020 WL 1528013 (Ohio Ct. App. Mar. 31, 2020) .......67

*Sudler v. City of New York*,

   689 F.3d 159 (2d Cir. 2012) ...................................................................1

*Suesz v. Med-1 Sols., LLC*,

   757 F.3d 636 (7th Cir. 2014) ................................................................36

*T.B., Sr. v. Prince George's Cty. Bd. of Educ.*,

   897 F.3d 566 (4th Cir. 2018) ................................................................66

*Thomas v. Regents of Univ. of Cal.*,

   No. 19-cv-06463-SI (N.D. Cal. July 10, 2020) ......................................47

*United States v. Virginia*,

   518 U.S. 515 (1996) ...............................................................................61

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

   858 F.3d 1034 (7th Cir. 2017) ..............................................................60

*Windsor v. United States,*

   699 F.3d 169 (2d Cir. 2012) ........................................................59, 60

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch.*

   *Athletic Ass'n,*

   647 F.2d 651 (6th Cir. 1981)....................................................38

STATUTES

20 U.S.C § 1681(a) ...................................................................33, 55, 59

20 U.S.C. § 1681....................................................................1, 56

42 U.S.C. § 2000e....................................................................56

OTHER AUTHORITIES

Brief for the Am. Acad. of Pediatrics *et al.* as Amicus Curiae, *Grimm v.*

   *Gloucester Cty. Sch. Bd.,*

   972 F.3d 586 (4th Cir. 2020)..............................................5, 6

CIAC By-Laws Article IX, Section B ...................................................8, 33

Code of Conduct for U.S. Judges, Canon 3(A)(3) ....................................64

*Title IX of the Education Amendments of 1972: A Policy Interpretation,*

   44 Fed. Reg. 71,413 (Dec. 11, 1979) .............................................*passim*

ix

U.S. D.O.J., *Memorandum re: Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972* (Mar. 26, 2021)......56

<u>R</u><small>EGULATIONS</small>

34 C.F.R. § 106.33......................................................................34

34 C.F.R. § 106.41.............................................................*passim*

x

## INTRODUCTION

Intervenor-Defendants Andraya Yearwood and Terry Miller ("Andraya" and "Terry") agree with Defendants that the district court's well-reasoned opinion should be affirmed. The district court properly concluded that the possibility that Plaintiffs will race against other transgender athletes in the future is speculative; that Plaintiffs have failed to plausibly allege that retroactively changing Plaintiffs' track and field records will redress any injury; and that Defendants did not have adequate notice to support a retroactive award of damages under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).

Terry and Andraya write separately to explain why Plaintiffs' claims also fail on the merits. These merits arguments were fully briefed before the district court and provide an independent basis for affirming the district court's order. *See Sudler v. City of New York*, 689 F.3d 159, 168 (2d Cir. 2012) ("We may affirm on any ground supported by the record.").

Plaintiffs' claims are based on the unprecedented theory that Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its regulations force schools to discriminate against transgender

1

students. Without identifying any statute, regulation, pre-existing agency guidance document, or court precedent to support their argument, Plaintiffs assert that Title IX establishes a federal definition of "sex" that preempts state non-discrimination laws and prohibits schools from ever allowing girls who are transgender to participate on school athletic teams with other girls. To bolster their novel legal argument, Plaintiffs rely on baseless factual assertions that they "simply can't win" against girls who are transgender. JA147. These assertions are contradicted by Plaintiffs' own track and field records, which reveal that Plaintiffs repeatedly outperformed Andraya and Terry in direct competition. Far from enforcing the plain text of Title IX or its goals of ensuring equal athletic opportunity for all students, the sweeping, discriminatory injunctions requested by Plaintiffs would violate the rights of Terry, Andraya, and other girls and young women who are transgender under both Title IX and the Equal Protection Clause.

Plaintiffs' demand for reassignment on remand is equally baseless. As part of his duty to maintain civility in legal proceedings, Judge Chatigny instructed Plaintiffs' counsel to stop gratuitously referring to Andraya and Terry as "males." JA022. In seeking reassignment,

Plaintiffs falsely assert that Judge Chatigny ordered them "to refrain from calling transgender athletes 'biological males'" (Pls.' Br. 3), when, in fact, Judge Chatigny expressly allowed Plaintiffs' counsel to use that term. JA022. Plaintiffs falsely assert that Judge Chatigny prejudged the merits of the dispute by referring to the "science" of athletic advantages in sports (Pls.' Br. 49), when, in fact, Judge Chatigny made clear that his reference to "science" was about the harms of misgendering. JA022. Plaintiffs falsely assert that Judge Chatigny's ruling on the motion to dismiss trivialized the importance of female athletic achievement (Pls.' Br. 52), when, in fact, Judge Chatigny's opinion simply noted that Plaintiffs had failed to plausibly allege that retroactively changing Plaintiffs' high school athletic records would have a non-speculative effect on their future employment. JA277-78. And Plaintiffs falsely assert that Judge Chatigny showed favoritism by "sitting on" their motion for a preliminary injunction to exclude Terry and Andraya from participating in the spring 2020 track and field season (Pls.' Br. 14), without mentioning the critical fact that the COVID-19 pandemic forced the Connecticut Interscholastic Athletic Conference ("CIAC") to delay and ultimately cancel the spring 2020 sports season entirely. JA263, 275.

3

This Court should affirm the district court's order and deny the request for reassignment on remand.

## STATEMENT OF THE CASE

<u>Andraya and Terry[1]</u>

This case involves a challenge to Connecticut's policy of permitting students who are transgender to participate in athletic competition consistent with their gender identity, as reflected in the students' daily life and school records. When the underlying events in this case took place, Andraya and Terry were high school students who participated in interscholastic track and field events in accordance with Connecticut law and CIAC policy. SA019, SA023. Both Terry and Andraya are girls who are transgender. SA018, SA022. Like non-transgender girls and women, Terry and Andraya have a female gender identity and live their lives as girls. *Id.* At the time the complaint in this case was filed, Andraya was

---

[1] Some of the facts in this subsection are drawn from declarations that Andraya and Terry submitted in support of their motion to intervene. *See* SA017-20 (Andraya); SA021-24 (Terry). These undisputed facts were before the district court during the hearing on the motion to intervene, when Judge Chatigny asked for Plaintiffs' counsel to stop gratuitously referring to Andraya and Terry as "males." The factual record in support of the motion to intervene must be considered on appeal in evaluating Plaintiffs' argument that Judge Chatigny's statements created an appearance of bias.

4

an 18-year-old in her senior year at Cromwell High School. SA018. Terry was a 17-year-old in her senior year at Bloomfield High School. SA022.

Gender identity is a medical term for a person's "deeply felt, inherent sense" of belonging to a particular sex. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), (relying on amicus brief from medical organizations ("AAP Amicus")), *cert. denied* No. 20-1163, 2021 WL 2637992 (June 28, 2021).[2] Everyone has a gender identity, and most people have a gender identity that aligns with the sex assigned to them at birth. *See id.* Transgender people, however, have a gender identity that does not align with their birth-assigned sex. *See id.* Girls who are transgender are girls who were assigned a male sex at birth. Boys who are transgender are boys who were assigned a female sex at birth. There is a medical consensus that gender identity has a biological component

---

[2] In describing transgender individuals, the Fourth Circuit in *Grimm* relied upon an amicus brief submitted by the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society. *See* Br. of Am. Acad. of Pediatrics *et al., Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, ECF No. 32-1 (4th. Cir. Nov. 25, 2019), https://tinyurl.com/9th8maw; *see also Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.) ("Some amicus briefs collect background or factual references that merit judicial notice."). A similar amicus brief will be filed in this case.

and cannot be changed by medical intervention. *See id.* at 594-95; AAP Amicus 7-8, 11-12.

The lack of alignment between their gender identity and their sex assigned at birth can cause transgender people to develop clinically significant distress, known as "gender dysphoria." *See Grimm*, 972 F.3d at 594-95. Before puberty, gender dysphoria is treated by allowing transgender children to live and express themselves in accordance with their gender identity. *See id.* at 596; AAP Amicus 14. As transgender children reach puberty, they may receive puberty-blocking medication to avoid going through endogenous puberty, thereby avoiding the physical changes and heightened gender dysphoria that puberty causes for many young people who are transgender. *See Grimm*, 972 F.3d at 596; AAP Amicus 15-16. Later in adolescence, transgender youth may receive gender-affirming hormone therapy. *See Grimm*, 972 F.3d at 596; AAP Amicus 14-15.

From the time she was a child, Andraya knew she was a girl. SA018. The summer before eighth grade, Andraya told her parents that she is transgender and started to receive social and medical support for her transition. *Id*. By the time Andraya started high school, she was

6

known to her family and peers as a girl and participated in all aspects of school consistent with her female gender. *Id.* She legally changed her name to "Andraya" and has been undergoing hormone therapy for several years. SA019. As a result of her medical transition, Andraya's circulating hormones are comparable to the hormone levels of non-transgender girls. *Id.* In her everyday life, Andraya was accepted as a girl by her family, her friends, her teammates, and her coaches. SA018.

