# 21-1365

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

FOR THE SECOND CIRCUIT

Selina Soule, a minor, by Bianca Stanescu, her mother, Chelsea Mitchell, a minor, by Christina Mitchell, her mother, Alanna Smith, a minor, by Cheryl Radachowsky, her mother, Ashley Nicoletti, a minor, by Jennifer Nicoletti, her mother,

Plaintiffs-Appellants,

v.

Connecticut Association of Schools, Inc, DBA Connecticut Interscholastic Athletic Conference, Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education, Glastonbury Public Schools Board of Education, Canton Public Schools Board of Education, Danbury Public Schools Board of Education,

Defendants-Appellees,

Andraya Yearwood, Thania Edwards, on behalf of her daughter T.M., Commission on Human Rights and Opportunities,

Intervenor-Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, CASE 3:20-CV-00201 (RNC)

## BRIEF FOR DEFENDANTS - APPELLEES

PETER J. MURPHY
LINDA L. YODER
SHIPMAN & GOODWIN LLP
ONE CONSTITUTION PLAZA
HARTFORD, CT 06103
TELEPHONE: 860-251-5000
FACSIMILE: 860-251-5316
EMAIL:
PJMUPRHY@GOODWIN.COM

FOR THE CIAC AND THE
DANBURY BOARD OF EDUCATION

DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 WETHERSFIELD AVENUE
HARTFORD, CT 061114
TELEPHONE: 860-249-1361
FACSIMILE: 860-249-7665
EMAIL:
DMONASTERSKY@HL-LAW.COM

FOR THE CANTON BOARD OF
EDUCATION AND
THE GLASTONBURY BOARD OF
EDUCATION

JOHANNA G. ZELMAN
FORDHARRISON, LLP
CITYPLACE II
185 ASYLUM STREET
HARTFORD, CT 06103
TELEPHONE: 860-740-1355
FACSIMILE: 860-578-2075
EMAIL:
JZELMAN@FORDHARRISON.COM

FOR THE CROMWELL BOARD
OF EDUCATION AND
THE BLOOMFIELD BOARD OF
EDUCATION

MICHAEL E. ROBERTS
COMMISSION ON HUMAN
RIGHTS AND OPPORTUNITIES –
450 COLUMBUS BLVD.
SUITE 2
HARTFORD, CT 06103
TELEPHONE: 860-541-4715
FACSIMILE: 860-241-4869
EMAIL:
MICHAEL.E.ROBERTS@CT.GOV

FOR THE COMMISSION ON
HUMAN RIGHTS AND
OPPORTUNITIES

# Table of Contents

COUNTER STATEMENT OF THE ISSUES ............................................. 1

COUNTER STATEMENT OF THE CASE ................................................ 1

SUMMARY OF THE ARGUMENT ......................................................... 11

ARGUMENT ........................................................................................ 13

I.  The District Court correctly held that Smith's and Nicoletti's claims are moot and that it lacked subject matter jurisdiction over their claim for an injunction against the CIAC Policy. ................. 13

    A.  *Standard of Review is "Clear Error" for Factual Findings and "De Novo" for Legal Conclusions*...............................................14

    B.  *The "Absolutely Clear" Burden Asserted by Plaintiffs Applies only to the Voluntary Cessation Doctrine, which is Irrelevant Here*...........15

    C.  *Smith and Nicoletti's Claim for Injunctive Relief is Moot*.............16

    D.  *Plaintiffs Have Failed to Prove that the Harm Alleged is "Capable of Repetition, Yet Evading Review."*.....................................19

    E.  *Neither Smith nor Nicoletti are Actively Harmed by the Mere Existence of the CIAC Policy*...........................................21

II.  Plaintiffs do not have standing to pursue injunctive relief tied to altering records of races from prior school years ........................... 25

    A.  *Standard of Review*.......................................................25

    B.  *The District Court properly concluded that concerns about lost educational and employment opportunities were too speculative to provide Plaintiffs with standing*................26

        i.  *Plaintiffs have failed to allege lost educational opportunities that are non-speculative*................27

10457644

ii. *Plaintiffs' claim that an inaccurate record will lead to lost employment opportunities is improper and highly speculative*..............................................32

C. *Plaintiffs personal desires do not provide standing*...........37

III. The District Court properly dismissed Plaintiffs' claims for monetary damages ..........................................................................42

IV. Alternatively, the District Court's order dismissing the case should be upheld because the CIAC policy does not violate Title IX ......................................................................................................48

V. This case should not be reassigned if remanded ...........................49

A. *Legal Standards Governing Reassignment*.......................48

B. *Judges Must Enforce "Duties of Courtesy"*.................…..…..51

C. *Since Intentional and Deliberate Misgendering has been Widely Recognized as a Form of Harassment, A Judge does not Display Bias in Preventing its Occurrence in Judicial Proceedings*.....................................................................56

D. *Judge Chatigny did not Opine on the Ultimate Issue in Requiring Adherence to the Duty of Courtesy*...............…..62

E. *This Case Lacks the Hallmarks of "Extra Judicial" Comments made in Cases Relied on by Plaintiffs*..............66

CONCLUSION ..........................................................................................70

CERTIFICATION OF COMPLIANCE.................................................72

CERTIFICATION OF SERVICE............................................................72

iv

# Table of Authorities

**Cases**                                                                          **Page**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200, 210-11 (1995)……. ................................................................ 22, 23

*Allen v. Wright,*
468 U.S. 737 (1984)…............................................................................... 40, 41

*Altman v. Bedford Cent. Sch. Dist.,*
245 F.3d 49, 71 (2d Cir.). .......................................................................... 19, 20

*Armstead v. United States,*
347 F.2d 806, 807–08 (D.D.C. 1965)…………………................................................... 54

*Barry v. Lyon,*
834 F.3d 706 (6th Cir. 2016)……….. .......................................................... 20 n.16

*Biediger v. Quinnipiac Univ.,*
691 F.3d 85, 96 (2d Cir. 2012)…………………….. ............................................. 44

*Bd of Ed. of the Highland Local Sch. Dist. V. United States Dept. of Education,*
208 F.Supp.3d 850, 867 (S.D. Ohio 2016)…………….......................................... 43

*Bostock v. Clayton Cty.,*
140 S. Ct. 1731 (2020)…………………….................................................. 55 n.24

*Boucher v. Syracuse Univ.,*
164 F.3d 113, 118 (2d Cir. 1999)…………………. .................................. 18, 22

*Byrne v. Cromwell, Bd. of Educ.,*
243 F.3d 93, 103 (2d Cir. 2001)……………... .................................................. 34

*Canada v. Hall,*
No. 18-CV-2121, 2019 WL 1294660, *1 n.1 (N.D. Ill. Mar. 21, 2019)…........ 55

*City News & Novelty, Inc. v. City of Waukesha,*
531 U.S. 278, 285 (2001)……………… ........................................................ 17

10457644

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398, 408 (2013)……………………….. ..................................... 26, 34, 37

*Cohen v. Brown Univ.,*
    101 F.3d 155 (1ˢᵗ Cir. 1996)…………………… ..................................... 36, 37

*Conn. Citizens Def. League, Inc. v. Lamont,*
    6 F.4th 439, 446 (2d Cir. 2021)…………………… ..................................... 16, 17

*Cook v. Colgate Univ.,*
    992 F.2d 17 (2d Cir. 1993)……………………….. ..................................... 17, 18, 22

*D.N. v. Gov. R. DeSantis et al.,*
    Case 0:21-cv-61344-RKA…………………………….. ..................................... 32

*Davis v. Monroe County Bd. Of Educ.,*
    526 U.S. 629 (1999)……………………………… ..................................... 47

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629, 640 (1999)……………………… ..................................... 42

*Deeper Life Christian Fellowship, Inc. v. Sobol,*
    948 F.2d 79, 82 (2d Cir. 1991)……………………….. ..................................... 21 n.16

*DeGroat v. Townsend,*
    495 F. Supp. 2d 845, 846 n.3 (S.D. Ohio 2007)………………................... 55, 64

*Dennin v. Connecticut Interscholastic Athletic Conf., Inc.,*
    94 F.3d 96, 101 (2d Cir. 1996)………………………………...................... 20

*Dibari v. Bedford Cent. Sch. Dist.,*
    534 U.S. 827 (2001)……………………………….. ..................................... 19

*DiFolco v. MSNBC Cable LLC,*
    622 F.3d 104, 111 (2d Cir. 2010)…………………… ..................................... 2

*Dodds v. United States Dep't of Educ.,*
    845 F.3d 217 (6th Cir. 2016)…………………… ..................................... 47

vi

*Doe v. City of New York*,
   976 N.Y.S.2d 360, 364 (N.Y. Sup. Ct. 2013)…………….......................... 62

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S.Ct. 2636 (2019)… .............. 47

*Doe ex rel. Doe v. Vermilion Par. Sch. Bd.*,
   421 Fed. Appx. 366, 373 (5th Cir. 2011)……………… ....................... 22, 23

*Doyle v. Midland Credit Mgmt., Inc.*,
   722 F.3d 78, 80 (2d Cir. 2013)……………………… ................................. 14

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019), *cert. denied sub nom*…………………….. 55 n.24

*Etsitty v. Utah Transit Auth.*,
   502 F.3d 1215 (10th Cir. 2007)……………….. ........................................ 64

*Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 868
   F.3d 1248, 1268 (11th Cir. 2017)…………….. ................................................ 38

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992)………………………………… ....................................... 46, 47

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
   822 F.3d 709 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239
   (2017)…………………………………………….................................. 47

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998)……………………………….. ................................. 46, 47

*Hamilton v. Alabama*,
   376 U.S. 650 (1964)………………………………… ........................ 53 n.23

*Hampton v. Baldwin*,
   No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, *2 (S.D. Ill. Nov. 7,
   2018)……………………………………………….................................. 59

*Hecox v. Little*,
   479 F. Supp. 3d 930, 957 n.11 and n.12 (D. Idaho 2020)……… 56 n.25, 59, 64

10457644

*Honig v. Doe*,
484 U.S. 305 fn. 6 (1988)…………………………………….. ...... 20 n.16, 21

*Idaho Dept. of Correction v. Edmo*,
141 S. Ct. 610 (2020)………………………………………… ....... 55 n.24

*In re J.P. Linahan, Inc.*,
138 F.2d 650, 654 (2d Cir. 1943)……………………………… ............. 57

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167, 169 (2005)……………………………………… ................ 46

*Jameson v. Donahoe*,
EEOC Appeal No. 0120130992, 2013 WL 2368729, *2
(May 21, 2013)………………………………………………… .................... 61

*Johnson v. Virginia*,
373 U.S. 61, 62 (1963)………………………………… ...................... 53

*K. L. v. Missouri State High Sch. Activities Ass'n*,
178 F. Supp. 3d 792, 799 (E.D. Mo. 2016)……………………………...... 29

*Kapur v. Fed. Commc'ns Comm'n*,
991 F.3d 193, 196 (D.C. Cir. 2021)………………………………. ......... 38

*Ketcham v. City of Mount Vernon*,
992 F.3d 144, 152 (2d Cir. 2021)……………………………............ 49

*Lacewell v. Off. of Comptroller of Currency*,
999 F.3d 130, 141 (2d Cir. 2021)……………………….................... 26

*Ligon v. City of New York*,
736 F.3d 118, 128 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d
362 (2d Cir. 2014)……………………………………. .................. 49, 66, 68

*Liteky v. United States*,
510 U.S. 540, 555 (1994)…………………………………50, 52, 56, 58, 67, 69

viii

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555, 564 n. 2 (1983)…………………………………… ... 23, 25, 26

*Lynch v. Lewis*,
  No. 7:14-CV-0024 (HL), 2014 WL 1813725, *4 n.3 (M.D. Ga. Mar. 24,
  2014)……………………………………………........................... 55, 64

