21-1365-cv
*Selina Soule et al. v. Connecticut Association of Schools et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――――――

August Term 2022

(Argued:  September 29, 2022   Decided:  December 16, 2022)

Docket No. 21-1365-cv

―――――――――――――

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a
minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl
Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her
mother,

*Plaintiffs-Appellants,*

*v.*

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. D/B/A CONNECTICUT
INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD
OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY
PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF
EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

*and*

ANDRAYA YEARWOOD; THANIA EDWARDS, on behalf of her daughter, T.M.;
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES,

*Intervenor-Defendants-Appellees.*[*]

―――――――――――――

[*]    The Clerk of the Court is directed to amend the caption to conform to the above.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

———————————————

Before:    CHIN, CARNEY, and ROBINSON, *Circuit Judges*.

———————————————

Appeal from a judgment of the United States District Court for the District of Connecticut (Chatigny, *J.*) dismissing claims against defendants-appellees Connecticut Interscholastic Athletic Conference and its member high schools under Title IX of the Education Amendments of 1972 challenging its policy allowing transgender students to participate in gender specific sports consistent with their gender identity.  Plaintiffs-appellants are four cisgender female students who allege that the policy disproportionally disadvantages cisgender girls as compared to boys.  The district court granted defendants-appellees' motion to dismiss the challenge to the policy as not justiciable and the claims for monetary relief as barred.

AFFIRMED.

———————————————

ROGER G. BROOKS (John J. Bursch, Christiana M. Holcomb, *and* Cody S. Barnett, *on the brief*), Alliance Defending Freedom, Scottsdale, AZ, Washington, DC, *and* Ashburn, VA, *for Plaintiffs-Appellants*.

PETER J. MURPHY (Linda L. Yoder, *on the brief*), Shipman
& Goodwin LLP, Hartford, CT, *and* Johanna G.
Zelman, FordHarrison, LLP, Hartford, CT, *and*
David S. Monastersky, Howd & Ludorf, LLC,
Hartford, CT, *and* Michael E. Roberts,
Commission on Human Rights and
Opportunities, Hartford, CT, *for Defendants-
Appellees*.

JOSHUA BLOCK (Lindsey Kaley, Galen Sherwin, Elana
Bildner, *and* Dan Barrett, *on the brief*), ACLU
Foundation, New York, NY, *and* ACLU
Foundation of Connecticut, Hartford, CT, *for
Intervenor-Defendants-Appellees*.

————————————

CHIN, *Circuit Judge*:

Since 2013, defendants-appellees, Connecticut Interscholastic

Athletic Conference (the "CIAC") and its member high schools (together,

"Defendants"), have followed the "Transgender Participation" Policy (the

"Policy"), which permits high school students to compete on gender specific

athletic teams consistent with their gender identity if that is different from "the

gender listed on their official birth certificates."  CIAC By-Laws Article IX,

3

Section B.[1]  Plaintiffs-appellants are four female athletes who are cisgender

("Plaintiffs"), and who attended CIAC member high schools and competed in

CIAC-sponsored girls' track events against female athletes who are transgender.

Plaintiffs allege that the Policy violates Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), because the participation of transgender

females in girls' high school athletic events results in "students who are born

female" having materially fewer opportunities for victory, public recognition,

athletic scholarships, and future employment "than students who are born male."

J. App'x at 131 ¶ 4.

   To remedy the alleged Title IX violations, Plaintiffs requested

damages and two injunctions -- one to enjoin future enforcement of the Policy

and one to alter the records of certain prior CIAC-sponsored girls' track events to

remove the records achieved by two transgender girls, who intervened in this

action.  The district court dismissed the claims on grounds that (1) Plaintiffs'

request to enjoin future enforcement of the Policy was moot; (2) Plaintiffs lacked

standing to assert their claim for an injunction to change the record books; and

---

[1]  The CIAC's Handbook, which includes the Policy at Article IX, Section B of the By-Laws, can be found on the CIAC's website at http://www.casciac.org/ciachandbook.  The Policy is available at page 54 of the Handbook.

(3) Plaintiffs' claims for monetary damages were barred under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).[2]

Like the district court, we are unpersuaded, with respect to the claim for an injunction to alter the records, that Plaintiffs have established the injury in fact and redressability requirements for standing; both fail for reasons of speculation. And because we conclude that the CIAC and its member schools did not have adequate notice that the Policy violates Title IX -- indeed, they had notice to the contrary -- Plaintiffs' claims for damages must be dismissed.

