# 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SELINA SOULE, a minor, by Bianca Stanescu, her mother;
CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother;
ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother;
ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs-Appellants*,

v.

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a
CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE;
BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION;
CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION;
GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION;
CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY
PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her
daughter, T.M.; COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of
Connecticut, Case No. 3:20-cv-00201 (RNC)

## OPENING EN BANC BRIEF OF APPELLANTS

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. KIEFER
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
ckiefer@ADFlegal.org

RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti (collectively, Plaintiffs) are private individuals with no parent corporation or stockholders.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................... i

Table of Authorities.................................................................v

Jurisdictional Statement...........................................................1

Statement of the Issues............................................................2

Introduction........................................................................3

Statement of the Case ............................................................4

    A.    Title IX's background and requirements ...........................4

    B.    Title IX's revolutionary impact on sports ...........................8

    C.    Eligibility for girls' athletic teams in Connecticut ..............10

    D.    Biological males' competitive advantage and the devastating impact on female athletes................................11

    E.    Proceedings in the district court...........................................15

    F.    Proceedings on appeal .........................................................18

Summary of Argument................................................................21

Argument.............................................................................23

I.    Standard of Review ....................................................23

II.    Article III Standing........................................................23

III.    Plaintiffs plausibly alleged an injury in fact resulting from the CIAC policy. ..................................................24

    A.    The four elements of an "injury in fact" ...........................24

B.     The female athletes have plausibly claimed that the CIAC policy harmed them........................................................25

C.     Plaintiffs' alleged injuries are concrete. ...............................30

D.     The female athletes' claimed injuries are particularized. .....................................................................32

E.     Plaintiffs' alleged harms are actual or imminent. ..............35

F.     Court of Appeals rulings in athletic-record cases establish Plaintiffs' continuing harm and ability to seek prospective relief. ........................................................38

G.     Other circuits' student-educational-records cases validate the ongoing nature of Plaintiffs' injury and their right to pursue an injunction to fix them. ..................41

IV.     Plaintiffs have plausibly alleged that their injury in fact is redressable by a judicial decision. ..................................................44

A.     Defining redressability..........................................................44

B.     Compensatory or nominal damages will likely redress Plaintiffs' completed harms. ..................................................45

C.     Declaratory and injunctive relief will likely redress the female athletes' ongoing injuries. ........................................46

D.     Sports organizations often correct records and awards after the fact, demonstrating the premium put on accuracy and fair play. .......................................................49

V.     *Pennhurst*'s notice requirement does not apply to Plaintiffs' damages claims. Regardless, Title IX gave Defendants notice they could be liable for damages....................................................53

A. Supreme Court precedent establishes that *Pennhurst*'s notice requirement does not apply to recipient's own intentional decisions, and that Title IX itself gave Defendants any notice they required.................................53

B. Court of Appeals rulings confirm that *Pennhurst*'s notice requirement does not bar claims based on recipient's official policies. ..................................58

Conclusion .........................................................................60

Certificate of Service .......................................................62

Certificate of Compliance................................................63

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams ex rel. Kasper v. School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022)........................................................27

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ..............................................................25, 31

*Allen v. Wright*,
  468 U.S. 737 (1984) ......................................................................30

*American Farm Bureau Federation v. E.P.A*,
  836 F.3d 963 (8th Cir. 2016) ........................................................2

*AMG Capital Management, LLC v. Federal Trade Commission*,
  141 S. Ct. 1341 (2021) ..................................................................46

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................23

*Barnes v. Gorman*,
  536 U.S. 181 (2002) ......................................................................56

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................23, 24

*Biediger v. Quinnipiac University*,
  691 F.3d 85 (2d Cir. 2012)..............................................................8

*Bird v. Lewis & Clark College*,
  303 F.3d 1015 (9th Cir. 2002) ......................................................43

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ..................................................................20

*Boucher v. Syracuse University*,
  164 F.3d 113 (2d Cir. 1999)..........................................................33

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
    190 F.3d 705 (6th Cir. 1999) ..........................................................3

*Burke v. Barnes*,
    479 U.S. 361 (1987) ......................................................................39

*Calbillo v. San Jacinto Junior College*,
    434 F.2d 609 (5th Cir. 1970) ........................................................42

*Cannon v. University of Chicago*,
    441 U.S. 677 (1979) ................................................................7, 25

*Cape v. Tennessee Secondary School Athletic Association*,
    563 F.2d 793 (6th Cir. 1977) ..........................................................3

*Carney v. Adams*,
    141 S. Ct. 493 (2020) ......................................................25, 32, 35

*Church of Scientology of California v. United States*,
    506 U.S. 9 (1992) ..........................................................................47

*Clark v. Arizona Interscholastic Association*,
    695 F.2d 1126 (9th Cir. 1982) ......................................................28

*Cohen v. Brown University*,
    101 F.3d 155 (1st Cir. 1996)..........................................................27

*Constantine v. Rectors & Visitors of George Mason University*,
    411 F.3d 474 (4th Cir. 2005) ........................................................42

*Cottrell v. Alcon Laboratories*,
    874 F.3d 154 (3d Cir. 2017)............................................................2

*Crane by Crane v. Indiana High School Athletic Association*,
    975 F.2d 1315 (7th Cir. 1992) ......................................................40

*Davis v. Monroe County Board of Education*,
    526 U.S. 629 (1999) ..........................................................55, 56, 60

*E.M. v. New York City Department of Education*,
    758 F.3d 442 (2d Cir. 2014)......................................................2, 53

*Florida v. Georgia*,
141 S. Ct. 1175 (2021) .................................................................. 25

*Franklin v. Gwinnett County Public Schools*,
503 U.S. 60 (1992) ................................................................. 54, 55

*Gardner v. Mutz*,
962 F.3d 1329 (11th Cir. 2020) .................................................... 39

*Gebser v. Largo Vista Independent School District*,
524 U.S. 274 (1998) ............................................................... 55, 59

*Hall v. Millersville University*,
22 F.4th 397 (3d Cir. 2022) ......................................................... 58

*Hatter v. Los Angeles City High School District*,
452 F.2d 673 (9th Cir. 1971) ....................................................... 43

*Heckler v. Mathews*,
465 U.S. 728 (1984) ................................................................... 31

*Horner v. Kentucky High School Athletic Association*,
43 F.3d 265 (6th Cir. 1994) ........................................................... 8

*Jackson v. Birmingham Board of Education*,
544 U.S. 167 (2005) ..................................................... 7, 8, 57, 59

*Jones v. Wichita State University*,
698 F.2d 1082 (10th Cir. 1983) .................................................... 41

*Karasek v. Regents of University of California*,
956 F.3d 1093 (9th Cir. 2020) ...................................................... 59

*Klinger v. Department of Corrections*,
107 F.3d 609 (8th Cir. 1997) .......................................................... 6

*Larson v. Valente*,
456 U.S. 228 (1982) ................................................................... 45

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................. passim

*Mansourian v. Regents of University of California,*
  602 F.3d 957 (9th Cir. 2010) .................................................. 27, 59

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004) .............................................. 7, 27, 33

*McPherson v. Michigan High School Athletic Association, Inc.,*
  119 F.3d 453 (6th Cir. 1997) .................................................. 29, 39

*Meese v. Keene,*
  481 U.S. 465 (1987) .............................................................. 45, 47

*Mission Product Holdings, Inc. v. Tempnology, LLC,*
  139 S. Ct. 1652 (2019) ................................................................ 45

*Muir v. Navy Federal Credit Union,*
  529 F.3d 1100 (D.C. Cir. 2008) ................................................... 2

*Neal v. Board of Trustees of California State Universities,*
  198 F.3d 763 (9th Cir. 1999) ................................................... 8, 10

*Northeastern Florida Chapter of Associated General Contractors of
    America v. City of Jacksonville,*
  508 U.S. 656 (1993) .................................................................. 31

*O'Connor v. Board of Education of School District 23,*
  449 U.S. 1301 (1980) ................................................................ 27

*Overdam v. Texas A&M University,*
  43 F.4th 522 (5th Cir. 2022) ...................................................... 42

*Parents Involved in Community Schools v. Seattle School District
    No. 1,*
  551 U.S. 701 (2007) .................................................................. 31

*Parker v. Franklin County Community School Corp.,*
  667 F.3d 910 (7th Cir. 2012) ...................................................... 59

*Pederson v. Louisiana State University,*
  213 F.3d 858 (5th Cir. 2000) ...................................................... 33

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ................................................................... 18, 54

*Poloceno v. Dallas Independent School District*,
    826 F. App'x 359 (5th Cir. 2020) .................................................. 58

*Pottgen v. Missouri State High School Activities Association*,
    40 F.3d 926 (8th Cir. 1994) ........................................................ 40

*Pryor v. National Collegiate Athletic Association*,
    288 F.3d 548 (3d Cir. 2002) ........................................................ 58

*Rent Stabilization Association of New York v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993) ........................................................... 23

*Rocky Mountain Helium, LLC v. United States*,
    841 F.3d 1320 (Fed. Cir. 2016) ..................................................... 2

*Sandison v. Michigan High School Athletic Association, Inc.*,
    64 F.3d 1026 (6th Cir. 1995) ................................................... 29, 39

*Sierra Club v. E.P.A.*,
    699 F.3d 530 (D.C. Cir. 2012) ...................................................... 2

*Simpson v. University of Colorado Boulder*,
    500 F.3d 1170 (10th Cir. 2007) ................................................. 59, 60

*Soule by Stanescu v. Connecticut Association of Schools, Inc.*,
    57 F.4th 43 (2d Cir. 2022) .................................................... passim

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................. 25, 30

*Sprint Communications Company, L.P. v. APCC Services, Inc.*,
    554 U.S. 269 (2008) ................................................................ 44

*State Employees Bargaining Agent Coalition v. Rowland*,
    494 F.3d 71 (2d Cir. 2007) ......................................................... 36

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ................................................... 36, 45, 46, 47

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ........................................................................ 25

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................. 23, 24, 30, 37

*United States v. Oregon State Medical Society*,
    343 U.S. 326 (1952) ........................................................................ 35

*Utah v. Evans*,
    536 U.S. 452 (2002) ........................................................................ 45

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ............................................................... 25, 46

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................... 2, 23, 24, 39

*Washington v. Indiana High School Athletic Association, Inc.*,
    181 F.3d 840 (7th Cir. 1999) .......................................................... 40

*West Virginia v. Environmental Protection Agency*,
    142 S. Ct. 2587 (2022) .................................................................... 39

*Wiley v. National Collegiate Athletics Association*,
    612 F.2d 473 (10th Cir. 1979) .................................................. 29, 40

*Williams v. School District of Bethlehem*,
    998 F.2d 168 (3d Cir. 1993) .......................................................... 6, 8

