No. 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**SELENA SOULE, A Minor, by Bianca Stanescu, Her Mother; CHELSEA MITCHELL, A Minor, by Christina Mitchell, Her Mother; ALANNA SMITH, A Minor, by Cheryl Radachowsky, Her Mother; and ASHLEY NICOLETTI, A Minor, by Jennifer Nicoletti, Her Mother,**

*Plaintiffs-Appellants,*

v.

**CONNECTICUT ASSOCIATION OF SCHOOLS, INC., d/b/a CONNECTICUT INTERSCHOLASTIC CONFERENCE; BLOOMFIELD SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; and DANBURY SCHOOLS BOARD OF EDUCATION**

*Defendants-Appellees,*

And

**ANDRAYA YEARWOOD; THANIA EDWARDS, on behalf of her child, T.M.; and CONNECTICUT COMMISSION ON HUMAN RIGHTS,**

*Intervenors-Appellees*

## BRIEF OF *AMICUS CURIAE*, RAY D. HACKE, IN SUPPORT OF PLAINTIFF-APPELLANTS' OPENING BRIEF

Ray D. Hacke, Esq.
rhacke@pji.org
PACIFIC JUSTICE INSTITUTE
CENTER FOR PUBLIC POLICY
P.O. Box 276600
Sacramento, CA 95826
Telephone: 916.857.6902
Facsimile: 916.857.6902
*Pro hac vice application pending.*

Edward T. Mechmann, Esq.
Emechlaw@gmail.com
1011 First Avenue, 7th Floor
New York, NY 10022
646-794-2807

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................3

STATEMENT OF IDENTITY & INTEREST OF *AMICUS CURIAE*....6

SUMMARY OF THE ARGUMENT.......................................9

ARGUMENT ........................................................................10

   I.  Courts Have Long Recognized the Existence of Physiological Differences Between the Sexes, and to Ensure Equality of Opportunity for Biological Women and Girls, They Still Should. ......................................................................................13

   II.  Because Congress Enacted Title IX to Advance Opportunities for Women, Not Male-Bodied Athletes Who Self-Identify as Women, the Court Should Interpret Title IX Accordingly. .......................20

   III.  Requiring Females to Compete Against Male-Bodied Athletes For Opportunities Previously Reserved for Females Would Foreseeably Conclude Women's Participation in Athletics.........23

CONCLUSION......................................................................26

# **TABLE OF AUTHORITIES**

## CASES

*Calix v. Lynch*
     784 F.3d 1000 (5th Cir. 2015)………………………………………….20-21

*Clark ex rel. Clark v. Ariz. Interscholastic Assn.* (*Clark*)
     695 F.2d 1126 (9th Cir. 1982)…………………………………11, 17, 18, 23

*Cohen v. Brown Univ.*
     991 F.2d 888 (1st Cir. 1993)…………………………………………….21

*Gomes v. R.I. Interscholastic League* (*Gomes*)
     469 F. Supp. 659 (D.R.I. 1979)………………………………………...12, 18

*Hecox v. Little* (*Hecox*)
     479 F. Supp. 3d 930 (D. Idaho 2020)……………………………11, 12, 23

*Hoover v. Meiklejohn* (*Hoover*)
     430 F. Supp. 164 (D. Colo. 1977)……………………………………...13, 26

*Knight v. Jewett*
     3 Cal.4th 296 (Cal. 1992)……………………………………………….18-19

*Mansourian v. Regents of the Univ. of Calif., Univ. of Calif. at Davis*
     594 F.3d 1095 (9th Cir. 2010)……………………...………………10, 23-25, 27

*Moore v. Hannon Food Services, Inc.*
     317 F.3d 489 (5th Cir. 2003)…………………………………………….21

*Neal v. Bd. of Trs. of Cal. State Univs.* (*Neal*)
     198 F.3d 763 (9th Cir. 1999)………………………………...11, 20-23, 26, 27

*North Haven Bd. of Educ. v. Bell* (*Bell*)
     456 U.S. 512 (1982)…………………………………………………..22, 23, 26

*O'Connor v. Bd. of Educ. of Sch. Dist. 23*
     449 U.S. 1301 (1980)………………………………………………10, 24-26

*Petrie v. Ill. High Sch. Athletic Ass'n*
    394 N.E.2d 855 (Ill. 1979)……………………………………………..13, 14

*Thomas Jefferson Univ. v. Shalala*
    512 U.S. 504 (1994)…………………………………………………..20

*United States. v. Sherbondy*
    865 F.2d 996 (9th Cir. 1988)…………………………………………20

*Williams v. Sch. Dist. of Bethlehem, Pa.*
    998 F.2d 168 (3d Cir. 1993)…………………………………….....17-18

