# 21-1365

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

SELINA SOULE, A MINOR, BY BIANCA STANESCU, HER MOTHER;
CHELSEA MITCHELL, A MINOR, BY CHRISTINA MITCHELL, HER MOTHER;
ALANNA SMITH, A MINOR, BY CHERYL RADACHOWSKY, HER MOTHER;
ASHLEY NICOLETTI, A MINOR, BY JENNIFER NICOLETTI, HER MOTHER,
*Plaintiffs-Appellants*,

*v.*

CONNECTICUT ASSOCIATION OF SCHOOLS, INC., D/B/A CONNECTICUT
INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC
SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS
BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF
EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION;
DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,
*Defendants-Appellees,*

*And*

ANDRAYA YEARWOOD; THANIA EDWARDS, ON BEHALF OF HER DAUGHTER,
T.M.; COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES,
*Intervenor-Defendants-Appellees*

———————

On Appeal from the United States District Court
For the District of Connecticut, No. 3:20-cv-00201 (RNC) (Chatigny, J.)

———————

## BRIEF OF DEFENSE OF FREEDOM INSTITUTE FOR POLICY STUDIES, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

_____

Gary M. Lawkowski
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703-574-1654
GLawkowski@DhillonLaw.com

*Counsel for amicus curiae Defense of
Freedom Institute for Policy Studies, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Defense of Freedom Institute for Policy Studies, Inc., has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

/s/Gary M. Lawkowski

Dated: March 30, 2023                              Gary M. Lawkowski

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ........................................................1

INTRODUCTION ........................................................................1

ARGUMENT .............................................................................3

   I.   The Unambiguous Text of Title IX Provides Clear Notice that "Sex" Refers to a Binary Distinction Between Biological Men and Women ...........................5

     A.  The Text of a Statute is Paramount in Assessing its Meaning.....................5

     B.  "Sex" in Title IX Unambiguously Refers to a Binary Distinction Between Biological Males and Females, Not Gender Identity .........................................7

   II.   The Original Meaning of "Sex" as a Binary Distinction Between Biological Males and Females Bolsters Appellants' Prior Notice ..........................................8

     A. The Court's Understanding of "Sex" at the Time Title IX was Adopted Reflects a Binary Distinction Based on Immutable Characteristics Determined at Birth ..........................................................................9

     B.  Contemporary Dictionaries Reflect a Binary Understanding of "Sex" ........9

     C.  Interpreting "Sex" Beyond a Binary Dichotomy Based on Biologically Determined Differences Fails Justice Scalia's "Cocktail Party" Test..............11

   III.   The History of the Adoption of Title IX Provides Additional Notice that "Sex" Meant Biological Sex ..........................................................................13

   IV.   Understanding "Sex" to Refer to a Binary Distinction Between Biological Men and Women Accords with Nearly 40 Years of Consistent Agency Interpretations of Title IX ..................................................................................18

CONCLUSION ......................................................................23

# TABLE OF AUTHORITIES

Cases

*Adams v. Sch. Bd. of Saint Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022).......... passim

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ................................................8

*Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020)......................... passim

*Cayuga Nation v. Tanner*, 6 F.4th 361 (2d Cir. 2021)................................................6

*Cohen v. Brown University*, 101 F.3d 155 (1st Cir. 1996) ........................................1

*Conchise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019) ..8

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999)............... 20, 21

*Frontiero v. Richardson*, 411 U.S. 677 (1973)...........................................................9

*Johnson v. United States*, 529 U.S. 694 (2000) .......................................................11

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ..................................................6

*McCormick ex rel. McCormick v. School District of Mamaroneck*, 370 F.3d 275
 (2d Cir. 2004)............................................................................................. 11, 18

*Meriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...........................................20

*N. Haven Bd. of Educ. v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980).......................13

*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981) .................3

*Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003) ..........................................9

*Santana v. Barr*, 975 F.3d 195 (2d Cir. 2020) ..........................................................5

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ...................................................................5

*United States v. Helm*, 58 F.4th 75 (2d Cir. 2023) ...................................................5

*United States v. Virginia*, 518 U.S. 515 (1996)....................................................9, 21

iii

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) .......................................................6, 18

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) ................. 7, 9, 12, 13


