No. 2-1365

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

SELINA SOULE ET AL.,

*Plaintiffs-Appellants,*

v.

CONNECTICUT ASSOCIATION OF SCHOOLS ET AL.,

*Defendants-Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS, ON BEHALF OF HER DAUGHTER, T.M.;
COMMISSION ON HUMAN RIGHTS AND OPPORTUINITES,

*Intervenor- Defendants-Appellees.*

---

On Appeal from the United States District Court for the
District of Connecticut, No. 3:20-cv-00201-RNC,
The Honorable Robert N. Chatigny, United States District Judge

---

**PROPOSED BRIEF OF
*AMICUS CURIAE LORIANNE UPDIKE TOLER*
IN SUPPORT OF NEITHER PARTY**

---

Lawrence A. Stein
Assistant Clinical Professor of Law
Northern Illinois University
Swen Parson Hall
Dekalb, Illinois 60115
(312) 929-5741
l-stein@niu.edu

COUNSEL FOR AMICUS CURIAE PROFESSOR LORIANNE UPDIKE TOLER

## QUESTION PRESENTED

Does the Privileges *or* Immunities Clause prohibit discrimination and class-based legislation

in public education as a fundamental right based on the history of the Clause?

# TABLE OF CONTENTS

Question Presented…………………………………………... *i*

Table of Contents…………………………………………. *ii*

Table of Authorities………………………………………….. *iii*

Statement of Interest…………………………………….... 1

Summary of the Argument………………………………… 1

Argument……………………………………………….... 2

   I.   Historical Sources Show that the Privileges *qnd* Immunities Clause of Article Four, the Antecedent to the Privileges *or* Immunities Clause, Prohibits Discrimination……………………..…...…. 2

   II.   The Privileges *or* Immunities Clause of the Fourteenth Amendment Protects Against Class-Based Discrimination in Education…………………………………………… 5

   III.   The History of the Privileges and Immunities Clause Establishes that Education is a Fundamental Privilege……………….………………….…… 11

   IV.   Pre-Ratification Legislative History Indicates that "Privileges" Protected by the Fourteenth Amendment go Beyond Those Which are Fundamental and Should Certainly Include Education………………………………. 16

Conclusion……………………………………………….… 17

# TABLE OF AUTHORITIES

## Supreme Court Opinions

*San Antonio Indep. Sch. Dist. v. Rodriguez,* ...............................................................

    411 U.S. 1 (1973) .................................................... 11

*Slaughter-House Cases,*

    83 U.S. 36, 116 (1872) ........................................... 15

## U.S. Constitution

U.S. CONST. art. IV, § 2, cl. 1 ...................................... 2

U.S. CONST. amend. XIV § 1 ....................................... 5

## State Constitutions

CAL. CONST. art. I, § 21(1879) ..................................... 7

FIRST CHARTER OF VIRGINIA § XV(1606) ................... 7

SECOND CHARTER OF VIRGINIA § 43 (1612) ............... 7

DEL. CONST. art. VIII, § 9 (1792) ................................ 6

DEL. CONST. art. VII, § 8 (1831) ................................. 6

GA. CONST. art. V, § 8 (1865) ................................... 6, 7

IND. CONST. art. I, § 23 (1851) ................................. 6, 7

IOWA CONST. art. I, § 6 (1857) ................................ 6, 7

IOWA CONST. art. VIII, § 12 (1857) .......................... 6, 7

KAN. CONST., BILL OF RIGHTS, § 2 (1859) ............... 6, 7

KY. CONST. art. VIII, § 21(1850) ................................. 6

MASS. CONST. pt. II, art. 12 (1780) .......................... 6, 7

MASS. CONST. pt. II, ch. V, § 1, art. I (1780) ............ 6, 7

MASS. CONST. amend. II (1780) ................................ 6, 7

MASS. CONST. ch. V, § 2 (1780) ................................. 13

ME. CONST. § art. II (1820) ........................................ 9

MD. CONST. § XXI (1776) ........................................... 7

N.C. CONST. § III (1776) ............................................ 7

N.C. CONST. § XII (1776) .................................................................. 7

N.H. CONST. pt. I, art. 1, § 15 (1784) ............................................. 6

N.H. CONST. pt. I, art. 15 (1784, as amended in 1792) .................... 6

N.J. CONST. § 19 (1776) ............................................................. 6, 7

OHIO CONST. art. I, § 2 (1851) .................................................. 6, 7

OR. CONST. art. I, § 20 (1857) ...................................................... 6

OR. CONST. art. I, § 21 (1857) ...................................................... 7

PA. CONST. § 45 (1776) ............................................................. 6, 7

PA. CONST. art. VII, § 3 (1790) .................................................... 6

PA. CONST. art. VII, § 3 (1838) .................................................... 6

S.C. CONST. art. VIII, § 2 (1790) .................................................. 6

S.C. CONST. art. VIII, § 2 (1861) .................................................. 6

S.C. CONST. art. IX, § 9 (1865) .................................................... 6

TENN. CONST. art. XI, § 7 (1834) ............................................. 6, 7

UT. CONST. art. IV, §1 (1896) ...................................................... 8

VA. CONST. § 4 (1776) ................................................................. 7

VT. CONST. ch. II, § 41(1777) ...................................................... 6

VT. CONST. ch. I, § 1 (1777) ........................................................ 7

VT. CONST. ch. II, § 38 (1777, as amended in 1786) ...................... 6

VT. CONST. ch. II, § 41(1793) ...................................................... 6

WY. CONST. art. VI, §1(1890) ...................................................... 8

## Cases

*Bank of Toledo v. Toledo*,
   1 Ohio St. 622, 632 (1853) ...................................................... 14

*Corfield v. Coryell*,
   6 F. Cas. 546, 550, 551, 552 (E.D. Pa. 1823) (No. 3230). ...................... 5, 13, 14, 16

*Crandall v. State*,
   10 Conn. 339, 343, 351 (1834) .................................................. 14

**Rules**

Fed. R. App. P. 29A4E ........................................................................... 1

**Bills and Statutes**

Civil Rights Act, Public Law 39-26, 14 Stat. 27 (Apr. 9, 1866)...................................... 10

Conn. Gen. Assemb., An act in addition to an Act entitled 'An Act for the admission and settlement of Inhabitants of Towns' (May 24, 1833) ................................................. 3

