# 21-1365

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Selina Soule, a minor, by Bianca Stanescu, her mother; Chelsea
Mitchell, a minor, by Christina Mitchell, her mother; Alanna Smith, a
minor, by Cheryl Radachowsky, her mother; Ashley Nicoletti, a minor,
by Jennifer Nicoletti, her mother,
*Plaintiffs-Appellants,*

*v.*

Connecticut Association of Schools, Inc, D/B/A Connecticut
Interscholastic Athletic Conference; Bloomfield Public Schools Board of
Education; Cromwell Public Schools Board of Education; Glastonbury
Public Schools Board of Education; Canton Public Schools Board of
Education; Danbury Public Schools Board of Education,
*Defendants-Appellees,*

*and*

Andraya Yearwood; Thania Edwards on behalf of her daughter, T.M.;
and Commission on Human Rights and Opportunities,
*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut, No. 3:20-cv-00201 (RNC)

---

## EN BANC BRIEF OF INTERVENORS-APPELLEES ANDRAYA
## YEARWOOD AND THANIA EDWARDS ON BEHALF OF T.M.

Joshua A. Block
Ria Tabacco Mar
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2593
jblock@aclu.org

Elana Bildner
Dan Barrett
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
ebildner@acluct.org

*Counsel for Intervenors-Appellees
Andraya Yearwood and Thania
Edwards on behalf of her
daughter, T.M.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES....................................................... iii

INTRODUCTION............................................................... 1

STATEMENT OF THE CASE ................................................5

SUMMARY OF ARGUMENT ...............................................24

LEGAL STANDARD ...........................................................27

ARGUMENT ......................................................................28

I.     Plaintiffs Have Adequately Alleged An Injury In Fact For Races In Which They Personally Participated......................................28

II.    Plaintiffs Lack Standing To Seek Injunctive Relief. ..................29

A.    Plaintiffs Do Not Have Standing to Alter Records for Athletic Events in Which They Did Not Personally Compete...............30

B.    Plaintiffs' Abstract Desire for "Credit" Is Not Redressable By an Injunction Years After Races Were Completed. .................31

III.   The Viability Of Plaintiffs' Damages Claims Under *Pennhurst* Is Intertwined With The Merits Of Their Title IX Claims............35

IV.   Plaintiffs Have Failed To Allege Cognizable Title IX Claims....36

A.    Title IX and Its Implementing Regulations Do Not Define Girls Who Are Transgender as "Males" for Purposes of School Athletics. ...................................................................38

B.    Title IX and Its Regulations Do Not Mandate Sex-Separated Teams as the Exclusive Means of Promoting Equal Athletic Opportunity. ...........................................................44

C.    Plaintiffs Have Not Alleged Cognizable Claims of Unequal Athletic Opportunity Under the Department of Education 1979 Policy Interpretation. ...........................................47

i

1.    Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" Under the 1979 Policy Interpretation's "Selection of Sports" Provision. ...............................................48

2.    Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" under the 1979 Policy Interpretation's "Levels of Competition" Provision. .......................................52

3.    Plaintiffs Have Not Alleged Cognizable Equal Treatment Claims. ...................................................................................57

CONCLUSION ....................................................................................61

# TABLE OF AUTHORITIES

<u>CASES</u>

*A.M. by E.M. v. Indianapolis Pub. Schs.*,
  No. 1:22-CV-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July 26,
  2022)................................................................................................ 12

*Adams v. Baker*,
  919 F. Supp. 1496 (D. Kan. 1996) ....................................................... 46

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ......................................................... 13, 28

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015)............................................................................ 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................... 13, 28

*B.P.J. v. W. Va. State Bd. of Educ.*,
  No. 2:21-CV-00316 (S.D.W. Va. July 21, 2021)............................ 12, 43

*Barrett v. State of Montana*,
  No. DV-21-581B (Mont. 18th Jud. Dist. Ct., Gallatin Cty. Sept. 14,
  2022)................................................................................................ 12

*Beattie v. Line Mountain Sch. Dist.*,
  992 F. Supp. 2d 384 (M.D. Pa. 2014).................................................. 46

*Bednar v. Neb. Sch. Activities Ass'n*,
  531 F.2d 922 (8th Cir. 1976).............................................................. 46

*Bellin v. Zucker*,
  6 F.4th 463 (2d Cir. 2021).................................................................. 28

*Biediger v. Quinnipiac Univ.*,
  691 F.3d 85 (2d Cir. 2012) ............................................... 47, 53, 55, 56

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)............................................................ 36, 42, 61

*Chevron U.S.A. Inc. v. NRDC*,
  467 U.S. 837 (1984)........................................................................... 47

iii

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
178 F. Supp. 2d 805 (W.D. Mich. 2001)................................................58

*D.M. by Bao Xiong v. Minn. State High Sch. League*,
917 F.3d 994 (8th Cir. 2019)................................................46

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................35

*Dennin v. Conn. Interscholastic Athletic Conf., Inc.*,
94 F.3d 96 (2d Cir. 1996)................................................34

*Dixon v. von Blanckensee*,
994 F.3d 95 (2d Cir. 2021)................................................50

*Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018)................................................2, 40

*Dubuisson v. Stonebridge Life Ins. Co.*,
887 F.3d 567 (2d Cir. 2018)................................................29

*Fabian v. Hosp. of Cent. Conn.*,
172 F. Supp. 3d 509 (D. Conn. 2016)................................................42

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021)................................................27

*Grimm v. Gloucester Cty. Sch. Bd.*,
822 F.3d 709 (4th Cir. 2016)................................................36, 42

*Grimm v. Gloucester Cty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020)................................................6, 7, 40, 42

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020)................................................12, 56

*Henrietta D. v. Bloomberg*,
331 F.3d 261(2d Cir. 2003)................................................36

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)................................................35

*Lantz v. Ambach*,
620 F. Supp. 663 (S.D.N.Y. 1985)................................................46

*McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004)................................................39, 47, 53, 58

iv

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014)................................................................55

*Ollier v. Sweetwater Union High Sch. Dist.*,
  858 F. Supp. 2d 1093 (S.D. Cal. 2012) .................................................59

*P.A. v. Comm'r*,
  293 F.3d 128 (3d Cir. 2002) ...................................................................6

*Pereida v. Wilkinson*,
  141 S. Ct. 754 (2021)............................................................................38

*Roe v. Utah High Sch. Activities Ass'n*,
  No. 220903262, 2022 WL 3907182 (Utah Dist. Ct. Aug. 19, 2022) .....12

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ...................................................................28

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)..............................................................................47

*Suesz v. Med-1 Sols., LLC*,
  757 F.3d 636 (7th Cir. 2014).................................................................42

*Thomas v. Regents of Univ. of Cal.*,
  No. 19-cv-06463-SI (N.D. Cal. July 10, 2020) ......................................53

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)..........................................................................29

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ...............................................29

*Valley Forge Christian Coll. v. Americans United for Separation of
  Church & State, Inc.*, 454 U.S. 464 (1982) .............................................4

*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) .................................................................31

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch.
  Athletic Ass'n*, 647 F.2d 651 (6th Cir. 1981).........................................45

### STATUTES

20 U.S.C § 1681(a) ...................................................................................43

v

## REGULATIONS

34 C.F.R. § 106.33 ................................................................... 44

34 C.F.R. § 106.41 ............................................................ passim

## OTHER AUTHORITIES

Arbitration CAS 2009/A/2019 Jakub Wawrzyniak v. Hellenic Football Federation (HFF), award of 21 May 2010 ........................................... 33

Ashley Schwartz-Lavares et al., *Trans women targeted in sports bans, but are they really at an advantage?* ABC News (Apr. 7, 2021) .......... 19

CIAC By-Laws Article IX, Section B ........................................... 9, 10, 38

Dan Brechlin, *Connecticut high school transgender athletes 'no longer want to remain silent' following Title IX complaint*, Hartford Courant (June 20, 2019) ................................................................... 9

Deborah Brake, *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. 41 (2023) ....................................................... 40, 41

Gerry deSimas, Jr., *Canton's Chelsea Mitchell signs letter of intent to run at William and Mary*, Collinsville Press (Nov. 16, 2019) ............ 17

Gerry deSimas, Jr., *Canton's Chelsea Mitchell wins State Open title in long jump, takes 3rd in 55 meters*, Collinsville Press (Feb. 18, 2019). 51

Movement Advancement Project, "Equality Maps: Bans on Transgender Youth Participation in Sports." .......................................................... 11

Off. Civ. Rts., U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) ........ 55

Sam Levin, *Mapping the anti-trans laws sweeping America: 'A war on 100 fronts,'* The Guardian (June 14, 2021) ......................................... 11

*Sex Discrimination Regs. Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Labor, House of Representatives*, 94th Cong. (1975) ...................................................... 41

Shawn McFarland, *2019 All-Courant girls outdoor track and field athlete of the year: Chelsea Mitchell, Canton*, Hartford Courant (July 10, 2019) ..................................................................................... 51

Shawn McFarland, *For the second week in a row, Canton's Chelsea Mitchell beats Terry Miller in 55-meter dash, this time to win State Open title*, Hartford Courant (Feb. 23, 2020) .......................................15

*Title IX of the Education Amendments of 1972: A Policy Interpretation*, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ................................... 27, 49, 58, 59

Will Aldam, *Danbury's Smith smashing records in first indoor season*, CT Insider (Jan. 4, 2022) ................................................................16

vii

## INTRODUCTION

Intervenors Andraya Yearwood and Terry Miller ("Andraya" and "Terry") are transgender women who each participated in their respective school's track-and-field team several years ago, when they were teenagers in high school. They did so in accordance with a Connecticut policy that allows students who are transgender to play on sex-separated sports teams consistent with their gender identity if they meet certain criteria. Andraya and Terry followed all the rules of competition, on and off the field. They have done nothing wrong.

