# 21-1365-cv

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA
MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA
SMITH, a minor, by Cheryl Radachowski, her mother; ASHLEY
NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs – Appellants,*

v.

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a
CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE;
BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION;
CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION;
GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION;
CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY
PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants – Appellees,*

and

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her
daughter, T.M.; COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES,

*Intervenor-Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, CASE 3:20-CV-00201 (RNC)

## *EN BANC* BRIEF FOR DEFENDANTS - APPELLEES

PETER J. MURPHY
LINDA L. YODER
SHIPMAN & GOODWIN LLP
ONE CONSTITUTION PLAZA
HARTFORD, CT 06103
TELEPHONE: 860-251-5000
FACSIMILE: 860-251-5316
EMAIL:
PJMUPRHY@GOODWIN.COM

FOR THE CIAC AND THE
DANBURY BOARD OF EDUCATION

JOHANNA G. ZELMAN
FORDHARRISON, LLP
CITYPLACE II
185 ASYLUM STREET
HARTFORD, CT 06103
TELEPHONE: 860-740-1355
FACSIMILE: 860-578-2075
EMAIL:
JZELMAN@FORDHARRISON.COM

FOR THE CROMWELL BOARD
OF EDUCATION AND
THE BLOOMFIELD BOARD OF
EDUCATION

DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 WETHERSFIELD AVENUE
HARTFORD, CT 061114
TELEPHONE: 860-249-1361
FACSIMILE: 860-249-7665
EMAIL:
DMONASTERSKY@HL-LAW.COM

FOR THE CANTON BOARD OF
EDUCATION AND
THE GLASTONBURY BOARD OF
EDUCATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iv

COUNTER-STATEMENT OF THE ISSUES ...........................................1

COUNTER-STATEMENT OF THE CASE ...............................................2

    A.    The CIAC Policy .........................................................2

    B.    Andraya Yearwood and Terry Miller.....................................4

    C.    Plaintiffs ..................................................................5

    D.    Plaintiffs' Participation in High School Girls' Track ............6

        1.    Selina Soule...................................................8

        2.    Ashley Nicoletti...............................................9

        3.    Alanna Smith .................................................9

        4.    Chelsea Mitchell............................................10

    E.    Plaintiffs' Claims and Requested Relief ...............................11

    F.    Procedural history......................................................12

SUMMARY OF THE ARGUMENT ......................................................14

ARGUMENT .......................................................................................15

I.    PLAINTIFFS DID NOT SUFFER AND INJURY IN FACT AS A RESULT OF THE TRANSGENDER PARTICIPATION POLICY AND, THEREFORE, THE DISTRICT COURT AND THE PANEL OF THIS COURT PROPERLY HELD THAT THEY DO NOT HAVE STANDING TO ALTER ATHLETIC RECORDS ..............15

A. Violation of Title IX Alone is Insufficient to Establish Injury-in-Fact Absent Actual Harm ................................................. 17

B. Plaintiffs have not Plausibly Alleged a Concrete, Particularized Injury that is Actual or Imminent and is not Conjectural or Hypothetical .................................................. 20

    1. The Authority Cited by Plaintiffs Fails to Support the Proposition that they have a Cognizable Ongoing Interest in Athletic Records ........................................ 22

    2. Plaintiffs Have not Plausibly Alleged that they were Denied the Chance to be Champions ........................... 27

    3. Plaintiffs Have not Plausibly Alleged that Their High School Athletic Records will Impair their Future Employment Prospects ................................................. 30

II. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED THAT THEY SUFFERED AN INJURY IN FACT REDRESSABLE BY ORDERING THEIR ATHLETIC RECORDS TO BE ALTERED AND THEREFORE THE PANEL CORRECTLY UPHELD THE ORDER OF THE DISTRICT COURT DISMISSING PLAINTIFFS' AMENDED COMPLAINT ............................................................ 32

A. To the Extent Plaintiffs Continue to Seek Prospective Injunctive Relief, the Claim is Moot ..................................... 33

B. Plaintiffs cannot be awarded compensatory or nominal damages ................................................................................ 35

C. Plaintiffs' claim of lost educational opportunities is moot and has been abandoned ............................................................ 37

D. Plaintiffs' requested relief exceeds what they could be awarded in this case ............................................................. 38

E. Plaintiffs' claim of on ongoing injury to their employment opportunities is improper and wholly speculative ............... 39

ii

F. Plaintiffs have not identified any process allowing for the extraordinary relief requested in regard to athletic records .................................................................. 49

III. PENNHURST'S NOTICE REQUIREMENT BARS PLAINTIFFS' CLAIM FOR MONEY DAMAGES ................................................. 57

 A. The CIAC policy has ample textual, regulatory, and judicial support, precluding an award of money damages for any alleged Title IX violation ....................................................... 58

 B. There is no categorical exception to Pennhurst's notice standard for intentional violations, nor would Plaintiffs' claims satisfy any such exception ........................................ 64

CONCLUSION ......................................................................... 72

CERTIFICATION OF COMPLIANCE .................................................. 74

CERTIFICATE OF SERVICE ............................................................ 74

# TABLE OF AUTHORITIES

**Cases**                                                      **Page**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) .......................................................63, 64

*Allen v. Wright*,
  468 U.S. 737 (1984) ........................................................................18, 29

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ........................................................................59, 68

*Asfall v. Los Angeles Unified Sch. Dist.*,
  No. 20-55599, 2022 WL 2764747 (9th Cir. July 15, 2022) ..................36

*Barnes v. Gorman*,
  536 U.S. 181 (2002) ........................................................................59, 67

*Biediger v. Quinnipiac Univ.*,
  691 F.3d 85 (2d Cir. 2012) ..............................................................61, 65

*Bird v. Lewis & Clark Coll.*,
  303 F.3d 1015 (9th Cir. 2002), *cert. denied*. 538 U.S. 923 (2003)........27

*Bostock v. Clayton Cty.*,
  --- U.S. ---, 140 S. Ct. 1731 (2020) ...........................................60, 61, 69

*Boucher v. Syracuse Univ.*,
  194 F.3d 113 (2d Cir. 1999)......................................................19, 29, 33

*Byrne v. Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001).................................................................45

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................16, 29

iv

*Clapper v. Amnesty Intl USA,*
568 U.S. 398 (2013) ................................................................... *passim*

*Clark, By & Through Clark v. Arizona Interscholastic Ass'n,*
695 F.2d 1126 (9th Cir. 1982),
*cert. denied,* 464 U.S. 818 (1982)............................................ 22, 23, 24

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ........................................................................57

*Constantine v. Rectors & Visitors of George Mason Univ.,*
411 F.3d 474 (4th Cir. 2005) .................................................. 26, 55, 56

*Cook v. Colgate University,*
992 F.2d 17 (2d Cir. 1993)...................................................... 20, 33, 39

*Crane by Crane v. Indiana High Sch. Athletic Ass.,*
975 F.2d 1315 (7th Cir. 1992) ...........................................................25

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
--- U.S. ---, 142 S. Ct. 1562 (2022) ...................................... 21, 36, 58, 59

*Davis v. FEC,*
554 U.S. 724 (2008) ..............................................................................16

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999) ................................................................... *passim*

*DiFolco v. MSNBC Cable LLC,*
622 F.3d 104 (2d Cir. 2010)...................................................................2

*Dodds v. United States Dep't of Educ.,*
845 F.3d 217 (6th Cir. 2016) ...............................................................63

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.,*
897 F.3d 518 (3d Cir. 2018),
*cert. denied,* --- U.S. ---, 139 S. Ct. 2636 (2019)...................................63

*Doe v. Ohio Univ.*,
    No. 2:21-CV-00858, 2023 WL 2652482 (S.D. Ohio Mar. 27, 2023).....36

*Does 1 - 10 v. Suffolk Cnty., New York*,
    No. 21-1658, 2022 WL 2678876 (2d Cir. July 12, 2022) ...................... 19

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016), *vacated*, 137 S. Ct. 1239 (2017)........... 63

*Gebser v. Lago Vista Independent School Dist.*,
    524 U.S. 274 (1998) ....................................................................... 67, 69

*Georgia Republican Party v. Sec. & Exch. Comm'n*,
    888 F.3d 1198 (11th Cir. 2018),
    *cert. denied*, --- U.S. ---, 140 S. Ct. 908 (2020) ................................... 45

*Grimm v. Gloucester Cty. Sch. Bd.*,
    302 F. Supp. 3d 730 (E.D. Va. 2018) ..................................................... 4

*Guardians Ass'n v. Civ. Serv. Comm'n*,
    463 U.S. 582 (1983) .............................................................................. 68

*Hall v. Millersville Univ.*,
    22 F.4th 397 (3d Cir. 2022) ................................................................. 71

*Hollander v. United States*,
    354 Fed. Appx. 592 (2d Cir. 2009),
    *cert. denied*, 559 U.S. 1069 (2010)...................................................... 16

*Horner v. Kentucky High Sch. Athletic Ass'n*,
    206 F.3d 685 (6th Cir., *cert. denied*, 531 U.S. 824 (2000).............. 66, 67

*Illinois Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ............................................................... 60

*Jackler v. Byrne*,
    658 F.3d 225 (2d Cir. 2011), *cert. denied*, 565 U.S. 1234 (2012) ......... 20

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) .................................................................. *passim*

*Karasek v. Regents of University of Cal.*,
  956 F.3d 1093 (9th Cir. 2020) ........................................................... 71

*Keepers, Inc. v. City of Milford*,
  807 F.3d 24 (2d Cir.), *cert. denied*, ---U.S. ---, 137 S. Ct. 277 (2015)... 16

*Knife Rights, Inc. Vance*,
  802 F.3d 377 (2015) ............................................................................ 19

*Lacewell v. Off of Comptroller of Currency*,
  999 F.3d 130 (2d Cir. 2021)............................................... 15, 16, 30, 31

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................... 18, 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ......................................................... 18, 32, 33, 40

*Maddox v. Bank of New York Mellon Tr. Co., N.A.*,
  19 F.4th 58 (2d Cir. 2021) ............................................................ 16, 18

*Mansourian v. Regents of Univ. of Cal.*,
  602 F.3d 957 (9th Cir. 2020) ........................................................ 70, 71

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004)........................................................... 18, 29

*McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*,
  119 F.3d 453 (6th Cir. 1997) (*en banc*)........................................... 22, 23

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017),
  *cert. denied*, --- U.S. ---, 137 S. Ct. 2188 (2017).................................... 45

vii

*Overdam v. Texas A&M Univ.*, 43 F.4th 522 (5th Cir. 2022)
(petition for certiorari filed Apr. 14, 2023) ................................... 26, 27

*Parker v. Franklin Cty Comm. Sch. Corp.*,
667 F.3d 910 (7th Cir. 2012) ............................................................... 70

*Pederson v. La. State Univ.*,
213 F.3d 858 (5th Cir. 2000) ............................................................... 65

*Pennhurst State School and Hospital v. Halderman*,
451 U.S. 1 (1981) ............................................................... *passim*

*Pierro v. Hudson City Sch. Dist.*,
No. 122CV670GLSCFH, 2023 WL 2742245
(N.D.N.Y. Mar. 31, 2023) .................................................................... 36

