# 21-1365

## United States Court of Appeals for the Second Circuit

SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother,

*Plaintiffs–Appellants,*

*against*

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE;

*(caption continued on next page)*

On Appeal from the United States District Court for the District of Connecticut, No. 3:20-cv-00201 (RNC)

## EN BANC BRIEF OF *AMICUS CURIAE* CITY OF NEW YORK IN SUPPORT OF DEFENDANTS-APPELLEES

RICHARD DEARING
JAMISON DAVIES
CHASE HENRY MECHANICK
  *of Counsel*

May 1, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel
of the City of New York*
Attorney for City of New York
100 Church Street
New York, New York 10007
212-356-0841
cmechani@law.nyc.gov

Reproduced on Recycled Paper

BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION;
CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION;
GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION;
CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY
PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants–Appellees,*

*and*

ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her
daughter, T.M.; COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES,

*Intervenor-Defendants–Appellees.*

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF *AMICUS CURIAE* ......................................................... 1

INTRODUCTION ................................................................................. 4

ARGUMENT ......................................................................................... 7

POINT I................................................................................................. 7

    PLAINTIFFS LACK STANDING TO FORCE SCHOOLS TO
    ERASE THE ACHIEVEMENTS OF TRANSGENDER
    ATHLETES......................................................................................... 7

    A.  The denial of "recognition" and "credit" does not bear a
        close relationship to a type of injury traditionally
        recognized as a basis for a lawsuit in American courts. ........... 7

    B.  Plaintiffs remain free to communicate their athletic
        achievements to their prospective employers........................... 14

POINT II .............................................................................................. 18

    THE *PENNHURST* DOCTRINE PRECLUDES
    PLAINTIFFS' CLAIM FOR DAMAGES. ...................................... 18

    A.  Title IX recipients are not on notice that policies like
        defendants' are unlawful. .......................................................... 19

    B.  Under *Pennhurst*, monetary liability for "intentional"
        conduct still requires clear notice of recipients' statutory
        obligations. .................................................................................. 22

POINT III.............................................................................................27

PLAINTIFFS IGNORE THE BROAD PUBLIC
CONSEQUENCES OF FORCING  SCHOOLS TO
DISCRIMINATE AGAINST TRANSGENDER STUDENTS........ 27

CONCLUSION ......................................................... 32

CERTIFICATE OF COMPLIANCE ....................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Gorman,*
  536 U.S. 181 (2002) ............................................................. 18, 23, 25

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ................................. 21

*Birchfield v. North Dakota,*
  579 U.S. 438 (2016) ......................................................................... 29

*Bird v. Lewis & Clark Coll.,*
  303 F.3d 1015 (9th Cir. 2002) ........................................................ 12

*Celle v. Filipino Reporter Enters.,*
  209 F.3d 163 (2d Cir. 2000) ............................................................. 8

*Conf. of Presidents of Maj. Italian Am. Orgs., Inc. v. City of
  Philadelphia,*
  2022 U.S. Dist. LEXIS 5819 (E.D. Pa. Jan. 12, 2022) ....................... 16

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) .......................................................... 12

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
  142 S. Ct. 1562 (2022) ............................................................... 18, 19

*Davis v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629 (1999) ....................................................... 16, 17, 24, 25

*Davis v. New York State Board of Elections*, 689 F. App'x 665
  (2d Cir. May 3, 2017) ................................................................ 15, 16

*Franklin v. Gwinnett Cty. Pub. Sch.,*
  503 U.S. 60 (1992) ..................................................................... 22, 23

*Gebser v. Lago Vista Indep. Sch. Dist.,*
  524 U.S. 274 (1998) ............................................................. 23, 25, 26

*Guardians Association v. Civil Service Commission*,
463 U.S. 582 (1983) .......................................................... 19, 23, 25, 26

*Gully v. NCUA Bd.*,
341 F.3d 155 (2d Cir. 2003) ................................................................ 9

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020) ............................................ 27, 28

*In re Horizon Healthcare Servs. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017) ................................................................ 9

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .......................................................... 19, 23, 24, 26

*Jones v. Wichita State Univ.*,
698 F.2d 1082 (10th Cir. 1983) ......................................................... 13

*Jordan By & Through Jones v. Indiana High Sch. Ath. Ass'n*,
16 F.3d 785 (7th Cir. 1994) ............................................................... 13

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*,
944 F.3d 613 (6th Cir. 2019) (Thapar, J., concurring), *cert.
denied* (Oct. 13, 2020) .................................................................... 23

*Kucharczyk v. Regents of University of California*, 48 F.
Supp. 2d 964 (N.D. Cal. 1999) ........................................................ 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 14

*McPherson v. Mich. High Sch. Ath. Assn.*,
119 F.3d 453 (6th Cir. 1997) ............................................................. 13

*Meese v. Keene*,
481 U.S. 465 (1987) ............................................................................ 9

*Missouri v. McNeely*,
569 U.S. 141 (2013) .......................................................................... 29

*Oneida Indian Nation v. United States DOI*, 789 F. App'x
271 (2d Cir. Oct. 21, 2019) .......................................................... 10, 11

iv

*Overdam v. Texas A&M Univ.*,
   43 F.4th 522 (5th Cir. 2022) ............................................................ 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ........................................................................ *passim*

*Pulphus v. Ayers*,
   909 F.3d 1148 (D.C. Cir. 2018) ...................................................... 9, 13

