No. 21-1365

# In the United States Court of Appeals
# For the Second Circuit

---

**SELINA SOULE, a minor, by Bianca Stanescu, her mother;
CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother;
ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother;
ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother,**

*Plaintiffs-Appellants*,

v.

**CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT
INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC
SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS
BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF
EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION;
DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,**

*Defendants-Appellees,*

and

**ANDRAYA YEARWOOD; THANIA EDWARDS on behalf of her daughter,
T.M.; COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES,**

*Intervenors-Appellees.*

---

On Appeal from the United States District Court
for the District of Connecticut, No. 3:20-cv-00201 (RNC)

---

**BRIEF OF *AMICUS CURIAE* FOR
CONCERNED WOMEN FOR AMERICA
*in Support of Petitioners***

---

Mario Diaz
Concerned Women for America
1000 N. Payne St.
Alexandria, VA 22314
(202) 488-7000
mdiaz@cwfa.org

Braden W. Sparks
Braden W. Sparks, P.C.
100 Crescent Court, 7th Floor
Dallas, TX 75201
214-986-5505
brady@sparkslaw.com

Counsel of Record for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* is a nonprofit organization with no parent
corporation or stockholders.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

INTERESTS OF *AMICUS CURIAE* ............................................ 1

SUMMARY OF THE ARGUMENT ............................................ 2

ARGUMENT ......................................................................... 3

I. Policy Allowing Trans-identifying Males to Compete in Women's Sports Denies Equal Competition Benefits on the Basis of Sex in Direct Violation of Title IX ...................................... 3

II. Policy Allowing Trans-identifying Males to Compete in Women's Sports Dangerously and Disproportionately Affects Female Athletes ....................................................... 7

III. Title IX Protections on the Basis of Sex Do Not Change Based on Political or Cultural Pressures ..................................... 10

IV. An Educational Institution's Willful Disregard for Longstanding Title IX Protections for Female Athletes Harms Women and Assumes Risks for Potential Violations .................. 11

V. The Court Should Consider the Real and Considerable Mental and Emotional Harms to Female Athletes ................................... 17

VI. *Bostock* Provides No Basis for Policy Allowing Trans-Identifying Males to Compete in Women's Sport ......................... 21

CONCLUSION ..................................................................... 22

CERTIFICATE OF SERVICE ................................................. 24

CERTIFICATE OF COMPLIANCE ......................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Ballard v. United States*, 329 U.S. 187 (1946)...........................................3

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)...................................3

*Michael M. v. Superior Ct. of Sonoma Cnty.*,
    450 U.S. 464 (1981) ...........................................................7

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
    140 S. Ct. 1731 (2020) ....................................................21

*Rinaldi v. Yeager*, 384 U.S. 305 (1966) ......................................................6

*Soule by Stanescu v. Connecticut Association of Schools, Inc.*,
    57 F.4th 43 (2d Cir. 2022) .........................................11, 20

*United States v. Virginia*, 518 U.S. 515 (1996)..........................................6

**Statutes**

20 U.S.C. § 1681 et seq..........................................................................2, 3

Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).................................6

**Other Authorities**

American College of Pediatricians, *Sex is a Biological Trait
    of Medical Significance* (March 2021) .......................................5, 18

Amy Tennery, *Fifty years since Title IX, the world of women's
    sports is transformed*, Reuters (June 22, 2022)...............................4

Concerned Women for America, *U.S. Department of Education,
    Office for Civil Rights, Complaint Against the University of
    Pennsylvania*, No. 03-22-2104 (March 17, 2022)...........................13

David J Handelsman, Angelica L Hirschberg, Stephane Bermon, *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, Endocrine Reviews, Volume 39, Issue 5, October 2018...................................................5

Doriane Lambelet Coleman and Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys and Men*, Duke Law .......................................................................5

Elizabeth Chuck, *Suicides put spotlight on how hard it can be for student-athletes to ask for help*, ABC News (April, 28, 2022) .............................................................................18

Ian Janssen, Steven B. Heymsfield, ZiMian Wang, and Robert Ross, *Skeletal muscle mass and distribution in 468 men and women aged 18–88 yr*, Journal of Applied Physiology 2000 89:1, 81-88 ............................................................6

