No. 21-1365
*Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, concurring:

I join the opinion of the court. The plaintiffs have standing to seek an injunction to modify athletic records to account for the "CIAC's policy that allow[ed] biological males to compete in girls-only events." Second Am. Compl. ¶ 82. And the district court erred in treating the *Pennhurst* notice requirement as jurisdictional.

I write separately to make three points about the Spending Clause issues in this case. First, the district court erred not only in treating *Pennhurst* as jurisdictional but also in failing to address whether the CIAC Policy was intentional conduct and therefore not subject to the notice requirement at all. Second, I would join the Fifth, Ninth, and Tenth Circuits in holding that an official policy of a recipient educational institution always qualifies as intentional conduct. For that reason, the Policy is not subject to the *Pennhurst* notice requirement. Third, even if we were to split from those circuits that have held that official policies are not subject to the *Pennhurst* notice requirement, the district court and the panel erred in concluding that the CIAC could not have been on notice that the Policy violated Title IX.

## I

When they filed this lawsuit, the plaintiffs were "high school girls who compete[d] in interscholastic girls' track and field," each of whom "trained much of her life—striving to shave mere fractions of seconds off her race times—in order to experience the personal satisfaction of victory, gain opportunities to participate in state and regional meets, gain access to opportunities to be recruited and offered athletic scholarships by colleges, and more." *Id.* ¶ 1. According to the complaint, their "personal and attainable goals of

victory" were "taken from them" when they were "forced to compete against males with inherent physiological advantages in the girls' category." *Id.* ¶¶ 114, 117.

The plaintiffs allege that the CIAC Policy failed to provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c), because it afforded "students who are born female … materially *fewer* opportunities" for athletic achievement "than students who are born male," Second Am. Compl. ¶ 4.

The entire *en banc* court now agrees that the plaintiffs have suffered an injury in fact. *See ante* at 20-23 (majority opinion); *post* at 6 (Chin, J., dissenting). Indeed, the denial of an equal opportunity to compete is an injury whether or not the plaintiffs could show that the outcome of any particular race would have been different under nondiscriminatory conditions. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing.") (internal quotation marks and alteration omitted); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (identifying the injury as "the opportunity to play for a team that can qualify for the Regional and State Championships" rather than obtaining such qualification).

The court correctly concludes that the injury is redressable by an injunction to modify the records to reflect the placements that would have occurred but for the alleged discriminatory treatment. There is no rule that equitable relief is unavailable to redress

discrimination if it would have the incidental effect of depriving a faultless third party of the benefits of discrimination. *See, e.g.*, *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) ("[W]e find untenable the conclusion that [seniority] relief may be denied merely because the interests of other employees may thereby be affected."); *Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport*, 647 F.2d 256, 281 (2d Cir. 1981) ("[T]he mere possibility that a race-conscious remedy may have an adverse impact on nonminority individuals does not render that remedy impermissible.").[1]

Moreover, the district court would have discretion to craft an equitable remedy, so it may be possible to preserve the intervenors' records while providing an appropriate recognition to the plaintiffs, perhaps in two different categories. Even if there were a rule about avoiding an impact on third parties, the district court could provide a remedy without violating that rule.[2]

---

[1] The intervenors acknowledged this point at oral argument. *See* Oral Argument Transcript at 71 (Counsel for the intervenors stating "[L]et's say there is a discriminatory employment test that's used. Someone gets a job as a result of passing that discriminatory employment test. Courts do have broad powers to provide the job to people who were unfairly excluded, and sometimes, in some circumstances, if it's an inherently unique job, someone can be bumped, through no fault of their own. I think that is not the preferred remedy that—and courts are very reluctant to do that, but I can't say that as an absolute matter that it is never appropriate to negatively affect the right of a third party.").

[2] *See* Oral Argument Transcript at 9-10 (Counsel for the plaintiffs stating "When you're talking about equitable relief, I won't say the sky is the limit, but certainly within parameters to make sure that the harm is actually remedied, the district court does have some discretion in how they're going to award relief. It may not involve striking from the record books entirely someone else's recorded times.").

3

**II**

I also agree with the court that the district court erred in treating the *Pennhurst* notice requirement as jurisdictional. *See ante* at 39. The *Pennhurst* notice requirement—when it applies—arises because "legislation enacted pursuant to the spending power is much in the nature of a contract" and therefore liability "rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because the question is whether there has been an *acceptance* of contractual terms, *Pennhurst* operates as a defense to liability.[3] Such a defense is waivable and not jurisdictional. *See* 23 Williston on Contracts § 63:14 (4th ed.) ("[T]he defendant has the burden of pleading and proving any affirmative defense.").

