No. 21-1365
*Soule v. Connecticut Association of Schools, Inc.*

PÉREZ, *Circuit Judge*, concurring in part and dissenting in part:

There are at least three issues on which the majority opinion and dissenting opinion in this case are in full agreement: (1) the Intervenors—girls who are transgender who competed in the high school track-and-field competitions at issue—did nothing wrong; (2) Plaintiffs have adequately pled a concrete, particularized injury in fact with respect to their denial of equal athletic opportunity and concomitant public recognition; and (3) Plaintiffs' alleged injuries may, at least for the purposes of the standing inquiry, be redressable through nominal or compensatory damages under Title IX.

I join Part II of the dissenting opinion because I believe that Plaintiffs have failed to allege injuries that are redressable through injunctive relief. I join Parts I.A, I.B.I., and II of the majority opinion because I believe the district court should have considered the merits of Plaintiffs' Title IX claims before or alongside the question of whether Defendants were on adequate notice under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1982), to expose them to potential damages liability. I write below to briefly explain my views.

## I.     Standing

The instant dispute in our Court as to standing is a narrow one.

Plaintiffs allege two injuries arising from Defendants' purported violations of

Title IX: a denial of equal athletic opportunity and a denial of concomitant public

recognition for their success in high school track-and-field competitions.  The

majority opinion and dissenting opinion agree that Plaintiffs have adequately

alleged an injury in fact that is causally connected to the Connecticut

Interscholastic Athletic Conference ("CIAC") policy and could be redressable

through nominal or compensatory damages.  They disagree only as to whether

these alleged injuries are plausibly redressable through injunctive relief as well.

### A.     Plaintiffs Have Standing to Seek Damages

Across the opinions in this appeal, this Court speaks in one voice

that denial of equal opportunity in violation of an antidiscrimination statute is

clearly a cognizable injury in fact.  The majority opinion points out that "[t]he

Supreme Court has identified 'discriminatory treatment' as an example of a

'concrete, *de facto*, injur[y].'"  Maj. Op. at 21 (quoting *TransUnion LLC v. Ramirez*,

141 S. Ct. 2190, 2205 (2021)).  And the dissenting opinion similarly finds that "the

denial of equal athletic opportunity under Title IX" is a potential harm "sufficient

to establish injury in fact."  Diss. Op. at 6.  That this Court agrees that Plaintiffs

2

have adequately pled an injury in fact is an important reaffirmation of our standing precedent because, as the majority opinion notes, "questions of standing . . . have broad implications for all manner of civil rights litigation and civil rights plaintiffs," and "[p]recedent and principle require that we proceed cautiously before limiting access to courts and remedies." Maj. Op. at 5.

Because all parties, as well as the majority opinion and dissenting opinion, agree that damages would provide some relief, *See* Maj. Op. at 24; Diss. Op. at 26, I will not belabor the discussion on damages.

### B. Plaintiffs' Requested Injunctive Relief Fails to Meet the Low Bar for Redressability

In addition to seeking damages, Plaintiffs also requested that the district court remedy their alleged injuries by issuing an injunction to "correct the records" of high school track-and-field competitions in which girls who are transgender competed by "reallocating" relevant titles and placements to girls who are not transgender. Appellants' En Banc Br. at 46–47. As the majority opinion notes, standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." Maj. Op. at 19 (*quoting TransUnion*, 141 S. Ct. at 2208). Plaintiffs cannot do so as to the injunctive relief they seek.

3

In general, the hurdle a plaintiff must clear to demonstrate that an injury is redressable through injunctive relief is low. Plaintiffs must establish only that the "risk [of injury] would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("To demonstrate standing, the plaintiff must . . . seek a remedy that redresses that injury."). The majority opinion points out that "Plaintiffs 'need not show that a favorable decision will relieve [their] *every* injury.'" Maj. Op. at 26 (*quoting Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). A remedy that "'would serve to . . . eliminate any effects of' the alleged legal violation that produced the injury in fact" is sufficient. Maj. Op. at 23 (*quoting Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998)). Thus, in the case before us, "Article III only requires that some form of altering the records 'would at least partially redress' the alleged injury." Maj. Op. at 26 (*quoting Meese v. Keene*, 481 U.S. 465, 476 (1987)).

