CHIN, *Circuit Judge*, dissenting, joined by CARNEY and KAHN, *Circuit Judges*, in full; MERRIAM, *Circuit Judge*, as to Parts I and II; LEE and PÉREZ, *Circuit Judges*, as to Part II; and LOHIER and ROBINSON, *Circuit Judges*, as to Part III:

From 2017 through early 2020, Intervenors Andraya Yearwood and Terry Miller, transgender females, participated in girls' high school track events in Connecticut. They won some events and lost some events, but they always competed in accordance with the applicable rules and policies of the governing body, the Connecticut Interscholastic Athletic Conference (the "CIAC"). Plaintiffs -- four non-transgender female athletes who competed against Yearwood and Miller -- brought this lawsuit seeking, *inter alia*, injunctive relief to "correct" certain athletic records by removing all references to Yearwood and Miller, as if they had never competed. Plaintiffs also sought damages for purported violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

When Plaintiffs filed suit, their central claim for relief was for an injunction barring transgender girls from competing in CIAC-sponsored girls' sporting events. But with the onset of the pandemic and the resulting cancelled competitions over the following school years, that claim for relief was rendered moot, leaving only the request for injunctive relief "correcting" the records. The

district court dismissed that claim, concluding that Plaintiffs lacked standing to seek an injunction to rewrite the records.  The district court also dismissed Plaintiffs' claim for damages.  The district court did not reach the merits of the Title IX issue, but held that the damages claim was barred by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), reasoning that the CIAC and its member high schools (together, "Defendants") did not have adequate notice that their policy permitting transgender students to participate in athletics consistent with their gender identity (the "Policy") violated Title IX -- even assuming that it did.

The majority vacates and remands, holding that Plaintiffs have pleaded facts sufficient to establish standing for the requested injunctive relief and that the district court erred by not considering the merits of the damages claim "before or in tandem with the question of notice."  Maj. Op. at 10.

We respectfully dissent.  First, with respect to Plaintiffs' claims for injunctive relief seeking to "correct" the records, we conclude that although Plaintiffs have alleged injury in fact, they have not sufficiently alleged redressability, that is, that their injury will be redressed by the relief sought.  The claimed injury -- the denial years ago of an equal opportunity to compete under Title IX -- would not be redressed by an injunction erasing the times and titles

achieved by Yearwood and Miller.  Second, with respect to the damages claim,

we see no reversible error in the district court's decision to address the *Pennhurst*

bar before resolving the more difficult issue of the merits, and we agree that

given the uncertain state of the law and government directives endorsing the

type of approach they adopted, Defendants did not have notice that the Policy

violated Title IX -- again, even assuming that it did.

## I.

In 2013, the CIAC first implemented its Policy permitting students

who are transgender to participate in gender-specific athletic competitions

consistent with their gender identity, as established in the student's "current

school records and daily life activities."  CIAC By-Laws Article IX, Section B.  The

Policy was by no means an outlier.  The District of Columbia and fifteen states

have similar policies affording transgender students like Yearwood and Miller

"equal access to sports participation."  Amicus Br. for States of New York,

Hawaii, California, Colorado, Delaware, Illinois, Maine, Massachusetts,

Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and

Washington, and the District of Columbia at 13, 24-26.

Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti brought this action in February 2020, when they were high school seniors (Soule and Mitchell) and sophomores (Smith and Nicoletti), alleging that the Policy violates Title IX. According to Plaintiffs, as a result of the participation of transgender girls in girls' athletic events, "girls and women are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." App'x at 148.

Despite Plaintiffs' sweeping assertions about opportunities lost to transgender girls, three of the Plaintiffs each alleged *only one race*, over the course of their high school athletic careers, in which competing against transgender girls affected their athletic achievements; one of the Plaintiffs alleged four races. Specifically, the Second Amended Complaint (the "Complaint") alleges that, but for the Policy:

- Mitchell would have placed second in the 2018 State Open Championship Women's Outdoor 100-meter final, first in the 2019 State Open Championship Women's Indoor 55-meter final, first in the 2019 Class S State Championship Women's Outdoor 100-meter final, and third in the 2019 State Open Championship Women's Outdoor Track 200-meter final;

- Nicoletti would have placed seventh in the 2019 Class S State Championship Women's Outdoor 100-meter preliminary race, and advanced to the 100-meter final;

- Smith would have placed second in the 2019 State Open Championship Women's Outdoor 200-meter final; and

- Soule would have placed sixth in the 2019 State Open Championship Women's Indoor 55-meter preliminary race, and advanced to the 55-meter final. *See id.* at 154-58 (Tables 10-15 in the Complaint).[1]

The injury Plaintiffs allege is the "denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements during track and field competitions in which they participated against and finished behind Intervenors" in violation of Title IX. Maj. Op. at 6. Plaintiffs originally requested the following relief: (1) an injunction prohibiting Defendants from enforcing the Policy going forward; (2) an injunction requiring Defendants to "correct any and all records, public or non-public," by removing Yearwood and Miller and giving "credit and/or titles" to the non-transgender girls who had lost to them; (3) an injunction requiring Defendants to "correct any and all records, public or non-public, [by] remov[ing] times achieved by"

---

[1]    Smith and Mitchell outperformed Yearwood and Miller on multiple occasions. For example, in the 2019 Combined State Open Championship Women's Outdoor 100-meter final, Mitchell and Smith both outperformed Yearwood and Miller. *Compare* Appellees' Supp. App'x at 68 (showing first-place finish for Mitchell) *with id.* at 83 (showing third-place finish for Smith) *with id.* at 28 (showing fourth-place finish for Yearwood) *and id.* at 41 (showing false start for Miller). In the 2019 Class S Championship Women's Indoor 55-meter final, Mitchell finished second and Yearwood finished in third. *See id.* at 30, 70.

Yearwood and Miller; and (4) "[a]n award of nominal and compensatory

damages." App'x at 176. Because "plaintiffs must demonstrate standing . . . for

each form of relief that they seek," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

2208 (2021) (citation omitted), we first address Plaintiffs' standing for their claims

for injunctive relief and then turn to Plaintiffs' claims for damages.

## II.

We agree that Plaintiffs have alleged that they have suffered a

concrete, particularized, and actual harm -- the denial of equal athletic

opportunity under Title IX -- which is sufficient to establish injury in fact. *See*

Maj. Op. at 20-23; *see also* Intervenors' En Banc Br. at 28-29 ("Plaintiffs have

alleged an injury in fact because each Plaintiff has identified at least one specific

instance in which she allegedly raced against -- and finished behind -- a girl who

is transgender.").[2] Even so, as set forth below, Plaintiffs' claims for injunctive

---

[2]    When this case was argued before the three-judge panel of this Court, Plaintiffs
alleged that the Policy deprived them of a "chance to be champions" and that they "feel
erased" because their "records fail to appropriately credit female achievements."
Appellants' Panel Br. at 18-19. The panel held that these allegations were insufficient to
establish injury in fact because "feel[ing] erased" is not a cognizable Article III injury,
and Plaintiffs regularly competed at state track championships where they had the
opportunity to compete for state titles and were indeed "champions" on numerous
occasions. After the panel issued its opinion, Plaintiffs' theory of injury evolved.

relief are either now moot or fail to satisfy the redressability prong of standing, and therefore dismissal is warranted.

