21-1365 (en banc)
*Soule ex rel. Stanescu v. Connecticut Association of Schools, Inc.*

# United States Court of Appeals For the Second Circuit

August Term 2022

Argued *en banc*: June 6, 2023
Decided: December 15, 2023

No. 21-1365

SELINA SOULE, A MINOR, BY BIANCA STANESCU, HER MOTHER; CHELSEA MITCHELL, A MINOR, BY CHRISTINA MITCHELL, HER MOTHER; ALANNA SMITH, A MINOR, BY CHERYL RADACHOWSKY, HER MOTHER; ASHLEY NICOLETTI, A MINOR, BY JENNIFER NICOLETTI, HER MOTHER,

*Plaintiffs-Appellants,*

*v.*

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. D/B/A CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

ANDRAYA YEARWOOD; THANIA EDWARDS, ON BEHALF OF HER DAUGHTER, T.M.; COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES,

*Intervenor-Defendants-Appellees.*

CERTIFIED COPY ISSUED ON 12/15/2023

---

Appeal from the United States District Court
for the District of Connecticut
No. 20-cv-201, Robert N. Chatigny, *Judge*.

---

Before:    LIVINGSTON, *Chief Judge*, CHIN, LOHIER, CARNEY, SULLIVAN, BIANCO, PARK, NARDINI, MENASHI, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *Circuit Judges.* [*]

NATHAN, *J.*, filed the majority opinion in which LIVINGSTON, *C.J.*, SULLIVAN, BIANCO, PARK, NARDINI, and MENASHI, *JJ.*, joined in full, LOHIER and ROBINSON, *JJ.*, joined as to Part I, LEE and PÉREZ, *JJ.*, joined as to Parts I.A, I.B.1, and II, and MERRIAM, *J.*, joined as to Part II.

PARK, *J.*, filed a concurring opinion in which NARDINI and MENASHI, *JJ.*, joined.

MENASHI, *J.*, filed a concurring opinion in which PARK, *J.*, joined.

NATHAN, *J.*, filed a concurring opinion in which ROBINSON, *J.*, joined.

LOHIER, *J.*, filed an opinion concurring in part and dissenting in part.

PÉREZ, *J.*, filed an opinion concurring in part and dissenting in part.

MERRIAM, *J.*, filed an opinion concurring in part and dissenting in part.

CHIN, *J.*, filed a dissenting opinion in which CARNEY and KAHN, *JJ.*, joined in full, MERRIAM, *J.*, joined as to Parts I and II, LEE and PÉREZ,

---

[*] Judge Chin and Judge Carney, who are senior judges, participated in this rehearing *en banc* pursuant to 28 U.S.C. § 46(c)(1) and 28 U.S.C. § 294(c).

*JJ.*, joined as to Part II, and LOHIER and ROBINSON, *JJ.*, joined as to Part III.

An athletic conference permits Connecticut high school students to participate on athletic teams consistent with the gender identity established in their school records. Four non-transgender female track and field athletes sued the conference and member school districts, alleging that allowing transgender girls to participate in girls' track and field deprives them of equal athletic opportunity in violation of Title IX. Two transgender female athletes intervened.

We do not consider whether Plaintiffs' Title IX claims have any merit or whether they would be entitled to the relief that they seek as a matter of equity, but rather whether the district court has jurisdiction to hear their claims in the first instance. We conclude that it does, for the reasons advocated for both by Plaintiffs and by Intervenors. First, Plaintiffs have established Article III standing at this stage in the litigation. They have pled a concrete, particularized, and actual injury in fact that is plausibly redressable by monetary damages and an injunction ordering Defendants to alter certain athletic records. Second, the district court was not required to determine whether Defendants had adequate notice of a Title IX violation to be liable for monetary damages before reaching the merits of Plaintiffs' Title IX claims. Accordingly, we **VACATE** and **REMAND** for further proceedings.

————

> JOHN J. BURSCH (Christiana M. Kiefer, Roger G. Brooks, Cody S. Barnett, Rory T. Gray, *on the brief*), Alliance Defending Freedom, Washington, DC, *for Plaintiffs-Appellants*.
>
> PETER J. MURPHY (Linda L. Yoder, *on the brief*), Shipman & Goodwin LLP, Hartford, CT, *for Defendants-Appellees Connecticut Association of Schools, Inc. d/b/a Connecticut Interscholastic Athletic Conference; Danbury Public Schools Board of Education*.

Johanna G. Zelman, FordHarrison, LLP, Hartford, CT, *for Defendants-Appellees Bloomfield Public Schools Board of Education; Cromwell Public Schools Board of Education*.

David S. Monastersky, Howd & Ludorf, LLC, Hartford, CT, *for Defendants-Appellees Glastonbury Public Schools Board of Education; Canton Public Schools Board of Education*.

Joshua A. Block (Ria Tabacco Mar, Elana Bildner, Dan Barrett, *on the brief*), ACLU Foundation, New York, NY, *for Intervenor-Defendants-Appellees Andraya Yearwood; Thania Edwards, on behalf of her daughter, T.M.*

Michael E. Roberts, Commission on Human Rights and Opportunities, Hartford, CT, *for Intervenor-Defendant-Appellee Commission on Human Rights and Opportunities*.