Terry also knew from a young age that she is a girl. SA022. She recalls, as far back as fifth grade, being aware of her female gender but not yet having the language or support to understand what she needed in order to live authentically. *Id.* After years of repressing her identity, Terry came out as transgender in tenth grade and began to live all aspects of her life as a girl. *Id.* She has since updated her Connecticut birth certificate to accurately reflect her sex as female and is undergoing hormone therapy. SA023. Terry has circulating hormone levels typical of non-transgender girls and, like Andraya, has been accepted as a girl by her family, her friends, her teammates, and her coaches. SA023.

Andraya and Terry love to run. They both participated in indoor and outdoor track and field on their schools' respective girls' teams, in

7

accordance with a CIAC policy that allows students who are transgender to play on sex-separated sports teams consistent with their gender identity if they meet certain criteria. SA019, SA023; JA149 (citing CIAC By-Laws art. IX, § B). Neither Andraya nor Terry "abruptly" began competing in girls' track. *Contra* JA153. Rather, both girls spent long periods of their lives coming to terms with their gender, coming out to their friends and family, and then living consistently with their gender at school and in the community. *See generally* SA018-19; SA022-23. Only then did they begin to compete on girls' teams, consistent with the recommendation of medical providers and the CIAC policy.

Under the CIAC policy, which has been in place since 2013, each school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC By-Laws art. IX, § B.[3] By submitting a team roster to the CIAC, each school district verifies that the students listed

---

[3] The CIAC By-Laws are available online at http://www.casciac.org/ciachandbook.

"are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*[4]

The CIAC policy is not an outlier. High school athletic associations across the country have policies that—like the CIAC's—allow boys and girls who are transgender to play on the same teams as other boys and girls. Laws and policies in approximately fourteen states and the District of Columbia allow transgender students to participate in athletics consistent with their gender identity without requiring students to establish any proof of medical transition. *See* Transathlete.com: *K-12 Policies*, https://www.transathlete.com/k-12 (collecting citations). An additional twenty states allow transgender students to participate in sports consistent with their gender identity on a case-by-case basis or with some proof of medical transition other than surgery. *See id.*

---

[4] The CIAC policy does not, as Plaintiffs allege, allow students to play on girls' teams based on whether "they claim" to have a female gender identity. JA131. Rather, as quoted above, it dictates student participation based on "the gender identification of that student in current school records and daily life activities in the school and community."

(collecting citations).[5] The National College Athletic Association ("NCAA") and the International Olympic Committee also allow women who are transgender to compete on women's teams after a period of hormone therapy. *See* NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* (2011), tinyurl.com/cr6ykbax; International Olympic Committee, *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism* (2015), https://tinyurl.com/kcfhc8cc.

Andraya and Terry participated on their schools' track teams for the same reasons as their non-transgender peers in Connecticut and beyond. They participated because they love to run; because being a part of a team provides a supportive community and creates lasting social and emotional relationships; because training and competition allowed them to improve their athletic skills, challenge themselves, and release stress

---

[5] In 2020 and 2021, eight states passed laws attempting to ban transgender women and girls from women's athletics. *See id.* (collecting citations); Sam Levin, *Mapping the anti-trans laws sweeping America: 'A war on 100 fronts,'* The Guardian (June 14, 2021). Federal courts have issued preliminary injunctions against two of those laws under either the Equal Protection Clause or Title IX. *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 3081883 (S.D.W. Va. July 21, 2021); *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020), *appeal filed* Nos. 21-35813, 21-35815 (9th Cir. Sept. 7, 2020).

and anxiety; and because the experience gave them a place to be themselves and thrive. SA019, SA023. Like their teammates and other athletes, they valued participation and the opportunity to achieve. SA020, SA024. During track seasons, they each trained multiple hours per day, five days per week, and pushed themselves and their teammates to improve. SA019, SA023. "This is what keeps me going.," Andraya explained in 2019. "Every day I train hard—I work hard to succeed on the track, to support my teammates, and to make my community proud." Dan Brechlin, *Connecticut high school transgender athletes 'no longer want to remain silent' following Title IX complaint*, Hartford Courant (June 20, 2019), https://tinyurl.com/j6sns4vk.

Plaintiffs' Allegations

Plaintiffs are four non-transgender girls—Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti—who allege that Andraya and Terry's participation in girls' track and field events deprived Plaintiffs of equal athletic opportunities. JA173-75.[6] All four plaintiffs

---

[6] Soule currently attends Florida Atlantic University and has filed a motion to intervene as a defendant in a lawsuit challenging a new Florida law prohibiting girls who are transgender from participating on girls' sports teams. *See* Mot. to Intervene, *D.N. v. DeSantis*, No. 21-cv-61344-RKA (S.D. Fla. Sept. 21, 2021), ECF No. 46.

assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' high school athletic events, Plaintiffs "are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." JA148.

But Plaintiffs fail to back up their rhetoric with an accurate recounting of the facts. Although the court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context,'" including documents incorporated into the complaint by reference. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)). Nearly all of Plaintiffs' assertions are based on publicly available records from the Athletic.net website. *See* JA150-51 ("All names, times, and other information provided in this section are taken from public sources, including Connecticut high school track records available on AthleticNET, at the web addresses indicated."). The complete set of records from Athletic.net paints a different picture from the selected excerpts highlighted in the Second Amended Complaint.

12

*First,* and most significantly, the Second Amended Complaint is filled with conclusory assertions that the Plaintiffs and other non-transgender girls "can't win" when competing against Andraya and Terry. JA147-48, JA163. But the complete set of track and field records for CIAC events reflects that Alanna Smith and Chelsea Mitchell outperformed both Terry and Andraya on multiple occasions:

(a) In the 2019 outdoor season, Mitchell outperformed Andraya in the 100m state open championship. *Compare* SA068 (showing first-place performance for Mitchell) *with* SA028 (showing fourth-place finish for Andraya). Mitchell also outperformed Andraya in the 2019 indoor Class S championship in the 55m dash. *Compare* SA070 *with* SA030 (showing Mitchell in second and Andraya in third).

(b) In the 2019 outdoor season, Smith also outperformed both Andraya and Terry in the 100m state open championship. *Compare* SA083 (showing third-place finish for Smith) *with* SA028 (showing fourth-place finish for Andraya) *and* SA041 (showing false start for Terry).

(c) In the 2020 indoor season, Mitchell won first place in the 55m dash Class S championship, first place in the 55m dash state open championship, and first place in the 300m Class S championship, outperforming Terry each time. *Compare* SA065 (showing Mitchell's results) *with* SA039 (showing Terry's results).[7]

---

[7] *See also* Shawn McFarland, *For the second week in a row, Canton's Chelsea Mitchell beats Terry Miller in 55-meter dash, this time to win State Open title*, Hartford Courant (Feb. 22, 2020), https://tinyurl.com/yz3am9jc.

13

All of these victories occurred before the Second Amended Complaint was filed on August 11, 2020. *See* JA130 (showing date filed).[8]

*Second,* and in similar fashion, the Second Amended Complaint asserts in conclusory terms that Plaintiffs have been denied the "chance to be champions" and "the satisfaction, public recognition, and scholarship opportunities that can come from victory." JA131, 148. But Plaintiffs have an extensive record of victories, both when competing against Andraya and Terry and when competing in other events. Soule won gold trophies in the 4x200 relay in the state open and Class LL championships in both the 2019 and 2020 indoor seasons, along with the 2020 Class LL championship in the indoor 55m, for a total of five state

---

[8] Smith recently competed in the 2021 outdoor season in both the 100m and the 200m, where she recorded faster times than Andraya ran *at any point* in Andraya's high school career. *Compare Published Results of Alanna Smith's track and field events* (unattached), Athletic.net, https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L =1 (showing Smith achieving times of 11.83 in the outdoor 100m and 24.00 in the outdoor 200m) (last visited October 6, 2021) *with* SA026 (showing Andraya's fastest times as 12.17 in the outdoor 100m, and 25.33 in the outdoor 200m). Smith's 200m time of 24.00 also exceeds Terry's fastest-ever 200m time. *See* SA039 (reflecting Terry's best outdoor 200m time as 24.17 in 2017).

14

titles. SA050, SA051, SA055.[9] Smith won gold trophies in the 2019 400m

state open championship and the 400m New England Championship.

SA085. And Mitchell won at least twelve gold trophies, including:

- Eight Class S championships in the 2018 outdoor 100m (SA073), 2018 outdoor 200m (SA073), 2018 outdoor 4x100 relay (SA075), 2019 outdoor long jump (SA069), 2020 indoor 55m (SA065), 2020 indoor 300m (SA066), and 2019 and 2020 indoor long jump (SA066, SA071);

- Three CIAC state open championships in the 2019 outdoor 100m (SA068), 2019 indoor long jump (SA071), and 2020 indoor 55m (SA065); and

- A New England championship in the 2019 outdoor 100m (SA068).