*Lyndonville Sav. Bank & Tr. Co. v. Lussier*,
  211 F.3d 697, 701 (2d Cir. 2000)……………… ................................. 15, 26

*Marshall v. New York State Pub. High Sch. Athletic Ass'n, Inc.*,
  374 F. Supp. 3d 276, 286 (W.D.N.Y. 2019)……………………… ........ 18

*Mauclaire v. State of Conn. Dept. of Educ.*,
  397 F.3d 77, 86 (2d Cir 2005)………………………....................... 21

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275, 296 (2d Cir. 2004)……………… ........................... 39, 40, 44

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*,
  861 F.3d 40, 47-49 (2d Cir. 2017)………………….................................. 22

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
  819 F.3d 581, 603–04 (2d Cir. 2016)…………………………........... 15

*Middleton v. State*,
  64 N.E.3d 895, 902 (Ind. Ct. App. 2016)…………………… ................. 54

*Murphy v. Hunt*,
  455 U.S. 478, 482 (1982)…………………………………… ...................... 20

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. V. Jacksonville*,
  508 U.S. 656, 666 (1993)………………………… ...................... 22, 23

*Parents for Privacy v. Barr*,
  949 F.3d 1210 (9th Cir.), *cert. denied*, 141 S.Ct. 894 (2020)…. ................ 47, 63

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701, 718 (2007)………………………… ............................ 22, 23

ix

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
  667 F.3d 910, 916 (7th Cir. 2012)……………………............................ 39

*Pederson v. Louisiana State Univ.*,
  213 F.3d 858, 871 (5th Cir. 2000)…………………………….…........ 22, 23

*Pennhurst State School and Hospital v. Halderman,*
  451 U.S. 1, 17 (1981)……………………………………… ......... 22 n.18, 42

*Prescott v. Rady Children's Hosp.-San Diego*,
  265 F. Supp. 3d 1090, 1096 (S.D. Cal. 2017)…………………… ............... 59

*Qz'etax v. Ortiz*,
  170 Fed. Appx. 551, 553 (10th Cir. 2006)……………………….. .................. 54

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
  743 F.3d 11, 24 (2d Cir. 2014)……………………………………….. ........ 57 n.26

*Robinson v. Sessions*,
  721 Fed. App'x 20, 24 (2d Cir. 2018)……………………….......................... 42

*Rumble v. Fairview Health Servs*.,
  No. 14-CV-2037, 2015 WL 1197415, *71
  (D. Minn. Mar. 16, 2015)……………………………………….. ........................... 61

*Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*,
  260 F.3d 114, 118 (2d Cir. 2001)…………………………………….. ........ 17, 19, 20

*Smith v. Rasmussen*,
  57 F. Supp. 2d 736, 740 n.2 (N.D. Iowa 1999)…………………… ................. 55

*Southern Pacific Terminal Co. v. ICC*,
  219 U.S. 498 (1911)……………………………………….. ................................. 19

*State v. Bright*,
  916 P.2d 922, 926 n.23 (Wash. 1996)……………………………........................ 54

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83, 107 (1998)……………………………………….. ....................... 38, 39

x

*Sulzer Mixpac AG v. A&N Trading Co.*,
　988 F.3d 174, 184 (2d Cir. 2021)…………………………….. ......................... 48

*T.B., Jr. by & through T.B., Sr. v. Prince George's Cty. Bd. of Ed.*,
　897 F.3d 566, 577 (4th Cir. 2018), *cert. denied*,
　139 S. Ct. 1307 (2019)………………………….......................................... 61

*United States v. Awadallah*,
　436 F.3d 125, 135 (2d Cir. 2006)……………………….......................... 49, 50

*United States v. Bayless*,
　201 F.3d 116, 127 (2d Cir. 2000)……………………….................. 65, 66, 67

*United States v. Lauersen*,
　648 F.3d 115, 115 (2d Cir. 2011)……………………….................................. 40

*United States v. McGrath*,
　80 Fed. Appx. 207, 208 n.1 (3d Cir. 2003)………………………… ............... 54

*United States v. Wedd*,
　993 F.3d 104, 116 (2d Cir. 2021)………………………….................... 50

*Video Tutorial Servs., Inc. v. MCI Telecommunications Corp.*,
　79 F.3d 3, 6 (2d Cir. 1996)………………………………….................... 20

*Weinstein v. Bradford*,
　423 U.S. 147, 149 (1975)……………………………………………… 19, 20

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d
　1034 (7th Cir. 2017)……………………….. ....................................... 43, 47

## Other Authorities

*Chan Tov McNamarah, Misgendering as Misconduct, 68 UCLA L. REV
　DISCOURSE 40, 49 n.36 (2020)*…………………………………………… ..60

*CIAC By-Laws Article IX, Section B)*....................................................... .2

*Code of Conduct for U.S. Judges, Canon 3(A)(3) (2019)*…………………..52

xi

*Connecticut Rules of Professional Conduct have recently been amended to include a similar prohibition. 83 Conn. L.J., No. 2, p. 35-36PB (July 13, 2021)*……………………………………………........ .52

*Irene J. Dolan et. al. Misgendering and experiences of stigma in health care settings for transgender people, 212 THE MEDICAL JOURNAL OF AUSTRALIA 1 (2020); Kristie L. Seelman, et. al., Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults, 2 TRANSGENDER HEALTH 1 (2017)*……………..60

*Julia Serano, WHIPPING GIRL: A TRANSSEXUAL WOMAN ON SEXISM AND THE SCAPEGOATING OF FEMININITY 185 (2007)*…………………………61

*Kevin A. McLemore, Experiences With Misgendering: Identity Misclassification of Transgender Spectrum Individuals, 14 SELF & IDENTITY 51, 60 (2015)*………………………………………………...59

*McNamarah, Misgendering as Misconduct, at 49 n.36*…………………. 63

*Model Rules of Prof'l Conduct r.8.4(g) (Am. Bar Ass'n 2018)*……...........52

*Sally McConnell-Ginet, What's in a Name? Social Labeling and Gender Practices, in THE HANDBOOK OF LANGUAGE AND GENDER 69, 73 (Janet Holmes & Miriam Meyerhoff eds., 2003)*……………………………… 63

*Sandy E James Et Al., The Report of the 2015 U.S. Transgender Survey 4, NAT'L CTR. FOR TRANSGENDER EQUALITY (2016)*……………………59

10457644

## COUNTER-STATEMENT OF THE ISSUES

1.      Did the district court properly hold that Ashley Nicoletti and Alanna Smith's requests for prospective injunctive relief were moot?

2.      Did the district court properly hold that Plaintiffs lacked standing to seek the requested injunction requiring Defendants to alter records related to races completed several years ago?

3.      Did the district court properly dismiss Plaintiffs' claims for monetary damages because Defendants' lacked prior notice that their conduct violated Title IX?

4.      Alternatively, should the district court's order dismissing Plaintiffs' Amended Complaint be affirmed on the grounds that the CIAC policy does not violated Title IX, as fully set forth in the brief of the intervenor-defendants Terry Miller and Andraya Yearwood?

5.      Whether, if this case is remanded, this Court should reassign the case to a different judge in the District of Connecticut?

## COUNTER-STATEMENT OF THE CASE

Because the district court granted Defendants' motion to dismiss, this factual background section is based on the allegations in the operative complaint, any documents attached to the complaint or

1

10457644

incorporated by reference in the complaint, and other facts of which judicial notice may be taken. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

A.    <u>The CIAC Policy</u>

Since 2013, the Connecticut Interscholastic Athletic Conference ("CIAC") has followed a policy of allowing students who are transgender to play on sex-separated sports teams that are consistent with their gender identity if they meet certain criteria. (JA149, ¶74)[1] (*citing* CIAC By-Laws Article IX, Section B).[2] The CIAC Policy specifies that:

> The CIAC is committed to providing transgender student-athletes with equal opportunities to participate in CIAC athletic programs consistent with their gender identity. Hence, this policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates [at the time of birth].[3]

---

[1] On July 9, 2021, Plaintiffs filed a two-volume Joint Appendix. FRAP 30(b)(1) requires the parties to meet and confer about the contents of the Appendix, and sets forth a process to resolve any disagreements. In this case, the Plaintiffs' counsel failed to confer with counsel for any of the Defendants before filing the "Joint Appendix."

[2] The CIAC By-Laws are available online at
http://www.casciac.org/ciachandbook.

[3] Of course, some transgender students may have had their gender markers changed on their birth certificates as part of the process of transitioning. The CIAC policy would cover those students as well.

CIAC By-Laws Article IX, Section B. The policy acknowledges that any other rule would be "fundamentally unjust and contrary to applicable state and federal law." *Id.* For purposes of the CIAC policy, a student's school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." *Id.* By submitting a team roster to the CIAC, each school district "is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*

B. <u>Andraya Yearwood and Terry Miller</u>

Individual Intervenor-Defendants Andraya Yearwood and Terry Miller attended the Cromwell Public Schools ("Cromwell") and Bloomfield Public Schools ("Bloomfield"), respectively. (JA133, ¶¶15–16)

3

They are teenage girls who are transgender, which means that they have a gender identity that differs from their sex designated at birth.[4]

Pursuant to the CIAC policy, Yearwood competed on the girls' track-and-field team at Cromwell High School for the 2017, 2018, and 2019 indoor and outdoor seasons. (JA151-56 ¶¶90, 91, 99).[5]  Miller competed on the girls' track-and-field team at Bloomfield High School for the 2018 outdoor season and the 2019 indoor and outdoor seasons. (JA153-55, ¶¶88–91)[6] Both Yearwood and Miller also competed on the girls' track-and-field team for the 2020 indoor season, but they graduated from high school in 2020. (Pl. Brief pg. 8).

---

[4] *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018) (quoting Endocrine Society's clinical practice guidelines).

[5] The published results of all of Yearwood's track-and-field events ("Yearwood's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14519891. A copy was attached as Exhibit A to Defendants Memorandum of Law in Support of Motion to Dismiss ("Mem.") [Ecf.145-1].

[6] The published results for Miller's events ("Miller's Results"), Ex. B. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14046370.

10457644

C.    **Plaintiffs**

Plaintiffs are four non-transgender girls: Selina Soule,[7] Chelsea Mitchell,[8] Alanna Smith,[9] and Ashley Nicoletti.[10] Soule and Mitchell have now graduated from high school. (Pl. Brief pg. 8). Thus, the only parties to this case who are current high school students are Smith and Nicoletti. (JA170, 175-77) (stating that only plaintiffs Smith and Nicoletti are seeking prospective injunctive relief) (Pl. Brief pg. 9, n.2).

D.    **Plaintiffs' Participation in High School Girls' Track**

The high schools attended (or formerly attended) by Plaintiffs and the Individual Intervenor-Defendants all participate in the CIAC for

---

[7] The published results for Soule's events ("Soule's Results"), Ex. C to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=10678905.

[8] The published results of Mitchell's events ("Mitchell's Results"), Ex. D. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=12095608.

[9] The published results of Smith's events ("Smith's Results"), Ex. E. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L=4.

[10] The published results of Nicoletti's events ("Nicoletti's Results"), Ex. F to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14752303.