Accordingly, we AFFIRM the district court's dismissal of Plaintiffs' claims against the CIAC and its member high schools.

### STATEMENT OF THE CASE

The material facts alleged in Plaintiffs' second amended complaint (the "Complaint") are assumed to be true, and all reasonable inferences are drawn in their favor. *See Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012) (Rule 12(b)(1) motion to dismiss); *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (Rule 12(b)(6) motion to dismiss).

---

[2]    At oral argument, Plaintiffs conceded that their claim for prospective injunctive relief is moot because all Plaintiffs have graduated from high school and are no longer subject to the Policy. Thus, the dismissal of this claim as moot is affirmed.

*I.*     *The Facts*

Plaintiffs Chelsea Mitchell, Ashley Nicoletti, Alanna Smith, and Selina Soule were -- at the time the Complaint was filed -- Connecticut high school students who each ran track for their high school teams.  Each was competitive at the statewide level and trained hard to "shave mere fractions of seconds off [their] race times."  J. App'x at 130 ¶ 1.  Plaintiffs allege that the Policy forced them to compete against female athletes who are transgender, which deprived them of a fair shot at statewide titles.

The CIAC has applied the Policy since the 2013-2014 school year, permitting high school students to participate on gender specific sports teams consistent with their gender identity.  The Policy expresses a commitment "to providing transgender student-athletes with equal opportunities to participate in CIAC athletic programs consistent with their gender identity," and "conclude[s] that it would be fundamentally unjust and contrary to applicable state and federal law to preclude a student from participation on a gender specific sports team that is consistent with the public gender identity of that student for all other purposes."  CIAC By-Laws Article IX, Section B.  Thus, a student's eligibility to participate on a CIAC gender specific sports team is based on "the gender

identification of that student in current school records and daily life activities in the school and community," and the school district's "determin[ation] that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*

Pursuant to the Policy, intervenor-defendant-appellee Andraya Yearwood participated on the girls' track team at Cromwell High School for the 2017, 2018, and 2019 indoor and outdoor seasons, and the 2020 indoor season. Also pursuant to the Policy, intervenor-defendant-appellee Terry Miller participated on the girls' track team at Bloomfield High School for the 2018 outdoor season, the 2019 indoor and outdoor seasons, and the 2020 indoor season. During these track seasons, Yearwood and Miller, both girls who are transgender, competed in CIAC-sponsored track events against girls who are cisgender, including Plaintiffs -- Mitchell, Nicoletti, Smith, and Soule.

In certain races, Yearwood and Miller finished ahead of Plaintiffs. For example:

*Mitchell*:  In the 2019 Class S State Championship Women's Indoor 55-meter; the 2019 State Open Championship Women's Indoor 55-meter; the 2019 Class S State Championship Women's Outdoor 100-meter; and the

2019 Class S State Championship Women's Outdoor 200-meter, Mitchell either placed second after Miller, or third after both Miller and Yearwood.

*Nicoletti*:  In the 2019 Class S State Championship Women's Outdoor 100-meter preliminary race, Miller took second place, Yearwood took third, and Nicoletti took ninth.

*Smith*:  In the 2019 State Open Championship Women's Outdoor 200-meter final, Miller placed first and Smith placed third.

*Soule*:  In the 2019 State Open Championship Women's Indoor 55-meter preliminary race, Miller, Yearwood, and Soule finished first, second, and eighth, respectively.

In other races, Plaintiffs finished ahead of Yearwood and Miller.  For example, in the 2019 Class S State Championship Women's Outdoor 100-meter preliminary race, Mitchell, Miller, and Yearwood finished first, second, and third, respectively.

## II.    *The Proceedings Below*

In February 2020, Plaintiffs brought this action against the CIAC and its member high schools, alleging that the Policy "is now regularly resulting in boys displacing girls in competitive track events in Connecticut"; "students who

8

are born female now have materially *fewer* opportunities to stand on the victory

podium, fewer opportunities to participate in post-season elite competition,

fewer opportunities for public recognition as champions, and a much smaller

chance of setting recognized records, than students who are born male"; and

"[t]his reality is discrimination against girls that directly violates the

requirements of Title IX."  J. App'x at 131 ¶¶ 3-5.