*Yellow Springs Exempted Village School District Board of
    Education v. Ohio High School Athletic Association*,
    647 F.2d 651 (6th Cir. 1981) ............................................................ 6

## Statutes

20 U.S.C. § 1681 ..................................................................... 1, 5, 6, 54

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 1331 .................................................................................. 1

28 U.S.C. § 1343 ........................................................................... 1

Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974) ................................ 5, 7, 26

## **Other Authorities**

*10 years later, American Lashinda Demus poised to win Olympic gold after Russian hurdler stripped of medal for doping,* CBS News (Dec. 21, 2022) ............................................................ 51

130 Cong. Rec. 18,535 (1984) ...................................................... 4

Alan Burdick, *The Olympics' Never-Ending Struggle to Keep Track of Time*, The New Yorker (Feb. 8, 2018) ....................................... 14

CIAC 2022–2023 Handbook .................................................. 10, 20, 48, 49

Daniel J. Emam, *Manufacturing Equality: Title IX, Proportionality, & Natural Demand*, 105 GEO. L.J. 1107 (2017) ................................................................................. 9, 10

Deborah Brake, *Getting in the Game: Title IX and the Women's Sports Revolution* (2010) .................................................... 9

Doriane Coleman, Michael Joyner, & Donna Lopiano, *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POL'Y 69 (2020) ........................................... 9, 10, 11, 12

*Frequently Asked Questions*, Court of Arbitration for Sport .................. 50

*History of the CAS*, Court of Arbitration for Sport ............................... 50

*How to Describe Athletics on a Resume*, Lewis & Clark College Career Center .............................................................. 38

*Injury*, Black's Law Dictionary (11th ed. 2019) ............................... 24

Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ. SPORTS L. REV. 11 (2003) ........................ 6

*Lee McConnell receives belated world bronze medal in fourth major upgrade*, BBC (June 27, 2022) ............................................51

*More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. Commission on Civil Rights (July 1980) ............................4, 8

*Olympic Medal Reallocation Principles*, International Olympic Committee ......................................................................52

*Olympics: Canadian weightlifter Girard gets gold medal at last*, Reuters (Dec. 3, 2018) ....................................................52

Press Release, Athletics Integrity Unit, *Natalya Antyukh's Olympic Victory Officially Disqualified* (Dec. 21, 2022)...............52

Ryan Westwood, *5 Reasons Why Sporting a Staff of Athletes is a Game-Winning Strategy*, Forbes (Mar. 19, 2018) ........................37

Terry Miller Boys' Track & Field Bio, Athletic.net ................................13

*The ITA concludes the sample re-analysis program for the Olympic Games London 2012*, International Testing Agency (Dec. 5, 2022) ......................................................................51

*Title IX at 45*, National Coalition for Women & Girls in Education (2017) ......................................................................4, 9

Tony Black, *Tervel Dlagnev of Team USA receives his 2012 Olympic bronze medal in Olympic Medal reallocation ceremony in Lincoln, Neb.*, USA Wrestling (Mar. 6, 2022) ...........52

William Thro & Brian Snow, Cohen v. Brown University *and the Future of Intercollegiate and Interscholastic Athletics*, 84 ED. LAW REP. 611 (1993) ........................................................8

## Rules

Fed. R. App. P. 4(a)(1)(A) ......................................................1

## <u>Regulations</u>

34 C.F.R. § 106.41 .............................................................. passim

44 Fed. Reg. 71,413 (1979) ...................................................... 26

## JURISDICTIONAL STATEMENT

Four female athletes sued in the U.S. District Court for the District of Connecticut under Title IX to the Education Amendments, 20 U.S.C. § 1681(a), to vindicate their statutory rights. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Plaintiffs' Second Amended Verified Complaint sought declaratory and injunctive relief, nominal and compensatory damages, and attorney fees and costs. The district court granted Defendants' joint motion to dismiss on April 26, 2021. Plaintiffs filed a timely notice of appeal 30 days later. Fed. R. App. P. 4(a)(1)(A).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This Court's February 21, 2023, order instructs the parties to brief the following three issues:

1.     Whether Plaintiffs-Appellants have alleged an injury in fact resulting from Defendants-Appellees' "Transgender Participation" policy.

2.     Whether Plaintiffs-Appellants have alleged an injury in fact redressable by ordering the alteration of athletic records.

3.     Whether Plaintiffs-Appellants are barred by the *Pennhurst* doctrine from seeking monetary damages in relation to their claim brought pursuant to Title IX of the Education Amendments Act of 1972.[1]

---

[1] The en banc Court did not ask the parties to brief the merits of Plaintiffs' Title IX claim, and rightfully so. When assessing a plaintiff's Article III standing, federal courts "assume that on the merits the plaintiffs would be successful in their claims." *Am. Farm Bureau Fed'n v. E.P.A*, 836 F.3d 963, 968 (8th Cir. 2016) (quoting *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008)); *accord Sierra Club v. E.P.A.*, 699 F.3d 530, 533 (D.C. Cir. 2012). "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *accord E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (quoting *Warth*); *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (same); *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162 (3d Cir. 2017) ("To maintain [the] fundamental separation between standing and merits at the dismissal stage, we assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims.").

# INTRODUCTION

The Connecticut Interscholastic Athletic Conference ("CIAC") and member schools promulgated and enforced a policy that allowed biologically male students to compete in girls' sports based solely on their gender identity, ignoring "the distinct differences in physical characteristics and capabilities between the sexes." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds by Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999). Subsequently, two biological males competed in girls' track. And the effects were devastating on high-performing female track athletes, like Plaintiffs here. One named plaintiff, for instance, was deprived of "four state championship titles, two All New England awards, medals, points, and publicity" because she lost to one or both biological males. Appellants' App.69 ("App.").

So Plaintiffs sued under Title IX, which has protected female athletes' equal opportunities and effective accommodation for decades. Over *three years later*, the female athletes still have not obtained a merits ruling. The injustice that began on the track followed the female athletes to the courtroom. The district court and panel dismissed their plausible allegations out of hand on standing or notice grounds. Only the en banc Court can vindicate Plaintiffs' Article III standing and their right to seek damages and prospective relief for the CIAC policy's lasting harms. It should reverse and remand for a ruling on the merits.

## STATEMENT OF THE CASE[2]

### A.  Title IX's background and requirements

For most of our nation's history, equal athletic opportunity for women and girls was not simply devalued but actively opposed. Schools channeled female students into home economics classes and spurned their direct athletic participation as either dangerous, unfeminine, or not worth the cost. *More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. Comm'n on Civ. Rts. at 1 (July 1980) ("*More Hurdles to Clear*"), https://perma.cc/X3W3-T2YF; *Title IX at 45*, Nat'l Coal. for Women & Girls in Educ. at 2 (2017) ("*Title IX at 45*"), https://perma.cc/V7KM-PJ97. On and off the field, sex-based discrimination was commonplace.

During the 1971–1972 school year, only "7% of all high school athletes were girls." *Title IX at 45* at 38. Many high schools had no girls' sports teams, choking off the number of women who could compete in college. And, at the college level, "women received only 2% of schools' athletic budgets, and athletic college scholarships for women were nonexistent." *Id.* at 40. Women were denied important "opportunities for athletic competition and scholarships" as a result. 130 Cong. Rec. 18,536 (1984) (statement of Rep. Snowe).

---

[2] In keeping with the complaint and the nature of Plaintiffs' Title IX claims, this brief uses the terms "female," "girls," or "women" only in reference to athletes who are biologically female. App.131 n.1.

In 1972, Congress passed Title IX to end this sex-based discrimination. The statute declares that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a). Two years later, Congress re-affirmed that Title IX applies to athletics by directing the Department of Education's predecessor agency to issue regulations that "with respect to intercollegiate athletic activities [contain] reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).

These implementing regulations feature three key components. First, they set a general rule that sex discrimination, including providing "athletics separately," is disallowed in "interscholastic, intercollegiate, club or intramural" sports. 34 C.F.R. § 106.41(a). Second, the regulations provide an exception for sex-based teams "where selection … is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Last, they establish an overriding principle that Title IX mandates "equal athletic opportunity for members of both sexes," including "the selection of sports and levels of competition [that] effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1).

Under a prior scheme, Congress had the authority to review these regulations and scrap them in whole or in part. It scrutinized Title IX's

implementing regulations closely but deliberately chose to leave them intact. Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ. SPORTS L. REV. 11, 20–22 (2003).

The implementing regulations generally require non-selective athletic opportunities in schools, such as physical education classes, to be coed. Sex-based teams are *permissible* if tryouts are based on competitive skill or a contact sport is involved. But if providing equal athletic opportunities—including effectively accommodating both sexes' interests and abilities—requires maintaining separate girls' and boys' teams, then sex-based teams are *required. Cf. Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993) (Title IX grants a school "flexibility … to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met"); *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (same).

Under Title IX, equal opportunity is substantive, not hollow. *E.g.*, *Klinger v. Dep't of Corr.*, 107 F.3d 609, 614 (8th Cir. 1997) (Title IX requires "equality," not "parity" (quotations omitted)). The statute does not simply bar sex discrimination. It requires "the benefits of [ ] … any education program" to be sex neutral. 20 U.S.C. § 1681(a). And when it comes to athletics, this equal-benefits mandate accounts for "the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).

6

Put differently, "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

The regulations ensure sex-neutral benefits by: (1) barring sex discrimination generally; (2) yet allowing sex separation to maintain selectivity and competitiveness, or avoid an enhanced risk of injury, based on the features of a particular sport; and (3) establishing a paramount equal-athletic-opportunity requirement for both sexes that encapsulates Title IX's text and purpose. 34 C.F.R. § 106.41(a)–(c).

Courts have given Title IX's language a wide scope to realize Congress's goals of "avoid[ing] the use of federal resources to support discriminatory practices" and "provid[ing] individual citizens effective protection against" them. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979); *accord Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach."). Specifically, Congress enacted Title IX "in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).

For 40 years, the Supreme Court has "constru[ed] 'discrimination' under Title IX broadly" to ensure that women and girls benefit equally from educational programs. *Jackson*, 544 U.S. at 174. And the Courts of

Appeals have followed suit, characterizing Title IX as "a dynamic statute," *Neal* v. *Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 769 (9th Cir. 1999); that mandates "real [athletic] opportunities, not illusory ones," *Williams*, 998 F.2d at 175. Notably, this Court has already held that Title IX requires that girls have "*genuine* athletic participation opportunities." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 101 (2d Cir. 2012) (emphasis added). So any "measure[ ]" of Title IX "compliance" must account for "whether [athletic programs actually] achieve … equal opportunity" for both sexes. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273–74 (6th Cir. 1994).