## STATUTES

20 U.S.C. § 1681 (Title IX)………………………………………………*passim*

## LAW JOURNAL ARTICLES

Trudy Sanders Bredthauer, *Twenty-Five Years Under Title IX: Have We Made Progess?*, 31 Creighton L. Rev. 1107 (1998)……………………………………..11

Betsey Stevenson, *Title IX and the Evolution of High School Sports*, 25 Contemporary Economic Pol'y No. 4 486 (Oct. 2007)…………………………...11

## NEWS ARTICLES

Robert Johnson, *What No One is Telling You: An Athlete Who Ran NCAA Track as a Man For Three Years Just Won an NCAA Women's Title*, LetsRun.com (May 28, 2019)………………………………………………………………………………15

Eric Levenson and Steve Almasy, *Swimmer Lia Thomas Becomes First Transgender Athlete to Win an NCAA Division I Title*, CNN.com (last updated March 17, 2022)…………………………………………………………………16-17

Caitlin O'Kane, *Teen Nicknamed 'White Lightning' Runs 100-Meter Dash in 9.98 Seconds – Fast Enough For the Olympics*, CBSNews.com (April 30, 2019)…….14

Jeremy W. Peters, Jo Becker, & Julie Hirschfield Davis, *Trump Rescinds Rules on Bathrooms for Transgender Students*, NYTimes.com (Feb. 22, 2017)…………...21

Rick Reilly, *Not Your Average Skirt Chaser*, SI.com (Nov. 26, 2001)……….18, 19

Blue Telusma, *President Biden Signs Executive Order Protecting Transgender Athletes in School Sports*, Yahoo.com (Jan. 22, 2021)………………………..21-22

Billy Witz, *Her Video Sparked Changes in Women's Basketball: Did They Go Far Enough?*, NYTimes.com (March 15, 2022)………………………………………20

## STATEMENT OF IDENTITY & INTEREST OF *AMICUS CURIAE*[1]

Ray D. Hacke ("Mr. Hacke") is an attorney with the Pacific Justice Institute's Center for Public Policy (hereinafter "PJI"), a non-profit 501(c)(4) organization based in Sacramento, California.  In that capacity, Mr. Hacke has testified before multiple state legislatures – including those of Idaho, Montana, North Dakota, South Dakota, Missouri and Wisconsin – concerning bills aimed at protecting women's sports in those states in accordance with the purpose underlying Title IX, the federal law aimed at advancing educational opportunities for girls and women, including in interscholastic sports.  Mr. Hacke has also advised legislators in Oklahoma, Arkansas, and West Virginia concerning bills aimed at protecting women's sports in those states.  Mr. Hacke is the author of *Girls Will Be Boys, and Boys Will Be Girls: The Emergence of the Transgender Athlete and a Defensive Game Plan for High Schools That Want to Keep Their Playing Fields Level – For Athletes of Both Genders*, 25 Sports Law J. 57 (Spring 2018), which extensively addresses constitutional and legal issues concerning the impact that the presence of male-bodied athletes who identify as "transgender" in women's sports has on opportunities for female-bodied athletes.

In addition to being an attorney licensed in both California and Oregon, Mr.

---

[1] This *amicus curiae* brief was filed with the consent of all parties. Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local R. 29.1(b), *amicus* states as follows: no party's counsel authored the brief in whole or in part, and no party, party's counsel, or any person other than *amicus curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.

Hacke is an award-winning sportswriter with more than three decades of experience covering girls' and women's sports at a variety of levels, from youth teams to the Olympic and professional levels. As a correspondent for WORLD, a magazine that covers news, sports, and entertainment from a Christian worldview, Mr. Hacke has extensively covered transgender athletes' impact on interscholastic athletics – including the impact of Terry Miller and Andraya Yearwood, whose rewriting of Connecticut's high school track-and-field record books has given rise to this case. *See*, e.g., *Built-in Advantage*, wng.org (May 30, 2019)[2] and *Transforming Record Books*, wng.org (June 14, 2018).[3] Having written about the sport of track and field extensively, Mr. Hacke can attest firsthand that boys and men, far more often than not, run faster, jump higher and farther, and throw the shot put and discus than girls and women do – using heavier shots and discs to boot.