**Statutes**

20 U.S.C. § 1681 ...................................................................................... 4, 7, 8


**Other Authorities**

116 Cong. Rec. 22681–82 (1970) .......................................................................16

116 Cong. Rec. 6398–400 (1970) .......................................................................15

117 Cong. Rec. 22735–43 (1971) .......................................................................17

117 Cong. Rec. 32476 (1971) .............................................................................17

117 Cong. Rec. 39259 (1971) .............................................................................17

118 Cong. Rec. 5808 (1972) ...............................................................................18

Akeem Glaspie, *"Father of Title IX" Birch Bayh Leaves Lasting Legacy for Women's Sports*, IndyStar (Mar. 14, 2019), https://www.indystar.com/story/sports/2019/03/14/father-title-ix-birch-bayh-leaves-lasting-legacy-womens-sports/3160476002/ ............................................16

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................. 5, 6, 7

Brief of Defense of Freedom Institute for Policy Studies, Inc. as *Amicus Curiae* in Support of Plaintiff-Appellees and Intervenor-Appellees, *Tennessee v. United States Dep't of Education*, Case No. 22-5807 (6th Cir. Jan. 30, 2023)..................4

Dep't of Justice and Dep't of Educ., Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf. ..................................................................................................................19

iv

Dep't of Justice and Dep't of Educ., Dear Colleague Letter (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf ................................................................................................... 19

*Discrimination Against Women*: *Hearings Before the Special Subcomm. on Education of the H. Comm. on Education and Labor*, 91st Cong. (1970) ........... 16

H.R.J. Res. 208, 92nd Cong. (1972) .................................................................... 16

Maggie Mertens, *50 Years of Title IX: How One Law Changed Women's Sports Forever*, Sports Illustrated (May 19, 2022), https://www.si.com/college/2022/05/19/title-ix-50th-anniversary-womens-sports-impact-daily-cover ............................................................................................... 2

NCAA Demographics Database, National Collegiate Athletic Association (Dec. 2022), https://www.ncaa.org/sports/2018/12/13/ncaa-demographics-database.aspx (reporting 229,060 female student athletes in 2022) ...................... 3

Paula Lavigne, *Education Secretary Miguel Cardona on Title IX Compliance: 'It Shouldn't Be that the Federal Government has to Watch – It's Everyone's Job*,' ESPN (June 15, 2022), https://www.espn.com/college-sports/story/_/id/34084273/education-secretary-miguel-cardona-title-ix-compliance-the-federal-government-watch-everyone-job ..................................... 2

Peg Pennepacker, *The Beginning of Title IX—The Bernice Sandler Story*, National Federation of High School Associations (May 12, 2022), https://www.nfhs.org/articles/the-beginning-of-title-ix-the-bernice-sandler-story/ ................................................................................................................................. 15

President's Task Force on Women's Rts. & Resps.*, A Matter of Simple Justice III (1970) ................................................................................................................ 15

Public Submission of the Defense of Freedom Institute for Policy Studies, Inc., Dep't of Education, *Notice of Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390, 41391 (Jul. 12, 2022) ........................................ 4

Rhonda R. Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States*, 30 Hastings L. J. 799 (1979) ................................. 13

Robert C. Bird, *More than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137 (1997)..........................................................................15

## STATEMENT OF INTEREST[1]

The Defense of Freedom Institute for Policy Studies, Inc. ("DFI") is a nonprofit, nonpartisan 501(c)(3) institute dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker and to protecting the civil and constitutional rights of Americans at school and in the workplace. Former senior leaders of the U.S. Department of Education ("the Department") who are experts in education law and policy founded DFI in 2021. DFI possesses significant legal expertise and policy experience in interpreting and administering Title IX of the Education Amendments of 1972 and the Department's implementing regulations.

## INTRODUCTION

"There can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in an attitude toward women athletes and women's sports." *Cohen v. Brown University*, 101 F.3d 155, 188 (1st Cir. 1996). As one writer posited, "one of [Title IX's] major achievements [is] giving young women an equal opportunity to participate in sports." *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731, 1779 (2020) (Alito, J., dissenting).