Freedmen's Bureau Act, 13 Stat. 507-09 (Mar. 3, 1865)...................................... 9

H.R. 493, 16th Congress (1820)........................................................... 3

H.R. 502, 16th Congress (1821)........................................................... 4

Mo. Compromise, 16th Cong. (1820) ..................................................... 3

Privileges and Immunities Bill, H.R. 437, 39th Cong. § 1 ............................................. 10

**Letters**

From Henry B. Benson to William Lloyd Garrison (Mar 12, 1833), in FRUITS OF COLONIZATIONISM 2-3 (1833), Pamphlet, Samuel J. May Anti-Slavery Collection, Division of Rare Books and Manuscript Collections, Cornell University Library, https://glc.yale.edu/sites/default/files/files/Henry%20B%20Benson.pdf ....................................................................................... 2

From Pardon Crandall, et al, to Andrew T. Judson and Chester Lyon (May 5, 1833), in FRUITS OF COLONIZATIONISM (1833), Pamphlet, Samuel J. May Anti-Slavery Collection, Division of Rare Books and Manuscript Collections, Cornell University Library, https://glc.yale.edu/sites/default/files/files/Letter%20to%20Andrew%20T%20Juds on%20and%20Chester%20Lyon%20(May%205%2C%201833).pdf............................. 3

From Prudence Crandall to Simeon Jocelyn (Feb 26, 1833), in Captain Arthur B. Spingarn, *Abolition Letters*, 18 J. OF NEGRO HIST. 80, 81 (1933)................................. 2, 3

From Prudence Crandall to Simeon Jocelyn (Apr 17, 833), in Captain Arthur B. Spingarn, *Abolition Letters*, 18 J. OF NEGRO HIST. 82-84 (1933)................................... 2, 3

From Prudence Crandall to the Windham County Advertiser (May 7, 1833), in FRUITS OF COLONIZATIONISM (1833), Pamphlet, Samuel J. May Anti-Slavery Collection, Division of Rare Books and Manuscript Collections, Cornell University Library, https://glc.yale.edu/sites/default/files/files/Letter%20to%20Andrew%20T%20Juds on%20and%20Chester%20Lyon%20(May%205%2C%201833).pdf........................ 2, 3

**Other**

Albert Castel, *The Founding Fathers and the Vision of a National University,* 4 HIST. EDUC. Q. 280, 281(1964) ............................................................... 11

Andrew T. Judson, *Argument of Andrew T. Judson, in the case of the State vs. Prudence Crandall.* Conn. Super. Ct. Err. (July 1834) [excerpt]......................................... 3

Andrew T. Judson, *Andrew T. Judson's Remarks to the Jury, on the Trial of the Case* State v. P. Crandall., Super. Ct. Err. (Oct. 1833) ............................................. 3

Anthony B. Sanders, *"Privileges And/Or Immunities" In State Constitutions Before the Fourteenth Amendment,* 26 GEO. MASON L. REV. 1059, 1064-65, 1076 (2019) ..... 6, 7, 11

Calvin Goddard, *Argument of Calvin Goddard, in the case of the State vs. Prudence Crandall.* Conn. Sup. Ct. Err. (July 1834) [excerpt]........................................... 3

*Cong. Globe*, 42nd Cong., 2d Sess. 3189-90 (May 8, 1872) ........................... 15

*Cong. Globe*, 39th Cong., 1st Sess. 2765 (1866) ............................................. 16

David Jaffee, *Industrialization and Conflict in America: 1840–1875*, THE MET (April 2007) .................................................................................................. 11

David Jaffee, *Religion and Culture in North America, 1600–1700*, THE MET (October 2004).................................................................................................. 11,12

EDWIN WOLF II AND KEVIN J. HAYES, THE LIBRARY OF BENJAMIN FRANKLIN 9 (2006) .................................................................................................. 12

Free Library Movement, Encylopedia.com, https://www.encyclopedia.com/history/encyclopedias-almanacs-transcripts-and-maps/free-library-movement....................................................................12

*Free-Soilism,* Wash. Union (Nov. 17, 1857), at 2,
https://www.loc.gov/resource/sn82006534/1857-11-17/ed-1/?sp=2&st=image..... 4

Gene Zechmeister, *Timeline of the Founding of the University of Virginia.* The Jefferson
Monticello (2011*),* https://www.monticello.org/research-education/thomas-
jefferson-encyclopedia/timeline-founding-university-virginia/#fn-src-4.............. 11,13

Geo. Wash. U., Graduate Sch. of Educ. And Hum. Dev., Ctr. On Educ. Pol'y, *History
and Evolution of Public Education in the U.S.* 1 (2020)
https://files.eric.ed.gov/fulltext/ED606970.pdf........................................................ 11

Gerard N. Magliocca, Washington's Heir: The Life of Justice Bushrod
Washington 130 (2022)
.................................................................................................................. 13, 17

Gerry Souter & Janet Souter, The Constitution: the Story of the
Creation and Adaptation of the Most Important Document in the
History of the United States of America 17 (2019) ..................................... 12, 13

H.C. Barnard, A History of English Education from 1760 2-4 (1961)............ 12

*History and Evolution of Public Education in the U.S.* 1 Center for Education Policy (2020),
Geo. Wash. U.(2020), https://files.eric.ed.gov/fulltext/ED606970.pdf...................... 12

James Madison, *Notes of the Constitutional Convention*, (September 14, 1787), *in* 2 The
Records of the Federal Convention of 1787, 616 (Max Farrand ed. 1911)..... 12

Jeffrey M. Shaman, *The Evolution of Equality in State Constitutional Law*,
34 Rutgers L.J. 1013, 1087 (2003) ........................................................... 13

Jon Meacham, Thomas Jefferson: The Art of Power 457-58 (2012)................ 12

Kara A. Millonzi*, Education as a Right of National Citizenship under the Privileges or
Immunities Clause of the Fourteenth Amendment,* 81 N.C.L. Rev. 1286 (2003) ............. 15, 16

*Opinion of Judge Davis*., 44 Me. 576, 578–79 (1857)......................................... 8, 9

*Opinion of Judge Appleton*, 44 Me. 521, 521–22 (1857)..................................... 8, 9