Andraya and Terry participated in high school athletics for the same reasons as their non-transgender peers in Connecticut and beyond. They participated because they love to run; because being a part of a team provided them a supportive community and created lasting social and emotional relationships; because training and competition allowed them to improve their athletic skills, challenge themselves, and release stress and anxiety; and because athletics gave them a place to be themselves and thrive. Both achieved significant success at the state-wide and regional level in particular events, but they were repeatedly outperformed by cisgender girls—including the Plaintiffs in this case.

1

Unlike the Plaintiffs in this case, Andraya and Terry did not receive any college scholarships, and they are not even participating in college athletics.

Andraya and Terry respectfully submit this brief to answer the specific questions posed by the en banc court, but also to correct the fundamentally flawed merits arguments of Plaintiffs-Appellants and their supporting amici. Plaintiffs' Complaint is based on the false legal premise that Title IX creates a federal definition of sex that invalidates the antidiscrimination laws of every state in this Circuit, and requires schools to treat transgender girls as though they were cisgender boys. Plaintiffs cannot identify any statute, regulation, or pre-existing agency guidance document supporting these assertions. And to the extent that courts have considered similar arguments in the context of restrooms, they have unanimously rejected the argument that Title IX requires schools to exclude transgender students from facilities consistent with their gender identity. *See, e.g.*, *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018).

But the Complaint suffers from an even deeper flaw. Title IX's regulations and controlling policy interpretations have specific tests and standards for determining what does—and does not—constitute a denial of "equal athletic opportunity." Even if this Court accepted Plaintiffs' false legal premise that Title IX defines girls who are transgender as cisgender boys, Plaintiffs would still have failed to plausibly allege that they have actually been denied equal athletic opportunity under those controlling tests and standards. Title IX does not require sex-separated teams or an equal number of trophies for male and female athletes. And while Plaintiffs rely on baseless factual assertions that they "simply can't win" against girls who are transgender, Plaintiffs-Appellants' En Banc App. ("PA") 147, those assertions are contradicted by Plaintiffs' own track-and-field records, which reveal that Plaintiffs repeatedly outperformed Andraya and Terry in direct competition.

Plaintiffs and their amici seek to engage in a broad policy debate about the inclusion of girls and women who are transgender in athletics. This Court's jurisdiction, however, is limited to resolving particular cases and controversies, which "assure[s] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating

3

society, but in a concrete factual context." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). It is not enough for Plaintiffs to speculate about a hypothetical future in which "a larger wave of" girls and women who are transgender "hits high school and college" and cisgender girls "simply vanish from the victory podium." PA148. Plaintiffs must allege facts about what actually happened to these specific plaintiffs in Connecticut, between 2017 and 2020. As a matter of law, even accepting Plaintiffs' false premise that girls who are transgender are defined by Title IX as "males," the presence of two transgender girls on girls' track-and-field teams in Connecticut during the relevant time period does not state a claim of denial of equal athletic opportunity for these four plaintiffs.

For the reasons set forth in Andraya and Terry's previous brief, ECF 101, and for the reasons set forth below, this Court should affirm the district court's dismissal of Plaintiffs' claims for injunctive relief for lack of Article III standing, and should affirm the district court's dismissal of Plaintiffs' damages claims on the grounds that Plaintiffs have failed to state a valid Title IX claim on which relief can be granted.

## STATEMENT OF THE CASE

<u>Andraya and Terry</u>[1]

This case involves a challenge to Connecticut's policy of permitting students who are transgender to participate in athletic competition consistent with their gender identity, as reflected in the students' daily life and school records. When the underlying events in this case took place, Andraya and Terry were high school students who participated in interscholastic track-and-field events in accordance with Connecticut law and Connecticut Interscholastic Athletic Conference ("CIAC") policy. SA019, SA023. Like non-transgender girls and women, Andraya and Terry have a female gender identity and live their lives as young women. *Id*. At the time the complaint in this case was filed, Andraya was an 18-year-old girl in her senior year at Cromwell High School. SA018. Terry was a 17-year-old girl in her senior year at Bloomfield High School. SA022.

---

[1] Some of the facts in this subsection are drawn from declarations that Andraya and Terry submitted in support of their motion to intervene. *See* SA017-20 (Andraya); SA021-24 (Terry).

Gender identity is a medical term for a person's "deeply felt, inherent sense" of belonging to a particular sex. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020); AAP Amicus 8, ECF 106.[2] Everyone has a gender identity, and most people have a gender identity that aligns with the sex assigned to them at birth. *See id.* Transgender people, however, have a gender identity that does not align with their birth-assigned sex. *See id.* Girls who are transgender are girls who were assigned a male sex at birth. Boys who are transgender are boys who were assigned a female sex at birth. There is a medical consensus that gender identity has a biological component and cannot be changed by medical intervention. *See Grimm*, 972 F.3d at 594-95; AAP Amicus 9-12.

The lack of alignment between their gender identity and their sex assigned at birth can cause transgender people to develop clinically significant distress, known as "gender dysphoria." *See Grimm*, 972 F.3d

---

[2] In describing transgender individuals, the Fourth Circuit in *Grimm* relied upon an amicus brief submitted by the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society. A similar amicus brief has been filed in this case. *See* AAP Amicus, ECF 106. *See also Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.) ("Some amicus briefs collect background or factual references that merit judicial notice.").

at 594-95; AAP Amicus 12-13. Before puberty, gender dysphoria is treated by allowing transgender children to live and express themselves in accordance with their gender identity. *See Grimm*, 972 F.3d at 596; AAP Amicus 18. As transgender children reach puberty, they may receive puberty-delaying medication to avoid going through endogenous puberty, thereby avoiding the physical changes and heightened gender dysphoria that puberty causes for many young people who are transgender. *See Grimm*, 972 F.3d at 596; AAP Amicus 20. Later in adolescence, transgender youth may receive gender-affirming hormone therapy. *See Grimm*, 972 F.3d at 596; AAP Amicus 19.

From the time she was a child, Andraya knew she was a girl. SA018. The summer before eighth grade, Andraya told her parents that she is transgender and started to receive social and medical support for her transition. *Id*. By the time Andraya started high school, she was known to her family and peers as a girl and participated in all aspects of school consistent with her female gender. *Id*. She legally changed her name to "Andraya" and, at the time the Complaint was filed, had been undergoing hormone therapy for several years, with circulating hormones that were comparable to the hormone levels of non-

transgender girls. SA019. In her everyday life, Andraya was accepted as a girl by her family, her friends, her teammates, and her coaches. *Id.*

Terry also knew from a young age that she is a girl. SA022. She recalls, as far back as fifth grade, being aware of her female gender but not yet having the language or support to understand what she needed in order to live authentically. *Id.* After years of repressing her identity, Terry came out as transgender in tenth grade and began to live all aspects of her life as a girl. *Id.* She updated her Connecticut birth certificate to accurately reflect her sex as female and, at the time the Complaint was filed, was undergoing hormone therapy with hormone levels typical of non-transgender girls. SA022-23. Like Andraya, Terry was accepted as a girl by her family, her friends, her teammates, and her coaches. *Id.*

Andraya and Terry love to run. They both participated in indoor and outdoor track and field on their schools' respective girls' teams, in accordance with a Connecticut Interscholastic Athletic Conference ("CIAC") policy that allows students who are transgender to play on sex-separated sports teams consistent with their gender identity if they meet certain criteria. SA019, SA023; PA149 (citing CIAC By-Laws art. IX, §

8

B). Neither Andraya nor Terry "abruptly" began competing in girls' track. *Contra* PA153. Rather, both girls spent long periods of their lives struggling internally, coming to terms with their gender, coming out to their friends and family, and then living consistently with their gender at school and in the community. *See generally* SA018-19; SA022-23. Only then did they begin to compete on girls' teams, consistent with the recommendation of their medical providers and the CIAC policy.