*Poloceno v. Dallas Ind. Sch. Dist.*,
826 Fed. Appx. 359 (5th Cir. 2020) .................................................... 69

*Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington
Union Free Sch. Dist.*, 478 F.3d 494 (2d Cir. 2007) ............................ 20

*Pottgen v. Missouri State High Sch. Activities Ass'n*,
40 F.3d 926 (8th Cir. 1994) ................................................................. 25

*Pryor v. NCAA*,
288 F.3d 548 (3d Cir. 2002) ................................................................ 69

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................. 18

*Russman v. Bd. of Educ. Of Enlarged City Sch. Dist. Of City of
Watervliet*,
260 F.3d 114 (2d Cir. 2001) ................................................................ 33

*Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*,
64 F.3d 1026 (6th Cir. 1995) ......................................................... 22, 23

viii

*Simpson v. Univ. of Colorado Boulder*,
    500 F.3d 1170 (10th Cir. 2007) ........................................... 71

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................. 32, 33, 57

*TransUnion LLC v. Ramirez*,
    --- U.S. ---, 141 S. Ct. 2190 (2021) ............................... 15, 16, 17, 18, 29

*Washington v. Indiana High Sch. Athletic Ass'n, Inc.*,
    181 F.3d 840 (7th Cir.), *cert. denied*, 528 U.S. 840 (1999) ............ 25, 26

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of
    Educ.*, 858 F.3d 1034 (7th Cir. 2017),
    *cert. dismissed*, --- U.S. ---, 138 S. Ct. 1260 (2018) ........................ 60, 63

*Wiley v. Nat'l Collegite Athletics Ass'n*,
    612 F.2d 473 (10th Cir. 1979) ..................................... 26, 54

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High
    Sch. Athletic Ass'n*, 647 F.2d 651 (6th Cir. 1981) ................................ 68

## Statutes

20 U.S.C. § 1681 ................................................. 60

## Rules

FRAP 30(b)(1) ....................................................... 2

## Regulations

34 C.F.R. § 106.41(b) .............................................. 20

34 C.F.R. § 106.41(c) ............................................. 20, 65

ix

**Other Authorities**

Shawn McFarland, "One year ago, the CIAC cancelled high school
    sports due to COVID-19. Here's how the decision went down."
    Hartford Courant, available at: https://www.courant.com/sports/high-
    schools/hc-sp-prem-ciac-cancelled-winter-sports-tournament-one-year-
    ago-20210309-j5xhb4yjmnh37jo77o22xrgppq-story.html .................. 13

Joe Morelli, "CIAC officially cancels 2020 spring season, following
    schools' closure." Available at https://www.gametimect.com/ciac-
    expected-to-finally-cancel-spring-season/ ........................................... 13

## COUNTER-STATEMENT OF THE ISSUES

On February 21, 2023, this Court instructed the parties to brief the following issues:

1. Whether Plaintiffs-Appellants have alleged an injury-in-fact resulting from Defendants-Appellees' "Transgender Participation" policy;

2. Whether Plaintiffs-Appellants have alleged an injury-in-fact redressable by ordering the alteration of athletic records; and

3. Whether Plaintiffs-Appellants are barred by the *Pennhurst* doctrine from seeking monetary damages in relation to their claim brought pursuant to Title IX of the Education Amendments Act of 1972.

## COUNTER-STATEMENT OF THE CASE

Because the district court granted Defendants' motion to dismiss, this factual background section is based on the allegations in the operative complaint, any documents attached to the complaint or incorporated by reference in the complaint, and other facts of which judicial notice may be taken. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

### A.    The CIAC Policy

Since 2013, the Connecticut Interscholastic Athletic Conference ("CIAC") has followed a policy of allowing students who are transgender to play on sex-separated sports teams that are consistent with their gender identity if they meet certain criteria. (JA149, ¶74)[1] (*citing* CIAC By-Laws Article IX, Section B).[2] The CIAC Policy specifies that:

> The CIAC is committed to providing transgender student-athletes with equal opportunities to participate in CIAC athletic programs consistent with their gender identity. Hence, this policy addresses eligibility determinations for

---

[1] On July 9, 2021, Plaintiffs filed a two-volume "Joint Appendix" ("JA"), without consulting first with defense counsel about its contends. *See* FRAP 30(b)(1).

[2] The CIAC's current 2022-2023 Constitution and By-Laws are available online at http://www.casciac.org/ciachandbook.

students who have a gender identity that is different from the gender listed on their official birth certificates [at the time of birth].[3]

CIAC By-Laws Article IX, Section B. The policy acknowledges that any other rule would be "fundamentally unjust and contrary to applicable state and federal law." *Id*. For purposes of the CIAC policy, a student's school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." *Id*. By submitting a team roster to the CIAC, each school district "is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*

---

[3] Of course, some transgender students may have had their gender markers changed on their birth certificates as part of the process of transitioning. The CIAC policy would cover those students as well.

3

**B.**   <u>**Andraya Yearwood and Terry Miller**</u>

Individual Intervenor-Defendants Andraya Yearwood and Terry Miller attended the Cromwell Public Schools ("Cromwell") and Bloomfield Public Schools ("Bloomfield"), respectively. (JA133, ¶¶15–16) At the time this lawsuit was filed, they were teenage girls who are transgender, which means that they have a gender identity that differs from their sex designated at birth.[4]

Yearwood competed on the girls' track-and-field team at Cromwell High School for the 2017, 2018, and 2019 indoor and outdoor seasons. (JA151-56 ¶¶90, 91, 99).[5]   Miller competed on the girls' track-and-field team at Bloomfield High School for the 2018 outdoor season and the 2019 indoor and outdoor seasons. (JA153-55, ¶¶88–91)[6] Both Yearwood

---

[4] *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018)

[5] The published results of all of Yearwood's track-and-field events ("Yearwood's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14519891. A copy was attached as Exhibit A to Defendants Memorandum of Law in Support of Motion to Dismiss ("Mem.") [Ecf.145-1].

[6] The published results for Miller's events ("Miller's Results"), Ex. B. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14046370.

4

and Miller also competed on the girls' track-and-field team for the 2020

indoor season.[7] They graduated from high school in 2020. (Pl. Brief pg.

8).

C.     **Plaintiffs**

Plaintiffs are four non-transgender girls: Selina Soule,[8] Chelsea

Mitchell,[9] Alanna Smith,[10] and Ashley Nicoletti.[11] All have now

graduated from high school, and all received spots on the university

track and field teams. Soule received an offer to run for Florida Atlantic

---

[7] The 2020 outdoor track season was canceled as a result of the COVID-19 pandemic.

[8] The published results for Soule's events ("Soule's Results"), Ex. C to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=10678905.

[9] The published results of Mitchell's events ("Mitchell's Results"), Ex. D. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=12095608.

[10] The published results of Smith's events ("Smith's Results"), Ex. E. to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L=4.

[11] The published results of Nicoletti's events ("Nicoletti's Results"), Ex. F to Mem., are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14752303.

University;[12] Nicoletti has signed to compete in for Belmont Abbey

College in North Carolina;[13] Smith is currently running at University of

Tennessee;[14] and Mitchell received an athletic scholarship to attend

William & Mary.[15]

Thus, neither Plaintiffs nor interveners attend a public school in

Connecticut, nor are they subject to the CIAC Policy.

### D.  <u>Plaintiffs' Participation in High School Girls' Track</u>

Defendant school districts all participate in the CIAC for outdoor

and indoor track. Schools are grouped by size, or "Class": Class S, M, L,

or LL. Schools generally compete against schools their same size. At the

---

[12] *See* Soule Decl. in Support of Intervention ¶ 29, *D.N. v. DeSantis*, No.
21-cv-61344-RKA, (S.D. Fla. Sept. 21, 2021), ECF 46-1.

[13] *See IHS Student Athletes Sign National Letters of Intent*, Immaculate
High School Mustang Monthly, *available at*
https://www.immaculatehs.org/discover-ihs/news/news-
post/~board/mustang-monthly/post/ihs-student-athletes-sign-national-
letters-of-intent-may-22.

[14] *See* Univ. of Tenn. 2022-23 team roster profile for Alanna Smith,
*available at* https://utsports.com/sports/track-and-field/roster/alanna-
smith/18624.

[15] *See* Ashley Schwartz-Lavares et al., *Trans women targeted in sports
bans, but are they really at an advantage?* ABC News (Apr. 7, 2021),
https://tinyurl.com/y7j98xbj.

end of the season, there is a Class championship meet in both indoor and outdoor track. (JA150 ¶79) The students with the five fastest times in, for example, the girls' outdoor track 100m final at the Class M championship advance to the subsequently held State Open Championship. (JA150-53, ¶¶79, 81, 87) At the State Open, students from the various Classes compete against each other in each race. *Id*. After some preliminary heats, the top finishers race in the final heat of, for example, the girls' outdoor track 100m final, and have the opportunity to move on to the New England Championship. *Id*.

Plaintiffs assert that girls who are transgender have an unfair "athletic advantage," and that Yearwood and Miller's participation in girls' track-and-field events deprives Plaintiffs of equal athletic opportunity on the basis of sex in violation of Title IX. (JA173-75, ¶¶165–66, 175–76). Plaintiffs assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' high school athletic events, Plaintiffs "are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." (JA148, ¶70) Despite these sweeping assertions,

Plaintiffs only identify a few specific instances in which Yearwood or Miller allegedly had any impact on Plaintiffs' athletic opportunities.

      1.   <u>Selina Soule</u>

Soule identifies only one instance in which she was allegedly denied an athletic opportunity as a result of competing against either Yearwood or Miller. (JA154-55 ¶¶91–92) (Pl. En Banc Br. at 7) During the 2019 indoor track season, Soule competed against Yearwood and Miller in the 55m dash at the State Open Championship. (JA154 ¶91). In the preliminary race, to determine eligibility for the final heat of the State Open Championship in the 55m dash, Miller had the fastest time and Yearwood had the second-fastest. *Id.* Soule had the eighth-fastest time—behind Miller, Yearwood, and five other, non-transgender girls, including Mitchell—and therefore failed to qualify for the final 55m championship race. *Id.*

Soule was, however, a "champion." She admits that "her high school athletic career included being a ten-time All-Conference Honoree recipient, a five-time state title holder, a three-time All New England award recipient, a four-time National qualifier, and she holds five high school records." *D.N. v. Gov. R. Desantis, et al.*, Case 0:21-cv-61344-RKA,

ECF 46, p. 7. He records shows that she won the 4x200 relay Class LL championship in both indoor and outdoor track in 2019. (SA050, SA051, SA055).