*Richards v. U.S. Tennis Ass'n*,
   93 Misc. 2d 713 (N.Y. Sup., N.Y. Cty. 1977) ...................................... 2

*Sandison v. Mich. High Sch. Ath. Assn.*,
   64 F.3d 1026 (6th Cir. 1995) .............................................................. 13

*Sec'y of Labor, Mine Safety & Health Admin. v. M-Class Mining, LLC*,
   1 F.4th 16 (D.C. Cir. 2021) ................................................................ 9

*Sheely v. MRI Radiology Network, P.A.*,
   505 F.3d 1173 (11th Cir. 2007) .......................................................... 25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................... 8, 9, 12

*St. Martin's Press, Inc. v. Carey*,
   605 F.2d 41 (2d Cir. 1979) ................................................................ 17

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................ 13

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ......................................................... 8, 9, 10, 12

*Whitney v. Cal.*,
   274 U.S. 357 (1927) .......................................................................... 17

*Wiley v. Nat'l Collegiate Ath. Assn.*,
   612 F.2d 473 (10th Cir. 1979) ........................................................... 13

**Statutes and Regulations**

20 U.S.C. § 1681(a) ................................................................. 20

35 U.S.C. § 256 ....................................................................... 11

Dignity for All Students Act, N.Y. Educ. L. §§ 10-18 .............................. 2

N.Y. Educ. L. § 3201-a .............................................................. 2

N.Y. Exec. L. § 292 .................................................................. 2

N.Y. Exec. L. § 296 .................................................................. 2

34 C.F.R. § 106.41 ............................................................... 20, 21

8 N.Y.C.R.R. § 100.2 ................................................................. 2

9 N.Y.C.R.R. 466.13 .................................................................. 2

NYCDOE Chancellor's Regulation A-830 ................................................ 1

**Other Authorities**

D. Purves, *What Is Sex?*, NEUROSCIENCE (2d ed. 2001) .......................... 30

Erin Buzuvis, *Caster Semenya and the Myth of a Level
    Playing Field*, 6 AM. U. MODERN AM. 36 (2010) ............................... 30

Jane Macartney & Hattie Garlick, *Girls Will Be Girls at the
    Beijing Olympics-Sex Tests Will Prove It*, THE TIMES
    (U.K.) (Jul. 29, 2008) ...................................................... 29

*Nondiscrimination on the Basis of Sex in Education
    Programs or Activities Receiving Federal Financial
    Assistance*, 87 Fed. Reg. 41,390 (Jul. 12, 2022) ........................... 20

*Nondiscrimination on the Basis of Sex in Educational
    Programs or Activities Receiving Federal Financial
    Assistance: Sex Related Eligibility Criteria for Male and
    Female Athletic Teams*, 88 Fed. Reg. 22,860 (Apr. 13,
    2023) .................................................................... 20, 21

vi

*Restatement (Second) of Torts* § 558 ........................................................ 8

*Restatement (Second) of Torts* § 559 cmt b ............................................... 8

Women's Sports Foundation, *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* (2020) ...................................................................... 31

## INTEREST OF *AMICUS CURIAE*[1]

New York City oversees the nation's largest public school system, responsible for the education and care of nearly one million students. Under New York City Department of Education policy, "[t]ransgender and gender expansive students must be given the same opportunities to participate in physical education as all other students." *See* NYCDOE, *Guidelines to Support Transgender and Gender Expansive Students* ("NYCDOE Guidelines").[2] To that end, NYCDOE—like the defendant schools and CIAC here—generally allows transgender students "to participate in physical education, intramural sports, and competitive athletic activities and contact sports in accordance with the student's gender identity asserted at school." *Id.* This policy implements regulations requiring that students be afforded "equal educational opportunities" regardless of their gender identity. *See* Chancellor's Regulation A-830 §§ I.B.1, IX (Feb. 17, 2022).[3]

---

[1] On February 21, 2023, this Court invited *amicus curiae* briefs from interested parties (*see* Doc. No. 261). No party's counsel authored this brief in whole or in part, and no party's counsel or other person (other than the City and its counsel) contributed money that was intended to fund the preparation or submission of this brief.

[2] https://perma.cc/8ST4-8CGQ.

[3] https://perma.cc/29NK-T3ER.

Multiple New York State laws, too, prohibit discrimination against students based on sex and gender identity—including in athletics. *See* Dignity for All Students Act, N.Y. Educ. L. §§ 10-18; N.Y. Educ. L. § 3201-a; N.Y. Exec. L. §§ 292(35), 296(4); 8 N.Y.C.R.R. §§ 100.2(c), (l), (jj), (kk); 9 N.Y.C.R.R. 466.13. Indeed, since the 1970s, New York's prohibition on sex-based discrimination had been construed to protect the right of transgender women to participate in female-division sports. *See Richards v. U.S. Tennis Ass'n*, 93 Misc. 2d 713 (N.Y. Sup., N.Y. Cty. 1977).

More broadly, the City is profoundly interested in the threshold questions under Article III and *Pennhurst* that are presented in this *en banc* proceeding. As a state actor whose constituents embrace a wide variety of viewpoints, we appreciate that the democratic process is the primary channel through which those competing viewpoints should be mediated. Particularly in matters involving political controversy, courts should enforce Article III's standing requirements scrupulously. As the panel correctly recognized, that requires dismissal of plaintiffs' claims for injunctive relief.