Institute of Medicine (US) Committee on Understanding the Biology of Sex and Gender Differences, Wizemann TM, Pardue ML, editors, *Exploring the Biological Contributions to Human Health: Does Sex Matter?* Washington (DC): National Academies Press (US); 2001. 2, 2, *Every Cell Has a Sex*................6

Jennifer Connellana, Simon Baron-Cohena, Sally Wheelwrighta, Anna Batkia, Jag Ahluwaliab, *Sex differences in human neonatal social perception*, Infant Behavior & Development, 23, (2000) 113–118 .........................................................20

Joe Kinsey, *Penn Trans Swimmer's Teammate Speaks Out as Lia Thomas Smashes More Records*, OutKick (Dec. 11, 2021)............15

Katie Reilly and Madeleine Carlisle, *Biden Administration Expands Title IX Protections—But Sidesteps Trans Athlete Question*, TIME (June 23, 2022) ....................................................12

Knox T, Anderson LC, Heather A, "Transwomen in elite
    sport: scientific and ethical considerations," Journal
    of Medical Ethics 2019;45:395-403 ................................................5

Louise Radnofsky and Rachel Bachman, *World Track and Field
    Bans Transgender Athletes From Women's Events*,
    The Wall Street Journal (March 23, 2023)....................................13

Macy Petty, *Statement Before the Tennessee House Education
    Administration Committee Hearing on H.B. 2316*
    (March 16, 2022)..............................................................................8

McManama O'Brien, K.H.; Rowan, M.; Willoughby, K.;
    Griffith, K.; Christino, M.A., *Psychological Resilience
    in Young Female Athletes*, Int. J. Environ. Res.
    Public Health 2021, 18, 8668 .........................................................20

Nell Gluckman, *'It's Definitely a Crisis': Why Women in College
    Sports Are Struggling With Mental Health*," The Chronicle
    of Higher Education (May 6, 2022)................................................18

Sara Smith, *Statement before the Missouri Senate Education
    Committee Hearing on S.B. 781* (March 1, 2022 )..........................9

Shawn Cohen, *EXCLUSIVE: 'We're uncomfortable in our own
    locker room.' Lia Thomas' UPenn teammate tells how the
    trans swimmer doesn't always cover up her male genitals
    when changing and their concerns go ignored by their
    coach*, Daily Mail (Jan. 27, 2022)................................................15

Sloan Rachmuth, *Update: HS Volleyball Player injured by
    Transgender Competitor in North Carolina*, Education
    First Alliance (Oct. 24, 2022) ..........................................................9

Thibault, Valérie et al. *Women and Men in Sport Performance:
    The Gender Gap has not Evolved since 1983*, Journal of
    sports science & medicine, vol. 9,2 214-23, 1 Jun. 2010..................6

U.S. Department of Education, Office for Civil Rights,
*Franklin Pierce University Resolution Agreement*,
Case No. 01-20-2023 (Sept. 18, 2020) ............................................. 10

U.S. Department of Education, Office for Civil Rights,
*Franklin Pierce University Resolution Letter*,
Case No. 01-20-2023 (October 16, 2020) ....................................... 10

*World Athletics Council decides on Russia, Belarus and female
eligibility*, World Athletics (March 23, 2023) ............................... 12

## Regulations

34 C.F.R. § 106.31(a) ...................................................................... 4

34 C.F.R. § 106.41(b) .................................................................. 4, 10

# INTERESTS OF *AMICUS CURIAE*[1]

Concerned Women for America ("CWA") is the largest public policy organization for women in the United States, with members in all fifty states and thousands in the Second Circuit. Through its grassroots organization, CWA encourages policies that strengthen and protect women and families and advocates for the traditional virtues that are central to America's cultural health and welfare. CWA is interested in working against the nullification of women's sports and protecting female athletes from the injustice of competing against biological males. In 2020, the Department of Education's Office of Civil Rights ("OCR") agreed with CWA's complaint against a university's inclusion concerning trans-identifying athletes, finding that the school violated Title IX equal opportunity protections for female athletes and requiring the school to rescind its policy. CWA's Young Women for America ("YWA") college chapters have numerous female college athletes that are actively speaking in legislatures on behalf of student-athletes.