In my view, the district court made a second error: It assumed that *Pennhurst* requires notice in this case without considering whether *Pennhurst* applies at all. Before concluding that *Pennhurst* barred a damages remedy, the district court should have determined whether the Policy qualifies as "intentional conduct" for which no *Pennhurst* notice is required.

The *Pennhurst* doctrine requires the federal government to provide "clear notice" to recipients of federal funds of the terms on which the funds are granted. *Pennhurst*, 451 U.S. at 25. Shortly after *Pennhurst* was decided, the Supreme Court clarified that this notice requirement applies in the anti-discrimination context only to

---

[3] *Pennhurst* might be compared to common-law doctrines that supply a defense to a breach-of-contract claim on the theory that no enforceable agreement was made in the first place. *See* Restatement (Second) of Contracts § 110 (1981) (statute of frauds); *id.* § 152(1) (mutual mistake); *id.* § 163 (material misrepresentation).

"violations not involving intentional discrimination." *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 603 (1983) (opinion of White, J., announcing the judgment). No notice beyond the statutory text is required—and damages are always available—when there is "proof of intentional discrimination." *Id.* at 600.

The Supreme Court has embraced and reiterated this principle in several cases. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74 (1992) (explaining that under *Pennhurst* "remedies were limited … when the alleged violation was *unintentional*"); *id.* at 74-75 ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged.") (citation omitted); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("[R]elief in an action … alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, it is surely not obvious that the grantee was aware that it was administering the program in violation of the condition.") (internal quotation marks and alteration omitted); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (noting that the *Pennhurst* "limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute" and that "*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute"); *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) ("[A] recipient may be held liable to third-party beneficiaries for intentional conduct that violates the clear terms of the relevant statute, but not for its failure to comply with vague language describing the objectives of the statute.") (citation omitted); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182

(2005) ("In *Gebser*, as in *Davis*, we acknowledged that federal funding recipients must have notice that they will be held liable for damages. But we emphasized that 'this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute.'") (citations omitted) (quoting *Davis*, 526 U.S. at 642).

The district court did not address the distinction between intentional and unintentional conduct. It simply stated "monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue." *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 20-CV-201, 2021 WL 1617206, at *8 (D. Conn. Apr. 25, 2021). The district court then concluded that "[t]here can be no doubt that the clear notice required by *Pennhurst* is lacking here." *Id.* That was erroneous because the district court applied the *Pennhurst* notice requirement without first considering whether the Policy was intentional conduct.

The district court acknowledged the plaintiffs' argument that "repeated Supreme Court decisions have put educational institutions on notice that they could be subjected to private suits for intentional sex discrimination and that this liability encompasses diverse forms of intentional sex discrimination." *Id.* at *10 (internal quotation marks and alteration omitted). Yet the district court interpreted the plaintiffs' argument as addressing whether the CIAC "did receive the requisite notice." *Id.* The district court failed to appreciate that the "notice problem does not arise in a case … in which intentional discrimination is alleged." *Franklin*, 503 U.S. at 74-75.

## III

In today's opinion, the court does not address whether the Policy is intentional or unintentional conduct. *See ante* at 42 n.7. I

would hold that a recipient's official policy is intentional conduct. For that reason, the Policy is not subject to the *Pennhurst* notice requirement.

## A

The Supreme Court has explained that the intentional conduct inquiry asks whether the recipient engaged in "intentional conduct that violates the clear terms of the statute," *Davis*, 526 U.S. at 642; *see also Barnes*, 536 U.S. at 187, or whether "a funding recipient intentionally violates the statute," *Jackson*, 544 U.S. at 182. In applying the rule in the context of the civil rights statutes, the Court has said that the relevant distinction is between intentional and unintentional discrimination. *See Franklin*, 503 U.S. at 74-75 ("This notice problem does not arise in a case such as this, in which *intentional discrimination* is alleged.") (emphasis added); *Gebser*, 524 U.S. at 287 ("[R]elief in an action … alleging *unintentional discrimination* should be prospective only, because where discrimination is unintentional, it is surely not obvious that the grantee was aware that it was administering the program in violation of the condition.") (internal quotation marks and alteration omitted and emphasis added). In *Guardians*, the Court indicated that the distinction between unintentional and intentional discrimination is between "unintentional, disparate-impact discrimination," on the one hand, and "deliberate racial discrimination," on the other. 463 U.S. at 593 (opinion of White, J.).