Plaintiffs fall far short of meeting even this low bar. The dissenting opinion rejects injunctive relief because the relief requested is too speculative. I would go even further to say that the Plaintiffs have set up their alleged injuries in such a way that makes injunctive relief impossible. However low the bar for

the redressability of injunctive relief may be, the form of relief Plaintiffs actually

request in this case is too fanciful and reliant on fiction to confer standing.

1.   *Plaintiffs' Alleged Denial of Equal Athletic Opportunity Could Be Redressed Only by Re-Running the Races—A Form of Relief that is Impossible to Grant Here*

As the dissenting opinion acknowledges, when Plaintiffs initially

filed their lawsuit as high school students in 2020, forward-looking injunctive

relief that would address their alleged ongoing injuries was indeed available to

them.  *See* Diss. Op. at 7.  At that time, Plaintiffs could have theoretically received

an injunction enjoining the CIAC policy moving forward, and it certainly was

"likely that granting [injunctive relief] would 'eliminate [some] effects of' the

alleged legal violation that produced the injury in fact."  Maj. Op. at 27-28

(*quoting Steel Co.*, 523 U.S. at 106).  However, before any alleged injuries could be

remedied, all Plaintiffs graduated from high school and all at-issue competitions

were completed, placing their alleged injuries of denial of equal athletic

opportunity in high school competitions firmly in the past.  *See* Maj. Op. at 24-25

("Plaintiffs' claim is based on a completed violation of a legal right . . . ." (citation

and internal quotation marks omitted)).

It is axiomatic that injunctive relief is forward-looking.  *See Texas v.*

*Lesage*, 528 U.S. 18, 21 (1999).  At this point in time, then, the only injunctive relief

5

that would redress the harm to Plaintiffs' equal athletic opportunity would be "ordering do-overs of the races."  Diss. Op. at 8.

But Plaintiffs did not request that the races at issue be re-run, and for good reason—doing so would be impossible, both jurisdictionally and practically.  An injunction ordering the races to be re-run would require the district court to compel countless individuals—mostly non-party competitors, coaches, and race officials now residing far and wide—to gather and reenact a series of years-past races in different venues across the state of Connecticut.

## 2. Plaintiffs Instead Seek to Redress their Alleged Denial of Public Recognition through a Contrived Form of Injunctive Relief Reliant on Fiction

Because none of the Plaintiffs are still in high school, they instead ask the court to travel back in time and retroactively declare them high school track-and-field champions.  This theory of injury and relief immediately descends into contortions and inconsistencies.

Plaintiffs specifically request that public records of past high school competitions be altered to redress alleged *ongoing* harm resulting from their lack

of public recognition for their high school achievements.[1]  In doing so, Plaintiffs essentially ask the district court and this Court to *pretend* that the impossible was done—that the races have been re-run without the participation of girls who are transgender.  Plaintiffs then expect the court to alter the public records of these races based on who Plaintiffs contend would have won had Intervenors Andraya Yearwood and Terry Miller not competed.  *See* Appellants' En Banc Br. at 19–20.

This attempt to retrofit a forward-looking remedy onto a past injury would require the district court to contort itself into knots and hold irreconcilable sets of facts as true.  Any resulting injunction would be the product of pure conjecture.  To elaborate, Plaintiffs allege that, but for the CIAC policy permitting girls who are transgender to participate in girls' track-and-field events, every at-issue preliminary race would have advanced a different slate of competitors to an at-issue final, resulting in differently run races with different outcomes.[2]  That is, scores of qualifying races would have been run with different slates, yielding

---

[1] Plaintiffs also request that the district court order Defendants to alter "non-public" records related to their high school track-and-field competitions.  To the extent such records exist, correction of a non-public record inherently cannot provide any relief for an alleged injury in the form of lack of public recognition.