When Plaintiffs first filed this lawsuit in February 2020, they undoubtedly had standing to seek an injunction prohibiting future enforcement of the Policy. At that time, the Policy applied to Plaintiffs, who were high school sophomores and seniors intending to compete in the upcoming Spring 2020 girls' track and field season against Intervenors. Therefore, future injury as a result of the Policy was "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013), and an injunction preventing Defendants from enforcing the Policy would redress that alleged injury. But the COVID-19 pandemic intervened, forcing school closures, and requiring cancellation of the entire spring athletics season. By the time Defendants filed their joint motion to dismiss in August 2020, Mitchell, Soule, Yearwood, and Miller had all graduated from high school. Nicoletti and Smith competed against no transgender athletes in their final years of high school, and they both had graduated before the three-judge panel of this Court heard oral argument in this case. Hence, as Plaintiffs have conceded and as the majority does not dispute, Plaintiffs' principal claim for injunctive relief --

7

an injunction forbidding future enforcement of the Policy -- is decidedly moot. *See* Maj. Op. at 24 n.3 (citing *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993)).

This leaves, with respect to injunctive relief, only Plaintiffs' requests for injunctions requiring Defendants to "correct" their official athletic records by giving "female athletes" the credit and titles they would have received and "remov[ing]" transgender girls from the records. App'x at 176. According to Plaintiffs, these injunctions, if granted, would remedy their past denial of equal athletic opportunities and related "ongoing harm of a degraded resume" by giving "credit where credit's due." Appellants' En Banc Br. at 29, 38.

We are not convinced, however, that an injunction requiring Defendants to erase the times and titles earned by Intervenors, and to give non-transgender athletes higher placements in past races where Intervenors had finished before them, would redress the alleged injury. The denial of equal athletic opportunity and related public recognition, it seems to us, could be redressed only by either ordering do-overs of the races, which Plaintiffs do not request, or awarding damages, which, as discussed further below, are barred under *Pennhurst* in this action.

## A.

At threshold, a past injury is not redressable by injunctive relief, unless accompanied by allegations of ongoing harm or a likelihood of future harm. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing . . . of any real or immediate threat that the plaintiff will be wronged again. . . .  The speculative nature of [plaintiff's] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.").  Therefore, "[a] plaintiff seeking injunctive or declaratory relief . . . must show a likelihood that he or she will be injured in the future." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004); *see also* Appellants' En Banc Br. at 46.

Next, to satisfy redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by" the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citation omitted).  This is a real and meaningful requirement. *See, e.g., Steel Co.*, 523 U.S.

at 107 ("Relief that does not remedy the injury suffered *cannot* bootstrap a

plaintiff into federal court; that is the very essence of the redressability

requirement." (emphasis added)); *cf. United States v. Juvenile Male*, 564 U.S. 932,

937 (2011) (per curiam) (a judgment's "possible, indirect benefit" does not

preserve standing). The Supreme Court has recently emphasized this point:

> But redressability requires that the court be able to afford
> relief through the exercise of its power, not through the
> persuasive or even awe-inspiring effect of the opinion
> explaining the exercise of its power. . . . Otherwise,
> redressability would be satisfied whenever a decision might
> persuade actors who are not before the court -- contrary to
> Article III's strict prohibition on issuing advisory opinions.

*Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (internal quotation marks and

citations omitted, alterations adopted, and emphasis removed).

Finally, as relevant here, a court's favorable decision that merely

bestows "psychic satisfaction" upon a plaintiff fails to satisfy redressability. *See*

*Steel Co.*, 523 U.S. at 107 (noting that "psychic satisfaction is not an acceptable

Article III remedy"); *Kapur v. Fed. Commc'ns Comm'n*, 991 F.3d 193, 196 (D.C. Cir.

2021) ("The 'psychic satisfaction' of winning doesn't cut it."); *I.L. v. Alabama*, 739

F.3d 1273, 1281 (11th Cir. 2014) ("[G]ranting the plaintiffs the relief they request

would result in nothing more than a mere 'moral' victory, something the federal

courts may not properly provide."); *Doyle v. Town of Litchfield*, 372 F. Supp. 2d 288, 303 (D. Conn. 2005) ("[S]ome emotional or mental satisfaction . . . is inadequate to confer standing, no matter how worthy the cause.").

**B.**

Applying these constitutional principles here, to establish standing for the requested injunctions to "correct" athletic records, Plaintiffs must adequately allege either ongoing harm or a likelihood of future harm resulting from the alleged Title IX violation, *and* that this ongoing or future injury is likely to be redressed by the requested relief. Plaintiffs fail to meet this burden.

Plaintiffs' requested injunctions for amending Defendants' records sweep broadly, seeking the removal of "*any and all*" times, titles, and records achieved by transgender girls -- irrespective of whether those records have any bearing on Plaintiffs' own athletic achievements. *See* App'x at 176 (emphasis added). Even the majority recognizes that Plaintiffs go too far in the relief they request. *See* Maj. Op. at 32-33. Indeed, an order requiring Defendants to remove record times and titles achieved by transgender girls that have *no impact* on Plaintiffs' own athletic achievements would at most afford Plaintiffs "psychic satisfaction," and remedy no actual injury of Plaintiffs. This is insufficient to

11

establish standing here. Plaintiffs cannot plausibly allege that they were

personally denied equal athletic opportunities in races where they did not finish

behind a girl who is transgender, and, therefore, there is no ongoing or

likelihood of future harm to Plaintiffs from maintaining the records related to

these races as is. Ordering Defendants to excise the achievements of transgender

girls in races where Plaintiffs finished ahead of, or did not compete against, a

transgender athlete would redress no concrete, particularized, or actual injury

suffered by Plaintiffs. This purported injury is thus insufficient to establish

standing. *See Steel Co.*, 523 U.S. at 107.

We reach the same conclusion for the records related to races where

Plaintiffs themselves placed behind or lost to a girl who is transgender. As

mentioned, Nicoletti, Soule, and Smith each allege *one* track event in their high

school careers where, "[b]ut for" Intervenors' participation, they would have

placed higher than they did.[3] Mitchell alleges *four* final championship races

where "[b]ut for" Intervenors' participation, Mitchell would have been the third,

---

[3]     Specifically, Nicoletti alleges she would have placed seventh instead of ninth in a
preliminary championship race; Soule alleges she would have placed sixth instead of
eighth in a preliminary championship race; and Smith alleges she would have placed
second instead of third in a final championship race. App'x at 154-59.

second, or first place finisher.  *See* App'x at 154-58.  Plaintiffs argue that they

continue to suffer ongoing harms from these seven past denials of equal athletic

opportunity, urging specifically that their "downgrade[d]" athletic records

impact their future employment prospects and result in a lack of public

recognition for "their hard-earned athletic accomplishments."  Appellants' En

Banc Br. at 36-37 (citing App'x at 172).[4]  But Plaintiffs fail to show how

"correcting" the records of these seven high school events that occurred in 2018

and 2019 is likely to redress either of these harms, even partially.