———

Nathan, *Circuit Judge*:

Ten years ago, the conference governing interscholastic sports in Connecticut made the decision to permit high school students to participate in school-sponsored athletics consistent with the gender identity established in their school records. This case arose when Plaintiffs, a group of non-transgender girls, challenged that policy in federal court, alleging that it violates Title IX, which

prohibits sex discrimination in education. To remedy their alleged injury, Plaintiffs seek monetary damages from the athletic conference and its member school districts, whom they named as Defendants. They also seek an injunction requiring Defendants to alter certain athletic records by removing times of transgender girls and reranking titles and placements of non-transgender girls.

Whether Plaintiffs' Title IX claims have any merit is not before us today. Nor is Plaintiffs' ultimate entitlement to a remedy. We consider only whether Plaintiffs have standing to sue and whether they can, at this stage, seek monetary damages. Although the specific issues before us are narrow and our decision very limited in scope, questions of standing and the availability of monetary damages have broad implications for all manner of civil rights litigation and civil rights plaintiffs. Precedent and principle require that we proceed cautiously before limiting access to courts and remedies.

At core, we conclude that the case should return to the district court for consideration in the first instance of whether Plaintiffs have plausibly stated a claim under Title IX. In doing so, we adopt the outcome advocated for on appeal

both by Plaintiffs and by Intervenors, the transgender girls against whom they competed. More specifically, we conclude that further proceedings in the district court are required for two reasons.

First, we hold that Plaintiffs have pled facts sufficient to establish Article III standing at this stage in the litigation. Plaintiffs all personally competed in high school track in Connecticut, and they all identified instances in which they raced against and finished behind one or both Intervenors. Plaintiffs allege—and we must assume—that but for Intervenors' participation in these specific races, they would have placed higher. For the purposes of the standing inquiry, we must also assume that Plaintiffs are correct that allowing Intervenors to compete in those races violated Title IX. With these assumptions in mind, we conclude that Plaintiffs adequately pled a concrete, particularized, and actual injury in fact: the alleged denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements during track and field competitions in which they participated against and finished behind Intervenors. On the issue of

whether Plaintiffs have plausibly stated an injury in fact, all members of the *en banc* Court agree unanimously that they have.

We further conclude that the alleged injury is plausibly redressable by monetary and injunctive relief.  To be sure, no injunction could change the way past races were run.  Moreover, ordering Defendants to alter private records or records that do not personally pertain to and impact Plaintiffs would provide Plaintiffs with at most psychic satisfaction, which is not an acceptable Article III remedy.  But Plaintiffs plausibly allege that directing Defendants to alter public athletic records related to the particularized injury they allege could at least provide Plaintiffs with the publicly recognized titles and placements they would have received if Intervenors had not competed and finished ahead of Plaintiffs in specific races.

The same would be true if the facts were reversed and an athletic conference decided to categorize transgender girl athletes as boys.  If transgender girls alleged that such a policy discriminated against them on the basis of sex and deprived them of publicly recognized titles and placements, they too would have standing

to bring a Title IX claim. And they too could seek an injunction altering the existing public records to accurately reflect their alleged athletic achievement. Similarly, Intervenors have an ongoing interest in litigating *against* any alteration to their public athletic records. The legally cognizable interest Intervenors have in protecting the records of their athletic achievements, including times and placements in races they have run, is materially indistinguishable from the interest Plaintiffs assert.

Defendants argue that an injunction to alter the relevant records would not be fair or appropriate. That may be. But our precedent establishes that the fairness, justice, and novelty of a remedy are equitable considerations that the district court would need to evaluate when exercising its discretion to fashion appropriate injunctive relief, not factors for determining Article III standing.

The second reason for remand to the district court concerns whether Plaintiffs have a private right of action to monetary damages, under a framework originating from the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). Because Congress enacted Title IX pursuant to its

Spending Clause power, the statute operates like a contract: in exchange for federal funds, educational institutions agree to comply with Title IX and its implementing regulations. In keeping with the contractual nature of this bargain, if an institution lacked notice of a Title IX violation, private parties generally cannot recover monetary damages for the violation. We do not resolve today whether Plaintiffs or Defendants are correct as to the availability of monetary damages in this case. Rather, consistent with the view espoused by Intervenors, there is good reason here to consider the merits of Plaintiffs' Title IX claims before or in tandem with the question of notice. Courts typically have not analyzed notice as a freestanding issue before reaching the merits of a Title IX claim, and understandably so. The parties here dispute whether, in order to recover monetary damages, Plaintiffs can establish there was adequate notice that allowing transgender girls to compete in girls' sports violated Title IX. This question is difficult to answer without first considering whether allowing transgender girls to compete in girls' sports even violates Title IX to begin with. Yet the district court concluded that it was *required* to resolve the theoretical

availability of monetary damages before reaching the merits of Plaintiffs' Title IX claims. That was error. On remand, we direct the district court to reach the merits before or in tandem with the question of notice.

Accordingly, we **VACATE** the judgment of the district court and **REMAND** for further proceedings. On remand, the district court[1] should assess in the first instance whether Plaintiffs' complaint states a claim for a violation of Title IX.

## BACKGROUND

### I.     Factual Allegations[2]

For the past decade, the Connecticut Interscholastic Athletic Conference (CIAC), a nonprofit organization that governs interscholastic sports in Connecticut, has applied a policy permitting high school students to participate on athletic teams consistent with their established gender identity (the CIAC Policy). The CIAC Policy directs member school districts to determine students'

---

[1] In their brief before the three-judge panel of this Court, Plaintiffs requested that the case be reassigned to a different district court judge upon remand. We deny that request.