As of the 2020 indoor season, Mitchell was ranked first among all girls in

Connecticut for the 200m and second among all girls nationally in the

long jump. *See* SA065; *see also* Gerry deSimas, Jr., *Canton's Chelsea*

*Mitchell signs letter of intent to run at William and Mary*, Collinsville

Press (Nov. 16, 2019), https://tinyurl.com/xj9dk7xs (summarizing

Mitchell's achievements).

---

[9] *See also* Soule Decl. in Support of Intervention ¶ 15, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, ECF 46-1 (S.D. Fla. Sept. 21, 2021) (describing herself as "a five-time state title holder").

*Third*, despite their sweeping assertions about lost athletic opportunities, three of the plaintiffs—Soule, Nicoletti, and Smith—allege only a single instance in which Andraya and Terry's participation affected their athletic opportunities *in any way*. *See* JA277. Soule alleged she would have finished in sixth place instead of eighth place in the preliminary 55m race for the 2019 indoor state open championship and advanced to the finals. *See id.* Nicoletti alleged she would have finished in seventh place instead of ninth place in the 100m preliminary race for the 2019 outdoor Class S championship and advanced to the finals. *See id.* And Smith alleged she would have finished second instead of third in the 200m at the 2019 outdoor state open championship. *See id.*

The only student who alleges she was actually denied a championship as a result of Andraya and Terry's participation is Chelsea Mitchell. *See id.* She alleges that without Andraya and Terry's participation, Mitchell would have won an additional four gold trophies on top of her other twelve. *Id.*

*Fourth*, although Plaintiffs make generalized assertions about lost scholarship or recruitment opportunities (JA130-31, JA174-75), they fail to support those generalizations with any specific factual allegations.

16

Smith, Soule, and Nicoletti provide no support for the conclusory assertion that they lost scholarship or recruitment opportunities based on the single race in which they claim to have been affected by Andraya or Terry's participation. The relevant race for Smith and Nicoletti each occurred when they were in only ninth grade. JA277. Meanwhile, Soule received an offer to run for Florida Atlantic University. *See* Soule Decl. in Support of Intervention ¶ 29, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, (S.D. Fla. Sept. 21, 2021), ECF 46-1. And Mitchell received an athletic scholarship to attend William & Mary. *See* Ashley Schwartz-Lavares et al., *Trans women targeted in sports bans, but are they really at an advantage?* ABC News (Apr. 7, 2021), https://tinyurl.com/y7j98xbj.[10]

Plaintiffs also fail to allege that any scholarships or recruitment opportunities actually went to Andraya or Terry. (In fact, Andraya and Terry received no scholarship opportunities to compete in college. *Id.*)

Moreover, although Plaintiffs spend a substantial portion of their opening brief arguing that amending their records could have an effect

---

[10] Mitchell's collegiate track records are also public. *See Published Results of Chelsea Mitchell's collegiate track and field events*, Athletic.net, https://www.athletic.net/TrackAndField/Athlete.aspx?AID=17575027 (last visited October 6, 2021).

17

on future employment opportunities (Pls.' Br. 2, 20-26, 52-54), the Second Amended Complaint does not contain any allegations whatsoever about athletic records' connection to employment opportunities—whether for these Plaintiffs or for anyone else.

Plaintiffs' Lawsuit

On February 12, 2020, Plaintiffs filed a Complaint against the CIAC and the five school boards representing the jurisdictions where Plaintiffs, Andraya, and Terry each attended school. JA009, JA010. Plaintiffs filed an Amended Complaint on April 17, 2020, and a Second Amended Complaint on August 11, 2020. JA017, JA024.[11] For ease of reference, Intervenor-Defendants cite here to the Second Amended Complaint when referring to "the Complaint."

Plaintiffs' Complaint is based on the premise that, by allowing Andraya and Terry to participate on the same teams as other girls, the CIAC policy allows "males" to participate in women's sports, and that such participation violates the rights of cisgender girls under Title IX. According to the Complaint, males have an athletic advantage over

---

[11] The original complaint was filed on behalf of only Soule, Mitchell, and Smith. The Amended Compliant added Nicoletti as a fourth plaintiff.

females because of "inherent and biologically dictated differences between the sexes." JA140. The Complaint alleges that "[w]hile boys and girls have comparable athletic capabilities before boys hit puberty, male puberty quickly increases the levels of circulating testosterone . . . and this natural flood of testosterone drives a wide range of physiological changes that give males a powerful physiological athletic advantage over females." *Id.* Referring to the fact that many girls and women who are transgender receive gender-affirming hormone therapy, the Complaint further alleges that "[a]dministering testosterone-suppressing drugs to males [sic] by no means eliminates their performance advantage." JA146. Andraya and Terry dispute these allegations, but acknowledge they must be accepted as true for purposes of a motion to dismiss.

Plaintiffs allege that the CIAC policy violates Title IX by failing to effectively accommodate the athletic abilities of non-transgender girls, *see* JA172-74, and by failing to provide equal treatment, benefits, and opportunities for non-transgender girls' athletics, *see* JA174-75. For these alleged violations, Plaintiffs seek nominal and compensatory damages. JA176. Plaintiffs also seek prospective relief in the form of a declaratory judgment and three injunctions:

- "An injunction prohibiting all Defendants . . . from permitting males [sic] from participating in events that are designated for girls, women, or females."[12]

- "An injunction requiring all Defendants to . . . remove male [sic] athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions."

- "An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women."

JA176.

Despite the centrality of testosterone and puberty to their factual allegations, the relief sought by Plaintiffs does not focus on hormones and puberty. Instead, Plaintiffs seek sweeping relief preventing all girls who are transgender—whom Plaintiffs refer to as "athletes born male with male bodies"—regardless of the age at which they transitioned, whether they have had puberty blockers or hormone therapy, and whether they actually went through endogenous "male" puberty. *Id.*

---

[12] This injunction was sought only by Smith and Nicoletti. JA177.

20

Plaintiffs' Request for a Preliminary Injunction

Together with the Complaint, Plaintiffs moved for a preliminary injunction to prohibit Andraya and Terry from participating in the spring 2020 outdoor season, which would have been the last season in which Soule, Mitchell, Andraya, or Terry competed before graduating. JA260-62.

Nine days after the Complaint was filed—and before the Complaint and motion for preliminary injunction had even been served on Defendants, JA011—Andraya and Terry filed a motion to intervene as defendants. JA012. The Connecticut Commission on Human Rights and Opportunities filed a motion to intervene as well. *Id.*

On March 10, Governor Lamont issued a public health emergency declaration in light of the COVID-19 pandemic. *See* Executive Order No. 7C, https://tinyurl.com/dw6mpkb. On March 12, he canceled sporting events, and on March 15, he closed schools. *See id.* Because a cancelation of the spring 2020 outdoor season would moot Plaintiffs' claims of irreparable injury, the district court deferred the motion for preliminary injunction until it became clear whether the season would be canceled. *See* JA014 (ECF No. 68); JA015 (ECF No. 79); JA016 (ECF 82).

21

The Court Orders Counsel to Refer to Andraya and Terry with Civility

On April 16, 2020, the court held a telephonic hearing on the pending motions to intervene. JA017. In their motion, Andraya and Terry took issue with the Complaint's reference to them as "males." *See, e.g.*, SA007. They explained that they are girls who are transgender, discussed medical treatments they have received for gender dysphoria, and identified ways in which they have been socially and legally recognized as girls in Connecticut. SA002-04. They also explained that the Plaintiffs' references to "biological sex" are inaccurate and imprecise because there are many biological components of sex, including chromosomal, anatomical, hormonal, and reproductive elements. SA007.

During the hearing, Plaintiffs' counsel nevertheless referred to Andraya and Terry as "male competitor[s]" and "male athletes." JA100, JA103. The Court then stated:

> I don't think we should be referring to the proposed intervenors as "male athletes." I understand that you prefer to use those words, but they're very provocative, and I think needlessly so. I don't think that you surrender any legitimate interest or position if you refer to them as transgender females. That is what the case is about. This isn't a case involving males who have decided that they want to run in girls' events. This is a case about girls who say that transgender girls should not be allowed to run in girls' events.

22

So going forward, we will not refer to the proposed intervenors as "males"; understood?

JA104.

Plaintiffs' counsel objected to the request. Counsel stated that "[g]ender identity is not the point of this case" and "[t]he point of this case is physiology of bodies driven by chromosomes and the documented athletic advantage that comes from a male body, male hormones, and male puberty in particular." JA105-06.

The court responded:

I'm not asking you to refer to these individuals as "females." I know that you don't want to do so. What I'm saying is you must refer to them as "transgender females" rather than as "males." Again, that's the more accurate terminology, and I think that it fully protects your client's legitimate interests. Referring to these individuals as "transgender females" is consistent with science, common practice and perhaps human decency.

To refer to them as "males," period, is not accurate, certainly not as accurate, and I think it's needlessly provocative; and, for me, civility is a very important value, especially in litigation.