5

outdoor and indoor track. Schools are grouped by size, or "Class": Class S, M, L, or LL. Schools generally compete against schools their same size. At the end of the season, there is a Class championship meet in both indoor and outdoor track. (JA150 ¶79) The students with the five fastest times in, for example, the girls' outdoor track 100m final at the Class M championship advance to the subsequently held State Open Championship. (JA150-53, ¶¶79, 81, 87) At the State Open, students from the various Classes compete against each other in each race. *Id.* After some preliminary heats, the top finishers race in the final heat of, for example, the girls' outdoor track 100m final, and have the opportunity to move on to the New England Championship. *Id.*

Plaintiffs assert that girls who are transgender have an unfair "athletic advantage," and that Yearwood and Miller's participation in girls' track-and-field events deprives Plaintiffs of equal athletic opportunity on the basis of sex in violation of Title IX. (JA173-75, ¶¶165–66, 175–76). Plaintiffs assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' high school athletic events, Plaintiffs "are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and

6

the satisfaction, public recognition, and scholarship opportunities that can come from victory." (JA148, ¶70) Despite these sweeping assertions, Plaintiffs only identify a few specific instances in which Yearwood or Miller allegedly had any impact on Plaintiffs' athletic opportunities.

i.   *Selina Soule.*

Soule identifies only one instance in which she was allegedly denied an athletic opportunity as a result of competing against either Yearwood or Miller. (JA154-55 ¶¶91–92) (Pl. Brief pg. 7) During the 2019 indoor track season, Soule competed against Yearwood and Miller in the 55m dash at the State Open Championship. (JA154 ¶91). In the preliminary race, to determine eligibility for the final heat of the State Open Championship in the 55m dash, Miller had the fastest time and Yearwood had the second-fastest. *Id.* Soule had the eighth-fastest time—behind Miller, Yearwood, and five other, non-transgender girls, including Mitchell—and therefore failed to qualify for the final 55m championship race. *Id.*

ii.   *Ashley Nicoletti*

Nicoletti also only cites one instance in which she was allegedly denied an athletic opportunity as a result of competing against either

7

Yearwood or Miller. (JA157 ¶100) During the 2019 outdoor season, Nicoletti competed against Yearwood and Miller in the 100m at the S Class Women's Outdoor Track Finals. *Id.* In the preliminary race, to determine eligibility for the final heat, Mitchell had the fastest time, Miller had the second- fastest time, and Yearwood had the third-fastest time. *Id.* Nicoletti had the ninth-fastest time and failed to qualify for the final. *Id.*

   iii. *Alanna Smith.*

Smith also cites only one occasion where she was negatively affected by Yearwood or Miller's participation. (JA158 ¶ 102) During the 2019 outdoor season, Smith competed against Miller in the 200m State Open Championship. *Id.* Miller placed first, and Smith placed third. *Id.*

   iv. *Chelsea Mitchell*

Plaintiff Chelsea Mitchell competed against Yearwood and Miller on several occasions, beating them in some races and finishing behind them in others. (JA154-58 ¶¶ 91, 100–02) For example, in the 2019 outdoor season, Mitchell outperformed both Miller and Yearwood in the preliminary heat in the 100m S Class championship, but then finished

8

behind Yearwood and in front of Miller in the final of that even*. Id.*
¶¶ 100–01. Miller identifies four races in total where, if Miller and/or
Yearwood did not participate, she would have finished first and "won"
the race.  *Id.* ¶ 108.

### E.    Plaintiffs' Claims and Requested Relief

Plaintiffs assert that as a result of Yearwood and Miller's
participation in track and field, Defendants have violated Title IX by
failing to effectively accommodate the athletic abilities of girls, and
failing to provide equal treatment, benefits, and opportunities for girls'
athletics. (JA175-76) For these alleged violations, Plaintiffs seek
nominal and compensatory damages. *Id.* Plaintiffs also seek prospective
relief in the form of a declaratory judgment and three injunctions. *Id.*

- Plaintiffs Smith and Nicoletti request "[a]n injunction
  prohibiting all Defendants . . . from permitting males [sic]
  from participating in events that are designated for girls,
  women, or females." *Id.*
- All Plaintiffs also seek "[a]n injunction requiring all
  Defendants to . . . remove male [sic] athletes from any
  record or recognition purporting to record times, victories,
  or qualifications for elite competitions designated for girls
  or women, and conversely to correctly give credit and/or
  titles to female athletes who would have received such
  credit and/or titles but for the participation of athletes
  born male and with male bodies in such competitions." *Id.*

- Finally, all Plaintiffs seek "[a]n injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women." *Id.*

## F.   Procedural history.

On February 12, 2020, Plaintiffs filed their Complaint and request for expedited hearing, which they did not serve on Defendants until February 18 and 19, 2020. (JA009 #1; JA011 #26) On February 27, 2020, the district court held a telephone status conference. (JA012 #52) Shortly thereafter, the COVID-19 pandemic forced significant changes upon all aspects of life, including high school sports. Specifically, the first COVID-19 case in Connecticut was announced March 8, 2020, and on March 10, the CIAC cancelled all games and tournaments for winter sports.[11] "On March 15, [Governor] Lamont signed an executive order directing all schools to cancel in-person education through the end of the month. The next day, the state ordered the closure of restaurants. Within weeks, the state was essentially locked down." *Id.* After initially

---

[11] Shawn McFarland, "One year ago, the CIAC cancelled high school sports due to COVID-19. Here's how the decision went down." Hartford Courant, available at: https://www.courant.com/sports/high-schools/hc-sp-prem-ciac-cancelled-winter-sports-tournament-one-year-ago-20210309-j5xhb4yjmnh37jo77o22xrgppq-story.html.

postponing the spring sports season, the CIAC voted By May 2020 to permanently cancel that season.[12]

On May 4, 2020, the district court held a pre-filing conference. (JA020 #101) On August 11, 2020, Plaintiffs filed a Second Amended Complaint. (JA130) On August 21, 2020, Defendants filed a joint motion to dismiss. (JA025 #145) On April 25, 2021, the district court granted the Defendants' motion to dismiss. (JA 259).

## SUMMARY OF THE ARGUMENT

The district court did not err in dismissing Plaintiffs' Second Amended Complaint. First, at the time that the motion to dismiss was decided by the Court, Yearwood and Miller had both graduated from their respective high schools, and Plaintiffs have not identified other transgender girls participating in track and field, much less in Plaintiffs' events and at a level to beat Smith or Nicoletti. Their request for prospective injunctive relief was therefore moot, and not capable of repetition yet avoiding review. Furthermore, the district court correctly concluded that Plaintiffs' request for retrospective injunctive relief was

---

[12] Joe Morelli, "CIAC officially cancels 2020 spring season, following schools' closure." Available at https://www.gametimect.com/ciac-expected-to-finally-cancel-spring-season/.

10457644

based on wholesale speculation, as Plaintiffs cannot credibly claim their educational or employment opportunities will be impacted by the results of a handful of races several years ago.

In addition to requesting their requests for injunctive relief, the district court also correctly dismissed Plaintiffs' claims for money damages. At the time the lawsuit was filed, there was simply no legal authority showing that Defendants' conduct violated Title IX. To the contrary, guidance from the Department of Education and holdings from across the country demonstrated that Defendants' conduct comported with Title IX.

For these reasons, Defendants believe that the district court's ruling should be affirmed on appeal. Should this case be remanded, however, it must be remanded to the same judge. Plaintiff's request for reassignment is inappropriate, as Judge Chatigny acted appropriately at all times and has not demonstrated that he has prejudged the case or engaged in any other conduct warranting reassignment.

Finally, even if the District Court erred in its ruling, the Court should affirm the dismissal for the alternative grounds set forth in the brief from Intervenor Defendants Yearwood and Miller. More

10457644

specifically, Title IX does not prohibit girls who are transgender from competing on the girls team. To hold otherwise would itself violate the Title IX and Equal Protection rights of Miller and Yearwood.

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY HELD THAT SMITH'S AND NICOLETTI'S CLAIMS ARE MOOT AND THAT IT LACKED SUBJECT MATTER JURISDICTION OVER THEIR CLAIM FOR AN INJUNCTION AGAINST THE CIAC POLICY.**

In ruling on Defendants' motion to dismiss, the District Court held that Smith's and Nicoletti's[13] claims for **prospective injunctive** relief, *i.e.*, an order that CIAC's policy violates their rights under Title IX, is moot because Miller and Yearwood, "whose participation in girls' track provided the impetus for this action," had graduated. (JA 271-75). Furthermore, the court held that, even if it is "theoretically possible" that a girl who is transgender may attempt to participate in girls' track in the future, injury to Smith and Nicoletti would depend on that hypothetical student participating in their events and winning, which was too speculative to satisfy the "case or controversy" requirement of Article III. *Id.* The district court rejected not only Plaintiffs' argument

---

[13] Plaintiffs concede that Mitchell and Soule have graduated and do not seek prospective injunctive relief. (Pls' Brief, p. 31).

13

that Defendants' burden to prove mootness was heightened, *id.*, but also

that the alleged injury was "capable of repetition, yet evading review"

*Id.* As is specifically relevant here, the district court held that any

possibility of repetition "is <u>not</u> reasonably likely but, at best, only a

theoretical and speculative possibility." (emphasis in original) *id.* at *6.

Plaintiffs fail to set forth any legal basis for overturning the District

Court's ruling.[14]

### A. Standard of Review is "Clear Error" for Factual Findings and "De Novo" for Legal Conclusions.

"Under Article III of the U.S. Constitution, when a case

becomes moot, the federal courts lack subject matter jurisdiction over

the action." (Internal quotation marks omitted). *Doyle v. Midland*

*Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013). "The standard of

review for determinations regarding subject matter jurisdiction is clear

error for factual findings, and *de novo* for the legal conclusion as to

---

[14] Plaintiffs' substantive arguments that the CIAC policy violates Title IX have no bearing on whether Plaintiffs' claims are moot. Defendants further note that Intervenor Defendants Miller and Yearwood have thoroughly examined the substantive arguments in their separately-filed brief setting forth alternative grounds for affirmance, which are incorporated herein.

whether subject matter exists." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 701 (2d Cir. 2000).

**B.    The "Absolutely Clear" Burden Asserted by Plaintiffs Applies only to the Voluntary Cessation Doctrine, which is Irrelevant Here.**

Plaintiffs argue that unless Defendants can prove that it is "absolutely clear" that Plaintiffs "will not face…competition" from girls who are transgender "in the future" their claims are not moot. (Pls' Brief, p. 27). This standard does not apply.

As the district court correctly held, the "absolutely clear" standard applies only to the "voluntary cessation doctrine."

> [U]nder the voluntary cessation doctrine. . . a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

(Internal quotation marks and citations omitted; emphasis in original).

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603–04 (2d Cir. 2016). This Court recently confirmed that the voluntary cessation doctrine does not apply where mootness did not result from the

10457644

defendant's conduct. *See Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 446 (2d Cir. 2021).

Here, Plaintiffs' claims are moot because Miller and Yearwood graduated high school, not because of Defendants' conduct. Accordingly, Plaintiffs' reliance on the heightened burden required by the voluntary cessation doctrine is simply incorrect.

## C. <u>Smith and Nicoletti's Claim for Injunctive Relief is Moot.</u>

In regard to mootness, this Court has explained:

> The federal courts are courts of limited jurisdiction, their powers circumscribed at their most basic level by the terms of Article III of the Constitution, which states that they may hear only "Cases" or "Controversies."…[A]t [the] uncontroverted core of [the "case or controversy" requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural.

> The requisite dispute must persist throughout the litigation— in a case such as this, from first filing in the district court through its many ascents and descents of the appellate ladder—and if the dispute should dissolve at any time due to a change in circumstances, the case becomes moot. Whenever mootness occurs, the court – whether trial, appellate, or Supreme – loses jurisdiction over the suit, which therefore must be dismissed.

(Internal citations, quotation marks and footnotes omitted). *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001); *see Conn. Citizens*, 6 F.4th at 444. "Mootness is

16

a recurring phenomenon in students' suits to vindicate constitutional rights associated with the conditions of their education: a student's graduation ends his individual interest in the conditions of education at his former school." *Russman*, 260 F.3d at 119.