    Plaintiffs also alleged that the Policy has impacted their individual

achievements by depriving them -- as cisgender female athletes -- of certain state

championship titles and opportunities to advance to higher levels of statewide

competition.  Specifically, Plaintiffs alleged that but for the Policy, Mitchell

would be the record holder of four additional state champion titles; Nicoletti

would have placed seventh in the 2019 Class S State Championship Women's

Outdoor 100-meter preliminary race, and advanced to the 100-meter final; Smith

would have placed second in the 2019 State Open Championship Women's

Outdoor 200-meter final; and Soule would have placed sixth in the 2019 State

Open Championship Women's Indoor 55-meter preliminary race, and advanced

to the 55-meter final.

Plaintiffs sought a declaration that the Policy violates Title IX by "failing to provide competitive opportunities that effectively accommodate the abilities of girls" and "equal treatment, benefits, and opportunities for girls in athletic competition"; monetary relief for the alleged Title IX violations; an injunction against future enforcement of the Policy; and an injunction requiring the CIAC and its member schools "to remove male athletes from any record . . . designated for girls or women" and "to remove times achieved by athletes born male . . . from any records purporting to record times achieved by girls or women."  J. App'x at 175-76 (prayer for relief).  Plaintiffs also moved for a preliminary injunction to prevent transgender girls from competing in the then-upcoming outdoor track season.

Before Plaintiffs' motion for a preliminary injunction could be heard, the COVID-19 pandemic closed schools and nonessential businesses throughout Connecticut, and all interscholastic athletic competition was suspended indefinitely.  The district court denied Plaintiffs' motion for expedited treatment on April 8, 2020, concluding that Plaintiffs had no need for a preliminary injunction when all spring track events had been cancelled due to the ongoing pandemic.

On August 21, 2020, the CIAC and its member schools jointly moved to dismiss the Complaint, asserting, *inter alia*, that Plaintiffs lacked standing to seek injunctions enjoining future enforcement of the Policy and requiring revisions to race records; Plaintiffs' requested relief would violate the rights of Yearwood, Miller, and other transgender students protected by Title IX and the Equal Protection Clause of the Fourteenth Amendment; Plaintiffs had not plausibly alleged that competing against girls who are transgender violates Title IX; and Plaintiffs' claims for monetary relief under Title IX were barred.

On April 25, 2021, the district court granted Defendants' motion to dismiss on grounds that (1) Plaintiffs' request for injunctive relief against the Policy became moot after Yearwood and Miller graduated in June 2020; (2) Plaintiffs lacked standing to seek an injunction requiring corrections to past athletic records because their theory of redressability was too speculative; and (3) Plaintiffs' request for damages was barred because the CIAC did not receive adequate notice that its Policy violated Title IX. *See generally Soule v. Conn. Ass'n of Schs., Inc.*, No. 20-CV-00201, 2021 WL 1617206 (D. Conn. Apr. 25, 2021). The court thereafter entered judgment, dismissing the action.

This appeal followed.

11

## DISCUSSION

We conclude that, first, Plaintiffs lack standing to seek an injunction rewriting the records and, second, Plaintiffs' claims for monetary relief are barred under *Pennhurst*. Accordingly, we affirm the district court's dismissal of the Complaint.

### I. *Claims for Injunctive Relief*

We review *de novo* the district court's dismissal of the claims for injunctive relief pursuant to Rule 12(b)(1). *See Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). "[A] plaintiff asserting standing must 'allege facts that affirmatively and plausibly suggest that [she] has standing to sue' and courts 'need not credit a complaint's conclusory statements without reference to its factual context.'" *Id.* (citation omitted).

To satisfy the constitutional requirement of standing, plaintiffs in federal court bear the burden of establishing that (1) they have suffered an "injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed

12

by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted).  "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (citation omitted).  The claimed future injury must be "*certainly impending* to constitute injury in fact," and "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and internal quotation marks omitted).

Here, Plaintiffs present two theories of standing.  First, Plaintiffs argue that the Policy deprived them of a "chance to be champions," and that CIAC's current records perpetuate this past injury because "[w]hen records fail to appropriately credit female achievements, athletes like Plaintiffs feel 'erased.'" Appellants' Br. at 18-19  Second, Plaintiffs argue that the current records affect Plaintiffs' future employment opportunities, and that correcting the records

would redress this harm.[3]  We conclude that both theories of standing fail to establish injury in fact and redressability.