### B.    Title IX's revolutionary impact on sports

Athletics have long been "an integral part of the educational process in American high schools and colleges." *More Hurdles to Clear* at iii. But "women and girls were not encouraged to participate until recently." *Id.* Title IX was the catalyst. It made the abolition of sex discrimination in education a federal priority, "trigger[ing] a revolution that changed the face of American sports." William Thro & Brian Snow, Cohen v. Brown University *and the Future of Intercollegiate and Interscholastic Athletics*, 84 ED. LAW REP. 611, 611 (1993).

Title IX sparked a "huge increase in the number of girls who grow up playing organized sports, with many of them continuing to do so into adulthood." Deborah Brake, *Getting in the Game: Title IX and the Women's Sports Revolution* 37 (2010). In the 47-year span from 1971–72

to 2018–19, high school girls' athletic participation surged from 294,000 to over 3.4 million. Doriane Coleman, Michael Joyner, & Donna Lopiano, *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POL'Y 69, 72 (2020) ("*Re-Affirming the Value of the Sports Exception*"). A similar rise occurred in college sports where women's participation started at 30,000 and rose to over 288,000. *Id.*

Due in large part to Title IX, girls and women benefit from "being physically strong," "developing the myriad skills associated with competitive sport," and "attending college on athletic scholarships." *Id.* "Title IX has successfully changed the lives of girls and of women …, protecting their rights, broadening their horizons[,] and setting them up for success in later stages of their education and careers." *Id.* at 70 (quotation omitted).

The Title IX revolution changed American education for the better. Sports participation yields many concrete benefits for girls and women, including "(1) better overall health; (2) better academic performance; and (3) lessons in teamwork, leadership[,] and confidence." Daniel J. Emam, *Manufacturing Equality: Title IX, Proportionality, & Natural Demand*, 105 GEO. L.J. 1107, 1123 (2017) ("*Manufacturing Equality*"); *accord Title IX at 45* at 5. One revealing metric is that "nearly 85 percent of female business executives played a varsity sport in high school or college, the majority of which say that their time on

9

the field contributed greatly to their success." *Manufacturing Equality*, 105 GEO. L.J. at 1123–24; *accord Re-Affirming the Value of the Sports Exception*, 27 DUKE J. GENDER L. & POL'Y at 106–07.

### C. Eligibility for girls' athletic teams in Connecticut

Title IX's mandate of equal athletic opportunity allows girls and women the same chance as boys and men "to enjoy the thrill of victory [and] the agony of defeat." *Neal*, 198 F.3d at 773. But female track athletes in Connecticut have experienced the "agony of defeat" disproportionately to the "thrill of victory." This inequality results from a Connecticut Interscholastic Athletic Conference ("CIAC") policy that "determine[s] a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC 2022–2023 Handbook at 54, https://perma.cc/9U2W-WBQW (the "CIAC policy"); *accord* App.149.

Under the CIAC policy, no testosterone suppression is required for biological males to compete on girls' athletic teams. School districts merely verify "that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity." CIAC 2022–2023 Handbook at 54. The policy stops biological male students from joining girls' teams only if they "claim a particular gender identity *for the purpose of* gaining a *perceived advantage* in athletic

competition." *Id.* (emphasis added). Physiological differences play no role in the eligibility decision: the policy deems irrelevant biological males' *actual advantage* in athletic competition.

### D. Biological males' competitive advantage and the devastating impact on female athletes

The competitive advantage that biological males have over girls is real and substantial. App.139–42. "[S]cientists agree that males and females are materially different with respect to the main physical attributes that contribute to athletic performance." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. GENDER L. & POL'Y at 92 (cleaned up); *accord id.* at 87–99. Regardless of how they identify, biological males have more muscle, higher cardiac outputs, larger hemoglobin mass, higher aerobic and anaerobic capacity, and different economy of motion. *Id.* at 94; *accord* App.140–41. These differences stem from biological males' exposure "to much higher levels of testosterone (T) during growth and development (puberty), and throughout [their] athletic career[s]." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. GENDER L. & POL'Y at 92; *accord* App.140, 146–47.

Based on their physiology, "even the very best females are not competitive for the win against males." *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. GENDER L. & POL'Y at 115; *accord* App.142–46. "[L]arge numbers of men *and even adolescent boys* are able to outperform the very top-performing women." App.34 (emphasis

added). The upshot is that when biological males are allowed to compete against biological girls, they dominate women's sports. *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. GENDER L. & POL'Y at 98–100. And that is precisely what happened in Connecticut after the CIAC effectively dismantled sex-specific track teams.

In 2017, the CIAC allowed Andraya Yearwood, a biologically male student who identified as female, to compete in high school girls' track and field. App.150. Yearwood, even as an inexperienced freshman, claimed two State Class championships,[3] App.151, and ultimately ranked third in the State Open championship, App.153.

Biological-male dominance of female athletics reached new heights in 2018. The CIAC also allowed Terry Miller, a biologically male athlete who identified as female, to compete in high school girls' track. App.153. Miller previously competed on the boy's track team for three seasons and never advanced to a State Class or State Open championship. App.153. In fact, Miller never ranked above 325th in Connecticut in a boys' track event.[4] All that changed when Miller switched to female

---

[3] Connecticut track and field competition involves multiple tiers. First, athletes may qualify to compete in statewide "Class" races based on school size. App.150. "[T]he top-performing students within each State Class championship qualify to participate in the State Open championships," in which the top athletes compete regardless of school size. *Id.* Finally, "the top performers in the State Open championships qualify to participate in the New England Championship." *Id.*

[4] Terry Miller Boys' Track & Field Bio, Athletic.net, bit.ly/3naPoT2.

athletics: Miller took first prize at the women's 2018 State Open 100m event by a large margin, while Yearwood won runner-up. App.153–54. Chelsea Mitchell, who would have ranked second in the state in sex-specific competition *as a freshman*, rated fourth instead. App.154.

The 2019 season was much the same. In a preliminary State Class race, Miller and Yearwood took second and third place, blocking freshman Ashley Nicolette from qualifying for the 100m State Class final. App.157. Miller and Yearwood also took the top slots in a preliminary State Open race, preventing Selina Soule from competing in the State Open 55m final. And in that final 55m State Open race, Miller and Yearwood won gold and silver by a wide margin, leaving Mitchell—the top-performing biological girl—with a bronze medal. App.155. What's more, Mitchell and another girl, Alanna Smith, ranked third and fourth, rather than second and third, in the 200m State Open final because Miller took first place—again by a large margin. App.158.

From 2017 to 2019, Miller and Yearwood won 13 girls' state-championship titles and took more than 68 opportunities to advance to and compete in higher-level track races. Those limited and valuable opportunities would otherwise have gone to biological girls. App.159. In fact, Miller and Yearwood won 13 out of 14 "girls" championships in seven important state-level events. *Id.* A biologically female athlete won just one. *Id.* Male athletes experienced no such harm: in boys' track,

13

males won all 14 parallel championship races. The brunt of the CIAC's policy falls on girls alone.

Athletes like Soule, Mitchell, Smith, and Nicoletti have personally felt the policy's impact. They trained hard to shave fractions of seconds off their race times so they could compete in state and regional meets, stand atop the winners' podium, and perhaps even secure college athletic scholarships and gainful employment beyond—just like champions in boys' track. App.72, 164. Often those dreams were dashed, as the CIAC policy forced Soule, Mitchell, Smith, and Nicoletti to compete against—and lose to—biological males.

The margins were generally not close. In track, victory often comes down to a thousandth or a hundredth of a second. *E.g.*, Alan Burdick, *The Olympics' Never-Ending Struggle to Keep Track of Time*, The New Yorker (Feb. 8, 2018), https://perma.cc/HJK8-C3Z9. Yet Miller and Yearwood, for instance, finished .28 and .22 seconds ahead of Mitchell, the fastest biological girl in the 2019 55m State Open championship final. App.155. And the margin was even greater in the 200m State Open championship final: Miller finished a whopping .42 seconds ahead of the fastest girl and .68 seconds ahead of Smith who placed third. App.158. Although Soule, Mitchell, Smith, and Nicoletti were already invested and persevered in track, the lure of competitive sports will lessen substantially if biological girls' chance of winning is slim-to-none.

14

In 2020, Soule and Mitchell graduated from high school, as did Miller and Yearwood. Smith and Nicoletti continued to participate in high school track until they graduated in 2022.

### E.    Proceedings in the district court

The school environment that Soule, Mitchell, Smith, and Nicoletti experienced is not the one Congress intended. So they sued CIAC and relevant member high schools, alleging the CIAC policy violates Title IX by failing to provide female athletes with equal treatment, benefits, and opportunities, App.174–75, and by not effectively accommodating female athletes' interests and abilities, App.172–74. The female athletes' complaint sought: (1) a declaration that the CIAC policy violates Title IX, (2) an injunction barring the policy's enforcement, (3) an injunction requiring CIAC and its members schools to correct their athletic records and properly credit biological girls' athletic records, titles, and achievements, as well as (4) nominal and compensatory damages, and (5) attorney fees and costs. App. 175–76. Simultaneously, Plaintiffs moved for a preliminary injunction. Mot. for Prelim. Inj., Doc.12.

But the inequity that plagued the female athletes on the track followed them to the courtroom. Though they moved for an expedited hearing on the preliminary-injunction motion, Mot. for Expedited Order to Show Cause Hr'g, Doc.15, the district court never required Defendants to file an opposition brief or scheduled a hearing on the motion.

15

The court simply ran the clock and denied the motion as moot nearly *14 months* later. Order Finding as Moot, Doc.176.

In stark contrast, when Miller and Yearwood moved to intervene as defendants, Mot. to Intervene as Defendants, Doc.36, the district court set a prompt hearing, Calendar Notice, Doc.88. The proceedings were lopsided from the start. On its own initiative, the district court barred Plaintiffs' counsel from "refer[ring] to the proposed intervenors as 'males,'" ordering him to call them "'transgender females'" instead. App.104. When Plaintiffs' counsel objected that biological distinctions were the cornerstone of the female athletes' case, the court responded: "This isn't a case involving males who have decided that they want to run in girls' events. This is a case about girls who say that transgender girls should not be allowed to run in girls' events." App.104. And the district court essentially accused Plaintiffs' counsel of "bullying" by referring to Miller and Yearwood as biological males. App.107. The court granted the motion to intervene, Order, Doc.93; as well as another intervention motion filed by the Connecticut Commission on Human Rights and Opportunities, Order, Doc.95.

Defendants then filed a joint motion to dismiss, arguing that the female athletes lacked standing and their complaint failed to state a claim on which relief could be granted. Mot. to Dismiss Second Am. Compl., Doc.145. Briefing on the motion was complete in September 2020. Reply to Resp. to Mot. to Dismiss, Doc.157. The district court held

16

a hearing five months later. Minute Entry, Doc.173. About two months following the court dismissed the complaint in its entirety, Ruling & Order, Doc.178, triggering this appeal.