Furthermore, Mr. Hacke is the father of a daughter who currently competes in interscholastic sports and who coached her in baseball, softball, and basketball from age 3 through age 11. Currently in middle school, Mr. Hacke's daughter is competing in an interscholastic sports landscape in which she may – and likely will – one day face a male-bodied athlete on a basketball court, softball diamond, or soccer field. Should Mr. Hacke's daughter have to compete against athletes who

---

[2] Last viewed online on March 13, 2023 at https://wng.org/articles/built-in-advantage-1617298760.
[3] Last viewed online on March 13, 2023 at https://wng.org/articles/trans-forming-record-books-1620613396.

have all the physical advantages that come with being male – because physically, they **_are_** male – at the high-school level, not only could she lose out on such opportunities as competing for and winning a state championship and earning a college scholarship, but her very safety could be in danger in the sports she plays due to the physical advantages that courts have recognized male-bodied athletes possess.  It is thus imperative that this Court remand this case to the District of Connecticut (the "District Court") for further proceedings so the appellants in this case – Selena Soule, Alanna Smith, Chelsea Mitchell, and Ashley Nicoletti (collectively the "Athletes") – have a full and fair opportunity to demonstrate what common sense should make clear: Namely, that Title IX exists, at least in part, to prevent girls and women from becoming also-rans in their own sports, and allowing male-bodied athletes to compete against them undermines that purpose.

## SUMMARY OF THE ARGUMENT

To ensure that biological women and girls do not lose meaningful opportunities to participate in their own sports:

1. Courts should continue to recognize that physiological differences do, in fact, exist between the sexes and that these differences give male-bodied athletes a significant advantage when competing against women and girls, thereby relegating females to second-class status as benchwarmers, spectators, or also-rans in their own sports. This Court need only look at the Athletes' sport of track and field to see just how pronounced those differences are: Male-bodied athletes' times are consistently faster than those of women and girls – especially in sprint races – and even when male-bodied athletes do not win, they stand a much better chance of displacing girls for all-state or all-conference honors than they do when competing against members of their own sex.

2. Courts should interpret the term "women," for purposes of Title IX, to include only persons who are biologically female. The Court need not show deference to an agency's interpretation of a statute or regulation when it conflicts with a prior, consistently held interpretation. The words of Title IX's primary sponsor, Sen. Birch Bayh of Indiana, are the authoritative guide to the statute's interpretation. Since the "women"

9

whose rights Sen. Bayh sought to advance were biological women, the Court should not interpret Title IX in a way that undermines its intent.

3. Requiring girls and women to compete with male-bodied athletes for spots on girls' women's teams, scholarships, and spots on medal podiums changes the conditions for female athletes under which they can participate in interscholastic sports and thereby foreseeably concludes their future participation. The U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit") recognized this in *Mansourian v. Regents of the Univ. of Calif.*, cited below. If the Court is concerned about foreseeably concluding transgender athletes' participation in sports, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, cited below, makes clear that male-bodied athletes who self-identify as female will not be denied such opportunities: While such athletes may not be able to compete on teams associated with their self-proclaimed gender identity, a school does not violate Title IX by requiring athlete to compete on teams associated with their sex.

## ARGUMENT

"The statute known as Title IX, 20 U.S.C. § 1681, is widely recognized as a source of vast expansion of athletic opportunities for women in the nation's schools and universities[.]" *Mansourian v. Regents of the Univ. of Calif., Univ. of Calif. at Davis*, 594 F.3d 1095, 1099 (9th Cir. 2010) (*Mansourian*). As illustrated

below, multiple courts have recognized that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes is unquestionably a legitimate and important interest, *which is served by precluding males from playing on teams devoted to female athletes*." *Hecox v. Little*, 479 F. Supp. 3d 930, 952 (D. Idaho 2020) (*Hecox*) (emphasis added) [citing *Clark ex rel. Clark v. Ariz. Interscholastic Assn.*, 695 F.2d 1126, 1131 (9th Cir. 1982) (*Clark*)]. Indeed, as the Ninth Circuit noted:

> "Title IX was Congress' response to significant concerns about discrimination against women in education. … [A] central aspect of Title IX's purpose was to encourage women to participate in sports: *The increased number of roster spots and scholarships <u>reserved for women</u> would gradually increase demand among women for those roster spots and scholarships*."

*Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766, 768 (9th Cir. 1999) (*Neal*) (emphasis added).

In terms of meeting its underlying goals, Title IX has been a rousing success: "The percentage of college athletes who are women rose from 15% in 1972 to 37% in 1998, and Title IX is at least partially responsible for this trend of increased by women." *Neal*, 198 F.3d at 769 [citing Trudy Sanders Bredthauer, *Twenty-Five Years Under Title IX: Have We Made Progess?*, 31 Creighton L. Rev. 1107, 1107 (1998)]. By 2007, out of more than 400,000 college athletes, roughly 43 percent (170,526) were female. Betsey Stevenson, *Title IX and the Evolution of High School Sports*, 25 Contemporary Economic Pol'y No. 4 486, 487 (Oct. 2007).