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus curiae or its counsel, contributed money to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

1

As a result, for the past fifty years Title IX has been closely identified with women's sports in the popular imagination. For some, Title IX "had an almost mythical air" that helped explain "why every girl [she] knew played some kind of sport." Maggie Mertens, *50 Years of Title IX: How One Law Changed Women's Sports Forever*, Sports Illustrated (May 19, 2022), https://www.si.com/college/2022/05/19/title-ix-50th-anniversary-womens-sports-impact-daily-cover; *see also Adams v. Sch. Bd. of Saint Johns Cnty.*, 57 F.4th 791, 812, 817-821 (11th Cir. 2022) (Lagoa, J., specially concurring) (describing the impact of Title IX on women's sports and the potential impact of allowing biological males to compete in women's sports based on gender identity).

This perception was supported by the numbers. Per Education Secretary Miguel Cardona, "in 1972, there were only 300,000 girls competing in high school athletics; today that number is 3.4 million. In college it was similar" with numbers increasing from an estimated 30,000 to an estimated 150,000. Paula Lavigne, *Education Secretary Miguel Cardona on Title IX Compliance: 'It Shouldn't Be that the Federal Government has to Watch – It's Everyone's Job*,' ESPN (June 15, 2022), https://www.espn.com/college-sports/story/_/id/34084273/education-secretary-miguel-cardona-title-ix-compliance-the-federal-government-watch-everyone-job; *see also* NCAA Demographics Database, National Collegiate Athletic Association

2

(Dec. 2022), https://www.ncaa.org/sports/2018/12/13/ncaa-demographics-database.aspx (reporting 229,060 female student athletes in 2022).

Appellants have plausibly alleged that Appellees' policy "threatens to undermine" that achievement by "forc[ing] young women to compete against students who have a very significant biological advantage." *Bostock*, 140 S.Ct. at 1779 (Alito, J., dissenting). *Pennhurst* and its progeny are no bar to consideration of Appellant's claims. Appellees have more than fifty years of notice that policies that discriminate against biological women in school sports violate Title IX. Accordingly, the panel's decision should be vacated, the decision of the district court reversed, and this matter should be remanded for consideration of Appellants' claims on the merits.

## ARGUMENT

"[L]egislation enacted pursuant to the spending power is much in the nature of a contract" between the federal government and the States. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). As a result, "if Congress intends to impose a condition on the grant of federal monies, it must do so unambiguously." *Id*. Congress did so when it adopted Title IX in 1972.

Title IX expressly prohibits discrimination "on the basis of sex" in educational programs receiving federal funding: "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be

3

subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (emphasis added).

The text, common public meaning at the time of enactment, and context and history of Title IX establishes that the word "sex" for purposes of Title IX refers to a binary distinction between biological men and women.[2] The text of Title IX repeatedly makes references to sex differences that only make sense in the context of a binary distinction between biological males and females. *See, e.g.*, 20 U.S.C. § 1681(a)(7) (referring to "Boy or Girl Conferences"); 20 U.S.C. § 1681(a)(8) (referring to "Father-Son or Mother-Daughter Activities at Educational Institutions"). Contemporary sources, including contemporary dictionaries and judicial opinions, indicate that this was also the commonly understood original meaning of the term "sex" at the time Title IX was adopted. Finally, the context and history surrounding the adoption of Title IX show that it was intended and understood to be directed at rectifying discriminatory treatment of biological females relative to biological men.

---

[2] *See also generally* Brief of Defense of Freedom Institute for Policy Studies, Inc. as *Amicus Curiae* in Support of Plaintiff-Appellees and Intervenor-Appellees, *Tennessee v. United States Dep't of Education*, Case No. 22-5807 (6th Cir. Jan. 30, 2023) (presenting substantially similar points regarding the text, purpose, and history of Title IX); Public Submission of the Defense of Freedom Institute for Policy Studies, Inc., Dep't of Education, *Notice of Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390, 41391 (Jul. 12, 2022) (same).

"We presume that Congress says in a statute what it means and means in a statute what it says." *Santana v. Barr*, 975 F.3d 195, 198 n.1 (2d Cir. 2020) (citing *Mizrahi v. Gonzales*, 492 F.3d 156, 158 (2d Cir. 2007) (cleaned up)). Neither newfound revisionist interpretations of Title IX itself nor the Court's decision in *Bostock* supersede the plain meaning of the text.