Philip Hamburger, *Privileges Or Immunities*, 105 Nw Univ. L. Rev. 61, 68 (2011) ....... 10

Randy E. Barnett & Evan D. Bernick, *The Privileges or Immunities Clause, Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 NOTRE DAME L. REV. 499, 507, 588 (2019) ................................................................................................................... 6

Steven G. Calabresi & Michael W. Perl, *Originalism and Brown v. Board of Education,* 2014 MICH. ST. L. REV. 429, 449 (2015) .................................................................... 13

*The Reconstruction Committee's Report Before the Senate*, N.Y. HERALD 1 (May 24, 1866).. 16

William W. Ellsworth, *Argument of William W. Ellsworth, in the case of the* State v. Prudence Crandall. Conn. Sup. Ct. Err. (July 1834) [excerpts]......................................... 3

## STATEMENT OF INTEREST IN COMPLIANCE WITH
## Fed. R. App. P. 29(a)(4)(E)

Amicus Curiae, Lorianne Updike Toler, is an assistant professor at Northern Illinois University College of Law specializing in constitutional legal history. She is assisted in this brief by students Maxwell Sharkey, Catherine Carter, Robert Harden, and Andrea Stout (JDs expected May 2023, Northern Illinois University College of Law). Amicus Curiae has an interest in the Court having an informed understanding of the constitutional history of the Privileges or Immunities Clause of the Fourteenth Amendment.

Counsel for neither party contributed to the writing of this brief. Additionally, counsel for neither party nor any other person other than Prof. Updike Toler made a monetary contribution funding the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

This case presents the opportunity to clarify the applicability of the Privileges or Immunities Clause of the Fourteenth Amendment to class-based discrimination, particularly as it relates to education. This brief will attempt to do so by exploring the history of its antecedent, the Privileges *and* Immunities Clause. Then, this brief will show how the Privileges *or* Immunities Clause prohibits class-based discrimination. Further, the Privileges *or* Immunities Clauses establishes protection of fundamental privileges, of which education is one. Lastly, even if education is not found to be a fundamental privilege, the Privileges *or* Immunities Clause protects privileges beyond those that are fundamental, including education.

.

# ARGUMENT

I.   HISTORICAL SOURCES SHOW THAT THE PRIVILEGES *AND* IMMUNITIES CLAUSE OF ARTICLE FOUR, THE ANTECEDENT TO THE PRIVILEGES *OR* IMMUNITIES CLAUSE, PROHIBITS DISCRIMINATION.

To properly examine the Privileges *or* Immunities Clause of the Fourteenth Amendment, it is necessary to first analyze the Privileges *and* Immunities Clause contained in Article IV of the U.S. Constitution. This Clause reads, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[1] This Clause provides federal protection against discrimination for persons moving between or across state lines. This historical prelude is precedent for the Privileges *or* Immunities Clause in the Fourteenth Amendment extending this protection to citizens of the same state.

When first examining the Privileges *and* Immunities Clause, there has been long standing public discourse about the breadth of its protection. One such example can be found in what is known as the Crandall Affair, which appeared in public discourse and legislation from 1833 to 1869. The Affair refers to Prudence Crandall's decision to open one of the first schools for African American girls and the subsequent issues she faced from the Connecticut legislature and community as a whole. Recorded in a series of early letters, Crandall insisted on keeping the school open despite public disapproval culminating in the criminalization of the education of these African-American girls.[2] Nonetheless, Crandall continued to keep the school open, which resulted in her arrest and

---

[1] U.S. CONST. art. IV, § 2, cl. 1

[2] *See* From Henry B. Benson to William Lloyd Garrison (Mar 12, 1833), in FRUITS OF COLONIZATIONISM 2-3 (1833), Pamphlet, Samuel J. May Anti-Slavery Collection, Division of Rare Books and Manuscript Collections, Cornell University Library, https://glc.yale.edu/sites/default/files/files/Henry%20B%20Benson.pdf, From Pardon Crandall, et al, to Andrew T. Judson and Chester Lyon (May 5, 1833), in FRUITS OF COLONIZATIONISM (1833), Pamphlet, Samuel J. May Anti-Slavery Collection, Division of Rare Books and Manuscript Collections, Cornell University Library, https://glc.yale.edu/sites/default/files/files/Letter%20to%20Andrew%20T%20Judson%20and%20Chester

2

trial.[3] Among three arguments made at trial, black citizenship and determination of what constituted a privilege remained integral.[4] While Crandall's lawyers argued education was "fundamental… the last privilege we will give up,"[5] the opposition claimed these privileges only guaranteed, "fundamental rights, like the right to life."[6] Though the first trial ended in a hung jury, Crandall was found guilty in the second trial, when it was ruled that African Americans were not citizens and therefore were not guaranteed Constitutional rights.[7] Had citizenship not been at issue, however, the privileges may well have been extended.

The extension of the protection of the Privileges *and* Immunities Clause continued to be at issue in the Second Missouri Compromise. After the first federal compromise (that attempted to create a balance of slave and non-slave states in the U.S., admitting Missouri as a slave state, and Maine as free), the Missouri constitutional convention allowed the state legislature to exclude free blacks in their proposed constitution for the new state, a provision that was objected to by the North. In response, Congress stipulated that Missouri would not be admitted to the Union until it agreed that the exclusionary clause at issue would never be used to abridge the privileges and immunities of U.S. citizens.[8] This amendment was eventually agreed to, stating that Missouri may gain admittance through, "the fundamental condition that [Missouri] shall never pass any law

---

%20Lyon%20(May%205%2C%201833).pdf, From Prudence Crandall to Simeon Jocelyn (Feb 26, 1833), in Captain Arthur B. Spingarn, *Abolition Letters*, 18 Journal of Negro History 80, 81 (1933), From Prudence Crandall to Simeon Jocelyn (Apr 17, 1833), in Captain Arthur B. Spingarn, *Abolition Letters*, 18 Journal of Negro History 82-84 (1933), From Prudence Crandall to the Windham County Advertiser (May 7, 1833), in FRUITS OF COLONIZATION (1833). [please include the URL here as above]; *See also,* Conn. Gen. Assemb., An act in addition to an Act entitled *An Act for the admission and settlement of Inhabitants of Towns* (May 24, 1833).