During track seasons, Andraya and Terry each trained multiple hours per day, five days per week, and pushed themselves and their teammates to improve. SA019, SA023. "This is what keeps me going," Andraya explained in 2019. "Every day I train hard—I work hard to succeed on the track, to support my teammates, and to make my community proud." Dan Brechlin, *Connecticut high school transgender athletes 'no longer want to remain silent' following Title IX complaint*, Hartford Courant (June 20, 2019), https://tinyurl.com/j6sns4vk.

Like other girls and women who are transgender, Andraya and Terry participated in sports for the same reasons that cisgender girls participate. All parties in this case agree that participating in high school athletics yields concrete—and lifelong—physical and emotional benefits

9

for students. While Plaintiffs and their amici describe the importance of athletics for cisgender girls, *see* Pls.' En Banc Br. at 9-10, athletic participation is no less important for Andraya, Terry, and other girls who are transgender. *See* Trevor Project Amicus 8-15, ECF 134; AAP Amicus 22-25; State Amicus 10-14, ECF 141; 155 Athletes in Women's Sports Amicus 18-27, ECF 131.

Under the CIAC policy, which has been in place since 2013, each school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC By-Laws art. IX, § B.[3] By submitting a team roster to the CIAC, each school district verifies that the students listed "are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the

---

[3] The CIAC By-Laws are available online at http://www.casciac.org/ciachandbook.

10

student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*[4]

The CIAC policy is not an outlier. High school athletic associations across the country have policies that allow boys and girls who are transgender to play on the same teams as other boys and girls. *See* State Amicus 19-21. Policies in the District of Columbia and fourteen states— including every state within this Circuit—allow transgender students to participate in athletics consistent with their gender identity without requiring students to establish any proof of medical transition. *See* Transathlete.com: *K-12 Policies*, https://www.transathlete.com/k-12 (collecting citations).[5]

---

[4] The CIAC policy does not, as Plaintiffs allege, allow students to play on girls' teams based on whether "they claim" to have a female gender identity. PA131. Rather, as quoted above, it dictates student participation based on "the gender identification of that student in current school records and daily life activities in the school and community."

[5] In the past three years, 21 states passed laws attempting to ban transgender women and girls from women's athletics, often overriding the policies of state athletic associations that had previously allowed for inclusion of transgender athletes. *See* Movement Advancement Project, "Equality Maps: Bans on Transgender Youth Participation in Sports," *at*, www.mapresearch.org/equality-maps/youth/sports_participation_bans (collecting citations); Sam Levin, *Mapping the anti-trans laws sweeping America: 'A war on 100 fronts,'* The Guardian (June 14, 2021). Federal

11

Plaintiffs' Allegations

Plaintiffs are four non-transgender girls—Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti—who allege that Andraya and Terry's participation in girls' track-and-field events deprived Plaintiffs of equal athletic opportunities. PA173-75. All four Plaintiffs assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' high school athletic events, Plaintiffs "are losing competitive opportunities, the experience of fair competition, and

---

courts have issued preliminary injunctions against laws in Idaho, West Virginia, and Indiana under either the Equal Protection Clause or Title IX. *See Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020), *appeal filed*, Nos. 21-35813, 21-35815 (9th Cir. Sept. 7, 2020); *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 3081883 (S.D.W. Va. July 21, 2021), *injunction terminated*, 2023 WL 111875 (S.D.W. Va. Jan. 5, 2023)*, and injunction pending appeal granted*, No. 23-1078, 2023 WL 2803113 (4th Cir. Feb. 22, 2023), *and application to vacate injunction denied sub nom.*, *West Virginia v. B.P.J., by Jackson*, No. 22A800, 2023 WL 2801383 (U.S. Apr. 6, 2023); *A.M. by E.M. v. Indianapolis Pub. Schs.*, No. 1:22-CV-01075-JMS-DLP, 2022 WL 2951430, at *14 (S.D. Ind. July 26, 2022), *appeal dismissed*, No. 22-2332 (7th Cir. Jan. 19, 2023). State courts have also issued injunctions against laws in Utah and Montana under their state constitutions. *See Roe v. Utah High Sch. Activities Ass'n*, No. 220903262, 2022 WL 3907182, at *1 (Utah Dist. Ct. Aug. 19, 2022); *Barrett v. State of Montana*, No. DV-21-581B (Mont. 18th Jud. Dist. Ct., Gallatin Cty. Sept. 14, 2022), *available at*, https://montanafreepress.org/wp-content/uploads/2022/09/order_on_cross-motions_for_summary_judgment.pdf.

the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." PA148.

But Plaintiffs fail to back up their rhetoric with an accurate recounting of the facts. Although this Court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context,'" including documents incorporated into the complaint by reference. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)). Nearly all of Plaintiffs' assertions are based on publicly available records from the Athletic.net website. *See* PA150-51 ("All names, times, and other information provided in this section are taken from public sources, including Connecticut high school track records available on AthleticNET, at the web addresses indicated."). The complete set of records from Athletic.net paints a different picture from the selected excerpts highlighted in the Complaint.[6]

---

[6] For ease of reference, Intervenor-Defendants cite here to the Second Amended Complaint when referring to "the Complaint."

13

*First*, and most significantly, the Complaint is filled with conclusory assertions that the Plaintiffs and other non-transgender girls "can't win" when competing against Andraya and Terry. PA147-48, 163. But the complete set of track-and-field records for CIAC events reflects that Alanna Smith and Chelsea Mitchell outperformed both Terry and Andraya on multiple occasions:

(a) In the 2019 outdoor season, Mitchell outperformed Andraya in the 100m state open championship. *Compare* SA068 (showing first-place performance for Mitchell) *with* SA028 (showing fourth-place finish for Andraya).

(b) Mitchell also outperformed Andraya in the 2019 indoor Class S championship in the 55m dash. *Compare* SA070 *with* SA030 (showing Mitchell in second and Andraya in third).

(c) In the 2019 outdoor season, Smith outperformed both Andraya and Terry in the 100m state open championship. *Compare* SA083 (showing third-place finish for Smith) *with* SA028 (showing fourth-place finish for Andraya) *and* SA041 (showing false start for Terry).

(d) In the 2020 indoor season, Mitchell won first place in the 55m dash Class S championship, first place in the 55m dash state open championship, and first place in the 300m Class S championship, outperforming Terry each time. *Compare* SA065 (showing Mitchell's results) *with* SA039 (showing Terry's results).[7]

---

[7] *See also* Shawn McFarland, *For the second week in a row, Canton's Chelsea Mitchell beats Terry Miller in 55-meter dash, this time to win*

14

All of these victories occurred before the Complaint was filed on August 11, 2020. *See* PA130 (showing date filed).[8]

*Second*, and in similar fashion, the Complaint asserts in conclusory terms that Plaintiffs have been denied the "chance to be champions" and "the satisfaction, public recognition, and scholarship opportunities that can come from victory." PA131, 148. But Plaintiffs have an extensive record of victories, both when competing against Andraya and Terry and when competing in other events.

Soule won gold trophies in the 4x200 relay in the state open and Class LL championships in both the 2019 and 2020 indoor seasons, along

---

*State Open title*, Hartford Courant (Feb. 23, 2020), https://tinyurl.com/yz3am9jc.

[8] Smith subsequently competed in the 2021 outdoor season in both the 100m and the 200m, where she recorded faster times than Andraya ran *at any point* in Andraya's high school career. *Compare Published Results of Alanna Smith's track and field events* (unattached), Athletic.net, https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L =1 (showing Smith achieving times of 11.83 in the outdoor 100m and 24.00 in the outdoor 200m) (last visited October 6, 2021) *with* SA026 (showing Andraya's fastest times as 12.17 in the outdoor 100m, and 25.33 in the outdoor 200m). Smith's 200m time of 24.00 also exceeds Terry's fastest-ever 200m time. *See* SA039 (reflecting Terry's best outdoor 200m time as 24.17 in 2017).

with the 2020 Class LL championship in the indoor 55m, for a total of five state titles. SA050, SA051, SA055.[9]

At the time the Complaint was filed, Smith had already won two gold trophies—in the 2019 400m state open championship and the 400m New England Championship—during the same season in which she competed on a single occasion against Andraya and Terry, SA085. Smith has since gone on to win many more. *See* Will Aldam, *Danbury's Smith smashing records in first indoor season*, CT Insider (Jan. 4, 2022), at https://tinyurl.com/2dee6su3.

And Mitchell won at least twelve gold trophies, including:

- Eight Class S championships in the 2018 outdoor 100m (SA073), 2018 outdoor 200m (SA073), 2018 outdoor 4x100 relay (SA075), 2019 outdoor long jump (SA069), 2020 indoor 55m (SA065), 2020 indoor 300m (SA066), and 2019 and 2020 indoor long jump (SA066, SA071);

- Three CIAC state open championships in the 2019 outdoor 100m (SA068), 2019 indoor long jump (SA071), and 2020 indoor 55m (SA065); and

- A New England championship in the 2019 outdoor 100m (SA068).