### 2.  Ashley Nicoletti

Nicoletti cites one instance in which she was allegedly denied an athletic opportunity as a result of competing against either Yearwood or Miller. (JA157 ¶100) During the 2019 outdoor season, Nicoletti competed against Yearwood and Miller in the 100m at the S Class Women's Outdoor Track Finals. *Id.* In the preliminary race, to determine eligibility for the final heat, Mitchell had the fastest time, Miller had the second- fastest time, and Yearwood had the third-fastest time. *Id.* Nicoletti had the ninth-fastest time and failed to qualify for the final. *Id.*

### 3.  Alanna Smith

Smith cites one occasion where she was negatively affected by Yearwood or Miller's participation. (JA158 ¶ 102) During the 2019 outdoor season, Smith competed against Miller in the 200m State Open Championship. *Id.* Miller placed first, and Smith placed third. *Id.*

9

But Smith, too, had many opportunities to be a "champion" when competing against Yearwood and Miller. In 2019 she placed first at both the state open championship and New England Championship in the 400m. (SA085). And during the 2021 outdoor season, Smith recorded faster times in both the 100m and 200m, at 11.83 second and 24.00 seconds, respectively, than either Andraya or Terry ever recorded. (*Compare Published Results of Alanna Smith's track and field events* (unattached), Athletic.net, https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L =1 (last visited October 6, 2021) *with* SA026 (12.17 in the 100m, and 25.33 in the 200m) and SA039 (24.17 seconds in the 200m).

### 4. Chelsea Mitchell

Plaintiff Chelsea Mitchell competed against Yearwood and Miller on several occasions, beating them in some races and finishing behind them in others. (JA154-58 ¶¶ 91, 100–02) For example, in the 2019 outdoor season, Mitchell outperformed both Miller and Yearwood in the preliminary heat in the 100m S Class championship, but then finished behind Yearwood and in front of Miller in the final of that even. *Id*. ¶¶ 100–01. Miller identifies four races in total where, if Miller and/or

10

Yearwood did not participate, she would have finished first and "won" the race. *Id.* ¶ 108.

Mitchell had a plethora of opportunities to be a "champion," and, in fact, outran Yearwood and Miller on multiple occasions. During high school, she took home several Championships. In 2018, she won the outdoor 100m, 200m and 4x100 relay Class S championship. (SA073, SA075). In 2019, in the 55m indoor Class S championship, Mitchell finished second (and Andraya third). *Compare* SA070 *with* SA030. At the 2019 state open championships, Mitchell won the 100m, finishing ahead of both Yearwood (who finished fourth) and Miller (who had a false start). (*Compare* SA068 and SA83 *with* SA028 and SA041) In 2020, Mitchell came in first in the 55m indoor Class S championship, the 55m indoor state open championship and the indoor 300m Class S championship (each time finishing ahead of Andraya). *Compare* SA065 *with* SA039.

### E. <u>Plaintiffs' Claims and Requested Relief</u>

Plaintiffs assert that as a result of Yearwood and Miller's participation in track and field, Defendants have violated Title IX by failing to effectively accommodate the athletic abilities of girls, and failing to provide equal treatment, benefits, and opportunities for girls'

athletics. (JA175-76) Plaintiffs seek injunctive relief and nominal and compensatory damages. *Id*. Request for injunctive relief includes:

- All Plaintiffs also seek "[a]n injunction requiring all Defendants to . . . remove male [sic] athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions." *Id*.

- Finally, all Plaintiffs seek "[a]n injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women." *Id*.

### F.  <u>Procedural history.</u>

On February 12, 2020, Plaintiffs filed their Complaint and request for expedited hearing,. (JA009 #1; JA011 #26) On February 27, 2020, the district court held a telephone status conference. (JA012 #52) Thereafter, the COVID-19 pandemic forced significant changes upon all aspects of life, including high school sports. The first COVID-19 case in Connecticut was announced March 8, 2020, and on March 10, the CIAC cancelled all games and tournaments for winter sports.[16] "On March 15,

---

[16] Shawn McFarland, "One year ago, the CIAC cancelled high school sports due to COVID-19. Here's how the decision went down." Hartford

12

[Governor] Lamont signed an executive order directing all schools to cancel in-person education through the end of the month. The next day, the state ordered the closure of restaurants. Within weeks, the state was essentially locked down." *Id*. After initially postponing the spring sports season, the CIAC voted By May 2020 to permanently cancel that season.[17]

On May 4, 2020, the district court held a pre-filing conference. (JA020 #101) On August 11, 2020, Plaintiffs filed a Second Amended Complaint. (JA130) On August 21, 2020, Defendants filed a joint motion to dismiss. (JA025 #145) On April 25, 2021, the district court granted the Defendants' motion to dismiss. (JA 259).

Plaintiffs appealed on May 26, 2021. After argument, this Court affirmed the decision of the District Court. The Panel held that Plaintiffs lacked Article III standing because they did not suffer an injury in fact that was redressible by the Court. The Panel also held

---

Courant, available at: https://www.courant.com/sports/high-schools/hc-sp-prem-ciac-cancelled-winter-sports-tournament-one-year-ago-20210309-j5xhb4yjmnh37jo77o22xrgppq-story.html.

[17] Joe Morelli, "CIAC officially cancels 2020 spring season, following schools' closure." Available at https://www.gametimect.com/ciac-expected-to-finally-cancel-spring-season/.

13

that because Defendants lacked sufficient notice that their conduct may violate Title IX, *Pennhurst* barred any claim for monetary relief.

On February 21, 2023, this Court *sua sponte* issued on order for rehearing en banc limited to the three issues set forth in the Counterstatement of the Issues.

## SUMMARY OF THE ARGUMENT

The district court did not err in dismissing Plaintiffs' Second Amended Complaint, and the original Panel that reviewed that decision correctly, and unanimously, affirmed the district court's decision. Simply put, the Plaintiffs have not established an injury in fact that would allow them to sue over the CIAC's Transgender Participation Policy and to seek a court order changing past athletic records, thus depriving the federal courts of jurisdiction under Article III. Additionally, pursuant to the *Pennhurst* doctrine, the federal courts have no jurisdiction over Plaintiffs' claim for monetary damages. For all of these reasons, the original Panel's affirmance of the District Court's dismissal of this case must be re-affirmed.

## ARGUMENT

14

The first two questions ask whether the Plaintiffs having standing to pursue this lawsuit. The Court's third question raises an issue about the *Pennhurst* doctrine. Plaintiffs do not have standing because they did not suffer an injury in fact that are redressible and, furthermore, *Pennhurst* precludes any award of damages against the Defendants.

## I.     PLAINTIFFS DID NOT SUFFER AND INJURY IN FACT AS A RESULT OF THE TRANSGENDER PARTICIPATION POLICY AND, THEREFORE, THE DISTRICT COURT AND THE PANEL OF THIS COURT PROPERLY HELD THAT THEY DO NOT HAVE STANDING TO ALTER ATHLETIC RECORDS.

"Article III [of the Constitution] confines the federal judicial power to the resolution of 'Cases' and 'Controversies'." *TransUnion LLC v. Ramirez*, --- U.S. ---, 141 S. Ct. 2190, 2203 (2021). To satisfy the Constitution's "case-or-controversy requirement," a plaintiff in federal court "must establish that they have standing to sue." *Clapper v. Amnesty Intl USA*, 568 U.S. 398, 408 (2013). The party invoking federal jurisdiction – in this case Plaintiffs – bears the burden of establishing that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Lacewell v. Off of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021)(cleaned up).

15

"In addition, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 42 (2d Cir.) (*quoting Davis v. FEC*, 554 U.S. 724, 734 (2008), *cert. denied*, ---U.S. ---, 137 S. Ct. 277 (2015).

An "injury in fact" is one that is concrete, particularized, and actual or imminent," *TransUnion*, 141 S. Ct. 2190, at 2203, "not conjectural or hypothetical," *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021); "Abstract injury is not enough." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). And the imminence requirement aims "to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (quotation marks omitted); *see also, e.g.*, *Lyons*, 461 U.S. at 111 (speculative claim that alleged prior injury will recur failed to support standing). Nor is an injury-in-fact plausibly alleged where the injury claimed is purely speculative. *See Hollander v. United States*, 354 Fed. Appx. 592, 593 (2d Cir. 2009), *cert. denied*, 559 U.S. 1069 (2010).

16

A. **Violation of Title IX Alone is Insufficient to Establish Injury-in-Fact Absent Actual Harm**

Plaintiffs concede that the question of whether the CIAC Policy is consistent with Title IX is not currently before this Court.[18] (Pl. En Banc Br. at 2 n.1). The only question is whether a federal court has jurisdiction to consider such a challenge based on the procedural posture of the case. Because Plaintiffs lack an injury in fact and, therefore, lack standing, the answer is "no" and the Panel's affirmance of the District Court's dismissal of this case should be affirmed.

Plaintiffs argue that if they can establish that the CIAC Policy violates Title IX, that alone will suffice to establish that they suffered an injury-in-fact. That argument is incorrect.

In *TransUnion*, SCOTUS distinguished between an "injury in law" ("a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law,") and an "injury in fact" ("a concrete harm [suffered] because of the defendant's violation of federal law." *TransUnion*, 141 S. Ct. at 2205. Although Plaintiffs argue the former is

---

[18] This renders many of the amici briefs submitted in support of the Plaintiffs on the merits to be outside the scope of the questions presented in the Court's en banc order.

sufficient they are wrong, because "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* (emphasis in original). In other words, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 2204; *see Maddox*, 19 F.4th at 65-66 (holding that credit union's statutory violation of lending laws alone did not satisfy injury in fact requirement). And that injury must be "particularized" and "affect the plaintiff in a personal and individual way." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (*quoting Lujan,* 504 U.S. at 560 n. 1); s*ee also Raines v. Byrd*, 521 U.S. 811, 819 (1997) (collecting cases).

Thus, plaintiffs to a discrimination case  "have no standing to complain simply that their Government is violating the law," nor may they "litigate their claims based on the stigmatizing injury" allegedly resulting from unequal treatment because "such injury accords a basis for standing only to those persons who are *personally* denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l,*

18

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (emphasis added). An injury "suffered by all members of a [] group," is not a "judicially cognizable" injury in fact sufficient to establish Article III standing. *Id.* at 555-56; *see Boucher v. Syracuse Univ.*, 194 F.3d 113, 116 (2d Cir. 1999) (students who competed only in club sports lacked Article III standing to maintain Title IX challenge to allocation of funding on varsity level).

This Court addressed this issue in considering whether a group of plaintiffs had standing to make a challenge to a firearm possession policy. *See Does 1 - 10 v. Suffolk Cnty., New York*, No. 21-1658, 2022 WL 2678876, at *2 (2d Cir. July 12, 2022). The Court held that it was not enough that the plaintiffs had alleged a potential future injury, but rather needed to show a "credible threat sufficient to satisfy the imminence requirement of injury of fact." *Id.* (*quoting Knife Rights, Inc. Van*ce, 802 F.3d 377, 384 (2015)).

Plaintiffs cannot use this lawsuit to press a freestanding challenge to the CIAC Policy's adherence to Title IX. Without more, their objection does not constitute a cognizable injury in fact. Instead, they

must plausibly allege that the policy caused them a particularized and concrete harm. They cannot do so.

### B. Plaintiffs have not Plausibly Alleged a Concrete, Particularized Injury that is Actual or Imminent and is not Conjectural or Hypothetical.

Plaintiffs cannot make a generalized challenge to the CIAC Policy because of Article III's case and controversy requirement. *Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.,* 478 F.3d 494, 498 (2d Cir. 2007). Trying to overcome that hurdle, they argue that specifically were denied an equal athletic opportunity, and an effective accommodation, *see* 34 C.F.R. § 106.41(b), (c)(1).