Moreover, as a recipient of federal funds under Title IX and other statutes derived from the Spending Clause, the City opposes plaintiffs'

efforts to chip away at the *Pennhurst* doctrine through their claims for damages. This doctrine benefits school districts—and, by extension, their students—by ensuring that schools are not ambushed with monetary liabilities they had no notice of, as would undoubtedly be the case here if plaintiffs won this lawsuit.

Finally, we offer comment on the practical consequences of plaintiffs' reading of Title IX. Mandating that schools exclude transgender students from the teams that match their gender identity would upend the City's policies. It would likely require the City to build from scratch a new system for tracking and verifying students' "biological" sex at enrollment —something it does not currently do. It would undermine the City's recognition that "[p]articipation [in athletics] is integral to developing a student's fitness and health, self-esteem, and general well-being." NYCDOE Guidelines, *supra*. And it would frustrate the City's commitment to being "the most supportive city that we can be" for LGBTQ+ youth. *See* NYC Mayor's Office for Economic Opportunity, Generation NYC, NYC Unity Project.[4]

---

[4] https://perma.cc/V8KQ-BLYC.

3

**INTRODUCTION**

Plaintiffs are cisgender women who, as high school track athletes, competed in races against two of their transgender peers: Andraya Yearwood and Terry Miller. In some of those races, Yearwood or Miller finished ahead of plaintiffs. In other races, one or more cisgender students—sometimes one of the plaintiffs themselves—finished ahead of Yearwood or Miller. And, frequently, plaintiffs finished behind other cisgender girls (who are not parties in this lawsuit). Three of the four plaintiffs cannot identify any first-place title that they definitely would have won had Yearwood and Miller been excluded from competing as women. The fourth plaintiff beat Yearwood and Miller in some races— proving she was capable of overcoming any "advantage" they had—but, in other races, she was unable to replicate that superior performance. Suffice it to say, this record does not bear out the simple story plaintiffs wish to tell.

Nevertheless, plaintiffs brought this lawsuit contending that the races were rigged to their detriment by Yearwood's and Miller's very presence on the track. In addition to damages, plaintiffs sought an

unprecedented injunction forcing defendants to alter accurate competition records and fabricate new ones based on hypothetical races.

The district court dismissed plaintiffs' claims for an injunction to alter the race records on standing grounds, and dismissed their damages claim on *Pennhurst* grounds. A panel of this Court affirmed. Hoping for a different outcome on rehearing, plaintiffs place invigorated emphasis on several faulty arguments. This Court should reject them and stand behind the panel's well-reasoned conclusions.

To begin, plaintiffs still lack a cogent theory of standing, as defendants have persuasively shown. We seek here to amplify two standing points in particular. First, plaintiffs' belief that they have been denied "credit" and "recognition" fails because this is not a concrete harm; it does not bear "a close relationship" to the type of reputational injury traditionally recognized as cognizable in American courts. Second, plaintiffs lack standing as to their only potentially tangible alleged injury, diminished employment prospects, because nothing is stopping plaintiffs from truthfully communicating to employers how they performed against other cisgender athletes.

Defendants are also correct in arguing that plaintiffs' request for damages is barred by *Pennhurst*. Plaintiffs do not seriously dispute that defendants lacked notice that the challenged policy violated Title IX, but nevertheless contend that such notice is unnecessary when a challenged policy is "intentional" (En Banc Brief for Appellants ("App. Br.") 53-57). But they misread applicable Supreme Court precedent. Under the *Pennhurst* doctrine, Title IX recipients must have clear notice of their statutory obligations. They cannot be held liable, even for "intentional" actions and policies, absent such notice.

Finally, plaintiffs also overlook the broad real-world consequences of their policy preferences. An ultimate ruling for them on the merits would not only roll the clock back on equal opportunity for transgender students, as other *amici* have pointed out; it would also likely force the City and other school districts to gather intimate medical information about students in an effort to somehow verify their "biological" sex. As we explain below, such a mandate would harm students and raise daunting logistical challenges—not to mention privacy and civil liberties concerns. Fortunately, their claims all fail at the threshold.

The Court should affirm.

6

## ARGUMENT

## POINT I

## PLAINTIFFS LACK STANDING TO FORCE SCHOOLS TO ERASE THE ACHIEVEMENTS OF TRANSGENDER ATHLETES

While we endorse the full sweep of defendants' arguments challenging plaintiffs' standing, we write to highlight additional deficiencies in plaintiffs' claims of injury based on the alleged loss of athletic "recognition" and alleged loss of "employment prospects."

### A. The denial of "recognition" and "credit" does not bear a close relationship to a type of injury traditionally recognized as a basis for a lawsuit in American courts.

Plaintiffs claim the race records—if not modified under their requested injunction—will injure them by denying them the "recognition" and "credit" they are due (*see* App. Br. 28-29). But it is indisputable that the race records are neither false (insofar as they accurately reflect the outcomes of races that were held) nor inherently stigmatizing. And plaintiffs fail to identify a single case forcing an institution to retract truthful, non-stigmatizing records based on the purported denial of "recognition" or "credit."