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

Recognition of objective, scientific reality serves as the basis for our legal system's respect for the fundamental rights of women and the protections they won under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). Principles of equality and fairness have led Congress and the courts to strongly consider the physiological differences between the male and female anatomy in multiple areas of law. *Amicus* urges this Court to affirm that foundational reality in the context of women's sports, sparing women the indignity of enduring a new form of discrimination on the basis of sex in the name of promoting inclusion based on self-defined identities. The Connecticut Interscholastic Athletic Conference ("CIAC") Transgender Policy ("the Policy") at issue here deprives female athletes of the opportunities guaranteed to them under Title IX. In the context of athletics, separations based on sex are not optional but necessary to protect and promote equal opportunities for women.

Government-forced blindness to the differences between the sexes would undo decades of progress that opened the door for women to participate on athletic teams and compete safely and fairly in their own

sports like never before. The Court should not ignore the fact that policies allowing males to compete in female sports, such as CIAC Policy, disproportionately impact women, denying them equality of opportunity for success and producing precisely the type of injustice Title IX was created to avoid. Nothing in the law requires this or sanctions it either. The appellate panel erred to the extent it relied on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), as justification for such a departure from the traditional protections women have enjoyed by having separate sports categories.

## ARGUMENT

### I. Policy Allowing Trans-identifying Males to Compete in Women's Sports Denies Equal Competition Benefits on the Basis of Sex in Direct Violation of Title IX

The very nature of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX") stands on the scientific fact that "the two sexes are not fungible." *Ballard v. United States*, 329 U.S. 187, 193, (1946). There can be no question that the positive benefits of Title IX for women have been historic, with the number of females playing sports increasing exponentially since its inception. According to the National Center for Education Statistics, female high school sports

participation has increased by more than 1,000% since the law was passed.[2] In other words, promoting sex-specific sports augmented women's equality and opportunities at unprecedented levels by acknowledging the genetic, biological, and physiological differences between the sexes thus requiring separate sports categories based on sex.

As applied to education programs or activities under 34 C.F.R. § 106.31(a), "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance." In athletics, the regulation makes clear the connection between physiology and opportunity, saying "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). This emphasis on competitive skills and contact sports, which

---

[2] Amy Tennery, *Fifty years since Title IX, the world of women's sports is transformed*, Reuters (June 22, 2022), https://www.reuters.com/lifestyle/sports/fifty-years-since-title-ix-world-womens-sports-is-transformed-2022-06-22/.

include boxing, wrestling, rugby, and ice hockey, among others, stresses the clear intent and purpose of the protections Congress envisioned. The Court should rely on biological realities in applying and interpreting Title IX in sports competition. Female athletes stand at a considerable competitive skills disadvantage against males because of their differing biological makeup.

As the American College of Pediatrics has stated, "Among humans, sex is a dimorphic, innate and immutable trait established at fertilization by sex determining genes located on the X and Y chromosomes. This sexual dimorphism is genetically programmed and is present in every nucleated somatic cell of the body; sex does not and cannot change."[3] These genetic facts mean males competing in female sports objectively bear all the genetic advantages that come from the male sex without regard to identity.[4] If this were not so, Title IX would

---

[3] American College of Pediatricians, *Sex is a Biological Trait of Medical Significance* (March 2021), https://acpeds.org/position-statements/sex-is-a-biological-trait-of-medical-significance.

[4] *See* Knox T, Anderson LC, Heather A, *Transwomen in elite sport: scientific and ethical considerations*, Journal of Medical Ethics 2019;45:395-403, https://jme.bmj.com/content/45/6/395; David J Handelsman, Angelica L Hirschberg, Stephane Bermon, *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, Endocrine Reviews, Volume 39, Issue 5, October 2018, 803–829, https://doi.org/10.1210/er.2018-00020; Doriane Lambelet Coleman and Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys and Men*, Duke Law, https://law.duke.edu/sites/default/files/centers/

indeed be unnecessary in the context of sports, for both males and females could simply compete together equitably. It is also noteworthy that Congress mandated the enforcement of Title IX take into account "the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). Given the nature of track competition, biological girls are not similarly competitive against equally skilled biological boys.