The distinction between intentional and unintentional conduct may not be simple to apply in every case. But in this context, the Supreme Court has already answered the question: Official policies of recipients of federal funds qualify as intentional conduct under Title IX.

In *Gebser*, the Court explained that "[w]hen Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition." 524 U.S. at 287 (citing *Franklin*, 503 U.S. at 74-75; *Guardians*, 463 U.S. at 596-98 (opinion of White, J.); *Pennhurst*, 451 U.S. at 28-29). We do so because of the "central concern" with "ensuring that 'the receiving entity of federal funds [has] notice that it will be liable for a monetary award.'" *Id.* (quoting *Franklin*, 503 U.S. at 74). The Court said that if a recipient's liability "rests on principles of constructive notice or *respondeat superior*, it will … be the case that the recipient of funds was unaware of the discrimination." *Id.*

For that reason, the Court "fashioned" the "implied damages remedy" under Title IX along the same lines as the statute's "express remedial scheme." *Id.* at 290. Because the express remedial scheme was "predicated upon notice to an 'appropriate person'" who received "an opportunity to rectify any violation," the damages remedy would be subject to actual-notice and opportunity-to-cure requirements. *Id.* (quoting 20 U.S.C. § 1682). In other words, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* The response "must amount to deliberate indifference to discrimination" so as to parallel the "premise" of the administrative enforcement scheme that there be "an official decision by the recipient not to remedy the violation." *Id.*

The Court confined the deliberate indifference framework to "cases like [*Gebser*] that do not involve official policy of the recipient

entity." *Id.* In cases that do involve "official policy," there is no reason to require notice, opportunity to cure, and deliberate indifference in order to establish the equivalent of "an official decision by the recipient." *Id.* That is because an official policy already represents such an official decision, made intentionally by the recipient itself. Unlike rogue behavior by an employee, there is no problem of attribution to the recipient when the recipient itself has officially adopted a policy. *See Jackson*, 544 U.S. at 183 (explaining that retaliation is "intentional conduct that violates the clear terms of the statute" because "[i]t is easily attributable to the funding recipient, and it is always—by definition—intentional").

In *Gebser*, the Court explained this framework by way of an analogy to 42 U.S.C. § 1983. *See Gebser*, 524 U.S. at 290-91. The "§ 1983 municipal-liability cases reveal how the standard changes when the claim involves official policy, although the underlying principle—liability only for intentional acts by the institution itself—remains the same." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (internal quotation marks, citation, and alteration omitted). Pursuant to § 1983, a plaintiff may sue any person acting "under color" of state law for a violation of a federal or constitutional right. 42 U.S.C. § 1983. [4] But a § 1983 claim is not available against a municipality—just as a Title IX claim is not available against an educational program receiving federal funds—unless the liability arises from the municipality's "own official decision," not "its

---

[4] While a § 1983 claim is available against a state officer for the violation of a federal right, a Title IX claim is not available against an employee of a school because the employee is not an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But both § 1983 and Title IX contemplate liability for the employing entity: the municipality in the § 1983 context and the recipient educational program under Title IX.

employees' independent actions." *Gebser*, 524 U.S. at 291. Municipal liability can be established by showing that the actions of the municipality "amount[ed] to deliberate indifference to the rights of persons with whom [its employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Alternatively, the municipality may be liable if the plaintiff establishes that the municipality's "official policy[] inflict[ed] the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). In this way, under both § 1983 and Title IX, intentional conduct may be established by way of deliberate indifference to the acts of employees *or* by way of an official policy. *Gebser* and *Davis* involved the former. This case involves the latter.

For these reasons, three circuits have held, in the Title IX context, that the official acts—including policies—of a recipient of federal funds qualify as intentional conduct and are not subject to a further *Pennhurst* notice requirement. *See Mansourian v. Regents of Univ. of Calif.*, 602 F.3d 957, 967 (9th Cir. 2010) ("[T]he Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision."); *Simpson*, 500 F.3d at 1178 ("[A] funding recipient can be said to have 'intentionally acted in clear violation of Title IX' when the violation is caused by official policy.") (quoting *Davis*, 526 U.S. at 642); *Pederson v. La. State Univ.*, 213 F.3d 858, 882 (5th Cir. 2000) (explaining that when it is "the institution itself that is discriminating" by "denying females equal athletic opportunity … [t]he proper test is not whether [the institution] knew of or is responsible for the actions of others" but whether it "intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity"). I would join these circuits.