[2] *See* Appellants' En Banc App'x at 150 ¶ 78 (alleging at least 85 different opportunities where runners would have advanced to higher level competitions but for Intervenors Yearwood and Miller's participation); *id*. at 153 ¶ 89 (alleging Miller's participation in girls' events "immediately and systematically deprived female athletes of opportunities to advance and participate in state-level competition").

different results and advancing different runners to successive races, which themselves would have been run differently and advanced different runners to championship races, and so on and so forth.  As just one of many examples, Plaintiffs allege that, "[b]ut for CIAC's policy, Plaintiff Selina Soule . . . would have advanced to the next level of competition in the [2019 CIAC] indoor state championship 55m preliminary race and competed for a spot at the New England Championship."  Appellants' En Banc App'x at 155 ¶ 92.  According to Plaintiffs, the CIAC's policy permitted Yearwood and Miller to edge Soule out of the 2019 CIAC State Open Championship, thereby depriving Soule of an opportunity to run in (and perhaps win) the 2019 CIAC 55-meter indoor state championship.  In their next breath, however, Plaintiffs also allege that, "[b]ut for CIAC's policy, Plaintiff Chelsea Mitchell would have placed first in the 55m at the indoor state championship, been named State Open Champion, received a gold medal instead of a bronze medal, and received public recognition of her achievements."  *Id.* at 155 ¶ 93.  But winning a race is a mutually exclusive achievement—it cannot be simultaneously true that but for the CIAC policy, Soule *could* have won that race *and* that Mitchell definitively *would* have won it.

8

Track-and-field competitions are inherently unpredictable events. Absent Yearwood and Miller's participation, every at-issue race would have been run with a different slate of competitors, which could have affected other variables such as lane placements, athlete reaction times, and false starts.[3] This unpredictability is evident in this case, as Plaintiffs Smith and Mitchell in fact outperformed Yearwood and Miller on many occasions over the course of their high school careers. *See* Intervenors' En Banc Br. at 14–17 (outlining record of numerous instances where Plaintiffs defeated Yearwood or Miller in individual races). Notwithstanding Plaintiffs' specific allegations that the results of counterfactual races are inherently uncertain, such that Soule or Mitchell could have prevailed in a but-for world, they ask the court to wade into this deep uncertainty by seeking a remedy to "correct the records and give credit and/or titles" for scores of counterfactual races.

---

[3] Academic literature has suggested that these variables significantly affect the outcome of track-and-field sprint competitions. *See, e.g.*, Espen Tønnessen, Thomas Haugen & Shaher A I Shalfawi, *Reaction Time Aspects of Elite Sprinters in Athletic World Championships*, J. Strength & Conditioning Rsch., April 2013, at 885–92 (observing that reaction time can vary between competitions and between rounds of an individual competition); Aditi S. Majumdar & Robert A. Robergs, *The Science of Speed: Determinants of Performance in the 100m Sprint*, 6 Int'l J. of Sports Sci. & Coaching, no. 3, 2011, at 485 (observing differences in athlete reaction time based on lane placement); Chris Englert et al, *The Effect of Ego Depletion on Sprint Start Reaction Time*, 36 J. Sport & Exercise Psych. 506 (2014) (observing unpredictable nature of false start penalties).

The majority opinion presents its own hypothetical, suggesting that "if some other athletic conference adopts a policy that, unlike the CIAC Policy, categorizes transgender girl athletes as boys in their public records of athletic accomplishment," girls who are transgender "would have standing to seek to have those public records altered to indicate their alleged accurate athletic achievement."  Maj. Op. at 28.  Indeed, if the girls who are transgender in the majority opinion's hypothetical were still high school athletes alleging an ongoing harm, they would certainly have standing to pursue forward-looking injunctive relief of some kind.  No argument there.  This hypothetical is of limited use, however, in the case actually before us.  The majority opinion's hypothetical competitors did not ask the Court, as Plaintiffs in this appeal do, to retroactively reconstruct the results of a race that never actually happened.