    Although Plaintiffs admit that "it is too late for" an injunction to

"correct" the records to have any effect on their opportunities for college

recruitment and scholarships, they argue that the current records "will *always*

impact" their future employment opportunities.  *Id.* at 37.  Setting aside the issue

that the Complaint is devoid of allegations regarding employment, Plaintiffs

---

[4]    Plaintiffs also assert that they suffer ongoing "stress, anxiety, intimidation, and emotional and psychological distress" from the alleged Title IX violations in 2018 and 2019.  Appellants' En Banc Br. at 28.  Emotional distress of this variety is not a cognizable injury in fact.  *See Santos v. Dist. Council of N.Y.C. & Vicinity of United Brotherhood of Carpenters & Joiners of Am., AFL-CIO*, 547 F.2d 197, 200 (2d Cir. 1977) (explaining that "disappointment" in election results is "an emotional loss insufficient to establish standing" (internal quotation marks and citation omitted)); *see also Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 619-20 (2007) (Scalia, *J.*, concurring) (explaining that "[p]sychic [i]njury" that consists of an individual's "mental displeasure" is insufficiently "concrete and particularized" to confer standing).

have consistently presented nothing other than speculation that "correcting" the records would have any effect in this arena.  It strikes us as pure speculation that changing Plaintiffs' placements in one high school race (or four races in Mitchell's case) would affect a prospective employer's decision to hire any one of them in the future.  And the reality is that no prospective employers would be bound by an injunction issued in this case to overlook the current records, which reflect the outcomes of the races as they were run.  Therefore, even if Mitchell were, for example, to change her two second-place finishes on her resume to be first-place finishes, whether this change would improve her employment opportunities "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562.  Under these circumstances, a court can only speculate as to how prospective employers might exercise their discretion in hiring.  This is insufficient to satisfy redressability.  *See id.* at 561.

It is conceivable that, if Plaintiffs' requested injunction is granted, some prospective employer, at some undetermined point in the future, *could* be persuaded to interview or hire one of the Plaintiffs because of her belated higher

14

placement in a race she had lost to Yearwood and Miller years ago.

Redressability, however, is not "satisfied whenever a decision *might persuade*

actors who are not before the court." *Haaland*, 599 U.S. at 294 (emphasis added).

Moreover, the likelihood that Plaintiffs' higher placements would impact their

employment prospects in this way is minimized by the fact that any hiring

decisions would be made years after Plaintiffs' high school athletic careers

ended. After all, as collegiate runners, Plaintiffs have only added to their already

impressive athletic records.[5] College-level sports are generally considered to be

much more elite and competitive than high school sports, and teams are likely to

be significantly more selective: in fact, only 6.2% of girls who compete in high

school track and field across the country go on to run at the collegiate level.[6]

Therefore, it is entirely speculative, if not highly implausible, that Plaintiffs'

placement in any one high school race years ago -- as opposed to the totality of

their more recent and more impressive college records -- would have an impact

on Plaintiffs' future employment opportunities.

---

[5]     All four Plaintiffs currently compete on collegiate track-and-field teams. Some
were awarded scholarships. By contrast, Yearwood and Miller have not participated in
athletics or competed since high school. *See* En Banc Transcript at 72.

[6]     *See Estimated probability of competing in college athletics*, NCAA (Apr. 8, 2020),
https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-college-
athletics.aspx [https://perma.cc/H2SC-YZNH].

We are left, then, with Plaintiffs' allegedly ongoing lack of public recognition for their athletic achievements as the remaining basis to support standing for their claims for injunctive relief. According to the majority, Plaintiffs have standing for an injunction to "correct" public records for the seven races where Plaintiffs finished behind Intervenors because such relief "*could at least* provide [them] with the publicly recognized titles and placements they would have received if Intervenors had not competed and finished ahead of Plaintiffs in specific races," Maj. Op. at 7 (emphasis added), "albeit belatedly," *id.* at 27. This argument also rests on speculation.

As alleged in the Complaint, the lack of public recognition is not an ongoing harm that is redressable by an Article III court. What does "belated" public recognition mean in this case? The majority does not say. Nor does the majority recognize that Plaintiffs' high school athletic records, as they currently exist, *do* give them public recognition for their achievements in races that were run in conformity with the rules in effect at the time. For example, the current records provide that Mitchell was the third-place finisher in the 2019 State Open Championship Women's Indoor 55-meter final and the second-place finisher in the 2019 Class S State Championship Women's Outdoor 100-meter final. App'x

16

at 155, 158.  Plaintiffs do not allege that these records fail to reflect that they won

according to the rules in place at the time.  Rather, Plaintiffs allege that they

would have won or placed higher if the rules had been different, and that if an

injunction were now to be issued, retroactively changing the rules of the game,

they would somehow receive measurably greater public recognition and their

reputations would be further enhanced.[7]  These allegations, too, are purely

speculative.  An injunction "correcting" the records to reflect an alternate

universe according to how Plaintiffs say they would have competed in seven

races had the rules been different would give Plaintiffs nothing more than the

satisfaction of a judicial decision vindicating their position that the Policy

violates Title IX.  But, as counsel for Plaintiffs conceded, *see* En Banc Transcript at

7, achieving "psychic satisfaction is not an acceptable Article III remedy," *Steel*

*Co.*, 523 U.S. at 107.  While we do not take the position that psychic relief can

never be sufficient to confer standing, here, where the injunction seeks merely to

---

[7]      Although in particular cases both types of relief may be warranted, damages
generally provide adequate and appropriate redress for claims of past reputational
injury.  *See, e.g.*, *TransUnion*, 141 S. Ct. at 2210-13 (holding that plaintiffs who were
erroneously identified by credit reporting agency to potential creditors as being on a
government "terrorist list" suffered concrete injury of "reputational harm" and have
standing to seek retrospective damages); *Bohnak v. Marsh & McLennan Companies, Inc.*,
79 F.4th 276, 289 (2d Cir. 2023) (holding that risk of harm caused by public disclosure of
private information is redressable with retrospective damages).

remedy a past injury by giving "credit where credit's due" and the claim is principally for Plaintiffs' moral or emotional satisfaction, it is not sufficient. *Id.*; *Kapur*, 991 F.3d at 196; *I.L.*, 739 F.3d at 1281; *see also Lyons*, 461 U.S. at 107 n.8 ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant. Of course, emotional upset is a relevant consideration in a damages action.").

Had Plaintiffs adequately alleged a non-speculative ongoing or future harm resulting from the past denial of equal athletic opportunity, our standing analysis would be different. The circumstances here are distinguishable from, for example, those of a law student who, as a result of sex or racial discrimination, was downgraded from receiving a "magna cum laude" designation to "cum laude" only. *See* En Banc Transcript at 6-7. There is no question that an injunction to reallocate Latin honors that were illegally bestowed upon a law school graduate would provide more than "psychic satisfaction" to the injured individual. Such an injunction is likely to redress a non-speculative and ongoing or future harm by directly improving employment prospects or earning capacities in a field of study. The link, however, between

improved employment opportunities after college graduation and finishing first

instead of third in a high school track race held years earlier is much more

attenuated -- if it exists at all.