[2] The factual allegations are taken from Plaintiffs' second amended complaint and any incorporated documents, and they are assumed to be true at this stage. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

eligibility to participate on teams "based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC By-Laws Article IX, Section B. Students are "not . . . permitted to participate in practices or to try out for gender specific sports teams that are different from their publicly identified gender identity at that time or to try out simultaneously for CIAC sports teams of both genders." *Id.*

Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti are four non-transgender female athletes who competed in high school track in Connecticut. During the 2017, 2018, and 2019 track seasons, Plaintiffs competed in CIAC-sponsored events against two transgender female athletes, Andraya Yearwood and Terry Miller, who are Intervenors in this case. In some but not all races, Intervenors finished ahead of Plaintiffs. For example, in the 2019 state open indoor 55m final, Plaintiff Mitchell finished in 3rd place behind Intervenors Miller and Yearwood. For each Plaintiff, the complaint identifies at least one race in which she allegedly competed against and lost to one or both Intervenors. The

complaint further alleges that at times, Intervenor Miller's and Intervenor Yearwood's results meant that they qualified for the next level of competition and certain Plaintiffs did not. For example, Plaintiff Soule finished 8th in the 2019 state open indoor 55m preliminary race, losing to both Intervenors Miller and Yearwood, who took 1st and 2nd place. The complaint alleges that if Intervenors Miller and Yearwood had not competed in that race, Plaintiff Soule would have qualified for the regional championship.

In Plaintiffs' view, the CIAC Policy of allowing participation consistent with an individual's established gender identity discriminated against them by requiring Plaintiffs to compete against transgender girls, who Plaintiffs allege have a "physiological athletic advantage." App'x 140. Plaintiffs claim that by putting them at this alleged competitive disadvantage, the CIAC Policy violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which prohibits sex discrimination in education by institutions that receive federal financial assistance.

## II.  Procedural History

Beginning in 2018, Plaintiffs and their parents complained to CIAC officials and their respective schools, alleging that the CIAC Policy denied them fair and equal competitive opportunities and the publicly recognized titles and placements they deserved.  Defendants continued to enforce the CIAC Policy.  In June 2019, Plaintiffs filed a Title IX complaint with U.S. Department of Education's Office for Civil Rights, which launched a formal investigation.  As the spring 2020 track season approached, Plaintiffs turned to federal court to attempt to prevent Intervenors Yearwood and Miller from competing consistent with their established gender identity as girls.

In February 2020, Plaintiffs commenced this action in the District of Connecticut against the CIAC and several of its member school districts.  Plaintiffs principally sought (1) a declaration that Defendants violated Title IX; (2) an injunction prohibiting Defendants from enforcing the CIAC Policy; (3) an injunction requiring Defendants to "correct" their official athletic records by giving "female athletes" the "credit and/or titles" they "would have

13

received . . . but for the participation" of transgender girls in "elite competitions designated for girls or women"; (4) an injunction requiring Defendants to further "correct" the records by "remov[ing]" transgender girls from the records for those competitions and "remov[ing] times achieved" by transgender girls "from any records purporting to record times achieved by girls or women"; (5) nominal and compensatory damages; and (6) attorneys' fees and expenses under 42 U.S.C. § 1988.  App'x 175–76 (Second Amended Complaint).  The district court allowed Yearwood, Miller, and the Connecticut Commission on Human Rights and Opportunities to intervene as Intervenor-Defendants.

Soon after the case commenced, the COVID-19 pandemic broke out, causing all spring track events to be cancelled.  In August 2020, Defendants moved to dismiss the operative complaint for lack of subject-matter jurisdiction and for failure to state a claim on which relief could be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

In April 2021, the district court granted Defendants' motion to dismiss.  *See Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 20-cv-201, 2021 WL 1617206

14

(D. Conn. Apr. 25, 2021).  First, the district court found that Plaintiffs' request for an injunction prohibiting Defendants from enforcing the CIAC Policy going forward was moot.  By that time, Plaintiffs Soule and Miller and both Intervenors had all graduated from high school.  Plaintiffs Smith and Nicoletti had not yet graduated, but they could not identify any transgender student against whom they were likely to compete.  Second, the district court dismissed Plaintiffs' request for an injunction requiring Defendants to "revise" their athletic records, reasoning that Plaintiffs failed to establish the redressability element of standing for that form of relief.  *Id.* at \*7.  Finally, the district court held that Plaintiffs' claims for monetary damages were barred because under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), "monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue" and Defendants "did not receive the requisite notice."  *Soule*, No. 20-cv-201, 2021 WL 1617206, at \*8.  Though Plaintiffs argued that "the question of notice should be deferred until a later stage of the case," the district court determined that doing so would be improper.  *Id.* at \*8 n.13.  It reasoned that if

15

monetary damages were barred under *Pennhurst*, "the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case . . . is insufficient, standing alone, to sustain jurisdiction." *Id.* (quotation marks omitted). The district court did not reach the merits question of whether Plaintiffs plausibly allege a violation of Title IX.

Plaintiffs timely appealed to the Second Circuit. On December 16, 2022, a panel affirmed the judgment of the district court. *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43 (2d Cir. 2022). Plaintiffs conceded that their claim for injunctive relief barring enforcement of the CIAC Policy going forward was moot. As for the remaining claims, the panel held that Plaintiffs lacked standing to seek an injunction "rewriting the records" because they failed to establish a redressable injury in fact, and that their claim for monetary damages was barred under *Pennhurst*. *Id.* at 50–56. Like the district court, the three-judge panel did not reach the merits question of whether Plaintiffs stated a valid claim under Title IX. In February 2023, the Court ordered that the appeal be reheard *en banc*, limited to the issues of injury in fact, redressability, and *Pennhurst* notice.