So if you feel strongly that you and your clients have a right to refer to these individuals as "males" and that you therefore do not want to comply with my order, then that's unfortunate. . . . I don't want to bully you, but at the same time, I don't want you to be bullying anybody else. . . . My goals for this

23

> case include, very importantly, the goal of maintaining civil
> discourse, respectful, humane, intelligent, civil discourse in
> the course of the case. Nothing more, nothing less.

JA107-08.

In response to a follow-up question from Plaintiffs' counsel, the Court further clarified that it was not ordering Plaintiffs' counsel to use the specific phrase "transgender female" and that counsel could refer to girls who are transgender as people who "have male bodies" or "went through male puberty." JA108.

On May 8, 2020, Plaintiffs filed a motion for the district court to recuse himself, arguing that his request for courtesy created an appearance of partiality. JA020. The court denied the motion in a minute order entered on June 16, 2020. JA022. The court reiterated that "plaintiffs' counsel would still be able to refer to them as 'biologically male' with 'male bodies.' They just couldn't refer to them as 'males, period.'" *Id.* The court further explained:

> I do not agree that the public might reasonably construe my
> reference to "science" as a comment on the merits of the issue
> whether transgender athletes have an unfair competitive
> advantage in girls' sports. . . . That statement does not reflect
> a preconceived conclusion on the issue of unfair competitive
> advantage presented by this case. In fact, and as I think
> objective members of the public would readily understand, the

24

"science" I referred to is not the science relating to the issue of unfair competitive advantage but the science that tells us calling transgender girls "males" can cause significant mental and emotional distress. The insight provided by this science has led to a "common practice" of referring to transgender persons by their gender identity, which is viewed by many as a matter of "human decency." . . .

By referring to science in this way, in this context, and for this purpose, I did not state or imply anything about whether the transgender youth in this case do or do not enjoy an unfair competitive advantage when they compete in girls' track. . . . The issue of unfair competitive advantage can be fully and fairly litigated consistent with professional ethics and constitutional protections without referring to the transgender females involved in this case as "males, period." I think objective members of the public would agree. I also think objective members of the public would understand that just because I want plaintiffs' counsel to avoid needlessly calling the transgender females in this case 'males, period" does not mean I am partial or biased with regard to any issue in the case.

JA022-23 (paragraph breaks added). Plaintiffs then filed a petition for writ of mandamus with this Court, and, at the parties' request, the district court stayed proceedings until the petition was denied on November 4, 2020. JA024-26.[13]

---

[13] Plaintiffs misleadingly state that this Court denied the petition "[b]ecause mandamus is a 'drastic and extraordinary' interlocutory remedy." Pls.' Br. 11 n.3 (citation omitted). This Court did not provide any reasoning for its decision.

25

The Motion to Dismiss

Defendants and Intervenor-Defendants filed a consolidated motion on August 21, 2020, to dismiss the Second Amended Complaint for lack of standing and for failure to state a claim upon which relief could be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* JA025.

The district court granted the motion to dismiss on April 25, 2021. JA028. It held that Plaintiffs' request to enjoin the CIAC policy had become moot because Andraya and Terry graduated from high school in 2020, and the plaintiffs still attending high school had failed to demonstrate a non-speculative possibility that they would compete against other girls who are transgender in the future. JA271-72. The district court further held that Plaintiffs lacked standing to seek an injunction to retroactively change their records because Plaintiffs failed to plead any facts supporting their conclusory assertions that doing so could have a plausible effect on their future athletic recruitment or employment opportunities. JA278. Finally, the district court held that Plaintiffs' requests for damages were barred by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981). JA279-87.

26

The court did not address Defendants' alternative arguments—that Plaintiffs had failed to allege a cognizable violation of Title IX, or that Plaintiffs' requested remedies would violate the rights of transgender students. JA260. But the court noted that its decision was bolstered by the fact that "[c]ourts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity." JA286.

## SUMMARY OF ARGUMENT

This Court may affirm the district court's order on any ground supported by the record. Although the district court properly dismissed Plaintiffs' claims on jurisprudential grounds, Plaintiffs' unprecedented argument that Title IX requires schools to discriminate against transgender students also fails on the merits.

Without making any attempt to ground their arguments in the actual text of Title IX and its regulations, Plaintiffs argue that Title IX's athletic regulations define girls who are transgender as "males," and that a school's failure to exclude transgender girls from the girls' team constitutes a failure to provide cisgender girls with a sex-separated team,

which they say automatically violates Title IX. Plaintiffs are wrong on both counts.

Nothing in the text of Title IX or in the athletic regulation purports to define girls who are transgender as "males," or requires the CIAC to subject girls who are transgender to different and discriminatory treatment. And even if Plaintiffs could somehow establish that a girls' team with girls who are transgender is not "sex-separated," Title IX does not mandate sex separation as the exclusive means of providing equal athletic opportunity. Rather, under Title IX regulations and guidance, Plaintiffs could not state a claim for denial of effective accommodation unless they could show that they do not possess sufficient skill "to compete actively" alongside girls who are transgender. *Title IX of the Education Amendments of 1972: A Policy Interpretation*, at § VII.C.4.b(3), 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation"), https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html. Plaintiffs do not even attempt to make that showing. To the contrary, Plaintiffs' own records establish that they have actively competed against—and even outperformed—Andraya and Terry on multiple occasions, building an impressive record of victories.

28

Plaintiffs have also failed to state viable Title IX claims because the injunctions Plaintiffs seek would violate the legally protected rights of Andraya, Terry, and other girls who are transgender. Plaintiffs demand sweeping injunctions prohibiting all girls who are transgender from competing—regardless of whether they have gone through endogenous "male puberty," whether they have received gender-affirming hormone therapy, and whether they possess any of the alleged athletic advantages that Plaintiffs attribute to "male bodies." Two federal courts have already held that state laws with similarly sweeping bans likely violated the rights of transgender students under either the Equal Protection Clause or Title IX, and issued preliminary injunctions prohibiting their enforcement. *See B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 3081883 (S.D.W. Va. July 21, 2021); *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020), *appeal filed sub nom. Hecox v. Kenyon*, Nos. 21-35813, 21-35815 (9th Cir. 2020).

Finally, Plaintiffs' request for reassignment on remand should be rejected. Judge Chatigny acted well within his discretion in admonishing counsel to stop gratuitously referring to two teenage girls who are transgender as "males, period." When Plaintiffs' counsel engaged in

29

similar conduct a few months later in *Hecox v. Little*, that district court issued the same admonishment, explaining that counsel had numerous other ways to "make[] counsel's point without doing so in an inflammatory and potentially harmful manner." 479 F. Supp. 3d at 957 n.11. Courts routinely respect the gender identity of litigants by referring to them with appropriate pronouns and honorifics, and have required counsel to do the same as a matter of common courtesy. Plaintiffs' remaining arguments for reassignment rest on either blatant misrepresentations of what Judge Chatigny said or misleading omissions of critical facts. No reasonable person provided with an *accurate* representation of the facts would question the impartiality of the district court.

## LEGAL STANDARD

"On appeal following a dismissal of a complaint for either lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim under Rule 12(b)(6), [this Court] review[s] the district court's decision de novo." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 379 (2d Cir. 2021). In conducting de novo review, this Court "may affirm the district court's order granting

30

summary judgment on any ground supported by the record, even if it is not one on which the district court relied." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316 (2d Cir. 2013) (internal quotation marks omitted).

On a motion to dismiss, the court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (internal quotation marks and citations omitted). Although the court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009)). "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Id.* at 147.

31

## ARGUMENT

### I. Plaintiffs Have Failed to Allege a Cognizable Title IX Claim.

As the district court properly recognized, "[c]ourts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity." JA286. But the question here is even narrower. The question in this case is not whether Title IX *requires* schools to allow girls who are transgender to participate on girls' athletic teams, but whether Title IX *prohibits* schools from doing so. No court has ever interpreted Title IX to prohibit the inclusion of girls who are transgender on girls' athletic teams, and neither the plain text of Title IX nor its implementing regulations supports such a claim. "[N]one of [Plaintiffs'] contentions about what [they] think the law was meant to do, or should do, allow us to ignore the law as it is." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1745 (2020).

### A. Title IX and Its Implementing Regulations Do Not Define Girls Who Are Transgender as "Males" for Purposes of School Athletics.

Plaintiffs' Title IX claims are premised upon the faulty assumption that Title IX and its regulations establish a definition of "sex" that

32

precludes girls who are transgender—and who are recognized as girls "in current school records and daily life activities in the school and community" CIAC By-Laws art. IX, § B—from being recognized as girls for purposes of sex-separated athletic activities.

But Plaintiffs fail to identify any text from Title IX or the implementing regulations that define sex or otherwise support their claims. Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C § 1681(a). Although the statutory text does not explicitly address athletics, regulations codified at 34 C.F.R. § 106.41 "set forth the standards for assessing an athletics program's compliance with" the statute. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004). Under the regulations, schools are generally prohibited from "provid[ing] athletics separately" "on the basis of sex," but "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a)-(b). Schools are also required to

provide "equal athletic opportunity for members of both sexes." *Id.* § 106.41(c).