Citing no law to support their assertions, Plaintiffs argue that their claims are not moot based on Miller and Yearwood's graduation because there could *possibly* be another girl who is transgender waiting in the wings.[15] (Pls' Brief, pp. 27-28). This type of mere speculation does not keep a controversy live. *See City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001). Once Miller and Yearwood graduated, Smith and Nicoletti no longer had a "personal stake" in the outcome of this litigation. *See Conn. Citizens*, 6 F.4th at 444.

For example, in *Cook v. Colgate Univ.*, 992 F.2d 17 (2d Cir. 1993), the plaintiffs were female collegiate hockey players who challenged the university's decision to only offer a men's varsity hockey team under

---

[15] Plaintiffs claim that the district court erroneously tasked them with the burden of proving that there are other girls who are transgender against who they will compete, rather than on Defendant to prove otherwise. That is not true. The district court noted that "Defendants have the burden of establishing mootness" and that it was "[a]pplying this standard." (JA271).

Title IX. *See id*. at 18. The injunction issued by the trial court did not take effect until after the plaintiffs graduated. *See id*. at 19. Even though overturning the injunction meant that the Title IX violation remained unremedied, the plaintiffs no longer had a "personal stake" [b]ecause…nothing that we decide could affect their rights vis-a-vis Colgate" and, therefore, the claims were moot. *Id*. (collecting similar cases); *see also Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (injunction seeking unequal funding was moot because university funded various women's varsity teams).

The CIAC policy has no effect on Plaintiffs unless a girl who is transgender competes against them. Although Miller and Yearwood were competing at the time the lawsuit was filed, they graduated in June 2020, and Plaintiffs have not alleged that there are other girls who are transgender competing against them in track during the 2021-2022 school year, before Smith and Nicoletti also graduate. As in *Cook*, an injunction barring the CIAC policy will have no practical effect on either girl because neither Smith nor Nicoletti have any "personal stake" remaining. *See Marshall v. New York State Pub. High Sch. Athletic Ass'n, Inc.,* 374 F. Supp. 3d 276, 286 (W.D.N.Y. 2019) (claim

18

moot because "there is no live case or controversy *between the parties to this action*" (emphasis in original)).

    **D.**    <u>**Plaintiffs Have Failed to Prove that the Harm Alleged is "Capable of Repetition, Yet Evading Review."**</u>

As first recognized in *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911), "[a] narrow exception to the principle that a moot claim is to be dismissed, available only in exceptional situations, is that the court may adjudicate a claim that, though technically moot, is 'capable of repetition, yet evading review'." (Internal citations and quotation marks omitted). *Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 71 (2d Cir.), *cert. denied sub. nom Dibari v. Bedford Cent. Sch. Dist.*, 534 U.S. 827 (2001); *see also Russman*, 260 F.3d at 119 (same).

In *Sosna v. Iowa*, 419 U.S. 393 (1975), the U.S. Supreme Court held that an action "capable of repetition, yet evading review" is "limited to the situation where two elements combine[]: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). Plaintiffs "of course, bear[] the burden of demonstrating that this controversy is

19

indeed "capable of repetition, yet evading review," *Video Tutorial Servs., Inc. v. MCI Telecommunications Corp.*, 79 F.3d 3, 6 (2d Cir. 1996), and that "the repetition would affect the 'same complaining party'." *Altman*, 245 F.3d at 71 (*quoting Weinstein*, 423 U.S. at 149).

To "evade review," the conduct at issue "could not be entirely litigated before again becoming moot, including prosecution of appeals as far as the Supreme Court." *Russman*, 260 F.3d at 119. To satisfy the repetition requirement, more than "a mere physical or theoretical possibility" is necessary; "[r]ather…there must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). "[T]he appellant must show that these *same parties* are reasonably likely to find themselves again in dispute over the issues raised in this appeal," but "mere speculation…does not rise to the level of a 'reasonable expectation' or 'demonstrated probability' of recurrence." *Dennin v. Connecticut Interscholastic Athletic Conf., Inc.*, 94 F.3d 96, 101 (2d Cir. 1996).[16]

---

[16] Plaintiffs rely on *Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016) (*citing Honig v. Doe*, 484 U.S. 305 fn. 6 (1988)) for the proposition that they need only to show that they "*possibly* could [find themselves] once again

20

Thus, even assuming, *arguendo*, that the first prong is met, the second prong clearly is not. At the time the case was dismissed, both Miller and Yearwood had graduated. Smith and Nicoletti are now Seniors, and they have not alleged that another girl who is transgender is expected to participate against them in indoor or outdoor track in their Senior year, no less in their specific events. Plaintiffs repeatedly use the words "possibly" and "may." But "theoretical possibility" and "mere speculation" are insufficient to meet this standard.

### E. Neither Smith nor Nicoletti are Actively Harmed by the Mere Existence of the CIAC Policy.

Finally Plaintiffs argue that the CIAC policy is facially discriminatory and therefore they need not identify any other girl who

---

in the situation [they] faced when [the] suit was filed." (Pls' Brief, p. 41) The Second Circuit explicitly rejected this interpretation of *Honig*. *See Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 86 (2d Cir 2005) (*citing Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 82 (2d Cir. 1991) ("This court…has explicitly rejected efforts to read *Honig* broadly to require only that repetition could possibly occur, not that there is a probability that it will occur.").

21

is transgender against whom they must compete to avoid dismissal.[17]

(Pls' Brief, pp. 28-37). The Second Circuit has flatly rejected similar

arguments in cases seeking injunctive relief.[18] *See MGM Resorts Int'l*

*Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 47-49 (2d Cir. 2017), *as*

*amended* (Aug. 2, 2017). Nor is the CIAC policy discriminatory. (*See*

Intervenor's Brief).

Moreover, the cases cited by Plaintiffs are inapposite. Plaintiffs

cite only to portions of those decisions addressing standing, not

mootness. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No.*

*1*, 551 U.S. 701, 718 (2007); *Adarand Constructors, Inc. v. Pena*, 515

U.S. 200, 210-11 (1995); *Ne. Fla. Chapter, Associated Gen. Contractors*

*of Am. V. Jacksonville*, 508 U.S. 656, 666 (1993); *Doe ex rel. Doe v.*

*Vermilion Par. Sch. Bd.*, 421 Fed. Appx. 366, 373 (5th Cir. 2011);

*Pederson v. Louisiana State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000);

*Boucher v. Syracuse Univ.*, 164 F.3d 113, 116 (2d Cir. 1999).

---

[17] They also argue others may be harmed as well, but this is not a class action and Plaintiffs do not have standing to assert the claims of others.

[18] A damages claim may survive Yearwod and Miller's graduations, but here damages are unavailable pursuant to *Pennhurst. See Cook*, 992 F.2d at 19; *Boucher,* 164 F.3d at 118.

22

Even if standing were relevant, which it is not, none of the cases are helpful. *Parents Involved*, *Adarand* and *Ne. Fla. Contractors* involve set aside programs, which are not at issue here. Moreover, there is no "barrier" because there is no girl who is transgender competing against either Smith or Nicoletti, nor any other "actual or imminent, not conjectural or hypothetical" injury. *Ne. Fla. Contractors*, 508 U.S. at 663; *see Adarand*, 515 U.S at 211-12. An "alleg[ation] [of] an injury at some indefinite future time" that is dependent on another girl who is transgender deciding to run track "stretch[s] [the concept of imminence] beyond [its] breaking point." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n. 2 (1983).

Furthermore, while *Ne. Fla. Contractors* and *Parents Involved* did touch upon mootness in other parts of the decisions, they followed the voluntary cessation doctrine, which does not apply here. *See Seattle*, 551 U.S. at 719; *Jacksonville*, 508 U.S. at 662; *see also Pederson*, 213 F.3d at 874-75 (class claims only). And *Pederson*, helps Defendants – the plaintiffs' individual claims were dismissed as moot because the plaintiffs had graduated. *See id*; *see also Doe*, 421 Fed. Appx. at 375-76 (same).

23

The same holds true with *Boucher*. In *Boucher*, the university had two more men's varsity teams than women's. *See Boucher*, 164 F.3d at 116. The complaint was brought as a class action by several female athletes who participated in club sports. *See id.* at 115. After affirming dismissal of equal treatment claims based on lack of standing because the plaintiffs were club, not varsity, athletes, *see id.* at 116, it also dismissed/recommended dismissal of claims for injunctive relief as moot, *see id.* at 117-19, the very result Plaintiffs seek to avoid here. The claims were moot because the University developed and implemented women's teams while the case was pending. *Id.* at 118. The Court did not, as Plaintiffs argue, "allow[] [the] Title IX suit to move forward" because the "plaintiff[s] demonstrated equal treatment." (Pls' Brief, p. 37). It flatly rejected it. *Boucher*, 164 F.3d at 120.

In sum, Plaintiffs claims for injunctive relief are moot because Miller and Yearwood graduated high school, and Plaintiffs have not met their burden of proof that their alleged injury is capable of repetition, yet evading review.

24

## II.   PLAINTIFFS DO NOT HAVE STANDING TO PURSUE INJUNCTIVE RELIEF TIED TO ALTERING RECORDS OF RACES FROM PRIOR SCHOOL YEARS

Plaintiffs also request an injunction ordering Defendants to change prior athletic records.  The district court found Plaintiffs lacked standing for the injunctive relief because they had not demonstrated it was "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560.   In their opening brief, Plaintiffs argue that the District Court's finding was erroneous because "an injunction that requires Defendants to correct athletic records to recognize female athletes achievements would bolster Plaintiff's prospects for college recruitment and future employment," and therefore Plaintiffs have a redressible injury.  (Pl. Brief p.26). Plaintiffs also argue that the records codify and exacerbate the injuries caused by the Policy, and that altering the records would redress those injuries. These arguments rely on pure speculation, however, and fail to provide any basis for standing.

### A.   Standard of Review.

"The standard of review for determinations regarding subject matter jurisdiction is clear error for factual findings, and de novo for the

25

10457644

legal conclusion as to whether subject matter exists." *Lyndonville*, 211 F.3d at 701.

**B.** **The District Court properly concluded that concerns about lost educational and employment opportunities were too speculative to provide Plaintiffs with standing.**

To satisfy the Constitution's "case-or-controversy requirement," a plaintiff in federal court "must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). As this Court recently stated, the party invoking federal jurisdiction bears the burden of establishing that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021)(cleaned up). In regards to the redressability element, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560. Speculation is not a valid basis for standing. *Clapper*, 568 U.S. at 401. Therefore, the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decision makers will exercise their judgment." *Id.* at 413. Plaintiffs' claims of potential

26

educational and employment-related injuries in the future are both based on the exact type of speculation that the Supreme Court has found is an improper basis for standing.

i.   *Plaintiffs have failed to allege lost educational opportunities that are non-speculative.*

The operative complaint alleges that Smith and Nicoletti were sophomores when the lawsuit was initiated in February 2020, which would make them seniors during this 2021-2022 school year.[19] In the operative complaint, Plaintiffs do not specifically allege that Smith and Nicoletti have lost out on scholarship opportunities because of the results of races in the 2018-2019 school year.  Instead, the operative complaint only makes broad statements about these Plaintiffs being excluded from "honors, opportunities to compete at higher levels, and public recognition critical to college recruiting and scholarship opportunities  . . . ." (JA131, ¶3; JA174, ¶ 167) Despite the lack of specific factual allegations in the operative complaint, Plaintiffs argue in their opening brief that college coaches and administrators would be

---

[19] Plaintiffs' opening brief does not make a claim of lost educational opportunities on behalf of either Soule or Manning, both of whom graduated in 2020. (Pl. Brief, p.19-20).