###### A.    A Chance to be Champions

Plaintiffs' theory of injury in fact -- that the Policy deprived them of a "chance to be champions" -- fails because they have not alleged a cognizable deprivation here.  All four Plaintiffs regularly competed at state track championships as high school athletes, where Plaintiffs had the opportunity to compete for state titles in different events.  And, on numerous occasions, Plaintiffs were indeed "champions," finishing first in various events, even sometimes when competing against Yearwood and Miller.  *See, e.g.*, J. App'x at 157 ¶ 100 (Mitchell defeated Yearwood and Miller in 2019 Class S Women's Outdoor 100-meter); Suppl. App'x at 54-55 (Soule placed first in long jump and 4x200 relay at 2019 state championships).  Plaintiffs simply have not been deprived of a "chance to be champions."

---

[3]    Plaintiffs also alleged in their Complaint that maintaining the current records affects their college recruitment and scholarship opportunities.  This claim, however, is now moot because all Plaintiffs have graduated from high school, have matriculated at undergraduate institutions, and are competing on collegiate track-and-field teams; it would be impossible, at this point, for an injunction correcting the records to grant Plaintiffs improved college recruitment opportunities.  *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (citation and internal quotation marks omitted)).

We do not hold that the deprivation of a "chance to be champions" can never be "an invasion of a legally protected interest," sufficient for injury in fact. *Lujan*, 504 U.S. at 560. Indeed, in *McCormick*, a case which Plaintiffs rely on, we found that female athletes suffered this deprivation, in violation of Title IX, when the school district scheduled girls' soccer in the Spring and boys' soccer in the Fall, because participation in state championships for soccer was available only to teams scheduled in the Fall. *See McCormick*, 370 F.3d at 295-96.

But the injury suffered by the female athletes in *McCormick* is easily distinguishable from Plaintiffs' circumstances here. In *McCormick*, the school district's scheduling decision afforded male athletes, and simultaneously deprived female athletes of, the opportunity to *compete* at state championships -- the "chance to be champions." *Id.* at 295 ("The scheduling of soccer in the spring, therefore, places a ceiling on the possible achievement of the female soccer players that they cannot break through no matter how hard they strive. The boys are subject to no such ceiling."). Here, the Policy did not deprive Plaintiffs of the opportunity to compete at state championships.

Even assuming Plaintiffs could show injury in fact, the independent constitutional requirement of redressability remains unsatisfied. It is not

apparent that an injunction to rewrite the records would redress Plaintiffs'
alleged deprivation -- revising the records would not give Plaintiffs "a *chance* to
be champions."  Plaintiffs' injury of being deprived of a "chance to be champions"
could be remedied only with damages for past deprivation, or with an injunction
requiring do-overs of the races.  But the former, as explained below, are
unavailable to Plaintiffs, and Plaintiffs do not seek the latter.  Indeed, the races
were run in conformity with the rules in effect at the time; times were recorded;
medals for gold, silver and bronze were in fact awarded to athletes who finished
first, second, and third; and the records accurately reflect those results.  Plaintiffs
have not shown that there is a proper legal framework for invalidating or
altering records achieved by student-athletes who competed in conformity with
the applicable rules.  This mismatch between Plaintiffs' alleged injury and
requested relief is fatal to establishing redressability.  *See Steel Co. v. Citizens for a*
*Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury
suffered cannot bootstrap a plaintiff into federal court; that is the very essence of
the redressability requirement.").

       Plaintiffs argue that an injunction changing the records would
remedy the fact that Plaintiffs feel "erased" by the current records, because the

injunction would give Plaintiffs additional public recognition for their athletic

achievements and hard work.  Appellants' Br. at 19-20.  But absent a proper

means to alter the records, a ruling from this Court would give Plaintiffs nothing

more than "psychic satisfaction," which, on its own, "is not an acceptable Article

III remedy because it does not redress a cognizable Article III injury."  *Steel*, 523

U.S. at 107; *accord Kapur v. Fed. Commc'ns Comm'n*, 991 F.3d 193, 196 (D.C. Cir.

2021) ("The 'psychic satisfaction' of winning doesn't cut it."); *I.L. v. Alabama*, 739

F.3d 1273, 1281 (11th Cir. 2014) ("[G]ranting the plaintiffs the relief they request

would result in nothing more than a mere 'moral' victory, something the federal

courts may not properly provide."); *Doyle v. Town of Litchfield*, 372 F. Supp. 2d

288, 303 (D. Conn. 2005) ("[S]ome emotional or mental satisfaction . . . is

inadequate to confer standing, no matter how worthy the cause.").