By the time the district court finally ruled on the motion, Miller and Yearwood had graduated. The court did not doubt Plaintiffs' standing when the complaint was filed. App.267. Yet it regarded Miller and Yearwood's "participation in girls' track . . . [as] the impetus for this action," App.271, and held that Plaintiffs' request to enjoin *future* enforcement of the CIAC policy was moot, App.271–75. While the case lingered on the docket, Smith and Nicoletti graduated too.

The district court also held that Plaintiffs lacked standing to seek an injunction requiring CIAC and member schools to correct *past* athletic records, medals, and achievements. App.277–78. Absent the CIAC policy, and Miller and Yearwood's competition in girls' track, the court recognized that:

> (1) Chelsea Mitchell would have finished first in four elite events in 2019, and qualified for the 2017 New England Regional Championship in the Women's 100m; (2) Selina Soule would have advanced to the next level of competition in the 2019 CIAC State Open Championship in the Women's Indoor 55m; (3) Ashley Nicoletti would have qualified to run in the 2019 CIAC Class S women's Outdoor 100m; and (4) Alanna Smith would have finished second in the Women's 200m at the 2019 State Outdoor Open. [App.277]

Yet the court belittled these harms, reasoning that anyone "impressed" by Mitchell's corrected record "would learn that *she did not actually*

*finish first* in the four races," App.277–78 (emphasis added), a biological male did. Overall, the court deemed athletic records—unlike disciplinary records—as of trivial importance to students, colleges, and employers. App.278.

Mootness could not hinder Plaintiffs' claim for damages. Even so, the court erroneously dismissed that relief as barred by a notice requirement derived from *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). App.279–87. Viewing that requirement as a lesser form of qualified immunity, the court held that U.S. Department of Education ("DOE") guidance and Title IX court rulings did not give Defendants "clear notice" that enacting and enforcing the unlawful CIAC policy could expose them to damages. App.279–80, 282.

## F.   Proceedings on appeal

On appeal, a panel of this Court affirmed the dismissal of the female athletes' Title IX claims. When it came to Plaintiffs' request for an injunction correcting CIAC and its members' athletic records, the panel held they lacked standing. *Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 50–51 (2d Cir. 2022). Yet it ignored Plaintiffs' chief source of injury: "No less than any other athlete, Plaintiffs want their hard work accurately and fairly recognized." Op.Br.19. Because of the CIAC policy, Plaintiffs' "records do not recognize [their] actual achievements—an inherent harm that the courts can redress."

Op.Br.16. Not once did the panel opinion discuss Plaintiffs' "interest in having their achievements recognized."[5] Op.Br.19.

Instead, the decision morphed Plaintiffs' asserted "right to be *recognized* as champions," Op.Br.18 (emphasis in original), into "a '*chance* to be champions'" and held no injury exists. *Soule*, 57 F.4th at 51 (emphasis added). But Plaintiffs did not allege merely that they were barred from "compet[ing] at state track championships as high school athletes." *Id*. Their claim is—and has always been—that "[b]oys who compete in CIAC-sponsored events do not worry that their achievements will be 'erased' or 'wiped from the books' due to unfair competition," and that Title IX entitles girls to equal benefits. Op.Br.18.

Redressability was also lacking, according to the panel, based on the same alchemy. Fixing the CIAC's athletic records "would not give Plaintiffs 'a *chance* to be champions.'" *Soule*, 57 F.4th at 51. But Plaintiffs' argument has always been that Title IX requires funding recipients to provide female athletes with fair "opportunities to win,"[6] Op.Br.33, and that biological males participating in girls' track have an "unfair advantage in competition," Op.Br.24. Correcting female

---

[5] Though Plaintiffs faulted the district court for "never discuss[ing] the inherent value to female athletes of having their achievements properly recognized," Op.Br.19, the panel opinion repeats the same error.

[6] *Accord* Op.Br.17 ("Athletes compete to win.").

athletes' records, recognizing their achievements, and reallocating medals would at least partially redress that harm.

Essentially recognizing as much, the panel opinion hints that altering athletic records is impossible. *Soule*, 57 F.4th at 51. Yet the CIAC handbook shows that this (improper) negative inference is not true. When a student athlete uses performance-enhancing substances, "[a]ll CIAC contests/games/tournaments/championships in which the offending athlete participated while under the influence of [those] substances shall be declared forfeitures and all records will be expunged." CIAC 2022–2023 Handbook at 103; *accord* Op.Br.18–19. Nothing stops a court from ordering a similar remedy here—especially as the steroids athletes sometimes use to gain an unfair advantage are often synthetic modifications of testosterone. App.140.

As to Plaintiffs' damage claims, the panel ruled that funding recipients must have "'adequate notice that they could be liable'" under Title IX. *Soule*, 57 F.4th at 54 (quotation omitted). The opinion first looked to DOE guidance, which it said "never clearly provided [that the CIAC policy] violates Title IX. *Id.* at 55. Implying that *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and Court of Appeals decisions concerning transgender students' bathroom use *required* the CIAC policy, the opinion said that caselaw failed to provide Defendants with notice of potential liability. *Soule*, 57 F.4th at 55.

Lastly, the panel opinion cabins the "'intentional conduct' exception to *Pennhurst*'s notice requirement" to "retaliation or sexual harassment" cases. *Id.* at 56. So this case would not qualify. *Id.* But even if it did, the opinion holds that the exception requires "'intentional conduct that violates the clear terms of [Title IX]'" and the CIAC policy does not fit that bill. *Id.* (alteration in original).

Of its own accord, this Court granted en banc review. 2/13/2023 Order, Doc. 258.

## SUMMARY OF ARGUMENT

Plaintiffs plausibly alleged that Defendants' promulgation and enforcement of the CIAC policy caused an injury in fact. Depriving Plaintiffs of equal athletic benefits and opportunities, as well as effective accommodation of their abilities, violated Title IX and harmed them by causing Plaintiffs emotional and psychological distress; blocking their advancement to regional meets; stripping them of medals, championship titles, and records; and depriving them of public recognition for their achievements. Those injuries are concrete, not abstract, and particular to each named Plaintiff, not generalized.

They are also actual or imminent. Violation of Plaintiffs' Title IX rights and the resulting emotional distress; loss of medals, titles, and advancement; degrading their official athletic records; and dampening of college scouts' and scholarship committees' interest are actual, completed harms. Because the injuries resulting from those harms are

ongoing—particularly when it comes to the accuracy of Plaintiffs' official athletic records and their resulting marketability—they are not only actual but imminent too. Other Courts of Appeals' rulings in prior athletic-records cases and academic-or-disciplinary record cases prove Plaintiffs' ongoing injuries and right to seek prospective relief.

Plaintiffs have also plausibly alleged that their injuries are at least partially redressable by a judicial decision. Compensatory or nominal damages will likely redress their completed harms, and prospective relief will likely remedy their ongoing injuries by correcting their official athletic records, medals, and titles. CIAC's own policies demonstrate that correcting students' athletic records after the fact is both possible and necessary to address the effect of unfair competition. And the highest levels of competitive sport show that society highly values corrected athletic medals and records, no matter how long it takes to get them right.

What's more, *Pennhurst*'s notice requirement does not apply to Title IX claims based on recipients' intentional actions. Official policies—like Defendants' CIAC policy—are always intentional and subject to recipients' direct control, so notice is not required. Anyway, Title IX itself gave Defendants notice of potential liability. And rulings by other Courts of Appeals verify that *Pennhurst* does not bar Plaintiffs' damages claims here.

## ARGUMENT

### I. Standard of Review

Because "the trial court dismissed on the basis of the complaint alone or the complaint supplemented by undisputed facts evidenced in the record," this Court's review "is *de novo.*" *Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993).

### II. Article III Standing

Plaintiffs have Article III standing if they (1) suffered an injury in fact that is concrete and particularized, as well as actual or imminent; (2) it's likely the defendant caused the injury; and (3) it's likely the injury would be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Together, these requirements ensure that plaintiffs have suffered an injury caused by the defendant that a court can solve. *Id.* This Court ordered briefing on the injury-in-fact and redressability prongs. 2/21/2023 Order, Doc.261.

The female athletes are "invoking federal jurisdiction" and "bear[ ] the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). But Article III's requirements are "relatively modest," especially at the pleadings stage. *Bennett v. Spear*, 520 U.S. 154, 171 (1997). This Court "accept[s] as true all [plausible] allegations of the complaint, and must construe the complaint in [Plaintiffs'] favor." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And it "presume[s] that [the complaint's] general

allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quotation omitted). Under this standard, Plaintiffs' "general factual allegations of injury resulting from the defendant's conduct may" show standing without more. *Id.*

## III. Plaintiffs plausibly alleged an injury in fact resulting from the CIAC policy.

### A. The four elements of an "injury in fact"

The Supreme Court defines an "injury in fact" as the invasion of a cognizable interest that is concrete and particularized, actual (not conjectural) or imminent (not hypothetical). *E.g.*, *Bennett*, 520 U.S. at 167; *Lujan*, 504 U.S. at 560. Broken down, there are four elements: (1) an injury that is (2) concrete and (3) particularized, and either (4) actual or imminent. *Accord TransUnion*, 141 S. Ct. at 2203.

First, an "injury" may be "[a]ny harm or damage" or, more specific to the law, "[t]he violation of a[ ] legal right, for which the law provides a remedy," *Injury*, Black's Law Dictionary (11th ed. 2019), including the breach of an individual's statutory rights, *Warth*, 422 U.S. at 500.

Second, the injury must be "concrete," which means "real, and not abstract." *TransUnion*, 141 S. Ct. at 2204 (quotation omitted). Courts use "history and tradition" as a "guide" in testing whether the alleged injury bears "a close relationship to a harm traditionally recognized as providing a basis [for suing] in American courts." *Id.*

24

Third, the harm must be "particularized." In other words, "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Generalized grievances that virtually anyone could raise are not enough. *E.g.*, *Carney v. Adams*, 141 S. Ct. 493, 498–99 (2020); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

Last, the injury must be "actual or imminent." This requirement is straightforward: plaintiffs must show "*actual* past or threatened [future] harm." *Florida v. Georgia*, 141 S. Ct. 1175, 1183 (2021); *accord Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021). "[P]ast injury" grants standing for backward-looking relief, while ongoing or "imminent future injury" confers standing for prospective relief. *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009); *accord Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11 (1995).

## B. The female athletes have plausibly claimed that the CIAC policy harmed them.

Individual students may sue for violations of Title IX. *Cannon*, 441 U.S. at 689, 717. In particular, the statute gives student athletes a catalogue of important rights. Recipients cannot deny girls and women "the benefits of . . . or otherwise . . . discriminate[ ] against [them] in" athletics. 34 C.F.R. § 106.41(a). Stopping *direct* discrimination against female athletes is good, but Title IX doesn't stop there.