Now that states across the country are letting biologically male athletes who identify as female compete against girls and women, however, there is understandably concern that the trend will be reversed. *See*, e.g., *Hecox*, 479 F. Supp. 3d at 952. While transgender athletes, their allies, and even some courts may write off such concerns as nothing more than fear-mongering or jealousy from athletes who either are unwilling to put in the work to succeed on the court or field or just do not have what it takes to be triumphant, courts nationwide have long recognized that maintaining sex-segregated teams for males and females is perhaps the best, if not only, way to ensure that women and girls have an equal opportunity to compete due to the physiological differences between the sexes. As one federal district court put it:

> "At the high school level, the average male is objectively more physically capable than the average female. Open competition would, in all probability, relegate the majority of females to second-class positions as benchwarmers or spectators."

*Gomes v. R.I. Interscholastic League*, 469 F. Supp. 659, 662 (D.R.I. 1979) (*Gomes*).

To ensure that the cisgender female athletes – i.e., those athletes whose gender identity aligns with their biological sex – do not lose out on the athletic opportunities that Title IX created specifically for them, this Court should overturn the District Court's holding that this case and remand this case to the District Court so the Athletes may have a full and fair opportunity to be heard at trial.

I.      **Courts Have Long Recognized the Existence of Physiological Differences Between the Sexes, and to Ensure Equality of Opportunity for Biological Women and Girls, They Still Should.**

Multiple courts nationwide have recognized that "the effective equalization of athletic opportunities for members of both sexes would be better served by comparable teams" and competitions "for members of each sex … [because] mixed-sex teams" and competitions "would probably be dominated by males." *Hoover v. Meiklejohn*, 430 F. Supp. 164, 166 (D. Colo. 1977) (*Hoover*). This is due to the physiological advantages that boys typically have over girls:

> "[A]fter puberty the female body has a higher ratio of adipose tissue to lean body weight as compared with the male, and females have less bone density than males. It is also true that, when matured, the male skeletal construct provides a natural advantage over females in the mechanics of running. Accordingly, applying the formula of force equals mass times acceleration, a collision of a male and a female of equal weights, running at full speed, would tend to be to the disadvantage of the female."

*Id.*; s*ee also Petrie v. Ill. High Sch. Athletic Ass'n*, 394 N.E.2d 855, 861 (Ill. 1979) (*Petrie*) [noting that "in general, high school boys are substantially taller, heavier and stronger than their girl counterparts and have longer extremities"].

It is precisely because of the physiological advantages male-bodied athletes typically have over females that courts have recognized the need to keep interscholastic sports segregated by biological sex. Perhaps no sport illustrates the physical disparity between the sexes better than the Athletes' sport, track and field: Just seven years after Title IX's passage, the Illinois Supreme Court noted that "in

the high school track season previous to the trial, none of the girls' State (sic)

record holders in track and field would have qualified in any event for the boys'

state track and field meet." *Petrie*, 394 N.E.2d at 861.  Any state's high school

track-and-field record book will reflect that boys consistently run faster, jump

higher, and throw farther in the shot put and discus – using a heavier shot and disc

to boot.  *See* SportsRec.com [noting that in high school, boys use a 12-pound shot

while girls use an 8.8-pound shot][4] and WhatThingsWeigh.com [noting that in high

school, a boys' discus weighs 3.5 pound, while girls use a 2.2-pound disc].[5]

A look at history's fastest recorded 100-meter times shows that

approximately 150 men have run track and field's fastest race in less than 10

seconds.[6]  Matthew Boling of Texas became the first high schooler to accomplish

the feat in 2019.  Caitlin O'Kane, *Teen Nicknamed 'White Lightning' Runs 100-*

*Meter Dash in 9.98 Seconds – Fast Enough For the Olympics*, CBSNews.com

(April 30, 2019).[7]  Only one woman, Florence Griffith-Joyner, has ever run the 100

in less than 10.5 seconds, posting a time of 10.49 to become the fastest woman

ever to run the race at the 1988 Summer Olympics in Seoul Korea.  *Top 10*

---

[4] See https://www.sportsrec.com/5918784/what-is-the-weight-of-a-shot-put (last viewed online on March 18, 2023).
[5] See https://whatthingsweigh.com/how-much-does-a-discus-weigh/#:~:text=The%20weight%20of%20a%20discus%20depends%20on%20the,for%20girls%20are%201%20kilogram%20or%202.2%20pounds (last viewed online on March 18, 2023).
[6] See https://www.worldathletics.org/records/all-time-toplists/sprints/100-metres/outdoor/men/senior?page=2 (last viewed online on March 18, 2023).
[7] See https://www.cbsnews.com/news/matthew-boling-100m-teen-nicknamed-white-lightning-runs-100-meter-dash-in-9-98-seconds/ (last viewed online on March 18, 2023).