Title IX is unambiguous: school districts that receive federal funding cannot discriminate in school sports on the basis of sex. The text, context, and history of Title IX is equally clear that "sex," for purposes of Title IX, is a binary distinction between biological men and women. For over forty years, this was a widely accepted and largely uncontroversial interpretation. As a result, Appellees have clear, unambiguous notice that they cannot discriminate against biological women.

## I. The Unambiguous Text of Title IX Provides Clear Notice that "Sex" Refers to a Binary Distinction Between Biological Men and Women

### A. The Text of a Statute is Paramount in Assessing its Meaning

"Statutory interpretation, as we always say, begins with the text." *United States v. Helm*, 58 F.4th 75, 90 (2d Cir. 2023) (citing *Ross v. Blake*, 578 U.S. 632, 638 (2016); *United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir. 1996)); *see also Tanzin v. Tanvir*, 141 S.Ct. 486, 489 (2020) ("As usual, we start with the statutory text."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) [hereinafter *Reading Law*] ("As Justinian's Digest put it: *A verbis legis non est recedendum* ('Do not depart from the

words of the law')" (quoting Digest 32.69 pr. (Marcellus))); *Cayuga Nation v. Tanner*, 6 F.4th 361, 378 (2d Cir. 2021) ("In interpreting a statute, we look first to the language of the statute itself. When the language of the statute is unambiguous, judicial inquiry is complete.") (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289-90 (2d Cir. 2002) (cleaned up)).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. Env't Prot. Agency*, 142 S.Ct. 2587, 2607 (2022) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also New York State Restaurant Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 129-30 (2d Cir. 2009) (same) (quoting *Food and Drug Admin. V. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also* READING LAW at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also* READING LAW at 167–169 (describing the "whole-text canon" of statutory construction).

As Sir Edward Coke explained, "it is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for

that best expresseth the meaning of the makers." READING LAW at 167 (quoting 1 Edward Coke, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND, OR A COMMENTARY UPON LITTLETON § 728, at 381a (1628; 14[th] ed. 1791)). Accordingly, "[i]f any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other." *Id*.

### B. "Sex" in Title IX Unambiguously Refers to a Binary Distinction Between Biological Males and Females, Not Gender Identity

"The words used in legislation are used for a reason." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 143 (2d Cir. 2018) (Lynch, J., dissenting). The word "sex" in Title IX is unambiguous, particularly in the textual context of the rest of Title IX. Title IX repeatedly draws binary distinctions between "boys" and "girls." For example:

- Section 1681(a)(5) refers to public universities with "a policy of admitting only students of *one sex*," 20 U.S.C. § 1681 (a)(5) (emphasis added);

- Subsection (6)(B) refers to youth service organizations that have "traditionally been limited to persons of *one sex* . . .," 20 U.S.C. § 1681 (a)(6)(B) (emphasis added);

- Subsection (7) applies to "Boy or Girl conferences," 20 U.S.C. § 1681 (a)(7);

- Subsection (8) concerns "father-son or mother-daughter activities at educational institutions" and provides "if such activities are provided for

7

students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*," 20 U.S.C. § 1681 (a)(8) (emphasis added);

- Subsection (9) addresses "'beauty' pageants" in which "participation is limited to individuals of *one sex* only," 20 U.S.C. § 1681 (a)(9) (emphasis added); and

- Section 1681(b) likewise refers to "disparate treatment to the members of *one sex*," 20 U.S.C. § 1681 (b) (emphasis added).

"In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Conchise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S.Ct. 1507, 1512 (2019). These intertextual references show that "sex" can only be understood as a reference to a binary understanding that categorizes persons as either male or female for the purposes of Title IX.

## II. The Original Meaning of "Sex" as a Binary Distinction Between Biological Males and Females Bolsters Appellants' Prior Notice

The Court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock,* 140 S.Ct. at 1738; *see also Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."). Since "the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might

8

have meant something else at the time of its adoption or might mean something different in another context." *Bostock*, 140 S.Ct. at 1750.