[3] *Id.*

[4] Andrew T. Judson, *Argument of Andrew T. Judson, in the case of the State vs. Prudence Crandall.* Conn. Sup. Ct. Err. (July 1834) [excerpt], Calvin Goddard, *Argument of Calvin Goddard, in the case of the State vs. Prudence Crandall.* Conn. Sup. Ct. Err. (July 1834) [excerpt], William W. Ellsworth, *Argument of William W. Ellsworth, in the case of the* State v. Prudence Crandall, Conn. Sup. Ct. Err. (July 1834) [excerpts].

[5] Andrew T. Judson, *Andrew T. Judson's Remarks to the Jury, on the Trial of the Case State v. P. Crandall*, Sup. Ct. Err. (Oct. 1833).

[6] *Id.*

[7] *Id.*

[8] Mo. Compromise, 16th Cong. (1820); *See also* H.R. 493, 16th Congress (1820).

preventing any … persons from going to and settling in [Missouri] who now are, or may become, citizens of any of the States of this Union."[9] This agreement extended privileges and immunities to any person in Missouri if they had become a citizen in another state, including free blacks. By extension, this agreement granted privileges and immunities to all citizens, regardless of their race, even if they visited a state where they were not recognized as a citizen.

Following the repeal of the Second Missouri Compromise via the Kansas-Nebraska Act of 1854, public discourse again showed that many believed the Privileges and Immunities Clause protected U.S. citizens from discriminatory measures. One example is an article entitled "Free-Soilism," published in the November 17, 1857 edition of *The Washington Union*, a Washington, D.C. newspaper.[10] The article raised a spirited argument against the notion of a State's authority to prevent slaveholders from entering its territory and forfeiting their slaves.[11] In doing so, the article references Article Four's Privileges and Immunities Clause. Insofar as the southern states and the slaveholders residing therein have contributed to the acquisition of new territories by their tax contributions, they retain access to all public rights:

> "...If [State or Territorial land is] acquired by purchase, it is paid for out of the common fund of the public revenue, to which every man who eats and drinks, and wears clothes, contributes his full proportion. Setting aside all laws and constitutions, and simply applying the great principles of natural justice and equity to the case, we would ask if those who are equal parties to the attainment of a good are not entitled to an equal share of its benefits? This is a universal law, equally recognized by the ignorant and the wise…"[12]

The article clearly evinces a belief by the public that all citizens, regardless of their differences, have a right to partake in the privileges created by the state by virtue of their tax contributions to that state. The author fails to consider how the natural injustice of slavery impacts such "natural justice."

---

[9] H.R. 502, 16th Congress (1821).
[10] *Free-Soilism*, WASH. UNION, (Nov. 17, 1857), at 2, https://www.loc.gov/resource/sn82006534/1857-11-17/ed-1/?sp=2&st=image [attached as "Image 1" in the accompanying Appendix].
[11] *Id.*
[12] *Id.*

but the argument nevertheless lays the foundation that one of the privileges held as a citizen of a

state is to equally access state-funded entitlements, or public rights, without discrimination.[13] The

history of the Privileges and Immunities Clause of Article Four shows that it prohibits inter-state

discrimination. Such historical and interpretive prelude is precedential to the Privileges *or* Immunities

Clause of the Fourteenth Amendment.

## II.   THE PRIVILEGES *OR* IMMUNITIES CLAUSE OF THE FOURTEENTH AMENDMENT PROTECTS AGAINST CLASS-BASED DISCRIMINATION IN EDUCATION.

The Privileges or Immunities Clause of the Fourteenth Amendment has been dormant in

American jurisprudence compared to the Equal Protection Clause of the same Amendment;

however, this clause can be important in shedding light onto the public meaning of equality as it is

applied to education. This Clause reads:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; […][14]

When looking to the original public meaning of the Privileges or Immunities Clause in the current

U.S. Constitution, state charters and constitutions, judicial opinions, and federal legislation

immediately prior to the Fourteenth Amendment provide clarity on how "privileges and/or

immunities" as legal terms of art were used and applied at the time of the Fourteenth Amendment's

writing. In this section, each will be addressed in turn.

Before the Privileges or Immunities Clause was added to the Fourteenth Amendment,

Anthony Sanders indicates that the words "privilege(s)" and "immunit(ies)" were used within a word

---

[13] *Corfield v. Coryell*, 6 F. Cas. 546, 551 (E.D. Pa. 1823) (No. 3230).
[14] U.S. CONST. amend. XIV § 1.

or two of each other approximately twenty-six times in state constitutions.[15]  When analyzing this data, there appears to be four categories in which the words are applied; "(1) the rights of corporate bodies; (2) bans on class-based state action; (3) protections of fundamental liberties; and (4) others."[16] In this section, the focus will be on the second category: bans of class-based state action. But what do these words mean? A better question presented is what did the public understand these words to mean around the time the Fourteenth Amendment was written? There is some debate on this question, although "privilege" was sometimes used interchangeably with "right": a privilege was understood to mean rights given in exchange for entering society.[17] The scope of what, exactly, these "rights" consist of is hotly contested. Some scholars argue that these include natural rights, while others, such as Kurt Lash, argue that these rights include only what is enumerated in the Constitution, though his view is not supported by a majority of Fourteenth Amendment scholars.[18] Many scholars agree that "privileges" were understood to extend beyond the enumerated rights of the Constitution.[19] The meaning of "immunities" evoke less dispute, and is generally understood by scholars to mean something that is not relinquished to the government.[20]

The use of these words in American legislation can be traced back long before the Fourteenth Amendment was passed. In 1606, the first royal charter for planting a colony in America