_____

[9] *See also* Soule Decl. in Support of Intervention ¶ 15, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, ECF 46-1 (S.D. Fla. Sept. 21, 2021) (describing herself as "a five-time state title holder").

As of the 2020 indoor season, Mitchell was ranked first among all girls in Connecticut for the 200m and second among all girls nationally in the long jump. *See* SA065; *see also* Gerry deSimas, Jr., *Canton's Chelsea Mitchell signs letter of intent to run at William and Mary*, Collinsville Press (Nov. 16, 2019), https://tinyurl.com/xj9dk7xs (summarizing Mitchell's achievements).

*Third*, despite their sweeping assertions about lost athletic opportunities, three of the plaintiffs—Soule, Nicoletti, and Smith—allege only a single instance in which Andraya and Terry's participation affected their athletic opportunities *in any way*. *See* PA277. Soule alleges she would have finished in sixth place instead of eighth place in the preliminary 55m race for the 2019 indoor state open championship and advanced to the finals. *See id.* Nicoletti alleges she would have finished in seventh place instead of ninth place in the 100m preliminary race for the 2019 outdoor Class S championship and advanced to the finals. *See id.* And Smith alleges she would have finished second instead of third in the 200m at the 2019 outdoor state open championship. *See id.*

The only student who alleges she was actually denied a championship as a result of Andraya and Terry's participation is Chelsea

Mitchell. *See id.* Mitchell alleges that without Andraya and Terry's participation, she would have won an additional four gold trophies *Id.* Mitchell also alleges that without Andraya and Terry's participation, she would have advanced to the New England 2017 outdoor regional championships for the 100m; that she would have received second place in the 2018 outdoor state open for 100m; and that she would have received third place instead of fourth place in the 2019 outdoor state open for 200m. PA153-54, 158.

*Fourth*, although Plaintiffs make generalized assertions about lost scholarship or recruitment opportunities (PA130-31, 174-75), they fail to support those generalizations with any specific factual allegations. To the contrary, Soule received an offer to run for Florida Atlantic University;[10] Nicoletti has signed to compete in Division II Track and Field for Belmont Abbey College in North Carolina;[11] Smith is currently running at

---

[10] *See* Soule Decl. in Support of Intervention ¶ 29, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, (S.D. Fla. Sept. 21, 2021), ECF 46-1.

[11] *See IHS Student Athletes Sign National Letters of Intent*, Immaculate High School Mustang Monthly, *available at* https://www.immaculatehs.org/discover-ihs/news/news-post/~board/mustang-monthly/post/ihs-student-athletes-sign-national-letters-of-intent-may-22.

18

University of Tennessee;[12] and Mitchell received an athletic scholarship to attend William & Mary.[13] Plaintiffs also fail to allege that any scholarships or recruitment opportunities actually went to Andraya or Terry. (In fact, Andraya and Terry received no scholarship opportunities to compete in college and are not participating in college athletics.)

Plaintiffs' Lawsuit

On February 12, 2020, Plaintiffs filed a Complaint against the CIAC and the five school boards representing the jurisdictions where Plaintiffs, Andraya, and Terry each attended school. PA9-10.[14] Nine days after the Complaint was filed, Andraya and Terry filed a motion to intervene as defendants. PA012. The Connecticut Commission on Human Rights and Opportunities filed a motion to intervene as well. *Id.*

---

[12] *See* Univ. of Tenn. 2022-23 team roster profile for Alanna Smith, *available at* https://utsports.com/sports/track-and-field/roster/alanna-smith/18624.

[13] *See* Ashley Schwartz-Lavares et al., *Trans women targeted in sports bans, but are they really at an advantage?* ABC News (Apr. 7, 2021), https://tinyurl.com/y7j98xbj.

[14] Plaintiffs filed an Amended Complaint on April 17, 2020, and a Second Amended Complaint on August 11, 2020. PA17, 24. The original complaint was filed on behalf of only Soule, Mitchell, and Smith. The Amended Compliant added Nicoletti as a fourth plaintiff.

Plaintiffs' Complaint is based on the premise that, by allowing Andraya and Terry to participate on the same teams as other girls, the CIAC policy allows "males" to participate in women's sports, and that such participation violates the rights of cisgender girls under Title IX. According to the Complaint, males have an athletic advantage over females because of "inherent and biologically dictated differences between the sexes." PA140. The Complaint alleges that "[w]hile boys and girls have comparable athletic capabilities before boys hit puberty, male puberty quickly increases the levels of circulating testosterone . . . and this natural flood of testosterone drives a wide range of physiological changes that give males a powerful physiological athletic advantage over females." *Id.* Referring to the fact that many girls and women who are transgender receive gender-affirming hormone therapy, the Complaint further alleges that "[a]dministering testosterone-suppressing drugs to males [sic] by no means eliminates their performance advantage." PA146. Andraya and Terry dispute these allegations, but acknowledge they must be accepted as true for purposes of a motion to dismiss.

Plaintiffs allege that the CIAC policy violates Title IX by failing to effectively accommodate what they describe as lesser athletic abilities of

non-transgender girls, *see* PA172-74, and by failing to provide equal treatment, benefits, and opportunities for non-transgender girls' athletics, *see* PA174-75. For these alleged violations, Plaintiffs seek nominal and compensatory damages. PA176. Plaintiffs also seek prospective relief in the form of a declaratory judgment and three injunctions:

- "An injunction prohibiting all Defendants . . . from permitting males [sic] from participating in events that are designated for girls, women, or females."[15]

- "An injunction requiring all Defendants to . . . remove male [sic] athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions."

- "An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women."

PA176.

---

[15] This injunction was sought only by Smith and Nicoletti. PA177. Both have since graduated.

Despite the centrality of testosterone and puberty to their factual allegations, the relief sought by Plaintiffs does not focus on hormones and puberty. Instead, the Complaint seek sweeping relief preventing all girls who are transgender—whom Plaintiffs refer to as "athletes born male with male bodies"—from participation regardless of the age at which they transitioned, whether they have had puberty-delaying medication or hormone therapy, and whether they actually went through endogenous "male" puberty. *Id.*

Plaintiffs' Request for a Preliminary Injunction

Together with the Complaint, Plaintiffs moved for a preliminary injunction to prohibit Andraya and Terry from participating in the spring 2020 outdoor season, which would have been the last season in which Soule, Mitchell, Andraya, or Terry competed before graduating. PA260-62.

On March 10, Governor Lamont issued a public health emergency declaration in light of the COVID-19 pandemic. *See* Executive Order No. 7C, https://tinyurl.com/dw6mpkb. On March 12, he canceled sporting events, and on March 15, he closed schools. *See id.* Because a cancelation of the spring 2020 outdoor season would moot Plaintiffs' claims of

22

irreparable injury, the district court deferred the motion for preliminary injunction until it became clear whether the season would be canceled. *See* PA014 (ECF No. 68); PA015 (ECF No. 79); PA016 (ECF 82).

The Motion to Dismiss

Defendants and Intervenor-Defendants filed a consolidated motion on August 21, 2020, to dismiss the Second Amended Complaint for lack of standing and for failure to state a claim upon which relief could be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* PA025.

The district court granted the motion to dismiss on April 25, 2021. PA028. It held that Plaintiffs' request to enjoin the CIAC policy had become moot because Andraya and Terry graduated from high school in 2020, and the plaintiffs still attending high school had failed to demonstrate a non-speculative possibility that they would compete against other girls who are transgender in the future. PA271-72. The district court further held that Plaintiffs lacked standing to seek an injunction to retroactively change their records because Plaintiffs failed to plead any facts supporting their conclusory assertions that doing so could have a plausible effect on their future athletic recruitment or

23

employment opportunities. PA277-78. Finally, the district court held that Plaintiffs' requests for damages were barred by *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). PA279-87.

The court did not address Defendants' alternative arguments—that Plaintiffs had failed to allege a cognizable violation of Title IX, or that Plaintiffs' requested remedies would violate the rights of transgender students. PA260. But the court noted that its decision was bolstered by the fact that "[c]ourts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity." PA286.

## SUMMARY OF ARGUMENT

The en banc Court has asked the parties to address the following questions:

1. Whether Plaintiffs-Appellants have alleged an injury-in-fact resulting from Defendants-Appellees' "Transgender Participation" policy.

2. Whether Plaintiffs-Appellants have alleged an injury-in-fact redressable by ordering the alteration of athletic records.

24

3. Whether Plaintiffs-Appellants are barred by the *Pennhurst* doctrine from seeking monetary damages in relation to their claim brought pursuant to Title IX of the Education Amendments Act of 1972.

The answers are: "Yes," "No," and "It depends on the merits."