Plaintiffs concede that efforts to prospectively enjoin the CIAC Policy's application to future high-school races were mooted by the graduation of Plaintiffs in Intervener-Defendants. *See, e.g., Cook v. Colgate University*, 992 F.2d 17, 18-20 (2d Cir. 1993). And their brief's silence on the matter abandons any contrary theory. *See Jackler v. Byrne*, 658 F.3d 225, 233 (2d Cir. 2011) (claim abandoned when appellant's "brief on appeal contain[ed] no argument" about it), *cert. denied*, 565 U.S. 1234 (2012).

20

To the extent that Plaintiffs now allegethat they suffered "stress, anxiety, intimidation, and emotional and psychological distress" (Pl. En Banc Br. at 28), Title IX does not permit recovery for such retrospective, noneconomic harms. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, --- U.S. ---, 142 S. Ct. 1562, 1576 (2022) ("emotional distress damages are not recoverable" for alleged violations of "Spending Clause antidiscrimination statutes").

Plaintiffs otherwise argue that they suffered injury in fact in their "ongoing interest in their athletic records." (Pl. En Banc Br. at 28). Specifically, they assert that application of the CIAC Policy denied them "chance to be champions"[19] and *possible future* employment opportunities. These injuries are neither concrete nor actual, but rather conjectural and hypothetical.

---

[19] Plaintiffs rephrase this single alleged harm in various ways. They claim loss of "medals, advancement to regional meets, championship titles and records and recognition on the victory podium" (Pls.' en banc Brief, p. 28), "credit where credit is due" (id., p. 29) and "high level opportunities to race, athletic records and track medals" (id., p. 31). But all of these formulations assert the same purported harm of not placing higher – including first – in the races in which they competed. These are not separately alleged injuries.

1. <u>The Authority Cited by Plaintiffs Fails to Support the Proposition that they have a Cognizable Ongoing Interest in Athletic Records</u>.

Plaintiffs cite three decision to support their argument that there is some inherent harm due to their alleged "inaccurate" athletic records. *See McPherson v. Mich. High Sch. Athletic Ass'n, Inc*., 119 F.3d 453 (6th Cir. 1997) (*en banc*), *Sandison v. Mich. High Sch. Athletic Ass'n, Inc*., 64 F.3d 1026 (6th Cir. 1995) and <u>*Clark, By & Through Clark v. Arizona Interscholastic Ass'n*</u>, 695 F.2d 1126, 1127 (9th Cir. 1982), *cert. denied*, 464 U.S. 818 (1982). These cases are inapposite.

In *McPherson* and *Sandison*, the Sixth Circuit analyzed whether student athlete cases had become moot, not whether the plaintiffs plausibly alleged an injury in fact. The issue in both cases was the plaintiffs' eligibility to participate in high school athletics during their senior year, which was delayed due to their disabilities, and caused them to "age out" of participation. *See McPherson*, 119 F.3d at 455; *Sandison*, 64 F.3d at 1028-29. They both alleged violation of disability laws, and obtained injunctions allowing them to participate in athletics. *See McPherson*, 119 F.3d at 456; *Sandison*, 62 F.3d at 1029. On appeal, their individual claims were moot because they had since graduated or

22

the sports season had ended. *See McPherson*, 119 F.3d at 458;

*Sandison*, 62 F.3d at 1029-30. However, the policy itself required that

the schools forfeit any game in which the ineligible students

participated and subjected them to penalties, keeping the claims

brought by the schools alive. Because the athletic association sought to

vacate the injunction and enforce penalties, the case was not moot. *See*

*McPherson*, 119 F.3d at 459; *Sandison*, 62 F.3d at 30. *McPherson* and

*Sandison* specifically rejected that the plaintiffs in those case had any

individual rights at stake.

Here, the CIAC Policy does not affect Plaintiffs' records, and the

CIAC is not seeking to vacate Plaintiff's results or penalize their

schools. The athletic records of all four Plaintiffs remain intact, nor

were they completely barred from participating on the track team, often

times with great success. Nothing in either *McPherson* or *Sandison*

establishes that they "have an ongoing interest in their athletic

records." (Pl. En Banc Br. at 8-29).

In *Clark*, the school only had a girls' volleyball team, on which

boys were barred from competing under a Arizona Interscholastic

Association policy that prohibited boys from competing on a girl's team.

23

*See Clark, Etc. v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1127 (9th Cir. 1982). The male plaintiffs claimed that their inability to compete in volleyball constituted gender-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. *See id*. The case did not address Article III standing at all, but, instead, addressed whether this class-based exclusion met intermediate scrutiny. *See id*. at 1129-30. That is a merits question, which is not at issue here. Moreover, as the Panel correctly noted, unlike the boys in *Clark*, Plaintiffs were not excluded from participating in their chosen sport or events. All four participated, and had success. And losing a faction of the races in which they participated did not completely exclude them from running.

None of the other athletic or education record cases cited help Plaintiff either. As Plaintiffs admit, each involves mootness (which is more akin to redressibility), not injury in fact. (Pl. En Banc Br. at 39, 41). Plaintiffs' attempt to bootstrap an injury in fact argument into one of mootness is unavailing. These cases are distinguishable in other ways as well.

24

For example, in *Crane by Crane v. Indiana High Sch. Athletic Ass.*, 975 F.2d 1315 (7th Cir. 1992), the plaintiff was a student who sought eligibility to play golf in his new high school. *See id*. at 1317. He was declared ineligible for one year. The district court held the decision violated the student's constitutional rights and issued an injunction against the athletic association. *See id*. at 1318. At the time of the appeal, the year was over. *See id*. But the appeal was brought by the athletic association, not as here by the student. The court did not hold that the student suffered an injury in fact, or even that he had an interest in his athletic records; rather the court held that "the [athletic association] still has a very real, legal interest in the outcome of this appeal which satisfies the requirements of Article III" because it was the one enjoined. *Id*. at 1318-19.

It was for this same reason that jurisdiction remained in *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir.), *cert. denied*, 528 U.S. 840 (1999) and *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926 (8th Cir. 1994). In both cases, the district courts issued injunctions barring the schools and athletic associations from enforcing its rules, leaving the court with jurisdiction

25

because of the school's injury, even though the students' claims were moot. *See Washington*, 181 F.3d at 844-45; *Pottgen*, 40 F.3d at 928

In *Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d 473 (10th Cir. 1979), *cert. denied*, 446 U.S. 943 (1980), contrary to Plaintiff's assertions, the court actually held that "the district court's opinion granting prospective relief in the form of an injunction has indeed been mooted by Wiley's graduation." *Id*. at 475. The court only retained jurisdiction because Wiley competed under an NCAA rules allowing him to do so in the face on an injunction, but the NCAA was permitted to vacate any records retroactively if the injunction was overturned. *See id*. at 476. Not only was an injunction not issued in this case, but no similar CIAC rule exists.

The academic and disciplinary record cases fair no better, for the primary reason that Plaintiffs' education and disciplinary records are not at issue. In *Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474 (4th Cir. 2005), the Court did not address Article III standing at all, but, rather, Eleventh Amendment immunity in a disability discrimination claim. In *Overdam v. Texas A&M Univ*., 43 F.4th 522, 525 (5th Cir. 2022) (petition for certiorari filed Apr. 14,

26

2023), which challenged a disciplinary record, the plaintiff had a "cognizable liberty injury," not in the record itself, but in his right to constitutionally protected Due Process before being disciplined. *Id.* at 529. In *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015 (9th Cir. 2002), *cert. denied.* 538 U.S. 923 (2003), because the school failed to accommodation the plaintiff's disability, she actually received poor grades, and, therefore, still had standing for prospective injunctive relief – not to change her grades but to enjoin the college from releasing them. *See id.* at 1020. That is not at issue in the case since Plaintiffs did not perform poorly, and their athletic records are publically available.

Plaintiffs have not cited any case whatsoever supporting the notion that allegedly "incorrect" athletic records alone are an injury in fact. Defendants could not locate any such case either.

2. <u>Plaintiffs Have not Plausibly Alleged that they were Denied the Chance to be Champions</u>.

Plaintiffs make the broad sweeping claim that because the CIAC Policy permits girls who are transgender to participate in girls' track, they were denied the "chance to be champions," in that they were excluded from "honors, opportunities to compete at higher levels, and public recognition critical to college recruiting and scholarship

opportunities"[20] (JA131, ¶3, JA174, ¶ 167), and they "los[t] competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." (JA148, ¶70). But, all four Plaintiffs did get the "chance to be champions," even when competing against Yearwood and Miller. Their records showing their successes are set forth above and in Section II, and highlighted by the Intervener-Defendants in their briefing. As the Panel summarized:

> All four Plaintiffs regularly competed at state track championships as high school athletes, where Plaintiffs had the opportunity to compete for state titles in different events. And, on numerous occasions, Plaintiffs were indeed "champions," finishing first in various events, even sometimes when competing against Yearwood and Miller. *See, e.g.*, J. App'x at 157 ¶ 100 (Mitchell defeated Yearwood and Miller in 2019 Class S Women's Outdoor 100-meter); Suppl. App'x at 54-55 (Soule placed first in long jump and 4x200 relay at 2019 state championships). Plaintiffs simply have not been deprived of a "chance to be champions."

*Soule*, 57 F.4th at 51. Plaintiffs offer no rejoinder to this factual accounting of their athletic achievements. And injury to other or all

---

[20] The Panel correctly noted that, having graduated from high school, Plaintiffs can no longer pursue remedies based on college recruiting and scholarship opportunities.

28

female athletes alone is insufficient to support Article III Standing here. *See Allen*, 468 U.S. at 755-56; *Boucher*, 164 F.3d at 116.

*McCormick,* on which Plaintiffs have relied throughout this litigation, does not warrant a different result. The policy in *McCormick* resulted in boys soccer being played in the fall but girls in the spring – while the championships for both took place in the fall. See *McCormick*, 370 F.3d at 279-80. As a result, the plaintiff girls were *completely* shut out from the state and regional championship games, but the boys were not. *See id.* at 280-81. Here, Plaintiffs did participate in the championships, and did prevail even against Yearwood and Miller.

Furthermore, the *McCormick* plaintiffs were still high school students at the time of the decision. *Id.* at 279, 285. Plaintiffs here are not and no longer seek prospective injunctive relief to affect future application of the CIAC Policy. Nor do Plaintiffs specify the nature and number of opportunities that must be "lost," and to what degree, before they are no longer considered a "champion." "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion LLC*, 141 S. Ct. at 2203. And the "speculative nature of [t]his claim" precludes a finding of injury in fact. *Lyons*, 461 U.S. at 109.

29

The Panel decision should not be disturbed.

3. Plaintiffs Have not Plausibly Alleged that Their High School Athletic Records will Impair their Future Employment Prospects.

Plaintiffs' allusions to the loss of amorphous future employment opportunities do not establish an imminent or concrete injury in fact. The operative complaint omits any reference to this theory of injury, which is clear given that the brief does not cite any such allegation. There is also no evidentiary support for it. On this alone, Plaintiffs have failed to set for that they have plausibly alleged that they suffered an injury in fact..