7

The Supreme Court's decisions in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) and *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) provide the relevant analytic framework. As the Court explained, "intangible harms"[5] are sufficiently "concrete" to confer standing if they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204 (citing *Spokeo*, 578 U.S. at 340-41). Such harms include "the reputational harm associated with the tort of defamation." *Id.* at 2208. Defamation consists of a statement that is false and "tend[s] to expose another to hatred, ridicule or contempt." *Restatement (Second) of Torts* §§ 558, 559 cmt b; *see also Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000) (describing defamation as a false statement exposing "an individual to public hatred, shame, [or] obloquy" (cleaned up)).[6]

Thus, a plaintiff cannot claim reputational injury simply because they disagree with something the defendant said about them. While there need not be a perfect overlap with each of the traditional elements of

---

[5] Plaintiffs' argument that they are suffering a tangible harm is addressed in subpart I.B, below.

[6] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

defamation, there must nevertheless be a "close relationship" to this common law tort. *TransUnion*, 141 S. Ct. at 2209. The upshot, as a plethora of cases shows, is that the defendant's message must at minimum be factually false or "inherently stigmatizing." *Pulphus v. Ayers*, 909 F.3d 1148, 1153 (D.C. Cir. 2018) (collecting cases); *see In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 639 (3d Cir. 2017) ("No common law tort proscribes the release of truthful information that is not harmful to one's reputation or otherwise offensive.").[7]

Here, plaintiffs have not suffered a reputational injury closely related to defamation or any other cause of action traditionally recognized in American courts. The records are "entirely accurate," *Spokeo*, 578 U.S. at 342, as they merely state the participants'

---

[7] *See also, e.g., TransUnion*, 141 S. Ct. at 2209 (finding reputational standing based on designation of plaintiffs as "potential terrorist[s]"); *Spokeo*, 578 U.S. at 342 (suggesting there would be no reputational standing based on the dissemination of "entirely accurate" information); *Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (finding reputational standing based on designation of plaintiff's films as "political propaganda"); *Sec'y of Labor, Mine Safety & Health Admin. v. M-Class Mining, LLC*, 1 F.4th 16, 22 (D.C. Cir. 2021) (no reputational standing to challenge agency order indicating that "something" occurred at petitioner's mine, as the order was not "inherent[ly] stigmatiz[ing]"); *Pulphus*, 909 F.3d at 1154 (no reputational standing for winner of art competition to challenge the disqualification of his artwork and its removal from an exhibit displaying the winning paintings); *Gully v. NCUA Bd.*, 341 F.3d 155, 160, 162 (2d Cir. 2003) (finding reputational standing to challenge agency determination that plaintiff engaged in misconduct).

performances and the rankings, titles, and awards conferred. That plaintiffs believe different rules should have been implemented—resulting in Yearwood's and Miller's exclusion—does not negate the fact that records correctly reflect the actual results of the races under the rules in place when they were conducted. And there is nothing stigmatizing about declining to bestow upon plaintiffs better rankings and titles than the ones they received.

This conclusion makes sense. Plaintiffs obviously could not sue the local newspaper that described Miller's victory over them—even though plaintiffs claim that report "felt like a slap in the face" (JA075). Such reports aren't defamatory. More than that, they do not even bear a "close relationship" to defamation. *TransUnion*, 141 S. Ct. at 2209. That similar reports appear in defendants' athletic records rather than media outlets does not change this analysis.

This Court tackled a remarkably similar issue in *Oneida Indian Nation v. United States DOI*, holding that a plaintiff lacked standing to challenge records that supposedly failed to grant the plaintiff the "recognition" it thought it deserved. *See* 789 F. App'x 271, 277-78 (2d Cir. Oct. 21, 2019) (summary order). In that case, the Department of the

Interior allowed a federally recognized Indian tribe in Wisconsin to use the name "Oneida Nation" and published that name in its list of recognized tribes. *Id.* at 273-74. The Oneida Nation of New York then sued to, among other things, force the Department to set aside the new listing. *See id.* at 274. Claiming "injury to [its] reputation or dignity," the New York tribe alleged that it had standing because the listing "vindicated the Wisconsin tribe's erroneous claim to the Oneida Nation legacy," *id.* at 277 & n.4, much like plaintiffs' claim, here, that the race records vindicate Yearwood's and Miller's supposed usurpation of plaintiffs' achievements. Without addressing the merits of the New York tribe's substantive claims, this Court held that it lacked standing, as the listing did not convey "anything derogatory" about it. *Id.* at 277.

Similarly, in *Kucharczyk v. Regents of University of California*, the court dismissed (in relevant part) a lawsuit by two inventors to correct a patent which, they claimed, erroneously split inventorship between them and someone who was not a co-inventor. *See* 48 F. Supp. 2d 964, 973-75, 978 (N.D. Cal. 1999). The court held that the inventors lacked standing based on their supposed pride in their invention. *See id.* at 795 ("If plaintiffs were correct that [35 U.S.C. §] 256 grants them standing on the

11

grounds that they are proud of their invention, then the statute would be in grave danger of running afoul of Article III."). Plaintiffs' argument for reputational injury is even weaker here than in *Kucharczyk*, because here they cannot dispute that the race results are factually accurate.