But, as Justice Ruth Bader Ginsburg recognized in *United States v. Virginia*, 518 U.S. 515, 533 (1996), "Physical differences between men and women, however, are enduring…" and the disparate discriminatory (or negative) impact on the benefits available to female athletes is palpable based on that genetic reality.[5]  Courts have traditionally understood this and acknowledge the law "does not require things which are different in fact… to be treated in law as though they were the same*." Rinaldi v. Yeager*, 384 U.S. 305, 309, (1966). American

---

sportslaw/comparingathleticperformances.pdf; Ian Janssen, Steven B. Heymsfield, ZiMian Wang, and Robert Ross, *Skeletal muscle mass and distribution in 468 men and women aged 18–88 yr*, Journal of Applied Physiology 2000 89:1, 81-88, https://doi.org/10.1152/jappl.2000.89.1.81.

[5] *See* Thibault, Valérie et al. *Women and Men in Sport Performance: The Gender Gap has not Evolved since 1983*, Journal of sports science & medicine, vol. 9,2 214-23. 1 Jun. 2010; Institute of Medicine (US) Committee on Understanding the Biology of Sex and Gender Differences, Wizemann TM, Pardue ML, editors, *Exploring the Biological Contributions to Human Health: Does Sex Matter?* Washington (DC): National Academies Press (US); 2001. 2, 2, *Every Cell Has a Sex* https://www.ncbi.nlm.nih.gov/books/NBK222291/.

jurisprudence "realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct. of Sonoma Cnty.,* 450 U.S. 464, 469 (1981). Title IX modeled this traditional approach and it has allowed women athletes to thrive within an environment that protects their unique nature as females.

## II.  Policy Allowing Trans-identifying Males to Compete in Women's Sports Dangerously and Disproportionately Affects Female Athletes

Women disproportionately lose under the artificial conditions promoted by the Policy. The violations of the protections guaranteed by Title IX are not equal if a female seeks to compete in a male sport, as it is the other way around. CWA Young Women for America member and college scholarshipped volleyball athlete Macy Petty testified before the Tennessee House Education Administration Committee about this disparate impact in her specific sport.

> Through my time playing club volleyball, I have had the chance to play my sport against boys. My volleyball club had a men's league, and some clubs let men play on their women's teams. In the rules of volleyball, the standard men's net is seven inches higher than a women's net because of their natural biological ability to jump higher. This obviously made it extremely difficult for us when trying to play on their net. When the boys would come to play with us, I would cover my head, scared of them giving me a concussion. It became very obvious to me why we played on separate

height nets. Not only could they jump higher, but they were also stronger and, on average, much taller.[6]

Such reactions to sex differences, as experienced by female athletes, are reasonable and foreseeable, which is why Congress took them into account as it passed Title IX. As a women's organization, *amicus* hears from this type of female apprehension and frustration from young female athletes with regularity. One CWA member named Ciara wrote to us seeking help for her 13-year-old niece, who wanted to try out for a team but did not follow through after finding out there were males who identified as female who would be allowed to compete against female athletes. She did not feel safe but also did not feel confident enough to speak out about it publicly. Macy's justifiable fears of a concussions help illustrate the seriousness of a female athlete's thought processes and concerns. They are not insignificant or imaginary. A high school female volleyball athlete in North Carolina was recently seriously injured by a trans-identifying male player who was allowed to compete against female athletes. A report related the severity of the injuries sustained by the female athlete:

---

[6] Macy Petty, *Statement Before the Tennessee House Education Administration Committee Hearing on H.B. 2316* (March 16, 2022), https://concernedwomen.org/wp-content/uploads/2022/03/TN-Testimony-Macy-Petty.pdf.

> During a girls' tournament last month, a male Highlands
> High volleyball player pelted a female Hiwassee Dam High
> player in the forehead with the ball during a return.
> The Hiwassee Dam player, a biological girl, suffered severe
> head and neck injuries, resulting in long-term concussion
> symptoms, including vision problems. The girl has still not
> yet been cleared to play again by her primary care physician
> or a neurologist.[7]

Sara Smith, another one of CWA's Young Women for America college chapter member athletes, testified before the Missouri Senate Education Committee, emphasizing these concerns in her very dangerous sport of martial arts. She said: "When I first began Taekwondo, I was only eight years old. In the 12 years since, I have competed with and alongside many males. Martial arts is a dangerous sport. It only takes one uncontrolled kick or punch for a person to be seriously injured or knocked unconscious."[8]

---

[7] Sloan Rachmuth, *Update: HS Volleyball Player injured by Transgender Competitor in North Carolina*, Education First Alliance (Oct. 24, 2022), https://www.edfirstnc.org/post/female-hs-volleyball-player-seriously-injured-by-alleged-trans-competitor-in-north-carolina.