10

**B**

The dissent notes that "a Title IX recipient's liability cannot turn solely on the 'intentionality' of its challenged action." *Post* at 40. And that is true: there must be intentional conduct as well as knowing acceptance of a funding condition that the conduct violates. Because the CIAC Policy is intentional conduct, the remaining question is whether that conduct "violates the clear terms of the statute." *Davis*, 526 U.S. at 642.

The Supreme Court has clarified that the "clear terms" inquiry is about ensuring that the statute clearly establishes a funding condition. In *Barnes*, the Court distinguished between "intentional conduct that violates the clear terms of the relevant statute," on the one hand, and actions that "fail[] to comply with vague language describing the objectives of the statute," on the other. 536 U.S. at 187; *see also Pennhurst*, 451 U.S. at 25 (identifying "[t]he crucial inquiry" as whether the statute "provid[es] clear notice" to a recipient that it, "by accepting funds under the Act, would indeed be obligated to comply with" a funding condition). Accordingly, conduct violates the "clear terms of the statute" when it contravenes a legal requirement articulated in the statute rather than a general statutory objective.[5]

The "clear terms" requirement does not establish a standard resembling qualified immunity, pursuant to which a defendant will

---

[5] The Supreme Court has not required clarity in the scope of the legal requirement as distinct from its existence. In *Davis*, the Court decided that Title IX provided clear notice for recipients to be liable for student-on-student harassment despite "a conflict in the Circuits" over the question, 526 U.S. at 637, and the opinion of four justices that the statute was insufficiently clear, *see id.* at 657 (Kennedy, J., dissenting) (objecting that "the majority finds statutory clarity where there is none" and "treats the issue as one of routine statutory construction alone").

be liable only if his actions "violate[d] clearly-established rights of which an objectively reasonable official would have known." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006)). The "clear terms" requirement is satisfied if the statutory language creates enforceable legal rights; a plaintiff need not demonstrate that the rights are "clearly established" and that reasonable officials "would have known" about those rights.

In this case, the plaintiffs sued under Title IX, which prohibits an educational program receiving federal funds from "subject[ing] to discrimination" any person in relation to the program. 20 U.S.C. § 1681; Second Am. Compl. ¶ 33. As the dissent acknowledges, "the plain terms of Title IX place a duty on a funding recipient to not discriminate intentionally on the basis of sex." *Post* at 39. That is a clear legal mandate, not "vague language describing the objectives of the statute." *Barnes*, 536 U.S. at 187. Thus, if the Policy violates Title IX's anti-discrimination provision on the merits, it violates the "clear terms of the statute." *Davis*, 526 U.S. at 642.[6]

---

[6] The connection between the merits and the question of whether conduct violates the clear terms of the statute explains why "the Supreme Court cases applying *Pennhurst* to Title IX either begin with a merits analysis of whether the challenged conduct was prohibited or weave that analysis into considerations of notice." *Ante* at 41 (majority opinion). The dissent cites cases from outside the Title IX context in which the relevant statutes had no "clear terms" authorizing a remedy at all, so whether the conduct violated such clear terms was beside the point. *See, e.g., Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1576 (2022) (concluding that "emotional distress damages are not recoverable under … Spending Clause antidiscrimination statutes" because such "distress damages are [not] 'traditionally available in suits for breach of contract,' and [there is]

Even if we understood the "clear terms" requirement to involve notice beyond this low bar, the result would be the same. We have held that "[w]here Congress has explicitly directed the courts to create and administer a private right of action, judicial determination of the rules governing the scope of liability is itself, in effect, a clear statement by Congress." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003). In other words, the CIAC accepted federal funds "with the knowledge that the rules for [Title IX] liability will be subject to judicial determination." *Id.*[7] That the CIAC was subject to conflicting guidance from the Department of Education on this issue, *see* Appellees' Br. 62, made clear that the issue implicated Title IX and would ultimately be decided by a court.

I would hold that official policies of a recipient of federal funds qualify as intentional conduct. And if the CIAC Policy violates Title IX on the merits, then it violates the clear terms of the statute. For these reasons, the *Pennhurst* notice requirement does not bar the plaintiffs' damages claim.