Of course, courts often must engage with hypotheticals or imagine fact patterns that have not materialized, and alteration of public records will most certainly be a plausible form of relief for standing purposes in many circumstances.  But just because record alteration could be a meaningful theory of redress in some alternative situation does not make it so in this case.  Plaintiffs also may be correct that "the reallocation of records and medals" in this manner

10

is "commonplace" in sports. Appellants' En Banc Br. at 51. However, unlike an athletics association operating according to its own internal rules, federal courts are bound by Article III's standing requirement. The fact that athletics associations have taken such actions in the past according to their own internal rules does not relieve Plaintiffs of their burden of establishing "the nexus between relief and redress" for the purposes of Article III standing. *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992).[4]

Our precedent and the majority opinion are crystal clear that it is far easier for a plaintiff to satisfy standing burdens than to demonstrate entitlement to a remedy. A plaintiff has much leeway in bringing cases that will get heard on the merits. Similarly, our precedent does not limit a court's equitable power to only the relief that a plaintiff requests. And courts' equitable powers permit and even demand creativity, novelty, and imagination in fashioning remedies. However, Article III limits federal courts' equitable powers to relief that would at least partially redress a party's injuries. Plaintiffs in this

---

[4] For reasons capably pointed out by the dissenting opinion, Plaintiffs' pleadings also do not explain how retroactively stripping Yearwood and Miller of their placements and reallocating spots in championship races would provide meaningful public recognition to individuals who are now several years removed from competing in high school track-and-field. *See* Diss. Op. at 17–19.

11

case fail to demonstrate how their contrived and fictitious theory of relief, which

would require the court to reconstruct the results of counterfactual races

involving multiple participants who have long since graduated from high school,

would even partially redress an injury.

Judge Menashi's concurring opinion suggests that "it may be

possible to preserve [Yearwood and Miller's] records while providing an

appropriate recognition to the plaintiffs, perhaps in two different categories."

Conc. Op. of Menashi, *J.*, at 3. This suggestion falls into the same pitfalls as

Plaintiffs' own requested injunction. What would "an appropriate recognition"

consist of, other than a judicial declaration that another individual could have

won the race had Yearwood or Miller not competed? And how could such a

judicial declaration account for the fact that multiple individuals, including in

many circumstances multiple Plaintiffs, competed in each of the at-issue races

and hypothetically could have won but for the CIAC policy?

The awkwardness of this case's pleadings stems from Plaintiffs'

attempt to retrofit a forward-looking remedy onto a past injury. The bar for

redressability is indeed low—but at some point, a theory of injunctive relief

becomes too fanciful and unrealistic for a court to credit. This case has reached that point.

## II. *Pennhurst* Notice

On the question of whether Plaintiffs are potentially entitled to damages under Title IX, I would hold that the district court erred in resolving the question of notice under *Pennhurst* before analyzing the merits of Plaintiffs' Title IX claims in this matter. I acknowledge the dissenting opinion's thoughtful observation that courts conduct *Pennhurst* sequencing in different ways and no precedent explicitly prohibits assessing notice before considering merits. *See* Diss. Op. at 31-32. But in this particular case, as Plaintiffs allege, any requisite notice would likely stem from the text of Title IX itself and the statute's implementing regulations. Thus, some interpretation of Title IX would appear necessary to determine what notice Defendants had. The notice and merits inquiries are thus intertwined, and the district court erred in considering notice to the exclusion of merits.