The majority acknowledges that "Plaintiffs do not have standing to

seek remedies for generalized grievances about the [] Policy," Maj. Op. at 31, but

the record leaves no doubt that Plaintiffs are indeed waging a generalized

campaign in federal court against transgender athletes.[8]  Indeed, the majority

---

[8]      That Plaintiffs brought this case to pursue generalized grievances is evident from
the language they use throughout the Complaint.  Plaintiffs refer to themselves as
"girls" and "female athletes," App'x at 164, but refer to Intervenors as "student[s] born
male," *id.* at 133; "biological males," *id.* at 164; and "athletes born male and with male
bodies," *id.* at 176.  Notably, in the district court Plaintiffs moved to disqualify the
district judge after he ordered them to stop referring to Intervenors as "males."  In his
order denying the motion, the district judge observed that Plaintiffs' use of "males" in
this respect was "needlessly provocative" and not necessary to advance Plaintiffs'
position.  In our dissent, we refer to Intervenors as "transgender females" and
"transgender girls."  We do so to afford them the respect and dignity they are due as
litigants in our Court.  Because a transgender person's gender identity is what some
"would think of as opposite to their assigned sex," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972
F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020), calling attention to a
transgender person's biological sex by referring to them as a "biological male" is
harmful and invalidating.  *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-
Dysphoric/Gender-Incongruent Persons:  An Endocrine Society Clinical Practice Guideline*,
102(11) J. Clinical Endocrinology & Metabolism 3869, 3875 tbl.1 (2017) (observing, "[a]s
[the physical aspects of maleness and femaleness] may not be in line with each other . . .
the terms biological sex and biological male or female are imprecise and should be
avoided").  Research indicates that misgendering -- referring to the gender of a person
incorrectly -- can cause or exacerbate feelings of stigmatization, stress, and depression.
*See* Sabra L. Katz-Wise, *Misgendering:  What it is and why it matters*, Harvard Health

implicitly acknowledges as much by, *inter alia*, purporting to limit Plaintiffs'

standing to seek an injunction to "correct" public -- as opposed to private --

athletic records only. "Correcting" private records, according to the majority,

would afford Plaintiffs only "psychic satisfaction." *Id.* at 32-33 (citing *Steel Co.*,

523 U.S. at 107). Implicit in the majority's distinction between private and public

records is the recognition that an injunction to "correct" the records *cannot*

remedy Plaintiffs' past denial of equal athletic opportunities and is effective only

for providing "some" additional public recognition to Plaintiffs. Because private

athletic records do not give public recognition, the majority is forced to draw the

line there. If this case were genuinely about redressing Plaintiffs' alleged past

denial of equal athletic opportunities, there would be no distinction between

public and private records -- there would be only damages. Instead, the majority

accepts Plaintiffs' invitation to be not an arbiter of justiciable disputes but a

dispenser of public acclaim.

---

Publishing, Harvard Medical School (July 23, 2021), https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 [https://perma.cc/F8Q3-AP39]; *see also* Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma and Health 1, 53-64 (2018). For transgender people, the experience of being misgendered -- whether intentionally or negligently -- harms their "deeply felt, inherent sense" of gender, a core part of what makes each of us human. *Grimm*, 972 F.3d at 594.

There is no case, to our knowledge, where a court has held that a plaintiff had standing for a claim for injunctive relief and the *only* redress a court's favorable decision could bestow came in the form of public recognition. *But cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 134-35, 140 (1951) (holding that plaintiff had standing for an injunction striking its name from a public list of organizations designated by the Attorney General as Communist because plaintiff alleged that the designation was erroneous and that it resulted in a laundry list of ongoing harms -- including "a multiplicity of administrative proceedings . . . to rescind licenses, franchises, or tax exemptions," and the resignation or withdrawal of its members). Moreover, unlike the cases from our sister circuits holding that a plaintiff continued to have standing to seek relief from an athletic association's attempts to vacate or expunge their athletic records, Plaintiffs here do not allege any such future threat to their records. *Cf. e.g.*, *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *Crane by Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992); *Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d 473, 476 (10th Cir. 1979). Plaintiffs' reliance on these cases is ill-placed; rather, it is Intervenors who, due to this lawsuit, "have an interest in preventing" the "erasure of" their

individual records.[9]  *Sandison*, 64 F.3d at 1030.  Indeed, in the absence of any

plausible, non-speculative allegations of ongoing or future harm, Plaintiffs'

remaining claims for injunctive relief are fundamentally retrospective -- seeking

to remedy the past denial of equal athletic opportunities -- and therefore, if they

have a meritorious claim, the proper remedy is damages.  *See Lyons*, 461 U.S. at

111.

Even assuming that the redressability requirement were met, other

considerations warrant our caution in ultimately awarding such injunctive relief,

particularly when there is no dispute that Plaintiffs' claims for damages -- if

sustained -- would redress the alleged harm.  *Cf. Metro. Opera Ass'n, Inc. v. Loc.*

*100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (stating

that, given First Amendment considerations, injunctive relief will not usually be

granted to enjoin a libel or slander and that, ordinarily, the only remedy for

---

[9]    In her concurrence, our colleague Judge Nathan writes, "it is not surprising that
[Intervenors'] own lawyers suggested at oral argument" that Plaintiffs have standing.
Nathan, *J.*, Concurrence at 4 (citing Oral Arg. Tr. at 63-64, 66, 68-69, 71-72).  We do not
understand counsel to have made any such suggestion.  For instance, at oral argument,
Intervenors' counsel simply noted that the availability of a remedy presented a
"redressability question," but this statement does not "suggest[]" that Plaintiffs had
standing with respect to the remaining claim for an injunction rewriting the records.  In
the same exchange, counsel reiterated Intervenors' position that this case should "be
resolved on a 12(b)(6) motion for failure to state a claim."

defamation is an action for damages). "Correcting" the records as Plaintiffs request would require stripping Yearwood and Miller of the athletic achievements earned by them when, at all times relevant, they were eligible competitors and competed in full compliance with all applicable and existing CIAC rules.

Plaintiffs assert that "the reallocation of records and medals" is "commonplace," Appellants' En Banc Br. at 51, and point to the practice of various sports governing bodies withdrawing awards previously bestowed on certain athletes who were determined to have been ineligible to compete under the (unamended) governing rules. In none of these examples, however, did the governing bodies grant the precise relief Plaintiffs seek here. Plaintiffs have not, and cannot, point to a sports governing body that retroactively stripped an athlete of accomplishments where the athlete did not cheat or take an illegal substance, but instead complied with all the then-existing rules. Even assuming that Plaintiffs are right on the merits and the Policy violates Title IX, it is unprecedented to retroactively change the ground rules of individual local competitions, such that certain competitors will be deemed ineligible only after the fact, and then, to take it even further, to strip those competitors of their duly

earned achievements based on a late-developing interpretation of a federal

statute.  It is not the business of the federal courts to grant such relief.

To be sure, whether a plaintiff is ultimately entitled to the relief she

seeks goes to the merits of her claims and does not control the threshold

jurisdictional question of whether she can maintain her claims in an Article III

court.  *See E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014); *see also*

*Chafin v. Chafin*, 568 U.S. 165, 174 (2013).  But we do not assert that an injunction

"correcting" the records is legally unavailable to Plaintiffs -- we simply

acknowledge that granting the requested relief would require taking something

away from third parties, who, as Plaintiffs admit, "haven't done anything

wrong."  En Banc Transcript at 8.  Moreover, the redressability requirement of

standing requires consideration of whether the relief sought is "an acceptable

Article III remedy," *Steel Co.*, 523 U.S. at 107, and thus "the linkage of justiciability

doctrine to concerns about necessary and acceptable remedies is evident on the

face of the 'redressability' prong of the standing test."  Richard H. Fallon, Jr., *The*

*Linkage Between Justiciability and Remedies -- and Their Connections to Substantive*

*Rights*, 92 Va. L. Rev. 633, 670 (2006).  Although "[r]edressability does not permit

us to wade so deeply into the merits," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405

24

(2d Cir. 2011), "there should be no categorial resistance to courts allowing

judgments about necessary and unacceptable remedies to influence their framing

of justiciability rules," Fallon, 92 Va. L. Rev. at 692.  Here, the balance of the

equities does not raise an issue of redressability on its own, but it triggers a need

for special caution in assessing redressability, and reaffirms that the preferable

remedy in a case such as this is the more traditional one of monetary relief,

notwithstanding a court's de facto power to enter an order changing the records

if the circumstances warranted.