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint for lack of standing and for failure to state a claim on which relief can be granted. *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012). We construe the complaint in Plaintiffs' favor, accepting all material factual allegations as true. *Id.*

The scope of this case has changed since it was before the district court and since it was before the original three-judge panel. Only two live issues remain before us: whether Plaintiffs have Article III standing to sue for the remedies they seek and whether *Pennhurst* bars their claim for monetary damages. For the reasons that follow, we conclude (1) that Plaintiffs have pled facts sufficient to establish standing to seek monetary damages and some of the requested injunctive relief, and (2) that the district court can and should reach the merits of Plaintiffs' Title IX claims before or in tandem with the question of *Pennhurst* notice. Consistent with the outcome on appeal advocated for both by Plaintiffs and by Intervenors, we remand to the district court to consider the merits question in the first instance.

17

## I.     Standing

Article III limits the federal judicial power to deciding "Cases" and "Controversies."  U.S. Const. art. III § 2.  "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue," meaning a personal stake in the outcome of the litigation.  *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023).  This limitation ensures that the judiciary "respects the proper—and properly limited—role of the courts in a democratic society" by refraining from expounding on issues that courts "have no business deciding."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quotation marks omitted).  But courts must equally refrain from narrowing constitutional standing requirements beyond what Article III dictates, lest we needlessly bar plaintiffs with justiciable claims from having their day in court.  Standing is about who may access the courthouse, not about the merits of the claims to be heard once inside.  "[T]he fundamental aspect of standing is its focus on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated" and "[t]he standing issue must therefore

18

be resolved irrespective of the merits of the substantive claims." *United States v. Vazquez*, 145 F.3d 74, 80–81 (2d Cir. 1998) (cleaned up).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing Article III standing by showing three elements: (1) that they "suffered an injury in fact," (2) that the injury "is fairly traceable" to Defendants' challenged conduct, and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The "manner and degree of evidence required" to meet this burden depends on the stage of litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Id.* Moreover, "[s]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citation omitted).

Defendants contend that Plaintiffs failed to establish the injury in fact and redressability prongs of standing. As set forth below, we disagree.

### A. Injury In Fact

To constitute an injury in fact sufficient to sustain Article III standing, an alleged harm must be (1) concrete, (2) particularized, and (3) actual or imminent. *TransUnion*, 141 S. Ct. at 2203. To be concrete, an injury must be "real, and not abstract." *Id.* at 2204 (quoting *Spokeo*, 578 U.S. at 340). While traditional tangible harms such as physical and monetary injuries readily qualify as concrete, so do some intangible harms, particularly if they have a "close historical or common-law analogue." *Id.* To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation marks omitted). Finally, an injury is "actual or imminent" if it has actually happened or is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted).

In this case, Plaintiffs allege that the CIAC Policy deprived them of an opportunity to compete in fair and non-discriminatory high school track races, in violation of Title IX. Moreover, the complaint alleges that Plaintiffs' results in those races were specifically impacted by the CIAC Policy: "each Plaintiff has

20

identified at least one specific instance in which she allegedly raced against—and finished behind—a girl who is transgender." Intervenors' Br. at 28–29. The complaint further alleges that three of the Plaintiffs have additionally identified races in which they would have qualified to advance to the next level of competition if Intervenors had not participated. Intervenors, the transgender athletes who would be impacted by an adverse ruling, agree with Plaintiffs that this suffices to establish injury in fact. So do we.

First, Plaintiffs allege a concrete injury: the denial of "equal athletic opportunities" and loss of publicly recognized titles and placements in track and field competitions, in violation of Title IX. App'x 163. The Supreme Court has identified "discriminatory treatment" as an example of a "concrete, *de facto*, injur[y]." *TransUnion*, 141 S. Ct. at 2205 (quotation marks omitted). In cases involving claims of discriminatory treatment, the alleged harm is frequently twofold: plaintiffs are discriminated against and that discriminatory treatment results in the denial of certain benefits that they would otherwise have enjoyed. Here, Plaintiffs allege that they were denied equal opportunities in track and field

competitions and, as a result, they were also denied the publicly recognized titles and placements that would have flowed from those opportunities. And crucially for Plaintiffs' request for an injunction to alter the records, the alleged impact of the CIAC Policy on Plaintiffs is measurable, not abstract or speculative. Plaintiffs' claim is not that they *might* have won placements and titles if Intervenors had not competed, but rather that they certainly would have. *See Spokeo*, 578 U.S. at 340 ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist." (quoting Black's Law Dictionary 479 (9th ed. 2009))); *see also Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1017–19 (9th Cir. 2002) (finding standing for injunctive relief because plaintiff alleged "a *plausible* causal connection between her academic performance . . . and the alleged discrimination" (emphasis added)). Though a court considering Plaintiffs' claims on the merits might ultimately conclude that competing under the CIAC Policy did not deprive them of equal athletic opportunity and amount to discriminatory treatment under Title IX, standing "in no way depends on the merits of the claim." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quotation marks omitted).

Second, the alleged injury is particularized because Plaintiffs are athletes who personally competed in CIAC-sponsored events, rather than, for instance, bystanders who simply wish to challenge the CIAC Policy because they disagree with it on principle.  *See, e.g.*, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (holding that an alleged injury related to the scheduling of girls' soccer was "particularized" because plaintiffs were "soccer players who the parties have stipulated would play soccer for their high schools" if the challenged schedule changed).  Finally, the injury is actual because it is alleged to have already occurred.