Plaintiffs assert that in authorizing schools to sponsor "teams for members of each sex," Title IX and its implementing regulation implicitly defined sex as "biological sex" and preempted state laws and policies recognizing girls who are transgender as girls. *See* JA172-75. In doing so, Plaintiffs repeat the same arguments that have been considered and rejected in the context of regulations authorizing separate school restrooms on the basis of sex. *See* 34 C.F.R. § 106.33. Every court of appeals to consider the question has held that the restroom regulation does not create a definition of sex or require schools to exclude transgender students from restrooms consistent with their identity. "[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on [']biological sex['] and cannot accommodate gender identity." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir.), *cert denied*, 141 S. Ct. 894 (2020); *accord Doe ex rel. Doe v. Boyertown Area*

*Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018); *see also Grimm*, 972 F.3d at 618. Plaintiffs' arguments should be rejected for the same reasons.

Moreover, even assuming for the sake of argument that the word "sex" refers exclusively to physiological and biological characteristics, the so-called "biological sex" of a transgender student is not necessarily the sex they were assigned at birth. As discussed above, there are many different biological components of sex, and "transgender individuals often undergo a variety of procedures and treatments that result in anatomical and physiological changes, such as puberty blockers and hormone therapy." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 461 (E.D. Va. 2019), *aff'd,* 972 F.3d 586; *see also F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136 (D. Idaho 2018) ("There is scientific consensus that biological sex is determined by numerous elements, which can include chromosomal composition, internal reproductive organs, external genitalia, hormone prevalence, and brain structure.").

The regulations authorizing sex-separated sports teams assume that the student population consists of "what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction." *G.G.*

35

*ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded on other grounds,* 137 S. Ct. 1239 (2017). But they "shed[] little light on how exactly to determine the 'character of being either male or female' where those indicators diverge." *Id.*; *cf. Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 639 (7th Cir. 2014) (en banc) ("[T]erms that seem plain and easy to apply to some situations can become ambiguous in other situations.").[14]

Plaintiffs offer a variety of policy arguments for excluding girls who are transgender, but those policy arguments (which Intervenor-Defendants vigorously dispute) cannot be shoehorned into the allegedly plain meaning of the word "sex." Plaintiffs argue that the word "sex" in the athletic regulations must refer to biology because "male bodies" have

---

[14] The Supreme Court recently declined the invitation to limit the meaning of sex under Title VII to the physiological distinctions advocated by the Plaintiffs here. Instead the Court merely "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female," without deciding whether "the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Bostock*, 140 S. Ct. at 1739; *see, e.g.*, *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016) (collecting definitions). As in *Bostock*, it is not necessary in this case to decide whether the word "sex" in Title IX refers only to biological distinctions because, as noted above, many transgender students have biological characteristics that align with their gender identity and not the sex assigned to them at birth.

an inherent physiological advantage over "female bodies." JA140. But Plaintiffs' own pleadings admit that all of those physiological differences result from hormones, not from genetics or anatomy at birth. Plaintiffs admit that "boys and girls have comparable athletic abilities before boys hit puberty," and the alleged physiological advantages typical of boys do not occur until puberty, when "testosterone drives a wide range of physiological changes." *Id*. Thus, even under Plaintiffs' own allegations, a girl who is transgender and who—as a result of receiving puberty-blocking medication and gender-affirming hormone therapy—never goes through endogenous puberty will have none of the alleged physiological advantages that Plaintiffs complain about. *See B.P.J.*, 2021 WL 3081883, at *5 (granting preliminary injunction to transgender girl and noting that "B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State.").

Neither the plain text of Title IX nor the plain meaning of the word "sex" requires schools to discriminate against girls who are transgender by treating them like cisgender boys.

37

**B. Title IX and Its Regulations Do Not Mandate Sex-Separated Teams as the Exclusive Means of Promoting Equal Athletic Opportunity.**

Even assuming for purposes of a motion to dismiss that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs' claims would still be based on a second faulty assumption: that the lack of sex separation automatically violates Title IX and its athletic regulations. Far from mandating separate teams, section (a) of the regulations establishes a "[g]eneral" rule *prohibiting* schools from "provid[ing] . . . athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a) (emphasis added). Section (b) of the regulations then carves out an exception to that general prohibition, stating that "a recipient *may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b) (emphasis added).

The regulation thus allows schools to provide sex-separated teams, but does not require schools to do so. It is "purposely permissive and flexible on this point, rather than mandatory." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking down high school athletic association

rule mandating sex-separation for all teams as inconsistent with Title IX). The only thing mandated by subsection (b) is that "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited," members of the "excluded sex" must be allowed to try out for the team unless it is a contact sport. 34 C.F.R. § 106.41(b).

Subsection (c) of the regulation further requires schools to provide "equal athletic opportunity" but does not impose a general requirement for schools to use sex-separated teams as the exclusive means of doing so. *Id.* § 106.41(c). Indeed, at the time that Title IX was adopted, and continuing to this day, courts have recognized that allowing girls to play on boys' teams (and vice versa) can sometimes be the only effective way

to provide equal athletic opportunity under the Fourteenth Amendment.[15]

Plaintiffs' assumption that Title IX universally requires sex-separated athletics is particularly unwarranted in Connecticut, which—like many other states—allows girls and boys to compete with each other on the same contact-sports team. According to statistics from the National Federation of State High School Associations, during the 2018-19 academic year, forty-two girls in Connecticut played on boys' football teams, twenty-one girls in Connecticut played on boys' ice hockey teams, and 131 girls in Connecticut played on boys' wrestling teams. *See* Nat'l Fed. of State High Sch. Ass'ns: Participation Data, *available at* https://members.nfhs.org/participation_statistics (last accessed Aug. 17, 2020).

---

[15] *See, e.g.*, *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) (injunction allowing boys to compete on girls' competitive dance team); *Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922, 923 (8th Cir. 1976) (injunction allowing girl to compete on boys' cross-country team); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014) (injunction allowing girl to compete on boys' wrestling team); *Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) (same); *Lantz v. Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985) (injunction allowing girl to compete on boys' football team).

Thus, even accepting Plaintiffs' flawed argument that all girls who are transgender are actually boys, that alone would not give rise to a Title IX violation.

### C. Plaintiffs Have Not Alleged Cognizable Claims of Unequal Athletic Opportunity Under the Department of Education 1979 Policy Interpretation.

Plaintiffs also fail to establish a Title IX violation under longstanding guidance from the Department of Education defining how to measure "equal athletic opportunity." The 1979 Policy Interpretation, which was adopted through notice and comment, divides claims for denial of "equal athletic opportunity" into two categories: claims for "equal treatment" and claims for "effective accommodation." *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012).[16]

Conflating and distorting "effective accommodation" and "equal treatment" claims, Plaintiffs assert that Title IX requires not merely an equal opportunity for girls and boys to compete, but also requires that an

---

[16] This court has deferred to the 1979 Policy Interpretation without resolving whether the deference was based on *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 290 (2d Cir. 2004). *But see Biediger*, 691 F.3d at 96 (stating that *McCormick* applied *Chevron* deference).

equal number of trophies be awarded to (in Plaintiffs' words) people with "male bodies" and people with "female bodies." JA175. Plaintiffs cannot identify any court, or any prior enforcement action by OCR, that has interpreted Title IX in such a manner.

### i. Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" under the 1979 Policy Interpretation's "Selection of Sports" Provision.

In Count One, Plaintiffs assert a claim for "effective accommodation," but fail to identify the only Title IX regulatory document that addresses when a school is required to provide separate teams for boys and girls. Under a section addressing effective accommodation in selection of sports, the 1979 Policy Interpretation provides that "where an institution sponsors a team in a particular sport for members of one sex, it may be required *either* to permit the excluded sex to try out for the team *or* to sponsor a separate team for the previously excluded sex." 1979 Policy Interpretation § VII.C.4 (emphases added). Sex-separated teams in non-contact sports such as track and field are required only if, among other things, "[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team or to compete actively on such a team if selected." *Id.* § VII.C.4.b(3). Thus,

even assuming for purposes of this appeal that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs could not state a claim for denial of effective accommodation unless they could show that they do not possess sufficient skill "to compete actively" alongside girls who are transgender. *Id.* § VII.C.4.b(3).

Any argument that Plaintiffs are unable to "compete actively" with girls who are transgender is both implausible on its face and belied by facts incorporated in the Complaint itself. As discussed above, Plaintiffs' complete sets of track and field records unequivocally demonstrate that Mitchell and Smith actively competed against Andraya and Terry and repeatedly *won* those competitions. *See supra* at pp. 13-15 (detailing these plaintiffs' many wins). Plaintiffs' assertion that they "simply can't win" is "simply not true." *Dixon v. von Blanckensee*, 994 F.3d 95, 107 (2d Cir. 2021).

Plaintiffs also assert that they have been denied the "chance to be champions," but, as discussed above, Plaintiffs' records demonstrate that Soule, Mitchell, and Smith have been "champions" on multiple

43

occasions.[17] Smith had already won two championships (as of the date of the Second Amended Complaint); Soule has won five championships; and Mitchell has won twelve.