27

focused on the results of certain races during the 2018-2019 school year when assessing possible scholarships for Smith and Nicoletti in 2021 or 2022, and, therefore, if records related to those races are corrected, this will "bolster" their chances for a scholarship. (Pl. Brief, p. 26) This argument suffers from significant factual and logical errors.

It is well understood that colleges consider a wide-range of information when making athletic scholarship offers, including academic factors (e.g., a student's GPA, class rank, SAT or ACT scores, and the reputation of the high school they attended), non-academic factors (e.g., extracurricular activities, community involvement, legacy status, financial need, etc.), and athletic accomplishments (overall performance in high school, whether the student progressed over the years, the level of competition, the league the team was in, and other more sport-specific factors such as the student's speed on their fastball, shooting percentage on three-point shots, or a best time in a specific type of swimming or running race). The wide range of factors that colleges consider demonstrates that Plaintiffs' argument concerning the

28

importance of those particular races from 2018-2019 is pure

speculation.[20]

When addressing Smith and Nicoletti's hypothetical loss of

educational opportunities, Plaintiffs focus exclusively on their places in

two races in the 2018-2019 season, which they claim they "lost because

the Policy allowed biological males to compete." (Pl. Brief, p.16)

Plaintiffs first allege that, as a freshman in 2019, Smith placed third in

a State Open Championship event, and that she would have finished

runner-up but for the Policy. *Id.* Plaintiffs offer no credible explanation

for how this single event during her freshman year would negatively

impact her ability to secure an athletic scholarship for college, or any

explanation as to why a second place in one race may be more

important than a third place finish. It simply defies logic to believe that

any such change in position would provide any relief to Smith. This is

---

[20] Moreover, no high school student has a right to a college scholarship, athletic or academic, and courts have consistently rejected claims that a student's opportunity for a scholarship was limited in some manner by schools or athletic associations. *See, e.g.*, *K. L. v. Missouri State High Sch. Activities Ass'n*, 178 F. Supp. 3d 792, 799 (E.D. Mo. 2016) ("Courts are generally in accord . . . . that the speculative possibility of obtaining a college athletic scholarship is not a protected property right justifying judicial intervention.")(citation omitted; collecting cases).

29

especially true since that race occurred in her freshman year, and

Plaintiffs specifically allege that Smith plans to compete throughout the

rest of her high school career--for which she seeks an injunction

preventing any transgender students from competing against her

during that time. (JA 170, ¶149-50) Given this expressed desire to

compete in her junior and senior years, when her times will be a better,

more recent example to colleges of her potential for an athletic

scholarship, she cannot credibly claim that she will miss out on any

athletic scholarships because of the results of one race in her freshman

year.

Nicoletti's claim of potential lost educational opportunities is even

weaker, as the only record that Plaintiffs want changed for her is a race

where she "would have advanced to the next level of competition in . . .

[a] state championship and competed for a spot at the State Open

Championship." (Pl. Brief, p.16-17)  A closer examination of the record

she seeks to changes reveals that it was a *preliminary* race in the 2019

Class S Women's Outdoor 100m championship.  (JA157 ¶100) In that

race, Nicoletti did not even finish in the top 8, which was necessary to

advance to the final, championship heat. (JA169 ¶ 144) It would require

30

a great deal of speculation to find that the results of this preliminary race, if left to stand, could somehow impact Nicoletti's chances of an athletic scholarship several years later.

Even if records could be changed, Plaintiffs do not explain in the operative complaint or in their opening brief why, for example, a student's place in the Connecticut Class S State Championship 100m race would be more relevant to a college coach than the student's actual time in that race. For example, a fifth place finish in that race would be impressive to a college coach if the race happened to contain five college-bound runners and the fifth-place runner ran a time that would be competitive on the college level. In contrast, a student who finishes first in that race, but runs a time that is slower than needed to be competitive on a college team would be unlikely to receive any scholarship offers even though she finished first. If Smith or Nicoletti can run fast enough to run in college, they may get a scholarship. If they cannot, they will not. Changing the results of two races in 2018-2019 simply will have no impact on their scholarship opportunities.

This conclusion is buttressed by the fact that both Mitchell and Soule have obtained spots on their college's track and field team. The

31

Court can take judicial notice that Mitchell is included on the publicly -

available 2021-22 Women's Track & Field Roster for William & Mary.

See https://tribeathletics.com/sports/womens-track-and-
field/roster/chelsea-mitchell/14810  The Court also may take judicial

notice of the fact that Soule is competing on the track team at Florida

Atlantic University. *See D.N. v. Gov. R. DeSantis et al.*, Case 0:21-cv-

61344-RKA, Ecf. 46, Selina Soule's Motion to Intervene and

Memorandum in Support, p. 7 of 25. Soule's motion is based, in part, on

Soule's statement that "her high school athletic career included being a

ten-time All-Conference Honoree recipient, a five-time state title holder,

a three-time All New England award recipient, a four-time National

qualifier, and she holds five high school records." *Id.* Because racing

against Yearwood and Miller did not prevent either Mitchell or Soule

from competing in college, and there simply is no reason to believe it

will prevent Smith or Nicoletti from competing in college, either.

      ii.   *Plaintiffs' claim that an inaccurate record will lead to*
           *lost employment opportunities is improper and highly*
           *speculative.*

    Plaintiffs also claim that their employment prospects will be

bolstered if Miller and Yearwood's performances are erased in records

from the 2018-2019 school year, which provides them with non-speculative relief for an actual injury. (Pl. Brief p.20) But nowhere in the operative complaint is "employment" even mentioned. This argument is something created out of whole cloth following the cancellation of the Spring 2020 season due to COVID-19. Put more simply, now that Miller, Yearwood, Mitchell, and Soule have all graduated high school, Plaintiffs are desperately attempting to find an alternative ground for standing. Such ground must be based in the allegations of the operative complaint, however, but this claim of lost employment opportunities is not.

Even if there was some basis in the complaint for this argument, it still would not provide Plaintiffs with a non-speculative ground for standing. Because two Plaintiffs were sophomores at the time of the lawsuit was filed, and two were seniors, all of them are still numerous years away from seeking post-college employment. Plaintiffs cannot credibly argue that they may be denied employment opportunities as a result of the 2018-2019 races. Employers consider a wide range of factors when making job offers, including the competitiveness and location of the student's school, and the student's major, GPA, awards

33

and honors, internships, foreign language skills, other specialized skills, recommendations from professors, and leadership positions. Given this, it is not surprising that this Court has consistently stated that a federal court "does not sit as a super-personnel department to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions." *Byrne v. Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (superseded on other grounds).

In an attempt to remove their argument from the realm of speculation, Plaintiffs claim that society places a high value on athletic achievements, that an overwhelming number of female business executives participated in and recorded achievements in interscholastic sports, and therefore that "it is neither speculative nor guesswork to conclude that employers would find female athletic achievements relevant." (Pl. Brief, p.21). As noted previously, though, the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decision makers will exercise their judgment," *Clapper*, 568 U.S. at 413, and employers look at a variety of factors when making decisions about who to hire. It would be

34

10457644

speculative to assume to that employers will look to the results of certain races from 2018-2019 when making those decisions in the future. Secondly, the studies and articles cited in Plaintiffs' brief stand for the unremarkable proposition that employers value *participation* in athletics because athletes derive "goal setting, persistence, problem solving, teamwork, managing emotions, and managing time" from competitive sports. (Pl. Brief, p.23). Those attributes come about regardless of whether a student finished first or last in any race.

Unlike with Smith, Nicoletti, and Soule, the district court acknowledged that the requested relief could provide Mitchell with a basis to list four additional "wins" on her resume. The district court found, however, that even changing those records to show that she finished "first" would not provide Mitchell with any relief because "it seems inevitable that before making an offer to Mitchell, a prospective employer impressed by her record would learn that she did not actually finish first in the four races. In other words, even with the requested changes, Mitchell's position with regard to her employment prospects would remain essentially the same." (JA 278) In their brief, Plaintiffs take issue with that statement, but is cannot seriously be disputed that

35

any potential employer doing even a cursory check on Mitchell's background will see the reported results in many sources, including the numerous media appearances Mitchell has made, the op-eds she has written, and the attention she has brought to her case and the disputed races from the 2018-2019 season.[21] More importantly, even if they are changed to first place finishes on paper, it is entirely speculative to believe that a prospective employer would consider her high school athletic achievements when hiring for the position. Indeed, it his significantly more likely that such an employer would be interested in her college performance, including successes she had running on the Division I women's track and field team at William & Mary.

Plaintiffs next claim that the District Court's reasoning mirrors the reasoning that courts have rejected in other cases, citing in particular *Cohen v. Brown Univ.*, 101 F.3d 155 (1st Cir. 1996). Plaintiffs are mistaken, as *Cohen* has no bearing on this case. The plaintiffs in

---

[21] *See, e.g.*, editorial from Chelsea Mitchell in USA Today, available at: https://www.usatoday.com/story/opinion/2021/05/22/transgender-athletes-girls-women-sports-track-connecticut-column/5149532001/; television appearance on Fox News, available at https://www.youtube.com/watch?v=Zt4-5NhQGRA; and numerous on-line publications and solicitations published on her law firm's website, available at: https://adflegal.org/search?search_term=Chelsea.

*Cohen* challenged the school's decision to demote women's gymnastics and volleyball from university-funded varsity sports to donor-funded status, which plaintiffs contended limited their opportunities for participation. In response, the University argued that the disparity in athletic opportunities for men and women at the school was the result of a gender-based differential in the level of interest in sports." *Id.* 178. The First Circuit rejected this argument based on statistical and actual evidence from the university, including the fact that these two teams had been university-funded varsity sports up that that moment. Here, in contrast, Plaintiffs are asking the courts to divine how third-party employers might weigh the results of a high school track meet when making employment decisions years later. This case is far from *Cohen*, and squarely within the Supreme Court's cautionary zone concerning "guesswork as to how independent decision makers will exercise their judgment." *Clapper*, 568 U.S. 398.

### C. <u>Plaintiffs personal desires do not provide standing.</u>

As demonstrated above, changing the records by eliminating Miller and Yearwood's accomplishments would not provide any practical relief for Plaintiffs' alleged past injuries, as required for

37

standing. Recognizing this, Plaintiffs next argue that the district court improperly overlooked the "inherent value to female athletes of having their achievements properly recognized." (Pl. Brief p.19). For example, Plaintiffs argue that the alleged lack of fair recognition came as a "gut punch" to Mitchell, which left her feeling defeated and upset that "many great female athletes" have been "wiped from the books." (Pl. Brief p.18). Plaintiffs purportedly seek to vindicate their interest in "showcasing their athletic ability and competiveness," which they allege gives them standing. (Pl. Brief p.19).

To the extent the erasure of Miller and Yearwood's records would make Plaintiffs feel better, it is well-settled law that "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107 (1998); *Kapur v. Fed. Commc'ns Comm'n*, 991 F.3d 193, 196 (D.C. Cir. 2021)( "The 'psychic satisfaction' of winning doesn't cut it" for purposes of standing); *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 868 F.3d 1248, 1268 (11th Cir. 2017)("[Plaintiffs] may truly believe that this purely psychic satisfaction would serve as an effective remedy for their complained-of

injuries. However, as in the standing context, absent an accompanying practical effect on the legal rights or responsibilities of the parties before us, we are without jurisdiction to give them that satisfaction.").

In the Amended Complaint, Plaintiffs ask for the erasure of Miller and Yearwood's—as well of those of any other transgender students— records and times across the board, not only "record[s] or recognition" for events in which Plaintiffs took part. (JA 175-177) Eliminating any trace of Miller and Yearwood (or other transgender athletes) from events in which Plaintiffs did not take part does not redress any purported injury to Plaintiffs. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.,* 523 U.S. at 107.