Thus, Plaintiffs' first theory of standing -- that the Policy deprived

them of a "chance to be champions" -- fails to establish both injury in fact and

redressability.

**B.**      ***Prospects at Future Employment***

Next, Plaintiffs argue that the records "*could* . . . affect all four

Plaintiffs' prospects at future employment."  Appellants' Br. at 20 (emphasis

added).  "[A]llegations of *possible* future injury," however, are insufficient to satisfy injury in fact.  *Clapper*, 568 U.S. at 409.  To support the argument that Plaintiffs' future employment opportunities are harmed by maintaining the records as is, Plaintiffs assert that "[o]ur society places a high value on athletic achievements," 94% of female business executives "participated and recorded achievements in interscholastic sports," and most employers will likely "consider Plaintiffs more favorably in light of their achievements."  Appellants' Br. at 21-22.

It is true that employers often find candidates with athletic experience more appealing.  Indeed, some employers (including federal judges perhaps) may favor candidates for employment who competed on collegiate athletic teams for the very reason that athletic experience speaks loudly about the candidate's discipline, time-management skills, patience, and ability to collaborate.  But the records that Plaintiffs want re-written already show their participation and impressive achievements in high school athletics; the mere fact that athletic experience may be a significant factor for prospective employers in their hiring decisions does not show that Plaintiffs' future employment opportunities are harmed by the current records.

18

Moreover, because "[a]n employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position," *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e), Plaintiffs can only speculate as to how prospective employers will exercise their discretion when hiring and whether the requested revisions to the records would have any noticeable impact. This speculation is insufficient to show injury in fact. *See Clapper*, 568 U.S. at 410-14 (concluding that plaintiffs' claim of future injury was not "certainly impending" where harm to plaintiffs depended on the discretion of government officials and plaintiffs could only speculate as to how they would exercise their discretion). Thus, Plaintiffs have failed to show injury in fact because they have not established that maintaining the records as they are now will cause future injury to Plaintiffs' employment opportunities that is "certainly impending."

Nor have Plaintiffs established redressability. Plaintiffs argue that athletic achievements highlight valuable skill sets to employers and can distinguish Plaintiffs from other applicants. But even conceding that some athletic achievements can impact one's opportunities for employment, Plaintiffs have only speculated that changing the records -- so that (1) Mitchell finishes first

19

instead of second in four championship races, (2) Smith finishes second instead of third in one championship race, and (3) Soule and Nicoletti both advance to the next level of competition in their respective events -- would change a prospective employer's decision to hire any one of them. The reality is that an injunction requiring changes to the records would not bind any prospective employers who consider hiring Plaintiffs because they are not before the court, and thus a favorable decision for Plaintiffs is not likely to change their future employment prospects or outcomes. *See Lujan*, 504 U.S. at 562 (holding no injury and redressability where their "existence . . . depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (citation omitted)). And, as the district court noted, even if the records were amended, Plaintiffs have not shown that their employment prospects are likely to be any different, given that a simple internet search would reveal to the prospective employer this controversy about the records. *See Soule*, 2021 WL 1617206, at *7. Thus, because Plaintiffs have failed to plausibly allege that an injunction requiring changes to the records is likely to change their employment opportunities, Plaintiffs have failed to meet their burden on redressability.

To be clear, we do not decide now whether a court can ever award an injunction to rewrite records.  As the parties to this appeal emphasized at argument, the accuracy of records are significant, "inaccurate" records can cause real injury to athletes, and the question of accuracy can go beyond identifying who had the fastest time, who jumped the farthest, or who hit the most home runs.[4]  Even so, not every harm is an injury that can be redressed in an Article III court -- the requirements of standing must be satisfied, and Plaintiffs have failed to do so here.