25

Funding recipients must also "provide equal athletic opportunity for" girls and women, including by offering "sports and levels of competition [that] effectively accommodate [their] interests and abilities." 34 C.F.R. § 106.41(c)(1); *accord* 44 Fed. Reg. 71,413, 71,414 (1979) ("[T]he governing principle in this area is that the athletic interests and abilities of male and female students must be equally effectively accommodated."). So Title IX also bars *indirect* discrimination against female athletes, as recipients may not enforce athletic "policies" that are "discriminatory in . . . effect." 44 Fed. Reg. at 71,417.

Instead of ignoring girls and women's unique capabilities and concerns, funding recipients must effectively accommodate them. And in ensuring that female athletes benefit equally from their sports programs, recipients must keep all relevant circumstances in mind, including "competitive skill," 34 C.F.R. § 106.41(b), and "the nature of particular sports," Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).

Plaintiffs plausibly allege indirect discrimination that violates Title IX. Specifically, they claim the CIAC policy allowing biological males to compete against them in girls' track has a discriminatory effect and deprived them of equal athletic opportunities. *E.g.*, App.131 (alleging female athletes have "*fewer* opportunities to stand on the victory podium," "participate in post-season elite competition," obtain "public recognition as champions," and "set[ ] recognized records"). And they contend that dismantling sex-based track teams failed to

26

effectively accommodate girls' abilities. *E.g.*, App.173 ("[A]fter puberty, the athletic abilities of girls relevant to track and field competitions are not equal to those of comparably fit and trained boys.").

Those are classic Title IX injuries. For decades, courts have recognized female athletes' right to sue based on identical statutory harms. *E.g.*, *McCormick*, 370 F.3d at 291–92 (discussing Title IX "'equal treatment'" and "'accommodation'" requirements); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010) (same); *Cohen v. Brown Univ.*, 101 F.3d 155, 180–81 (1st Cir. 1996) (ruling for female athletes on an effective-accommodation claim). So the injuries the female athletes allege here are plainly cognizable.

Depriving Plaintiffs of the equal benefits and effective accommodation to which Title IX entitles them is *itself* an injury. Courts have recognized the danger of demolishing schools' sex-based athletic teams for decades. *E.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification . . ., there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022) (Lagoa, J., specially concurring) ("commingling of the biological sexes in the female athletics arena would significantly undermine the benefits" that separate sports

27

teams "afford[] to female student athletes"); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("recognizing the physiological fact that males would have an undue advantage competing against women for positions on the volleyball team"). Plaintiffs' complaint plausibly alleges those anticipated harms resulted here because of the CIAC policy.

This experience of "[un]fair competition" in CIAC-sponsored athletics cascaded into a series of additional harms. App.148, 174–75. To name a few, Plaintiffs experienced "stress, anxiety, intimidation, and emotional and psychological distress from being forced to compete against males with inherent physiological advantages in the girls' category." App.164; *accord* App.175. Competing "for second or third place" resulted in Plaintiffs stepping up "to the starting line thinking, 'I can't win.' 'I'm just a girl,'" App.163, leading to "depression," App.164.

What's more, the CIAC policy robbed the female athletes of "medals, advancement to regional meets, championship titles and records, and recognition on the victory podium." App.148. Because these achievements feature prominently on college, scholarship, and job applications, App.156, taking "public recognition" away from Plaintiffs forever changed the trajectory of their lives, App.158–59, 170, 174–75.

Yet these harms are not all that matters. Student athletes have an ongoing interest in their athletic records. Courts of Appeals have recognized that interest for over 40 years. *E.g.*, *McPherson v. Mich.*

*High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458–59 (6th Cir. 1997) (en banc) (basketball player had a post-graduation interest in keeping his teams' victories from being "vacate[d] or strike[n]"); *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995) (track athletes "still have an interest [post-graduation] in preventing" the "erasure of individual performances" and "forfeiture of team victories"); *Wiley v. Nat'l Collegiate Athletics Ass'n*, 612 F.2d 473, 476 (10th Cir. 1979) (track athlete had a post-graduation interest "[a]s long as [his] records and awards are at stake").

The female athletes also have an interest in getting "credit where credit's due." *Accord* App.166–67 (Defendants should "correct official records and publicity material to give accurate credit to girls who would have been recognized as victors but for [their] violations of Title IX"). The CIAC policy irreparably harms that interest by denying Plaintiffs accurate official records of "their hard-earned athletic accomplishments," which they can look back to—and gain confidence from—for a lifetime. App.172. Defendants publish these inaccurate records, medal assignments, and lists of champions in perpetuity. App.171–72. So the harm to Plaintiffs' "interest in having their achievements recognized" never ends. Op.Br.19.

In fact, it is precisely *because* records matter across a lifetime that Intervenors continue to oppose Plaintiffs' requested relief. Before the panel, Miller and Yearwood's counsel admitted that being improperly

denied a trophy is a sufficient injury to support standing.[7] All the athletes involved in this litigation are of one voice that athletic records matter profoundly.

Each of these harms is cognizable. And any one of them is sufficient to give Plaintiff standing under Article III.

### C.   Plaintiffs' alleged injuries are concrete.

Concrete injuries are real and not abstract. *Spokeo*, 578 U.S. at 340. But concrete harms are not always tangible. As the Supreme Court has explained, "intangible injuries can nevertheless be concrete." *Id.* Plaintiffs need only show that the intangible injury alleged has "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341.

Title IX is a non-discrimination law that bars funding recipients from (directly or indirectly) committing sex discrimination. The Supreme Court has listed "discriminatory treatment" as an archetypal example of the "concrete, *de facto* injuries" that "Congress may elevate to the status of legally cognizable injuries." *TransUnion*, 141 S. Ct. at 2204–05 (quotation omitted) (citing *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984)). So the harms Plaintiffs experienced as a result of Defendants' violation of Title IX are concrete.

---

[7] Oral argument, *Soule v. Conn. Ass'n of Schs.*, No. 21-1365 (Sept. 29, 2022), at 20 min., 48 sec. through 21 min, 22 sec.

What's more, American courts accept the concreteness of closely related—if not identical—harms in the equal-protection context. Courts have long recognized that "persons who are personally denied equal treatment" may incur "serious non-economic injuries." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984). Often the concrete injury boils down to plaintiffs' "inability to compete on an equal footing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *accord Adarand*, 515 U.S. at 211. Plaintiffs have "standing" if they are "able and ready" to compete once "a discriminatory policy [that] prevents [them] from doing so on an equal basis" is erased. *Ne. Fla. Chapter*, 508 U.S. at 666. Article III does *not* require plaintiffs in equal protection cases to allege that they "would have obtained the benefit but for the [wrongful] barrier." *Id.* The injury "is being forced to compete in [an illegal] system." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). And the same is true in Title IX cases—like Plaintiffs' here.

Going above and beyond, the complaint alleges specific benefits that the female athletes would have obtained but for the CIAC policy. This includes specific high-level opportunities to race, athletic records, and track medals that Defendants denied to Plaintiffs because the CIAC policy allows biological males to compete in girls' track. *E.g.*, App.152–62. Because the female athletes' alleged injuries are real and not abstract, they meet Article III's concreteness requirement.

31

**D.    The female athletes' claimed injuries are particularized.**

Plaintiffs allege injuries that are particularized to them, not widespread. Soule, Mitchell, Smith, and Nicoletti are high-performing female track athletes. The CIAC policy marred their individual track careers by forcing them to compete *personally* on a *repeated basis* against two biological males—and nearly always lose. App.152–62. Plaintiffs thus base their claims on "a personal and individual injury," not a "general interest common to all members of the public." *Carney*, 141 S. Ct. at 499 (quotations omitted).

For example, the policy uniquely injured Plaintiffs by subjecting them to "[un]fair competition" and depriving them of equal athletic benefits and opportunities. App.148, 174–75. Plaintiffs also directly experienced, and were harmed by, "Defendants' failure to provide competitive opportunities that fairly and effectively accommodate the athletic abilities of female athletes." App.175; *accord* App.173. Soule, Mitchell, Smith, and Nicoletti personally "face[d] a level of [track] competition that does not equally reflect and accommodate girls' different physiological characteristics and abilities." App.163.

Student athletes who experience discriminatory policies firsthand, and who suffer real-world harms as a result, have a particularized injury. Courts recognize that female varsity athletes—like Plaintiffs— have standing to raise equal-treatment claims. *E.g.*, *McCormick*, 370

F.3d at 281, 284–85 & n.9 (varsity athletes who played, or would play, soccer if the girls' team received equal treatment had standing); *cf. Boucher v. Syracuse Univ.*, 164 F.3d 113, 116 (2d Cir. 1999) (rejecting such a claim "since none of the named plaintiffs were varsity athletes"); *Pederson v. La. State Univ.*, 213 F.3d 858, 872 (5th Cir. 2000) (equal-treatment plaintiffs "lack[ed] standing" because "no named plaintiff was a member of a varsity team").

The bar is even lower for effective-accommodation claims. Courts acknowledge that standing extends to *any female student* who "is 'able and ready' to compete for a position on [a] team," whether or not that student currently participates in sports. *Pederson*, 213 F.3d at 871; *accord Boucher*, 164 F.3d at 117–18 (former female club athletes would have standing to litigate an effective-accommodation claim if they'd lodged a timely claim for damages).

Over and above what Article III requires, the complaint alleges competitive harms exclusive to each plaintiff. The female athletes "trained harder than ever," App.72, not just to compete but "to win [or place highly in] championships" staged on a level playing field, App.170. Fitness or entertainment were not Plaintiffs' goals. Soule, Mitchell, Smith, and Nicoletti worked tirelessly "to shave mere fractions of seconds off" their run times, App.72, because they aspired "to receive public recognition of their achievements, and to experience the thrill of victory," App.170. Then the CIAC changed the rules, admitting

33

biological males to girls' sports—which pulled the rug out from under the female athletes. Naming just a few examples, but for the CIAC policy:

- Soule would have advanced beyond a preliminary race to the 2019 State Open Championship Women's Indoor Track 55m Final, App.154–55, and "competed for a spot at the New England Championship," App.155;

- Mitchell "would have made her school's history as the first female athlete . . . ever to be named State Open Champion, App.156; claimed a gold medal in the 2019 State Open Championship Women's Indoor Track 55m Final, App.155; "won second place statewide" in the 2018 State Open Championship Women's Outdoor Track 100m, App.154; and enjoyed "the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships" in 2017, App.152;

- Smith would have been runner-up in the 2019 State Open Championship Women's Outdoor Track 200m Final as a freshman, App.158;

- And Nicoletti "would have advanced to the next level of competition in the outdoor Class S state championship 100m

preliminary race" in 2019 "and competed for a spot at the State Open Championship." App.157.