*Women's 100m Times in History*, Olympics.com (updated Oct. 5, 2021).[8]  In other words, running on their best day, the fastest male high schooler ever to run the 100 would easily defeat the fastest women's Olympic champion head-to-head.

This explains why CeCe (formerly Craig) Telfer of New Hampshire's Franklin Pierce University became the first biological male to win an NCAA track-and-field title in 2019, capturing Division II's 400-meter hurdles crown, despite barely ranking in the top 400 when competing against men just two years earlier. Robert Johnson, *What No One is Telling You: An Athlete Who Ran NCAA Track as a Man For Three Years Just Won an NCAA Women's Title*, LetsRun.com (May 28, 2019).[9]  And even when male-bodied athletes do not win when competing against females, they still displace girls and women for top honors.  Consider:

- When transgender sprinter Nattaphon Wangyot of Alaska earned all-state honors by placing third in the girls' 200 meters and fifth in the girls' 100 at Alaska's state track and field championships in 2016, Wangyot's times would not have come close to earning medals in the boys' races.  *See* Athletic.net.[10]

- The same can be said, incidentally, of Terry Miller's record-setting high school track-and-field times in Connecticut: Miller's 55-meter record of 6.95

---

[8] See https://olympics.com/en/news/athletics-top-10-women-100m-history (last viewed online on March 18, 2023)..
[9] See https://www.letsrun.com/news/2019/05/what-no-one-is-telling-you-an-athlete-who-ran-ncaa-track-as-a-man-for-3-years-just-won-an-ncaa-womens-title/ (last viewed online on March 18, 2023).
[10] See https://www.athletic.net/TrackAndField/meet/259989/results (last viewed online on March 18, 2023).

seconds against girls, set at Connecticut's Open Meet – for runners from schools of all sizes, large and small – in 2019, would have put him dead last in the boys' final at the state championships, assuming Miller would even qualify for the final with that time.  CIACSports.com.[11]  Miller's time of 39.91 in the girls' indoor 300-meter dash would have put Miller well behind the pack in the boys' race.  *Id.*

In outdoor track, Miller's Open Meet-record time of 24.33 in the girls' 200 meters would not have put Miller in the top 20 in the boys' race.[12]  The same goes for Miller's record 100-meter time of 11.64 seconds.  *Id.*

- Competing against men in cross country for the University of Montana, the best June (formerly Jonathan) Eastwood fared at the Big Sky Conference championships was 24th.  *See* GoGriz.com.[13]  Competing against women at the conference championships in 2018, Eastwood placed eighth – good enough for all-conference honors.[14]

Track and field is not the only sport where male-bodied athletes who were comparatively mediocre at best against men have dominated against women: In 2022, just two years after last competing as man, Lia (formerly Will) Thomas of

---

[11] See https://content.ciacsports.com/it19o.shtml (last viewed on March 21, 2023).
[12] See https://content.ciacsports.com/ot19o.shtml (last viewed on March 21, 2023).
[13] See https://gogriz.com/sports/mens-cross-country/roster/jonathan-eastwood/4479 (last viewed online on March 18, 2023).
[14] See https://gogriz.com/news/2019/11/2/womens-cross-country-eastwood-frissell-run-to-all-big-sky-finishes (last viewed online on March 18, 2023).

the University of Pennsylvania became the first biologically male NCAA women's swimming champion, claiming the 500-yard freestyle crown. Eric Levenson and Steve Almasy, *Swimmer Lia Thomas Becomes First Transgender Athlete to Win an NCAA Division I Title*, CNN.com (last updated March 17, 2022).[15] In the process, Thomas defeated three female swimmers who had earned medals in the women's 500 free at the 2021 Summer Olympics in Tokyo. *Id.* During the 2019-20 season – Thomas' last season before "transitioning" – Thomas did not have a time ranked in the top 100 among collegiate male swimmers. USASwimming.org.[16]

It is precisely because male-bodied athletes tend to dominate against girls and women that courts have allowed females to compete in traditionally male sports, such as football and wrestling, when their schools do not offer equivalent teams for women and girls, but not allowed boys to play on teams traditionally reserved for females when the situation is reversed: Boys, for the most part, tend to be bigger, taller, stronger, and faster than girls; they can jump higher, hit harder, and which gives boys an advantage over girls in sports that schools have traditionally reserved exclusively for girls, such as field hockey and volleyball. *Clark*, 695 F.2d at 1127 [concerning volleyball] and *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 179-80 (3d Cir. 1993) [holding that determining

---

[15] See https://www.cnn.com/2022/03/17/sport/lia-thomas-ncaa-swimming/index.html (last viewed online on March 18, 2023).
[16] See https://www.usaswimming.org/times/otherorganizations/ncaa-division-i/top-times-report (last viewed online on March 18, 2023).

whether boys are likely to dominate against girls in field hockey is crucial to

determining whether a school district's "policy of excluding boys from girls' teams

is necessary to the (district's) recognized interest in preserving meaningful athletic

opportunities for girls"].  Consider:

- "There are six basic skills necessary in volleyball – serving, passing

  setting, digging, hitting and blocking.  Of these skills, hitting and

  blocking are enhanced by physical size, strength, and vertical jump.