### A. The Court's Understanding of "Sex" at the Time Title IX was Adopted Reflects a Binary Distinction Based on Immutable Characteristics Determined at Birth

In 1972, when Title IX was adopted, the ordinary public meaning of "sex" was a binary distinction between males and females. Less than a year later the Supreme Court stated that "sex, like race and national origin, is an *immutable characteristic determined solely by the accident of birth*." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (emphasis added). Similarly, the Court has repeatedly referred to "inherent differences" between men and women as a factor in its discussion of "sex" in the context of education. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of members of either sex or for artificial constraints on an individual's opportunities."); *see also Ramos v. Town of Vernon*, 353 F.3d 171, 179 (2d Cir. 2003) ("[A]lthough such laws elicit some suspicion, the physical differences between the sexes are relevant and enduring.").

### B. Contemporary Dictionaries Reflect a Binary Understanding of "Sex"

Dictionary definitions are particularly useful in determining the plain meaning of sex-related discrimination claims. *See Zarda*, 883 F.3d at 113 (citing to the

9

*Black's Law Dictionary* definition of "Sexual Orientation" for purposes of analyzing Title VII). "Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean." *Bostock*, 140 S.Ct. at 1766 (Alito, J., dissenting). "Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex." *Adams*, 57 F.4th at 812. The Eleventh Circuit in *Adams* identified at least six such dictionary definitions. *Id*. In his *Bostock* dissent, Justice Alito also identified at least six contemporary dictionary definitions of sex predating Title IX. *See Bostock*, 140 S.Ct. at 1784–89 (Alito, J. dissenting) (Appendix A). "In all of those dictionaries, the primary definition of 'sex' was essentially the same as that in the then-most recent edition of Webster's New International Dictionary . . . '[o]ne of the two divisions of organisms formed on the distinction of male and female.'" *Id.* at 1756 (Alito, J., dissenting) (quoting the definition for "sex," *Webster's New International Dictionary* 2296 (def. 1) (2d ed. 1953); *see also Bostock*, 140 S.Ct. at 1756 (Alito, J., dissenting) ("Anyone who examines those dictionaries can see the primary definition in every one of them refers to the division of living things into two groups, male and female, based on biology, and most of the definitions further down the list are the same or very similar.").

### C. Interpreting "Sex" Beyond a Binary Dichotomy Based on Biologically Determined Differences Fails Justice Scalia's "Cocktail Party" Test

Finally, a binary, biologically based definition of "sex" is consistent with how the word was used when Title IX was adopted in 1972.

In assessing the ordinary meaning of a statute, the late Justice Scalia counseled "the acid test of whether a word can reasonably bear a particular meaning is whether you could use the word in that sense at a cocktail party without having people look at you funny." *Johnson v. United States*, 529 U.S. 694, 718 (2000) (Scalia, J., dissenting). Interpreting "sex" in the context of Title IX as anything other than a biologically based binary dichotomy plainly fails this test as "[a]ny such notion would have clashed in spectacular fashion with the societal norms of the day." *Bostock*, 140 S.Ct. at 1769 (Alito, J., dissenting).

First, the purpose of Title IX was to address shocking and pervasive discrimination against women in favor of men in the educational context. *See McCormick ex rel. McCormick v. School District of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004) ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."); *see also Adams*, 57 F.4th at 811 ("Its purpose, as derived from its text, is to prohibit sex discrimination in education.").

11

"From the moment President Kennedy proposed the Civil Rights Act in 1963, women's rights groups, with the support of some members of Congress, had urged that sex discrimination be included as a target of the legislation." *Zarda*, 883 F.3d at 138 (Lynch, J., dissenting). "[T]he concept of discrimination 'because of,' 'on account of,' or 'on the basis of' sex was well understood" because it "was part of the campaign for equality that had been waged by women's rights advocates for more than a century" and "meant . . . equal treatment for men and women." *Bostock*, 140 S.Ct. at 1769 (Alito, J., dissenting).

In contrast, there is a paucity of contemporaneous records referencing alternative interpretations of the word "sex" that likely reflects the novelty of such understandings. For example, "[w]hile it is likely true that there have always been individuals who experienced what is now termed 'gender dysphoria' . . . [i]t was not until 1980 that the APA, in DSM-III, recognized two main psychiatric diagnoses related to this condition." *Id.* at 1773 (Alito, J., dissenting) (citations omitted). By contrast, "[t]he term 'transgender' is said to have been coined 'in the early 1970s,' and the term 'gender identity' . . . apparently first appeared in an academic article in 1964." *Id.* at 1772 (Alito, J., dissenting) (cleaned up). At the same time, even in the late 1970s, "[t]here [was] a popular, but incorrect, belief that transsexualism and homosexuality are the same thing," with "transsexualism" defined as a person "whose psychological identity differs from his physiological sex." Rhonda R.

Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States*, 30 Hastings L. J. 799, 802-03 (1979).

Interpreting sex in the context of Title IX beyond a biologically based binary classification—such as encompassing concepts like presently ascendant views on gender identity—would plainly fail the "cocktail party" test when Title IX was first adopted in 1972.

## III. The History of the Adoption of Title IX Provides Additional Notice that "Sex" Meant Biological Sex

Title IX did not arise in a vacuum. It was the product of a long struggle to seek and obtain equality for biological women vis-à-vis biological men and should be interpreted consistent with that context.

Title IX was directed specifically at rectifying traditional discriminatory treatment of women, particularly as contrasted with the treatment of men. "Legislation is adopted in response to perceived social problems, and legislators adopt the language that they do to address a social evil or accomplish a desirable goal. The words of the statute take meaning from that purpose, and the principles it adopts must be read in light of the problem it was enacted to address." *Zarda*, 883 F.3d at 143 (Lynch, J., dissenting); *see also generally N. Haven Bd. of Educ. v. Hufstedler*, 629 F.2d 773, 777 (2d Cir. 1980) ("As in any other problem of statutory interpretation we must examine the words of the statute, the legislative history, and *the statutory purpose to be served*.") (emphasis added).

13

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination." *Frontiero*, 411 U.S. at 684. Traditionally, discrimination against women "was rationalized by an attitude of 'romantic paternalism.'" *Id.* "As a result of notions such as these, our statute books gradually became laden with gross, stereotyped distinctions between the sexes," including prohibiting women from holding public office, serving on juries, bringing suits in their own names, and even voting until the early 20th century. *Id.* at 685. Leading up to the 1970s, "the position of women in America . . . improved markedly," even while "it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face[d] pervasive, although at times more subtle, discrimination." *Id.* at 685–86 (citations omitted).

Before Title IX, high level government reports, congressional statements, and congressional hearings made clear that Congress was interested in addressing discrimination against women, particularly in the context of education, and place the phrase "on the basis of sex" squarely within that context.

In 1970, Representative Martha Griffiths—one of the most forceful advocates for the addition of "sex" to Title VII of the Civil Rights Act—"gave the first speech ever in the U.S. Congress on the discrimination against women in education," stating in part "[i]t is shocking and outrageous that universities and colleges, using Federal monies, are allowed to continue treating women as second-class citizens, while the

14

Government hypocritically closes its eyes." Peg Pennepacker, *The Beginning of Title IX—The Bernice Sandler Story*, National Federation of High School Associations (May 12, 2022), https://www.nfhs.org/articles/the-beginning-of-title-ix-the-bernice-sandler-story/; 116 Cong. Rec. 6398–400 (1970); *See generally* Robert C. Bird, *More than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137 (1997).

In April 1970, the President's Task Force on Women's Rights and Responsibilities issued a report which warned "[s]o widespread and pervasive are discriminatory practices against women that they have come to be regarded, more often than not, as normal." PRESIDENT'S TASK FORCE ON WOMEN'S RTS. & RESPS., A MATTER OF SIMPLE JUSTICE III (1970). Presaging what would become Title IX, the Task Force also recommended that Congress amend the Civil Rights Act to "authorize the Attorney General to aid women and parents of minor girls in suits seeking equal access to public education, and to require the Office of Education to make a survey concerning the lack of equal educational opportunities for individuals by reason of sex." *Id*. at IV.

In May 1970, the House and Senate held multiple hearings on and eventually proposed the Equal Rights Amendment to the Constitution ("ERA"), including debating legislation to prevent discrimination against women at American

15

universities. *See* H.R.J. Res. 208, 92d Cong. (1972). In June and July 1970, Congress held hearings on discrimination against women, which sought to prohibit discrimination "on the basis of sex," including in the educational context, placing the phrase "on the basis of sex" squarely within the context of the treatment of women. *See Discrimination Against Women*: *Hearings Before the Special Subcomm. on Education of the H. Comm. on Education and Labor*, 91st Cong. (1970).