---

[15] *See* Anthony B. Sanders, "*Privileges And/Or Immunities" In State Constitutions Before the Fourteenth Amendment*, 26 GEO. MASON L. REV. 1059 (2019) (citing DEL. CONST., art. VII, § 8 (1831); DEL. CONST., art. VIII, § 9 (1792); GA. CONST., art. V, § 8 (1865); IND. CONST., art. I, § 23 (1851); IOWA CONST., art. I, § 6 (1857); id. art. VIII, § 12; KAN. CONST., Bill of Rights, § 2 (1859); KY. CONST., art. VIII, § 21 (1850); MASS. CONST., pt. I, art. 12 (1780); id. pt. II, ch. V, § 1, art. 1; id. amend. II; N.H. CONST., pt. I, art. 15 (1784, as amended in 1792); N.H. CONST., pt. I, art. 1, § 15 (1784); N.J. CONST., § 19 (1776); OHIO CONST., art. I, § 2 (1851); OR. CONST., art. I, § 20 (1857); PA. CONST., art. VII, § 3 (1838); PA. CONST., art. VII, § 3 (1790); PA. CONST., § 45 (1776); S.C. CONST., art. IX, § 9 (1865); S.C. CONST., art. VIII, § 2 (1861); S.C. CONST., art. VIII, § 2 (1790); TENN. CONST., art. XI, § 7 (1834); VT. CONST., ch. II, § 41 (1793); VT. CONST., ch. II, § 38 (1786); VT. CONST., ch. II, § 41 (1777)). [hereinafter "Sanders"].
[16] *Id.* at 1064-65 (citing WILLIAM BLACKSTONE, COMMENTARIES 127-28).
[17] *Id.* at 1076.
[18] Randy E. Barnett & Evan D. Bernick, *The Privileges or Immunities Clause, Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 NOTRE DAME L. REV. 499, 507, 588 (2019).
[19] *Id.*
[20] Sanders*, supra* n. 15, at 1076.

included the phrase "shall have and enjoy all Liberties, Franchises, and Immunities."[21] The colony of Virginia later changed this language to include "privileges" in 1612.[22]

After states started to create their own constitutions during the Revolutionary War, several states included some form of a privileges or immunities clause.[23] Moreover, though not a recognized state yet, Vermont's 1777 Constitution explicitly identifies male and female rights, which indicates the rights given in the Constitution apply to both sexes.[24] Delving further into the work of Sanders, of the twenty-six times that "privilege(s)" and "immunit(ies)" is used within close proximity of one another, the reference was only used eleven times to grant privileges and/or immunities to an *individual* or *class* of citizens rather than the words "bodies of men", corporations, or religious societies.[25] This observation may reflect that the Privileges or Immunities Clause has a broader scope and is applicable to groups of persons. Alternatively, it may reflect that the original understanding prioritized stronger protections for corporations and religious societies—or both.

Focusing purely on when "privileges" or "immunities" referenced individuals or classes of citizens, the language is relatively similar among the state Constitutions, granting that "citizens or class of citizens" shall not have their privileges or immunities taken that are granted to all citizens. The Fourteenth Amendment was passed by Congress in 1866 and ratified in 1866. Contemporaneously or soon thereafter, several states added notable privilege or immunities clauses to their constitutions.[26] In the 1890s, about one generation after the passage of the Fourteenth

---

[21] FIRST CHARTER OF VIRGINIA § XV (1606).

[22] SECOND CHARTER OF VIRGINIA (1612), at 43.

[23] MD. CONST., § XXI (1776); N.C. CONST., §III (1776); ID., § XII; N.J. CONST., § 19 (1776); PA. CONST., §45 (1776); VA. CONST., § 4 (1776).

[24] VT. CONST. ch. I, §I (1777).

[25] GA. CONST., art. V, § 8 (1865); IND. CONST., art. I, § 23 (1851); IOWA CONST., art. I, § 6 (1857); id. art. VIII, § 12; KAN. CONST., Bill of Rights, § 2 (1859); MASS. CONST., pt. I, art. 12 (1780); id. pt. II, CH. V, § 1, ART. 1; id. amend. II; N.J. CONST., § 19 (1776); OHIO CONST., art. I, § 2 (1851); OR. CONST., art. I, § 21 (1857); TENN. CONST, art. XI, § 7 (1834). (*emphasis added*).

[26] CAL. CONST., art. I, § 21 (1879); IL. CONST., art. I, § 16 (1870); WA. CONST., art. XIV, § 1 (1881).

Amendment, the language evolved. States began adding "male" and "female" into their state Privilege or Immunities Clauses.[27] This significant addition in several states could suggest the Privileges or Immunities Clause was meant to protect similarly situated citizens regardless of their gender identity or sex. Alternatively, it might mean the Privileges or Immunities Clause protected birth characteristics. This could translate into males being compared with similarly situated males and females compared with similarly situated females.[28]

State courts also adopted this approach. In 1857, the Maine Supreme Court responded to the Maine Senate's inquiry request for an advisory opinion to elucidate whether free blacks were citizens. There, Judge John Appleton explained that the Privileges and Immunities of Article Four of the U.S. Constitution ascribed to citizens of one state are ascribed to citizens of all states.[29] Further, he stated that the privileges awarded through citizenship are not restricted by color, race, or any other limit; these privileges are given to everyone, including paupers, vagabonds, and fugitives from justice.[30] According to Judge Appleton, a citizen's privileges under Article Four and under Maine's Constitution are not limited by any physical qualities or criteria. Since the Privileges *and* Immunities Clause holds similar protections to those of the Privilege *or* Immunities Clause, Judge Appleton's opinion seems to argue that the Privileges or Immunities Clause was meant to protect similarly situated citizens regardless of their gender identity or sex.

In response to a similar request, Judge Woodbury Davis also wrote to Maine's President of the Senate, also adopting the view that free blacks were citizens and entitled to all Privileges and

---

[27] UT. CONST., art. IV, §1 (1896); WY. CONST., art. VI, §1 (1890).

[28] It is not the purpose of this brief to argue one or the other, nor to weigh in what was meant by "male" and "female" at the time of the passage of these clauses.

[29] *Opinion of Judge Appleton*, 44 Me. 521, 521–22 (1857).

[30] *Id.*

Immunities Clause of that citizenship, including the right to elect their officers, under Article Two of

the Maine Constitution and Article Four of the U.S. Constitution:[31]

> "[Citizen's] privileges under the government may depend on age, sex or condition, and not on their allegiance; their citizenship is determined by this alone.… In this country, the Indian tribes have always been permitted to maintain their separate nationalities, and have never been considered within our jurisdiction. But with this exception, every person born within our territorial limits owes this allegiance, and is constituted a citizen…"[32]

Judge Davis defined the privileges and immunities of citizens as fundamental, even saying these

rights are just as fundamental as the rights of protection of life and liberty.[33] Judge Davis further

stated:

> "With this avowed purpose in view, the federal constitution was formed, and adopted by the people of the several states. It was designedly-so made as to need no amendment when slavery should be *abolished*. Its privileges were granted to *all*, without distinction of race or color. Free colored persons have always been recognized as citizens under it, and they are entitled to the same privileges and immunities which the constitution guarantees to other citizens."[34]

Under Judge Davis' view, blacks emancipated from slavery were citizens and, because of that status,

were guaranteed all the privileges and immunities of whites. Interpreted more broadly, Davis

therefore supported privileges and immunities for all despite minority status. There could be no

class-based discrimination under the Maine or U.S. Privileges and Immunities Clause.