With respect to the first question, Plaintiffs have plausibly alleged an injury in fact because each Plaintiff has identified at least one specific instance in which she allegedly raced against—and finished behind—a girl who is transgender. As discussed below, those allegations are insufficient to state a claim for denial of equal athletic opportunity under Title IX, but a plaintiff does not need to allege a valid claim on the merits to establish an injury in fact for purposes of standing.

With respect to the second question, Plaintiffs' alleged injuries in fact are not redressable through injunctive relief altering athletic records. Even assuming that Plaintiffs' alleged interest in getting "credit where credit's due" (Pls.' En Banc Br. 29) were sufficient to satisfy redressability, Plaintiffs identify no precedent in sports for altering athletic records by retroactively changing the rules of competition and "expunging" all records of Andraya and Terry's accomplishments. In the absence of any other plausible allegations of ongoing harm for an

25

injunction to redress, the proper remedy for Plaintiffs' fundamentally retrospective claim is damages, including nominal damages, not an injunction requiring CIAC to create records for a hypothetical athletic event that never occurred.

With respect to the third question, the viability of Plaintiffs' claims under *Pennhurst* depends in part on whether Plaintiffs have alleged "discrimination" prohibited by the statutory text. It is, therefore, appropriate in this case to address the merits of Plaintiffs' claims as part of the *Pennhurst* inquiry. Nothing in the text of Title IX, the athletic regulations, or controlling policy interpretations purports to define girls who are transgender as "males," or requires the CIAC to subject girls who are transgender to different and discriminatory treatment. And even if Plaintiffs could somehow establish that a girls' team with girls who are transgender is not "sex-separated," Title IX does not mandate sex separation as the exclusive means of providing equal athletic opportunity.

Rather, under Title IX regulations and guidance, even accepting the false premise that Title IX defines girls who are transgender as "males," Plaintiffs still could not state a claim for denial of equal athletic

26

opportunity unless they could allege that they do not possess sufficient skill "to compete actively" alongside girls who are transgender. *Title IX of the Education Amendments of 1972: A Policy Interpretation*, at § VII.C.4.b(3), 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979) ("1979 Policy Interpretation"). Plaintiffs do not even attempt to make that showing. To the contrary, Plaintiffs' own records establish that they have actively competed against—and even outperformed—Andraya and Terry on multiple occasions, building an impressive record of victories. And because Plaintiffs have failed to allege a viable claim for denial of equal athletic opportunity, they have also necessarily failed to allege a viable damages claim under *Pennhurst*.

## LEGAL STANDARD

"On appeal following a dismissal of a complaint for either lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim under Rule 12(b)(6), [this Court] review[s] the district court's decision de novo." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 379 (2d Cir. 2021). "[T]he sufficiency of a complaint to state a claim is a matter of law and is particularly suitable for determination by a court of appeals, whether or not the sufficiency

27

question has been addressed by the district court." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

On a motion to dismiss, the court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (internal quotation marks and citations omitted). Although this Court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009)). "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Id.* at 147.

## ARGUMENT

## I. Plaintiffs Have Adequately Alleged An Injury In Fact For Races In Which They Personally Participated.

Plaintiffs have alleged an injury in fact because each Plaintiff has identified at least one specific instance in which she allegedly raced

against—and finished behind—a girl who is transgender. Although Plaintiffs' allegations are woefully inadequate to state a valid claim for denial of equal athletic opportunity under Title IX, "one must not confuse weakness on the merits with absence of Article III standing." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (internal quotation marks and brackets omitted); *see also Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 576 (2d Cir. 2018). Article III requires Plaintiffs to *allege* that they have a "legally protected interest," but whether that interest is *actually* legally protected is a merits question. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (explaining that the government's argument that plaintiffs did not have a legally protected interest under the Establishment Clause "depends upon the scope of plaintiffs' Establishment Clause rights" and thus "concerns the merits rather than the justiciability of plaintiffs' claims").

## II. Plaintiffs Lack Standing To Seek Injunctive Relief.

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). In this case, Plaintiffs have no standing to seek injunctive relief

29

for races in which they did not personally participate, and Plaintiffs fail to plausibly allege that their own alleged injuries can be redressed through injunctive relief by altering athletic records. Rather, their alleged injury in fact—and any alleged ongoing harm flowing from that injury—is redressable through damages, including nominal damages.

### A. Plaintiffs Do Not Have Standing to Alter Records for Athletic Events in Which They Did Not Personally Compete.

The only injunctive relief Plaintiffs seek that arises from an actual injury in fact is Smith and Mitchell's requests to receive "credit and/or titles" they allegedly "would have received" if Andraya and Terry had not participated in their races. PA176. Specifically, Smith seeks to be named the second-place finisher for the 2019 outdoor state open for 200m, and Mitchell seeks to be named the third-place finisher for the 2019 outdoor state open for 200m, the second-place finisher for 2018 outdoor state open for 100m, the first-place finisher for the 2019 outdoor Class S championship in 100m and 200m, and the first-place finisher for the 2019 indoor Class S and state open in 55m.[16]

---

[16] Soule and Nicoletti have failed to allege any "credit and/or title" they could possibly receive through altered records. Soule and Nicoletti both raced against Andraya and Terry in *preliminary* races—not in

**B.    Plaintiffs' Abstract Desire for "Credit" Is Not Redressable By an Injunction Years After Races Were Completed.**

Plaintiffs' storied high school athletic careers are now over, and their college athletic careers already underway. Plaintiffs admit, as they must, that "it is too late" for altered athletic records to have any downstream effects on their college recruitment and scholarship opportunities. En Banc Br. 37. Plaintiffs implausibly speculate in their brief that their high school athletic records—as opposed to their college records—will have an impact on future employment opportunities, but the actual Complaint does not contain any allegations about athletic records' connection to employment opportunities—whether for these Plaintiffs or for anyone else. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (refusing to consider allegation that "does not appear anywhere in the amended complaint and did not enter the case until [plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss").

---

championship races. There are no credits or titles for preliminary races. And Plaintiffs do not attempt to argue that "[e]mployees, business owners," or "social media influencers" list their rankings on preliminary races "to stand out." Pls.' En Banc Br. 38.

Plaintiffs' sole remaining basis for seeking an injunction, as opposed to damages, is to give them the satisfaction of receiving "credit where credit's due" by striking Andraya and Terry from the list of recorded finishers. Pls. En Banc. Br. 29. But even assuming that interest were sufficient for purposes of redressability, Plaintiffs do not identify any precedent in sports for retroactively changing the rules for races that have already been run, or depriving other athletes of victories *those athletes* won based on the rules in place at the time.

Although Plaintiffs assert that "the reallocation of records and medals" is "commonplace" (Pls.' En Banc. Br. 51), their request to "reallocate" awards by retroactively changing the rules of the game is unprecedented. They cannot identify a single example in which awards and titles were retroactively stripped from athletic competitors who followed all the existing rules. To the contrary, the Court of Arbitration for Sport—which Plaintiffs point to as a forum that "often decides whether athletes should have been disqualified or had their medals stripped after the fact" for anti-doping violations, Pls.' En Banc Br. 50— has made clear that under "well established CAS jurisprudence, in order to determine whether an act constitutes an anti-doping rule

32

infringement, the Panel applies the law in force at the time the act was committed. In other words, new regulations do not apply retroactively to facts that occurred prior to their entry into force, but only for the future." *See* Arbitration CAS 2009/A/2019 Jakub Wawrzyniak v. Hellenic Football Federation (HFF), award of 21 May 2010.[17]

Thus, unlike the facts of this case, all the examples cited by Plaintiffs in which championships or medals were "reallocat[ed]" were situations in which a competitor violated the rules in place at the time of competition. In those circumstances, reallocating medals and titles corrects the records to accurately reflect the results for people who participated according to the rules of the game. *See* Pls.' En Banc Br. at 48 (discussing CIAC procedure for changing records when a student participated using banned "performance enhancing substances" or when a school wrongly fields "an ineligible competitor"); *id.* at 50-53 (discussing reallocation of Olympic medals after tests discovered previously undetected doping violations). By contrast, Plaintiffs ask this Court to

---

[17]     Available     at     https://arbitrationlaw.com/sites/default/files/ free_pdfs/CAS%202009-A-2019%20JW%20v%20HFF%20Award.pdf.

create *inaccurate* alternative records to simulate what Plaintiffs believe would have occurred under different hypothetical rules.[18]

Plaintiffs do not allege that they won according to the rules in place at the time, but that they *would have* won if the rules had been different. In the absence of any other plausible allegations of ongoing harm for an injunction to redress, the proper remedy for Plaintiffs' fundamentally retrospective claim is damages, including nominal damages, not an injunction requiring CIAC to create records for a hypothetical athletic event that never occurred.