Even if such allegations were included, what an unknown employer in an unnamed industry may do in the future is pure speculation.

> Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact and that allegations of *possible* future injury are not sufficient.

*Clapper*, 568 U.S. at 409 (cleaned up) (conjecture that government might surveil might violate First and Fourteenth Amendment in the future failed to show imminent injury); *accord Lacewell*, 999 F.3d at 144-48 (2d Cir. 2021) (same for claim of regulatory harm couched "in

30

conditional or future-oriented terms"). More than a "speculative chain of possibilities" is required. *Clapper*, 568 U.S. at 414.

There is no allegation anywhere that Plaintiffs are actively seeking employment, much less that they have been denied employment opportunities based on high school race records. Given their actual successes both in high school and now completing in Division I and II NCAA track teams, their alleged potential future injury because even more speculative. As the Panel decision states:

> ….[T]he records that Plaintiffs want re-written already show their participation and impressive achievements in high school athletics; the mere fact that athletic experience may be a significant factor for prospective employers in their hiring decisions does not show that Plaintiffs' future employment opportunities are harmed by the current records.

> Moreover, because an employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position, Plaintiffs can only speculate as to how prospective employers will exercise their discretion when hiring and whether the requested revisions to the records would have any noticeable impact. This speculation is insufficient to show injury in fact. Thus, Plaintiffs have failed to show injury in fact because they have not established that maintaining the records as they are now will cause future injury to Plaintiffs' employment opportunities that is "certainly impending."

*Soule*, 57 F.4th at 52–53 (citation and quotation marks omitted).

## II.   PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED THAT THEY SUFFERED AN INJURY IN FACT REDRESSABLE BY

**ORDERING THEIR ATHLETIC RECORDS TO BE ALTERED AND THEREFORE THE PANEL CORRECTLY UPHELD THE ORDER OF THE DISTRICT COURT DISMISSING PLAINTIFFS' AMENDED COMPLAINT.**

It is not enough for Plaintiffs to show an injury in fact (which, as discussed *supra*, they cannot) because they must also show redressability.

A plaintiff has the burden of establishing that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). And speculation is not a valid basis for standing. *Clapper*, 568 U.S. at 401. The Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decision makers will exercise their judgment." *Id*. at 413. When "none of the relief sought by [plaintiff] would likely remedy its alleged injury in fact," a court "must conclude" that the plaintiff lacks standing to maintain the suit, and that "the lower courts lack jurisdiction to entertain it." *Steel Co.*, 523 U.S. at 109; *accord Lujan*,

504 U.S. at 568 (plaintiffs lacked standing because allegations in the complaint failed to establish redressability).

## A. To the Extent Plaintiffs Continue to Seek Prospective Injunctive Relief, the Claim is Moot.

"Mootness is a recurring phenomenon in students' suits to vindicate constitutional rights associated with the conditions of their education: a student's graduation ends his individual interest in the conditions of education at his former school." *Russman v. Bd. of Educ. Of Enlarged City Sch. Dist. Of City of Watervliet*, 260 F.3d 114, 119 (2d Cir. 2001)); see *Boucher*, 164 F.3d at 118 (2d Cir. 1999) (prospective injunction seeking equal funding was moot because university funded women's varsity teams); *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (prospective injunction to fund women's hockey team was moot because the plaintiffs graduated).

Plaintiffs argue that athletic records from while they were in high school are causing ongoing harm, for which they are seeking some form of prospective relief. (Pls.' En Banc Br. 22). But no prospective relief is available here given their graduation, which renders their request for prospective relief moot. They cannot run the races again without Yearwood and Miller present. *Soule*, 57 F.4th at 51. They cannot

33

participate in awards ceremony, if any were held, at their high schools or at a statewide meet related to those prior races. They also cannot advance to the New England Championships for those years and events.

These realities expose an overarching flaw in Plaintiffs' entire theory that a federal court can order the entry "accurate official records" of past races by bumping up their places in races in which Yearwood and Miller ran a faster time. (Pl. En Banc Br. at 29). The races cannot now be redone, nor are Plaintiffs seeking such a redo. In fact, Plaintiff agree that "[e]ach meet, once over, cannot be redone. Each opportunities lost for participation in an elite meet cannot be recovered." And there is no telling how these races might have ended up if non-transgender females had participated instead of Miller and Yearwood—or, if the races had occurred minus what Plaintiffs now allege to have been "unfair competition." (Pl. En Banc Br. 22). The substitute participants would have had the same opportunity, and the same desire, to compete for "medals" and "championship titles" as would anyone else in the race—including Plaintiffs. (*Id.* at 21). It is not possible to tell if Plaintiffs would have run at the same pace if they had been in different lanes next to different runners. To the extent that they

were in a lane near Yearwood and Miller they may have pushed themselves to run faster to keep pace.

Any relief Plaintiffs seek is retrospective in nature. Specifically, Plaintiffs claim that a federal court can order two forms of relief that will address their alleged injuries: (1) compensatory and nominal damages; and (2) declaratory and injunctive relief regarding athletic records. (Pls.' En Banc Br. 46-47). Plaintiffs are incorrect: these requests for retrospective relief are, respectively, barred as a matter of law and based exactly on the type of speculation that the Supreme Court has held cannot support standing.

## B.  **Plaintiffs cannot be awarded compensatory or nominal damages**.

Plaintiffs claim that an award of compensatory damages would be "likely to redress Plaintiffs' quantifiable damages." (Pls.' En Banc Br. 45). The only type of damages they request in the complaint that could be "quantifiable" are emotional distress damages—for the alleged "stress, anxiety, intimidation, and emotional and psychological distress" they claim to have suffered from competing against Yearwood and Miller. (Pls.' En Banc Br. 28)

35

SCOTUS recently confirmed that damages for emotional distress are not recoverable in a private action to enforce Spending Clause antidiscrimination statutesbecause emotional distress damages are generally not available in breach of contract actions. *Cummings, supra; see also*, *Asfall v. Los Angeles Unified Sch. Dist.*, No. 20-55599, 2022 WL 2764747, at *4 (9th Cir. July 15, 2022) (declining to address *Cummings*-based challenge to emotional distress damages awarded at trial because, even before *Cummings*, party "should have known that the argument against noneconomic damages under Title IX was viable"); *Doe v. Ohio Univ.*, No. 2:21-CV-00858, 2023 WL 2652482, at *5 (S.D. Ohio Mar. 27, 2023) (citing *Cummings* and granting summary judgment on claim for emotional distress damages under Title IX); *Pierro v. Hudson City Sch. Dist.*, No. 122CV670GLSCFH, 2023 WL 2742245, at *4 n5 (N.D.N.Y. Mar. 31, 2023)(Sharpe, J.)(same). Accordingly, Plaintiffs cannot recover compensatory damages for any alleged emotional distress in this case.

Plaintiffs claim that they can be awarded nominal damages, which allegedly will provide redress for their unquantifiable injuries resulting from Defendants' alleged violations of Title IX. (Pls.' En Banc Br. 46).

36

Although nominal damages may be available in some Title IX cases, they are not available in this particular case by virtue of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). Because the law does not authorize monetary damages in these circumstances, Plaintiffs cannot meet the redressability element of standing through their request for such damages.

**C.** **Plaintiffs' claim of lost educational opportunities is moot and has been abandoned.**

Plaintiffs alleged that the CIAC's policy and the presence of Yearwood and Miller caused them and other girls to be excluded from honors and public recognition critical to college recruiting and scholarship opportunities. (JA131¶ 3, JA 174-75 ¶¶ 167, 177) Plaintiffs' allegations are conclusory – they did not allege they actually lost any such recruiting or scholarship opportunities based on their placements in the races where Miller or Yearwood ran. At this point it is undisputed that all four of the Plaintiffs have graduated from high school (Pls.' En Banc Br. 17, 37), and as noted previously all four have received opportunities to participate in college athletics.. As the Panel correctly noted, therefore, any claims for relief based on lost educational opportunities are moot. *Soule*, 57 F.4th at 50 n.3. Moreover, those

37

claims have been abandoned, as Plaintiffs concede in their En Banc brief that it is "too late" for them to benefit from things such as superior college applications, scholarship applications, and college recruiting profiles. (Pls.' En Banc Br. 37).

For both of these reasons, the en banc court does not need to address Plaintiffs' lost educational opportunities claim.

## D. **Plaintiffs' requested relief exceeds what they could be awarded in this case.**

Plaintiffs also argue that they are seeking an injunction ordering Defendants to remove times and records for any girls who are transgender in any "elite sports competition designated for girls," and to correct the records to give "credit and/or titles to the female athletes who would have received them but for" the participation of transgender females. (Pls.' En Banc Br. 46-47).

The requested relief goes well beyond what any court can properly order. This lawsuit was brought by Plaintiffs on behalf of themselves, not former teammates or other students. There is no basis for them to seek relief benefiting strangers to the lawsuit or going beyond the specific races in which they claim they were harmed by the

38

participation Yearwood or Miller. *See Cook*, 992 F.2d at 20 (2d Cir. 1993) (claims by graduated students were moot).

### E.  Plaintiffs' claim of on ongoing injury to their employment opportunities is improper and wholly speculative.

Plaintiffs assert that correcting their athletic records from high school will affect their "career success."  (Pls.' En Banc Br. 47).  This will happen, they say, because revised athletic records will "give them stronger resumes and inspirational stories," which "will always impact their competitiveness in the marketplace."  (Pls.' En Banc Br. 37).  This contention rests on speculation – including about decisions to be made sometime in the future by unnamed third parties not before the Court. Thus, the District Court and the Panel both correctly found that this was an insufficient basis for Article III standing.

The word "employment" is not mentioned in the operative complaint. This argument about an alleged impact on unknown employment prospects was created out of whole cloth following the Spring 2020 season being canceled due to COVID-19, and Plaintiffs' subsequent graduation from high school. Put more simply, Plaintiffs are trying to manufacture *some* ground for standing where there is none.

To survive dismissal, the operative complaint must plausibly alleged standing, including redressibility. *See Lujan*, 504 U.S. at 561 (plaintiff has the burden to demonstrate standing through "general factual allegations of injury resulting from the defendant's conduct" at the pleading stage). Not only is lost employment opportunities not plausibly alleged in the operative complaint, it is not alleged at all.

But even if this Court entertains Plaintiffs' belated claim of injury, the en banc Court should conclude, just like the District Court and the Panel, that injury is not redressible because it is far too speculative.