The cases plaintiffs cite that involve college disciplinary and academic records (*see* App. Br. 41-43) are readily distinguished, as those records were derogatory on their face and clearly resulted in diminished employment opportunities. *See Overdam v. Texas A&M Univ.*, 43 F.4th 522, 529 (5th Cir. 2022) (suspension for alleged sexual misconduct); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 478-79 (4th Cir. 2005) (failing F grade); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1019-20 (9th Cir. 2002) (C- and D grades). Plaintiffs have not made a similar, nonconjectural showing of damaged employment prospects flowing from the race records here (*see* Panel Op. 19-20; subpart I.B, *infra*).

Plaintiffs also cite decisions from other circuits purportedly holding that students have an ongoing interest in their competition records (*see* App. Br. 28-29, 39-41). But all of them were decided without the benefit of the Supreme Court's guidance in *Spokeo* and *TransUnion*. Indeed, the

most relevant, post-*Spokeo*, circuit-level decision we have located held that the winner of a high school art competition did *not* have a concrete interest in avoiding post-competition disqualification. *See Pulphus*, 909 F.3d at 1154. Although the student there was not formally stripped of his "winner" status, he was denied the benefits of victory because the Architect of the Capitol disqualified his painting and removed it from the exhibit where all of the other winning artwork was displayed. *Id.* Even so, the court held, those actions were not "inherently stigmatizing" and thus did not inflict an Article III injury. *Id.*[8]

---

[8] Plaintiffs' reliance on decades-old, out-of-circuit authority also overlooks at least one such case holding that a student did not have a concrete interest in avoiding vacatur of an athletic victory. *See Jordan By & Through Jones v. Indiana High Sch. Ath. Ass'n*, 16 F.3d 785, 788 (7th Cir. 1994). Moreover, some of the cases plaintiffs cite have questionable precedential value for the point at issue because the parties did not dispute whether there was an ongoing, concrete injury. *See McPherson v. Mich. High Sch. Ath. Assn.*, 119 F.3d 453, 458 (6th Cir. 1997); *Jones v. Wichita State Univ.*, 698 F.2d 1082, 1087 n.7 (10th Cir. 1983); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings" lack "precedential effect.").

In other cases, students were allowed—under rules put in place by lower court injunctions—to compete and earn points and rankings, which the defendants threatened to wipe away after they graduated. *See, e.g., Sandison v. Mich. High Sch. Ath. Assn.*, 64 F.3d 1026, 1029-30 (6th Cir. 1995); *Wiley v. Nat'l Collegiate Ath. Assn.*, 612 F.2d 473, 474-75 (10th Cir. 1979). Because the defendants sought to eliminate a factually accurate record of the students' achievements under the conditions in place at the time of the relevant competitions, the students arguably would have had standing (even under a post-*Spokeo* framework) to preserve the records' accuracy. But in this case, what plaintiffs want is the opposite: to manufacture records that do *not* reflect the reality of the competition rules that were in place. There is no

*(cont'd on next page)*

13

**B. Plaintiffs remain free to communicate their athletic achievements to their prospective employers.**

Beyond the insufficient intangible reputational injury, plaintiffs also assert a tangible injury in the form of lost employment opportunities (*see* App. Br. 37-38). As the panel correctly recognized, this is a "conjectural" and "hypothetical" injury, which confers no standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); (*see* Panel Op. 19-20). But plaintiffs' argument is unavailing for a separate and independent reason: there is nothing stopping them from communicating their achievements to any future employers.

At bottom, what plaintiffs want to do is show potential employers how well they performed against other cisgender athletes, and to describe the awards and advancements they believe they would have achieved had transgender athletes been barred from competition. After all, that is what the requested injunction would do: order defendants to display the hypothetical rankings and titles of only plaintiffs and their cisgender competitors (JA176). Thus, for there to even be an injury redressable by

---

precedent supporting that kind of claim (*see* En Banc Br. for Intervenor-Defendants–Appellees 32-34).

14

the requested injunction, plaintiffs would have to show that they are currently unable to communicate this information to employers.

But they are not. If plaintiffs wish to convey truthful information about their high school race times to prospective employers (and compare them to their cisgender competitors), the records do not stop them from doing so. And, furthermore, plaintiffs are free to re-characterize, qualify, or spin their high school athletic records however they wish. For example, Ashley Nicoletti can claim—on her resumé or during job interviews—how she would have come in 7th place instead of 9th at the 2019 Class S State Championship Women's Outdoor 100-meter preliminary race if only she were not required to compete against transgender competitors (*see* Panel Op. 8). Selena Soule can tell employers she would have come in 6th place instead of 8th at the 2019 State Open Championship Women's Indoor 55-meter preliminary race (*id.*). Alanna Smith can tell employers she would have come in 2nd place instead of 3rd at the 2019 State Open Championship Women's Outdoor 200-meter final (*id.*). And Chelsea Mitchell can tell employers about the races she would have won had she not faced competition from Yearwood and Miller (*see* Panel Op. 7-8).