[8] Sara Smith, *Statement before the Missouri Senate Education Committee Hearing on S.B. 781* (March 1, 2022 ), https://concernedwomen.org/wp-content/uploads/2022/03/Sara-Smith_MO-Education-Hearing-Statement.pdf.

### III. Title IX Protections on the Basis of Sex Do Not Change Based on Political or Cultural Pressures

The women *amici* represent have previously raised and won a Title IX complaint with the U.S. Department of Education's Office for Civil Rights, alleging policies like CIAC's deny female student-athletes equal athletic benefits and opportunities by permitting male athletes identifying as women to participate in women's intercollegiate athletic teams. Just three years ago, Franklin Pierce University agreed to rescind its inclusion policy under an agreement requiring that "Where the University operates or sponsors a particular sport for members of one sex, it will not permit participation of members of the opposite sex except to the extent permitted under 34 C.F.R. § 106.41(b)." *See* U.S. Department of Education, Office for Civil Rights, *Franklin Pierce University Resolution Agreement*, Case No. 01-20-2023 (Sept. 18, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/0120 2023-b.pdf; U.S. Department of Education, Office for Civil Rights, *Franklin Pierce University Resolution Letter* (October 16, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/0120 2023-a.pdf.

The scientific facts and the history of discrimination against female athletes that gave rise to the protections women won under Title IX fifty years ago have not changed. Federal law has not changed. The words prohibiting discrimination based on sex within the text of Title IX continue to extend to female student-athletes. The specific references to contact sports and competitive skills continue to remind us the law seeks to protect and promote female athletes against a deep history of discriminatory practices. The appellate panel erred to the extent it seemed willing to excuse the failure to comply with Title IX longstanding requirements because OCR guidance "fluctuated with the changes in presidential administrations." *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, 57 F.4th 43, 55 (2d Cir. 2022). Neither political, executive or administrative approval should shield a failure to adhere to longstanding Title IX statutory requirements or protect a discriminatory policy from valid legal challenges under Title IX.

**IV.  An Educational Institution's Willful Disregard for Longstanding Title IX Protections for Female Athletes Harms Women and Assumes Risks for Potential Violations**

Given the history of Title IX, including modern policy and political controversies, it is reasonable to conclude that any entity receiving

federal funds which chooses to act proactively to implement a dubious progressive transgender policy such as the one involved here assumes the risks of their potential Title IX violations. Even under the current progressive administration's aggressive efforts to transform Title IX without congressional approval, it has had to "sidestepped the question of what rights transgender athletes are granted under Title IX," according to news reports.[9]  As we have argued, this is to be expected given the lack of any scientific support to warrant such a drastic departure from the historic protections properly accorded women in sports. Recently, the World Athletics Council, the international governing body for track and field, voted to "maintain fairness for female athletes above all other considerations."[10] Sebastian Coe, the federation's president, said, "The World Athletics Council has today taken the decisive action to protect the female category in our sport,

---

[9] Katie Reilly and Madeleine Carlisle, *Biden Administration Expands Title IX Protections—But Sidesteps Trans Athlete Question*, TIME (June 23, 2022), https://time.com/6190460/title-ix-changes-biden-trans-athletes/.