---

correspondingly no ground … to conclude that federal funding recipients have 'clear notice' that they would face such a remedy in private actions brought to enforce the statutes at issue").

[7]  The Fourth Circuit relied on similar reasoning to conclude that *Pennhurst* did not bar damages in a transgender student's lawsuit to access the boys' bathroom. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020) ("Title VII has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them. So too Title IX. And the Board knew or should have known that the separate facilities regulation did not override the broader statutory protection against discrimination. We reject the Board's *Pennhurst* argument.") (internal quotation marks and citation omitted).

13

**IV**

Even if the Policy somehow qualified as unintentional conduct and was subject to the *Pennhurst* notice requirement, the district court and the panel erred in holding that either the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), or appellate case law about bathroom access forecloses a finding that the CIAC was on notice that it needed to provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c).

*Bostock* did not establish that assigning sports teams based on biological sex would constitute discrimination, much less hold that "discrimination based on transgender status is generally prohibited under federal law." *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 56 (2d Cir. 2022). *Bostock* held that Title VII prohibits the firing of an employee based on transgender status because such discrimination would amount to discrimination based on biological sex. The Court explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. It offered the hypothetical of "an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" and "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id*. at 1741-42. In reaching its conclusion, the Court accepted the premise that "sex" in Title VII refers "only to biological distinctions between male and female." *Id*. at 1739; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex,

like race and national origin, is an immutable characteristic determined solely by the accident of birth.").

Moreover, there are important differences between the two statutes. While Title VII makes sex "not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 140 S. Ct. at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)), the Title IX framework expressly allows a funding recipient to maintain separate sports teams based on sex, 34 C.F.R. § 106.41(b), provided that the recipient offers "equal athletic opportunity for members of both sexes," *id*. § 106.41(c). In other words, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022). In fact, the Title IX framework effectively requires a recipient to maintain separate sports teams.[8] Thus, while an employer risks Title VII liability when it

---

[8] *See, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Neal v. Bd. of Trs.*, 198 F.3d 763, 767 (9th Cir. 1999) ("Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field."); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) ("If, to satisfy [T]itle IX, all that the School District were required to do was to allow girls to try out for the boys' teams, then it need not have made efforts … to equalize the numbers of sports teams offered for boys and girls."); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic

makes distinctions among employees based on sex, an education program risks Title IX liability when it *fails* to distinguish between student athletes based on sex. The division that the plaintiffs propose here—separating teams on the basis of sex—is what the Title IX regulations authorize. *Bostock* does not suggest that Title IX requires separating athletic teams on a different basis.

The district court cited several cases from other circuits for the proposition that the CIAC Policy was required by federal law. *See Soule*, 2021 WL 1617206, at *10 ("Courts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity.") (collecting cases); *see also Soule*, 57 F.4th at 55-56. Each of those cases concerns bathrooms rather than athletic competitions.

The circuits are split on the question of whether Title IX permits a school to maintain separate bathrooms based on biological sex. The Eleventh Circuit has held that "Title IX allows schools to provide separate bathrooms on the basis of biological sex." *Adams*, 57 F.4th at 817. More importantly, bathrooms are not athletic competitions. The plaintiffs argue that allowing biological males to enter girls' athletic competitions denied them "equal athletic opportunity," 34 C.F.R. § 106.41(c), because it limited their opportunities for athletic achievement. The different circumstances and regulatory framework applicable to bathrooms does not answer that argument.

The context is important. "[T]hat a characteristic may be relevant under some or even many circumstances does not suggest any reason to presume it relevant under other circumstances where there is reason to suspect it is not. A sign that says 'men only' looks

---

involvement."); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women … are enduring.").

very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *see also Davis*, 526 U.S. at 651 ("Courts, moreover, must bear in mind that schools are unlike the adult workplace."). *Bostock* took this careful contextual approach. It had nothing to say about bathrooms. *Bostock*, 140 S. Ct. at 1753 ("[W]e do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"). Neither *Bostock* nor the case law about bathrooms tells recipients how to provide equal athletic opportunity in educational programs.

\*    \*    \*

The merits question in this case has not yet been decided. Today, the court correctly holds that the district court erred in concluding that standing requirements and *Pennhurst* notice prevented that question from being addressed. I join its opinion. But I would also hold that the district court erred in its *Pennhurst* analysis by failing to consider whether an official policy was intentional conduct and by determining that inapposite case law foreclosed the conclusion that the CIAC had adequate notice.

17