The Supreme Court has conducted *Pennhurst* sequencing in a variety of ways. For example, it has sometimes considered merits first when looking at a claim for monetary damages under a Spending Clause statute. *See, e.g.*, *Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (finding that "[r]etaliation

against a person because that person has complained of sex discrimination is . . .

intentional sex discrimination encompassed by Title IX's private cause of action"

before proceeding to determine whether Defendant was on notice that their

conduct violated Title IX). In other situations, it has merged the merits and

notice inquiries. *See, e.g., Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,

526 U.S. 629, 643 (1999) ("We consider here whether the misconduct identified . . .

amounts to an intentional violation of Title IX, capable of supporting a private

damages action . . . . Additionally, the regulatory scheme surrounding Title IX

has long provided funding recipients with notice that they may be liable for their

failure to respond to the discriminatory acts of certain nonagents."). However,

the Supreme Court has rarely considered notice first to the exclusion of merits

because notice is, in most cases, a function *of* merits: The statutory text and

implementing regulations typically *constitute* a funding recipient's notice of

funding conditions. *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548

U.S. 291, 296 (2006) ("In considering whether the [Spending Clause statute]

provides clear notice, we begin with the text. . . . '[C]ourts must presume that a

14

legislature says in a statute what it means and means in a statute what it says

there.'" (quoting *Ct. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

      The implied rule extending from that line of cases is thus quite plain:

When the alleged notice arises from the actual text of a Spending Clause statute,

a court generally cannot consider whether a funding recipient was on notice

without also analyzing whether the text of the Spending Clause statute prohibits

the at-issue conduct.

      The dissenting opinion points to several cases in which courts have

considered notice before merits.  *See* Diss. Op. at 32.  None of these cases,

however, required interpretation of statutory or regulatory text because the at-

issue Spending Clause statutes were silent as to available remedies.  For example,

in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), the Supreme

Court made clear that it would have started its *Pennhurst* analysis with the merits

*if it had text to interpret*.  Instead, the Court found that "[b]ecause the statutes at

issue are silent as to available remedies, it is not obvious how to decide whether

funding recipients would have had the requisite 'clear notice regarding the

liability at issue in this case.'"  *Id.* at 220.

15

In my view, the merits and notice inquiries in this case are indeed intertwined, and the district court should not have considered notice to the exclusion of merits.  On remand, the district court should reconsider its *Pennhurst* holding on a fuller record.  As the majority opinion points out, it is not clear whether the district court fully understood that resolution of *Pennhurst* notice is not a prerequisite to merits analysis.  Maj. Op. at 39.  Nor did it seem to understand that *Pennhurst* notice could be a function of merits analysis.  Indeed, Title IX and its implementing regulations give the district court an ample starting point for determining whether Defendants "had adequate notice that they could be liable for the conduct at issue."  *Davis*, 526 U.S. at 640.  Plaintiffs recognized as much, as their pleadings "argue that the requisite notice stems from the statutory text itself," and not from "a judicial decision or agency guidance."  Maj. Op. at 42.  Given the text of the statute itself and the context of Plaintiffs' claims and allegations regarding notice, it is appropriate to remand for the district court to consider the merits of the Title IX claim and determine whether Plaintiffs could be entitled to nominal or compensatory damages.[5]

---

[5] The merits of Plaintiffs' Title IX claims are rightly a question for the district court in the first instance.  In analyzing whether CIAC was on notice that its policy could violate Title IX, however, Judge Menashi's concurring opinion makes a number of statements about the law

16

\*    \*    \*

The record in this case clearly indicates that Yearwood and Miller

followed every rule in place in Connecticut track and field at the time.  Even the