Accordingly, in the circumstances presented here, we are not

persuaded that striking Yearwood's and Miller's records would meaningfully

redress Plaintiffs' alleged past injury of a denial of equal athletic opportunities

and related public recognition.[10]

---

[10]     In support of its standing analysis, the majority contends that "if the facts were
reversed and an athletic conference decided to categorize transgender girl athletes as
boys," the transgender girls would have standing to bring a Title IX claim.  Maj. Op. at
7.  The majority also asserts that our standing analysis "would leave the transgender girl
athletes [in a reversed hypothetical] without standing to seek alteration of existing
athletic records consistent with their athletic achievement."  *Id.* at 29 n.6.  We are unclear
as to what the majority means by a reversed hypothetical.  If transgender girls were
barred from racing in girls' races, they surely would have standing to sue for damages
and to seek injunctive relief with respect to the policy (as long as their claims were not
moot).  But there would be no basis for an injunction to alter existing records if they had
not been permitted to run in the first place.  If the majority has in mind a situation
where transgender girls were permitted to run in races and the athletic conference then

## III.

As discussed, an award of monetary damages, even in nominal amounts, would redress Plaintiffs' alleged injury of a denial of equal athletic opportunities. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (where plaintiff's legal rights were violated and he could not or would not quantify his injury in economic terms, for "purpose[s] of Article III standing, nominal damages provide the necessary redress"). We would, however, affirm the district court's holding that monetary relief is unavailable in this case by virtue of *Pennhurst*.

Congress enacted Title IX pursuant to its authority under the Spending Clause. *See* Maj. Op. at 37. *Pennhurst* imposes a limit on this power,

---

changed course and struck their results from the records, they would also likely lack standing to sue to reinstate their results years later unless they could allege a non-speculative ongoing or future injury resulting from the athletic conference's actions. The nature of the injury in the latter scenario (unlikely as it may be) would be substantially different from the injury at issue in the present case, for the transgender girls would be seeking not just to alter records to move up in the race results, but to rectify the complete elimination of their athletic achievements from the records. If, finally, the majority contemplates a scenario where transgender girls are permitted to race but are grouped with non-transgender boys in the results, that too would present an injury of a different kind than Plaintiffs' here. The majority's "shoe on the other foot" hypothetical, Maj. Op. at 28, overlooks the fact that in that case, transgender girls would have standing based on an *ongoing* injury caused by being misgendered in public records of past races. In contrast, Plaintiffs here were never prevented from competing and do not claim that the records are inaccurate as to their gender identity.

26

"requir[ing] Congress to speak *unambiguously* in imposing conditions" on States

when they accept "federal grant money." *State of New York v. U.S. Dep't of Just.*,

964 F.3d 150, 153 (2d Cir. 2020) (citation and quotation marks omitted). When

Congress fails to "speak unambiguously," liability cannot be imposed on a

federal funding recipient for violating the Spending Clause statute. *Id.*

　　　　The majority faults the district court for dismissing Plaintiffs' claims

for monetary relief pursuant to the *Pennhurst* bar before addressing the merits of

the Title IX claim. We address first the issue of "*Pennhurst* sequencing" -- that is,

whether courts must consider the merits before reaching the *Pennhurst* bar.

Finding that neither the Supreme Court nor this Court has recognized any such

requirement, we then turn to the district court's application of the *Pennhurst* bar

in this case.

**A.**

　　　　Contrary to the majority's view, the district court did not conclude

"that it was *required* to resolve," Maj. Op. at 9, or "that it *must* resolve the question

of [*Pennhurst*] notice before reaching the merits of Plaintiffs' Title IX claims," *id.* at

37 (emphasis added). The district court made no such ruling. The majority's

erroneous conclusion rests entirely on a footnote in the district court's opinion:

> Plaintiffs argue that the question of notice should be deferred
> until a later stage of the case. However, if the plaintiffs' claims
> for money damages are barred due to lack of adequate notice,
> the action is subject to dismissal in its entirety because the
> only remaining form of relief sought in this case – attorney's
> fees and expenses -- is 'insufficient, standing alone, to sustain
> jurisdiction.'

*Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL

1617206, at *8 n.13 (D. Conn. Apr. 25, 2021) (quoting *Cook*, 992 F.2d at 19). From

this footnote, the majority surmises that it is "apparent" that the district court

thought that it "lacked discretion to reach the merits of Plaintiffs' claims without

first determining if monetary damages would be available under *Pennhurst*."

Maj. Op. at 39.

It is true that the district court, in this footnote, adverted to the

possible need for dismissal of the action "in its entirety" and mentioned

jurisdiction. It did so cursorily, however, without any analysis, and only in

response to Plaintiffs' request that it "*should*" defer consideration of the *Pennhurst*

issue. 2021 WL 1617206, at *8 n.13 (emphasis added). But nowhere in its lengthy

discussion of *Pennhurst* does the district court note, or even suggest, that it

believed it was *required* to decide the notice question first or that it lacked the

discretion to consider Plaintiffs' claims for monetary relief on the merits. Rather,

notwithstanding the footnote, we think the better reading of the district court's

28

opinion is that it exercised its discretion by choosing to determine the *Pennhurst* bar first. Its discussion of the sequencing issue, in tone and substance, took the posture of an aside or afterthought. Moreover, in briefing the motion to dismiss in the district court, no party suggested that the district court was *required* to decide the *Pennhurst* issue first. Indeed, in moving to dismiss, Defendants addressed the merits first and the *Pennhurst* bar second. The structure and language of the briefing below made clear that, in the parties' view, the district court was free to address the merits first if it was so inclined.[11] Instead, it exercised its discretion to address the *Pennhurst* issue first.

In this context, we cannot conclude that the district court erred in doing so. After dismissing Plaintiffs' claims for injunctive relief for mootness and lack of standing, *see Soule*, 2021 WL 1617206, at *4-8, only Plaintiffs' claims for damages and attorneys' fees and costs remained. Therefore, the district court correctly concluded that, if *Pennhurst* provided a defense against Plaintiffs'

---

[11] Defendants addressed the damages claim in Point III of their memorandum of law, which contained four sub-points. The first three subpoints argued that Plaintiffs had failed to allege a plausible claim for a violation of Title IX, and only in the fourth sub-point did they raise the *Pennhurst* bar. Moreover, sub-point D begins by arguing that "[a]t a minimum," the damages claim was barred by *Pennhurst*. And in their memorandum in opposition to Defendants' motion to dismiss, Plaintiffs argued, with respect to the *Pennhurst* issue, that "debates about *proper* relief are for a later day, not a basis for dismissal." Dist. Ct. Doc. 154 at 53.

claims for damages, then Plaintiffs could not win any of the relief they requested, and the request for attorneys' fees and expenses would not provide a basis for the court to adjudicate the merits of Plaintiffs' Title IX claim. *See id.* at *8 n.13.[12] The district court surely did not abuse its discretion in refraining from deciding more than was necessary to resolve Defendants' motion to dismiss. *See Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, *J.*, concurring in part and dissenting in part) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (citation and quotation marks omitted)).

To be sure, when "questions are 'indispensably necessary' to resolving the case at hand, 'the court must meet and decide them.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375 (2010) (Roberts, *C.J.*, concurring) (quoting *Ex parte Randolph*, 20 F. Cas. 242, 254 (Cir. Ct. Va. 1833) (Marshall, *C.J.*)). Even the majority recognizes that the district court did not abdicate its duty to resolve a question that was indispensably necessary to this case; the majority

---

[12]     The district court was merely observing that, once the other claims were dismissed, Plaintiffs' request for attorneys' fees and expenses could not provide a basis for it to reach the merits because "such fees are available only to a party that 'prevails' by winning the relief it seeks." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990); *see also Uzuegbunam*, 141 S. Ct. at 801 ("[T]hose awards are merely a 'byproduct' of a suit that already succeeded[.]" (citation omitted)).

asserts only that "there are strong reasons for addressing the merits first."  Maj.