## B. Redressability

To satisfy the redressability element of Article III standing, a plaintiff must show that it is "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (quotation marks omitted).  A plaintiff makes this showing when the relief sought "would serve to . . . eliminate any effects of" the alleged legal violation that produced the injury in fact.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998).

Plaintiffs must separately establish standing for each form of relief sought. *See TransUnion*, 141 S. Ct. at 2208. Therefore, we address whether Plaintiffs' alleged injury in fact is likely redressable both by monetary damages and by the specific injunctive relief sought in the complaint.[3]

### 1. Monetary Damages

In their prayer for relief, Plaintiffs seek "[a]n award of nominal and compensatory damages and other monetary relief as permitted by law." App'x 176. All parties acknowledge that some form of monetary damages could redress Plaintiffs' alleged injury.[4] Because Plaintiffs' claim is "based on a completed

---

[3] We do not address Plaintiffs' request for an injunction prohibiting Defendants from enforcing the CIAC Policy going forward. As conceded by Plaintiffs at oral argument before the three-judge panel of this Court, that claim is now moot because "all Plaintiffs have graduated from high school and are no longer subject to the Policy." *Soule*, 57 F.4th at 47 n.2; *see Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (holding that "the end of the ice hockey season and the graduation of the last of the plaintiffs render this [Title IX] action moot" because "[n]one of the plaintiffs can benefit from an order requiring equal athletic opportunities for women ice hockey players").

[4] Defendants' brief asserts that "nominal damages may be available in some Title IX cases," but that "they are not available in this particular case by virtue of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)"—in other words, monetary damages are unavailable "[b]ecause the law does not authorize [them]," not because they would fail to redress Plaintiffs' alleged injury. Defendants' Br. at 37. At oral argument, Defendants took the position that Plaintiffs have not alleged "an injury in fact . . . that would be redressable by money damages if money damages are available under *Pennhurst*." Transcript at 40. To the extent that Defendants have changed their position, we reject their view of redressability via monetary damages.

24

violation of a legal right"—their Title IX right to equal athletic opportunity and related loss of publicly recognized titles and placements—"nominal damages provide" at least some "necessary redress." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). So too would compensatory damages, if available, which are definitionally "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).

### 2. Injunctive Relief to Alter Athletic Records

Plaintiffs' prayer for relief additionally includes two requests for an injunction related to the "correct[ion]" of Defendants' official athletic records:

> (D) An injunction requiring all Defendants to correct any and all records, public or non-public, to remove male athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions;

> (E) An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women . . . .

App'x 176.  We conclude that Plaintiffs have standing to seek some, but not all, of this requested injunctive relief.  Specifically, as explained below, we conclude that an injunction could plausibly redress the injury that allegedly resulted from Plaintiffs' loss of publicly recognized titles and placements in specific races at which they competed against and finished behind Intervenors.

Once again, at this stage in the litigation, we must draw all reasonable inferences in favor of Plaintiffs and assess only whether the allegations are sufficient to establish that their requested injunctive relief would theoretically redress the alleged denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements.  To be sure, no court has the ability to rewind time.  Plaintiffs cannot rerun different races or compete in championships long past.  But Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).  Article III only requires that some form of altering the records "would at least partially redress" the alleged injury. *Meese v. Keene*, 481 U.S. 465, 476 (1987).  Here, the complaint alleges that Plaintiffs would have placed higher in several

26

races but for the participation of Intervenors Yearwood and Miller, who finished

before them in those races.  In this procedural posture, we must assume Plaintiffs

are correct that permitting transgender girls to compete in those races violated

federal law and that Plaintiffs' current records are therefore impacted by an

unlawful policy.  It is plausible that altering certain public athletic records—for

example, indicating that Plaintiff Mitchell finished 1st rather than 3rd in the 2019

state open indoor 55m final—would at least partially redress the alleged denial of

equal athletic opportunity by giving Plaintiffs the higher placements and titles

they would have received without the CIAC Policy in place, albeit belatedly.[5]  In

other words, it is likely that granting the above-described injunctive relief would

"eliminate [some] effects of" the alleged legal violation that produced the injury

---

[5] Nothing in our analysis requires counterfactual imagination about how Plaintiffs would have ranked if the races were rerun.  *See* Pérez, J., Concurring Op. at 7.  Rather, the injury is theoretically redressable by adjusting final placements and titles in specific races that were *actually* run.  The same is true, for example, in cases where athletic records are retroactively altered to account for cheating or doping.  Nor does anything in our analysis contemplate that multiple Plaintiffs would place first in some imagined race.  *See id.* at 8.  For example, Mitchell's record could theoretically be altered to indicate a 1st place finish in the 55m final, whereas Soule's record could theoretically be altered to indicate that she finished 6th in the 55m preliminary race, which would make her a finals qualifier.

in fact, *Steel Co.*, 523 U.S. at 106, because those effects allegedly include loss of publicly recognized titles and placements in specific races that were run—effects that persist even after their high school athletic careers have ended.