Mitchell has also received virtually all of the accolades and public recognition that she claims to have lost to Terry and Andraya. For example, Plaintiffs misleadingly allege that during the 2019 indoor season, Andraya and Terry "egregiously" denied Mitchell the ability to "ma[k]e her school's history as the first female athlete . . . ever to be named State Open Champion." Pls.' Br. 26 (quoting JA156). In reality, although Mitchell was not named state open champion in the 55m dash, she still "made her school's history" by winning the state open championship for the long jump on the same day. *See* SA071; Gerry deSimas, Jr., *Canton's Chelsea Mitchell wins State Open title in long*

---

[17] Soule and Nicoletti do not allege that they would have won a trophy for any particular event had Andraya or Terry not participated. Both runners placed behind at least five presumably non-transgender runners, including other plaintiffs to this lawsuit, in events they claim denied them a chance to be a champion.

*jump, takes 3rd in 55 meters*, Collinsville Press (Feb. 18, 2019), *available at* https://tinyurl.com/yu2khbz2.

Mitchell further complains that Andraya and Terry took recognition away from her when the Hartford Courant named them "All-Courant girls indoor track and field athletes of the year" for the 2018-19 season. JA156. But only months later, Mitchell herself was named "All-Courant girls outdoor track and field athlete of the year" for the 2019 season. *See* Shawn McFarland, *2019 All-Courant girls outdoor track and field athlete of the year: Chelsea Mitchell, Canton*, Hartford Courant (July 10, 2019), *available at* https://tinyurl.com/tde86a37.

Though Plaintiffs complain that they want more trophies and accolades to go along with those they have already received, there is enough room in Connecticut—and in track-and-field competition more generally—for girls who are transgender to have "the chance to be champions," too. Providing effective accommodation for the interests and abilities of these four Plaintiffs does not require Defendants to deny

45

effective accommodation to other girls, including girls who are transgender.

### ii. Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" under the 1979 Policy Interpretation's "Levels of Competition" Provision.

Plaintiffs also fail to allege a denial of "effective accommodation" claim under the "levels of competition" provision. In accordance with the 1979 Policy Interpretation, courts address effective accommodation claims through a three-part test that analyzes:

> (1) Whether [] participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or (2) Where the members of one sex have been and are underrepresented among [] athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or (3) Where the members of one sex are underrepresented and the institution cannot show a continuing practice of program expansion . . ., whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Biediger*, 691 F.3d at 92–93 (citing 1979 Policy Interpretation). "The test is applied to assess whether an institution is providing nondiscriminatory *participation opportunities* to individuals of both

46

sexes, and an institution is in compliance if it meets any one of the three prongs of the test." *McCormick*, 370 F.3d at 300 (emphasis in original).

An effective accommodation claim based on "levels of competition" is assessed at the aggregate level. It focuses on a school's athletic program as a whole, rather than on any one particular individual's ability to compete on a given team in a given event. *See Biediger*, 691 F.3d at 92–93 (effective accommodation claim regarding Quinnipiac University's elimination of women's volleyball team as varsity sport and systemic manipulation of rosters to make the number of female participants appear larger than it actually was); *Thomas v. Regents of Univ. of Cal.*, No. 19-cv-06463-SI, 2020 WL 3892860, at *9 (N.D. Cal. July 10, 2020) (effective accommodation claim regarding "systemwide imbalance in athletic opportunities for women"). The focus throughout the effective accommodation analysis is on how an athletics program, taken as a whole, provides participation opportunities for each sex as a whole.

Plaintiffs do not allege that they have been denied effective accommodation under the three-part test. Instead, Plaintiffs assert that each time a cisgender girl fails to advance to the next level of post-season competition, she has been denied a "participation opportunity." But the

47

term "participation opportunity" under the 1979 Policy Interpretation has a specific definition. The 1979 Policy Interpretation defines "participants" as those athletes

> a. Who are receiving the institutionally sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

> c. Who are listed on the eligibility or squad lists maintained for each sport; or

> d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

*Biediger*, 691 F.3d at 93 (quoting 44 Fed. Reg. at 71,415) (alterations incorporated). Participation opportunities are not calculated based on the number of times an athlete qualifies to participate in a particular post-season race.

Taking words out of context, Plaintiffs also argue that Title IX requires that athletic opportunities not be "illusory." Pls.' Br. 30 (quoting *Biediger*, 691 F.3d at 101). "Illusory" participation opportunity under the three-part test are "unfilled slots" that exist on paper but "are not filled

48

by actual athletes." Off. Civ. Rts., U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test (Jan. 16, 1996); *accord Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014). Thus, the "illusory" opportunities in *Biediger* referred to Quinnipiac's attempt "to pump up its women's track team rosters by requiring every injured field hockey, soccer, and volleyball player to join these teams even though they would never actually compete in the indoor and outdoor track seasons and, for that matter, would never want to enter a race." 691 F.3d at 101. Neither *Biediger* nor any other case stands for the proposition that a participation opportunity is "illusory" if the student does win not every competition.

Plaintiffs also focus on a hypothetical situation in which "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." Pls.' Br. 29 (internal quotation marks and citations omitted). But Plaintiffs' factual allegations—as opposed to their rhetoric—show nothing of the kind. The allegations show that for the past seven years, only two girls who are transgender, Andraya and Terry, have run competitively in girls' track and field, each in only three events out of dozens per track-and-field meet.

49

Plaintiffs' records also show that non-transgender girls have repeatedly won championships by outperforming Andraya and Terry in direct competition. Irrespective of Andraya and Terry's talents, their participation in three events per meet has not caused cisgender girls to "vanish from the victory podium." JA148; *see also Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho Aug. 17, 2020) ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

Here, it is undisputed that Plaintiffs' schools have separate girls' indoor and outdoor track teams; that those teams participated in numerous meets; and that based on those meets, Plaintiffs were able to qualify for their Class championships, for the State Open, and for the New England Championship—often with great success. *See supra* (discussing the other athletic opportunities and achievements reflected in Plaintiffs' track records). Accordingly, Plaintiffs have failed to allege a

50

valid claim that they lack participation opportunities when analyzed under the relevant three-part test for an "effective accommodation."

### D. Plaintiffs Have Not Plausibly Alleged an Equal Treatment Claim.

Plaintiffs also fail to allege a cognizable claim for denial of "equal treatment" under the 1979 Policy Interpretation. When determining whether equal treatment has been denied, courts review the second through tenth factors set forth in the Title IX regulations:

> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c)(2)-(10); *McCormick*, 370 F.3d at 291.

Under the 1979 Policy Interpretation, a school may be liable for denial of equal treatment "[i]f comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability," for "members of both sexes." *See* 1979 Policy Interpretation § VII(B)(2). Thus, for example, an athletic program may

51

be found to deny equal treatment when it schedules women's sports in a less advantageous manner than men's sports. *See McCormick*, 370 F.3d at 299 (sustaining unequal treatment claim by members of women's soccer team given high school's "off-season scheduling that disadvantaged members of only one sex"); *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 855-57 (W.D. Mich. 2001) (high school athletic association violated Title IX by scheduling athletic seasons and competitions for girls' sports during nontraditional and less advantageous times compared to boys' sports).

Plaintiffs' factual allegations fail to state a valid equal treatment claim under this legal framework. Plaintiffs do not even attempt to argue that the CIAC treats the boys' track and field team differently from the girls' track and field team. The only allegations even remotely related to the regulatory factors are Plaintiffs' vague claims that they were denied publicity and recognition of their efforts due to victories by other girls. But, as with any "effective accommodation" claim, the assessment of unequal publicity focuses on the publicity institutions provide to their teams as a group—not the coverage ultimately enjoyed individually by each athlete from third-party news outlets. *See* 1979 Policy

52

Interpretation § VI(B)(3)(i) (explaining that compliance is assessed based on "access to publicity resources for men's and women's programs" as well as "quantity and quality of publications and other promotional devices featuring men's and women's programs"). For example, if a school were only publicizing its male athletes, and not its female athletes, on the school's website, that would support a claim for unequal publicity. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1112 (S.D. Cal. 2012) (sustaining unequal treatment claim on the basis of, among other things, a showing that "girls' athletic activities were provided with less coverage and promotion in yearbooks, fewer announcements in the school's Daily Bulletin, less signage on the school's electronic marquee, and inferior signage"), *aff'd*, 768 F.3d 843. Plaintiffs have alleged nothing of the kind.

## II. The Requested Injunctions Would Violate the Rights of the Individual Intervenors and Other Girls Who Are Transgender.

Even if Plaintiffs' claims were otherwise cognizable under Title IX, Plaintiffs' sweeping demands for injunctive relief would violate the statutory and constitutional rights of Andraya, Terry, and other girls in Connecticut who are transgender.