Plaintiffs reliance on *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 296 (2d Cir. 2004) and *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012) is misplaced, as both of those cases involved the issue of whether "discriminatory scheduling practices are actionable under Title IX. . . ." *Parker*, 667 F. 3d at 913 (addressing discrepancy in "prime-time games" for the boys and girls basketball teams); *McCormick*, 370 F.3d at 296

39

(addressing discrepancy in the seasons in which boys and girls soccer played). Those cases simply have no relation to Plaintiffs' attempt to force standing based on the psychic satisfaction they may receive from changing records of events that were completed more than two years ago. In fact, it is undisputed that, unlike the girls in *McCormick*, Plaintiffs in this case had the opportunity to compete for the championship, and Smith and Nicoletti still have that opportunity in their senior years.

Finally, Plaintiffs for the first time on appeal state that they feel "erased" by the existing records, and cite *Allen v. Wright*, 468 U.S. 737 (1984) for the proposition that such a "stigmatizing" injury is one of the most serious consequences of discriminatory government action and is "sufficient . . . to support standing . . . to those persons who are personally denied equal treatment." *Id.* at 755. To the extent the Court concludes that Plaintiffs have not waived this argument because they failed to raise this before the trial court; *see United States v. Lauersen*, 648 F.3d 115, 115 (2d Cir. 2011); Plaintiffs' reliance on *Allen* is misplaced. As an initial matter, Plaintiffs improperly omitted the phrase "in some circumstances" from the portion of *Allen* that they

40

quote in the brief, as the full phrase states that a stigmatizing injury "is sufficient *in some circumstances* to support standing…" *Id.* (emphasis added). It was not sufficient in *Allen* itself, as the Court there found that plaintiffs "have no standing to complain simply that their Government is violating the law. Neither do they have standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination." *Id.*

Similarly, purporting to feel "erased" is not "stigmatic" in nature, as that term is commonly understood under *Allen*. Furthermore, *Allen* made clear that "a claim of stigmatic injury, or denigration, suffered by all members of a [ ] group," i.e. "abstract stigmatic injury," is not "judicially cognizable" for purposes of standing. *Id.* at 755-56. Even if feeling "erased" can be construed as "stigmatic" in nature, which Defendants dispute, the stigma would apply to *all* female athletes and is too abstract to be actionable. For example, Plaintiffs complain that "the district court, in fact, never discussed the inherent value to female athletes of having their achievements properly recognized." (P19) Like in *Allen*, such purported injury is too "abstract" to support standing. Thus, Plaintiffs standing argument should be rejected. *See, e.g.,*

*Robinson v. Sessions*, 721 Fed. App'x. 20, 24 (2d Cir. 2018) (rejecting Plaintiffs argument that they had standing based on being stigmatized as terrorists and potential terrorists).

## III. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIMS FOR MONETARY DAMAGES

The Supreme Court has long held that since Title IX was enacted pursuant to the Spending Clause, the recipient defendant(s) must have "adequate notice that they could be liable for the conduct at issue." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The Court stated that when Congress enacts laws pursuant to the Spending Clause, the "legislation [is] 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981). Thus, in order to be under adequate notice, "Congress [must] speak with a clear voice… [as] there can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. *Id.* In other words, the law requires that there be a clear understanding from Congress as to

42

what is expected of Defendants in order for them to be on adequate notice that certain conduct or enactment of a policy would be in violation of Title IX. That is not the case here as Congress, nor its supporting regulations or Court opinions, have ever spoken in a clear voice that a policy that allows transgender students to participate on female athletic teams is a violation of Title IX.

Title IX simply states that "[n]o person in the United states shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. §1681. It does not use the word "biological" as a determination of how "sex" should be interpreted. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir. 2017). "Looking at both the specific and broader context of the use of the term 'sex,' neither Title IX nor the implementing regulations define the term 'sex' or mandate how to determine who is male and who is female …." *Bd of Ed. of the Highland Local Sch. Dist. V. United States Dept. of Education*, 208 F.Supp.3d 850, 867 (S.D. Ohio 2016).

43

As the district court noted, since the statute is so broad, Congress delegated authority to the Department of Education to "promulgate specific rules" regarding its interpretation. (JA280); *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96 (2d Cir. 2012) ("Congress explicitly delegated to the administering agency 'the task of prescribing standards for athletic programs under Title IX.' " (quoting *McCormick*, 370 F.3d at 288). Thus, guidance from ED would be what puts the defendants on notice as to what violates Title IX. See *Davis*, 526 U.S. at 647 (guidance issued by ED providing that certain discrimination violates Title IX would have "contribute[d] to [the School] Board's notice of proscribed misconduct" had it been issued earlier).

ED has not released any regulations or statements that allowing girls who are transgender to participate in girls athletics violates Title IX. Instead, ED's guidance has been that transgender students are protected under Title IX. Beginning in 2014, ED's Office of Civil Rights ("OCR") notified schools that "[a]ll students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX." (JA241)

44

In 2015, OCR released a letter stating that "[t]he Department's Title IX regulations permit schools to provide sex-segregated … athletic teams…[and] [w]hen a school elects to separate or treat students differently on the basis of sex … a school must generally treat transgender students consistent with their *gender identity*." (Emphasis added). (JA241) The next year, OCR released another letter indicating that transgender students <u>must</u> be allowed to participate in such activities…consistent with their gender identity." (JA241) Although the 2016 letter from OCR was technically rescinded by the 2017 letter from OCR, the 2017 letter never changed the law – it merely said that they are rescinding the statement pending legal investigation. As the district court noted, "[a]t a minimum, the letter did not provide clear notice that allowing transgender students to compete in girls' track would violate Title IX." (JA282) The 2017 guidance was the last letter released prior to Plaintiffs filing this action.[22] In other words, there was nothing else

---

[22] OCR's Title IX website currently states: "A recipient institution that receives Department funds must operate its education program or activity in a nondiscriminatory manner free of discrimination based on sex, including sexual orientation and gender identity. Some key issue areas in which recipients have Title IX obligations are: recruitment, admissions, and counseling; financial assistance; athletics; sex-based harassment, which encompasses sexual assault and other forms of

45

that clearly stated that a policy that allows transgender girls to participate in female athletics violates Title IX, and accordingly the district court correctly found that there has been no clear and unambiguous statement made by either Congress or the OCR that if Defendants enact a policy allowing transgender students to participate in female athletics, they would be in violation of Title IX. (JA280).

Plaintiffs argue that the Defendants did not need pre-litigation notice that their acts violate Title IX because they intentionally enacted the CIAC policy. Plaintiffs rely on a series of cases concerning an institutions deliberate indifference to sexual harassment or retaliation by institutions. Plaintiff cite to *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 169 (2005), which held that it is intentional discrimination in violation of Title IX for a defendant to act in retaliation against a plaintiff because they complained of sex discrimination, and, since regulations and case holdings for 30 years have considered retaliation to a report of sex discrimination, no further

sexual violence; treatment of pregnant and parenting students; treatment of LGBTQI+ students; discipline; single-sex education; and employment."
https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html

46

notice was necessary. Plaintiffs also rely on the court's decision in *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992), which based its holding on a sexual harassment claim between a teacher and a student where the school took no action to address the issue. Likewise, Plaintiffs rely on the holdings in *Gebser* and *Davis*, which are both claims on deliberate indifference to a student being sexually harassed by a teacher. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629 (1999).

As the Sixth Circuit noted, however, *Gebser, Davis*, and *Franklin* decisions "are not readily analogous to the present situation" of a case involving transgender rights in athletics. *Horner v. Kentucky High Sch. Athletic Ass'n.*, 206 F.3d 685, 693 (6th Cir. 2000). Indeed, the district court correctly concluded that these cases are "readily distinguishable from the plaintiffs' claims of denial of equal treatment and effective accommodation." (JA 283).

Moreover, every Court of Appeals to consider the issue both before and after this lawsuit was filed has held that Title IX requires schools to treat transgender students consistent with their gender identity. *See Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir.), *cert. denied*, 141

47

S.Ct. 894 (2020); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S.Ct. 2636 (2019); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017).

For all of these reasons, the district court correctly found that Defendants clearly did not have notice that enacting a policy that reinforces transgender student rights would be a violation of Title IX.

## IV. ALTERNATIVELY, THE DISTRICT COURT'S ORDER DISMISSING THE CASE SHOULD BE UPHELD BECAUSE THE CIAC POLICY DOES NOT VIOLATE TITLE IX.

For all of the reasons set forth in the Intervenor Defendants' brief, the district court's ruling should be affirmed on the alternative basis that there is no violation of Title IX.

## V. THIS CASE SHOULD NOT BE REASSIGNED IF REMANDED.

Plaintiffs have asked that the case be reassigned if they are successful on appeal and the case is remanded. Yet there is no basis for doing so, and the case should be returned to Judge Chatigny.

48

A. <u>Legal Standards Governing Reassignment.</u>

"Reassignment upon remand is a serious request rarely made and rarely granted." (Internal quotation marks omitted.) *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 184 (2d Cir. 2021). In evaluating whether such drastic action is called for, this Court generally considers the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006); *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 152 (2d Cir. 2021). This Court has at times also considered whether the facts and history of the case are such as "might reasonably cause an objective observer to question the judge's impartiality." *Ligon v. City of New York*, 736 F.3d 118, 128 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).

The Supreme Court has made clear that "judicial rulings alone almost never constitute a valid basis for a bias or partiality" claim, as

"in and of themselves (i.e., apart from surrounding comments or
accompanying opinion), they cannot possibly show reliance upon an
extrajudicial source; and can only in the rarest circumstances evidence
the degree of favoritism or antagonism required… when no extrajudicial
source is involved." *Liteky v. United States*, 510 U.S. 540, 555 (1994);
s*ee also United States v. Wedd*, 993 F.3d 104, 116 (2d Cir. 2021).
Moreover,

> opinions formed by the judge on the basis of… events
> occurring in the course of the current proceedings… do not
> constitute a basis for a bias or partiality motion unless they
> display a deep-seated favoritism or antagonism that would
> make fair judgment impossible. Thus, judicial remarks… that
> are critical or disapproving of… the parties, or their cases,
> ordinarily do not support a bias or partiality challenge.

*Liteky*, 510 U.S. at 555. Ultimately, "[a] judge's ordinary efforts at
courtroom administration… remain immune" from a claim of bias or
partiality, even if "stern and short-tempered". *Id.*, at 556.

Plaintiffs base their request for reassignment squarely on a need
to "preserve the appearance of justice" in relation to conduct they say
would cause an objective observer to question the judge's impartiality.

(Pl. Brief p.51)[23] Plaintiffs claim that Judge Chatigny displayed partiality and prejudgment regarding the merits of the case by prohibiting Plaintiffs' counsel from referring to Yearwood and Miller as "'males,' period" when they do not identify as such, and by ruling against them on an issue of standing. Neither of these events suffice to show the kind of bias or partiality that warrants reassignment.

Judge Chatigny's direction to Plaintiffs' counsel not to refer to Yearwood and Miller as "'males,' period" out of respect for their gender identity was precisely the kind of "ordinary effort[] at courtroom administration" which is generally immune to a charge of bias or impartiality. Moreover, as Judge Chatigny's order was in furtherance of the well-established duty of courtesy owed all participants in the legal setting, to reassign the case even partly on that basis would *impede* the appearance of justice rather than preserve it.