---

[4]    Controversies over athletic records are not uncommon.  Around the time of argument in this case, the controversy over who holds the single-season home run record in Major League Baseball ("MLB") was reignited when New York Yankee Aaron Judge beat Roger Maris's record by hitting his sixty-second home run that season.  *See* Jack Vita, *WATCH:  Aaron Judge Hits 62nd Home Run Passing Roger Maris' AL HR Record*, Sports Illustrated (Oct. 4, 2022), https://www.si.com/fannation/mlb/fastball/news/watch-aaron-judge-hits-62nd-home-run-passing-roger-maris-al-hr-record.  Before Judge, Barry Bonds, Mark McGwire, and Sammy Sosa each had surpassed Maris's sixty-one home runs.  But their season records, set in MLB's infamous "steroid era," carry the stain of performance-enhancing drugs.  *See* Mike Gavin, *Aaron Judge Hits 61st Home Run to Tie Roger Maris' Record*, NBC Sports (Sept. 28, 2022), https://www.nbcsports.com/philadelphia/phillies/aaron-judge-hits-61st-home-run-tie-roger-maris-record.  Some, including Judge, say Bonds's seventy-three home run record is the one to beat, because seventy-three is the most home runs hit in a single MLB season.  *See* Joseph Salvador, *Aaron Judge Recently Said Barry Bonds's 73 Home Runs Is True Record*, Sports Illustrated (Sept. 29, 2022), https://www.si.com/mlb/2022/09/29/aaron-judge-barry-bonds-73-home-runs-true-record.  Others maintain that Babe Ruth still holds the record, because Ruth's sixty home runs in a 154-game season is more impressive than the records set in 162-game seasons by Maris, Bonds, McGwire, Sosa and Judge.  *See* Gavin, *supra*.  All this is to say the debate over who holds the record, whether aided by more games or abetted by banned substances, persists to this day, among MLB fans and athletes, on the internet, and in the ballparks -- but it, like this controversy, is not a debate for the courtroom.

## II.    *Claims for Damages*

We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  *See Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 95 (2d Cir. 2010).

### A.    *Applicable Law*

Title IX broadly prohibits education programs that receive federal funding from discriminating "on the basis of sex."  20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .").  The Supreme Court has recognized an implied private right of action under Title IX, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979), and has held that monetary relief is available in such suits, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992).

Because Congress enacted Title IX pursuant to its authority under the Spending Clause, however, private damages actions under Title IX "are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue."  *Davis Next Friend LaShonda D. v. Monroe*

*Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract:  in return for federal funds, the States agree to comply with federally imposed conditions.'" (citation omitted)); *see also Pennhurst*, 451 U.S. at 17 ("There can, of course, be no knowing acceptance if a State is unaware of the conditions [imposed by Congress's Spending Clause legislation] or is unable to ascertain what is expected of it.").  To determine whether a funding recipient is on notice that its conduct "falls within the scope of Title IX's proscriptions," *Davis*, 526 U.S. at 647, we look to guidance promulgated by the agency responsible for Title IX's enforcement, the Department of Education's Office of Civil Rights ("OCR"), *see Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012), and to relevant decisions from the Courts of Appeals, *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183-84 (2005).

There is one recognized exception to *Pennhurst*'s notice requirement: "*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute."  *Davis*, 526 U.S. at 642.

### B.    Application

There is no dispute here that the CIAC and its member schools are recipients of federal education funding for Title IX purposes.  Thus, unless the exception set forth in *Davis* were to apply, Plaintiffs' suit for private damages may proceed only if *Pennhurst*'s notice requirement is satisfied -- *i.e.*, if it is shown that the CIAC and its member schools had adequate notice that they could be liable under Title IX as a result of the Policy.  We conclude that only the opposite has been shown here.

Looking first to guidance promulgated since the Policy's adoption in 2013, OCR's position on transgender students' participation in athletics has fluctuated with the changes in presidential administrations in 2016 and 2020.[5] But even when promulgating and rescinding its guidance, OCR never clearly provided that allowing transgender students to participate on athletic teams

---

[5]      In 2017, OCR rescinded its guidance from 2016 -- which stated that transgender students must be allowed to participate in activities consistent with their gender identity, *see* Letter from Catherine E. Lhamon, Ass't Sec'y for Civil Rights, U.S. Dep't of Educ., and Vanita Gupta, Principal Dep. Ass't Att'y Gen. for Civil Rights, U.S. Dep't of Justice (May 13, 2016), -- on grounds that the legal issues implicated in the 2016 guidance needed to be considered "more completely," Letter from Sandra Battle, Acting Ass't Sec'y for Civil Rights, U.S. Dep't of Educ., and T.E. Wheeler, II, Acting Ass't Att'y Gen. for Civil Rights, U.S. Dep't of Justice (Feb. 22, 2017). Similarly, in August 2020, OCR sent the CIAC a Revised Letter of Impending Enforcement Action, stating that OCR interpreted Title IX to require that gender specific sports teams be separated based on biological sex, but OCR withdrew this letter in February 2021, stating that it should "not be relied upon in this or any other matter."  *See* ECF Nos. 172-1, 154-2.

consistent with their gender identity violates Title IX. *Cf. Jackson*, 544 U.S. at 183 (finding adequate notice where "regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years").