Each Plaintiff experienced "[un]fair competition," App.148, 174–75, and "emotional distress, pain, [and] anxiety" as a result, App.175. The CIAC policy degraded each of the female athletes' accomplishments and deprived them of high-level opportunities to compete and public recognition that would attract the notice of scouts, scholarship committees, and future employers or customers. App.131, 156. Just as important, the policy forever scarred Plaintiffs' athletic records, irreparably harming each female athlete's interest in accurate recognition of her athletic achievements. App.171–72.

It is difficult to imagine injuries that are more particularized. The complaint outlines Plaintiffs' "personal and individual injur[ies]" in exquisite detail. *Carney*, 141 S. Ct. at 499. And that satisfies the particularity element.

### E.    Plaintiffs' alleged harms are actual or imminent.

Because the female athletes have now all graduated from high school, this appeal focuses on the *actual* injury that Plaintiffs experienced in the past or the *ongoing and imminent* harm they suffer both now and in the future on a continuing basis.[8] And the complaint

---

[8] Plaintiffs who allege ongoing injuries have standing to seek prospective relief. *E.g.*, *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("All it takes [for an] injunction is a real threat of future violation

reveals both harms in abundance. So this Article III requirement is easily met.

Defendants' violation of the female athletes' Title IX rights is an actual and completed harm, as are Plaintiffs resulting loss of medals, advancement to regional meets, championship titles, school records, and public recognition. The emotional and psychological distress Plaintiffs experienced as a result of the CIAC policy is an actual harm too. And so is Defendants' inaccurate reporting of each female athlete's official record and career achievements, especially as they dampened college scouts' and scholarship committees' interest.

But not all of Plaintiffs' injuries stayed in the past. Some of the CIAC policy's harms are ongoing and continue to affect the female athletes now and in the future. These harms are actual *and* imminent because Plaintiffs' completed injuries are "[ ]accompanied by . . . continuing, present adverse effects." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (quotation omitted).

Take Plaintiffs' athletic records. Athletes have an interest in ensuring that their "official records," App.166, accurately reflect "their hard-earned athletic accomplishments," App.172—even if no one else

---

or a contemporary violation of a nature likely to continue or recur."); *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 98 (2d Cir. 2007) (an injunction is proper to "prevent [an] alleged ongoing injury from occurring again in the future").

looks them up or considers them. The CIAC policy warped Soule, Mitchell, Smith, and Nicoletti's track records—in some cases, nullifying their greatest successes. App.152–62. Defendants' medal assignments, records, and winners lists *still* downgrade Plaintiffs' triumphs and fail to give them "accurate credit." App.166. And Defendants will continue to do so, in perpetuity, unless Plaintiffs obtain an injunction. App.171. Because these "downstream consequences" of the CIAC policy are ongoing, the female athletes have standing to seek prospective relief. *TransUnion*, 141 S. Ct. at 2214 (quotation omitted).

Or consider Plaintiffs' careers. Many employers consider high athletic achievement to be a valuable indicator of determination, persistence, and a will to win. *E.g.*, Ryan Westwood, *5 Reasons Why Sporting a Staff of Athletes is a Game-Winning Strategy*, Forbes (Mar. 19, 2018), https://perma.cc/L8EP-KBG8. Correcting the female athletes' official records will give them stronger resumes and inspirational stories. Even if it is too late for Plaintiffs to benefit from superior "college applications, scholarship applications, and college recruiting profiles," App.156, their resumes and personal narratives will *always* impact their competitiveness in the marketplace. If an unlawful policy dropped a female law students' class rank from the top 5% to the top 10%, everyone would agree that her flawed transcript causes ongoing harm. And the same is true of the female athletes' reduced athletic

records here. When it comes to medals, for instance, the world perceives an important difference between bronze or silver and gold.

Accomplishments are how people market and distinguish themselves. Employees, business owners, and even social media influencers use them to stand out. Traditionally, careers are built on resumes, and resumes, in turn, are based on rankings by educational institutions. Official rankings are even more crucial for individuals who are still in college, lack substantial work experience, and have little else to show on their resume—like Plaintiffs here. *E.g.*, *How to Describe Athletics on a Resume*, Lewis & Clark College Career Ctr., https://perma.cc/5WD4-Z9K3.

Only an injunction can end the ongoing harm of a degraded resume. That injury provides the female athletes standing to seek prospective relief.

> **F.   Court of Appeals rulings in athletic-record cases establish Plaintiffs' continuing harm and ability to seek prospective relief.**

Plaintiffs' continuing interest in the accuracy of their athletic records isn't novel. For decades, Courts of Appeals have recognized that students, schools, and athletic associations have a permanent interest in ensuring such annals of achievement are correct. So the *in*accuracy of the female athletes' records continually harms them.

A comparison to prior athletic cases is apples-to-apples except that courts normally analyzed the issue through the lens of mootness. Though there are distinctions between mootness and standing,[9] those differences are not relevant to whether an injury in fact exists: mootness never becomes an issue later on unless the plaintiff established an injury in fact in the first place. *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020). So the mootness cases discussed below are persuasive authority for the standing issue presented here. *Warth*, 422 U.S. at 499 n.10 (standing "bears close affinity to" mootness).

Consider the Sixth Circuit's ruling in *Sandison*. A dispute between two track athletes and Michigan's athletic association about an age-out rule wasn't resolved before the students graduated from high school. 64 F.3d at 1028–30. The resulting debate about the students' athletic records was not moot, the court said, as the plaintiffs "still have an interest in preventing" the "eras[ure] [of] their teams' victories and their own performances. Accordingly, this controversy remains live." *Id.* at 1030; *accord McPherson*, 119 F.3d at 458–59.

---

[9] One distinction is that courts assess standing in the past (*i.e.*, at the time the complaint was filed), *Lujan*, 504 U.S. at 569 n.4, but they weigh mootness in the present, *Burke v. Barnes*, 479 U.S. 361, 363 (1987). Another difference is that plaintiffs bear the burden of showing standing, *Lujan,* 504 U.S. at 561, whereas defendants generally must prove mootness, *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022).

The Seventh Circuit reached the same conclusion in *Crane by Crane v. Indiana High School Athletic Association*, 975 F.2d 1315, 1317 (7th Cir. 1992), which involved a debate between a golf-team member and Indiana's athletic association over a transfer-eligibility rule. Even though the injunction allowing the student to compete had expired, the court held that a dispute about athletic records was still live because the student "received an award for his second-place finish, he and his teammates received first-place team ribbons, and [his school] received a sectional championship trophy," all of which would be lost if the association prevailed. *Id.* at 1318; *accord Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 844–45 (7th Cir. 1999).

In *Pottgen v. Missouri State High School Activities Association*, 40 F.3d 926, 928–29 (8th Cir. 1994), the Eighth Circuit reasoned the same when a baseball player sued Missouri's athletic association over an age-out rule. A live controversy remained, the court said, even though the student had "played his last game of high school baseball," because "permanent records and awards" were at stake. *Id.* at 928.

Another example is the Tenth Circuit's decision in *Wiley*, which involved a clash between a college track athlete and the NCAA over the extent of his financial awards. 612 F.2d at 474–75. The student graduated but there was still "a substantial controversy," the court said, because his athletic "points," "places," "records[,] and awards [were] at stake." *Id.* at 475–76. And that harm allowed the court to "render a

decision that will affect the rights of the litigants." *Id.*; *accord Jones v. Wichita State Univ.*, 698 F.2d 1082, 1085 n.7 (10th Cir. 1983).

These Court of Appeals rulings establish that students have a continuing interest in their athletic records, placements, and awards. If the underlying dispute between students and athletic associations could impact these official records, courts have jurisdiction to resolve it. And that remains true regardless of whether a state athletic association's age-out, transfer-eligibility, financial-awards, or transgender-eligibility rule is at stake. Holding otherwise, as the panel did, isn't simply wrong, it creates a lopsided circuit split. This Court should avoid that split and join the Sixth, Seventh, Eighth, and Tenth Circuits in holding that inaccurate athletic records create an ongoing harm that can be alleviated through an injunction.

## G. Other circuits' student-educational-records cases validate the ongoing nature of Plaintiffs' injury and their right to pursue an injunction to fix them.

For similar reasons, established precedent holds that students have an ongoing interest in their educational records and may seek an injunction to correct or enhance them. Most of these cases arise in the mootness context. Again, that makes no difference when it comes to the existence of an injury in fact. A deep body of precedent holds that students are entitled to seek injunctions that address harms to their academic or disciplinary records. Such permanent histories of

41

achievement—or failure—are directly comparable to the student athletic records at issue here.

In *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 478 (4th Cir. 2005), the Fourth Circuit addressed Rehabilitation Act (and other) claims that a student lodged against her law school. The student alleged that she failed an exam and received an "F" because the school failed to accommodate her disability. *Id.* at 478–79. She requested an injunction ordering the school to "expunge the failing grade from her record." *Id.* at 496 n.15. Even though the student had graduated, the Fourth Circuit held that she could seek prospective relief, *id.*, because she claimed "the 'F' on her transcript continues to hamper her employment prospects," *id.* at 479.

The Fifth Circuit reached a similar conclusion in *Overdam v. Texas A&M University*, 43 F.4th 522, 525–26 (5th Cir. 2022) (per curiam), which involved a student accused of sexual misconduct who sued the university after he was found guilty of a policy violation and suspended for a semester. Once the student graduated, the university argued that his due process claim was moot. *Id.* at 529. Not so, the court said, because the student had a cognizable interest in remedying "continued reputational harm that may impede future employment." *Id.*; *accord Calbillo v. San Jacinto Junior Coll.*, 434 F.2d 609, 610 (5th Cir. 1970) (per curiam) (lawsuit might be moot only after the college altered its "record[s] . . . to delete reference to his expulsion").

42

Similarly, the Ninth Circuit in *Bird v. Lewis & Clark College*, 303 F.3d 1015 (9th Cir. 2002), faced a student's claim that the college failed to accommodate her disability during an overseas learning program, *id.* at 1017–19, resulting in the student receiving "one A, two C minuses and one D for the semester," *id.* at 1019. The student sued under the Rehabilitation Act and other laws. *Id.* Following graduation, the Ninth Circuit upheld her standing to seek an injunction "requiring the college not to release her semester grades," reasoning that "poor grades" on the student's "transcript . . . can adversely affect her chances of employment and of admittance to graduate school." *Id.* at 1020; *accord Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971) ("[S]o long as disciplinary measures . . . remain unexpunged from school records they threaten prejudice with respect to college admission and future employment.").