  Males generally have the potential to be better hitters and blockers than

  females and may dominate these two skills in volleyball." *Clark*, 695

  F.2d at 1127.  "There seems to be no question, then, that boys will on

  average be better volleyball players than girls." *Id.*  For this reason, a

  college coach admitted that she "would not recruit or offer scholarship

  aid to a female on a co-ed team because such a player is likely to have

  severely limited offensive skills." *Gomes*, 469 F. Supp. at 662.

- In field hockey, the presence of bigger, stronger, faster, and harder-

  hitting male-bodied athletes literally poses a danger to women and girls.

  *See* Rick Reilly, *Not Your Average Skirt Chaser*, SI.com (Nov. 26, 2001)

  (Reilly, *Not Your Age Skirt Chaser*).[17]  This is especially true given that

  boys cannot reasonably be expected to restrain themselves, or give less

---

[17] See https://vault.si.com/vault/2001/11/26/not-your-average-skirt-chaser (last viewed online on March 18, 2023).

than full effort, when facing girls in athletic competition any more than they can when facing other boys. *See Knight v. Jewett*, 3 Cal.4th 296, 318 (Cal. 1992) [a case involving a female touch football player who was injured in a collision with a male opponent while battling to catch a pass: "(I)n the heat of an active sporting event … a participant's normal energetic conduct often includes accidentally careless behavior. The courts have concluded that participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant only on the basis of his or her ordinary careless conduct"]. Worse than that, though, all-girls' field hockey teams recognize that having male-bodied teammates undermines the thrill of victory: As one Massachusetts field hockey player told nationally renowned sports columnist Rick Reilly in 2001, "When you win, people think it's only because of the boys on your team. It's so defeating." Reilly, *Not Your Average Skirt Chaser*. Having male-bodied athletes on women's and girls' teams thus robs females of a meaningful opportunity to enjoy success the way boys and men can with their male teammates.

Based on the foregoing, due to the physiological advantages male-bodied athletes have over athletes with female bodies, allowing male-bodied athletes to compete in girls' and women's sports would take away athletic opportunities from

females who have had to fight long and hard for equal opportunity in sports even after Title IX's passage – and, for which, they are arguably still fighting. *See*, e.g., Billy Witz, *Her Video Sparked Changes in Women's Basketball: Did They Go Far Enough?*, NYTimes.com (March 15, 2022) [concerning former University of Oregon women's basketball player Sedona Prince shining a spotlight on inequalities that existed between the NCAA's men's and women's basketball tournaments].[18]  Accordingly, the Court should remand this case to the District Court for further proceedings.

## II. Because Congress Enacted Title IX to Advance Opportunities for Women, Not Male-Bodied Athletes Who Self-Identify as Women, the Court Should Interpret Title IX Accordingly.

While federal courts must typically defer substantially to an agency's interpretation of its own regulations [*Neal*, 198 F.3d at 770], a court need not show substantial deference to an agency's interpretation of a statute or regulation when it conflicts with a prior, consistently held interpretation.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994).  While words, and combinations thereof, may be subject to multiple reasonable interpretations, "particularly in matters as complex as legislative enactments" [*United States. v. Sherbondy*, 865 F.2d 996 (9th Cir. 1988)], "[m]ultiple accepted meanings do not exist ***merely because a statute's 'authors did not have the forethought to contradict any creative contortion that***

---

[18] See https://www.nytimes.com/2022/03/15/sports/ncaabasketball/womens-march-madness-sedona-prince.html
(last viewed online on March 18, 2023).

*may later be constructed to expand or prune its scope*.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (emphasis added) [quoting *Moore v. Hannon Food Services, Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)]. In other words, courts should not interpret Title IX in a way that would undermine its purpose of advancing educational opportunities, including athletic opportunities, for women and girls – or, to be more accurate, biological women and girls. *Neal*, 198 F.3d at 767.