In July 1970, Rep. Abner Mikva (D-IL) introduced the Women's Equality Act of 1970, a bill to prohibit discrimination against women in federally assisted programs, government employment, and employment in educational institutions, noting "[i]t is surprising and inexcusable that the quality of life Americans have sought for nearly 200 years is in many ways denied female Americans by law." 116 Cong. Rec. 22681–82 (1970).

This focus continued in the lead up to Title IX. In September 1971, the "father of Title IX," Senator Birch Bayh, introduced a bill that was eventually largely included in Title IX, the Women's Educational Equality Act. *See* Akeem Glaspie, *"Father of Title IX" Birch Bayh Leaves Lasting Legacy for Women's Sports*, IndyStar (Mar. 14, 2019), https://www.indystar.com/story/sports/2019/03/14/father-title-ix-birch-bayh-leaves-lasting-legacy-womens-sports/3160476002/. In doing so, Senator Bayh stated, "[t]he bill I am submitting today will guarantee that women,

too, enjoy the educational opportunity every American *woman* deserves." 117 Cong. Rec. 32476 (1971) (emphasis added).

This focus on women was consistent with Senator Bayh's statements while attempting to introduce similar legislation earlier in 1971. At that time, Senator Bayh stated "[t]o my mind our greatest legislative failure relates to our continued refusal to recognize and take steps to eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, the *women* of this country." 117 Cong. Rec. 22735–43 (1971) (emphasis added). Senator Bayh further urged that the legislation would "narrow the gap between our obligations and our performance by giving to women the benefit of the major civil rights legislation of the last decade" and noted that it would "implement[] the recommendations of the President's Task Force on Women's Rights and Responsibilities." *Id*.

Likewise, when Title IX was introduced in the House, it was defended in terms of promoting equality for women. Representative Edith Green stated at the time that "[a]ll that this title does is to ask that a woman be considered as a human being, that her qualifications, her high-school work and other qualifications be considered in the same fashion of those of a male applicant." 117 Cong. Rec. 39259 (1971).

In February 1972, Senator Bayh introduced an amendment to S. 659 and noted that "[w]hile the impact of this amendment would be far-reaching, it is not a panacea.

It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work." 118 Cong. Rec. 5808 (1972).

"Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with the Title IX's mandate of equal opportunity for both sexes." *McCormick*, 370 F.3d at 295.

Title IX's history establishes that its use of the word "sex" should be understood consistent with the goal of rectifying discrimination between men and women.

**IV. Understanding "Sex" to Refer to a Binary Distinction Between Biological Men and Women Accords with Nearly 40 Years of Consistent Agency Interpretations of Title IX**

In *West Virginia v. Environmental Protection Agency*, Justice Gorsuch counseled "[a] 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight as evidence of the statute's original charge to an agency." 142 S.Ct. at 2623 (Gorsuch, J., concurring); *see also id.* (noting that "the Court [in *NFIB v. OSHA*, 142 S.Ct. 661 (2022)] found it 'telling that OSHA, in its half a century of existence, had never before adopted a broad public health

regulation' under the statute the agency sought to invoke as authority.") (citations omitted) (cleaned up).

It was not until 2010—nearly 40 years after the adoption of Title IX—that the Department of Education began to suggest that harassment on the basis of gender identity may constitute "sex discrimination" under Title IX, *see* Dep't of Educ., Dear Colleagues Letter (Oct. 26, 2010),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. Likewise, it was not until 2016—in a guidance document issued without the benefit of notice and comment—that the Department of Education first unequivocally asserted that Title IX's prohibition on sex discrimination "encompasses discrimination based on a student's gender identity." Dep't of Justice and Dep't of Educ., Dear Colleague Letter (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf. This "guidance" was promptly withdrawn less than a year later. Dep't of Justice and Dep't of Educ., Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

It is "telling" that for forty years, the Department of Education did not interpret sex for purposes of Title IX to encompass gender identity, and that the "contemporaneous" and "long-held" view of the agency is that "sex" means a binary distinction between biological males and biological females.

19

**V.     *Bostock* Does Not Alter the Unambiguous Meaning of Title IX**

The Court's holding in *Bostock* does not negate the plain meaning of Title IX or render discrimination against biological women in the field of scholastic athletics a jump ball.