Federal Statutes passed shortly before of the Fourteenth Amendment also support that

privileges or immunities of citizens are protected regardless of minority status. First was the

Freedman's Bureau Act of 1865, "An Act to establish a Bureau for the Relief of Freedmen and

Refugees." This similarly afforded to the minority, recently freed slaves, the rights of the majority.[35]

The Act sought to provide food, shelter, clothing, medical services, and land to refugees (displaced

---

[31] ME. CONST. § art. II (1820).
[32] *Opinion of Judge Davis.*, 44 Me. 576, 594-595 (1857)); *see also id.* at 578–79.
[33] *Id.*
[34] *Id.* (emphasis added).
[35] Freedmen's Bureau Act, 13 Stat. 507-09 (Mar. 3, 1865).

freed slaves).[36] Notably, it also established schools, arguably providing the privilege of education to this minority groups.[37]

Then, in 1866, even though it did not mention privileges or immunities, The Civil Rights Act was an Act to "protect all persons in the United States in their civil rights and furnish the means of their vindication."[38] By explicitly listing those civil rights, the Act enumerated some specific privileges enjoyed by all citizens, as it was unmistakably intended to afford the rights of white citizens to African Americans as well. The Act pointedly listed the right to contract, property rights, and the right to "full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens."[39] Thus, whichever privileges were afforded to the majority populous were also afforded to minorities as well.

Directly foundational to the Fourteenth Amendment was the Privileges and Immunities Bill of 1866, which was abandoned in favor of incorporating the same language into the Fourteenth Amendment.[40] Described as a measure "to declare and protect all the privileges and immunities of citizens of the United States in the several States,"[41] the Act laid out rights similar to that of the Civil Rights Act; this Act included rights that everyone was entitled to "as fully as such rights and privileges are held and enjoyed by the other citizens of such State… moreover, therein to have, enjoy, and demand the same immunities…"[42] Thus all three pieces of legislation—the first two passed into law, the last of which remained a proposal—ensured that black minorities, and, arguably, all minorities, had access to all privileges and immunities of the majority. This legislation provides

---

[36] *Id.*
[37] *Id.*
[38] Civil Rights Act, Public Law 39-26, 14 Stat. 27 (April 9, 1866).
[39] *Id.*
[40] Philip Hamburger, *Privileges Or Immunities*, 105 N.W. Univ. L. Rev. 61, 68 (2011).
[41] A Bill to Declare and Protect the Privileges and Immunities of Citizens of the United States in the Several States, H.R. 437, 39th Cong. § 1 (1866).
[42] *Id.*

the immediate legal context in which to understand the Fourteenth Amendment's Privileges and Immunities language, which extended such to all minorities equally, prohibiting class-based legislation. At least Act, the Freedman's Bureau Act, included public education as one of the privileges that could not be denied to minority groups as a privilege of citizenship.

All of the history discussed above—early charters and antebellum state constitutions, judicial opinions, and federal legislation immediately prior to the passage of the Fourteenth Amendment support a reading that the Privileges and Immunities Clause prohibits class-based legislation in the provision of those privileges. One of the fundamental privileges of citizenship that could not be denied through class-based discrimination is publicly-funded education.

## III.   THE HISTORY OF THE PRIVILEGES AND IMMUNITIES CLAUSE ESTABLISHES THAT EDUCATION IS A FUNDAMENTAL PRIVILEGE.

Regardless of one's gender or minority status, educational opportunity, if provisioned through state funds, is arguably protected under the Privileges or Immunities Clause as a fundamental privilege. Although the Supreme Court has ruled there is no fundamental right to education under the Due Process Clause, it does not mean that it is not a privilege protected under the Fourteenth Amendment.[43] As mentioned previously, privileges in state constitutions applied to fundamental rights plus the rights of corporate bodies, class-based discrimination, and other unenumerated rights.[44]

From the Founding, education was a core value.[45] The delegates to the Constitutional Convention discussed establishing a national university to unify the country.[46] It was not included in

---

[43] *San Antonio Independent School Dist. v. Rodriguez,* 411 U. S. 1, 37 (1973).

[44] Sanders*, supra* n. 16, at 1064-65.

[45] David Jaffee, *Religion and Culture in North America, 1600–1700*, THE MET, (October 2004).

[46] Albert Castel, *The Founding Fathers and the Vision of a National University*, 4 HIST. EDUC. Q. 280, 281(1964).

the Constitution because the drafters believed Congress would have inherit power to create such,

and thus there was no need to make it explicit.[47] This inherent Congressional power emanated from

and ran parallel to a long tradition of building educational institutions in America, underscored by

the importance placed on education. Collectively-funded dame schools were prevalent in colonial

New England settlements,[48] which gave way to grammar schools,[49] which in turn paved the way for

the establishment of the one-room school house and other publicly-supported schools.[50] In 1819,

Thomas Jefferson founded the University of Virginia in 1819, which was in part supported by state

funds.[51] Additionally, books were a key import item from London in the 1700s, "including works of

history, classical literature, science, and theology, as well as volumes of ornament prints for

silversmiths and furniture makers, and prints that were copied for needlework patterns."[52] In fact,

"[b]y 1850, nine out of every ten adult white Americans could read, and millions bought books."[53]

Benjamin Franklin established a private subscription, or social, library, the Library Company of

Philadelphia, in 1731, and the concept quickly caught on across the colonies, expanding access to

books.[54] One hundred years later, publicly-funded "free" libraries began to proliferate, beginning

with a library founded in Peterborough, New Hampshire.[55] The effect of access to books and an

---

[47] James Madison, Notes of the Constitutional Convention, (Sep. 14, 1787), in 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 616 (Max Farrand ed. 1911).

[48] H.C. BARNARD, A HISTORY OF ENGLISH EDUCATION FROM 1760, 2-4 (1961).