---

[18] Plaintiffs also note that the CIAC rules provide that records and performances may be vacated or stricken when a student is wrongfully allowed to participate via a court order that is later reversed. Pls.' En Banc Br. 49. Once again, altering records in these circumstances removes a competitor who was not eligible to participate according to the rules in place at the time; it does not retroactively change the rules. In any event, such provisions are likely unenforceable. *Dennin v. Conn. Interscholastic Athletic Conf., Inc.*, 94 F.3d 96, 101 (2d Cir. 1996) (vacating preliminary injunction requiring CIAC to waive its maximum age limitation for swimmer with Down Syndrome, but noting that "[t]he vacation of the judgment does not, of course, authorize CIAC, which complied with the district court's preliminary injunction, to alter the status quo by making any retroactive modification of David's eligibility for the 1995-1996 season").

34

Because Plaintiffs' alleged injury in fact is not redressable through injunctive relief, the district court's dismissal of Plaintiffs' claims for injunctive relief for lack of standing should be affirmed.

## III. The Viability Of Plaintiffs' Damages Claims Under *Pennhurst* Is Intertwined With The Merits Of Their Title IX Claims.

Under *Pennhurst*, a court must not only "define the scope of the behavior that Title IX proscribes," but also determine whether a violation of Title IX based on that behavior "can support a private suit for money damages." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). In Title IX cases, the Supreme Court has previously found that funding recipients were placed "on notice" that they could be liable for damages under *Pennhurst* for particular conduct based on the plain text of the statute, judicial precedent, regulations, guidance, background common law principles, or a combination of those elements. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182-84 (2005); *Davis*, 526 U.S. at 643-49.

In this case, Plaintiffs contend that *Pennhurst* does not bar their claims because allowing girls who are transgender to participate in girls' sports allegedly constitutes "discrimination" prohibited by the plain

35

terms of the statute. *See* Pls.' En Banc Br. 57.[19]  Plaintiffs' argument under *Pennhurst* is, therefore, intertwined with the merits of their claims: whether the CIAC policy constitutes "discrimination" under Title IX is the question that ultimately needs to be resolved, regardless of whether the question is examined as part of the scope of Title IX or the adequacy of notice under *Pennhurst*.

As discussed below, because Plaintiffs have failed to allege a viable claim for denial of equal athletic opportunity, they have also necessarily failed under *Pennhurst* to allege a viable damages claim.

## IV. Plaintiffs Have Failed To Allege Cognizable Title IX Claims.

As discussed in Andraya and Terry's brief before the panel, this Court can—and should—affirm the district court's judgment on the ground that Plaintiffs have failed to state a valid Title IX claim. Although this Court's en banc order did not request briefing on that issue, the

---

[19] *Cf. Grimm*, 972 F.3d at 619 n.18 (explaining that plain text of Title IX provides notice under *Pennhurst* that schools may not discriminate against transgender students even if such applications of the statute are unexpected "at least in the view of those on the receiving end of them" (quoting *Bostock v. Clayton Cty*, 140 S. Ct. 1731, 1753 (2020)); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003) (recognizing that "a State that accepts funds under [a statute with an implied cause of action] does so with the knowledge that the rules for . . . liability will be subject to judicial determination").

36

overwhelming majority of *amici* supporting Plaintiffs have chosen to weigh in on the underlying merits of Plaintiffs' claims. Those claims—and *amici*'s arguments in support—are based on two fundamentally flawed assertions about Title IX and its requirements.

First, Plaintiffs' claims are based on the flawed premise that Title IX creates a federal definition of "sex" that preempts the law of every state within this Circuit and requires schools to treat girls who are transgender as though they were cisgender boys. Second, even assuming for purposes of a motion to dismiss that Title IX's references to sex-separated teams refer exclusively to separation based on sex assigned at birth, Plaintiffs' claims are based on the flawed premise that Title IX is automatically violated whenever girls are required to compete against boys on a mixed team.

Title IX's text, regulations, and controlling policing statements provide longstanding—and well-defined—tests for determining what constitutes a denial of equal athletic opportunity. Plaintiffs do not even attempt to satisfy those tests, nor can they. Instead, they offer rhetoric about the alleged unfairness of not personally winning more trophies. But this Court's limited role is to apply Title IX's text, regulations, and

37

controlling policy interpretations—not to "pick and choose among competing policy arguments" to "select[] whatever outcome seems . . . most congenial, efficient, or fair." *Pereida v. Wilkinson*, 141 S. Ct. 754, 766 (2021). Because Plaintiffs' allegations do not satisfy the elements of a claim for denial of equal athletic opportunity under the text of the statute, regulation, and controlling policy interpretations, Plaintiffs have failed to state a claim upon which relief can be granted.

### A. Title IX and Its Implementing Regulations Do Not Define Girls Who Are Transgender as "Males" for Purposes of School Athletics.

Plaintiffs' Title IX claims are premised upon the faulty assumption that Title IX and its regulations establish a definition of "sex" that precludes girls who are transgender—and who are recognized as girls "in current school records and daily life activities in the school and community," CIAC By-Laws art. IX, § B—from being recognized as girls for purposes of sex-separated athletic activities. But Plaintiffs fail to identify any text from Title IX or the implementing regulations that defines sex, or to otherwise support those assertions.

Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C § 1681(a). Although the statutory text does not explicitly address

38

athletics, regulations codified at 34 C.F.R. § 106.41 "set forth the standards for assessing an athletics program's compliance with" the statute. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004). Under the regulations, schools are generally prohibited from "provid[ing] . . . athletics separately" "on the basis of sex," but "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a)-(b). Schools are also required to provide "equal athletic opportunity for members of both sexes." *Id.* § 106.41(c).

Plaintiffs assert that in authorizing schools to sponsor "teams for members of each sex," Title IX and its implementing regulations implicitly defined sex as "biological sex" and preempted state laws and policies recognizing girls who are transgender as girls. *See* PA172-75. In doing so, Plaintiffs repeat the same arguments that have been considered and rejected in the context of regulations authorizing separate school restrooms on the basis of sex. *See* 34 C.F.R. § 106.33. Every court of appeals to consider the question has held that the restroom regulation does not require schools to exclude transgender students from restrooms

39

consistent with their identity. "[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on [']biological sex['] and cannot accommodate gender identity." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *accord Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018); *see also Grimm*, 972 F.3d at 618. Plaintiffs' arguments should be rejected for the same reasons.

Indeed, while Plaintiffs assert with overconfidence that the framers of Title IX intended for sex-separated teams to be separated based exclusively on what Plaintiffs call "biological sex," that assertion is disputed. Title IX's allowance for sex separation did not solely "depend on the assertion of innate biological differences between the sexes, but rather on the historic and societal reality that girls and women have not had the benefit of anywhere near the same opportunities as boys and men to develop their athleticism." Deborah Brake, *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. 41, 70 (2023) (footnotes omitted). Thus, Title IX's legislative history repeatedly attributes the lack of equal athletic opportunities, in part, to the socialization of girls and women to conform to sex stereotypes, not just biology. *See, e.g.*, *Sex*

40

*Discrimination Regs. Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Labor, House of Representatives*, 94th Cong. 189 (1975) (Statement of Sen. Birch Bayh); *id.* at 197 (Statement of Rep. Stewart McKinney).[20]

Moreover, even assuming for the sake of argument that the word "sex" in Title IX's regulations refers exclusively to physiological and biological characteristics, the so-called "biological sex" of a transgender student is not necessarily the sex they were assigned at birth. *See generally* interACT Amicus, ECF 118. As discussed above, there are many different biological components of sex, and "transgender individuals often undergo a variety of procedures and treatments that result in anatomical and physiological changes, such as puberty blockers and hormone therapy." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp.

---

[20] While Plaintiffs purport to draw support from Professor Deborah Brake's book, Getting in the Game: Title IX and the Women's Sports Revolution (2010) (Pls.' En Banc. Br. 8), Professor Brake has criticized attempts to exclude girls who are transgender as "rest[ing] on a biological determinism that has historically and continues to hurt women's equality in general and women's prospects for equal athletic opportunity in particular." *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. at 85. *See also* NWLC Amicus 14 (explaining how policies excluding girls and women who are transgender threaten athletic opportunity for all girls and women).