First, Plaintiffs allege that, as a freshman in 2019, Smith placed third in a State Open Championship event, and that she would have finished in second place but for the Policy. (JA158 ¶102) Plaintiffs offer no credible explanation for how this single event during Smith's freshman year of high school would negatively affect her ability to secure employment after college, eight years later, or any explanation as to why a second-place finish in one race in her freshman year would be so substantially more impressive to a prospective employer than a third-place finish, especially given her time would not change. It simply defies logic to believe that finishing second instead of third would

40

provide any relief to Smith with regard to future employment opportunities. This is especially true since that she was a freshman high school at the time, and Plaintiffs concede that Smith was able to compete throughout the rest of her high school career to great success. For example, in her senior year, Smith finished first in the 100 meter outdoor race at the State Open as well as the New England Championships. She then finished second at the State Open in the 200 meter outdoor race, but first in the same event at the New England Championship.[21] In the 2021 outdoor season, Smith was the State Open champion in the 100, 200, and 400 meter races. *Id.* Smith now is an accomplished college athlete, too, where she is a member of the University of Tennessee's women's track and field team.[22] Her recent successes in the classroom and on the track at Tennessee, and her overall performance in high school, will be relevant to employers; it is

---

[21] In the operative complaint, Plaintiffs noted that they were relying on publicly available records from third-party websites such as Athleticnet.com, and they cited extensively to records on Athleticnet.com. Alanna Smith's high school records are available at: https://www.athletic.net/athlete/14790311/track-and-field/high-school (last visited April 21, 2023).

[22] *See* https://utsports.com/sports/track-and-field/roster/alanna-smith/18624 (last visited April 21, 2023).

mere speculation that her placement in a single race during her freshman year in high school would make any difference.

Nicoletti's claim of potential lost employment opportunities is even weaker. The only record Nicoletti seeks changed is a *preliminary* race in the 2019 Class S Women's Outdoor 100m championship. (JA157 ¶100). In that race, Nicoletti did not even finish in the top eight, which was necessary to advance to the final, championship heat. (JA169 ¶ 144). In other words, she finished behind Yearwood, Miller, and six other cis-gendered female athletes. It would require immense speculation to find that Nicoletti's future employment opportunities years later after college would be materially enhanced if she were able to report that she finished eighth in a preliminary heat.

Plaintiffs' employment opportunities claim falls short for both Mitchell and Soule, too. Since graduating, both have obtained spots on their college's respective track and field teams. The Court can take judicial notice that Mitchell was included on the publicly available 2021-22 Women's Track & Field Roster at the College of William &

Mary.[23] The Court also may take judicial notice of the fact that Soule is competing on the track team at Florida Atlantic University. *See D.N. v. Gov. R. DeSantis et al.*, Case 0:21-cv-61344-RKA, Ecf. 46, Selina Soule's Motion to Intervene and Memorandum in Support, p. 7 of 25. Soule's motion was based, in part, on her statement that "her high school athletic career included being a ten-time All-Conference Honoree recipient, a five-time state title holder, a three-time All New England award recipient, a four-time National qualifier, and she holds five high school records." *Id*. As this history demonstrates, racing against Yearwood and Miller did not prevent either Mitchell or Soule from competing in college, and there simply is no reason to believe that any change in reported race placements from 2018-2019 or earlier will have any impact on their future employment opportunities, either, given their success.

Plaintiffs now also claim that society places a high value on athletic achievements, and that an overwhelming number of female business executives participated in and recorded achievements in

---

[23] *See* https://tribeathletics.com/sports/womens-track-and-field/roster/chelsea-mitchell/14810 (last visited April 20, 2023).

interscholastic sports. As noted by the studies and articles cited in Plaintiffs' opening brief, employers value *participation* in athletics because athletes derive "goal setting, persistence, problem solving, teamwork, managing emotions, and managing time" from competitive sports. (Pl. Brief, p.23). Or, "sports *participation* yields many concrete benefits for girls and women, including '(1) better overall health; (2) better academic performance; and (3) lessons in teamwork, leadership, and confidence." (Pls.' En Banc Br. 9) (emphasis added). Those benefits, which Plaintiffs are seeking to deny to girls who are transgender, come from participation and not winning, or finishing in any particular order in any particular race.

Moreover, it is common knowledge that employers look at a variety of factors when making decisions about who to hire, including but not limited to the competitiveness and location of the student's college, and the student's major, GPA, awards and honors, internships, foreign language skills, extracurricular activities and sports, other specialized skills, recommendations from professors, and leadership positions. In employment cases, this Court has stated that a federal court "does not sit as a super-personnel department to reexamine a

firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions." *Byrne v. Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (superseded on other grounds). Similarly, redressability under Article III cannot rest on "guesswork as to how independent decision makers will exercise their judgment." *Clapper*, 568 U.S. at 413; *accord Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 654 (9th Cir. 2017) (no standing because the "alleged price effects for consumers are remote, speculative, and contingent upon the decisions of many independent actors in the causal chain"), *cert. denied*, --- U.S. ---, 137 S. Ct. 2188 (2017); *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1202 (11th Cir. 2018) (no standing where relief was "contingent on the choices of a third party"), *cert. denied*, --- U.S. ---, 140 S. Ct. 908 (2020). It would be speculative to assume to that employers will look to the high school race results from 2018-2019 when making hiring decisions years in the future about a college graduate. Changing athletic records would redress nothing.

This certainly is true for Smith, Nicoletti, and Soule, none of whom would have the fastest race time if even if records for Yearwood

and Miller were expunged. The district court stated that the requested

relief could provide Mitchell with a basis to list "four additional wins"

on her resume if Miller or Yearwood's results were stricken and she was

moved from third to first, for example.[24] Even so, the district court

found that even changing those records to show that she finished "first"

would not provide Mitchell with any relief because "it seems inevitable

that before making an offer to Mitchell, a prospective employer

impressed by her record would learn that she did not actually finish

first in the four races. In other words, even with the requested changes,

Mitchell's position with regard to her employment prospects would

remain essentially the same." (JA 278) The Panel agreed, concluding

that "even if the records were amended, Plaintiffs have not shown that

their employment prospects are likely to be any different, given that a

---

[24] This is incorrect. As noted on page 34 of Plaintiffs' En Banc brief, there are only two races where Mitchell finished behind Miller (JA 157-58, ¶101), or behind both Miller and Yearwood (JA 154-55, ¶91), and therefore (according to Plaintiffs) would have finished fist but for the presence of Miller and Yearwood. In the other two races cited by Plaintiffs and the District Court, Mitchell would move from seventh to sixth place (JA 152-53, ¶87), and from fourth to second (JA 153-54, ¶90).

46

simple internet search would reveal to the prospective employer the controversy about the records." *Soule*, 57 F.4th at 53.

Plaintiffs continue to take issue with these conclusions by the District Court and the Panel. (Pls.' En Banc Br. 17-19). It cannot be disputed, however, that any potential employer doing even a cursory check on Mitchell's background will see the reported results in many sources, including the numerous media appearances Mitchell has made, the op-eds she has written, and the attention she has brought to her case and the disputed

races from the 2018-2019 season.[25] And with or without a court order altering the race records, Mitchell is free to characterize her own experience the same way she does here: for example, by proclaiming that she was "the fastest biological girl in the 2019 55m State Open championship final." (Pls.' En Banc Br. 14). A federal court ruling that

---

[25] *See, e.g.*, editorial from Chelsea Mitchell in USA Today, available at: https://www.usatoday.com/story/opinion/2021/05/22/transgender-athletes-girls-women-sports-track-connecticut-column/5149532001/; television appearance on Fox News, available at https://www.youtube.com/watch?v=Zt4-5NhQGRA; and numerous on-line publications and solicitations published on her law firm's website, available at: https://adflegal.org/search?search_term=Chelsea.

the challenged decision to permit transgender athletes to participate violated Title IX would not meaningfully alter the status quo.

Finally, even if these four records were changed to first place finishes on paper, it is a stretch to believe that a prospective employer would consider these specific races when hiring for a position after her anticipated graduation from college in 2024, still more than a year away, and assuming she does not further enroll in school. Indeed, it is significantly more likely that such an employer would be interested in her college experience, including her academic performance and any successes she had running on the Division I women's track and field team at William & Mary. Thus, even for Mitchell, Plaintiffs' theory of relief would require significant "guesswork as to how independent decision makers will exercise their judgment." *Clapper*, 568 U.S. at 413.

As such, Plaintiffs have not suffered a redressible injury in fact sufficient to establish standing.

**F.** **Plaintiffs have not identified any process allowing for the extraordinary relief requested in regard to athletic records.**

Plaintiffs request that Yearwood and Miller's results and championships be stricken from the records, and that Plaintiffs be given "credit and/or titles" that they would have received but for the participation of Yearwood and Miller. (Pls.' En Banc Br. 47) In support of that request, Plaintiff cite three sections of the CIAC's student athlete handbook, and claim that these sections demonstrate that the CIAC can change records and issue individual awards retroactively. Injunctive relief for alleged violations of Title IX does not extend to specifically enforcing (whether directly or by analogy) sections of an interscholastic athletic organization's handbook—relief that is far afield from "traditional contract remedies." *Cummings*, 42 S. Ct. at 1572. In any event, Plaintiffs' mischaracterize or selectively quote the cited sections in the handbook, none of which provide support for Plaintiffs' requested relief.

The first section cited addresses the use of steroids by high school athletes, which is irrelevant to this case. (Pls.' En Banc Br. 48). Steroids are illegal, and any high school athlete using them would

49

knowingly be breaking the law at the time of their participation. Plaintiffs do not allege in the operative complaint that Yearwood or Miller were using illegal steroids, or that Yearwood or Miller were participating in girl's track in violation of CIAC policy. Instead, the CIAC Policy specifically permitted Yearwood and Miller to compete in these high school races, and such participation was permitted and appropriate under the CIAC policy, as well as guidance issued by the federal and state Departments of Education. Factually, therefore, the section addressing expungement of records for steroid use is not applicable here.

Moreover, that section does not support the requested relief. The cited section says that the student who used illegal steroids would have his or her records "expunged." There is nothing within that section stating that, in track and field for example, the second place runner could then be awarded first place. Nothing in this policy provides any basis for an order that Mitchell, for example, be moved up to first place

and be awarded a championship in a race where she came in second to either Yearwood or Miller. [26]

The next handbook section relied on by Plaintiffs addresses the consequences when a school permits a non-eligible student to compete in either team sports or an individual event. The part of that section addressing individual events, like track and field, describes how that an ineligible student would be disqualified, his or her opponent would advance, and the disqualified student's points would be subtracted from the team's total score. (Pls.' En Banc Br. 48-49). What Plaintiffs omit, however, is that section is titled "CIAC TOURNAMENT ONLY," and that it clearly only applies while a CIAC tournament is in process. *See* CIAC Handbook pg. 97.[27] This section is not relevant once the tournament is over. It is undisputed that all of the races cited by

---

[26] That the reallocation of medals sometimes occurs in high-level sports competitions, such as the Olympics (*see* En Banc Brief pg. 49-53), has no relevance to the standing issue before the Court. The Olympics is a private organization that is not governed by Title IX. Whatever the Olympics chooses to do, or chooses not to do, does not bear on Defendants' obligations under Title IX, what is permitted by CIAC policy or the relief that a federal court may properly award in this case.

[27] As noted on page 10 of Plaintiffs' En Banc brief, the CIAC 2022-2023 handbook is available at:
https://www.casciac.org/pdfs/ciachandbook_2223.pdf

Plaintiff occurred in the past. That section simply has no application to the current situation, and it provides no support for the type of retrospective relief sought by Plaintiffs in this case.