15

This Court's decision in *Davis v. New York State Board of Elections* is instructive. 689 F. App'x 665 (2d Cir. May 3, 2017) (summary order). There, an aspiring political candidate challenged state laws requiring him to affiliate himself with a nominating organization and emblem. *See id.* at 667. He asserted that this requirement violated the First Amendment by interfering with his candidacy's message that "voters should elect Delegates that are unaffiliated with any political party or group." *Id.* As a basis for standing, he claimed that the laws "risked damaging his reputation with voters if he told them (in his view 'lied' to them) that they could elect non-partisan Delegates." *Id.* at 669. But this Court held that he lacked standing because, "[i]f Davis cannot successfully explain to voters the differences between the required 'nominating body' and existing partisan political groups, the fault lies with Davis and not the Candidate Laws." *Id.* at 670. Nothing precluded him from truthfully telling voters that they could elect non-partisan candidates. *See id.* at 669-70.[9]

---

[9] *See also Conf. of Presidents of Maj. Italian Am. Orgs., Inc. v. City of Philadelphia*, 2022 U.S. Dist. LEXIS 5819, at \*18 (E.D. Pa. Jan. 12, 2022) (plaintiffs lacked standing to challenge the redesignation of Columbus Day as Indigenous Peoples' Day where "[n]othing in [the order] prevent[ed] Italian Americans from organizing a parade to honor Columbus").

16

So too here. Plaintiffs do not have standing to challenge a message sponsored by defendants simply because it places them in the position of having to "explain" their disagreement with it. *Davis*, 689 F. App'x at 670. Instead, plaintiffs can counteract that message with their own. The remedy to speech that plaintiffs dislike is "more speech," not the "enforced silence" of an injunction. *Cf. Whitney v. Cal.*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).[10]

---

[10] Plaintiffs may respond that it would be uncomfortable or embarrassing for them to have to acknowledge their losses to Yearwood and Miller while simultaneously portraying themselves as accomplished athletes. But mere "allegations of a subjective chill" do not confer standing. *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 44 (2d Cir. 1979) (cleaned up); *accord Davis*, 689 F. App'x at 669.

17

**POINT II**

**THE *PENNHURST* DOCTRINE PRECLUDES PLAINTIFFS' CLAIM FOR DAMAGES.**

Plaintiffs' argument that their damages claim survives under *Pennhurst* would erode the important protections of that doctrine. Although "Title IX contains no express remedies," the Supreme Court has recognized private rights of action for both damages and injunctive relief under the statute. *Barnes v. Gorman*, 536 U.S. 181, 187 (2002). At the same time, because Title IX was enacted pursuant to Congress's Spending Clause powers, the availability of compensatory relief is tempered by the *Pennhurst* doctrine.

This doctrine has been phrased differently by different courts. In a nutshell, it teaches that "Spending Clause legislation operates based on consent: 'in return for federal funds, the recipients agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (brackets omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16, 17 (1981)). Courts apply "this contract-law analogy" to "defin[e] the scope of conduct for which funding recipients may be held liable for money damages." *Id.* (quoting *Barnes*, 536 U.S. at 186).

18

Thus, "private damages action[s] under Title IX" (or other Spending Clause statutes) are only available "where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). The recipient must be "unambiguously" notified of any statutory conditions that "expose[] it[] to liability of that nature." *Cummings*, 142 S. Ct. at 1570 (cleaned up). Absent such notice, courts are limited to ordering prospective relief, subject of course to rules of article III standing. *See Pennhurst*, 451 U.S. at 29-30; *Guardians Association v. Civil Service Commission*, 463 U.S. 582, 596 (1983) (opinion of White, J.).[11]

## A. Title IX recipients are not on notice that policies like defendants' are unlawful.

The federal government has not notified Title IX recipients that allowing transgender girls to participate in female sports violates the statute. Plaintiffs do not seriously argue otherwise, having apparently abandoned any claim that such notice was conferred by the Department

---

[11] The reason for distinguishing between injunctive relief and damages is that a recipient can terminate the injunction by withdrawing from the funding scheme altogether. *See Guardians*, 463 U.S. at 596 (opinion of White, J.).

of Education's Office of Civil Rights (OCR) through its administrative actions. As the panel observed, federal guidance on this issue has oscillated between presidential administrations (Panel Op. 24 & n.5). Indeed, on April 13, 2023, OCR proposed rules that would in some cases prohibit schools from barring transgender students from the teams that match their gender identity. *See Nondiscrimination on the Basis of Sex in Educational Programs or Activities Receiving Federal Financial Assistance: Sex Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860, 22,872, 22,891 (Apr. 13, 2023); *see also Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390, 41,571 (Jul. 12, 2022) (proposing regulations under Title IX to clarify that "[d]iscrimination on the basis of sex includes discrimination on the basis of … gender identity.").

Plaintiffs suggest that Title IX's plain text is enough to vindicate their interpretation of the statute, but the statute and its implementing regulations are, at the very least, ambiguous. They prohibit discrimination on the basis of "sex," but do not define that word. 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41. And while the regulations permit recipients

20

to offer sex-separate teams in some cases, they also oblige recipients to provide "equal athletic opportunity" in their programs as a whole. 34 C.F.R. § 106.41(b), (c). Because "participation on a team that is inconsistent with a student's gender identity is not a viable option for many students," these statutory and regulatory mandates can reasonably be interpreted to require that transgender students be allowed to participate in athletics consistent with their gender identity. 88 Fed. Reg. at 22,870-71, 22,877.

Indeed, Justices Alito and Thomas have questioned—in reference to this very case—whether transgender students could be denied such opportunities in the wake of *Bostock v. Clayton County. See* 140 S. Ct. 1731, 1780 & n.49 (2020) (Alito, J., dissenting) (citing Complaint in *Soule v. Conn. Ass'n of Schools*, No. 3:20-cv-00201 (D. Conn., Apr. 17, 2020)). If Title IX's requirements are murky enough to confound two Supreme Court Justices as to whether the defendants *must* allow transgender students to compete in accordance with their gender identity, then surely defendants were not on clear notice that their policies were prohibited, as *Pennhurst* requires.