[10] *World Athletics Council decides on Russia, Belarus and female eligibility*, World Athletics (March 23, 2023), https://worldathletics.org/news/press-releases/council-meeting-march-2023-russia-belarus-female-eligibility.

and to do so by restricting the participation of transgender and DSD athletes."[11]

These considerable developments highlight the current administration's impasse and should serve as a clear sign to athletic bodies and educational institutions that there is no basis in fact for putting the well-being of women in jeopardy, to engage in these types of progressive social experimentations undermining women's protections in federal law, or denigrating female athletes' opportunities on athletic teams and in competitions. *Amicus* has experienced a similar standoff in OCR's complaint processing practices. Our complaint against the University of Pennsylvania (UPenn) for refusing to protect the rights of its female athletes under federal law in allowing Lia Thomas, a Division I swimmer who is biologically male but rostered as a senior on UPenn's women's team and competed through the season displacing teammates in events and shattering pool, league, and national records, was active for more than a year and only dismissed recently because OCR is

---

[11] Louise Radnofsky and Rachel Bachman, *World Track and Field Bans Transgender Athletes From Women's Events*, The Wall Street Journal (March 23, 2023), https://www.wsj.com/articles/world-track-and-field-transgender-ban-b64a7237.

currently addressing the same allegation involving the women's swim team at UPenn in OCR Docket 03-22-2035.[12]

The UPenn/Lia Thomas example is one that the Court should study carefully, as it illustrates many of the actual harms being caused to women athletes in this space. Policies such as we have here favor the desires of trans-identifying male athletes in the face of female athletes' legitimate concerns, effectively creating a hostile environment that negates Title IX protections. In the case of Lia Thomas at UPenn, female athletes were not only losing equitable opportunities, but were also forced to forfeit their right to privacy and dignity in sex-specific locker rooms in direct violation of Title IX. Because these policies favor trans-identifying male athletes in practice, female athletes do not feel safe speaking up to challenge the policy in any official capacity without fearing they will jeopardize their athletic college career. Therefore, many spoke up to the press only on the condition of anonymity. One outlet reported on one of Thomas' teammates as follows:

> "Pretty much everyone individually has spoken to our
> coaches about not liking this. Our coach [Mike Schnur] just

---

[12] Concerned Women for America, *U.S. Department of Education, Office for Civil Rights, Complaint against the University of Pennsylvania*, No. 03-22-2104 (March 17, 2022), https://concernedwomen.org/wp-content/uploads/2022/03/CWA-UPENN-Title-IX-Complaint.pdf.

really likes winning. He's like most coaches. I think secretly everyone just knows it's the wrong thing to do," the female Penn swimmer said during a phone interview.

"When the whole team is together, we have to be like, 'Oh my gosh, go Lia, that's great, you're amazing.' It's very fake," she added.[13]

She also spoke about their fear of speaking out for women's rights:

"If we protest it, we're only hurting ourselves because we're going to miss out on all that we've been working for," Thomas' female teammate said, but she added that *something needs to be done to protect biological women who've fought for an equal playing field in collegiate athletics." Id.* (Emphasis added.)

Teammates said female athletes felt uncomfortable changing in

their own locker room, which is something Title IX addresses explicitly.

"It's definitely awkward because Lia still has male body parts and is still attracted to women," one swimmer on the team told DailyMail.com in an exclusive interview…. "Multiple swimmers have raised it, multiple different times," the UPenn swimmer said. "But we were basically told that we could not ostracize Lia by not having her in the locker room and that there's nothing we can do about it, that we basically have to roll over and accept it, or we cannot use our own locker room."[14]

---

[13] Joe Kinsey, *Penn Trans Swimmer's Teammate Speaks Out as Lia Thomas Smashes More Records*, OutKick (Dec. 11, 2021), https://www.outkick.com/outkick-exclusive-penn-trans-swimmers-teammate-speaks-out-as-lia-thomas-smashes-more-records/.

[14] Shawn Cohen, *EXCLUSIVE: 'We're uncomfortable in our own locker room.' Lia Thomas' UPenn teammate tells how the trans swimmer doesn't always cover up her male genitals when changing and their concerns go ignored by their coach*, Daily Mail (Jan. 27, 2022), https://www.dailymail.co.uk/

This chilling, hostile environment where female athletes are afraid to speak out is itself a violation of Title IX protections against sex-based harassment. What these UPenn female swimmers experienced at the hands of university administrators and coaches was emotional blackmail that clearly violates Title IX. Something the Court should not ignore as too uncertain to redress. Any policy, even an apparently neutral one that has this kind of negative effect on women's opportunities, should not be able to escape the Court's judicial review.