majority opinion contemplates that any reallocation of titles and placements

would necessarily involve denying Yearwood and Miller *their* titles and

---

regarding inclusion of students who are transgender in schools and sports that merit a response.  *See* Conc. Op. of Menashi, *J.*, at 14-17.  Near-universal authority suggests that Title IX permits or even requires funding recipients to accommodate students who are transgender according to their gender identities.  *See, e.g.*, *A.C. by M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F. 4th 760, 771 (7th Cir. 2023) (finding plaintiffs had demonstrated a likelihood of success on the merits that two school districts' "refusal to grant gender-affirming facility access to the plaintiffs amounts to discrimination on the basis of sex."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("Unlike the other boys, [plaintiff] had to use either the girls restroom or a single-stall option.  In that sense, he was treated worse than similarly situated students."), *cert. denied*, 141 S. Ct. 2878 (2021); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1228 (9th Cir. 2020) ("[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity.  Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity."), *cert. denied*, 141 S. Ct. 894; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018) ("We . . . agree with the School District's position that barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation."), *cert. denied*, 139 S. Ct. 2636 (2019); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1737, 1744 (2020) (interpreting Title VII's identical prohibition of discrimination "on the basis of sex" as prohibiting discrimination on the basis of transgender status).

The Eleventh Circuit stands alone in holding that Title IX does not require school districts to allow students who are transgender to use the bathroom of their choice.  *Adams by and through Kasper v. Sch. Bd. of St. John's Cnty, Florida*, 57 F.4th 791, 812 (11th Cir. 2022).  And even if this court were to adopt the Eleventh Circuit's view of Title IX as it pertains to bathroom use, the Eleventh Circuit's holding in *Adams* would not necessarily affect CIAC's policy in the case before us today.  Holding that a school *need not* accommodate students who are transgender according to their gender identity in order to comply with Title IX is qualitatively different than holding that a school *cannot* do so.

placements and could be an overreach of a court's equitable power. However, in
my view, Plaintiffs' claim for injunctive relief fails before reaching the question of
whether such an injunction would be just and equitable because Plaintiffs
request relief that would not redress their alleged injuries and is impossible to
grant. For this reason, I would find that Plaintiffs lack standing to pursue their
claims for injunctive relief.

The district court now must address complicated questions about
the merits of Plaintiffs' Title IX claims, whether damages are available, and
whether Defendants were on notice that their policy could be in violation of
Title IX. Ensuring that people who are transgender are able to exercise their
inalienable rights to life, liberty, and the pursuit of happiness will continue to
generate nuanced legal and policy questions. The answers that courts and
policymakers come to will not spur universal agreement.

As our country grapples with these questions, the language we use
matters deeply, because our choice of words reflects the decency and humanity
we extend to people who are transgender.[6] In a recent national survey of

---

[6] In the proceedings below, the district court required Plaintiffs' counsel, as a matter of
"civility" and "respect[]," to refrain from referring to Yearwood and Miller as "males" or "male
athletes" rather than, for example, "transgender females" or "transgender athletes." *See* App'x

transgender and non-binary youth, 64% of all respondents reported being the

subject of discrimination due to their gender identity and 27% reported being

physically threatened or harmed due to their gender identity. Am. Br. of the

Trevor Project at 5-6 (citations omitted). And while the case before us is about

high school sports, the discrimination people who are transgender face in our

country today certainly does not end at high school graduation. A recent

analysis of the National Crime Victimization Survey found that transgender

adults are more than four times as likely to be the victims of violent crime as

adults who are not transgender. Andrew Flores et al, *Gender Identity Disparities

in Criminal Victimization: National Crime Victimization Survey, 2017-2018*, 111

American J. of Pub. Health, no. 4, 2021, at 726.

      I bring these statistics up not to suggest that they should weigh on

the outcome of this particular case, but to urge all participants in this ongoing

---

104-09. In their brief before the three-judge panel of this Court, Plaintiffs argued that the district court doing so formed a basis for reassignment on remand. The Court today denies that request. *See* Maj. Op. at 10 n.1. The district court did not exhibit bias, prejudge the merits, nor abuse its discretion in requiring counsel to refer to parties consistent with their gender identity. As many other courts have, *see, e.g.*, *Bostock*, 140 S. Ct. 1731 (Gorsuch, J.); *L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) (Sutton, C.J.); *Grimm*, 972 F.3d 586 (Floyd, J.), the majority and dissenting opinions of this Court refer to litigants such as Yearwood and Miller consistent with their gender identity.

national discussion to be thoughtful, respectful, and responsible in the words we

choose and the reactions we offer.