Op. at 41.  None of the majority's "strong reasons," however, lead to the

determination that, in this case, the district court was *required* to adjudicate the

merits of Plaintiffs' claims before addressing *Pennhurst*.  In fact, Intervenors

conceded at oral argument that there is nothing prohibiting a court from dealing

with the *Pennhurst* issue before the merits issue -- only that doing so in this

instance is "a little bit awkward."  En Banc Transcript at 58.  Appellate courts do

not vacate the reasoned judgments of experienced district judges on the basis of

"awkwardness" -- there must be an identified error in the district court's holding

or an abuse of its discretion to support vacatur.  Apart from its overreading of a

remark in footnote 13, the majority points to neither.

   A review of *Pennhurst*'s progeny confirms that no precedential

authority *requires* that a court in our Circuit reach the merits of a Title IX claim in

tandem with, or prior to, the question of notice.  The Supreme Court has, at

various times, addressed (1) the merits before notice, (2) the merits together with

notice, and (3) notice without reaching the merits at all.  For example, in *Jackson

v. Birmingham Board of Education*, 544 U.S. 167, 178-83 (2005), the Court addressed

first whether retaliation falls within the Title IX's prohibition of intentional

discrimination on the basis of sex, and then considered whether the recipient had

notice that it could be liable for damages with respect to claims of retaliation.

But *Jackson* is an outlier.  In two earlier cases -- both of which held that *Pennhurst*

does not bar damages where a funding recipient was deliberately indifferent to

known acts of sexual harassment -- the Supreme Court integrated the *Pennhurst*

notice and Title IX merits inquiries.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503

U.S. 60, 74-75 (1992) (stating, in one paragraph, that *Pennhurst* is inapplicable and

that "[u]nquestionably, Title IX placed on the [school district] the duty not to

discriminate on the basis of sex" by permitting teacher-on-student harassment in

its schools); *see also Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526

U.S. 629, 643-44 (1999) (concluding that "deliberate indifference to known acts of

harassment . . . amounts to an intentional violation of Title IX, capable of

supporting a private damages action, [even] when the harasser is a student"

because the "regulatory scheme surrounding Title IX" and common law have

"long provided funding recipients with notice that they may be liable for their

failure to respond to the discriminatory acts of certain nonagents").  Finally, in

certain cases involving other Spending Clause legislation akin to Title IX, the

Supreme Court has addressed only the *Pennhurst* notice issue, making no

32

determination as to the merits of the plaintiff's claims. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 222-23, *reh'g denied*, 142 S. Ct. 2853 (2022) (concluding that recipients lacked the requisite notice that they could face liability for emotional distress damages for violating Spending Clause statutes); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006) (holding that the fee-shifting provision of the Individuals with Disabilities Education Act, a Spending Clause statute, fails to furnish "clear notice" that a funding recipient could face liability to a prevailing parent for the cost of services rendered by experts).

Moreover, some of our sister circuits have considered first whether the *Pennhurst* bar applies to a claim brought under Title IX before turning to the merits of the claim. *See, e.g.*, *Hall v. Millersville Univ.*, 22 F.4th 397, 403 (3d Cir. 2022) ("The first issue we must address is whether, as a matter of law, [the funding recipient] could not be held liable under Title IX because it lacked notice that its deliberate indifference to sexual harassment perpetrated by a non-student guest could result in Title IX liability."); *cf. Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 921-22 (7th Cir. 2012) (requesting supplemental briefing on the *Pennhurst* notice question and addressing the merits of plaintiffs' claim that

33

sport-specific scheduling disparities violated Title IX only after holding the

*Pennhurst* defense to be waived).  Others, like the district court here, have

applied *Pennhurst* to bar claims for damages without ever reaching the merits.

*See, e.g., Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 277

(6th Cir. 2009) (en banc) (concluding that the No Child Left Behind Act "fails the

Spending Clause inquiry because it does not provide clear notice to States that

they must incur the costs of compliance" without resolving an issue of statutory

interpretation central to the merits of plaintiffs' claims); *Rendelman v. Rouse*, 569

F.3d 182, 188-89 (4th Cir. 2009) ("When Congress desires to impose a condition

under the spending clause, it is Congress' burden to affirmatively impose the

condition in clear and unmistakable statutory terms. We conclude therefore that

. . . Congress did not signal with sufficient clarity an intent to subject such a

person to an individual capacity damages claim under [the statute]." (internal

citations and marks omitted) (alterations adopted)).

Indeed, it *makes sense* that a district court would have discretion to

choose whether to address the merits of a claim first, or to determine whether

*Pennhurst* would bar the claim irrespective of its merit.  As the majority puts it,

*Pennhurst* "is a mere defense to [damages] liability," Maj. Op. at 43 (citations and

quotation marks omitted), and it should be treated as such.  Generally, a district court may choose to decide a defense that legally defeats a claim for relief, raised in a pre-answer motion to dismiss, "if the defense appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (statute of limitations); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (qualified immunity); *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (res judicata).  Had the district court dismissed Plaintiffs' claims for damages pursuant to another defense appropriately asserted in a Rule 12(b)(6) motion  -- such as for failure to comply with a statute of limitations or res judicata -- this Court would not vacate and remand on the ground that the district court *should* have adjudicated the merits of the claim before determining whether the asserted defense was applicable.  Indeed, it behooves any court to avoid such inefficiency.

So too here.  It was more efficient for the district court to address the *Pennhurst* issue first.  Because the law was unsettled as to whether the Policy violates Title IX, the issue of notice -- that is, the lack thereof -- provided a simpler, yet sufficient way for deciding the damages claim in this case, obviating the need to definitively resolve the more complicated merits question.

35

The majority raises the concern that "[i]f courts skip ahead to ask whether damages will be available under *Pennhurst*, then there may be fewer opportunities for Title IX law to develop on the merits in suits seeking only monetary relief," noting that "plaintiffs do not always -- and sometimes cannot -- bring and sustain injunctive claims." Maj. Op. at 43 & n.8. Apart from citing to no authority to support these assertions, the majority ignores the fact that claims for injunctive relief were asserted in nearly all the cases cited in the majority's section on *Pennhurst*. *See* Maj. Op. at 36-43; *see also Cummings*, 596 U.S. at 217 ("In her complaint, [plaintiff] sought declaratory relief, an injunction, and damages."); Amended Complaint, at 3, *Jackson v. Birmingham Bd. of Educ.*, No. 2:01-CV-01866 (KOB), 2002 WL 32668124 (N.D. Ala. Feb. 25, 2002) (seeking damages and "a permanent injunction enjoining the defendant . . . from continuing to violate Title IX"); *Davis*, 526 U.S. at 632 (noting that plaintiff's complaint included a "claim for monetary and injunctive relief under Title IX"); *Pennhurst*, 451 U.S. at 6 ("In addition to seeking injunctive and monetary relief, the complaint urged . . . ."); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 962 (9th Cir. 2010) ("The plaintiffs sought damages and injunctive relief under Title IX . . . ."); *cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 658-59 (1985) (seeking judicial review and

36

reversal of a final agency decision).[13]  Moreover, Title IX law will continue to

develop, irrespective of when courts choose to invoke *Pennhurst*, so long as

plaintiffs continue to assert claims for injunctive relief.[14]

In sum, the district court did not err or abuse its discretion here; it

did not hold that it was required to resolve the question of notice before reaching

the merits.  Nor was the court prohibited from dismissing Plaintiffs' claims for

monetary damages based on *Pennhurst* without addressing the merits.  Rather,

the district court logically elected, in its discretion, to address whether the CIAC

lacked the requisite notice, rather than first addressing the merits of the Title IX

claim.  For these reasons, the majority's "basis" for vacating the district court's

*Pennhurst* holding is no basis at all.  Maj. Op. at 42 n.7.[15]

---

[13]    *Franklin* and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), are the only cases cited by the majority without claims for injunctive relief.  Both dealt with allegations of sexual harassment, but only *Franklin* held that the funding recipient's conduct violated Title IX.  *See Franklin*, 503 U.S. at 74-76; *Gebser*, 524 U.S. at 292.