The same would be true were the shoe on the other foot. Imagine if some other athletic conference adopts a policy that, unlike the CIAC Policy, categorizes transgender girl athletes as boys in their public records of athletic accomplishment. Under today's holding, if those transgender girls sue alleging a Title IX violation, they would have standing to seek to have those public records altered to indicate their alleged accurate athletic achievement. And by similar logic, the Intervenors have an ongoing interest in litigating *against* any alteration of their public athletic records. *See Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001) (explaining that to intervene in an action as of right, a party must "show an interest in the action" and "demonstrate that the interest may be impaired by the disposition of the action" (quoting *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992))); *id.* at 129 (citing Fed. R. Civ. P. 24(a)(2)); *see also* Motion to Intervene at 9–10, *Soule*, No. 20-cv-201 (S.D.N.Y. Feb. 21, 2020), ECF No.

36 (Intervenors arguing they satisfied the Rule 24 standard in part because they "have a protectable legal interest . . . in protecting records of their past accomplishments"). The legal interest that underlies Yearwood and Miller's intervention in this case—an interest in protecting *against* after-the-fact revision of the public records of their race times and placements—is materially indistinguishable from the interest Plaintiffs invoke.[6]

The significance of these athletic records may not be apparent to those who do not participate in the world of competitive sports. But say, for example, that a group of plaintiffs challenged a policy that allegedly discriminated against girls in academics by leaving them off the honor roll (or denying Latin honors, *see* Diss. Op. at 18-19). Surely, those plaintiffs would have standing to seek an injunction

---

[6] The dissent's theory of standing for injunctive relief would leave the transgender girl athletes in the above hypothetical without standing to seek alteration of existing athletic records consistent with their athletic achievement. As to the Intervenors, the dissent acknowledges that they have an interest in preventing alteration of their individual records. *See* Diss. Op. at 21 (collecting cases confirming that student athletes have standing to prevent alteration of athletic records). But it asserts that this interest only exists when an athlete faces a future threat of records expungement. *Id.* This approach draws a distinction without a difference. In both cases, student athletes have an interest in the accurate public representation of their athletic achievements—an interest equally threatened by record expungement or inaccurate records from the start. And in both cases, ensuring that public records accurately reflect those achievements provides more than the "psychic satisfaction" derived from "a favorable judgment." *Steel Co.*, 523 U.S. at 107.

to alter their academic records.  To many, publicly recognized athletic achievements are just as important as academic ones.  Drawing a distinction between the two would import a value judgment into the standing analysis where it does not belong.

Nor does the standing analysis in this case depend on the relevance of the injunctive remedy for obtaining some additional future benefit, such as employment opportunities.  *See* Diss. Op. at 13-16.  The loss of publicly recognized titles and lower placements in specific races is itself an existing and ongoing effect of Plaintiffs' alleged injury—an effect that would be redressed by public record alterations reflecting those achievements.  That one may not deem them valuable is simply not the relevant inquiry for standing purposes.  Just as an award of nominal damages partially (even if nominally) remedies the violation of a legal right, injunctive relief can partially (even if nominally) remedy the existing harms that flow from the past denial of equal opportunity alleged in this case.  *See Uzuegbunam*, 141 S. Ct. at 801 ("True, a single dollar often cannot provide full

30

redress, but the ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks omitted)).

Now, there are several key limitations to our holding on standing. First, Plaintiffs do not have standing to seek remedies for generalized grievances about the CIAC Policy. Arguably, Plaintiffs' prayer for relief does not stop with their own records allegedly impacted by the CIAC Policy. In paragraph E, Plaintiffs seek the removal of "record times" achieved by transgender girls from "*any* records purporting to record times achieved by girls or women," seemingly irrespective of whether the record times personally impacted Plaintiffs. App'x 176 (emphasis added). In paragraph D, Plaintiffs ask for an order requiring Defendants both to remove transgender girls from "*any record or recognition* purporting to record times, victories, or qualifications for elite competitions designated for girls or women," and to give non-transgender female athletes the "credit and/or titles" they would have received in races but for the participation of transgender girls. *Id.* (emphasis added). To the extent that these prayers for relief request that Defendants update records that have no bearing on Plaintiffs'

own athletic achievement—such as by removing the victories of transgender girls who never competed against Plaintiffs or by making revisions to records that would only benefit non-transgender girls who are not parties to this suit—Plaintiffs have no standing.

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. Here, Plaintiffs allege an injury in fact because they claim that they were *personally* denied equal athletic opportunities and experienced the associated loss of publicly recognized titles and placements. A "generalized grievance[]" that a school's athletic offerings violate Title IX would be "too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, 227 (1974). By the same token, the remedy sought must redress the particularized harm that Plaintiffs allege. An order requiring Defendants to remove record times and achievements of transgender girls that have no impact on Plaintiffs' own athletic achievements would afford Plaintiffs at most the "psychic satisfaction" of "a

favorable judgment," which "is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. Plaintiffs may disagree with the way in which the CIAC's policy recognizes transgender girls and their athletic achievements, but policy disagreement without particularized harm is not a basis for Article III standing. Thus, Plaintiffs only have standing to seek the injunctive relief requested to the extent they seek to alter records related to the particularized injury they allege.

Second, Plaintiffs' standing to seek injunctive relief ordering Defendants to alter their athletic records is limited to the alteration of *public* athletic records. Plaintiffs' prayer for relief also asks for a court to order Defendants to alter their private records. *See* App'x 172 ("Plaintiffs are entitled to injunctive relief requiring all Defendants to correct all league or school records, public or private."). But such an order would afford Plaintiffs at most "psychic satisfaction," which, as explained above, is insufficient to establish Article III standing. *Steel Co.*, 523 U.S. at 107.