53

## A. Plaintiffs Cannot Retroactively Strip Other Students of Championships They Won in Accordance With Existing Rules.

In arguing that they have live claims for injunctive relief, Plaintiffs emphasize their request for an injunction to expunge all records of Andraya and Terry's accomplishments. Plaintiffs compare the instant case with contexts in which athletes have been found to be participating while under the influence of performance-enhancing drugs in violation of the competition rules. Pls.' Br. 18-19. But unlike in those contexts, Andraya and Terry followed all of the rules and competed consistent with the state law and policy. Plaintiffs do not allege otherwise.

As Plaintiffs themselves acknowledge, "[s]ociety values and awards those who win *according to the rules of the game*." Pls.' Br. 24 (emphasis added). If Plaintiffs could show a non-speculative possibility of future injury, they would be free to argue that the CIAC rules should be changed prospectively. But Title IX does not allow Plaintiffs to retroactively change the rules for races that have already been won, or to deprive other students of victories they won based on the rules in place at the time.

### B.   Plaintiffs' Requested Injunctions Would Violate Title IX.

Granting Plaintiffs' requested injunctions would also violate the Title IX rights of the Individual Intervenor-Defendants and other girls who are transgender. *See B.P.J.*, 2021 WL 3081883, at *6-*7 (granting preliminary injunction against West Virginia law banning girls who are transgender from participating in sports with non-transgender girls); *Boyertown Area Sch. Dist.*, 897 F.3d at 536 (refusing to grant preliminary injunction that "would essentially replicate" a school district policy that violated Title IX).

Title IX "prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)). In *Bostock*, the Supreme Court held that discrimination against a person because they are transgender is discrimination "because of . . . sex" under Title VII of the Civil Rights Act of 1964 "because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741.

The same reasoning applies to Title IX because both statutes require no more than "but for" causation: Title VII prohibits

discrimination "because of" sex, 42 U.S.C. § 2000e–2(a)(1); Title IX prohibits discrimination "on the basis of" sex, 20 U.S.C. § 1681(a). And this Court has already recognized that there is no "meaningful difference between 'on the basis of,' 'because of,' or 'based on,' which would require courts to use a causation standard other than 'but-for.'" *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2668 (2020). Thus, as with Title VII, to discriminate against a student because she is transgender is to discriminate based on sex. *See Grimm*, 972 F.3d at 616; U.S. D.O.J., *Memorandum re: Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972* (Mar. 26, 2021), https://www.justice.gov/crt/page/file/1383026/download (collecting cases before and after *Bostock*).

Granting Plaintiffs' requested injunction would unlawfully discriminate against girls who are transgender in violation of Title IX's plain text. "In the Title IX context, discrimination mean[s] treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 140 S. Ct. at 1740) (internal quotation marks omitted). Excluding a girl who is transgender from girls' sports teams would "treat[] [her] worse than girls with whom she is similarly

56

situated because she alone [could not] join the team corresponding to her gender identity." *B.P.J.*, 2021 WL 3081883, at *7. The exclusion would "very publicly brand[]" girls who are transgender "with a scarlet 'T'"— stigmatizing transgender students and marking them as different from their peers. *Grimm*, 972 F.3d at 617-18 (internal quotation marks and alterations omitted).

Such discrimination is not authorized by the Title IX regulation allowing schools to provide "separate teams for members of each sex." 34 C.F.R. § 106.41(b). The regulations do not purport to authorize "discrimination" in violation of the statutory text. Nor could they. "All [the regulation] suggests is that the act of creating sex-separated [teams] in and of itself is not discriminatory—not that, in applying [athletic] policies to students like [Andraya and Terry], the [government] may rely on its own discriminatory notions of what 'sex' means." *Grimm*, 972 F.3d at 618.

Plaintiffs assert that excluding girls who are transgender is not discriminatory because "biological males and biological females are not in fact similarly situated" for purposes of sex-separated athletic teams. Pls.' Br. 10 (quoting case involving cisgender boys and girls). But

57

Andraya, Terry, and other transgender girls who qualify to participate under the CIAC policy are not cisgender boys. They are girls who live and express themselves as girls in all aspects of daily life, and who are recognized as girls in school and state records. If they cannot participate in school sports as girls, they cannot participate at all. *See Grimm*, 972 F.3d at 624 (Wynn, J., concurring) (requiring students to choose between using the restroom associated with their physiology or a private, single-stall restroom "is no choice at all because" the policy "completely misses the reality of what it means to be a transgender [girl]"); *Hecox*, 479 F. Supp. 3d at 977 (forcing girls who are transgender to "[p]articipat[e] in sports on teams that contradict one's gender identity" would "entirely eliminate[] their opportunity to participate in school sports.").[18]

Categorically banning girls who are transgender from girls' sports teams based solely on their genetics and anatomy at birth would therefore "exclude[]" them "from participation in," "den[y]" them "the

---

[18] Moreover, even assuming *arguendo* that the "similarly situated" analysis should focus solely on physiology, the relevant physiological differences between transgender girls and non-transgender girls would be based on levels of circulating testosterone, not genetics or anatomy at birth. Plaintiffs nevertheless demand an injunction that excludes all girls who are transgender, regardless of whether they underwent endogenous puberty and experienced physiological changes caused by testosterone.

benefits of," and "subject[]" them "to discrimination under" an educational program receiving federal financial assistance, in violation of Title IX's plain text. 20 U.S.C. § 1681(a).

## C. Plaintiffs' Requested Injunctions Would Violate the Equal Protection Clause.

Granting Plaintiffs' requested injunctions would also violate the Equal Protection Clause. *See B.P.J.*, 2021 WL 3081883, at *4-6 (granting preliminary injunction against West Virginia law); *Hecox*, 479 F. Supp. 3d at 972 (granting preliminary injunction against Idaho law); *Boyertown Area Sch. Dist.*, 897 F.3d at 536 (refusing to grant preliminary injunction that "would essentially replicate" a school district policy that violated the Fourteenth Amendment).

Discrimination against transgender students is subject to heightened scrutiny under the Equal Protection Clause for two independent reasons. First, discrimination based on transgender status is at least a quasi-suspect classification based on the same factors this Court considered when it recognized sexual orientation as a quasi-suspect classification in *Windsor v. United States,* 699 F.3d 169 (2d Cir. 2012), *aff'd,* 570 U.S. 744 (2013). These include:

59

> A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable, or distinguishing characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless.

*Id.* at 181 (internal quotation marks, brackets, and citations omitted).

Applying that same test, the Fourth Circuit, the Ninth Circuit, and district courts across the country have held that discrimination based on transgender status requires heightened review under the Equal Protection Clause. *See, e.g.*, *Grimm*, 972 F.3d at 611-13; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

Second, excluding transgender students from sex-separated teams based on presumptions about their bodily sex characteristics would also independently trigger heightened scrutiny because it is inherently a form of sex discrimination. A policy purporting to define a "biological girl" for purposes of participating in sex-separated teams "cannot be stated without referencing sex" and would therefore be "inherently based upon a sex-classification." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). "[A]ll gender-based

60

classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation marks omitted).

The requested injunctions could not withstand heightened scrutiny. To survive heightened scrutiny, Plaintiffs' injunctions must serve an important governmental interest and "the discriminatory means employed" must be "substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). Here, even accepting Plaintiffs' allegations as true, Plaintiffs' own pleading demonstrates that their requested injunctions are not substantially related to the important governmental interest of providing equal athletic opportunity. As noted above, Plaintiffs' factual allegations do not plausibly support that they have actually been deprived of equal athletic opportunities at all.

Moreover, there is a critical difference between providing sex-separated sports teams for boys and girls and enacting discriminatory rules that bar girls who are transgender from participating on the same teams as other girls. Courts applying heightened scrutiny have held that providing sex-separated teams is substantially related to advancing an important governmental interest in "redressing past discrimination

61

against women in athletics and promoting equality of athletic opportunity between the sexes." *Clark, ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). But as explained by the district court in *Hecox*, those important interests are not similarly served by banning girls who are transgender from participating. "First, like women generally," and unlike cisgender men, "women who are transgender have historically been discriminated against, not favored." *Hecox*, 479 F. Supp. 3d at 977. Second, excluding girls and women who are transgender from participating in women's sports, and forcing them to participate in a manner inconsistent with their gender identity, would effectively prevent girls who are transgender from participating in school sports entirely. *Id.* Third, because transgender people represent just a small percentage of the population, "it appears untenable that allowing transgender women to compete on women's teams would substantially displace [non-transgender] female athletes." *Id.* at 977-78. And fourth, girls and women who receive puberty blockers or suppress testosterone through gender-affirming hormone therapy do not have the same presumed athletic advantages as cisgender males. *Id.* at 978.

62

The Complaint suffers from the same flaws as the Idaho statute at issue in *Hecox*. Granting Plaintiffs' request for a sweepingly overbroad and discriminatory injunction would not be substantially related to any interest in promoting equal athletic opportunity and could not survive heightened scrutiny.