## B. Judges Must Enforce "Duties of Courtesy".

---

[23] Plaintiffs do not argue more than in passing that Judge Chatigny "would reasonably be expected upon remand to have substantial difficulty in putting out of his… mind previously-expressed views or findings determined to be erroneous". *Awadallah*, 436 F.3d at 135. (Pls. Brief, p.53) (sole reference). If no error is found in, this factor will not be implicated. Nor have Plaintiffs addressed the "waste or duplication of effort" that would ensue if the case were to reassigned. *Id.*

"All persons involved in the judicial process – judges, litigants, witnesses, and court officers – owe a duty of courtesy to all other participants." *In re Snyder*, 472 U.S. 634, 647 (1985). In ordering Plaintiffs' counsel to refer to Yearwood and Miller in a manner consistent with (or even more minimally, not flatly inconsistent with) their gender identity, Judge Chatigny was engaged in activity that was "necessary to completion of [his] task"; *Liteky,* 255 U.S. at 550; namely, ensuring that Plaintiffs' counsel abided by that duty of courtesy.

The duty of courtesy has been enshrined in legal ethics rules as part of a broader effort to prevent and eliminate discrimination in legal proceedings. The American Bar Association Model Rules of Conduct hold that "it is professional misconduct for a lawyer to…  engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of… gender identity… in conduct related to the practice of law." Model Rules of Prof'l Conduct r.8.4(g) (Am. Bar Ass'n 2018). Such harassment and discrimination includes "derogatory or demeaning verbal… conduct." *Id.* The Connecticut Rules of Professional Conduct have recently been amended to include a similar prohibition.  83 Conn. L.J., No. 2, p. 35-36PB (July

52

13, 2021). The Code of Conduct for U.S. Judges not only requires that federal judges be "patient, dignified, respectful, and courteous to litigants", but that they take steps to "require similar conduct by those subject to [their] control, including lawyers to the extent consistent with their role in the adversary process." Code of Conduct for U.S. Judges, Canon 3(A)(3) (2019).

One of the most basic forms of courtesy is to address others respectfully, and refrain from addressing others in ways that are disrespectful or demeaning. The United States Supreme Court has long recognized the importance of respectful address in the judicial process. In *Hamilton v. Alabama*, 376 U.S. 650 (1964) (*per curiam*), the Court reversed a contempt citation issued against Mary Hamilton, a Black woman, for insisting that she be referred to as "Miss Hamilton" in a court proceeding rather than simply as "Mary".[24] The Court did so with reference to an earlier decision in in which it made unequivocally clear that "segregation in a court of justice is a manifest violation of the [government]'s duty to deny no one the equal protection of its laws."

---

[24] The facts of the case may be found in *Ex parte Hamilton*, 156 So. 2d 926 (Ala. 1963), *rev'd sub nom. Hamilton v. Alabama*, 376 U.S. 650 (1964).

10457644

*Johnson v. Virginia*, 373 U.S. 61, 62 (1963) (*per curiam*). This reference affirms that respectful and proper address in judicial proceedings is closely tied to the duty of the judiciary to ensure that litigants are afforded the fundamental protections of our legal system.

Consistent with *Hamilton* and *Johnson*, judges, lawyers, and other participants in the judicial process refrain from addressing parties by titles that are "needlessly degrad[ing] and humiliat[ing]". *Armstead v. United States*, 347 F.2d 806, 807–08 (D.D.C. 1965). Courts have deemed it "an abuse of formal courtroom protocol to address… participants" in derogatory ways, such "by first names only or nicknames without courtesy titles." *State v. Bright,* 916 P.2d 922, 926 n.23 (Wash. 1996) (admonishing "arrogant depersonalization" of arrestee through use of "her nickname only" in testimony). *See also*, *Middleton v. State*, 64 N.E.3d 895, 902 (Ind. Ct. App. 2016) (Plye, J., concurring) (finding counsel's use of racially-derogatory language impeded parties' rights "to the fair administration of justice"), *aff'd*, 72 N.E.3d 891 (Ind. 2017).

In accordance with these principles, judges have consistently addressed parties with pronouns consistent with their gender identity,

54

and have required counsel to do the same. *See, e.g.*, *Qz'etax v. Ortiz*, 170 Fed. Appx. 551, 553 (10th Cir. 2006) (granting transgender appellant's "motion for the continued usage of proper female pronouns" and affirming that the court would "continue to use them when referring to her"); *United States v. McGrath*, 80 Fed. Appx. 207, 208 n.1 (3d Cir. 2003) (noting use of female pronouns out of respect for transgender litigant); *DeGroat v. Townsend*, 495 F. Supp. 2d 845, 846 n.3 (S.D. Ohio 2007) (referring to transgender plaintiff using female pronouns as "a matter of courtesy"); *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 740 n.2 (N.D. Iowa 1999), *rev'd in part on other grounds*, 249 F.3d 755 (8th Cir. 2001) (affirming use of proper pronoun in reference to plaintiff "[a]s a matter of courtesy", and acknowledging courtesy of counsel and witnesses as to the same); *Lynch v. Lewis*, No. 7:14-CV-0024 (HL), 2014 WL 1813725, *4 n.3 (M.D. Ga. Mar. 24, 2014) (requiring use of proper pronouns "as a matter of courtesy, and because it is the Court's practice to refer to litigants in the manner they prefer to be addressed when possible"); *Canada v. Hall*, No. 18-CV-2121, 2019 WL 1294660, *1 n.1 (N.D. Ill. Mar. 21, 2019) (admonishing defendants' counsel for "careless disrespect for the plaintiff's transgender identity,"

55

in part through "consistent use of male pronouns to identify the plaintiff" when she did not identify as such).[25]

Judge Chatigny was therefore in strong company when he required that Plaintiffs' counsel adhere to the use of appropriate pronouns and other courteous address.[26] Doing so was necessary to fulfill his responsibility of ensuring compliance with the duty of courtesy owed not only to Yearwood and Miller, but all participants in the case. Far from an indication of bias or impartiality, it was well within Judge Chatigny's authority to require that appropriate gender references be used, and the appearance of justice was furthered by the steps he took.

C. **Since Intentional and Deliberate Misgendering Has Been Widely Recognized As A Form Of Harassment, A Judge Does Not Display Bias In Preventing Its Occurrence In Judicial Proceedings.**

---

[25] Courts have also begun to more regularly use proper pronouns as a matter of course, without noting that such use was out of courtesy. *See, e.g.*, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020); *Edmo v. Corizon, Inc.,* 935 F.3d 757 (9th Cir. 2019), *cert. denied sub nom. Idaho Dept. of Correction v. Edmo*, 141 S. Ct. 610 (2020).

[26] He is not the only judge to respond to intentional misgendering by Plaintiffs' counsel. *See Hecox v. Little*, 479 F. Supp. 3d 930, 957 n.11 and n.12 (D. Idaho 2020).

The Supreme Court has made clear that the terms "bias or prejudice" have a "pejorative connotation" and therefore that "not *all* unfavorable disposition towards an individual (or [their] case) is properly described by those terms." (Emphasis in original.) *Liteky*, 510 U.S. at 550. In order to be pejorative, and thus possible grounds for the appearance of "bias and prejudice", the judge's disposition toward a party or its case must be "somehow *wrongful* or *inappropriate*, either because it is undeserved or because it rests upon knowledge that the subject ought not to possess." (Emphasis in original.) *Id.* It is therefore a defense against accusations of bias and prejudice that the judge's disposition was *appropriate*, formed deservedly in response to reprehensible behavior displayed in the course of court proceedings.

A judge's disposition may arise in response to counsel who, in representing their client's theory of the case, utilizes repugnant tactics. *See generally*, *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943) (judge must "shrewdly observe the strategems of the... lawyers" and "cannily penetrate through the surface of their remarks to their real purposes and motives"). Suppose, for example, that a party's "theory of the case" was that the use of a racial slur in the workplace was not

57

sufficient to create liability for a hostile work environment.[27] It could

not conceivably be evidence of "bias or prejudice" if the judge ordered

the party's counsel not to refer to other parties or participants in the

case using such racial slurs, informal names rather than formal titles,

or with terms like "boy" or "girl", even if such an order *did* hamper

counsel's ability to articulate their theory of the case or appear to "pre-

judge" the ultimate issue. A judge's inherent power to prevent bullying,

harassment, and discrimination in the courtroom is not held hostage to

the concern that doing so might somehow hamper, or even appear to

hamper, tactics which are clearly "reprehensible." *Liteky*, 510 U.S. at

550.

Just as referring to members of a certain race with inappropriate

titles or other pejoratives would constitute offensive and discriminatory

conduct to which a judge might be unfavorably disposed without it

constituting improper bias, intentional misgendering has also been

---

[27] This Court has emphasized, however, that "[p]erhaps
no single act can more quickly alter the conditions of employment and
create an abusive working environment than the use of an
unambiguously racial epithet such as [the n-word] by a supervisor in
the presence of his subordinates." *Rivera v. Rochester Genesee Reg'l
Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014).

found to be offensive and discriminatory. Misgendering is both a psychological and sociological harm. A deep and growing body of psychological evidence shows that misgendering has a profound impact on the mental health of those misgendered. Studies indicate that misgendering is both "stigmatizing" and "associated with psychological distress."[28] Medical testimony relied on by courts has indicated that "misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating". *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, *2 (S.D. Ill. Nov. 7, 2018). Courts have found that this psychological harm is especially strong for adolescents, and that "for a transgender person with gender dysphoria, being referred to by the wrong gender pronoun is often incredibly distressing." *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1096 (S.D. Cal. 2017). *See also*, *Hecox*, 479 F. Supp. at 957 (describing misgendering as "degrading, mean, and potentially mentally devastating to transgender individuals").

---

[28] Kevin A. McLemore, *Experiences With Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, 14 SELF & IDENTITY 51, 60 (2015).

Sociologically, there is also a growing body of evidence that misgendering can promote social stigma toward transgender populations and reenforce "disturbing patterns of mistreatment and discrimination" against transgender persons in every dimension of social life.[29] The widespread societal practice of misgendering, and the accompanying stigma, also leads to worse physical health outcomes for transgender individuals.[30]

Finally, there is broad agreement among ethicists and scholars that intentional misgendering is a form of intentional disrespect which, when engaged in because of the misgendered party's group membership or protected class, constitutes a form of invidious discrimination. Since "terms of reference and address – pronouns, honorifics, titles, names, and the like – are *ordinary* signs of respect", the intentional

---

[29] Sandy E James Et Al., *The Report of the 2015 U.S. Transgender Survey* 4, NAT'L CTR. FOR TRANSGENDER EQUALITY (2016).

[30] Irene J. Dolan et. al. *Misgendering and experiences of stigma in health care settings for transgender people*, 212 THE MEDICAL JOURNAL OF AUSTRALIA 1 (2020); Kristie L. Seelman, et. al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, 2 TRANSGENDER HEALTH 1 (2017).

10457644

"withholding [of] these terms [is] disrespectful: Doing so says, in effect, that the person we are referring to or addressing does not deserve the ordinary respect given to all other citizens."[31] This analysis affirms the lived experience of transgender persons like Dr. Julia Serano, who explains in her memoir that "[c]onsidering how big of a social faux pas it is in our culture to misgender someone, and how apologetic people generally become upon finding out that they have made that mistake, it is difficult to view… the deliberate misgendering of [transgender persons] as anything other than an arrogant attempt to belittle and humiliate."[32]

The discriminatory nature of intentional misgendering has been affirmed by the EEOC, which has advised that the "[i]ntentional misuse" of gendered language "may constitute sex-based discrimination and/or harassment". *Jameson v. Donahoe*, EEOC Appeal No. 0120130992, 2013 WL 2368729, *2 (May 21, 2013); Courts have also rejected the characterization of misgendering as a "perceived slight[]",

---

[31] Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV DISCOURSE 40, 49 n.36 (2020).

[32] Julia Serano, WHIPPING GIRL: A TRANSSEXUAL WOMAN ON SEXISM AND THE SCAPEGOATING OF FEMININITY 185 (2007).