Next, the Supreme Court's recent decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the decisions of our sister circuits interpreting Title IX strongly support the conclusion that the CIAC and its member schools lacked notice that a policy such as that at issue here violates Title IX.

In *Bostock*, the Supreme Court interpreted Title VII's prohibition of discrimination "on the basis of sex" as proscribing discrimination based on one's transgender status, 140 S. Ct. at 1737, and the Court has "looked to its Title VII interpretations of discrimination in illuminating Title IX," *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting). Title IX includes language identical to that in Title VII, broadly prohibiting discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Thus, it cannot be said that the Policy -- which prohibits discrimination based on a student's transgender status by allowing all

students to participate on gender specific teams consistent with their gender

identity -- "falls within the scope of Title IX's proscriptions."

Moreover, the Courts of Appeals considering whether Title IX

prohibits schools from treating transgender students consistent with their gender

identity have held that the statute does not.  *See Parents for Priv. v. Barr*, 949 F.3d

1210, 1217 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020) (concluding that school

district's plan allowing transgender students to use bathrooms consistent with

their gender identity does not discriminate on the basis of sex in violation of Title

IX because the plan treats all students equally, regardless of their sex); *Doe by &*

*through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 535 (3d Cir. 2018), *cert.*

*denied*, 139 S. Ct. 2636 (2019) ("The School District's policy allows all students to

use bathrooms and locker rooms that align with their gender identity.  It does

not discriminate based on sex, and therefore does not offend Title IX.").

Some Courts of Appeals have taken it further and held that treating

transgender students consistent with their sex assigned at birth -- as the CIAC

and its member schools would be doing if the Policy were terminated -- violates

Title IX.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020), *as*

*amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) (holding that school

26

board's policy requiring students to use bathrooms based on biological sex unlawfully discriminated against transgender student in violation of Title IX); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017)("A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX."); *see also Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016). Although these cases from our sister circuits do not address the exact issue of participation of transgender athletes on gender specific sports teams, such authority nonetheless establishes that discrimination based on transgender status is generally prohibited under federal law, and further supports the conclusion that the CIAC and its member schools lacked clear notice that the Policy violates Title IX.

Invoking *Davis*, Plaintiffs argue that their suit for private damages may proceed even if there was no clear notice that the Policy violates Title IX because the CIAC and its member schools, through the Policy, intentionally discriminated against cisgender female athletes. We are not persuaded.

This "intentional conduct" exception to *Pennhurst*'s notice requirement has been applied only in cases where the funding recipient is

deliberately indifferent to known acts of retaliation or sexual harassment in violation of Title IX. *See, e.g.*, *Jackson*, 544 U.S. at 173 ("Retaliation against a person because [they] complained of sex discrimination is [a] form of intentional sex discrimination encompassed by Title IX's private cause of action."); *Davis*, 526 U.S. at 646-47 (concluding that federal funding recipients may be liable for private damages under Title IX "where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment"); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (concluding the same where deliberate indifference is to known teacher-on-student sexual harassment); *Franklin*, 503 U.S. at 74-75 (same). Plaintiffs have presented no persuasive arguments as to why the exception should also apply in this case, where the alleged Title IX violation is a facially neutral policy, and not a failure to respond to known instances of discriminatory conduct that clearly violates Title IX. *See Horner v. Kentucky High Sch. Athletic Ass'n*, 206 F.3d 685, 693 (6th Cir. 2000) (explaining that *Franklin*, *Gebser*, and *Davis* "all address deliberate indifference to sexual harassment, and are not readily analogous" to cases alleging sex discrimination with respect to facially neutral athletic opportunities). And even if this exception to the notice requirement is extended to cases involving claims of discrimination

in athletics, the Policy could not be considered "intentional conduct that violates the clear terms of [Title IX]," *Davis*, 526 U.S. at 642, given *Bostock* and the decisions from other Courts of Appeals.  Thus, the "intentional conduct" exception is inapplicable here.

Accordingly, we conclude that Plaintiffs' claims for money damages are barred.

## *CONCLUSION*

For the reasons stated above, we AFFIRM the district court's judgment dismissing the Complaint.