The lesson taught by these (and many other similar) cases is that students experience ongoing harm when a violation of law results in a deterioration of their educational records. Permanent records like these are always relevant to career success, as anyone who has sat through a law firm interview or U.S. Senate Judiciary Committee confirmation hearing knows. Nor is it fair to say that academic or disciplinary records are somehow different. Sports records *are* educational records because high-school athletics are an educational offering, and part and parcel of the academic experience. That is precisely the reason that

43

athletic opportunity is encompassed within the mandate of Title IX, even though the original text does not mention athletics at all.

As a result of the CIAC policy, Plaintiffs' official results, athletic rankings, and medal assignments decreased. That is directly comparable to the lowered grades and associated class rankings in *Constantine* and *Bird*. No reasonable person would question that a student who graduates *magna cum laude* instead of *summa cum laude* based on sex discrimination has an ongoing harm. The same is true here. Plaintiffs' athletic records are not as stellar as they should be. And that will impair the female athletes' competitiveness in the marketplace and the official record of their athletic achievements for the rest of their lives.

The panel's contrary ruling leads to absurd results. Under the CIAC policy, a single female athlete could be forced to compete against eight biological males in a championship race. The female athlete's chances of medaling—let alone winning—would be effectively nil, and her educational records would suffer as a result. Yet the panel, alone among the federal circuits, would say she lacks an injury in fact.

## IV. Plaintiffs have plausibly alleged that their injury in fact is redressable by a judicial decision.

### A. Defining redressability

Redressability focuses "on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008)

(emphasis omitted). The standard is one of probability, not certainty. "[A] *likelihood* that the requested relief will address the alleged injury" is enough. *Steel Co.*, 523 U.S. at 103 (emphasis added). If the "practical consequence" of a court order is "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," redressability is met. *Utah v. Evans*, 536 U.S. 452, 464 (2002).

In practice, courts ask whether plaintiffs are likely to "personally . . . benefit in a tangible way from the court's intervention." *Steel Co.*, 523 U.S. at 103 n.5 (quotation omitted). Plaintiffs are not required to "show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). A "favorable decision" must simply "relieve a discrete injury to" the plaintiff. *Id.* That means a judicial remedy that "at least partially redress[es]" the plaintiff's harm will suffice. *Meese v. Keene*, 481 U.S. 465, 476 (1987).

## B. Compensatory or nominal damages will likely redress Plaintiffs' completed harms.

"[N]othing so shows a continuing stake in a dispute's outcome as a demand for dollar and cents." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019). In their complaint, the female athletes requested "[a]n award of nominal and compensatory damages" to remedy their completed harms. App.176. Compensatory damages are likely to redress Plaintiffs' quantifiable damages. App.174–75. And

nominal damages, which are "awarded by default," are certain to "independently provide redress" for the unquantifiable injuries resulting from Defendants' violation of Plaintiffs' Title IX rights. *Uzuegbunam*, 141 S. Ct. at 800–01; *accord* App.171–77. These damages claims prove redressability. *Uzuegbunam*, 141 S. Ct. at 796–802.

### C. Declaratory and injunctive relief will likely redress the female athletes' ongoing injuries.

"Past exposure to illegal conduct" is redressable by declaratory and injunctive relief if plaintiffs show that the legal violation has "continuing, present adverse effects." *Steel Co.*, 523 U.S. at 109 (quotation omitted). Plaintiffs allege just such continuing adverse effects. So prospective relief is appropriate to redress Plaintiffs' "ongoing or future harm." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1347 (2021).

More specifically, the complaint requests a declaratory judgment that Defendants violated Plaintiffs' Title IX rights by failing to effectively accommodate them in sports competition and by not providing girls equal treatment, benefits, and opportunities. App.175–76. And to remedy the ongoing harms of that Title IX violation the complaint requests an injunction ordering Defendants to:

- remove biologically male athletes' times, victories, qualifications, record times—and any other records or recognitions—

during their participation in elite sports competitions designated for girls, App.176; and

- correct the records and give credit and/or titles to the female athletes who would have received them but for the participation of biologically male athletes in elite sports competition designated for girls, App.176.

The "court may not be able to return the parties to the *status quo ante*" before the CIAC policy took effect. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). But it can give Plaintiffs "a partial remedy" by wiping official data clean of the policy's most egregious effects and boosting their athletic records, medals, and achievements. *Id.* at 13. And that is enough for Plaintiffs to show redressability. *Accord Meese*, 481 U.S. at 476.

Corrected records will personally and tangibly benefit the female athletes. *Steel Co.*, 523 U.S. at 103 n.5. The Sixth, Seventh, Eighth, and Tenth Circuits have all recognized that students have an ongoing interest in their athletic placements, records, and awards. *Supra* Part III.F. And the Fourth, Fifth, and Ninth Circuits have acknowledged that anything in students' educational records that reduces their level of achievement is likely to impact their career success. *Supra* Part III.G. There is no basis for reaching a different conclusion here,

especially as the CIAC policy deprived Mitchell of "four state championship titles, two All New England awards," and associated records or medals. App.69.

The only potential obstacle to redressability would be if Defendants *couldn't* change athletic records and awards retroactively. But the sports-records cases discussed above and CIAC's own handbook demonstrate that isn't true. *Supra* Part III.F. In fact, three separate CIAC policies establish that record and award modifications are not only possible but necessary to remedy the effects of unfair competition.

First, CIAC prohibits student athletes from using "androgenic/anabolic steroids or other performance enhancing substances" to gain an unfair advantage. CIAC 2022–2023 Handbook at 103. Students who violate this rule are declared "ineligible," and all CIAC competitions in which the student participated in while under the influence of such substances are "declared forfeitures *and all records [are] expunged.*" *Id.* (emphasis added) This provision is especially relevant here because the steroids athletes sometimes use to gain an unfair advantage are often synthetic modifications of testosterone. App.140.

Second, CIAC punishes schools for fielding "an ineligible competitor" who shouldn't have competed in the first place. CIAC 2022–2023 Handbook at 97. In track and cross country, the ineligible student is "disqualified from the competition and his/her opponent will advance in his/her place," the points earned by that student are "subtracted from

[the] team's total score," and "[t]eam rankings [are] readjusted if warranted." *Id.* Comparably, if Title IX forbids biological males from competing in girls' track, they are ineligible competitors who should never have been allowed to race.

Last, CIAC orders certain remedies "in the interest of restitution and fairness to the competing schools" when a student is wrongfully allowed to participate in competition due to a court order that is later reversed or erased. CIAC 2022–2023 Handbook at 53. Individual or team "records and performances" achieved with that student's participation are "vacated or stricken;" "team victories [are] forfeited to [the] opponent;" and "team or individual awards earned by such [an] ineligible student [are] returned to the Association." *Id.*

Defendants' violation of Title IX is more—not less—serious than these lapses in CIAC rules. If Defendants can expunge athletic records, reassign points, adjust rankings, and return awards when its own rules are broken, a court can order CIAC to take the same steps when Plaintiffs' Title IX rights are violated. CIAC has recognized that "the interest[s] of restitution and fairness" require no less. *Id.*

**D. Sports organizations often correct records and awards after the fact, demonstrating the premium put on accuracy and fair play.**

According to the panel, even if Plaintiffs obtained an injunction to correct their athletic records and awards, it would make no difference to

their marketability because "a simple internet search would reveal . . . this controversy about the records." *Soule*, 57 F.4th at 53. The district court said the same thing more bluntly: anyone "impressed by [Mitchell's corrected] record would learn that she did not *actually* finish first in the four races." App.277–78 (emphasis added). These negative inferences are improper, *Lujan*, 504 U.S. at 561, and wrong.

The assumption seems to be that sports competitions are "won and done" and that the marketplace regards corrected sports records as fake or worthless. Not so. Society values accurate athletic records and awards, regardless of whether it takes days or years to get them right. A prominent example is the Court of Arbitration for Sport, which generally has the last word on all high-level athletic disputes. *Frequently Asked Questions*, Court of Arbitration for Sport, https://perma.cc/CF5J-WMBM. This specialized court often decides whether athletes should have been disqualified or had their medals stripped after the fact. *History of the CAS*, Court of Arbitration for Sport, https://perma.cc/G78V-BQ3N.

International sports bodies, governments, and fans place great stock in ensuring "legitimate winners" and "fairness" in sports. For example, the International Testing Agency recently re-analyzed 2,727 blood samples from the 2012 London Olympics using enhanced technology that was not available then. *The ITA concludes the sample re-analysis program for the Olympic Games London 2012*, Int'l Testing

50

Agency (Dec. 5, 2022), https://perma.cc/449N-S5D8.  The International
Olympic Committee withdrew 31 medals based on doping violations and
"reallocated 46 medals to subsequent legitimate winners in weight-
lifting (22), wrestling (4), athletics (18)[,] and canoe (2)." *Id.*

So the reallocation of records and medals in high-level sports
competition is legitimate, commonplace, and widely recognized as
important. Recently, Lashinda Demus—an American track star—
learned that she would receive an Olympic gold medal from the 2012
London Games "a decade after the race." *10 years later, American
Lashinda Demus poised to win Olympic gold after Russian hurdler
stripped of medal for doping*, CBS News (Dec. 21, 2022),
https://perma.cc/24YH-PTTD. That is not unusual: Scottish athlete Lee
McConnell received *four* reallocated medals celebrating her track career
*after* she retired. *Lee McConnell receives belated world bronze medal in
fourth major upgrade*, BBC (June 27, 2022), https://perma.cc/M2KS-
25KN.

These efforts to ensure fair competition and sport's integrity are
valued, not denigrated. One example is Canadian weightlifter Christine
Girard who received two upgraded medals from the London 2012 and
Beijing 2008 games. News reports toasted Girard as having "finally
[been] awarded her . . . gold medal on Monday to become Canada's first
Olympic champion in the sport." *Olympics: Canadian weightlifter*

*Girard gets gold medal at last*, Reuters (Dec. 3, 2018),

https://perma.cc/B94P-KYSZ.

Medal reallocation ceremonies celebrate finally getting records

right. *Olympic Medal Reallocation Principles*, Int'l Olympic Comm.,

bit.ly/3FelRhG. One was recently held during the 2022 Big Ten Confer-

ence Wrestling Championships for Tervel Dlagnev, an American wres-

tler who received a London 2012 Olympics bronze medal. Tony Black,

*Tervel Dlagnev of Team USA receives his 2012 Olympic bronze medal in*

*Olympic Medal reallocation ceremony in Lincoln, Neb.*, USA Wrestling

(Mar. 6, 2022), https://perma.cc/RR4Z-BKF9. At the ceremony, which

took place before a "large crowd," Dlagnev wore "his 2012 U.S. Olympic

podium uniform," received his medal from a member of the IOC, was

"present[ed] his official Olympic ceremonial flowers" from USA

Wrestling's Executive Director, and "the Olympic Anthem was played."