The federal Department of Education's Office of Civil Rights ("OCR") is "the administrative agency charged with administering Title IX." *Neal*, 198 F.3d at 770 [quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993)]. On May 9, 2016, under former President Obama, the OCR issued a controversial national directive (the "Obama Directive") ordering every public school in the nation to let transgender students play on the sports teams that were consistent with the students' proclaimed gender identity. *See* Ltr. From U.S. Dept. of Educ., Office of Civil Rights, *Dear Colleague Letter on Transgender Students* 1 (May 13, 2016).[19] Former President Trump rescinded the Obama Directive soon after taking office. Jeremy W. Peters, Jo Becker, & Julie Hirschfield Davis, *Trump Rescinds Rules on Bathrooms for Transgender Students*, N.Y. Times (Feb. 22, 2017).[20] However, President Biden reinstated the Obama Directive on his first day in office

---

[19] See http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf) (last viewed online on March 13, 2023).
[20] See https://www.nytimes.com/2017/02/22/us/politics/devos-sessions-transgender-students-rights.html (last viewed online on March 13, 2023).

after replacing Trump.  Blue Telusma, *President Biden Signs Executive Order Protecting Transgender Athletes in School Sports*, Yahoo.com (Jan. 22, 2021).[21]

The interpretation of Title IX set forth in the Obama Directive – which can now properly be called the Biden Directive – is grossly incorrect: To ascertain Congress' intent with regard to the construction of Title IX, this court must look to Title IX's legislative history.  *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 n. 26 (1982) (*Bell*).  Title IX's legislative history indicates that Congress enacted the statute as a "response to significant concerns about discrimination against women in education."  *Neal*, 198 F.3d at 766.  In other words, the term "sex," as used in Title IX, refers specifically to biological sex, not gender identity – any interpretations to the contrary by presidential administrations or federal courts notwithstanding.  *Id*. at 767 [noting that Title IX's drafters understood that "(m)ale athletes had been given an enormous head start in the race for athletic resources, and Title IX would prompt universities to level the proverbial playing field"].

Title IX's primary sponsor, Sen. Birch Bayh of Indiana, "stated that Title IX was specifically enacted to 'provide for the ***women*** of America something that was rightfully theirs – an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will

---

[21] See https://news.yahoo.com/president-biden-signs-executive-order-225800438.html (last viewed online on March 13, 2023).

have a fair chance to secure the jobs of their choice with equal pay for equal work.'" *Neal*, 198 F.3d at 766 [quoting 118 Cong. Rec. 5808 (1972)]. "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, ***are an authoritative guide*** to the statute's construction[.]" *Id.* (emphasis added) [quoting *Bell*, 456 U.S. at 526-27].

The "women" Bayh was referring to at the time were biologically female. Fifty years of Title IX jurisprudence makes clear that the statute was intended to advance the "legitimate and important interest" in "ensuring equality of athletic opportunity" for biological women. *Hecox*, 479 F. Supp. 3d at 952 [citing *Clark*, 695 F.2d at 1131]. The Court should thus not interpret the term "women," for purposes of Title IX, to include anyone except biological females, as doing so would undermine the intent of the statute and thereby deny female athletes the opportunities Title IX was enacted to give them.

## III. Requiring Females to Compete Against Male-Bodied Athletes For Opportunities Previously Reserved for Females Would Foreseeably Conclude Women's Participation in Athletics.

The Ninth Circuit has recognized that forcing women to compete against men for spots on the same athletic team undermines Title IX's purpose: In *Mansourian*, cited *supra*, four female wrestlers sued the University of California at Davis ("UCD") for kicking them off the university's wrestling team, then giving them the chance to rejoin on the condition that they defeat male counterparts in

their respective weight classes using men's collegiate wrestling rules. *Id.* at 1099. Before their dismissal, the female wrestlers had only wrestled against other women using international freestyle rules. *Id.* at 1099-1100. The Ninth Circuit's decision in *Mansourian* does not specify whether the female wrestlers proved unable to physically compete with the men or simply refused to out of discomfort, lack of knowledge and/or practice of men's collegiate rules, etc. What *Mansourian* does make clear is that the female wrestlers lost scholarships and academic credit due to their inability to participate. *Id.* In holding that UCD's exclusion of the female wrestlers violated Title IX, the Ninth Circuit stated that "[b]y requiring women to prevail against men, the university changed the conditions under which women could participate in varsity wrestling in a manner that ***foreseeably concluded their future participation***." *Id.* at 1108 fn. 16 (emphasis added).