First, by its plain terms, *Bostock* does not apply to Title IX.  The Court in *Bostock* took pains to emphasize that it was only resolving the issues directly before it.  *Bostock* also disclaimed the implications of extending its interpretation of section VII of the Civil Rights Act to Title IX, noting concerns about access to bathrooms, locker rooms, and dress codes before stating "none of these other laws are before us." *Bostock*, 140 S.Ct. at 1753. Moreover, the Court in *Bostock* acknowledged that a different statutory scheme could lead to a different result, stating "we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today." *Id.* .

"Courts . . . must bear in mind that schools are unlike the adult workplace." *Davis v. Monroe County Board of Education*, 526 U.S. 629, 651 (1999); *see also Adams*, 57 F.4th at 808 (differentiating *Bostock* from Title IX by noting "the school is not the workplace."). As the Sixth Circuit has recognized, "Title VII differs from Title IX in important respects," therefore "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriweather v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see also Davis*, 526

U.S. at 675 (Kennedy, J., dissenting) (stating that analogies between Title IX and Title VII "are inapposite, because schools are not workplaces and children are not adults.").

Second, the tradeoffs are different under Title IX and Title VII. *Bostock* addressed whether an employee could be terminated from employment based on sexual orientation. Whether an employee can be fired based on sexual orientation is primarily a matter impacting employee and employer. It does not inherently impact the rights and opportunities of others.

The application of Title IX to school sports does. As the Court, per Justice Ginsberg, acknowledged, "[p]hysical differences between men and women . . . are enduring: 'The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both.'" *Virginia*, 518 U.S. at 533 (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)) (cleaned up). Appellants have alleged that permitting a biologically male student to join girls' school sports teams based on self-selected gender identity harms them based on these physical differences and that this harm is based on a protected characteristic, their biological sex. As such, this case (and Title IX more generally) requires weighing the trade-offs between affirming self-selected gender identities and protecting equal treatment of biological women in school sponsored athletics. *Bostock* provides no guideposts resolving these tradeoffs.

Third, and relatedly, the tail cannot wag the dog; derivative rights and consequences of a law cannot trump the plain text. *See generally Adams*, 57 F.4th at 814 ("Reading 'sex' to include 'gender identity,' and moving beyond a biological understanding of 'sex,' would provide more protection against discrimination on the basis of transgender status under the statute and its implementing regulations than it would against discrimination on the basis of sex."). There is no doubt that whatever "sex" means in both Title VII and Title IX, it includes the binary distinction between biological males and biological females. *See generally Bostock*, 140 S.Ct. at 1739 (describing the parties' positions regarding the meaning of the word "sex"). *Bostock* determined that Title VII protected discrimination based on sexual orientation by reasoning that "because of" sex incorporates a "but for" test and that a man would not be fired for dating a woman nor a woman fired for dating a man, therefore the but for cause when terminating an employee based on sexual orientation was their sex. Protection of sexual orientation is thus a derivative consequence of protection because of sex.

The core of "sex" is a binary distinction between biological men and women. Derivative consequence, such as protection based on sexual orientation or gender identity, cannot trump the plain language of the statute without leading to absurd results. For example, the Eleventh Circuit noted that interpreting "sex" to include gender identity "would result in situations where an entity would be prohibited from

22

installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity," an outcome that "cannot comport with the plain meaning of 'sex' at the time of Title IX's enactment and the purpose of Title IX and its implementing regulations, as derived from the text." *Adams*, 57 F.4th at 814. Title IX protects students from discrimination on the basis of sex. That core cannot be trumped by second order consequences.

## CONCLUSION

For the foregoing reasons, the judgment of the panel of the Second Circuit should be reversed.

Respectfully submitted,

/s/Gary M. Lawkowski
Gary M. Lawkowski
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703-574-1654
GLawkowski@DhillonLaw.com

*Counsel for amicus curiae Defense of
Freedom Institute for Policy Studies, Inc.*

Dated: March 30, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,267 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Respectfully submitted,

/s/Gary M. Lawkowski

Dated: March 30, 2023                    Gary M. Lawkowski

24

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Respectfully submitted,

/s/Gary M. Lawkowski

Dated: March 30, 2023                    Gary M. Lawkowski