[49] GERRY SOUTER & JANET SOUTER, THE CONSTITUTION: THE STORY OF THE CREATION AND ADAPTATION OF THE MOST IMPORTANT DOCUMENT IN THE HISTORY OF THE UNITED STATES OF AMERICA 17 (2019).

[50] *History and Evolution of Public Education in the U.S.* 1 Center for Education Policy (2020), Geo. Wash. U.(2020), https://files.eric.ed.gov/fulltext/ED606970.pdf.

[51] JON MEACHAM, THOMAS JEFFERSON: THE ART OF POWER 457-58 (2012); Jaffee, *Religion and Culture*, *supra* n. 45.

[52] Gene Zechmeister, "*Timeline of the Founding of the University of Virginia.*" The Jefferson Monticello (2011*)*, https://www.monticello.org/research-education/thomas-jefferson-encyclopedia/timeline-founding-university-virginia/#fn-src-4.

[53] David Jaffee, "Industrialization and Conflict in America: 1840–1875," THE MET, (April 2007).

[54] EDWIN WOLF II AND KEVIN J. HAYES, THE LIBRARY OF BENJAMIN FRANKLIN 9 (2006).

[55] Free Library Movement, Encylopedia.com, https://www.encyclopedia.com/history/encyclopedias-almanacs-transcripts-and-maps/free-library-movement

education resulted in a 90% white literacy rate for both men and women between 1787-1795.[56] The universality of education, books, and literacy among whites at the time of the Framing is a strong argument for education being a fundamental privilege.[57]

State constitutions reflected this understanding. As has been shown above, as early as 1780, state constitutions included an education article.[58] Moreover, by 1868 education "had become a civil right" based on provisions of state constitutions.[59] Currently, *all* state constitutions have articles pertaining to education which arguably supports that it has been understood by the public to be a privilege covered by the Privileges or Immunities Clause.[60]

Case history further illustrates public understanding that the Privileges or Immunities Clause recognizes education as a fundamental privilege. One of the earliest federal cases to examine the Privileges *and* Immunities Clause was that of *Corfield v. Coryell* in 1823.[61] Though a case in federal district court, the matter was heard by Bushrod Washington, an Associate Justice of the Supreme Court of the United States, George Washington's nephew and, in the absence of children, his heir. In *Corfield*, a New Jersey law outlawing oyster-harvesting by non-residents was challenged, in part, as violating the Privileges and Immunities Clause of Article Four.[62] Justice Bushrod Washington found the law constitutional, reasoning that a decision to the contrary would "[amount] to a grant of a co-tenancy in the common property of the state" to non-residents, which he viewed as "going quite too far."[63]

---

[56] SOUTER & SOUTER, *supra* n. 50 at 17.

[57] *Id.; See also supra* n.48.

[58] MASS. CONST., ch. V, § 2 (1780).

[59] Steven G. Calabresi & Michael W. Perl, *Originalism and Brown v. Board of Education*, 2014 MICH. ST. L. REV. 429, 449, (2015).

[60] Jeffrey M. Shaman, *The Evolution of Equality in State Constitutional Law*, 34 RUTGERS L.J. 1013, 1087 (2003). [emphasis added].

[61] GERARD N. MAGLIOCCA, WASHINGTON'S HEIR: THE LIFE OF JUSTICE BUSHROD WASHINGTON 130 (2022); *Corfield v. Coryell*, 6 F. Cas. 546 (E.D. Pa. 1823) (No. 3230).

[62] *Corfield*, 6 F. Cas. at 550.

[63] *Id.* at 552.

Crucially, however, Justice Washington also provided perhaps the first definition of which categories of rights were protected by the Privileges and Immunities Clause, stating:

> "The inquiry is, what are the privileges and immunities of citizens of the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are in their nature fundamental, which belong of right to the citizens of all free Governments…[such as]: protection by the Government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole…"[64]

While avoiding specific examples, Washington's formative definition of privileges includes at least those rights that are fundamental.

In the 1834 case of *Crandall v. State*, Connecticut's high court indicated that education is a fundamental privilege.[65] In resolving the Crandall Affair discussed above, the Court stated: "…you may well consider that education is a 'fundamental privilege,' for this is the basis of all free government."[66] Although the context for these quotes is based on a discussion of which races are citizens, it is clear that the Supreme Court of Errors of Connecticut considered education a vital part of citizenship, declaring that "The right of education is a *fundamental* right. It is the main pillar of our free institutions."[67]

Connecticut state courts were not alone in examining the Privileges and Immunities Clause, clarifying that fundamental privileges could be created through legislation. When comparing the rights of property to civil rights, the Supreme Court of Ohio in *Bank of Toledo v. City of Toledo* articulated that the right to private property was an original and fundamental right, while civil rights are derivative rights.[68] These civil privileges and immunities are created by legislation.[69] The extent to which these rights and privileges are derived from statutory law was also discussed by Justice Bradley

---

[64] *Id.* at 551-52.
[65] *Crandall v. State*, 10 Conn. 339 (Conn. 1834).
[66] *Id.* at 343.
[67] *Id.* at 351 (emphasis in original) (citing *Corfield v. Coryell*, 6 F. Cas. at 551 (E.D. Pa. 1823) (No. 3230)).
[68] *Bank of Toledo v. City of Toledo*, 1 Ohio St. 622, 632 (1853).
[69] *Id.*

in his dissent in *The Slaughter-House Cases*, where he stated that the privileges and immunities of United States citizens are "…not limited to an enumerated list or confined to rights already existing under the Constitution."[70] Rather, citizenship allowed for "incidental rights, privileges, and immunities of the greatest importance," that could be created by legislation.[71] Both the Ohio Supreme Court and the correct side of the *Slaughter-House* Court indicated that fundamental privileges are creatures of legislatures.

Others agreed, and further stipulated that not only are fundamental privileges creatures of state legislation, but that education was one such privilege. During a Congressional session in 1872, Senator Lyman Trumbull of Illinois argued that "education was a right growing out of a privilege created by legislation."[72] This argument is consistent with earlier case law, *Crandall v. State*, which established that education is a fundamental privilege in Connecticut. It is also consistent with case law from Ohio, which demonstrates that civil rights and privileges are created by and derived from legislation.