3d 444, 461 (E.D. Va. 2019), *aff'd,* 972 F.3d 586. The regulations authorizing sex-separated sports teams assume that the student population consists of "what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded on other grounds,* 137 S. Ct. 1239 (2017). But they "shed[] little light on how exactly to determine the 'character of being either male or female' where those indicators diverge." *Id.*; *cf. Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 639 (7th Cir. 2014) (en banc) ("[T]erms that seem plain and easy to apply to some situations can become ambiguous in other situations.").[21]

Plaintiffs offer a variety of policy arguments for excluding girls who are transgender, but those policy arguments (which Intervenor-

---

[21] The Supreme Court in *Bostock* declined the invitation to limit the meaning of sex under Title VII to the physiological distinctions advocated by the Plaintiffs here. Instead the Court merely "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female," without deciding whether "the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Bostock*, 140 S. Ct. at 1739; *see, e.g.*, *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016) (collecting definitions). As in *Bostock*, it is not necessary

Defendants vigorously dispute) cannot be shoehorned into the allegedly plain meaning of the word "sex." Plaintiffs argue that the word "sex" in the athletic regulations must refer to biology because "male bodies" have an inherent physiological advantage over "female bodies." PA140. But Plaintiffs' own pleadings admit that all of those physiological differences result from hormones, not from genetics or anatomy at birth. Plaintiffs admit that "boys and girls have comparable athletic abilities before boys hit puberty," and the alleged physiological advantages typical of boys do not occur until puberty, when "testosterone drives a wide range of physiological changes." *Id*. Thus, even under Plaintiffs' own allegations, a girl who is transgender and who—as a result of receiving puberty-delaying medication and gender-affirming hormone therapy—never goes through endogenous puberty will have none of the alleged physiological advantages that Plaintiffs complain about. *See B.P.J.*, 2021 WL 3081883, at *10 (granting preliminary injunction to transgender girl and noting that "B.P.J. has not undergone and will not undergo endogenous puberty,

in this case to decide whether the word "sex" in Title IX refers only to biological distinctions because, as noted above, many transgender students have biological characteristics that align with their gender identity and not the sex assigned to them at birth.

the process that most young boys undergo that creates the physical advantages warned about by the State").

Neither the plain text of Title IX nor the plain meaning of the word "sex" requires schools to discriminate against girls who are transgender by treating them like cisgender boys.

### B. Title IX and Its Regulations Do Not Mandate Sex-Separated Teams as the Exclusive Means of Promoting Equal Athletic Opportunity.

Even assuming for purposes of a motion to dismiss that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs' claims would still be based on a second faulty assumption: that the lack of sex separation automatically violates Title IX and its athletic regulations.

Far from mandating sex-separated teams, section (a) of the regulations establishes a "[g]eneral" rule *prohibiting* schools from "provid[ing] . . . athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a) (emphasis added). Section (b) of the regulations then carves out an exception to that general prohibition, stating that "a recipient *may* operate or sponsor separate teams for members of each sex where

selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b) (emphasis added).

The regulation thus allows schools to provide sex-separated teams, but does not require schools to do so. It is "purposely permissive and flexible on this point, rather than mandatory." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking down high school athletic association rule mandating sex-separation for all teams as inconsistent with Title IX). The only thing mandated by subsection (b) is that "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited," members of the "excluded sex" must be allowed to try out for the team unless it is a contact sport. 34 C.F.R. § 106.41(b).

Subsection (c) of the regulation further requires schools to provide "equal athletic opportunity," but does not impose a general requirement for schools to use sex-separated teams as the exclusive means of doing so. *Id.* § 106.41(c). Indeed, at the time that Title IX was adopted, and continuing to this day, courts have recognized that allowing girls to play

45

on boys' teams (and vice versa) can sometimes be the only effective way to provide equal athletic opportunity under Title IX or the Fourteenth Amendment.[22]

Plaintiffs' assumption that Title IX universally requires sex-separated athletics is particularly unwarranted in Connecticut, which—like many other states—allows girls and boys to compete together on the same contact-sports teams. According to statistics from the National Federation of State High School Associations, during the 2018-19 academic year, forty-two girls in Connecticut played on boys' football teams, twenty-one girls in Connecticut played on boys' ice hockey teams, and 131 girls in Connecticut played on boys' wrestling teams. *See* Nat'l Fed. of State High Sch. Ass'ns: Participation Data, *available at*

---

[22] *See, e.g.*, *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) (injunction allowing boys to compete on girls' competitive dance team); *Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922, 923 (8th Cir. 1976) (injunction allowing girl to compete on boys' cross-country team); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014) (injunction allowing girl to compete on boys' wrestling team); *Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) (same); *Lantz v. Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985) (injunction allowing girl to compete on boys' football team).

https://members.nfhs.org/participation_statistics (last accessed Aug. 17, 2020).

Thus, even accepting Plaintiffs' flawed argument that all girls who are transgender are actually boys, that alone would not give rise to a Title IX violation.

### C. Plaintiffs Have Not Alleged Cognizable Claims of Unequal Athletic Opportunity Under the Department of Education 1979 Policy Interpretation.

Plaintiffs also fail to establish a Title IX violation under longstanding guidance from the Department of Education defining how to measure "equal athletic opportunity."

The 1979 Policy Interpretation, which was adopted through notice and comment, divides claims for denial of "equal athletic opportunity" into two categories: claims for "equal treatment" and claims for "effective accommodation." *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012).[23] Conflating and distorting "effective accommodation" and

---

[23] This Court has deferred to the 1979 Policy Interpretation without resolving whether the deference was based on *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 290 (2d Cir. 2004). *But see Biediger*, 691 F.3d at 96 (stating that *McCormick* applied *Chevron* deference).

"equal treatment" claims, Plaintiffs assert that Title IX requires not merely an equal opportunity for girls and boys to compete, but also requires that an equal number of trophies be awarded to (in Plaintiffs' words) people with "male bodies" and people with "female bodies." PA105-06, PA175. Plaintiffs cannot identify any court, nor any prior enforcement action by the Department of Education's Office of Civil Rights, that has interpreted Title IX in such a manner. To the contrary, as discussed below, Plaintiffs do not even attempt to allege the elements of a cognizable claim under the controlling legal frameworks.

### 1. Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" Under the 1979 Policy Interpretation's "Selection of Sports" Provision.

In Count One, Plaintiffs assert a claim for "effective accommodation," but fail to identify the only Title IX regulatory document that addresses when a school is required to provide separate teams for boys and girls: the 1979 Policy Interpretation's section addressing effective accommodation in selection of sports. The 1979 Policy Interpretation provides that "where an institution sponsors a team in a particular sport for members of one sex, it may be required *either* to permit the excluded sex to try out for the team *or* to sponsor a separate

48

team for the previously excluded sex." 1979 Policy Interpretation § VII.C.4 (emphases added). Sex-separated teams in non-contact sports such as track and field are required only if, among other things, "[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team or to compete actively on such a team if selected." *Id.* § VII.C.4.b(3). Thus, even assuming for purposes of this appeal that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs could not state a claim for denial of effective accommodation unless they could show that they do not possess sufficient skill "to compete actively" alongside girls who are transgender. *Id.* § VII.C.4.b(3).

Any argument that Plaintiffs are unable to "compete actively" with girls who are transgender is both implausible on its face and belied by facts incorporated in the Complaint itself. As discussed above, Plaintiffs' complete sets of track-and-field records unequivocally demonstrate that Mitchell and Smith actively competed against Andraya and Terry and repeatedly *won* those competitions. Plaintiffs' assertion that they "simply

49

can't win" is "simply not true." *Dixon v. von Blanckensee*, 994 F.3d 95, 107 (2d Cir. 2021).

Plaintiffs also assert that they have been denied the "chance to be champions," but, as discussed above, Plaintiffs' records demonstrate that Soule, Mitchell, and Smith have been "champions" on multiple occasions.[24] Smith had already won two championships as of the date of the Second Amended Complaint; Soule had won five championships; and Mitchell had won twelve.

Mitchell has also received virtually all of the accolades and public recognition that she claims to have lost to Terry and Andraya. For example, Plaintiffs misleadingly allege that during the 2019 indoor season, Andraya and Terry "egregiously" denied Mitchell the ability to "ma[k]e her school's history as the first female athlete . . . ever to be named State Open Champion." Pls.' En Banc Br. 34 (quoting PA156). In reality, although Mitchell was not named state open champion in the 55m

---

[24] Soule and Nicoletti do not allege that they would have won a trophy for any particular event had Andraya or Terry not participated. Both runners placed behind at least five presumably non-transgender runners, including other plaintiffs to this lawsuit, in events they claim denied them a chance to be a champion.

dash, she still "made her school's history" by winning the state open championship for the long jump on the same day. *See* SA071; Gerry deSimas, Jr., *Canton's Chelsea Mitchell wins State Open title in long jump, takes 3rd in 55 meters*, Collinsville Press (Feb. 18, 2019), *available at* https://tinyurl.com/yu2khbz2.

Mitchell further complains that Terry took recognition away from her when the Hartford Courant named her "All-Courant girls indoor track and field athlete of the year" for the 2018-19 season. PA156. But only months later, Mitchell herself was named "All-Courant girls outdoor track and field athlete of the year" for the 2019 season. *See* Shawn McFarland, *2019 All-Courant girls outdoor track and field athlete of the year: Chelsea Mitchell, Canton*, Hartford Courant (July 10, 2019), *available at* https://tinyurl.com/tde86a37.

Though Plaintiffs complain that they want more trophies and accolades to go along with those they have already received, there is enough room in Connecticut—and in track-and-field competition more generally—for girls who are transgender to have "the chance to be champions," too. Providing effective accommodation for the interests and abilities of these four Plaintiffs does not require Defendants to deny

51

effective accommodation to other girls, including girls who are transgender. *See* Teammates Amicus 12-23, ECF 139; NWLC Amicus 5, 8-9, ECF 124.