Plaintiffs lastly cite to Article VIII of the handbook, which addresses student eligibility, and alleges that this Article shows the CIAC has the ability to change individual records retrospectively and then award Plaintiffs the placements they allegedly are due. (*See* CIAC Handbook pg. 52-53). Plaintiffs are incorrect, and again have misquoted the handbook in an attempt to justify their request for relief. Article VIII addresses situations where the CIAC determined that a student is ineligible for a sport, but the student still participates in events pursuant to "a court restraining order or injunction against his/her school and/or the CIAC." This section clearly does not apply to the current situation because neither Yearwood nor Miller were deemed ineligible by the CIAC, much less participated in races pursuant to a restraining order or injunction. To the contrary, it is undisputed that Yearwood and Miller were both eligible for girls' track under the CIAC's rules. As the Panel correctly noted, "Plaintiffs have not shown that there is a proper legal framework for invalidating or altering records

52

achieved by student-athletes who competed in conformity with the applicable rules." *Soule*, 57 F.4th at 51.

Further, even if this section were applicable, there is no provision in Article VIII that would allow for Mitchell, for example, to then be awarded first place if Miller or Yearwood's results were stricken. Instead, if injunctive relief is later found not to be justified, the handbook provides that the following actions should be taken:

1. Require that individual or team records and performances achieved during participation by such ineligible student shall be vacated or stricken.

2. Require that team victories shall be forfeited to opponent.

3. Require that team and individual awards earned by such ineligible student be returned to the Association.

*See* CIAC Handbook pg. 53. Nothing in this policy provides that individual awards are then reallocated to other event participants.

In sum, when viewed in their proper context, the three handbook sections relied upon by the Plaintiffs fail to provide any procedural mechanism for the requested relief.

Nor do the cases on which Plaintiffs rely in their En Banc brief support such novel relief. For example, Plaintiffs state "the Sixth, Seventh, Eighth, and Tenth Circuits have all recognized that students

have an ongoing interest in their athletic placements, records, and awards." (Pls.' En Banc Br. 47). Those cases from Part III.F of Plaintiffs' brief, however, involved the exact situation addressed by Article VIII of the CIAC's handbook—when a student is allowed to participate in sporting events pursuant to a court order over the objection of the applicable governing organizations. (Pls.' En Banc Br. 38-41). In those cases, the courts found that, although the student had graduated or completed the season, the case was not moot or the plaintiff had standing because the governing body was still seeking to vacate or expunge the results obtained by the student who participated pursuant to a court order. *See e.g.*, *Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d at 476 (case not moot by graduation because NCAA and Big Eight sought to vacate and strike results of ineligible student who had participated in track events pursuant to an injunction). However, those cases have no application to the situation in this case because the CIAC is not looking to revoke or otherwise alter any results from 2018-2019 or earlier.

Plaintiffs next cite to Part III.G of their brief for the proposition that "the Fourth, Fifth, and Ninth Circuit have acknowledged that

anything in students' educational records that reduces their level of achievement is likely to impact their career success." (Pls.' En Banc Br. 47). These cases—which did not involve Title IX claims—do not go nearly so far as to indicate that "anything in a student's educational records" creates ongoing consequences sufficient for Article III standing, as Plaintiffs claim. *Id.* Instead, those cases are limited to academic or disciplinary records, having a much more obvious and direct ongoing consequence to the former students than that of the athletic records here.

A prime example is *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 478 (4th Cir. 2005), on which Plaintiffs heavily rely. (Pls.' En Banc Br. 42). In *Constantine*, plaintiff was a law student who had migraine headaches, unsuccessfully requested an accommodation for a final exam in Constitutional law, then failed the exam and received a grade of F. *Id.* The law school let her re-take the exam, which she failed again. The plaintiff alleged that the failing grade delayed her graduation, compromised her federal clerkship, and "continue[d] to hamper her employment prospects." *Id.* at 479.

This case is inapposite for several reasons. First, the Court
simply noted, without analysis, that all of plaintiff's claims were moot
except for the request that the school expunge the failing grade from
her record. *Id.* at 496 n.15. In addition, the student alleged a direct
causal relationship between her failing grade and her clerkship and
other employment opportunities. By contrast, Plaintiffs here draw no
such vector between their race times and employment prospects. Nor
could they, as the results of any individual sporting event or race are
not included in a student's high school transcript. Perhaps most
pertinent for this purpose, the student in *Constantine* sought only for
the law school to "expunge the failing grade from her record," *id.*, not for
the court to travel back in time and award her an A.[28]

---

[28] Unjustified disciplinary infractions on a student's record also would
plainly affect applications for post-graduation employment, continuing
education, or professional licensure. Employers and regulators often
require applicants to disclose and explain any past disciplinary
infractions, including those committed while in school, and background
checks routinely verify this information. *See, e.g.,* National Conference
of Bar Examiners, Character and Fitness, Sample Application, Question
18 ("Have you ever been dropped, suspended, warned, placed on
scholastic or disciplinary probation, expelled, requested to resign,
allowed to resign in lieu of discipline, otherwise subjected to discipline,
or requested to discontinue your studies by any college or university?"
(emphasis added)), https://www.ncbex.org/dmsdocument/134 In
general, the ongoing consequences to a student of past discipline are

In sum, Plaintiffs have failed to identify a single case that supports their request to alter the results of an athletic event or race in the circumstances present here—i.e., where the CIAC is not pursuing any relief. Whatever athletic opportunities Title IX may afford to student athletes, Plaintiffs have not demonstrated that a federal order rewriting race records would remedy any Article III harm under these circumstances. All it would do is vindicate Plaintiffs' alleged "interest in having their achievements recognized," or getting "credit where credit's due." (En Banc Brief pg. 29). But "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107.

## III. *PENNHURST*'S NOTICE REQUIREMENT BARS PLAINTIFFS' CLAIM FOR MONEY DAMAGES.

Finally, Plaintiffs seek compensatory or nominal damages for the supposed past harms that the CIAC policy has caused. Although these backward-looking claims for monetary relief may be justiciable, *see Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021), they fail on the merits,

---

thus far more concrete and imminent than those purportedly emanating from finishing in a particular place in a given athletic event.

even assuming that Plaintiffs are correct (and they are not) that application of the CIAC policy to them violated Title IX.

Because Congress enacted Title IX under the Spending Clause, money damages are available for alleged violations only if the funding recipients had "adequate notice that they could be liable for the conduct at issue." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999); *see Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17 (1981). This well-established hurdle bars recovery of money damages on account of the CIAC policy, which reflects a good faith and legally supported effort at federal *compliance*— not any clear federal *violation*.

### A. <u>The CIAC policy has ample textual, regulatory, and judicial support, precluding an award of money damages for any alleged Title IX violation.</u>

Spending Clause legislation is "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst,* 451 U.S. at 17; *accord Cummings*, 142 S. Ct. at ___. And "there can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected." *Pennhurst,* 451 U.S. at 17. This principle equally governs

the remedies available in a private Title IX suit and "defin[es] the scope of conduct for which funding recipients may be held liable for money damages." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002); *accord Cummings*, 142 S. Ct. at 1570. In either situation, the statute must offer "unambiguous notice regarding liability," rooted in obligations that "a state official would clearly understand." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). In other words, the law requires that there be a clear understanding from Congress as to what is expected of Defendants in order for them to be on adequate notice that certain conduct or enactment of a policy would be in violation of Title IX. That is not the case here, as neither Congress, Department of Education regulations nor Court opinions, have ever spoken in a clear voice that allowing girls who are transgender to participate on female athletic teams is a violation of Title IX.

Analyzing whether a Spending Clause statute "provides clear notice" must "begin with the text." *Murphy*, 548 U.S. at 296. Indeed, prior decisions defining the scope of monetary claims have "relied on the text of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Title IX simply says that "[n]o person in the United States

59

shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education

program or activity receiving federal financial assistance." 20 U.S.C.

§ 1681. It does not use the word "biological" as a determination of how

"sex" should be interpreted. *Whitaker ex rel. Whitaker v. Kenosha*

*Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir.

2017), *cert. dismissed*, --- U.S. ---, 138 S. Ct. 1260 (2018), *abrogated on*

*other grounds by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th

Cir. 2020).

    "Looking at both the specific and broader context of the use of the

term 'sex,' neither Title IX nor the implementing regulations define the

term 'sex' or mandate how to determine who is male and who is female

…." *Bd. of Ed. of the Highland Local Sch. Dist. v. United States Dept. of*

*Education*, 208 F.Supp.3d 850, 867 (S.D. Ohio 2016). Further, as the

Panel here observed, "Title IX includes language identical to that in

Title VII," and when interpreting Title VII the Supreme Court held, as

a textual matter, discrimination based on "transgender status

necessarily entails discrimination based on sex; the first cannot happen

without the second." *Bostock v. Clayton Cty.*, --- U.S. ---, 140 S. Ct. 1731,

1747 (2020); *see id.* at 1741 ("[I]t is impossible to discriminate against a person for being…transgender without discriminating against that individual based on sex.").

Agency regulations and guidance reinforce the CIAC Policy's adherence to Title IX. *See Davis*, 526 U.S. at 647 (holding that Department of Education's Title IX guidance may "contribute to [an entity's] notice of proscribed misconduct"). As relevant here, Congress has delegated authority to the Department of Education to "promulgate specific rules" regarding Title IX's interpretation. (JA280). *See also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96 (2d Cir. 2012) ("Congress explicitly delegated to the administering agency the task of prescribing standards for athletic programs under Title IX." (quotation marks omitted)). Thus, guidance from the Department of Education would be what puts Defendants on notice as to what violates Title IX. *See Davis*, 526 U.S. at 647 (guidance issued by the Department of Education providing that certain discrimination violates Title IX would have "contribute[d] to [the School] Board's notice of proscribed misconduct" had it been issued earlier).

61

The Department of Education has not issued any regulations or guidance stating that allowing girls who are transgender to participate in girls' high school athletics violates Title IX. Quite the contrary. In 2014, the Department of Education's Office of Civil Rights ("OCR") announced that "[a]ll students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX." (Appellants' App.281).

OCR's position has remained largely consistent over time. For example, an OCR letter from 2015 stated that "[w]hen a school elects to separate or treat students differently on the basis of sex," the "school must generally treat transgender students consistent with their gender identity." (Appellants' App.281). The next year, OCR reiterated that "transgender students must be allowed to participate in such activities…consistent with their gender identity." (Appellants' App.281) Although OCR technically rescinded this letter in 2017, the agency did not then explicitly advance a contrary view of Title IX, but merely retracted the prior statement pending a legal investigation. As the district court noted, especially given this history, the 2017 "letter did not provide clear notice that allowing transgender students to compete

62

in girls' track would violate Title IX." (Appellants' App.282). No further relevant agency guidance preceded this lawsuit. Accordingly, the Department of Education has never stated unambiguously (or at all) that a policy allowing transgender girls to participate in female athletics would violate Title IX. In other words, the "regulations implementing Title IX" do not "clearly prohibit" this practice. *Jackson*, 544 U.S. at 183.