21

**B. Under *Pennhurst*, monetary liability for "intentional" conduct still requires clear notice of recipients' statutory obligations.**

As explained, the federal government never notified Title IX recipients that letting transgender girls play in female sports violates the statute. But plaintiffs invite this Court to fashion a rule in which such notice is unnecessary whenever the action complained of is an "official policy" or an "intentional decision" (*see* App. Br. 56). This argument rests on a serious distortion of the relevant case law, and the panel was right to reject it.

It is true that many of the cases distinguish between "intentional" and "unintentional" violations (*id.* at 54-55). But plaintiffs misunderstand what "intentional" means in this context; the recipient must make an intentional choice to disregard a statutory duty of which it had "unambiguous[]" notice. *Pennhurst*, 451 U.S. at 17; *see Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74 (1992) ("T]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.").

22

Where the substantive statutory prohibition is already clear—as in cases of sexual abuse—the question of intent largely turns on whether the recipient had factual knowledge of the wrongdoing. *Compare Franklin*, 503 U.S. at 63-64, 74-75 (holding damages were available where school was allegedly aware of sexual abuse and it was "[u]nquestionably" clear that sexual abuse ran afoul of Title IX), *with Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283, 285 (1998) (holding damages were unavailable where, in contrast to *Franklin*, school officials lacked "actual notice" of the sexual harassment). It is primarily on these types of cases that plaintiffs rely for their warped reading of the *Pennhurst* doctrine (App. Br. 54-56). But ample authority makes clear that notice of the recipient's legal obligations is equally essential. *See Jackson*, 544 U.S. at 183 ("*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the *clear terms of the statute*") (emphasis added) (quoting *Davis*, 526 U.S. at 642); *accord Barnes*, 536 U.S. at 187.[12]

---

[12] *See also Guardians*, 463 U.S. at 598 (opinion of White, J.); *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 629 (6th Cir. 2019) ("Congress has to identify any condition on its funding unambiguously. And if it didn't, then the states may not be held liable for a violation. So even if there were any ambiguity, that very ambiguity

*(cont'd on next page)*

23

For instance, in *Jackson*, the Court considered whether a plaintiff could bring a damages action under Title IX for retaliation. "[B]y definition," retaliation is "always" an "intentional" act, 544 U.S. at 183, so if plaintiffs' reading of the *Pennhurst* doctrine were correct, that should have been the end of the analysis. But it wasn't. The Court proceeded to consider whether "Title IX itself … supplied sufficient notice" that a recipient "could not retaliate" against one who complains of unlawful sex discrimination. *Id.* at 183. Because Title IX's text said nothing about retaliation, the Court had to turn other sources of authority, including "regulations implementing Title IX" that "clearly prohibit retaliation and ha[d] been on the books for nearly 30 years." *Id.* Only in this way did the Court determine that retaliation was "intentional conduct that violates the clear terms of the statute," rendering damages recoverable. *Id.* (quoting *Davis*, 526 U.S. at 642).

---

would require us to adopt the less expansive reading of Title IX.") (Thapar, J., concurring) (cleaned up), *cert. denied* (Oct. 13, 2020). Plaintiffs' insinuation that this rule derives from nothing more than a stray remark in *Davis* (App. Br. 56) is plainly incorrect.

24

Also illustrative is Justice White's opinion in *Guardians*, 463 U.S. 582, which plaintiffs ignore.[13] That case arose under Title VI of the Civil Rights Act of 1964, a Spending Clause provision from which Title IX is "derived." 463 U.S. at 594. In *Guardians*, the grantee-defendant administered written examinations that were used to make entry-level job appointments. *See id.* at 585. The examinations were found to have a racially discriminatory impact, *see id.*, which Justice White held could amount to a violation of Title VI, *see* 463 U.S. at 589-93. Thus, though there was no "intentional discrimination," *id.* at 593, the challenged *conduct*—administering the exams—was intentional, much like defendants' policy here. Nevertheless, Justice White (joined by Justice Rehnquist) held that there could be no action for damages since it was "not immediately obvious what the grantee's obligations under [Title VI] were and it is surely not obvious that the grantee was aware that it was administering the program in violation of the statute or regulations." *Id.*

---

[13] While Justice White's opinion was not for the full Court, it has been extensively relied on by later decision in the Supreme Court and elsewhere. *See Barnes*, 536 U.S. at 186; *Davis*, 526 U.S. at 641; *Gebser*, 524 U.S. at 287; *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1192-93 (11th Cir. 2007).

25

at 598; *see also Gebser*, 524 U.S. at 287 (summarizing Justice White's reasoning in *Guardians*).

This case is more like *Guardians* than *Jackson*. Title IX and its implementing regulations do not unambiguously support (and if anything refute) plaintiffs' view that defendants' policies violate the statute. *Compare* subpart II.A, *supra*, *with Jackson*, 544 U.S. at 183. Because "it is surely not obvious" that defendants were "aware" they were "administering the program in violation of the statute or regulations," *Guardians*, 463 U.S. at 598 (opinion of White, J.), the panel correctly affirmed the dismissal of plaintiffs' damages claim.