An NCAA Division I female swim coach reached out to CWA on condition of anonymity and related her experience at the Women's Division I NCAA Championship in 2022, where Lia Thomas competed in violation of Title IX. She thanked CWA for submitting our complaint on behalf of female athletes and described how they were being silenced. She was surprised, more than anything, by "the psychological effects that it took on my athletes." She was gravely disturbed about the long-term effects of such mental strain, saying they "had to witness things that we have yet to process." She felt the violations were

---

news/article-10445679/Lia-Thomas-UPenn-teammate-says-trans-swimmer-doesnt-cover-genitals-locker-room.html.

palpable to all, though they couldn't speak about it. "Why was one allowed to warm up in a speedo yet race in a women's tech suit? Why can't our women walk around without their tops when their chest is flatter?" she wrote. The female athletes were told "they can find somewhere else to change" if they felt uncomfortable changing with a male-bodied athlete changing alongside them. These actions are blatantly sex-discriminatory and antithetical to historic Title IX protections.

## V.   The Court Should Consider the Real and Considerable Mental and Emotional Harms to Female Athletes

The Court should not diminish the significant mental strain put on female athletes by policies infringing on their rights and spaces. Plaintiffs in this case experienced "stress, anxiety, intimidation, and emotional and psychological distress from being forced to compete against males with inherent physiological advantages in the girls' category." Appellants' App.164; accord App.175. This represents another area of significant difference between males and females. "[S]ex differences have been identified among all major brain parameters, including: higher rates of cerebral blood flow, higher percentage of gray matter tissue, and higher interhemispheric

connectivity in females, compared with higher percentage of white matter and greater intrahemispheric connectivity as well as higher glucose metabolism in limbic regions in males."[15]

The Chronicle of Higher Education recently reported, "Many college students are experiencing mental-health crises, but one subset has seen a rash of reported suicides this year: female athletes."[16] The report includes an interview with Ellen J. Staurowsky, a professor of sports media at Ithaca College, who stated, "There's no question that athletes are experiencing high rates of depression, anxiety, and other forms of mental-health issues at levels that we've not seen before." *Id.*

An ABC News report highlighted:

Since the beginning of March, three high-profile college student-athletes have died by suicide across the United States. On their fields of play, the three young women projected indestructibility: Katie Meyer as a star goalkeeper on Stanford's soccer team; Sarah Shulze as a top runner for the University of Wisconsin-Madison; and Lauren Bernett as a standout softball player for James Madison University.

---

[15] American College of Pediatricians, *Sex is a Biological Trait of Medical Significance* (March 2021), https://acpeds.org/position-statements/sex-is-a-biological-trait-of-medical-significance.

[16] Nell Gluckman, *'It's Definitely a Crisis': Why Women in College Sports Are Struggling With Mental Health*," The Chronicle of Higher Education (May 6, 2022), https://www.chronicle.com/article/its-definitely-a-crisis-why-women-in-college-sports-are-struggling-with-mental-health.

But off the field, all three were secretly struggling.[17]

The report quoted Gina Meyer, mother of Katie, in an interview with NBC's "Today" show, saying, "There's so much pressure I think on athletes, right, especially at that high level, balancing academics and a high competitive environment. And there is anxiety and there is stress to be perfect, to be the best, to be No. 1." *Id.*

> "Perfectionism can come out with a particular tenacity for student-athletes," said Tommy Fritze, a sport and performance psychologist at the health and counseling center at the University of Denver, whose role is devoted to student-athletes and the athletic department. "The demands are high, and then if you're trying to meet those demands perfectly, or perform perfectly in all those areas, that can be a really problematic recipe."

*Id.* One study of psychological resilience in young female athletes found:

> Female athletes may experience significant stressors and psychological challenges that, instead of enhancing resilience, can actually inhibit their athletic and personal potential. It is well known that females experience higher levels of internalizing disorders relative to men, who demonstrate higher levels of externalizing disorders. For instance, females are nearly twice as likely to be diagnosed with depression than males and are also more likely to experience anxiety. Likewise, female athletes experience higher rates of anxiety and depression than male counterparts without a significant correlation with age. Female athletes with anxiety symptoms are 1.9 times more

---

[17] Elizabeth Chuck, *Suicides put spotlight on how hard it can be for student-athletes to ask for help*, ABC News (April, 28, 2022), https://www.nbcnews.com/news/us-news/suicides-put-spotlight-hard-can-student-athletes-ask-for-help-rcna26266.

likely to sustain injury than those without. Athletes recovering from injuries are more likely to experience psychological distress during their recovery and subsequent treatment. Nearly 80% of surveyed athletes in one study reported psychological issues due to their injuries.[18]

These differences are not merely a matter of puberty. The

American College of Pediatricians explains, "sex differences in neural

connectivity were also demonstrated throughout the prenatal period."