[14]    It is undisputed that the district court in this case would have had to resolve the merits question if Plaintiffs' claim for an injunction to enjoin the Policy had not become moot.  The anomaly of the pandemic and its impact on Plaintiffs' standing for injunctive relief allowed the district court to dismiss Plaintiffs' Title IX claim without reaching the merits.  Accordingly, nothing about the approach adopted by the district court elevates *Pennhurst* from a defense to damages liability to a kind of qualified immunity.

[15]    The majority also suggests that both Plaintiffs and Intervenors "advocated" for remand.  Maj. Op. at 17.  Not so.  In their *en banc* brief, Intervenors argued for affirmance, Intervenors' En Banc Br. at 4, and at oral argument, when asked whether the *en banc* Court should decide the merits or remand for the district court to do so, counsel

**B.**

Next, we consider whether the district court appropriately

dismissed Plaintiffs' claims for monetary damages because Defendants lacked

notice that the Policy violates Title IX.  In light of the lack clarity in the law, we

find that the requisite notice was lacking, and, therefore, we would affirm the

district court's dismissal on the ground that *Pennhurst* bars Plaintiffs' damages

claims.

A funding recipient's liability for violating Title IX depends, in part,

on whether its violation was "unintentional" or "intentional."  *Gebser*, 524 U.S. at

287.  Liability also depends on notice -- because Title IX is legislation enacted

pursuant to Congress's authority under the Spending Clause, "private damages

actions are available only where recipients of federal funding had adequate

notice that they could be liable for the conduct at issue."  *Davis*, 526 U.S. at 640;

*accord Gebser*, 524 U.S. at 287 ("Our central concern . . . is with ensuring that 'the

receiving entity of federal funds [has] notice that it will be liable for a monetary

award.'") (citation omitted).  As the Supreme Court explained,

> legislation enacted pursuant to the spending power is much in
> the nature of a contract:  in return for federal funds, the States

---

for Intervenors merely stated "either course of action would be perfectly appropriate."
Oral Arg. Tr. at 60-61.

> agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*.

*Pennhurst*, 451 U.S. at 17 (citations omitted) (emphasis added). Accordingly, if the funding recipient lacks notice that it could be held liable for certain conduct, or if the funding recipient unintentionally violates Title IX, *Pennhurst* would bar a plaintiff's private damages action under Title IX. *See also Franklin*, 503 U.S. at 74 ("The point of not permitting monetary damages for an unintentional violation [of Title IX] is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.").

*Pennhurst*'s notice requirement, however, "does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642. This is because the plain terms of Title IX place a duty on a funding recipient to not discriminate intentionally on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance[.]").  "Congress surely

did not intend for federal moneys to be expended to support the intentional

actions it sought by statute to proscribe."  *Franklin*, 503 U.S. at 75.

Plaintiffs invite this Court to extend *Davis* and fashion a rule holding

that *Pennhurst*'s notice requirement is inapplicable to Title IX claims that rest on a

funding recipient's "[o]fficial policies," which are "always known [and]

intended."  Appellants' En Banc Br. at 55; *see also* Menashi, *J.*, Concurrence at 6-7.

But to adopt Plaintiffs' argument would run afoul of the very essence of the

*Pennhurst* doctrine, and would conflate the requirement that a recipient's actions

be *intentional* with the requirement that a recipient have notice of its legal

obligations.  Indeed, contrary to Plaintiffs' argument, a Title IX recipient's

liability cannot turn solely on the "intentionality" of its challenged action.  Rather,

it is intentional action in *clear violation* of Title IX -- that is, *intentional*

*discrimination* -- that removes the *Pennhurst* bar.  *See Franklin*, 503 U.S. at 74-75

("This notice problem does not arise in a case such as this, in which *intentional*

*discrimination* is alleged.") (emphasis added).  A policy made in good faith and

without clear notice that it violates Title IX is unintentional discrimination and

cannot be a basis for damages retrospectively, even if it is ultimately deemed to

40

be unlawful. *Gebser*, 524 U.S. at 287 ("[R]elief in an action . . . alleging

unintentional discrimination should be prospective only, because where

discrimination is unintentional, it is surely not obvious that the grantee was

aware that it was administering the program in violation of the condition.")

(internal quotation marks and alteration omitted).

       *Jackson* is most persuasive on this point. When deciding whether a

school district could be held liable for damages under Title IX for retaliating

against a teacher who complained about sex discrimination, the *Jackson* Court

considered both whether the school district's conduct was intentional, *and*

whether Title IX had supplied sufficient notice to the school district that

retaliation violates the statute's clear terms. 544 U.S. at 183. The Court

proceeded to this second inquiry even after noting that retaliation "is always --

by definition -- intentional." *Id.* If Plaintiffs' view were correct that liability sinks

or swims on the sole basis of intentionality, the Court's analysis would have

ended there. But it did not. The Court continued to the notice inquiry,

considering the statute's text, the 30-year long history of Title IX regulations

"clearly prohibit[ing] retaliation," and the courts of appeals decisions that had

previously interpreted Title IX to cover retaliation. *Id.* at 183-84. Only then did

41

the Court determine that, "given this context," the funding recipient "could not

have realistically supposed that . . . it remained free to retaliate against those who

reported sex discrimination." *Id.*; *see also Davis*, 526 U.S. at 643-44 (noting first

that deliberate indifference to known acts of harassment is intentional conduct

and then holding that "the regulatory scheme surrounding Title IX" and the

common law have put schools on notice that they may be held responsible for

the discriminatory acts of third parties, like student-on-student sex harassment).