Finally, in holding that Plaintiffs have standing to seek injunctive relief ordering an alteration to certain public records, we express no view as to whether

33

the requested relief would be fair or appropriate, even assuming the success of Plaintiffs' claims on the merits.  Defendants argue that Plaintiffs' requested relief regarding their own records would also retroactively alter Intervenors' athletic records and therefore would raise serious equitable concerns.  That may be.  As Plaintiffs recognized at oral argument, Intervenors "haven't done anything wrong."  Transcript at 8.  Like Plaintiffs, their participation in girls' track events was consistent with the existing CIAC Policy.  Moreover, Intervenors participated in girls' track to the exclusion of other opportunities, which they could not now go back and pursue.  Defendants and Intervenors also argue that the novelty of the requested injunctive relief makes it an unsuitable means of remedying the alleged injury in fact.

Defendants view such equitable considerations as barriers to establishing Article III redressability.  And although Intervenors agree with our conclusion that Plaintiffs have alleged an injury in fact likely redressable by monetary damages, their brief argued that it could not be redressed by an injunction ordering an alteration of the records because "depriving other athletes of victories [they] won

based on the rules in place at the time" would be purportedly "unprecedented." Intervenors' Br. at 32. But Intervenors walked back this position at oral argument and agreed with Plaintiffs that arguments about the requested relief's unprecedented nature, however persuasive, may not go to our jurisdiction to hear Plaintiffs' claims. We adopt that view.

The fairness, justice, and novelty of a remedy do not speak to its ability to "redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. Instead, as Plaintiffs and Intervenors agreed at oral argument, the district court would evaluate such equitable considerations when exercising its discretion to fashion appropriate injunctive relief if the case proceeds to that stage. "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course," and "the balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The fact "that [a] plaintiff has standing to pursue her claim does not mean that she is entitled to the relief she seeks." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d

442, 461 (2d Cir. 2014). Factors such as whether the requested relief is "justified,"

"reasonable," and fair "bear not on our standing analysis under Article III, but on

the equities of [the] plaintiff's claim for relief." *Id.* Likewise, to the extent that

there may be legal obstacles to the requested injunction, "the legal availability of

a certain kind of relief" goes to the merits, not jurisdiction. *Chafin v. Chafin*, 568

U.S. 165, 174 (2013); *accord MOAC Mall Holdings LLC v. Transform Holdco LLC*, 143

S. Ct. 927, 935 (2023).

In sum, Plaintiffs have plausibly alleged a concrete, particularized, and

actual injury in fact redressable by monetary damages or an injunction ordering

Defendants to alter public athletic records related to the particularized injury they

allege.

## II. *Pennhurst* Notice

Though our jurisdictional inquiry ends with standing, the district court

dismissed Plaintiffs' claims for monetary damages on different grounds:

Defendants' lack of notice of liability under Title IX. We vacate that portion of the

district court's opinion on narrow grounds, based on the district court's erroneous

conclusion that it must resolve the question of notice before reaching the merits of Plaintiffs' Title IX claims.

An implied private right of action exists under Title IX, and because the right is judicially implied, courts "have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). In addition to injunctive relief, monetary damages are an available remedy in private Title IX actions. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). However, because Congress enacted Title IX pursuant to its Spending Clause power, private damages are not necessarily available for every violation of Title IX. In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court explained that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." 451 U.S. 1, 17 (1981). Accordingly, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State [or funding recipient] voluntarily and knowingly accepts the terms of the 'contract'" and there can "be no knowing

37

acceptance if a State [or funding recipient] is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* The contractual nature of Spending Clause legislation limits not only "the scope of conduct for which funding recipients may be held liable for money damages" but also "the scope of available remedies in actions brought to enforce Spending Clause statutes. After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (cleaned up).

In the context of Title IX, the Supreme Court has held that *Pennhurst* does not bar private damages "where the funding recipient engages in intentional conduct that violates the clear terms of the statute," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999), such as when school officials choose not to stop a teacher's sexual harassment of a student or when a school board retaliates against a teacher for complaining about sex discrimination in the school's athletic program. *See Franklin*, 503 U.S. at 74–75 (sexual harassment);

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005) (retaliation).  But in cases "that do not involve official policy" of the school receiving federal funding, private damages are unavailable unless an official with authority to act on the school's behalf has "actual knowledge of discrimination in the recipient's programs" and is deliberately indifferent.  *Gebser*, 524 U.S. at 290.

Plaintiffs and Defendants in this case dispute (1) whether *Pennhurst*'s notice requirement is applicable to Title IX suits challenging an official policy of a funding recipient, such as the CIAC Policy, and (2) if so, whether the notice requirement is satisfied.  The district court and panel both determined that Plaintiffs must satisfy the *Pennhurst* notice requirement to seek monetary damages, and that they failed to do so.  We need not and do not reach these questions because we vacate the district court's judgment on another basis: its apparent—and erroneous—determination that it lacked discretion to reach the merits of Plaintiffs' claims without first determining if monetary damages would be available under *Pennhurst*.

39

In opposing Defendants' motion to dismiss, Plaintiffs argued that "the question of notice should be deferred until a later stage of the case." *Soule*, No. 20-cv-201, 2021 WL 1617206, at *8 n.13. Addressing this argument, the district court determined that it lacked the discretion to do what Plaintiffs asked, reasoning that "if the plaintiffs' claims for money damages are barred due to lack of adequate notice, the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case—attorney's fees and expenses—is insufficient, standing alone, to sustain jurisdiction." *Id.* (quotation marks omitted). In other words, the district court concluded that in order to reach the merits, it had to determine whether it had jurisdiction. And, having determined that there was no standing to seek injunctive relief, the district court concluded that it must first assess whether monetary damages are available under *Pennhurst*. The district court erroneously concluded that if monetary damages are not available under *Pennhurst*, it would be required to dismiss the entire matter on jurisdictional grounds. But as noted previously, "the legal availability of a certain kind of relief" does not impact a court's jurisdiction to decide a claim. *Chafin*, 568 U.S. at 174.