## III. The Request for Reassignment on Remand Should Be Denied.

"Reassignment of a case is an extreme remedy, rarely imposed," and this Court "will only reassign a case on remand in an extraordinary case." *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 152 (2d Cir. 2021) (internal quotation marks omitted). "Reassignment of a case on remand should occur only when the facts might reasonably cause an objective observer to question the judge's impartiality." *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) (internal quotation marks and citations omitted). Those circumstances are entirely absent here.

### A. The Court's Order Was Consistent With Its Duty to Maintain Civility in Legal Proceedings.

Judge Chatigny's request for civility did not create any objective appearance of bias. Federal judges must not only "be patient, dignified, respectful, and courteous to litigants," but must also "require similar

63

conduct by those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process." Code of Conduct for U.S. Judges, Canon 3(A)(3). In carrying out these responsibilities, the Court acted well within its discretion in admonishing counsel to stop gratuitously referring to two teenage girls who are transgender as "males, period." JA022.

Judge Chatigny is not the only judge who has admonished Plaintiffs' counsel for gratuitously misgendering girls who are transgender. On May 26, 2020—over a month after Judge Chatigny's order—Plaintiffs' counsel filed a Motion to Intervene in *Hecox* on behalf of a cisgender college athlete to defend Idaho's ban on women who are transgender from participating in women's sports. Motion to Intervene, *Hecox v. Little*, No. 1:20-cv-00184-DCN (D. Idaho May 26, 2020), ECF No. 30-1. Chief Judge Nye noted that the motion to intervene was "replete with references to [the transgender female plaintiff] using masculine pronouns" and "refer[red] to other transgender women by their former male names." *Hecox*, 479 F. Supp. 3d at 956-57. Judge Nye expressed "concern[]" about "this conduct, as other courts have denounced such misgendering as degrading, mean, and potentially mentally devastating

64

to transgender individuals." *Id.* at 957. The judge noted that other terminology could "make[] counsel's point without doing so in an inflammatory and potentially harmful manner." *Id.* at 957 n.11. The court ultimately granted the motion to intervene because counsel refrained from misgendering the plaintiff and other transgender women during oral argument, and admonished counsel to "continue this practice in future filings and arguments before the Court." *Id.* at 957.

As Judge Chatigny and Judge Nye properly recognized, respecting a person's gender identity—or, at a minimum, refraining from gratuitously misgendering them—is common courtesy. Courts routinely respect the gender identity of litigants when referring to them with pronouns and honorifics, and require counsel to do the same. *See, e.g.*, *Canada v. Hall*, No. 18-CV-2121, 2019 WL 1294660, at *1 n.1 (N.D. Ill. Mar. 21, 2019) (stating "the Court would be derelict if it failed to note the defendants' careless disrespect for the plaintiff's transgender identity, as reflected through implications that the plaintiff might not actually be transgender and the consistent use of male pronouns to identify the plaintiff" and further "caution[ing] counsel against maintaining a similar tone in future filings"); *Lynch v. Lewis*, No. 7:14-CV-24 HL, 2014 WL

65

1813725 at *2 n.2 (M.D. Ga. May 7, 2014) (requiring the use of correct pronouns and explaining that "[s]uch use is not to be taken as a factual or legal finding. The Court will grant Plaintiff's request as a matter of courtesy, and because it is the Court's practice to refer to litigants in the manner they prefer to be addressed when possible."); *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 740 n.2 (N.D. Iowa 1999), *aff'd in part, rev'd in part on other grounds*, 249 F.3d 755 (8th Cir. 2001) ("As a matter of courtesy, the masculine pronoun will be used in reference to the plaintiff throughout this opinion, as it was throughout the trial by all parties. The court appreciates such courtesy from all counsel and witnesses, whatever the legal merits on any issue may be.").

Nor is there anything novel about Judge Chatigny's recognition that deliberately and repeatedly referring to girls and women who are transgender as "men" or "males" can be a form of "bullying." *See T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 577 (4th Cir. 2018) (describing student's harassment of transgender female teacher by referring to her as "Mr.," "sir," "he," and "him," as "pure meanness"); *Hampton v. Baldwin*, No. 3:18-cv-550, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (referencing expert testimony that

66

"misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating"); *State v. Cantrill*, No. L-18-1047, 2020 WL 1528013, at *8 (Ohio Ct. App. Mar. 31, 2020) (agreeing that "using an individual's preferred pronouns demonstrates respect for that person's dignity, regardless of what the law may require or prohibit" and reaffirming that "[t]here is no place in our judicial system for malice, disparagement, or intentional disrespect toward any party, witness, or victim").

Requiring counsel to address parties with courtesy and civility is not bias. It is part of a judge's responsibility to ensure that all litigants are afforded equal dignity when they seek justice from the courts.

## B. The Court's Request for Civility Did Not Prejudge the Merits of Plaintiffs' Legal Claims.

Judge Chatigny was clear that in instructing Plaintiffs to stop referring to Andraya and Terry as "'males,' period," he was not precluding Plaintiffs from arguing that the term "sex" in Title IX must be defined by physiology. The Court did not order Plaintiffs to refer to Terry and Andraya as "females" or "transgender females." The Court further clarified that Plaintiffs may refer to them as "transgender athletes"—and may even refer to girls who are transgender as "biologically male,"

67

individuals with "male bodies" and individuals who went through "male puberty." JA022, JA109.[19]

Plaintiffs take particular issue with the district court's statement that referring to girls who are transgender as "transgender females" is "consistent with science." JA107. But Plaintiffs completely ignore the Court's explanation in its order denying the motion to recuse. As the Court explained, "the 'science' I referred to is not the science relating to the issue of unfair competitive advantage but the science that tells us calling transgender girls 'males' can cause significant mental and emotional distress." JA022. In reaching that conclusion Judge Chatigny could properly rely upon the evidence presented in the Individual Intervenors' declarations, and other sources in their Motion to Intervene. Plaintiffs can continue to argue that sex-separated teams under Title IX must be defined based on certain physiological and biological characteristics while still extending common courtesy to Andraya and Terry. *See Hecox*, 479 F. Supp. 3d. at 957 n.11.

---

[19] Intervenor-Defendants do not concede that using the phrase "biologically male" or "physiologically male" would be medically accurate terminology to describe girls who are transgender. *See supra* p. 35.

68

## C. The Court Did Not "Trivialize[] Female Athletes' Achievements."

Judge Chatigny also acted appropriately in evaluating the plausibility of Plaintiffs' assertions that retroactively changing Chelsea Mitchell's records would have a non-speculative impact on future employment prospects. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In fulfilling those duties, Judge Chatigny noted that even if Mitchell were allowed to retroactively add four additional championship titles to her resume, an employer would inevitably know that Mitchell "did not actually finish first in [those] races." JA277-78.

Plaintiffs' assertion that Judge Chatigny was denigrating the importance of female athletic achievement is utterly baseless. No reasonable person could read Judge Chatigny's opinion and conclude that he was commenting about the comparative value of so-called "female bodied" and "male bodied" athletes. Pls.' Br. 53. Rather, Judge Chatigny was observing that—as Plaintiffs themselves admit—"[s]ociety values and awards those who win *according to the rules of the game*." Pls.' Br. 24 (emphasis added). At the time the races occurred, the rules of the game

69

allowed Andraya and Terry to participate. According to the rules of the game, Mitchell did not finish first. Retroactively declaring Mitchell to be the winner does not change that fact.

### D. The Court Did Not "Sit[] On" Plaintiffs' Motion for a Preliminary Injunction.

Finally, Plaintiffs misleadingly accuse Judge Chatigny of creating the appearance of bias by "sitting on the motion for a preliminary injunction." Pls.' Br. 14; *see also id.* at 51 (accusing Judge Chatigny of displaying a "high degree of . . . antagonism" by delaying ruling on the motion for a preliminary injunction). Incredibly, Plaintiffs level this accusation without even mentioning COVID-19 or the cancelation of the spring 2020 track season. As discussed above, and as reflected on the district court docket, the district court deferred the motion for preliminary injunction until it became clear whether the spring 2020 season would take place in light of the global pandemic and, thus, whether Plaintiffs would actually have a need for preliminary injunctive relief. *See* JA014 (ECF No. 68); JA015 (ECF No. 79); JA016 (ECF No. 82). A reasonable observer aware of all the facts would not conclude that Judge Chatigny created an appearance of bias in doing so.

70

## CONCLUSION

The decision of the district court should be affirmed, and the request for reassignment on remand should be denied.

Respectfully submitted,

/s/ Joshua Block_____
Joshua Block
Lindsey Kaley
Galen Sherwin
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2593
jblock@aclu.org

Elana Bildner
Dan Barrett
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
ebildner@acluct.org

*Counsel for Intervenor Defendants-Appellees Andraya Yearwood and Thania Edwards on behalf of T.M.*

71

## Federal Rules of Appellate Procedure Form 6
## Certificate of Compliance with Rule 32(a)

1.  This brief complies with the type-volume limits of Fed. R. Ap. P. 32(a)(7)(B), as well as Local Rule 32.1(a)(4), because it contains 13,981 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as well as Local Rule 32.1, because it has ben prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook font.

/s/ Joshua Block
Joshua Block

October 7, 2021

72