61

concluding instead that it is "objectively offensive behavior". *Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415, *71 (D. Minn. Mar. 16, 2015). *See also*, *T.B., Jr. by & through T.B., Sr. v. Prince George's Cty. Bd. of Ed.*, 897 F.3d 566, 577 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1307 (2019) (describing intentional misgendering as "pure meanness"). Purposeful misgendering is "not a light matter, but one which is laden with discriminatory intent". *Doe v. City of New York*, 976 N.Y.S.2d 360, 364 (N.Y. Sup. Ct. 2013).

Given the overwhelming acknowledgment of the reprehensible nature and harm of misgendering, it was correct for Judge Chatigny's to assert that concerns regarding such effects were "consistent with science". Since the science and the law supports the conclusion that misgendering is "needlessly provocative" and "bullying" behavior, it cannot be bias or prejudice for a judge, tasked with preventing such bullying and maintaining courtesy in the courtroom, to name it as such.

## D. Judge Chatigny Did Not Opine On The Ultimate Issue In Requiring Adherence To The Duty of Courtesy.

As Plaintiffs themselves contend, the case below involved the proper interpretation of the term "sex" as used in Title IX. (*See* Pls.' Mem., ECF No. 103-1 at 6). Plaintiffs are not disputing Yearwood or

62

Miller's female gender identity, and indeed take pains to argue that "gender identity" is entirely irrelevant to their legal claims. *Id.* By that argument alone, Plaintiffs cannot show that a judge's order directed to ensuring civility and respect for an opposing party's gender identity represents an opinion about the interpretation of "sex" under Title IX.

But even to the extent that the term "sex" as used in Title IX accommodates or accounts for gender identity; *Parents for Privacy*, 949 F.3d at 1227; Plaintiffs' argument fares no better. A district judge may issue orders to maintain civility in the courtroom without demonstrating bias, or an appearance of bias, with respect to the interpretation of "sex" in a statute such as Title IX. That is because pronouns and other gender-related terms of address "do not standardly have content in the same way as ordinary common nouns do…. [R]ather than characterizing, they [merely] indicate a person or a group."[33] Nevertheless, as was previously discussed, the correct use of such terms serves the function of demonstrating courtesy and respect, while the

---

[33] Sally McConnell-Ginet, *What's in a Name? Social Labeling and Gender Practices, in* THE HANDBOOK OF LANGUAGE AND GENDER 69, 73 (Janet Holmes & Miriam Meyerhoff eds., 2003).

63

intentionally-incorrect use of such terms demonstrates the opposite.[34] It is therefore possible to use gender-related terms for the sole purpose of adhering to (or flouting) duties and expectations of respectful address without conveying a legal position.

Judge Chatigny was careful to make such a distinction when presenting his order, stating that his object was "maintaining civil discourse… in the course of the case, nothing more." (JA107-08) Similar distinctions between the respectful and courteous use of gender pronouns and the use of related terms relevant to the merits of a case may be seen in the opinions of other courts. *See, e.g.*, *Lynch*, 2014 WL 1813725, at *4 n.3; *DeGroat*, 495 F. Supp. 2d at 846 n.4; *Smith*, 57 F. Supp. 2d at 740 n.2. Such courtesy has been maintained even where courts have ruled against a transgender plaintiff on the merits of a claim related to their sex or gender. *See, e.g.*, *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007) (acknowledging plaintiff's identity as a woman who is transgender and using female pronouns, but (erroneously) deciding against her on the merits). Indeed, counsel for Plaintiffs has received specific instruction – in a case conspicuously

---

[34] McNamarah, *Misgendering as Misconduct*, at 49 n.36.

omitted from their brief – on ways in which they may make their Title
IX arguments without relying on "inflammatory and potentially
harmful" conduct like misgendering. *Hecox*, 479 F. Supp. 3d at 957
n.11; *id.*, at 957 (counsels' adherence to theory of case "is not
compromised by simply referring to… transgender females as
'transgender women,' or by adopting [their] preferred gender
pronouns").

Though the use of terms could, in the abstract, confuse an "only
partly informed [person]-in-the-street," this Court has rejected that as
the measure for judicial impropriety. *United States v. Bayless*, 201 F.3d
116, 127 (2d Cir. 2000). A "reasonable person knowing *and
understanding* all the relevant facts;" *id.;* would have no difficulty
understanding that a judge can order the use of terms associated with
gender identity to be respectful, without pre-judging a matter of
statutory interpretation in the case. Indeed, the distinction between the
"partly informed [person]-in-the-street" and the "reasonable person
[with] know[ledge] and understanding" exists in part so that considered
behavior by judges in response to distinctions like those here do not

necessarily become grounds for a claim of judicial bias, rendering the

drawing of such important distinctions impossible in court.

That Judge Chatigny, in limiting misgendering, remained

agnostic on the ultimate issue of the case was all the more clear in light

of the wide latitude given to Plaintiffs. Out of an excess of caution,

Judge Chatigny explicitly *did* allow Plaintiffs to refer to Yearwood and

Miller as "biologically male," as having "male bodies," and as having

gone through "male puberty," and asked merely that Plaintiffs refrain

from referring to them as "'males,' period." (JA107-08) Plaintiffs had no

apparent difficulty articulating their theory of the case within these

generous semantic constraints, as demonstrated by the very brief in

which they assert that the constraints made argument impossible.

### E.    This Case Lacks The Hallmarks Of "Extra-Judicial" Comments Made In Cases Relied On By Plaintiffs.

The cases cited by Plaintiffs in support of reassignment all involve

extraordinary extra-judicial features not present here. In *Ligon*, the

"appearance of partiality stem[med] from [public] comments" made by

the judge concerning "a case yet to be filed." *Ligon* 736 F.3d at 127. In

ordering reassignment on remand, the court emphasized that a "judge's

statements to the media may… undermine the judge's appearance of

66

10457644

impartiality with respect to a pending proceeding" in a way that remarks in open court do not. *Id.*

In *Bayless*, the possibility of bias arose from the "remarkable… circumstances of [the] case", involving extra-judicial remarks by the President of the United States endorsing a public letter calling Judge Baer's earlier rulings in the case "a shocking and egregious example of judicial activism" at a White House press conference, further remarks by the President intimating that he would ask for Judge Baer's resignation depending on future rulings in the case, and a subsequent article in the New York Times reporting that "the white house put [Judge Baer] on public notice today that if he did not reverse a widely criticized decision… the president might ask for his resignation." *Bayless* 201 F.3d at 123.

In contrast to the extraordinary circumstances of those cases, the behavior of Judge Chatigny that Plaintiffs allege constitutes an "appearance of bias or prejudice" consists only of conduct "necessary to the completion" of the case. *Liteky* 510 U.S. at 541. Plaintiffs argue that Judge Chatigny's source of apparent bias consisted simply in a series of "adverse rulings", involving routine judicial activity such as enforcing

67

rules of civility in court, deciding which motions warranted briefing and arguments, and granting routine courtroom orders.

As the frequency of such rulings in the normal course of cases indicates, Judge Chatigny's order prohibiting counsel from engaging in misgendering was not rare or anomalous in such a way as might call into question his impartiality. Such orders are well within the common practice of federal judges exercising their professional discretion and fulfilling their duty to ensure lawyers avoid misconduct by "discriminate[ing]… on the basis of gender identity… in conduct related to the practice of law." Model Rules of Prof'l Conduct r.8.4(g) (Am. Bar Ass'N 2018).

Nor were Judge Chatigny's comments "easily avoidable", as media comments would have been. *Ligon*, 736 F.3d at 127. When issuing rulings and engaging in proper courtroom administration, Judge Chatigny was forced to make a judgment on the question whether or not misgendering would violate of the duty of courtesy. Unlike a voluntary comment at a media appearance, his judgment was necessary, and not easily avoidable under the circumstances. For a judge tasked with upholding courtesy in the courtroom to remain silent in the face of

68

misgendering would not be an agnostic position, but would in fact be a judgment that the attorney's conduct was *not* discourteous.

If Plaintiffs were correct that the proper pronoun requirement constituted some sort of partiality toward a party, then the opposite would also be true: allowing counsel's use of opposite-gendered pronouns would have constituted bias or partiality *toward Plaintiffs*, indicating there was nothing discriminatory or discourteous about misgendering parties. In such a case it would have been impossible for Judge Chatigny to remain neutral under Plaintiffs stance, since, when faced with an obligation to decide how to maintain an atmosphere of courtesy and respect in the courtroom, *any* action taken by him would have constituted an appearance of bias or prejudice against the disfavored party.

This point is equally true for Judge Chatigny's ruling that harms alleged by Plaintiffs – specifically, the alleged impact to employment prospects of not having a particular high school championship victory – were too speculative. Whether or not one agrees with Judge Chatigny's observation concerning the possibility that such high school sports records "might well have no bearing" on employment prospects years

69

later, the ruling itself cannot, as Plaintiffs allege, constitute bias against them. Rulings cannot constitute a recusable appearance of bias against a party merely in virtue of the fact that the ruling is contrary that party's own preferred view of the case. A contrary interpretation of the cases on this point is a result that courts have been clear should be avoided. *Liteky*, 510 U.S. at 555.

## CONCLUSION

Wherefore, for all those reasons set forth here, the District Court did not err in dismissing the Amended Complaint. Therefore, the District Courts' ruling must be affirmed.

70

THE CONNECTICUT
INTERSCHOLASTIC ATHLETIC
CONFERENCE AND DANBURY
BOARD OF EDUCATION

BY: /S/ PETER J. MURPHY
PETER J. MURPHY
LINDA L. YODER
SHIPMAN & GOODWIN LLP
ONE CONSTITUTION PLAZA
HARTFORD, CT 06103
TELEPHONE: 860-251-5000
FACSIMILE: 860-251-5316
PJMUPRHY@GOODWIN.COM

CANTON BOARD OF EDUCATION
AND GLASTONBURY BOARD OF
EDUCATION

BY: /S/ DAVID S. MONASTERSKY
DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 WETHERSFIELD AVENUE
HARTFORD, CT 061114
TELEPHONE: 860-249-1361
FACSIMILE: 860-249-7665
DMONASTERSKY@HL-LAW.COM

CROMWELL BOARD OF
EDUCATION AND
THE BLOOMFIELD BOARD OF
EDUCATION

BY: /S/ JOHANNA G. ZELMAN
JOHANNA G. ZELMAN
FORDHARRISON, LLP
CITYPLACE II
185 ASYLUM STREET
HARTFORD, CT 06103
TELEPHONE: 860-740-1355
FACSIMILE: 860-578-2075
JZELMAN@FORDHARRISON.COM

THE COMMISSION ON HUMAN
RIGHTS AND OPPORTUNITIES

BY: /S/ MICHAEL E. ROBERTS
MICHAEL E. ROBERTS
COMMISSION ON HUMAN
RIGHTS AND OPPORTUNITIES –
450 COLUMBUS BLVD., ST. 2
HARTFORD, CT 06103
TELEPHONE: 860-541-4715
FACSIMILE: 860-241-4869
MICHAEL.E.ROBERTS@CT.GOV[35]

---

[35] The Commission and its counsel gratefully acknowledge the work of Gregory Antill, a student at Yale Law School and legal intern at the Commission, in the researching and writing of the argument against reassignment.

71

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c), undersigned counsel certified that: This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Local R. App. P. 32-1(a)(4) because it contains 13,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Century Schoolbook 14 point font.

By   /s/ Peter J. Murphy   
Peter J. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October 2021, a true and accurate copy of the foregoing was filed electronically with the Court of Appeals for the Second Circuit via the Court's CM/ECF system.  Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By   /s/ Peter J. Murphy   
Peter J. Murphy

10457644