*Id.*

If the panel and district court were correct, a medal reallocation

ceremony—assuming it happened at all—would be viewed as phony and

useless. But everyone from sports organizations and governments to

fans recognizes that "[t]he integrity of . . . athletics is [an] utmost

priority" and that "athletes who competed fairly at the highest level

[should] ultimately be acknowledged as the rightful medal winners."

Press Release, Athletics Integrity Unit, *Natalya Antyukh's Olympic*

*Victory Officially Disqualified* (Dec. 21, 2022), https://perma.cc/GKL9-

52

8FD6. Those values apply equally to Plaintiffs and their athletic records here.[10]

## V. *Pennhurst*'s notice requirement does not apply to Plaintiffs' damages claims. Regardless, Title IX gave Defendants notice they could be liable for damages.

### A. Supreme Court precedent establishes that *Pennhurst*'s notice requirement does not apply to recipient's own intentional decisions, and that Title IX itself gave Defendants any notice they required.

The panel held that the "'intentional conduct' exception" to *Pennhurst*'s notice requirement was inapplicable, *Soule*, 57 F.4th at 56, and that Defendants lacked "adequate notice that they could be liable under Title IX as a result of the" CIAC policy, *Id.* at 54. Both conclusions are incorrect. *Pennhurst*'s notice requirement does not apply to Plaintiffs' Title IX damages claims. And Title IX gave Defendants notice they could be liable for damages for failing to provide girls with equal athletic opportunities and benefits, and for refusing to effectively accommodate girls' athletic abilities.

Start with *Pennhurst* itself. The question there was whether a federal law required states that took specific funds to "provide certain kinds of treatment" to the mentally disabled "at their own expense."

---

[10] As explained at length in footnote 1 to the Questions Presented, the Court must assume Plaintiffs' success on the merits of their Title IX claim for purposes of the foregoing Article III standing analysis. *E.M.*, 758 F.3d at 450.

*Pennhurst*, 451 U.S. at 32. No one previously thought the law forced states "to assume [that] high cost," *id.* at 18, and the Court held that the text at issue expressed "federal policy, not newly created legal duties," *id.* at 23. If Congress *had* wished to impose new state-funded "entitlements" under the Spending Clause, the Court said, it "must do so unambiguously," *id.* at 17, not retroactively, *id.* at 25.

No similar problem exists here. Congress explicitly tied Title IX funding to recipients agreeing not to discriminate against students based on sex. 20 U.S.C. § 1681(a); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992). And recipients have been on notice for over four decades that non-discrimination under Title IX means ensuring equal athletic opportunities and benefits for girls, and effectively accommodating their athletic abilities. 34 C.F.R. § 106.41.

Next came *Franklin*, which involved a Title IX damages claim by a student who alleged that she was sexually abused by a coach and that school officials knew but did nothing to stop it. 503 U.S. at 63. *Pennhurst* did not apply, the Court said, because the "alleged violation [in *Pennhurst*] was *unintentional*." *Id.* at 74. Yet Franklin alleged "intentional discrimination," by which the Court meant "intentional actions [Congress] sought by statute to proscribe." *Id.* at 75. And in that context, *Pennhurst*'s "notice problem does not arise." *Id.* at 74–75.

Plaintiffs' Title IX claims are also based on "intentional actions," Defendants' promulgation and enforcement of the CIAC policy. *Id.* at 75. So notice is irrelevant.

The Court's decision in *Gebser v. Largo Vista Independent School District*, 524 U.S. 274 (1998), confirms this. *Gebser* involved a student who sought Title IX damages from a school district based on alleged sexual harassment by a teacher, even though school officials were in the dark. *Id.* at 277–79. The Court refused to expose the district to damages because it had "no actual knowledge of the teacher's conduct" and no "opportunity to take [corrective] action," *id.* at 289. So any legal violation was unintentional and unavoidable, as in *Pennhurst. Id.* at 287. Yet, the Court said, none of those concerns apply when a Title IX claim "involve[s] [an] *official policy* of the recipient." *Id.* at 290 (emphasis added). Official policies are always known, intended, and subject to correction.

That's this case. Because this dispute involves an official policy— the CIAC policy—that Defendants enacted and enforced, App.165–67; *Gebser* clarifies that *Pennhurst*'s notice requirement does not apply to Plaintiffs' damages claims.

Later, *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), echoed the same principles. That case had to do with damages for peer-on-peer harassment. When it comes to Title IX, the Court said, *Pennhurst* ensures that recipients are "liable in damages . . . only for

55

[their] own misconduct," *id.* at 640, not students' or "employees'
independent actions," *id.* at 643 (quotation omitted). But when plaintiffs
attempt to hold schools "liable for [their] *own* decision[s]," notice is not
an issue *Id.* at 641. Summed up, "*Pennhurst* does not [apply] . . . where
the funding recipient engage[d] in *intentional conduct* that violates the
clear terms of the statute." *Id.* at 642 (emphasis added).

Enacting and enforcing the CIAC policy was Defendants' own
intentional decision—not something they can blame on students or
employees. So notice is not required.

The panel was led astray by *Davis*' "clear terms" language, which
it saw as transforming *Pennhurst* notice into a lesser form of qualified
immunity. *Soule*, 57 F.4th at 54–56. But that reading of *Davis* is
mistaken. By using that "clear terms" language, all the Supreme Court
meant is that:

> a recipient may be held liable to third-party beneficiaries for
> intentional conduct that violates the clear terms of the
> relevant statute, *Davis*, *supra*, at 642, . . . but not for its
> failure to comply with vague language describing the
> objectives of the statute, *Pennhurst*, *supra* at 24–25 . . . .
> [*Barnes v. Gorman*, 536 U.S. 181, 187 (2002)]

Plaintiffs don't rely on vague objectives of Title IX. Their complaint is
rooted in the statute, which "makes clear that . . . students must not be
denied access to educational benefits and opportunities on the basis of
gender." *Davis*, 526 U.S. at 650. So any notice Defendants needed they
already had.

Confirming that Defendants had notice is *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 171 (2005), which allowed damages for Title IX retaliation claims. The school argued that it lacked notice of potential lability. *Id.* at 182. But the Supreme Court rejected that argument for three reasons. First, the Court had "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination," which "put [the district] on notice." *Id.* at 183. Second, retaliation is "easily attributable to the funding recipient, and it is always—by definition—intentional." *Id.* Last, because retaliation is "intentional conduct that violates the clear terms of the statute," "Title IX itself . . . supplied sufficient notice" of potential liability to the district. *Id.* (quotation omitted).

The same logic applies here. Courts have applied Title IX broadly for over 40 years. Defendants' CIAC policy is—by definition—intentional. And Defendants received any notice they required from Title IX itself, which bars recipients from failing to provide girls equal athletics opportunities and benefits, and from refusing to effectively accommodate girls' athletic abilities.

*Franklin*, *Gebser*, *Davis*, and *Jackson* speak with one voice and all require the same result: *Pennhurst*'s notice requirement does not bar the female athletes' plausible claims for Title IX damages.

**B.    Court of Appeals rulings confirm that *Pennhurst*'s notice requirement does not bar claims based on recipient's official policies.**

Rulings by other Courts of Appeals verify that *Pennhurst*'s notice requirement does not bar Plaintiffs' Title IX damages claims, which is based on Defendants' official CIAC policy.

As the Fifth Circuit has explained, "[t]here are two avenues for stating a Title IX claim." *Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359, 362 (5th Cir. 2020) (per curiam). Either plaintiffs may show (1) "that the [recipient] has an official policy of sex discrimination," or (2) "an appropriate person had actual knowledge of . . . discrimination [by someone else] and [the recipient] responded with deliberate indifference." *Id.* (cleaned up). Notice is required for a recipient's latter "sin of omission, *not* [its former] sin of commission." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 568 (3d Cir. 2002) (emphasis added).

In fact, "the Supreme Court has, throughout its Title IX jurisprudence, rejected arguments that *Pennhurst* bars a [damages] action" when a "recipient's conduct constituted an intentional violation of Title IX," *Hall v. Millersville Univ.*, 22 F.4th 397, 404 (3d Cir. 2022), or "intentional conduct that violates the clear terms of the statute," *id.* at 405. Official policies—like the CIAC policy—are intentional acts, and "the text of Title IX gives recipients notice that intentional discrimination will result in liability under the statute." *Id.* at 404.

58

The panel was wrong to assume that *Pennhurst* requires Congress to "specifically identif[y] and proscribe[ ] each [intentional] condition" that violates Title IX. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 921 (7th Cir. 2012). That has never been the case. *E.g.*, *Jackson*, 544 U.S. at 183 ("Congress need not specifically identity and proscribe each condition in the legislation") (cleaned up).

Directly on point is *Mansourian*, a case in which the Ninth Circuit concluded that "no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision." 602 F.3d at 967. That court held that "[u]niversities' decisions with respect to athletics are . . . 'always—by definition—intentional.'" *Id.* at 968 (quoting *Jackson*, 544 U.S. at 183). So "[a]thletic programs that fail effectively to accommodate students of both sexes thus represent 'official policy of the recipient entity' and so are not covered by *Gebser*'s notice requirement." *Id.* (quoting *Gebser*, 524 U.S. at 290); *accord Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020) (when plaintiffs "allege[ ] that a school's official policy violates Title IX," they allege "the school has intentionally violated the statute") (cleaned up).

The Tenth Circuit held the same in *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007).[11] When an alleged Title IX "violation is caused by official policy," the court said, "a funding

---

[11] Then Judge (now Justice) Gorsuch joined the *Simpson* opinion.

recipient can be said to have 'intentionally acted in clear violation of Title IX.'" *Id.* at 1178 (quoting *Davis*, 526 U.S. at 642). So "the notice standards established for sexual-harassment claims in *Gebser* and *Davis* [does not] necessarily apply." *Id.* at 1177.

This Court should avoid a circuit split and join the Ninth and Tenth Circuits, which have both held that *Pennhurst*'s notice requirement does not apply to Title IX damages claims where—as here—they are based on recipients' official policies.

## CONCLUSION

The en banc Court should hold that Plaintiffs have Article III standing to raise their Title IX claims and that *Pennhurst*'s notice requirement does not bar their claims for damages. Accordingly, the Court should reverse and remand with instructions for the district court to address the merits of Plaintiffs' Title IX claims without delay.

Respectfully submitted,

*/s/ John J. Bursch*

Roger G. Brooks
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

John J. Bursch
Christiana M. Kiefer
Alliance Defending Freedom
440 First Street NW, Ste. 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
ckiefer@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

*Counsel for Appellants*

March 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ John J. Bursch*
John J. Bursch

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 13,489 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ John J. Bursch*
John J. Bursch
*Counsel for Appellants*

Dated: March 23, 2023