In *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301 (1980) (*O'Connor*), Justice John Paul Stevens, writing in his capacity as the Supreme Court's justice for the Seventh Circuit, held that "without a gender-based classification in competitive contact sports, ***there would be a <u>substantial</u> risk that boys participating in the girls' programs would dominate those programs and deny girls an equal opportunity to participate in interscholastic events***[.]" *Id.* at 1308 (emphasis added). *O'Connor* involved a female junior high basketball player whose basketball skills greatly exceeded those of other girls her age or older, and

were at least equal to those of many boys her age or older. *Id.* at 1302-03.
Because of this, the player sought – and won – an injunction from a federal district
court permitting her to try out for one of her school's boys' teams and compete
against boys in interscholastic competition if she made it. *Id.* The player's school
district successfully appealed the lower court's ruling and was granted a stay of the
injunction. *Id.* at 1303-04. In denying the player's motion to vacate the stay,
Justice Stevens held that ***only*** where (1) a school operates or sponsors a team for
one sex in a particular sport but has no equivalent team for the opposite sex, and
(2) athletic opportunities for members of the excluded sex have previously been
limited, must the school permit members of the excluded sex to try out for the team
offered. *Id.* at 1308 (emphasis added) [quoting 45 C.F.R. § 86.41(b) (1979)].

Taken together, *Mansourian* and *O'Connor* stand for the proposition that
interpreting Title IX to require that high schools permit transgender athletes to
compete on whichever athletic teams match their self-proclaimed gender identity
would, in fact, disadvantage biological women and girls, and thereby undermine
Title IX's remedial purposes. As *Mansourian* illustrates, a school may violate
Title IX by requiring biological girls to compete with biological boys for spots on
an athletic team that were once reserved exclusively for the girls. *Mansourian*, 594
F.3d at 1108. *O'Connor*, meanwhile, illustrates that high schools do not deny
equal athletic opportunities to athletes of either gender – and thereby violate Title

IX – by requiring them to compete on teams set apart exclusively for persons of their biological sex. *O'Connor*, 449 U.S. at 1306. As long as a school provides athletic teams for persons of both genders that are roughly equal in terms of the time, money, personnel, and facilities devoted to each team, Title IX's equal opportunity requirement is met. *Id.*; *see also Hoover*, 430 F. Supp. at 170.

Requiring sex-segregated teams to include persons whose "gender identity" does not match their biological sex "would hinder, and quite possibly reverse, the steady increases in women's participation and interest in sports that have followed Title IX's enactment." *Neal*, 198 F.3d at 770. This Court should thus uphold Title IX's stated purpose of expanding athletic opportunities for biological women by not letting men who claim to be women take such opportunities away from biological women. *Id.* at 766 [quoting *Bell*, 456 U.S. at 526-27].

## CONCLUSION

By ensuring that as many biological girls and boys as possible have the chance to compete in interscholastic athletic competition, schools comply with the letter, spirit, and intent of Title IX. *O'Connor*, 449 U.S. at 1306, and *Neal*, 198 F.3d at 766. Neither boys nor girls are denied equal athletic opportunities under Title IX by being required to try out for, and participate on, teams set apart exclusively for persons of their gender. *O'Connor*, 449 U.S. at 1306. However, by permitting male-bodied athletes to compete on teams set apart for girls and

women, schools change the conditions under which girls may participate in a manner that effectively denies girls and women the opportunity to participate in interscholastic athletics. *Mansourian*, 594 F.3d at 1108 n. 16. In other words, a biologically female track-and-field athlete who can only watch helplessly as a male-bodied competitor rewrites the state record books from an adjoining lane loses out on the very type of educational opportunity that Title IX was enacted to provide to the biological female. *Neal*, 198 F.3d at 767. Such a loss would not only undermine Title IX's purpose, it "would hinder, and quite possibly reverse, the steady increases in women's participation and interest in sports that have followed Title IX's enactment." *Id.* at 770.

To ensure true equality of athletic opportunities under Title IX, then, a school should continue to maintain separate athletic programs for boys and girls and limit participation in those programs to persons of the gender specified.

Respectfully submitted this 29th day of March, 2023.

*Edward T. Mechmann*

_____

Ray D. Hacke, Esq.
rhacke@pji.org
PACIFIC JUSTICE INSTITUTE
CENTER FOR PUBLIC POLICY
P.O. Box 276600
Sacramento, CA 95826
Telephone: 916.857.6902
Facsimile: 916.857.6902
*Pro hac vice application pending.*

Edward T. Mechmann, Esq.
Emechlaw@gmail.com
1011 First Avenue, 7th Floor
New York, NY 10022
646-794-2807

27

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO</u>
## <u>FED. R. CIV. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1</u>

 I certify that pursuant to Fed. R. 32(a)(7)(C) and Circuit Rule 32-1, the attached AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS/APPELLANTS is proportionally spaced, has a typeface of 14 points or more and contains 4,884 words.

Dated: March 29, 2023

*Edward T. MacCmann*

_____

Edward T. Mechmann, Esq.
Emechlaw@gmail.com
1011 First Avenue, 7th Floor
New York, NY 10022
646-794-2807