Education historically is a privilege of vital importance to citizens of the United States. As far back as 1834, case law has settled that education is a fundamental privilege. Privileges given to citizens are not dependent on criteria such as color, race, wealth, criminal history, or any other limit such as gender, and privileges do not need to be articulated in the Constitution to be considered a fundamental right. Therefore, case law establishes that under the original public meaning of the Fourteenth Amendment's Privileges and Immunities Clause, the right to education is a fundamental privilege that is afforded to all citizens regardless of their physical qualities or personal characteristics.

---

[70] Kara A. Millonzi, *Education as a Right of National Citizenship under the Privileges or Immunities Clause of the Fourteenth Amendment*, 81 N.C. L. Rev. 1286 (2003).
[71] *The Slaughter-House Cases*, 83 U.S. 36, 116 (1872) (Bradley, J., dissenting).
[72] Cong. Globe, 42nd Cong., 2d Sess. 3189-90 (May 8, 1872).

IV.     PRE-RATIFICATION LEGISLATIVE HISTORY INDICATES THAT
THE PRIVILEGES PROTECTED BY THE PRIVILEGES OR
IMMUNITIES CLAUSE GO BEYOND THOSE WHICH ARE
FUNDAMENTAL AND SHOULD CERTAINLY INCLUDE
EDUCATION.

The framers of the Fourteenth Amendment wanted to protect a broad range of privileges

and immunities, not just those explicitly articulated in Constitutions, amendments, laws, and caselaw.

Senator Jacob Howard of Michigan, one of the Fourteenth Amendment's framers and its chief

spokesperson in the U.S. Senate, reiterated that sentiment. He indicated that the Privileges or

Immunities Clause protected "the type of fundamental rights described in *Corfield v. Coryell.*"[73]

Senator Howard elaborated that the States, desiring to "put the citizens of the several States upon an

equality one with another in reference to certain fundamental rights," had effected a clause to be

"introduced into the constitution declaring that the citizens of each State shall be entitled to the

privileges and immunities of the citizens of the several States."[74] When addressing the Senate during

debates on the Fourteenth Amendment, as reported in *The New York Herald* the following day,

Senator Howard stated:

> "It would be a curious question to solve: What are the privileges and immunities of the
> citizens in each State in the several States? …It is certain that [the Privileges and Immunities]
> clause was inserted in the constitution for some good purpose; it certainly has in view some
> beneficial purposes to the citizens of the several States, or it would not have been
> inserted."[75]

In the *Congressional Globe*'s account of the same speech, Senator Howard cites Justice Bushrod

Washington's *Corfield*[76] opinion in asserting that the privileges protected by the Fourteenth

Amendment as those rights which are fundamental as under Article Four, plus the "personal right[s]

guaranteed by the first eight amendments to the constitution."[77] Together, this "mass of privileges

---

[73] Millonzi, *supra* n. 70, at 1295; *id.* at n. 63.
[74] *The Reconstruction Committee's Report Before the Senate*, N.Y. HERALD 1 (May 24, 1866).
[75] *Id.*
[76] Cong. Globe, 39th Cong., 1st Sess. 2765 (1866) (quoting Sen. Howard).
[77] N.Y. HERALD, *supra* n. 74.

and immunities and rights" are "secured to citizens of the United States" via the Fourteenth Amendment.[78]

In pursuing "egalitarian reform," many Reconstruction-era legislators "treated *Corfield* as a list of rights that every citizen was entitled to in every state," and gave the decision a "broader…reading"[79] which arguably expanded the protections afforded by the Clause. Professor Gerard Magliocca noted recently that although this interpretation is likely not what Justice Washington had meant, the adherence to such a view was common among reform-minded lawmakers at the time.[80] Legislative history shows that the Fourteenth Amendment's framers interpreted fundamental privileges much more broadly than Justice Washington had in *Corfield*. Even if education is not a fundamental privilege under the more limited interpretation of the Clause, it should certainly be included in this more expansive reading given by the Fourteenth Amendment's framers.

---

[78] *Id.*
[79] *Id.*
[80] MAGLIOCCA, *supra* n. 61, at 139.

CONCLUSION

Based on the historical evidence provided above, the Privileges or Immunities Clause of the Fourteenth Amendment both prohibits class-based discrimination and protects the fundamental privileges conferred by U.S. citizenship, of which education is one.

Respectfully submitted,

/s/ Lawrence A. Stein

Lawrence A. Stein

Lawrence A. Stein
Assistant Clinical Professor of Law
Northern Illinois University
Swen Parson Hall
Dekalb, Illinois 60115
(312) 929-5741
l-stein@niu.edu

*COUNSEL FOR* AMICUS CURIAE

*PROFESSOR LORIANNE UPDIKE TOLER*

## <u>CERTIFICATE OF SERVICE</u>

I, LAWRENCE A. STEIN, state, under penalty of perjury that on April 3, 2023, the foregoing *Proposed Brief of Professor Lorianne Updike Toler as* Amicus Curiae was submitted to the Court electronically, and thereby served on all parties, by the CM/ECF system.

Dated: April 3, 2023.

Respectfully submitted,

/s/ Lawrence A. Stein

Lawrence A. Stein

Lawrence A. Stein
Assistant Clinical Professor of Law
**NORTHERN ILLINOIS UNIVERSITY**
Swen Parson Hall
DeKalb, Illinois 60115
(312) 929-5741
l-stein@niu.edu

COUNSEL FOR AMICUS CURIAE PROFESSOR LORIANNE UPDIKE TOLER

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE

## REQUIREMENTS AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Seventh Circuit Rule 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

 X  this document contains 4,691 words, or

__this brief uses a monospaced typeface and contains [state the number of ] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

 X  this document has been prepared in a proportionally spaced typeface using Microsoft Word version 16.68 in typeface Garamond in 11 point-font size and footnotes in Garamond 11 point-font, or

__this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

/s/      Lawrence A. Stein

Attorney for Professor Lorianne Updike Toler

Dated:  April 3, 2023

Lawrence A. Stein
Assistant Clinical Professor of Law
**NORTHERN ILLINOIS UNIVERSITY**
Swen Parson Hall
DeKalb, Illinois 60115
(312) 929-5741
l-stein@niu.edu

*COUNSEL FOR* AMICUS CURAEI