> **2. Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" under the 1979 Policy Interpretation's "Levels of Competition" Provision.**

Plaintiffs also fail to allege a denial of "effective accommodation" claim under the "levels of competition" provision of the 1979 Policy Interpretation. Under that provision, courts address "levels of competition" effective accommodation claims through a three-part test that analyzes:

> (1) Whether [] participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or (2) Where the members of one sex have been and are underrepresented among [] athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or (3) Where the members of one sex are underrepresented and the institution cannot show a continuing practice of program expansion . . ., whether it can be demonstrated that the interests and abilities of the

members of that sex have been fully and effectively accommodated by the present program.

*Biediger*, 691 F.3d at 92-93 (citing 1979 Policy Interpretation). "The test is applied to assess whether an institution is providing nondiscriminatory *participation opportunities* to individuals of both sexes, and an institution is in compliance if it meets any one of the three prongs of the test." *McCormick*, 370 F.3d at 300 (emphasis in original).

Unlike other types of Title IX claims, an effective accommodation claim based on "levels of competition" and "participation opportunities" is assessed at the aggregate group level, not at the level of particular individuals. The 1979 Policy Interpretation's three-part test for such claims focuses on a school's athletic program as a whole, rather than on any one particular individual's ability to compete on a given team in a given event. *See Biediger*, 691 F.3d at 92-93 (effective accommodation claim regarding Quinnipiac University's elimination of women's volleyball team as varsity sport and systemic manipulation of rosters to make the number of female participants appear larger than it actually was); *Thomas v. Regents of Univ. of Cal.*, No. 19-cv-06463-SI, 2020 WL 3892860, at *9 (N.D. Cal. July 10, 2020) (effective accommodation claim

regarding "systemwide imbalance in athletic opportunities for women"). The focus throughout the "levels of competition" effective accommodation analysis for "participation opportunities" is on how an athletics program, taken as a whole, provides participation opportunities for each sex as a whole.

Plaintiffs do not allege that they have been denied effective accommodation under the three-part test. Instead, Plaintiffs assert that each time an individual cisgender girl fails to advance to the next level of post-season competition, she has been denied a "participation opportunity." But the term "participation opportunity" under the 1979 Policy Interpretation has a specific definition. The 1979 Policy Interpretation defines "participants" as those athletes

> a. Who are receiving the institutionally sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

> c. Who are listed on the eligibility or squad lists maintained for each sport; or

54

    d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

*Biediger*, 691 F.3d at 93 (quoting 44 Fed. Reg. at 71,415) (alterations incorporated). Participation opportunities are not calculated based on the number of times an athlete qualifies to participate in a particular post-season race.

Taking words out of context, Plaintiffs also argue that Title IX requires that athletic opportunities not be "illusory." Pls.' Opening Br. 30 (quoting *Biediger*, 691 F.3d at 101); *accord* Pls.' En Banc Br. 17. But "illusory" participation opportunity under the three-part test are "unfilled slots" that exist on paper but "are not filled by actual athletes." Off. Civ. Rts., U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996); *accord Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014). Thus, as this Court explained in *Biediger*, a participation opportunity would be "illusory" if a school "pump[ed] up its women's track team rosters by requiring every injured field hockey, soccer, and volleyball player to join these teams even though they would never actually compete in the indoor and outdoor track seasons and, for that

matter, would never want to enter a race." 691 F.3d at 101 (internal quotation marks omitted). Neither *Biediger* nor any other case stands for the proposition that a participation opportunity is "illusory" if the student does not win every competition.

Plaintiffs also focus on a hypothetical situation in which "the great bulk of the females [would] quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." Pls.' Opening Br. 29 (internal quotation marks and citations omitted). But Plaintiffs' factual allegations—as opposed to their rhetoric—show nothing of the kind. The allegations show that since the CIAC's inclusive policy has been in place, only two girls who are transgender, Andraya and Terry, have run competitively in girls' track and field, each in only three events out of dozens per track-and-field meet. Plaintiffs' records also show that non-transgender girls have repeatedly won championships by outperforming Andraya and Terry in direct competition. Irrespective of Andraya and Terry's talents in high school, their participation in three events per meet has not caused cisgender girls to "vanish from the victory podium." PA148; *see also Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho Aug. 17, 2020) ("It is inapposite to

compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

Here, it is undisputed that Plaintiffs' schools have separate girls' indoor and outdoor track teams; that those teams participated in numerous meets; and that based on those meets, Plaintiffs were able to qualify for their Class championships, for the State Open, and for the New England Championship—often with great success. Accordingly, Plaintiffs have failed to allege a valid claim that they lacked participation opportunities when analyzed under the relevant three-part test for an "effective accommodation."

### 3. Plaintiffs Have Not Alleged Cognizable Equal Treatment Claims.

Plaintiffs also fail to allege a cognizable claim for denial of "equal treatment" under the 1979 Policy Interpretation. When determining whether equal treatment has been denied, courts review the second through tenth factors set forth in the Title IX regulations:

(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 C.F.R. § 106.41(c)(2)-(10); *McCormick*, 370 F.3d at 291.

Under the 1979 Policy Interpretation, a school may be liable for denial of equal treatment "[i]f comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability," for "members of both sexes." *See* 1979 Policy Interpretation § VII(B)(2). Thus, for example, an athletic program may be found to deny equal treatment when it schedules women's sports in a less advantageous manner than men's sports. *See McCormick*, 370 F.3d at 299 (sustaining unequal treatment claim by members of women's soccer team given high school's "off-season scheduling that disadvantaged members of only one sex"); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 855-57 (W.D. Mich. 2001) (high school athletic association violated Title IX by scheduling athletic seasons and competitions for girls' sports during nontraditional and less advantageous times compared to boys' sports).

58

Plaintiffs' factual allegations fail to state a valid equal treatment claim under this legal framework. Plaintiffs do not even attempt to argue that the CIAC or other Defendants treat a boys' track-and-field team differently from a girls' track-and-field team. The only allegations even remotely related to the regulatory factors are Plaintiffs' vague claims that they were denied publicity and recognition of their efforts due to victories by other girls. But, as with "effective accommodation" claima, the assessment of unequal publicity focuses on the publicity institutions provide to their teams as a group—not the coverage ultimately enjoyed individually by each athlete from third-party news outlets. *See* 1979 Policy Interpretation § VI(B)(3)(i) (explaining that compliance is assessed based on "access to publicity resources for men's and women's programs" as well as "quantity and quality of publications and other promotional devices featuring men's and women's programs"). For example, if a school were only publicizing its male athletes, and not its female athletes, on the school's website, that would support a claim for unequal publicity. *See, e.g., Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1112 (S.D. Cal. 2012) (sustaining unequal treatment claim on the basis of, among other things, a showing that "girls' athletic activities

59

were provided with less coverage and promotion in yearbooks, fewer announcements in the school's Daily Bulletin, less signage on the school's electronic marquee, and inferior signage"), *aff'd*, 768 F.3d 843. Once again, Plaintiffs have alleged nothing of the kind.

*     *     *

As the district court properly recognized, "[c]ourts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity." PA286. Indeed, several courts have enjoined categorical exclusions of girls who are transgender from girls' sports teams under Title IX, the Equal Protection Clause, or state constitutions. *See supra* n.5 (collecting cases).

But the question in this case is even simpler. The question is not whether Title IX *requires* schools to allow girls who are transgender to participate on girls' athletic teams, but whether Title IX *prohibits* schools from doing so. No court has ever interpreted Title IX to prohibit the inclusion of girls who are transgender on girls' athletic teams, and neither the plain text of Title IX nor its implementing regulations supports such a claim. "[N]one of [Plaintiffs'] contentions about what

60

[they] think the law was meant to do, or should do, allow us to ignore the law as it is." *Bostock*, 140 S. Ct. at 1745.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of Plaintiffs' claims for injunctive relief for lack of Article III standing, and this Court should affirm dismissal of Plaintiffs' damages claims for failure to state a claim on which relief should be granted.

Respectfully submitted,

/s/ Joshua A. Block
Joshua A. Block
Ria Tabacco Mar
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2593
jblock@aclu.org

Elana Bildner
Dan Barrett
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
ebildner@acluct.org

61

*Counsel for Intervenor*
*Defendants-Appellees Andraya*
*Yearwood and Thania Edwards*
*on behalf of her daughter, T.M.*

Dated: April 24, 2023

**Federal Rules of Appellate Procedure Form 6**
**Certificate of Compliance with Rule 32(a)**

1.  This brief complies with the type-volume limits of Fed. R. Ap. P. 32(a)(7)(B), as well as Local Rule 32.1(a)(4), because it contains 12,131 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as well as Local Rule 32.1, because it has ben prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Joshua A. Block
Joshua A. Block

April 24, 2023

63