Every federal Court of Appeals to consider the issue before this lawsuit was filed held that Title IX requires schools to treat transgender students consistent with their gender identity. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, --- U.S. ---, 139 S. Ct. 2636 (2019); *Whitaker*, 858 F.3d 1034; *Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *vacated*, 137 S. Ct. 1239 (2017). This wealth of judicial authority further underscores the lack of clear notice that the CIAC policy's application to Plaintiffs violated Title IX.[29] *See Jackson*, 544 U.S. at

---

[29] Although Plaintiffs refer in briefing (at 27-28) to an Eleventh Circuit holding that Title IX permitted a state to separate school bathrooms by sex designated at birth, *see Adams ex rel. Kasper v. Sch. Bd. of St.*

183 (holding appellate decisions construing Title IX by "the time of the conduct at issue" relevant to notice).

## B. There is no categorical exception to *Pennhurst*'s notice standard for intentional violations, nor would Plaintiffs' claims satisfy any such exception.

Plaintiffs argue that *Pennhurst*'s requirement of clear notice does not apply to intentionally-adopted official policies, like the CIAC policy. As support for this novel idea, Plaintiffs rely on the Supreme Court's statement "that *Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642. Plaintiffs maintain that because enforcing the CIAC Policy was an "intentional decision," prior notice of its alleged noncompliance with Title IX "is not required" for money damages.  (Pls.' En Banc Brief p. 56).  The Panel correctly rejected this premise, which distorts *Pennhurst*'s rationale and the language of controlling decisions since.

Plaintiffs' claims would not satisfy any proffered *Pennhurst* exception for intentional misconduct. Title IX bars "intentional

_____

*Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022), that decision postdates the events underlying this lawsuit and does not bear on prior notice.

*discrimination* on the part of a [funding] recipient." *Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (emphasis added). But the CIAC Policy is facially sex-neutral, making no distinction between the treatment of males and females. Nor do Plaintiffs claim that any Defendant actually intended for girls who are transgender to prevail against cisgender females in races or other athletic events. Instead, Plaintiffs assert that Defendants voluntarily adopted and applied the CIAC policy despite its alleged negative consequences on cisgender female participants such as Plaintiffs. In their words, "the CIAC [P]olicy allowing biological males to compete against them in girls' track has a discriminatory effect" (Pls.' En Banc Brief p. 26), and thus the "brunt of the CIAC's policy falls on" Plaintiffs (*id.* p. 14).

As articulated, this claim bears the hallmarks of disparate impact, i.e., *un*intentional discrimination. Even if a showing of disparate impact could demonstrate unequal athletic opportunity under 34 C.F.R. § 106.41(c), *cf. Biediger*, 691 F.3d at 98 (discussing distinction between disparate treatment and disparate impact theories in context of Title IX accommodation claim), there is substantial doubt about whether a disparate-impact theory could sustain a private claim for money

damages under Title IX, *see, e.g.*, *Horner v. Kentucky High Sch. Athletic Ass'n*, 206 F.3d 685, 692 (6th Cir.) (predicting that Supreme Court "would likely hold that proof of intentional discrimination is a prerequisite for money damages under Title IX when a facially neutral policy is challenged under a disparate impact theory"), *cert. denied*, 531 U.S. 824 (2000).. Plaintiffs do not assert the kind of intent-based Title IX violation that, in their view, would escape the clear-notice requirement.

As the Panel observed, the "'intentional conduct' exception to *Pennhurst*'s notice requirement has been applied only in cases where the funding recipient is deliberately indifferent to known acts of retaliation or sexual harassment in violation of Title IX." In these types of cases, imposing a standard akin to deliberate indifference ensures that any Title IX violation is "attributable to the funding recipient," rather than its agents. *Jackson*, 544 U.S. at 183. This standard honors Congressional intent because "an award of damages in a particular case might well exceed a recipient's level of federal funding," making it unfair and anomalous to hold the entity liable based "on principles of

constructive notice." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287-90 (1998).

Yet, as the Sixth Circuit noted, *Gebser*, *Davis*, *Franklin,* and other such cases alleging "deliberate indifference to sexual harassment…are not readily analogous to" claims for denial of equal athletic opportunity. *Horner*, 206 F.3d at 693. Nothing in the former line of decisions states that basing a Title IX claim on an official policy obviates the need to demonstrate prior notice of liability to obtain money damages. Rather, either invoking an official policy or showing decision-makers' deliberate indifference is necessary for Title IX damages liability, but neither alone is sufficient.

Something else must be established: that "the funding recipient engage[d] in intentional conduct that *violates the clear terms of the statute*." *Davis*, 526 U.S. at 642 (emphasis added). The plaintiff must plead and prove "conduct that violates the clear terms of the relevant statute" *in addition to* linking the alleged violations to "an official with power to correct them," *Barnes*, 536 U.S. at 186-87 – whether through deliberate indifference or institutional policy. Given the potential unfairness of surprising a federal-funding recipient with a post hoc

67

money judgment, damages are available only if there is "no question as to what the recipient's obligation under the program was." *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 597 (1983) (opinion of White, J.) (cited in *Davis*, 526 U.S. at 641); *accord Murphy*, 548 U.S. at 296 (state official must "clearly understand" pertinent statutory obligations).

Title IX's plain terms "unquestionably place on" a funding recipient the duty not to tolerate sexual harassment in school. *Davis*, 526 U.S. at 643 (cleaned up). So too for a school's obligation not to retaliate against a sex-discrimination complainant. *See Jackson*, 544 U.S. at 183. But the same is untrue of the alleged duty not to enforce policies, like the CIAC Policy, that permit transgender students to participate in school sports according to their gender identities.[30] Plaintiffs sought via their now-moot claims for prospective injunctive relief to enshrine this uncertain duty in law. But that theory is not

---

[30] Title IX does not mandate sex-separated teams. *See Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981). The CIAC policy applies equally to all sexes. Additionally, Plaintiffs does not allege that the policy was adopted to target applies to only a particular sex.

monetarily compensable—particularly given *Bostock* and the decisions from other Courts of Appeals.

The out-of-circuit decisions on which Plaintiffs rely do not warrant a different result. (*See* En Banc Brief pg. 58-60). For example, the nonprecedential *Poloceno v. Dallas Independent School District* undermines Plaintiffs' theory of recovery in holding that "[a] plaintiff's Title IX claim must be based on intentional discrimination, not disparate impact." *Poloceno v. Dallas Ind. Sch. Dist.,* 826 Fed. Appx. 359, 363 (5th Cir. 2020). The decision affirmed dismissal of a claim that a gym teacher discriminated against female students by punishing them with exercise, for the lack of proof that any decisionmaker sufficiently knew about the misconduct. *Id.* at 364-65. This ordinary application of *Gebser* and *Davis* does not bear on whether Defendants had clear notice that the CIAC policy violated Title IX. And *Pryor v. NCAA* offers even less support, holding that a Title VI race-discrimination claim demands proof of purposeful discrimination, not just deliberate indifference. *See Pryor v. NCAA,* 288 F.3d 548, 567-68 (3d Cir. 2002).

In *Parker v. Franklin County Community School Corp.*, the appellate court asked the parties for supplemental briefing on whether public schools there had notice "that they were intentionally violating the clear terms of Title IX" by scheduling more boys' basketball games than girls' basketball games on primetime nights. *Parker v. Franklin Cty Comm. Sch. Corp.*, 667 F.3d 910, 921 (7th Cir. 2012). This request suggested that *Pennhurst*'s clear-notice standard could potentially bar monetary damages based on the intentional and official policy of scheduling basketball games. The court declined to answer its own question after the defendants "waived this argument." *Id.* In the present matter, the question is whether Defendants had adequate notice that the facially neutral CIAC Policy violated Title IX. *Parker* does not support Plaintiffs' argument that the *Pennhurst* notice requirement does not bar their claim for monetary damages.

Likewise, *Mansourian v. Regents of University of California* rejected the idea that a plaintiff had to supply a university that eliminated a women's wrestling team with presuit notice and an opportunity to cure before suing under Title IX for denial of athletic opportunities. *Mansourian v. Regents of Univ. of Cal.,* 602 F.3d 957, 962

70

(9th Cir. 2020). The court reasoned that "[d]ecisions to create or eliminate teams or to add or decrease roster slots for male or female athletes are official decisions" about which an institution already knows. *Id.* at 968. It did not consider whether *Pennhurst* otherwise barred recovery of damages for the substantive violation of eliminating the team. Furthermore, the facially discriminatory policy at issue in *Mansourian* is not comparable to the facially neutral CIAC policy.

The remaining decisions that Plaintiffs cite all concern allegations of intentional sexual assault falling squarely within Title IX's ambit. *See Hall v. Millersville Univ.*, 22 F.4th 397 (3d Cir. 2022); *Karasek v. Regents of University of Cal.*, 956 F.3d 1093 (9th Cir. 2020); *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007). Those cases are not applicable to the analysis applied to a facially neutral policy.

Despite Plaintiffs' assertions, a holding here that the *Pennhurst* doctrine bars their monetary claims would not create a split of authority among the circuits. The facially neutral CIAC Policy is not analogous to any decision of the other circuits, and the other circuits have not held that facially neutral official policies are not subject to the *Pennhurst* notice requirements for monetary damages. A holding here that the

71

*Pennhurst* doctrine bars their monetary claims would, however, honor

*Pennhurst*'s motivating principles and the language of decisions since.

## CONCLUSION

Wherefore, for all those reasons set forth here, the District Court did not err in dismissing the Amended Complaint, nor did the Panel err in affirming that dismissal. Therefore, the Panel's affirmance of the District Courts' ruling should be re-affirmed.

<div style="display: flex;">

THE CONNECTICUT
INTERSCHOLASTIC ATHLETIC
CONFERENCE AND DANBURY
BOARD OF EDUCATION

BY: /S/ PETER J. MURPHY
PETER J. MURPHY
LINDA L. YODER
SHIPMAN & GOODWIN LLP
ONE CONSTITUTION PLAZA
HARTFORD, CT 06103
TELEPHONE: 860-251-5000
FACSIMILE: 860-251-5316
PJMUPRHY@GOODWIN.COM

CANTON BOARD OF EDUCATION
AND GLASTONBURY BOARD OF
EDUCATION

BY: /S/ DAVID S. MONASTERSKY
DAVID S. MONASTERSKY
HOWD & LUDORF, LLC
65 WETHERSFIELD AVENUE
HARTFORD, CT 061114

CROMWELL BOARD OF
EDUCATION AND
THE BLOOMFIELD BOARD OF
EDUCATION

BY: /S/ JOHANNA G. ZELMAN
JOHANNA G. ZELMAN
FORDHARRISON, LLP
CITYPLACE II
185 ASYLUM STREET
HARTFORD, CT 06103
TELEPHONE: 860-740-1355
FACSIMILE: 860-578-2075
JZELMAN@FORDHARRISON.COM

</div>

TELEPHONE: 860-249-1361
FACSIMILE: 860-249-7665
DMONASTERSKY@HL-LAW.COM

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c), undersigned counsel certified that: This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Local R. App. P. 32-1(a)(4) because it contains 13,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Century Schoolbook 14 point font.

By    /s/ Peter J. Murphy    
        Peter J. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2023, a true and accurate copy of the foregoing was filed electronically with the Court of Appeals for the Second Circuit via the Court's CM/ECF system. Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By    /s/ Peter J. Murphy    
        Peter J. Murphy