## POINT III

## PLAINTIFFS IGNORE THE BROAD PUBLIC CONSEQUENCES OF FORCING SCHOOLS TO DISCRIMINATE AGAINST TRANSGENDER STUDENTS

The foregoing sections explain why plaintiffs' arguments on the threshold issues presented in this *en banc* proceeding are legally flawed. But plaintiffs also fail to grapple with the real-world consequences of the policy approach they advocate for on their claims' merits. Requiring a female athlete to affiliate with a male team against her wishes—labeling her a man when she is not one—can be a demeaning, even traumatic experience. *See Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020) (citing evidence that "[p]articipating in sports on teams that contradict one's gender identity 'is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical'"). Plaintiffs would deny transgender women and girls equal educational opportunities by forcing them to either submit to this experience or forgo the benefits of high school athletics altogether.

The administrative and civil liberties consequences extend beyond this. Striking down trans-inclusive policies would jeopardize *all* students' rights to medical and personal privacy and the rights of parents to keep

27

information about their children private, as all students would have to be subject to whatever sex-sorting mechanism is developed. New York City policy protects the rights of students to "decide when, with whom, and how much of their private information to share with others," meaning that transgender students are not required to out themselves to their classmates, teachers, and coaches. *See* NYCDOE Guidelines, *supra*. The City does not systematically track which of its students are transgender—and has no wish to start. When a student enrolls in school, they need not present any documentation, such as vital or medical records, establishing their gender. *See id.* Nor must students or their parents present such documents to update a student's name or gender marker. *See id.* And medical records retained by doctors, nurses, and other health staff are kept confidential. *See id.*

Were this Court to embrace plaintiffs' reading of Title IX and bar transgender girls from female sports, NYCDOE would have to reconsider these protections and implement a uniform, intrusive process of somehow verifying students' "biological" sex. Not only would these processes be unfair to the affected students, but they would likely spawn even more

litigation—diverting school resources away from their paramount mission to educate students.

For instance, questions linger about how such a program would be implemented. In competitive adult sports, sex verification often means a blood draw. *See* Jane Macartney & Hattie Garlick, *Girls Will Be Girls at the Beijing Olympics-Sex Tests Will Prove It*, THE TIMES (U.K.) (Jul. 29, 2008) (describing a "battery of examinations" involving "four tests, including blood tests, to examine [athletes'] sex hormones, genes and chromosomes for sex determination") (cleaned up).[14] The City does not believe children should be required to submit to such medical testing to sign up for a local high school track or swimming competition. As the Supreme Court has noted, a "compelled physical intrusion beneath [one's] skin and into [one's] veins" is "an invasion of bodily integrity that implicates an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *see also Birchfield v. North Dakota*, 579 U.S. 438, 463-64 (2016).

---

[14] https://perma.cc/P33B-JZ2R.

29

Even if a sex-verification system could be implemented without unduly violating students' privacy rights, it is not just transgender students who would be affected. There is no single chromosomal, hormonal, or anatomical definition of "sex" that can distinguish all cisgender females from all cisgender males. *See* D. Purves, *What Is Sex?*, NEUROSCIENCE (2d ed. 2001) (explaining how "genotypic sex, phenotypic sex, and gender are not always aligned").[15] Genetic testing, for instance, would "affect[] women [and girls] with chromosomal anomalies that likely or demonstrably produce no competitive advantage," such as cisgender females with XX/XY mosaicism or XY chromosomes with androgen insensitivity syndrome. Erin Buzuvis, *Caster Semenya and the Myth of a Level Playing Field*, 6 AM. U. MODERN AM. 36, 37 (2010). With millions of children enrolled in public schools across New York, Connecticut, and Vermont, individuals with these conditions cannot be discounted. *See id.* (providing real-world examples from competitive adult sports).

---

[15] https://perma.cc/RW3P-5R2Z.

The City believes these complications can and should be avoided. Even if preventing transgender athletes from "dominating" female sports were a valid public policy objective, the City's policy has not, and numerically could not, lead to such domination. The City estimates that transgender students are a tiny fraction of its overall student body. Meanwhile, national data show that transgender students already participate in athletics at a dramatically lower rate than high school students on average. *See* Women's Sports Foundation, *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* 19, 20 (2020) (noting studies estimating the rate of participation in sports to be 68% for all high school students, and 53% for girls, but only 12% for transgender girls).[16] These numbers not only refute any specter of a looming transgender takeover of high-school athletics, but also highlight another important truth: apart from the broader systemwide implications of plaintiffs' claims, they would unquestionably compound the profound adversity that transgender youth already face.

---

[16] https://perma.cc/2EVS-F4A8.

## CONCLUSION

The District Court's order should be affirmed.


Dated:  New York, NY
        May 1, 2023

                                    Respectfully submitted,

                                    HON. SYLVIA O. HINDS-RADIX
                                    *Corporation Counsel*
                                    *of the City of New York*
                                    Attorney for City of New York


                          By:   /s/ Chase Henry Mechanick
                                CHASE HENRY MECHANICK
                                Assistant Corporation Counsel

                                100 Church Street
                                New York, NY 10007
                                212-356-0841
                                cmechani@law.nyc.gov


RICHARD DEARING
JAMISON DAVIES
CHASE HENRY MECHANICK
   *of Counsel*

32

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 6,046 words, not including the table of contents, table of authorities, this certificate, and the cover.

<u>          /s/ Chase Henry Mechanick          </u>
CHASE HENRY MECHANICK