The report points to a study where:

> 102 human neonates, who by definition have not yet been influenced by social and cultural factors, were tested to see if there was a difference in looking time at a face (social object) and a mobile (physical-mechanical object). Results showed that the male infants showed a stronger interest in the physical-mechanical mobile while the female infants showed a stronger interest in the face. The results of this research clearly demonstrate that sex differences are in part biological in origin.[19]

Given these facts, the Court should not dismiss women's

(including Plaintiff's) serious mental and emotional distress resulting

from the unjust denial of their personal achievements due the Policy

---

[18] McManama O'Brien, K.H.; Rowan, M.; Willoughby, K.; Griffith, K.; Christino, M.A., *Psychological Resilience in Young Female Athletes*, Int. J. Environ. Res. Public Health 2021, 18, 8668, https://doi.org/10.3390/ijerph18168668.

[19] Jennifer Connellana , Simon Baron-Cohena, Sally Wheelwrighta , Anna Batkia , Jag Ahluwaliab, *Sex differences in human neonatal social perception*, Infant Behavior & Development, 23, (2000) 113–118, https://www.math.kth.se/matstat/gru/5b1501/F/sex.pdf

allowing males to displace them from their positions in female-only sports competitions. Another CWA college chapter member Noelle Fitchett testified about her experience as a young college student at the Texas Senate State Affairs Committee and said, "There is a strong correlation between women who compete in sports and their high career achievement levels. Women's sports are empowering. When we allow men self-identifying as women to compete in women's sports, there is a crushing feeling of defeat before the game, race, or match has begun." We urge the Court not to look down on such harms and debilitating effects for women under the Policy as it considers whether to correct the records in this case amounts to a mere "psychic satisfaction," *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, 57 F.4th 43, 52 (2d Cir. 2022). The evidence strongly supports the conclusion that it is not.

## VI. *Bostock* Provides No Basis for Policy Allowing Trans-Identifying Males to Compete in Women's Sport

The appellate panel misapplies *Bostock v. Clayton County, Ga.,* 140 S. Ct. 1731, 1753 (2020). The narrow issue in *Bostock* was whether an employer violated Title VII by terminating an employee on the basis of their identification as the opposite sex. A court, therefore, would commit a grave error when, as here, it seeks to apply the weight of

*Bostock* to the Title IX context. During oral arguments in *Bostock's* companion case, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 140 S. Ct. 1731 (2020), the employee's counsel conceded that the outcome of the case was not relevant to the question of whether a recipient's willingness to allow a biological male who identified as a transgender female to compete against biological females constituted a violation under Title IX. Both Justices Samuel Alito and Ruth Bader Ginsburg pressed the matter, and both got to the same answer: Title IX is a radically different statute than Title VII, with regulations that explicitly permit sex-segregated teams when competitive skill or contact sports are involved.

## CONCLUSION

For these reasons, we urge the Court to reverse the panel opinion and remand to the district court to address these claims on the merits.

Respectfully submitted,

*/s/ Braden W. Sparks*
Braden W. Sparks
Braden W. Sparks, P.C.
100 Crescent Court, 7th Floor
Dallas, TX 75201
214-986-5505
brady@sparkslaw.com

/s/ Mario Diaz
Mario Diaz
Concerned Women for America
1000 N. Payne St.
Alexandria, Va. 22314
(202) 488-7000
[mdiaz@cwfa.org](mailto:mdiaz@cwfa.org)


Counsel of Record for *Amicus Curiae*

May 18, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2023, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

_/s/ Braden W. Sparks_

Braden W. Sparks
Concerned Women for America

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 4,524 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Braden W. Sparks*
Braden W. Sparks
Concerned Women for America

May 18, 2023