Therefore, as compared to Plaintiffs' argument that mere promulgation and

enforcement of an "official policy" is sufficient, on its own, to hold a funding

recipient liable for damages, the more persuasive reading of *Jackson* (and *Davis*) is

that damages are barred unless a funding recipient *knew* that its policy *violated*

Title IX's clear proscription against sex discrimination.[16]

---

[16]      In his concurrence, our colleague Judge Menashi writes that "three circuits have
held, in the Title IX context, that the official acts -- including policies -- of a recipient of
federal funds qualify as intentional conduct and are not subject to a further *Pennhurst*
notice requirement." Menashi, *J.*, Concurrence at 10. The three cases, however, are all
factually distinguishable from this case. *See Mansourian*, 602 F.3d at 962 (university
eliminated all women from wrestling program and, after students filed complaint with
Office of Civil Rights, university agreed to permit women to participate but only on
terms that made the women unable to do so); *Simpson v. Univ. of Colorado Boulder*, 500
F.3d 1170, 1173 (10th Cir. 2007) (two women who were sexually assaulted by university
football players and high school students on a recruitment visit were permitted to
proceed with Title IX claim where there was evidence that (1) the university had an
"official policy" of showing high school football recruits a "good time" on their visits to

Looking to the facts of this case, the notice inquiry necessitates the conclusion that damages are barred. The plain text of Title IX's nondiscrimination mandate does not "unambiguously" prohibit trans-inclusive policies like those adopted by the CIAC; indeed, a substantial body of law suggests that Title IX allows or even requires such policies. *Pennhurst*, 451 U.S. at 17; *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) ("Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity."); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020) (applying Title VII's prohibition of discrimination "on the basis of sex" to discrimination based on one's transgender status). Plaintiffs do not dispute that federal guidance on this issue has oscillated between presidential

_____

campus, (2) the university failed to provide adequate supervision, and (3) "the likelihood of such misconduct was so obvious that [the university]'s failure was the result of deliberate indifference"); *Pederson v. La. State Univ.*, 213 F.3d 858, 864 (5th Cir. 2000) (female students alleged that LSU violated Title IX by denying them "equal opportunity to participate in intercollegiate athletics, equal opportunity to compete for and to receive athletic scholarships, and equal access to the benefits and services that LSU provides to its varsity intercollegiate athletes, and by discriminating against women in the provision of athletic scholarships and in the compensation [of] paid coaches"). While these cases did involve official acts and policies, these were acts and policies that involved intentional (or deliberately indifferent) discrimination in clear violation of Title IX.

administrations and that the Department of Education's Office of Civil Rights

(the "OCR") never clearly provided that allowing transgender students to

participate on athletic teams consistent with their gender identity violates Title

IX.  Indeed, counsel for Plaintiffs have acknowledged that conflicting federal

guidance created "confusion" as to what Title IX prohibits when it comes to

transgender athletes, En Banc Transcript at 26, and they have conceded that there

is no case under Title IX, or any other Spending Clause statute, that has

permitted monetary liability to be imposed in the circumstances present here --

that is, where the conduct at issue was approved by the agency responsible for

providing guidance to funding recipients, *id.* at 27.[17]  Nor do Plaintiffs cite a

single court decision that has interpreted Title IX to prohibit trans-inclusive

athletic policies like that of the CIAC.  Indeed, there are cases to the contrary,

holding that trans-exclusionary policies violate Title IX, or that trans-inclusive

---

[17]     *See* Letter from Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., U.S. Dep't of
Educ., and Vanita Gupta, Principal Dep. Assistant Att'y Gen. for Civ. Rts., U.S. Dep't of
Just. (May 13, 2016), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-
title-ix-transgender.pdf ("The Departments treat a student's gender identity as the
student's sex for purposes of Title IX and its implementing regulations.  This means that
a school must not treat a transgender student differently from the way it treats other
students of the same gender identity."); *Soule*, 2021 WL 1617206, at *9 (describing
relevant OCR guidance and concluding that notice was not clear).

policies do not.  *See, e.g., Grimm*, 972 F.3d at 619; *Barr*, 949 F.3d at 1227; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018).  The law is far from clear, but, as the majority notes, we need not decide the merits issue, for it is precisely because of this "confusion" and lack of clarity in the law that Defendants did not have notice that the Policy violated Title IX -- even assuming that it does.  Hence, Plaintiffs' claim for damages is barred under *Pennhurst*, irrespective of the merits.

## C.

In Part IV of his concurrence, Judge Menashi argues that *Bostock*, a Title VII case, is inapposite because Title IX, in contrast to Title VII, authorizes distinctions among student athletes based on sex.  Menashi, *J.*, Concurrence at 15-16.  But the fact that, in many circumstances, Title IX contemplates separate high school sports teams for boys and girls tells us nothing about the question before us here: whether Title IX "unambiguously" *requires* schools to *prohibit* transgender students from participating on sports teams aligning with their gender identity.  *Pennhurst*, 451 U.S. at 17.  If anything, *Bostock*'s holding that Title VII prohibits discrimination against individuals on the basis of their transgender status, *see Bostock*, 140 S. Ct. at 1737, suggests that Title IX, which is

informed by Title VII, may call for inclusion, not exclusion, of transgender individuals.

Judge Menashi writes that in *Bostock* "the Court accepted the premise that 'sex' in Title VII refers "only to biological distinctions between male and female.'" Menashi, *J.*, Concurrence at 14 (quoting *Bostock*, 140 S. Ct. at 1739). But the Court only accepted this proposition for the sake of argument. *See* 140 S. Ct. at 1739 ("because the employees concede the point for argument's sake, we proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female"). Indeed, because the cases before it did not "turn[] on the outcome of the parties' debate," the Court specifically declined to decide whether "the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Id.*; *see also Barr*, 949 F.3d at 1227 ("[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity."). Hence, the question remains open

46

whether the term "sex" in Title IX and its implementing regulations necessarily means "biological sex."[18]

Judge Menashi also writes that the bathroom cases are irrelevant because "bathrooms are not athletic competitions." Menashi, *J.*, Concurrence at 16. That may be so, but the bathroom cases are indeed relevant because they involve Title IX and, as discussed above, at least some of the decisions have suggested that Title IX allows or even requires trans-inclusive policies. The existing case law -- including the bathroom cases -- did not "unambiguously" tell funding recipients that Title IX was violated by a policy that permits transgender students to compete in gender-specific athletic competitions consistent with their

---

[18]     As the Intervenors note, "Title IX's legislative history repeatedly attributes the lack of equal athletic opportunities, in part, to the socialization of girls and women to conform to sex stereotypes, not just biology." Intervenors' En Banc Br. at 40 (citing *Sex Discrimination Regs. Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Labor, House of Representatives*, 94th Cong. 189, 197 (1975)) (Statements of Sen. Birch Bayh and Rep. Stewart McKinney). Moreover, the term "biological sex" itself is ambiguous in circumstances in which various biological markers often associated with sex (such as chromosomes, gonads, hormones, and genitals) are not necessarily congruent. *See generally* Katrina Karkazis, *The Misuses of "Biological Sex,"* 394 The Lancet 1898 (2019); *see also Matter of Childers-Gray*, 487 P.3d 96, 120 ¶ 86 (Utah 2021) ("At the very least, 'biological sex' is itself ambiguous and may mean more than the sex designated by examination at birth."). It is unclear whether resolution of these questions is even necessary to the outcome of Plaintiffs' claims. *See* Intervenors' En Banc Br. at 39-42.

gender identity.  Defendants did not have clear notice that the Policy violated

Title IX -- even assuming it did.

## IV.

"We do not allow plaintiffs to bring suit just because they oppose a

policy." *Biden v. Nebraska*, 143 S. Ct. 2355, 2385 (2023) (Kagan, *J.*, dissenting).  Yet

now that Plaintiffs' core claims for relief have been mooted by the pandemic and

their respective graduations, all that is really left is their disagreement with the

policy under which they previously competed.

We recognize that civil rights litigants -- and all of us -- are best

served when courts are cautious in limiting access to adjudication.  But the

majority is inadequately cautious about observing the fundamental limitations

on this Court's judicial power.  In too readily relaxing those limitations, the

majority invites courts to become arbiters of abstract social wrongs that they

have no real power to redress.  The invitation works to undermine, rather than

protect, the rights of litigants like Andraya Yearwood and Terry Miller.  We

respectfully dissent.