40

Moreover, we agree with Intervenors that there are strong reasons for addressing the merits first in this case. To begin, none of *Pennhurst*'s Title IX progeny have analyzed notice as a freestanding issue before reaching the merits. Instead, the Supreme Court cases applying *Pennhurst* to Title IX either begin with a merits analysis of whether the challenged conduct was prohibited or weave that analysis into considerations of notice. *See Franklin*, 503 U.S. at 75; *Gebser*, 524 U.S. at 280–93; *Davis*, 526 U.S. at 643; *Jackson*, 544 U.S. at 182–84.

We leave open the possibility that there may be circumstances in which it would be appropriate to decide the question of notice as a threshold freestanding issue. But under the circumstances of this present dispute, we direct the district court on remand to reach the merits before or in tandem with the question of notice. The parties here do not debate whether there was adequate notice of conduct. Defendants obviously knew that the CIAC Policy existed. Rather, the debate surrounds whether there was adequate notice that the CIAC Policy violates

Title IX and whether such notice is even required.[7]  The question of adequate

notice is difficult to answer without first considering whether the CIAC Policy

does indeed violate Title IX.  The entwinement of what the law requires and

whether there is notice of what the law requires is especially apparent where, as

here, Plaintiffs argue that the requisite notice stems from the statutory text itself—

not, for example, a judicial decision or agency guidance.  *Cf. Bennett v. Ky. Dep't of*

*Educ.*, 470 U.S. 656, 666 (1985) (explaining that *Pennhurst* was no defense to liability

because "[t]he requisite clarity in this case is provided by Title I; States that chose

to participate in the program agreed to abide by the requirements of Title I as a

condition for receiving funds").

  This sequencing approach—reaching the merits before or in tandem with

the question of notice—also has the benefit of aiding in the development of the

_____

[7] In *Mansourian v. Regents of the University of California*, 602 F.3d 957 (9th Cir. 2010), the Ninth Circuit held that "no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision," including "decisions with respect to athletics," which are "easily attributable to the funding recipient and always—by definition—intentional."  *Id.* at 967–68 (cleaned up).  Plaintiffs ask us to join the Ninth Circuit in holding that *Pennhurst*'s notice requirement does not apply to Title IX claims based on an official policy.  Because we vacate the district court's *Pennhurst* holding on a different basis, we decline to reach this question.

law, at least in the circumstances of this case. If courts skip ahead to ask whether damages will be available under *Pennhurst*, then there may be fewer opportunities for Title IX law to develop on the merits in suits seeking only monetary relief, which means fewer opportunities for funding recipients to be put on notice as to what Title IX requires of them.[8] And unlike, say, qualified immunity—which provides "an immunity from suit"—*Pennhurst* notice is "a mere defense to [damages] liability," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), so there is not the same countervailing reason to avoid resolving the merits first.

In sum, the district court was not required to consider whether monetary damages are barred under *Pennhurst* before reaching the merits of Plaintiffs' Title IX challenge. For that reason, we vacate the portion of its decision dismissing Plaintiffs' claim for monetary damages. On remand, the district court shall consider the merits before or in tandem with the question of notice.

---

[8] The concern with allowing the law to develop will not present itself when plaintiffs properly maintain a claim for injunctive relief. But unlike in this case, plaintiffs do not always—and sometimes cannot—bring and sustain injunctive claims. *See, e.g.*, *Cook*, 992 F.2d at 19 (collecting cases).

43

## CONCLUSION

The holding of the *en banc* Court is limited. A majority of the Court concludes that Plaintiffs have standing to sue for some of the injunctive relief outlined in the complaint. As to the availability of monetary damages, a different majority of the Court concludes that the district court on remand must resolve the underlying merits question before or in tandem with the *Pennhurst* question. Although competing concurring and dissenting opinions join issue on how the *Pennhurst* analysis should be resolved and whether money damages are available, a majority of the Court concludes a remand is appropriate *without* resolution of these issues at this stage. At base, a broad majority of the Court adopts the outcome advocated for both by Plaintiffs and by the girls who are transgender who intervened: the case is remanded for the district court to resolve whether Plaintiffs have stated a claim for a violation of Title IX.

The splintered nature of the Court's opinions should not in any way suggest that its holding encompasses a determination on that highly contested underlying merits question. It does not. The Court reaches no conclusion as to whether

Plaintiffs have plausibly stated a Title IX violation. Nor does the Court opine on the question of whether—even if Plaintiffs have stated such a claim—they are entitled to any of the injunctive relief they seek.

Nor should the splintered nature of the Court's *en banc* holding obfuscate the extent of agreement reached. The Court unanimously concludes that Plaintiffs have plausibly alleged an injury in fact, which would be redressable by monetary damages if monetary damages are available under *Pennhurst*. This is a conclusion of standing and remedies law that implicates access to courts for everyone.

The judgment of the United States District Court for the District of Connecticut is **VACATED** and **REMANDED** for further proceedings consistent with this Opinion. Plaintiffs' request for reassignment to a different district court judge on remand is **DENIED**.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

45